# EXHIBIT 34

**Form Number 1**
OPPS
Rich Bergeron
43 Longhill Drive
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

FILED
2007 DEC 15 P 12: 14
CLERK OF THE COURT

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

XYIENCE, INC., A Nevada Corporation,

Plaintiff,

v.

Rich Bergeron, An Individual,

Defendant.

CASE NO.: A544781

DEPT. No.: XVI

## DISPOSITIVE MOTION FOR RULE 11 SANCTIONS

### INTRODUCTION

Defendant Rich Bergeron presents this motion and supporting evidence primarily to facilitate sanctions against the plaintiff's attorney and Russell Pike for bringing a frivolous suit against him based on the federal and state provisions of Rule 11. This motion is also designed to encourage the immediate end to the litigation (order already submitted) based on plaintiff's lack of any response to defendant's motion to dismiss filed on October 11, 2007. Bergeron should be awarded legal fees and damages proportionate to the egregious injustices he has suffered as a result of this case and the amount of time he has had to put into defending this case. Bergeron has had to put himself through an informal law school that has occupied a ridiculous amount of time that can never be recovered. He is therefore



STAD 11/24/07

RECEIVED
DEC 1 5 2007
CLERK OF THE COURT

entitled to just compensation due to the initiation of the plaintiff's fraudulent complaint and subsequent motions filed by their counsel Jamie Cogburn that were all based on misrepresentations of fact, falsified evidence, and utter abuses of the legal process. As a result, the preliminary injunction issued by this court should be vacated, and the case should be dismissed ***with prejudice***. Any sanctions issued should weigh the culpability of the plaintiff appropriately and provide for severe punishment that adequately discourages such behavior in the future by each party involved in the deception at the heart of their entire fraudulent case.

## RULE 11 GROUNDS FOR SANCTIONS

**According to "Court Sanctions for Frivolous and Improper Litigation"**

© 1993 by Ron W. Widener and George J. Vogler:

> **"A frivolous lawsuit is one not grounded in fact and not supported by either a basis in current law or a sincere argument for a novel legal theory. An attorney/client who fails to conduct a reasonable inquiry into the facts of the case and the applicable law (and who does not otherwise accidentally hit sufficient fact or law) is in frivolous lawsuit territory. The rule creates an attorney/client duty to ascertain, by reasonable inquiry before filing suit, the accuracy of the facts alleged. No longer can a client demand, without possible repercussions, that an attorney file an immediate lawsuit. The attorney must attempt to discover whether a lawsuit is appropriate. If the attorney fails to inquire into the facts of the case and the law supporting a suit, sanctions may result. A client who misleads counsel creates an additional basis for personal sanctions."**

Under Rule 8.4 of Nevada's Rules of Civil Procedure regarding Misconduct, there are two classifications explaining restricted behavior under which the plaintiff's counsel should suffer consequences in this case:

**(c) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation;**

**(d) Engage in conduct that is prejudicial to the administration of justice;**

**Form Number 1**

The plaintiffs attorney in this case should incur sanctions levied by this court under Nevada's Rule 11 provisions based on the false and misrepresented evidence their case has relied on to this point. Defendant Bergeron has already provided significant evidence pointing to these misrepresented facts and the bulk of the false evidence plaintiff has presented thus far.

Bergeron also recently discovered new evidence that proves Attorney David Winterton never alleged that Bergeron made up any quotes of his. Bergeron searched his email database and found communications with Winterton that show the attorney he quoted had no complaints about the accuracy of those quotes (Exhibit 24).

Xyience has not officially announced who is providing the capital to allow them to keep doing business (Fertitta Enterprises) and continues to obscure the truth and commit fraud in their business practices. Their Web-site lists and pictures several fighters they claim to sponsor who have professed their unhappiness with their sponsorship (see articles in Exhibit 25), and despite reports of these fighters publicly proclaiming no affiliation with Xyience they are still prominently displayed in connection with the company. Four of nine fighters listed on the company's fighters page (Exhibit 26) have recently told the press they are no longer sponsored by the company. The Fertittas (Lorenzo and Frank) are heavily involved in providing the income to salvage Xyience and are also in a position to know which of their UFC fighters are actually sponsored by Xyience. It is clear that the failure to remove these fighters from the Web-site constitutes Fertitta Enterprises and the UFC willfully sanctioning ongoing fraud through the misrepresentation of Xyience's sponsorship efforts. Furthermore, one of the fighters (Sean Sherk), is in the midst of a steroids scandal in which Xyience product was found to be contaminated with banned substances (Exhibit 27).

The terms of the Fertitta Enterprises loan has some shareholders of Xyience stock enraged, because they likely feel that the agreement reached gives too many broad powers to the Fertittas to

take over Xyience in the event of the company suffering future difficulties in paying back the loan. Current stockholders might be left with no real tangible interest in the company should the Fertittas manage to take Xyience over after foreclosure or bankruptcy. Furthermore, much of the loan payment from the Fertittas went right back to the parent company of the UFC since Xyience owed the UFC over $5 million in sponsorship fees at the time the transaction went through. There was also an agreement to extend the Xyience sponsorship that was reached shortly after the Fertittas were able to provide much of the capital to prevent Xyience from going bankrupt. Essentially, most of the financing provided by the Fertittas came out of one pocket only to go right back into another since they own 90 percent of the UFC's parent company.

By refusing to publicly acknowledge their role in providing funding to Xyience while also announcing a new sponsorship deal with the company, the Fertittas and the UFC are committing clear fraud. On one hand they are literally sponsoring themselves, while on the other hand they are allowing Xyience to credit a nameless group of investors with providing Xyience the necessary financing to continue with the sponsorship. Here is a portion of the lead paragraph of Xyience's October 10th press release (see complete release in Exhibit 28):

> **"LAS VEGAS, Oct. 10 - XYIENCE(R) Inc. (pronounced zy-ince), one of the fastest growing brands in the beverage and nutritional supplements business, today announced that the company has received access to up to $12 million in a strategic funding effort from a group of investors."**

Xyience continues to maintain that sales numbers are constantly improving and the brand is thriving despite the obvious losses that continue to steer the company toward bankruptcy even after the Fertitta group loan. Xyience has consistently managed to burn through tens of millions of dollars of previous financing and investments. They call themselves the fastest growing brand in the industry while simultaneously announcing the acquisition of millions of dollars in financing they will be expected to pay back. This financing literally saved the company from the very brink of bankruptcy,

and most of it came from the company they are purporting to be a primary sponsor of. The question must be asked: how can this company claim to be growing while it is continually sinking itself into further debt? Their sales numbers have been exaggerated according to their own analytics firm. Even worse, both the UFC and Xyience are now being backed by the same financiers. Yet, both the UFC and Xyience are publicly celebrating their partnership as if they were two entirely different entities made stronger by a partnership with each other. Xyience claims the financing they received will be dedicated to expansion of the brand. Most of it has already been used to extend the contract for the middle of the mat advertising with the UFC and other perks for their Xenergy line that they hope to sell to the highest bidder.

The Fertitta loan conditions also restricted the voting rights of shareholders suspected of participating in fraudulent activity in selling their shares (see exhibit 23). This proves they had intimate knowledge of these shareholders selling their shares while other shareholders could not. The loan itself constitutes a cover-up of the fraud at Xyience.

The bankruptcy of Xyience would surely have led to close scrutiny of the reasons that brought the company to that point and would have been a significant embarrassment for the UFC. Any investigation of Xyience after declaring bankruptcy would have brought to light the UFC's complicity in looking past the clues that fraud was taking place.

Zuffa's directors and principal players had to have known about Xyience's transgressions since their top fighters were not getting paid, but they continued to stand by their delinquent sponsors. Allowing millions of dollars in fighter and company sponsorships to go unpaid, the UFC still prominently displayed the Xyience name at every event. The current deal saves face for both companies and relies on the public never being told the truth for it to be a successful agreement.

The capital provided by the Fertittas was not explained as any sort of stock purchase, though

they did receive stock, and there is no indication that these funds were provided as any kind of bridge financing to facilitate any IPO of Xyience stock. According to Exhibit 11, this is what a Xyience roper has represented to at least one investor and possibly multiple investors.

The Fertittas are in the process of taking Station Casinos off the publicly traded roster of companies in order to bring that company back into the private sector. Zuffa, the UFC's parent company, is also a private company. Their business transactions betray a position of favoring private companies over public ones. Their entry into this deal does not bode well for the company becoming publicly traded anytime soon (if at all). This is why current shareholders are voicing their disgust over this deal. Any takeover by the Fertittas would be a completely blatant example of defrauding investors, and it is clear from Exhibit 23 that the last-minute deal was presented as something everyone had to ratify in order to keep the company from suffering bankruptcy. This "make the deal or watch the company die" approach seems to have allowed the Fertittas and other new investors extreme leverage to create a situation most favorable to their personal interests over that of the actual existing shareholders, estimated to be a list that includes 340 names.

## DEFENDANT REQUESTS THAT THE COURT EXPEDITE THE VACATION OF THE PRELIMINARY INJUNCTION ORDER

The preliminary injunction in this case should be vacated as soon as possible, as significant reputational damage has been done to the defendant without due process of law. Plaintiff has used the court's injunction to remove some of the most popular articles on Bergeron's Web-site from Google's search engines. These pieces enjoyed high placement until Plaintiff was able to convince Google to remove them with the court's help. Bergeron exercised extreme caution in keeping these stories on his site while also conforming to the court's order by removing content that the order enjoined. Plaintiff purposely left the court in the dark about these changes Bergeron made after receipt of the court order.

**Form Number 1**

Plaintiff secured the amendments to the injunction without explaining to the court that Bergeron had acted in good faith by making these changes to comply with the order. Furthermore, the plaintiff has been able to remove several pieces not party to this litigation with the court's injunction despite their having no basis to do so. They have only ever entered one article into evidence in these proceedings to dispute the facts contained in it, yet multiple articles were removed from Google.

In light of the new evidence presented here and previous evidence presented in the motion for dismissal filed by the Defendant, the standing order is a prior restraint secured by the plaintiff's presentation of false and misrepresented evidence. The court can no longer let that order stand based on the evidence entered into the record and the preceding case law that stipulates this type of injunction is forbidden under the tenets of the First Amendment and precedent setting appeals decisions.

Furthermore, the defendant's motion to dismiss was entered into the record on October 9, 2007 and has yet to be answered. The RULES OF PRACTICE FOR THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA stipulate:

> **Within 10 days after the service of the motion, the opposing party must serve and file written opposition thereto, together with a memorandum of points and authorities and supporting affidavits, if any, stating facts showing why the motion should be denied. Failure of the opposing party to serve and file written opposition may be construed as an admission that the motion is meritorious and a consent to granting the same.**
>
> ***(b) If the time to oppose a motion has passed and no opposition has been filed, counsel for the moving party may submit an order granting the motion***

***pursuant to Rule 2.20 to the chambers of the assigned department.***

Bergeron has already submitted such order granting the case's dismissal and stipulating the vacation of the preliminary injunction.

**POINTS OF LAW TO SUPPORT RULE 11 SANCTIONS FOR BOTH THE PLAINTIFF AND THEIR COUNSEL**

*Pierce v. Commercial Warehouse*, 142 F.R.D. 687 (M.D.Fla. 1992) establishes the attorney's duty under Rule 11 to support a lawsuit with existing law. The court held that an attorney cannot mislead the court by contending that his or her argument is supported by existing law, in the sense that the issue has been decided, when that is not true. Attorney Jamie Cogburn repeatedly represented that precedent cases applied to this case that had nothing to do with the press or the Internet. In supporting his claims that personal jurisdiction was proper, he also misrepresented the law numerous times in offering precedent cases that did not properly address Bergeron's capacity as a journalist, which is what he clearly is according to the Free Flow of Information Act of 2007. That act defines journalism as:

> ***"the gathering, preparing, collecting, photographing, recording, writing, editing, reporting, or publishing of news or information that concerns local, national, or international events or other matters of public interest for dissemination to the public."***

An attorney must be clear in presenting the argument for what it is. Cogburn argued Bergeron was not a reporter in one motion without researching the case law specific to what classifies a person as such and what constitutes journalism. Cogburn also repeatedly misconstrued the law applicable to personal jurisdiction and preliminary injunctions relating to the press and the Internet. Rule 11 requires

**Form Number 1**

disclosure and precludes presentation of the argument as though it rested on existing law.

Fundamentally, a party cannot use litigation or litigation techniques to punish the opposing party. The playing field is leveled by this--a well padded party cannot litigate for the purpose of grinding the rest of us into submission. Cogburn, Xyience, and embattled Xyience Founder Russell Pike are all complicit in filing and supporting this case for fraudulent purposes and with specific intent to force Bergeron to give up without a fight. Their claiming over $25 million in damages, which is entirely unfounded and unsupported by evidence, was a clear scare tactic meant to inspire Bergeron to surrender swiftly. Bergeron has been genuinely harassed with needless litigation in this matter and hereby petitions the court for sanctions under Rule 11.

Adam Frank's affidavit was literally a carbon copy of Cogburn's argument in this case. He clearly drafted the document and instructed Frank to sign it. A perfect indicator of Cogburn's complicity in drafting the affidavit is the way Bergeron's article is referred to as: *"Xyience Investigative Report: Russel Pike's Criminal Tendencies R.* Cogburn left off the rest of the title and closing quotes in his own argument, and he repeated that same mistake in the affidavit.

Cogburn is Russell Pike's lawyer, and this piece of litigation is a Russell Pike con job. Russell Pike never intended to take Xyience public. Bergeron exposed his pattern of investment fraud and revealed how Pike was doing it all over again with Xyience. He was subsequently sued to suppress the evidence long enough for Fertitta Enterprises to buy into Xyience. This buy-in/loan is allowing Russell Pike's fraud to be erased in one transaction. There are millions of dollars changing hands, and there is enough to press a federal fraud case against all the players.

This case is not about defamation. It's about violating Bergeron's rights as a journalist to print the truth to make a business deal possible. It's about conflicts of interest. A sponsor is a sponsor, not an acquisition or a partner, or a side business. This case is about a lawyer abusing his privilege to stand

before the court and argue a motion without being looked down upon for not following the process step by step and inch by inch. He knows the game and the rules the Judge plays by. He used these rules to create a complaint out of thin air. He pressed that complaint with pure lies, every motion stuffed full of them. Sanctions should include ethics training for Cogburn. Not only has Cogburn already tried to settle this case with offers ranging from "a box of sodas" to $1,000, he continues to maintain he has not lied about anything. He is a classic example of why sanctions are needed to curtail rampant lawyers out for blood.

In *Harlyn Sales Corp. v. Investment Portfolios*, 142 F.R.D. 671 (N.D.Ill. 1992), the court established guidelines which acquit attorney and client from Rule 11 sanctions. The guidelines are these:

**1. Make a reasonable inquiry into the facts of the case before filing a pleading, motion, or any paper.**

**2. Make a reasonable investigation into the law applying to the case.**

**3. Do not submit any pleading to harass, delay, or increase the cost of litigation for the opposing party.**

**4. Do not include unnecessary parties.**

**5. Do not sign any document that could mislead the court.**

**6. Make sure every document explains the matter without a requirement for qualification. The writing must speak the entire truth by itself.**

**Form Number 1**

(1.) Cogburn and Xyience, through Pike, never made any kind of reasonable inquiry into the facts. They have repeatedly held that David Winterton's quotes were made up by Bergeron without bothering to secure any kind of affidavit from Winterton. Exhibit 24 shows that Winterton would have cooperated with Xyience by this point if there were quotes made up. They had ample opportunity to provide evidence that Bergeron's quotes were inaccurate, but they have provided nothing to even call into question Winterton's quotes in Bergeron's story. Winterton provides a clear-cut explanation of their tactics in his email.

Cogburn also charged that Bergeron made the false claim that Chuck Liddell is no longer sponsored by Xyience due to payment issues. Yet, Bergeron's claim is backed up by Exhibit 25. Cogburn had no reason to believe Bergeron's statement about Liddell was in any way false, Xyience knew it was true, and Cogburn did not investigate the matter adequately, if at all.

(2.) Cogburn also did not make any reasonable investigation into the law applying specifically to this case. Cogburn admitted in a recorded telephone conversation that he usually defends clients on Bergeron's side of this First Amendment issue. Yet, Cogburn relentlessly sought out a prior restraint he should have known to be restricted by precedent case law. The very judge overseeing the case actually had to instruct and order Cogburn to submit a supplemental brief regarding the First Amendment issues surrounding the case despite the fact that Cogburn admittedly had ample personal experience in that realm before taking this case on.

This case invoked the "effects" test employed in Calder v. Jones, 465 U.S. 783 (1984), and Core-Vent Corp. v. Nobel Industries, 11 F.3d 1482 (9th Cir. 1993), yet Cogburn never addressed or applied that test to his own arguments. Even after Bergeron presented the Calder vs. Jones test, the Plaintiff danced around the issue by pointing to cases with no significant connection or similarity to this case.

(3.) This entire case was designed to harass Bergeron, delay him from securing justice in the matter, and make him submit by way of forcing him to spend more time and money than he could afford to on defending the case. Bergeron becoming his own lawyer was never a contingency Cogburn or Xyience planned for. Defending the case without traveling to Nevada was also something they did not expect Bergeron to be able to accomplish. Xyience knew Bergeron could not afford to even appear in their jurisdiction from a previous attempt to get Bergeron to come to Las Vegas for an interview. Back then, they offered to fly Bergeron to Xyience headquarters on their dime. They requested in return that Bergeron write a positive piece about the company.

(4.) Cogburn's most significant evidence came from Adam Frank. Bergeron's stories that gave rise to this litigation had absolutely nothing to do with anything that occurred under Adam Frank's tenure with the company. Cogburn made Frank a party to the case and asked him to sign a document containing information Frank could not have possibly been in any position to corroborate.

(5.) Bergeron even recorded a conversation with Frank and Kirk Sanford recently in which Frank admits he had no knowledge of what went on at the company before he became involved in a position of authority on the board of directors. Frank and Sanford also both admit in the recording that they value Bergeron's Web-site as a resource to find out the history of the company. This recording is available at: http://www.fileden.com/files/2007/9/16/1434673/frankandsanford.mp3. Cogburn knew he was asking Frank to sign false testimony. Cogburn's signature on the pleadings entering that evidence into the case are an extension of the fraud. It is a clear case of inventing evidence to bolster a shaky, crooked civil lawsuit.

Xyience CEO Adam Frank and Investor/Shareholder Kirk Sanford just met with Bergeron in New York City to discuss working together to reshape the company. Bergeron returned home to find an email message from a shareholder/employee of the company in the other camp asking for help. This insider hinted at a class action suit against Sanford and Frank. This infighting will destroy the company. Bergeron is asking to be brought in as a contracted employee of Xyience for the purposes of

**Form Number 1**

seeing them through the process of cleansing the company's reputation and restoring the brand's popularity in the marketplace. This is the best course to take, but it must be taken with the interest of every existing investor in mind. There can be no more schemes or scandals threatening the process anymore if this company is to succeed. Bergeron is in position to put the company's bad history behind them by facilitating the removal of Russell Pike from any position of control or personal interest in the company.

Virtually every document Cogburn has signed that is not a simple formality of the litigation process has contained some lie, false evidence, or misrepresentation of the facts. He clearly drafted Frank's testimony and advised the newly crowned CEO to sign it. Pike is complicit as well, using Cogburn as his attack dog to erase the truth about his past. The piece Bergeron wrote pointed the finger at Pike, because Pike is the one who literally stole the company in the first place.

Xyience was literally stolen from the folks behind today's *John Scott's Nitro. **Nitro Supplements*** ceased to exist when Russell Pike took off with a wing of it and created Xyience after working his way into the inner circle while he was still on probation from his year at Nellis in the Federal Penitentiary. Bergeron has never voiced any kind of desire to hurt Xyience or Pike, but all the evidence shows Pike as the ringleader circulating a continuous scam on investors in the company. The ultimate goal of this entire company is to permanently separate Russell Pike from any involvement or ownership. The company simply cannot go public with Pike associated in any way with it. This is why Pike filed and funded this case to build Cogburn's great white wall, a wall of lies stacked upon lies stretching the entire length of this case. Pike is attempting to obscure the evidence connecting him to how the process started for him. Everything Pike's built so far has been a lie, and so was Xyience. Pike fed the beast (Cogburn), kept it on his own chain of lies, and sent it out to destroy Bergeron's right to publish the truth. This case is Pike's way of erasing his past if he's successful. He should not be

allowed to use this court to do that. Cogburn should not be allowed to abuse this court to protect his client's reputation, present a case based on evidence he should have known to be false, and continually present evidence that can easily be proven to be false, misleading, or manufactured. He has not only presented the material for the court's consideration, but he also affixed his signature to each and every document, literally signing off on what he knew was not a legitimate case.

(6.) Finally, Cogburn's arguments provide no explanation of any facts that do not require qualification. His motions thus far have not only obscured the truth, but they have also rewritten the truth to fit the mold of this frivolous case. Namely, Cogburn repeatedly insinuated that defamation is not protected speech under the First Amendment without explaining that such speech must be determined to be defamation by a complete trial process before it can be enjoined legally. Cogburn has blatantly lied to this court and bastardized the law, and it is clear that his client, namely Russell Pike, has been complicit in shaping these lies. Both should suffer Rule 11 consequences as a result. Neither Cogburn nor the plaintiff have any reason to be acquitted of facing sanctions.

One court has expressly stated that Rule 11 can be used to shift attorney fees to a party that has abused another by frivolous or improper litigation. In *Brandt v. Schal Associates, Inc.*, 960 F.2d 640 (7thCir. 1992), Circuit Judge Manion wrote a blistering opinion concerning the abuse of the judicial process. In *Brandt*, a dispute arose over a construction contract. The plaintiff's attorney prolonged the case for four years through extensive, unnecessary discovery. All the while, the lawsuit had no basis in law or fact. The United States District Court for the Northern District of Illinois assessed sanctions of $351,664.96 against the attorney. The court then added an additional $7,511.10 in sanctions when the attorney urged the court to modify the original sanction order. Finally, the court sanctioned the attorney an additional $84,388.60 as a "delay factor " for a total of $443,564.66.

Judge Manion, in writing the court's opinion affirming the sanctions, stated:

- **This case is an unfortunate example of why "litigation " has taken on a bad name. These claims may have been shallow, but the volume of pleadings, documents, and**

> **other clutter in the record could fill a bottomless pit. We have little sympathy for the litigant who fires a big gun, and when the adversary returns fire, complains because he was only firing blanks. Indeed, Campbell's antagonistic, windy, excessive, and voluminous style of practice easily suggests that Campbell's trial strategy was to exhaust his opponent's financial resources by needlessly increasing the costs of litigation. For such egregious behavior, Rule 11 expressly provides for the shifting of attorney's fees to the other party. This award addresses, not only the spurious complaint filed by Campbell, but it also addresses the bad faith pursuit of a worthless claim.**

Cogburn has flooded this case with motion after motion knowing Bergeron has had no representation throughout. He has taken advantage of every technicality to gain an edge. He has even asked for a default order to be granted before Bergeron even received any word that his request to proceed informa pauperis had been granted. There is every indication that Cogburn used his intimate knowledge of court procedure at every opportunity to try to discredit Bergeron and cast Bergeron's true stories in a bad light through legal wrangling, misdirection, and flat out lies rather than pure evidence. Cogburn has even relied on his relative proximity to the court to gain an unfair advantage over Bergeron, who is literally thousands of miles away from the Clark County facility.

## CONCLUSION

This case provides plenty of reasons and corroborating evidence calling for sanctions to be levied against the plaintiff and the plaintiff's counsel. The plaintiff's actions and behavior have resulted in litigation lasting months and taking a financial toll on both parties. Bergeron has had to

spend almost all of his Web-site's income on defending this case and so much time doing research and writing motions that his Web-site has suffered. It is impossible to determine exactly how much time he has spent defending himself in this case as his own attorney, but Bergeron estimates it is well over 400 hours thus far. The going rate for most attorneys for this type of case falls within the $200-$300 per hour range. In seeking an attorney at the beginning of the litigation process Bergeron could not find any lawyer to work on his behalf for anything less than a $50,000 retainer. Unlike a traditional attorney who knows the process well and is well-trained in litigation, Bergeron has had to research both precedent cases and points of procedure throughout the entire case while serving in the capacity of a pro se defendant.

The strain has been immeasurable in financial, physical, and mental costs. Bergeron has lost sleep, suffered endless worry and anxiety over the possibility of losing his livelihood and passing the voluminous debt of a potential judgment onto his children, and worked relentlessly long hours that have physically drained him. This ordeal has taken a chunk out of his life that he can never get back. He has had to abandon work on his site, work on a book project, and work to further his freelance writing career. By the very design of this frivolous case, he has also had to abandon work on one of the finest investigative reports he has ever put together. Yet this court has determined based on the plaintiff's lies that Bergeron cannot write the truth about what this company is doing and has done to swindle investors.

This company needs a shot of truth, an infusion of honesty, and a new direction that features a high level of integrity. Bergeron is now being asked to be a part of that new direction while there is a $25 million lawsuit hanging over his head based on lies. The company accusing him of ruining their reputation by printing false accusations now suddenly wants him to use his intimate knowledge of the company's questionable history to separate the new regime from the old, to disassociate with the felonious ones. Yet, the divided sides now pit some unusual subjects on opposite sides of the battlefield. There are 340 investors and then there is the GCA contingent and Fertitta Enterprises. One

side's threatening a class action suit while the other plans to press a civil RICO suit. Meanwhile other outstanding litigation will be put on hold while the top brass has to focus on defending a class action suit leveled by various shareholders. The solution on Frank and Sanford's side of the fence is to bankrupt the company. It doesn't seem right. It's certainly not fair to the 340 folks who bought in early.

What the plaintiff has done here is to turn the process upside down for their own personal benefit and to further their corrupt schemes. This should not be taken lightly. There should be severe penalties for that kind of behavior so as to discourage any other corporation from following the same protocol to quiet their critics. Because of the legwork Bergeron has accomplished other press outfits are picking up where he left off and exposing the details behind the Fertitta investment that Xyience and the UFC have so far refused to make public.

Bergeron's sources within the company report that Pike and several associates have been spotlighted by several government agencies recently that Bergeron has been supplying information to since this case against him began. Bergeron has been informed (as mentioned in the recording of Frank and Sanford) that Cogburn is Pike's personal attorney. Pike seems to have orchestrated this whole case against Bergeron and was able to pursue this frivolous action without the full support of the rest of the Xyience Board of Directors. Bergeron told Cogburn on several occasions that the truth would shine through. Bergeron told him he was lying, warned him it wasn't right or legal, and told Cogburn his entire case was fraudulent. Cogburn pressed on, manipulating facts and dismembering the truth at every step to press a joke of a civil case based on invented premises and flat out fabricated stories.

There is no way to adequately describe the level of torment Bergeron has suffered as a result of this needless litigation. The toll this case has taken on the defendant is tremendous. He will now have to re-establish his reputation and restore the links to his stories that the plaintiff has been able to

eradicate with the help of this court's decisions and a paid attorney. Even after this case is dismissed he will still have to put in a tremendous amount of work to undo the damage done by this court's unwarranted prior-restraint. This case is custom made for Rule 11 sanctions and is the kind of litigation that Rule 11 was specifically designed to handle.

Each day this case continues against Bergeron is another day his future is uncertain. All the while the plaintiff is reaping benefits based on false pretenses and manufactured evidence. Justice should be granted to Bergeron as soon as possible and without any further delay. He has suffered enough unjust and undue punishment for doing a service to society and alerting the public of corporate fraud. In most circles that is considered a venerable deed, a service he should be rewarded and heralded for. Instead, this court has chilled his speech and imposed unreasonable penalties on him without significant facts or supporting points of law to justify any merits of the plaintiff's case. Bergeron hereby requests immediate and complete relief in the form of a final dismissal with prejudice and damages in the amount of $5,000,000.00, with half of that devoted to severe financial sanctions against the plaintiff Xyience, Inc. and their attorney Jamie Cogburn. Cogburn should also be expected to participate in a rigorous legal ethics program as part of his sanctions.

Respectfully Submitted By:

By:

Rich Bergeron
43 Longhill Drive
East Sandwich, MA 02537
Serving as Attorney Pro Se

**Form Number 1**

470
471
472
473

474 # EXHIBIT 24

475
476
477

o

From Rich Bergeron <rich.bergeron@gmail.com> hide details Mar 21

| | |
|---|---|
| to | david@davidwinterton.com |
| date | Mar 21, 2007 10:10 AM |
| subject | Fwd: |
| mailed-by | gmail.com |

478

David,
Mr. Chadwell is on a mission. He is obviously trying to turn us both against each other. He forwarded this message to me:

**This does not seem like someone who made those quotes... He said that 90% of those quotes are WRONG.**

**From:** David Winterton [mailto:david@davidwinterton.com]
**Sent:** Tuesday, March 20, 2007 1:33 PM
**To:** John Chadwell
**Subject:** RE:

Thank you. That will be fine and I will be happy to speak to the attorneys. If Rich does not get it right, he will be liable. Thank for the heads up.
David Winterton

On 3/20/07, John Chadwell <jchadwell@xyience.com > wrote:

> I corresponded with one of your sources as you may know. Pete is still waiting for your call.
>
> J. Chadwell

479

From David Winterton <david@davidwinterton.com> hide details Mar 21

STAD 11/24/07

o

to Rich Bergeron <rich.bergeron@gmail.com>
date Mar 21, 2007 4:53 PM
subject RE:

**Images are not displayed.**
Display images below - Always display images from david@davidwinterton.com

He told me he is getting an attorney to go after you. I stated it is important to get it right or there could be liability. He is also misstating the facts. I said I did not know 90% of the information in your research. I told him I did not have any personal knowledge as to Xyience. 90% of the article dealt with Xyience. Now he is saying 90% of the information is wrong. It is a misrepresentation by him and fraud. I did not say it was wrong, I just said I did not know about Xyience. The information I did get came from two (2) people that wanted to sue Russell Pike and I was not going to talk to him about that conversations. They were confidential.

The information in my quotes are good but there are just a couple of things about Danny Lee I would like to clarify. After I review it, I will stand by the article 100%. I do not trust him. I will get back with you. Next time I will blind cc your on his emails

David Winterton

**Form Number 1**

# EXHIBIT 25

skip to main | skip to sidebar
http://www.mmapayout.com/http://www.mmapayout.com/

**October 23, 2007**

**More Trouble for Xyience: Top Fighters Split with Company *UPDATED***

Dave Meltzer reported in this week's Wrestling Observer that Chuck Liddell, Forrest Griffin, and Rich Franklin are no longer involved with Xyience for a variety of unreported reasons. Liddell ended his relationship after the company failed to pay on his substantial endorsement deal when it experienced its first round of financial trouble. The company's website still features Griffin and Franklin in its fighters media section along with Anderson Silva, Sean Sherk, Matt Hughes, BJ Penn, Mike Swick, Cung Le, and Josh Koscheck.

In an interview with Five Ounces of Pain, when asked about his association with the company, Sean Sherk responded: "Oh no, I'm not sponsored by them anymore. I used to be but they stiffed me a bunch of money. They stiff everybody. A lot of people are leaving them."

**UPDATE** - MMAPayout.com has confirmed that Matt Hughes is no longer associated with the company. When asked about the relationship, Hughes business manager Brian Patton said, "Matt is no longer with Xyience and is now with Nutritox. His contract expired on August 15th. He has since signed a long-term deal with Nutritox. He was not happy with [Xyience's] performance."

**UPDATE 2** - MMAPayout.com has confirmed with Rich Franklin's business manager, J.T. Stewart, that nonpayment was also the reason Franklin ended his association with Xyience.
Posted by Adam Swift

---

Update: Report Connects Zuffa to Xyience
By Adam Swift

[11/5/2007]

Xyience recently signed a three-year extension on its exclusive partnership with the UFC, but the supplement company's reportedly close ties to the mixed martial arts promotion have not appeased several disgruntled fighters Xyience once sponsored.

Xyience, which formed in 2004, announced the extension in conjunction with a $12 million funding effort.

A relationship between Xyience and Zuffa that runs much deeper than advertising and sponsorship agreements has long been speculated though not acknowledged. However, this week in the Wrestling Observer Newsletter, Dave Meltzer released a non-sourced report that said UFC owners Lorenzo and Frank Fertitta were responsible

for Xyience's recent multi-million dollar funding.

When asked for comment on the source of funding and specifically about the Fertittas' and Dana White's involvement in Xyience, the Las Vegas-based sports nutrition company, through a public relations representative, told Sherdog.com that the money was provided "by a private group of local strategic investors. Company policy is to not comment on the specific individuals that participated in a round of funding."

Requests for comment from the UFC went unanswered.

The Fertittas' reported involvement in Xyience could raise eyebrows in light of reports that several high-profile UFC fighters recently severed ties with the company, saying it failed to honor the financial terms of endorsement deals, and news of possible supplement contamination.

In the Oct. 24 Wrestling Observer Newsletter, Meltzer reported that former UFC light heavyweight champion Chuck Liddell (Pictures) is no longer associated with Xyience due to nonpayment on his substantial endorsement deal. Meltzer also reported that Forrest Griffin (Pictures) and Rich Franklin (Pictures) have left the company.

Liddell and Griffin -- along with Josh Koscheck (Pictures), Mike Swick (Pictures) and Cung Le (Pictures) -- have been paid in full as of a couple weeks ago, according to their manager DeWayne Zinkin Jr.

"Early on there were issues," Zinkin told Sherdog.com Monday morning. "But since we've dealt with [Xyience CEO] Adam Frank and the new people in charge now, everything that they have said they were going to do, they've done. All of our guys have been paid in full, so we're happy. We're waiting to get proposals from them for future work."

The same could not be said for Franklin.

"At the beginning of the year Xyience quit returning phone calls and e-mails," Franklin's manager, M-1 president and CEO Monte Cox, said late Sunday. "They are now seven or eight months behind on payment for Rich."

Despite the wishes of several fighters, including UFC champions Matt Hughes (Pictures) and Sean Sherk (Pictures), the Xyience Web site continues to feature fighters who have split with the company.

"Matt is no longer with Xyience and is now with Nutritox," Hughes' business manager, Brian Patton, told Sherdog.com. "His contract expired on Aug. 15. He has since signed a long-term deal with Nutritox. He was not happy with [Xyience's] performance."

Of his relationship with Xyience, Sherk told fiveouncesofpain.com in late October that he's no longer affiliated with them after "they stiffed me a bunch of money."

"They stiff everybody," said the lightweight, who is currently appealing California State Athletic Commission allegations that he tested positive for the anabolic agent nandrolone metabolite following a fight in Sacramento versus Hermes Franca (Pictures). "A lot of people are leaving them."

In response to the reports of fighters fleeing its ranks, a company representative said Xyience "has made good on its obligations regarding fighter sponsorships. Sponsoring fighters continues to be an important part of our strategy, and we value the relations with the fighters."

Of greater concern for Xyience could be the contents of a pre-trial brief and exhibits filed by Sherk's attorney Howard Jacobs with the CSAC and obtained by Sherdog.com.

Among a litany of reports, it is asserted that "Xyience Xtreme Joint Formula" -- one of several Xyience-branded supplements Sherk said he took before his July 7 title defense at the Arco Arena -- tested positive for the anabolic agent 1-androstendione.

**Form Number 1**

Said Susan Wierzbicki, Xyience's Director of Quality Assurance: "The company employs stringent quality control procedures and contracts with manufacturers that are GMP (Good Manufacturing Practices) compliant."

Jacobs told Sherdog.com it was not his intention to finger Xyience as the culprit of Sherk's positive test in California.

Wierzbicki said Xyience halted all shipments of the product until it can conduct independent testing by a certified lab.

Seemingly unrelated to the contamination and fight sponsorship issues, Xyience is currently subject to a Desist and Refrain Order issued by the California Department of Corporations on Sept. 10, 2007, for the fraudulent business practices of Xyience founder and former CEO Russell Craig Pike.

The Desist and Refrain Order obtained by Sherdog.com contains a laundry list of allegations against the company and Pike: selling $2.1 million of stock to California residents without the state's authorization; making material misrepresentations to investors regarding pending litigation and the prior business success of Pike; failure to disclose a default judgment against Pike for writing bad checks; failure to disclose signed confessions of judgment in an action involving Pike's former business venture, Advanced Cart Technology (ACT), for using false pretenses, false representations, and fraud to convince investors to invest in the company; failure to disclose a prior guilty plea to bank fraud, money laundering, and aiding and abetting in connection with ACT, resulting in a sentence of 59 months in a federal prison, three years of supervised release and a restitution order for $2,367,146; failure to disclose ACT bankruptcy proceedings; failure to disclose a prior prison sentence for grand theft and forgery.

According to Robert Walsh, public information officer for the Nevada secretary of state, Pike was listed as president of Xyience from July 20, 2005, until an amended list was filed on Oct. 13, 2006.

A Xyience spokesperson said Pike is currently a minority shareholder in the company, and any stock he owns is non-voting.

"He has no role in management or operations," the spokesperson said, "and is not an employee of the company."

In the year that Pike has taken a step back, Xyience increased distribution from 4,600 to 45,000 stores, including national chains such as 7-11 and GNC, according to a company news release.

Said UFC president Dana White on the relationship between his company and Xyience: "We look forward to our future endeavors together as both of our companies continue their explosive growth."

*Adam Swift is the editor of www.MMAPayout.com*

# EXHIBIT 26




XYIENCE
zip code
locate store
Fighter Bios
CALENDAR
fighter-bios
Contact Us | Policies | Careers | Sitemap | About Xyience | Affiliates | Forum
©2007 Xyience, Inc.

**Form Number 1**

# EXHIBIT 27

Steroids Found In Sherks Supplement By Jason Perkins | November 03, 2007

According to Sherdog.com, One of Sean Sherks Supplements manufactured by Xyience was found to contain amounts of 1-androstendione:

Seven tests totaling $3,000 were conducted on supplements Sherk took before his bout against Hermes Franca. One such product was the Xyience-branded "Xyience Xtreme Joint Formula." Five capsules were analyzed according to a report supplied by Don H. Catlin, M.D., president and CEO of Anti-Doping Research, Inc.

"No anabolic steroids were detected in four of the capsules," Catlin wrote. "In one capsule 1-androstendione was identified."

As for the one capsule of "Xyience Xtreme Joint Formula" in which 1-androstendione was identified, the company said it has halted all shipments of the product until it can conduct independent testing by a certified lab.

"While we are confident that Xyience products do not contain anabolic agents or any illegal substances," said Susan Wierzbicki, Director of Quality Assurance, Xyience, "we are taking this report very seriously."

## EXHIBIT 28

# XYIENCE(R) Announces $12 Million Funding and Signing of Long Term UFC(R) Sponsorship

LAS VEGAS, Oct. 10 - XYIENCE(R) Inc. (pronounced zy-ince), one of the fastest growing brands in the beverage and nutritional supplements business, today announced that the company has received access to up to $12 million in a strategic funding effort from a group of investors. The company intends to use a significant portion of the investment to expand distribution of its Xenergy brand energy drink. The name Xenergy is a combination of Zen and Energy and is pronounced "Zenergy".

In just one year, Xenergy has increased distribution from 4,600 stores to 45,000 and can be found in such national retailers as 7-11, Kroger and GNC as well as in regional grocery and convenience stores around the country.

XYIENCE recently introduced three new Xenergy flavors, Mango Guava, Pink Lemon and Blu Pom, which join the popular original flavors of Citrus Clear, Cran-Razz and Big Apple. Containing no calories, sugar or carbohydrates, Xenergy is formulated to provide clean, sustainable energy. Scientifically fortified with vitamins, the proprietary blend is designed to prevent the crash ending often associated with other energy drinks.

XYIENCE also announced that the company's exclusive sponsorship relationship with the Ultimate Fighting Championship(R) (UFC(R)) has been extended for an additional three years. Xenergy is the official energy drink of the UFC(R), the world's leading professional mixed martial arts organization.

"XYIENCE has been a long time sponsor of the UFC(R) and we look forward to our future endeavors together as both of our companies continue their explosive growth," said Dana White, UFC(R) President.
"We believe that the combination of new financing and the extension of our UFC(R) relationship firmly positions the company for success as we embark on a worldwide expansion of the XYIENCE and Xenergy brands," said Adam Frank, XYIENCE CEO.

**About XYIENCE(R)**
XYIENCE, one of the fastest growing brands in the health related category, utilizes advanced science in the development of nutritional products and supplements necessary for maintaining a dynamic lifestyle. XYIENCE offerings, including energy drinks and nutritional supplements, represent an authentic lifestyle that is both functional and fashionable. For more information, visit http://www.xyience.com/.

Source: PRNewswire - Xyience, Inc.