# EXHIBIT
# 47
# PART A

**Form Number 1**

RSPN
Rich Bergeron
43 Longhill Drive
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

XYIENCE, INC., A Nevada Corporation,

Plaintiff,

v.

Rich Bergeron, An Individual,

Defendant.

CASE NO.: A544781

DEPT. No.: XVI

**MOTION TO DISMISS**

**INTRODUCTION:**

Article I, Section 9 of the Nevada Constitution provides the following:

*"Every citizen may freely speak, write and publish his sentiments on all subjects being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions and civil actions for libels, the truth may be given in evidence to the Jury; and if it shall appear to the Jury that the matter charged as libelous is true and was published with good motives and for justifiable ends, the party shall be acquitted or exonerated."*

From the very beginning of the legal process in this case, Defendant Rich Bergeron has had to defend himself against malicious, hollow charges while always at a major disadvantage due to lack of resources. While Plaintiff's Attorney Jamie Cogburn has managed to make the truth somehow appear as blasphemy with motion after motion hiding and twisting the facts with no backup evidence, Bergeron's earnest attempts to prove his case have so far fallen on deaf ears despite his submission of reams of documented evidence. He has also not had a fair chance at a proper hearing in this case. Bergeron's first motion was filed in July to quash service of summons for lack of jurisdiction, yet this motion was pushed back for decision until September after three hearings regarding the preliminary injunction were held without him being able to attend.

Bergeron's first motion specifically explained it would qualify as a special appearance in and of itself and did not require his attendance. This motion was his only option to defend himself in this case without having to fly to Nevada. Bergeron was told from the beginning he could not appear telephonically for a hearing on the preliminary injunction, which was the only other possible option on such short notice if it could be arranged. It is impossible for him to afford a plane ticket to travel even one way to Nevada (as evidenced by his application to proceed Informa Pauperis). Finally, he has had no adequate time or assets to find a qualified attorney to represent him. There are no public defenders for civil cases, so Bergeron has had to become his own.

The entire idea of justice has long been represented by scales—the items weighing upon those scales being understood as the evidence both sides present in each case. The scales are always supposed to be balanced going in. In this case the scales were skewed to begin with, and the plaintiff still enjoys an unfair advantage in all aspects of the matter still before this court. For instance, it is approximately 2,750 miles from Boston, Massachusetts to Las Vegas, Nevada. Yahoo Directions computes a 15.5 mile distance between Attorney Cogburn's office and the Clark County District Court. By all accounts, Xyience is a major corporation while Bergeron is an individual.

**Form Number 1**

Due to the extenuating circumstances preventing Bergeron from attending any hearing in Nevada and several other mitigating factors beyond his control that put him at a disadvantage in this case, Bergeron has never enjoyed any fair shot to succeed.

Furthermore, after Bergeron submitted his two motions in the case he never received any direction from the court in the matter despite being the one party in the case who could have used it. Yet, according to the minutes in the case for August 23rd:

**"Court *advised* [plaintiff's] counsel it would like to proceed with caution so that any decision it makes will stand. Court *instructed* Mr. Cogburn to submit a proposed order, along with case law and Points and Authorities, on the First Amendment issue and, ORDERED, matter CONTINUED and set for DECISION on Court's Chamber Calendar."**

While the plaintiff's counsel was able to submit a myriad of motions (even including one accepted while the judge was making his decision in chambers) and enjoyed easy access to multiple hearings, Defendant submitted his first motion on July 25th. Bergeron's first and most important motion was not scheduled for any hearing until September 6th, at which point it was denied immediately using extremely vague reasoning.

The issued preliminary injunction's basis was also invalid and not applicable to the case currently before this court. In Sobol v. Capital Management Consultants, Inc., 102 Nev. 444, 726 P.2d 335 (1986), the Supreme Court of Nevada determined that usurping the name of a medical facility interferes with the legitimate business interests of the facility by causing confusion, infringing on goodwill, and potentially damaging the reputation of the legitimate namesake. This case has nothing to do with Bergeron assuming Xyience's name as his own. The case that served as the basis for the injunction also has no common issues regarding the press, the First Amendment, or the Internet.

Furthermore, Bergeron raised several more applicable and more current appeals level and

Supreme Court cases in arguing against the preliminary injunction ordered by the judge in this matter. Yet, the judge's final decision cited only one twenty-one-year-old Nevada case as a basis for his final determination, a case with absolutely no relevance in this matter currently before the court. The term "blog" was not even in use at the time that case was decided, and the Internet in 1986 was in the earliest of stages and nothing like it is today. Preliminary injunctions are more classically applied to town and city ordinances seen as facially unconstitutional or overbroad. They are not fit to be applied when it comes to the dissemination of information to the public by the media. Yet, in this case, the judge at first expressed a need to arrive at a decision that would stand only to ultimately pass down a ruling that flies in the face of generations of Supreme Court decisions. To enjoin a reporter from bringing the public the news based on a simple, entirely unfounded and unsupported claim of defamation is not only the classic definition of a prior restraint but also an unfortunate example of government censorship for the prime benefit of big business.

The question must be asked: why? Why has Bergeron continuously been denied due process and fair consideration in this matter before the court? Why is the court so willing to strike down his efforts to do a venerable service to society by exposing a corporation engaging in fraudulent activity? Did he not provide enough points of appeals law to prove his case? Was his failure to appear taken as an insult to the court? Is the fact that he is acting as his own representation offensive to the court? Did he not present enough evidence to prove it was the plaintiff defaming him rather than him defaming the plaintiff in this case? Was his treatment due to the plaintiff's counsel knowing more of the rules and procedures than Bergeron did? Bergeron may never know exactly why he has not been provided an even playing field in this case. The judicial process of this entire case has failed to take into consideration the entire question of why. For instance: the plaintiff was never asked to answer as to why Bergeron would ever have any reason to publicly defame Xyience.

*The elements that must be proved to establish defamation are: (1) A publication to one other*

*than the person defamed; (2) of a false statement of fact; (3) which is understood as being of and concerning the plaintiff; and (4) which is understood in such a way as* ***to tend to harm*** *the reputation of plaintiff.*

Plaintiff has provided no proof to show that Bergeron ever intended to harm Xyience. In fact, Bergeron only exposed the ongoing corruption at the company so as to have it addressed in order for Xyience to be able to prosper after the corrupt parties have been dealt with. He has publicly proclaimed this multiple times on his site and in communications with Xyience officials. Bergeron is in no position to profit through the reporting of this story. He does not have a rival sponsor to appease or any competing business interests that would lead him to purposely attack Xyience in order to gain any kind of personal or financial advantage. That alone should be enough to exonerate him in this matter under the tenets of the law.

Meanwhile, Xyience has brought this matter before the court admitting that they stand to gain at least $25 million if they can get Bergeron's stories removed from the Internet, though that claim can now be disputed based on the evidence. If anyone has the motivation to contort the facts to suit their own needs and obscure reality in order to achieve great profit, it is the plaintiff. With the stakes so high in getting an IPO off the ground, it is understandable that they would go to great lengths to discredit Bergeron for their own personal gain. Bergeron has no such motivation to do any harm and is actually inspired by the opposite purpose: to help. The evidence presented here shows that it is Xyience engaging in defamation while the truth is Bergeron's ultimate defense.

Also, the court has never explained *why* the plaintiff's word alone has been accepted as evidence while the defendant's word and direct evidence of the plaintiff's defamation of him have been virtually ignored and rejected.

Bergeron submitted the on-line addresses of slanderous blogs written about him in this case,

and they were subsequently removed, proving those directly connected to Xyience and this case must have authored them, and Xyience Counsel Jamie Cogburn himself may have even been the one who alerted the author to remove them for legal purposes. Cogburn has no doubt purposefully and recklessly tried to obscure the facts of this case before in multiple filings. This behavior goes beyond just trying to make a better case for his client and approaches the level of purposeful, malicious misrepresentation of clear, undeniable facts.

For instance, Cogburn made the bogus claim that Russell Pike is "merely a shareholder" of Xyience, Inc. and does not have any ongoing involvement with the company. Cogburn obscures the fact that Pike also founded the company and is one of the ***chief*** shareholders who just bought out his co-founder for all the shares Andrew Kriechbaumer's entire family owned. Also in Exhibit 21, Cogburn's communications admit that Russell Pike is still performing "consulting" for the Xyience Training Center and Xyience Apparel, and therefore he requires a company email address. Both companies are said to be separate from Xyience according to Cogburn, but they bear the same name and obviously people are using official Xyience email addresses to consult for them. There is also a business entity list attached to show the status of these companies and other Xyience enterprises.

There have been several individuals performing duties on behalf of Xyience, recruiting investors, and engaging in fraudulent activity while claiming to only be "consultants." Ronald Solomon (See Exhibit 22) has been one of the primary "consultants" trying to raise money for the company in that capacity so if they should violate any laws or procedures they can turn around and tell people they were not officially working for the company and were merely "consultants." These are not just semantics. They are specific methods being utilized by the inner circle at Xyience led by Russell Pike. Former Xyience Counsel Pete Rinato resigned from Xyience according to Attorney Cogburn yet is now also doing "consultant" work for Xyience. John Chadwell, who offered to have Bergeron flown to Vegas in exchange for writing a fluff piece about Xyience, represented himself as Xyience Security despite Pete Rinato later claiming he was also only a "consultant."

**Form Number 1**

Exhibits 20 and 23 outline major developments that confirm what Bergeron is now enjoined from reporting due to the recent injunction issued in this case. Xyience, through Russell Pike and an "investor recruitment network," sold over a million shares of stock in a fraudulent and irresponsible manner in the State of California. This behavior, despite appearances and claims to the contrary, is still going on and was confirmed recently through other evidence presented here. Exhibit 23, an internal company email sent to Bergeron from one of his inside sources, details that Russell Pike is not only still involved in Xyience but has the power for a simple decision of his to bankrupt the company. There is also absolutely no mention in this exhibit of Bergeron's stories having any effect on the bottom line or getting in the way of the Fertitta investment. This document confirms Cogburn has made another false claim in his filings by claiming it was Bergeron's reporting stalling this deal. In fact, it is Russell Pike's involvement in the company holding up the transaction. Like the other companies Pike has been involved in before this, his greed and desire for control threatens to bankrupt Xyience.

Bergeron submits Exhibit 11 to show that this court's own injunction served as a vehicle for an associate of Pike to seek funds on Pike's behalf from a company investor on the very day the order was officially issued. Just as Bergeron pointed out in his opposition to the injunction, these documents shows that the Fertitta Brothers and Dana White are planning to invest in Xyience. Exhibit 23 confirms the Fertitta connection. Pike is undoubtedly still heavily involved no matter how hard the other company officials try to separate him, and he is actively seeking personal loans on top of that from investors. This certainly validates Bergeron's prediction that the injunction would only empower the plaintiff to commit more fraud.

The roper utilized the injunction as a way to encourage the investor to commit further funds for Pike's own personal gain while purporting to also be raising funds to promote a public offering of Xyience stock. The roper also clearly slandered Bergeron while officially representing Xyience.

Bergeron has no working or professional history with Xyience, and he has never invested in Xyience. To make matters worse the roper not only presented the injunction to bolster his lies to the investor but also grossly misrepresented the court's findings.

Furthermore, Cogburn made his claim about Pike no longer being involved in the company while simultaneously submitting two emails as evidence that came directly from the desk of Russell Pike himself and featured his email address on them as the sender. If Pike actually were "merely a shareholder" why does he take such a major interest in the case before this court, and why does he still have a company email address? Cogburn claims Pike having an email address is incidental and relating to his consulting work, yet Cogburn knowingly perjured himself in a previous motion that maintains Pike no longer has *anything* to do with the company.

These documents outline everything Bergeron has exposed in his stories that Cogburn and Frank have claimed to be false. These exhibits ultimately prove Frank's affidavit amounts to perjury. These exhibits also present glaring, obvious facts that show the plaintiff intends to use the judge's injunction in this case and whatever subsequent ruling they can muster as tools to cover-up and hide from the public what is now a known fact: Xyience and Russell Pike have both defrauded investors, and these powerful and potent documents prove that Pike and Xyience are inseparable. The company's bankruptcy will result in millions of worthless shares held by investors sold with empty promises that Pike and his inner circle never intended to keep.

To better explain why Russell Pike cannot ever be permanently separated from acting in Xyience's day to day business affairs, consider the undisputed commentary Bergeron gleaned from an interview with former Xyience Counsel Pete Rinato:

*"'This whole company was his vision,' said Rinato. 'Everything that went on from the beginning is all his.* ***It's his baby.*** *There's gonna be people here in a position where important decisions come up, and they're gonna ask him his opinion.'"*

Russell Pike came up with the whole plan behind Xyience, up to and including the name, which

he bragged about under the guise of his alter ego "Friends of Chuck" in his Sherdog posts (Exhibit 5) slandering Bergeron. Pike was the one who personally negotiated with Chuck Liddell regarding the famous fighter's major endorsement contract, hence that label Pike used in his posts.

The claim that Pike is "merely a shareholder" is not the only time Cogburn has obscured the truth in his court filings. Plaintiff's counsel shapes new lies in each new document produced for this case. In the first document Cogburn filed he detailed a Securities and Exchange Commission investigation claim that appeared in **one email** (THAT NO LONGER EXISTS IN CONNECTION WITH ANY OF BERGERON'S SITES). Cogburn brought up the email itself first by calling it an "article." This one lone email (that Bergeron did not even author himself) is later not only framed as appearing in a "barrage of articles" Bergeron wrote but also somehow becomes a claim Bergeron is said to be "falsely alleging" in communications with Xyience vendors and shareholders by the last filing submitted by Cogburn. Clearly, there is no supporting evidence that verifies Cogburn's outlandish claims.

The plaintiff is supposed to be the party responsible for proving the merits of the case in order to secure an injunction. They have not provided any burden of proof that Xyience *is not* being investigated by the Securities and Exchange Commission. Exhibit 12 outlines the SEC's official policy regarding investigations. It proves that there is no way Xyience could know if there was an SEC investigation against them or not. In addition, the email in question from Bergeron's deleted MySpace profile was circulated and posted widely across the Internet, and Bergeron was not aware it was manufactured until long after the MySpace profile it was posted on was deleted. He has not printed any SEC Investigation claims since the profile was deleted. He has never maliciously or intentionally posted anything he did not have evidence to support. Even in posting the email he went above and beyond others who posted it with no disclaimer. He specifically announced not all of the contents had

been fully verified. Therefore, he never personally maintained the SEC portion of that email was a definitive fact in the first place.

Cogburn also tried to downplay AA Capital's involvement with Xyience by painting them as "one shareholder." AA Capital was much more than a simple shareholder. The ongoing SEC lawsuit against AA Capital's John Orecchio has had a profound impact on how Xyience has operated the business this year. The suit dealt directly with reconfiguring the $31 million investment made in Xyience by AA Capital subsidiary Brush Monroe. The SEC suit (Exhibit 13) featured a mandated leadership change for Xyience as part of the agreement reached in the case. "One shareholder" does not normally have such broad powers to shape a company.

Brush Monroe's sole asset was this Xyience investment package. This SEC lawsuit also sheds some major light on how the whole deal between Brush Monroe and Xyience came to pass. Orecchio failed to even inform the company's board of directors of the transaction with Xyience. There is also a major question as to exactly where all of the funds for that $31 million in Xyience debt and equity purchase actually went, as court documents show that not all of it went to Xyience.

Therefore it seems apparent that the AA Capital deal represents much more than just "one shareholder" and points to an instance of clear, documented fraud. Xyience officials should have been in a position to promptly point out the discrepancy having never received the full amount of that investment, yet instead that detail only came up in the course of receivership proceedings in the SEC case against Orecchio. Even when it came up Xyience officials acted suspiciously when asked for the proper records and stalled as long as possible.

Cogburn additionally claimed Bergeron "made up quotes" from Attorney David Winterton without any affidavit verifying that claim, and he subsequently abandoned that argument in his most recent motions. There is no possible way Cogburn can prove Bergeron made up any quotes. That contention is a bold-faced lie that Cogburn knew he had no evidence to prove from the very beginning.

In the very case the judge cites as the basis for his decision to grant the preliminary injunction,

**Form Number 1**

*Sobol v. Capital Management Consultants, Inc.*, the Supreme Court of Nevada sanctioned an attorney $5,000 because the attorney misrepresented a stipulated fact. Cogburn has done so repeatedly in this case and received no punishment as of yet. Cogburn's lies and misrepresentations of evidence in this matter can be easily verified and confirmed, in some cases by simply looking at the record of the plaintiff's argument compared to Bergeron's work in evidence. Cogburn's behavior and "obscure the truth at all costs" approach should result in his censure by this court.

While plaintiff 's counsel has used every trick in the book to hide the real evidence and skirt the law, Bergeron has worked to shed light on the truth at every stage. Despite having to work as his own attorney, Bergeron has actually taken more care to frame his arguments properly than Cogburn has as a paid officer of the court. If anyone should be given any leeway as far as citing precedents, it is Bergeron, yet Plaintiff has continuously applied cases to the argument that have no similarity whatsoever to the matter at hand. Cogburn has cited corporation vs. corporation suits, adult entertainment cases, and town ordinance injunctions. Plaintiff had to actually rely on Bergeron bringing up most of the First Amendment case law dealing specifically with passive Internet sites. Bergeron has received no paid legal guidance and relied only on court clerks to help him with the minor nuances of the process. On the other hand, the plaintiff, who is a practicing and paid attorney, has been advised in this case by the very judge deciding it.

The plaintiff is abusing this court's trust, corrupting the judicial process, and manipulating the facts to suit their needs. Rather than being reprimanded for this behavior, the plaintiff has been rewarded. Despite the fact that securing a preliminary injunction requires them to submit evidence showing the merits of their case, they have yet to provide one shred of verifiable, documented evidence that any of what Bergeron has written is definitively false. Yet, they still somehow received the injunction anyway.

Defamation is defined as the act of stating a "false assertion of fact." In order to produce evidence that Bergeron defamed Xyience, it is therefore reasonable to expect that they would have to provide concrete information not subject to opinion or speculation that would verify Bergeron printed something as fact that was not actually true. There is no evidence in the record which proves any of Bergeron's contentions are false assertions of fact.

The Plaintiff's entire case hinges on one affidavit from Adam Frank, the current General Manager of Xyience. There is no evidence as to how long Frank has even been an officer of Xyience or if he is in any position to know whether Bergeron's writing is accurate. The affidavit itself is basically a carbon copy of Cogburn's whole argument that was simply signed by Frank and does not include any unique observations whatsoever. If it was written by Cogburn, it is even more cause for sanctions against him since the contents amount to perjury considering the latest evidence presented here.

Certainly, this lone affidavit does not reveal any concrete proof of anything Frank personally witnessed that would show any of Bergeron's statements are not true. The court has no way of knowing to what extent Frank would even be aware of any fraudulent activity going on at the company on his short watch. Further, Frank is coming fresh off a development deal in which he and his company have been accused of squeezing out another investor (see Exhibit 14) in order to achieve a more significant profit. Frank also allegedly stands to profit from Bergeron's true stories being removed from the Internet by the plaintiff's own admission.

This case represents the first time Bergeron has ever been sued over any of his work, and this is the first challenge of any sort regarding Bergeron's reporting after authoring thousands of published articles to date. Bergeron submits his resume as proof of his credentials and experience as a full-time newspaper reporter (Exhibit 15). He is not a random, inesperienced blogger with no knowledge of the laws of libel and slander. He is not some nut on a rampage or vendetta. He reported this story objectively and insightfully, giving those at Xyience every opportunity to respond. They refused at

every turn and always indicated they wanted the truth to stay hidden.

Bergeron suddenly stands accused of reporting false accusations in this matter when his career history details no hint of any such previous activity. On the other hand, those involved in the plaintiff's company who are trying to claim his stories are lies have a documented history of transgressions on their records ranging from impropriety to serious criminal actions (See Exhibit 16).

The only other evidence Plaintiff produces to prove the "merits" of their case is Bergeron's own work. They cite Bergeron's own material, call it defamation without any basis or direct evidence, bring one of their own officers in who calls it defamation, and the judge in this case takes that all as fact without question. This scenario leads Bergeron to believe it is impossible for him to get a fair trial here in Nevada.

The plaintiff has not provided a shred of evidence to prove Bergeron's information is not coming from impeccable inside sources with intimate knowledge of the company's day to day affairs and knowledge of past and present fraudulent and corrupt activity. They haven't even ventured to guess who may be providing Bergeron with his inside information.

The only material plaintiff can possibly claim *may* not be true (regarding the SEC investigation) is by no means verifiably so. Furthermore, that claim was never even written by Bergeron himself as the article in evidence was, and there was a disclaimer attached to that now defunct email.

Yet, what if there should be an SEC investigation launched and resulting in arrests during the course of these proceedings? According to the judge's order, Bergeron would be enjoined from telling anyone about it, which would make the court itself party to silencing Bergeron for the benefit of the plaintiff. That is exactly what is already happening as far as Bergeron not being able to report on the fact that Xyience has been defrauding investors. As long as the current injunction is in effect, any

mention of Xyience defrauding investors on his part could put him in contempt for stating a fact.

Bergeron has recently uncovered more evidence he could use to write more stories in his series, but instead he decided to hand the new information over to the authorities. The latest developments and documentation provide for a significant basis for a criminal investigation into Xyience, as he suggested already in his opposition to the preliminary injunction. Bergeron recently discovered that, in addition to Russell Pike's criminal history, another current Xyience employee is in the midst of a U.S. District Court trial regarding his alleged involvement in selling tax scam software. Exhibit 17 outlines the case against Ric Klingenberg and his former associates, all charged with defrauding the federal government of over $320 million in tax revenue. A permanent injunction has already been issued against him. Bergeron also submits a communication from Klingenberg he received from Klingenberg's official Xyience email address (Exhibit 18).

The Plaintiff's case here is completely fraudulent and purely motivated by financial gain at the expense of silencing the truth. It has already led to the initiation of more fraudulent behavior and further slander of Defendant Bergeron by someone officially representing the plaintiff's company (See Exhibit 11) in the process of recruiting investment capital.

Corporations have an interest in maintaining a successful front in the eyes of shareholders and securities analysts because investors typically try to buy shares of companies that are healthy and growing. Corporate fraud, also known as shareholder fraud, occurs when, to maintain this front, corporations deliberately conceal or skew information. Those acting on behalf of Xyience are trying to do exactly that with this lawsuit, and the court's decisions thus far have made it easier for the plaintiff to defraud investors. Exhibits 11 and 23 clearly show examples of documented fraud starting from Pike's inception of the company to just recently.

This court's injunction aided and abetted Xyience officials in acts of clear fraud witnessed by an individual who provided both a written account and a fax of the injunction in question. This case represents precisely why these kinds of injunctions should *never* be issued in the first place. If any

corporation's fraudulent activity could be covered up by simply filing for and receiving a preliminary injunction and charging defamation, the press and the media would be permanently disfigured and incapacitated. Corporations are not infallible and above the law, and they should not be able to get away with fraud simply because they have lawyers. To promote justice as it so often does through comprehensive investigative reporting, the media relies on the protected and constitutionally guaranteed rights that soldiers and citizens have fought for throughout American history. These same rights are what this whole country is founded on. This court is trying to take those rights away from the Defendant without any due process or finding of fact in evidence to show Bergeron's reporting is in any way false. As a result, the truth has been silenced to the extent that it has allowed the Plaintiff to further commit more of the very acts Bergeron's reporting sought to expose AND PREVENT.

Both the preliminary injunction issued and the denial of Defendant's motion to quash service of summons for lack of jurisdiction are ripe for appeal and should not have been issued in the first place based upon the complete lack of merit to the plaintiff's entire argument and the preponderance of new evidence set forth in this motion.

**JURISDICTION IN NEVADA MAKES THE JUDICIAL PROCESS IMPOSSIBLE FOR BERGERON TO ACCESS AND IS NOT SUPPORTED BY SIGNIFICANT PRECEDENT CASES.**

Many courts have previously rejected the proposition that a defamatory statement made from the defendant's home state constitutes a tort committed in the plaintiff's home state, even if the defendant knew that the plaintiff was located there. *Nelson v. Bulso*, 149 F.3d 701 (7th Cir. 1998). Even if Bergeron's statements actually were defamatory, they should not be considered a tort in Nevada. Indeed, the finding of jurisdiction in Nevada here represents chilling implications for citizens'

right to speak freely about corporations and state officials that they believe have acted irresponsibly.

Every person who posts an opinion on the Internet knows that persons sitting at computers not just in their own country, but in foreign lands half way around the globe, may gain access to their views by the simple act of "clicking on their link" or finding them through a search engine. If citizens knew that they could be forced to defend themselves against litigation in every such forum, they would surely be chilled in the exercise of their First Amendment rights.

In recent cases, for example, other countries, such as China and Cuba, have undertaken efforts to purge the Internet of any dissenting opinions. The public's access to the Internet in Myanmar was recently shut down due to the exposure of the government's treatment of protestors. Without that citizen involvement at such a grassroots level, the full story would never be known. We are living in a new age of information, where any citizen can be a journalist, such as the efforts of CNN's Ireport program. The blogging age is also in full swing, and in this climate one big break can catapult an earnest, hard-working writer into the public eye overnight. If jurisdiction is allowed anywhere that a Web-site is accessible, the chilling effects on free Internet speech will become even more serious. Given the character of Bergeron's Web-site, the motion for a preliminary injunction should have been denied because it seeks a prior restraint. The motion to quash should have also resulted in the case's dismissal.

**THE ISSUED INJUNCTION IS CLEARLY A PRIOR RESTRAINT THAT HAS NO BASIS AND WOULD NOT HOLD UP ON APPEAL**

**The Supreme Court** has repeatedly held that injunctions which bar defendants from speaking, printing, or broadcasting statements about topics of public concern are prior restraints that require the most extraordinary justifications before they may be approved. *New York Times v. United States*, 403 U.S. 713(1971); *Near v. Minnesota*, 283 U.S. 697 (1931).

**Form Number 1**

When an injunction is entered based on a **mere finding of likelihood of success** in establishing illegal speech, instead of a final adjudication, it is a prior restraint subject to strict First Amendment scrutiny. *Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993); *Dataphase Systems v. CL Systems*, 1980 U.S. App. LEXIS 14978, 6 Media L. Rep. 2163 (8th Cir. 1980). *See also Carroll v. Commissioners of Princess Anne*, 393 U.S. 175 (1968). The law is clear and unequivocal - prior restraints are not permitted except in the most exceptional of circumstances, involving "such a grave threat to a critical government interest or to a constitutional right." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996). No such circumstance is present here, and thus the preliminary injunction should have been denied and should now be vacated.

To determine whether a statement implies a factual assertion, courts examine the totality of the circumstances in which it was made. First, they look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next they turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. ***Finally, they inquire as to whether the statement itself is sufficiently factual to be susceptible of being proved true or false***. See Partington v. Bugliosi, 56 F.3d 1147, 1153 (9th Cir.'94) (applying three-factor test as the starting point for analysis); Unelko Corp. v. Rooney, 912 F.2d 1049, 1053 (9th Cir.'90), cert. denied, 499 U.S. 961 (1991). The alleged defamation in this case does not qualify according to the scope and nature that justifies legal action. Particularly, the existence of an SEC investigation against Xyience cannot be proved true or false, and according to the plaintiff's most recent motion that claim published on a deleted site seems to be their strongest, albeit moot, point in this case.

The Supreme Court has declared that prior restraints may be justified, if at all, only in the most

exceptional circumstances, such as to prevent the dissemination of information about troop movements during wartime, *Near v. Minnesota*, 283 U.S. 697, 716 (1931), or to "suppress information that would set in motion a nuclear holocaust." *New York Times Co. v. United States*, 403 U.S. 713, 726 (1971) (Brennan, J., concurring). Accordingly, the Supreme Court has rejected the use of prior restraints, even where substantial governmental or private interests would be affected by the publication sought to be restrained, or where the information at issue was confidential by law. *See, e.g., Near*, 283 U.S. at 716-18 (invalidating prior restraint of defamatory and racist statements that allegedly disturbed the "public peace" and provoked "assaults and the commission of crime"); *Nebraska Press*, 427 U.S. at 556-561 (invalidating prior restraint against publication of information about criminal defendant's confession, despite alleged risk to Sixth Amendment rights); *New York Times*, 403 U.S. at 714 (invalidating prior restraint against publication of the "Pentagon Papers," despite the government's argument that disclosure of that information posed a "grave and immediate danger" to national security).

The Supreme Court has also reminded us that "Our liberty depends on the freedom of the press, and that cannot be limited without being lost." *Nebraska Press*, 427 U.S. at 548 (quoting 9 Papers of Thomas Jefferson 239 (J. Boyd ed. 1943)). Thus, "[r]egardless of how beneficent-sounding the purposes of controlling the press might be," the Court has "remain[ed] intensely skeptical about those measures that would allow government to insinuate itself into the editorial rooms of this Nation's press." *Id.* at 560-61 (quoting *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring)). The Supreme Court's longstanding hostility towards prior restraints is the most important manifestation of that skepticism.

At its core, the prior restraint doctrine expresses a constitutional aversion to censorship of the media and individuals by the government. The Supreme Court has explained that prior restraints against speech must be held to an even stricter standard than post-publication penalties because a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. There's no evidence of any laws being broken here, and this court is

still punishing Bergeron.

It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable. *Southeastern Promotions*, 420 U.S. at 559. When a branch of government, including the judiciary, restrains the publication of information that has been obtained lawfully by the media, it undermines the "main purpose" of the First Amendment, which is "to prevent all such previous restraints upon publications as [have] been practiced by other governments." *Nebraska Press*, 427 U.S. at 557 (quoting *Patterson v. Colorado*, 205 U.S. 454, 462 (1907)). It is widely agreed that "[t]here is, indeed, something peculiarly totalitarian about government systems of prior restraint." Rodney A. Smolla, *Smolla & Nimmer on Freedom of Speech* § 15:10 (2004). The Supreme Court has "learned, and continue[d] to learn, from what we view as the unhappy experiences of other nations where government has been allowed to meddle in the internal editorial affairs of newspapers." *Nebraska Press*, 427 U.S. at 560 (quoting *Tornillo*, 418 U.S. at 259 (White, J., concurring)). It is important that this lesson is not forgotten in this case because "[b]oth the history and language of the First Amendment support the view that the press must be left free to publish news, *whatever the source*, without censorship, injunctions, or prior restraints." *New York Times Co.*, 403 U.S. at 717 (Black, J., concurring). This court's order is an unwarranted and extreme violation of the news organization's (Fight News Unlimited) and Rich Bergeron's First Amendment rights, and ***defies nearly a century of precedent from the Supreme Court***. *See, e.g., Patterson*, 205 U.S. at 462; *Near*, 283 U.S. at 716.

If this Court allows the injunction order to stand, it will be ignoring the steeped history if the highest court in the land. *See, e.g., In re Providence Journal*, 820 F.2d at 1348 (noting that the United States Supreme Court "has never upheld a prior restraint on speech"). Nothing in the present case, however, justifies any such dramatic departure from the Supreme Court's constitutional jurisprudence.

The Supreme Court consistently has required the government to carry an exceptionally onerous burden to support a prior restraint, which "comes to th[e] Court with a 'heavy presumption' against its constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (quoting *Carroll v. Princess Anne*, 393 U.S. 175, 181 (1968)). As another court explained, a "publication must threaten an interest more fundamental than the First Amendment itself " before a prior restraint may be imposed. *Procter & Gamble Co.*, 78 F.3d at 227. As the Supreme Court has emphasized, "the barriers to prior restraint [must] remain high unless we are to abandon what the Court has said for nearly a quarter of our national existence and implied throughout all of it." *Nebraska Press*, 427 U.S. at 561.

To keep these barriers high, the Supreme Court has held that a prior restraint may be considered only where its proponent demonstrates that the restriction is necessary "to further a state interest of the highest order." *Smith*, 443 U.S. at 102. In articulating this standard, the Supreme Court has instructed that prior restraints must be supported by evidence of a "clear and present danger" of harm to a paramount state interest, and that "speculati[on]" or "factors unknown and unknowable" never can justify such an abridgement of the First Amendment. *Nebraska Press*, 427 U.S. at 563.

As New York State Supreme Court Justice Colabella ruled in 1992, "Short of a gun to the head, a greater threat to First Amendment expression can scarcely be imagined [than a lawsuit brought to silence public speech]." Gordon v. Marrone, 590 N.Y.S. 2d 649, 656 (1992). The plaintiff here is asking this Court itself to fire that gun, not just against Bergeron, but against the federal and state constitutions that this Court is supposed to preserve and respect. The plaintiff seeks only to chill free speech and deny the public their right to know what the defendant's true reports have uncovered.

In cases where the media defendant is treating an issue of public concern, the First Amendment also requires proof of actual malice or reckless disregard of the truth, even if the plaintiff is not a public figure. Gertz v. Robert Welch, 418 U.S. 323, 349-50 (1974). See also Hepps, 475 U.S. at 775 (In non-public concern, non-public plaintiff defamation case, First Amendment does not bar

application of mere negligence standard for defamation); Dun & Bradstreet v. Greenmoss Builders, Inc., 472 U.S. 749, 761 (1985) (Powell, J., concurring). Xyience is a company that is consistently in the public eye and featured in prominent advertising in the center of the cage floor at every Mixed Martial Arts event held by the Ultimate Fighting Championships, which is often broadcast worldwide. In addition, their advertising and commercial placement can also be seen at numerous other fighting events. If the company does not qualify under the definition of a public figure, then at the very least the subject of their behavior and character constitutes a topic of public concern.

## DEFENDANT CANNOT BE COMPELLED UNDER THE LAW TO REVEAL THE SOURCES THAT WOULD ULTIMATELY EXONERATE HIM OF ALL CHARGES

The Ninth Circuit Court of Appeals has concluded that there is a qualified privilege under the First Amendment. *Farr v. Pitchess*, 522 F.2d 464, 467-68 (9th Cir. 1975); *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993). The federal district courts in Nevada have followed the Ninth Circuit's precedent by recognizing the existence of a qualified privilege under the First Amendment. *See Newton v. National Broadcasting Co.*, 109 F.R.D. 522, 526-27 (D.Nev. 1985). The constitutional privilege, however, is not as protective as the statutory privilege provided for by NRS 49.275. In *Newton*, the federal district court concluded that a television reporter would have been required to disclose information concerning his confidential sources under the qualified First Amendment privilege against disclosure of confidential sources. *Id.* at 527.

The court applied a balancing test and found that disclosure was mandated under the constitutional privilege because the case was a libel action where the plaintiff was a public figure who had to meet the "actual malice" standard enunciated in *New York Times v. Sullivan*. The court found it

significant that the journalist claiming the privilege was a party defendant and that the plaintiff had effectively exhausted alternative means of learning the identity of the confidential sources. *Id.* Nonetheless, the court found the information to be privileged under NRS 49.275 and recognized that "Nevada's press shield law provides the broadest protection to news media sources of any State shield law enacted in the United States." *Id.* at 529.

Bergeron cannot be forced to reveal his sources under Nevada law, and he will not do so in these proceedings to save himself from the frivolous charges he is being railroaded by. He will not put anyone's life in danger to prove his innocence. This fact puts him at a significant disadvantage in this case that goes far beyond his problems with not being able to afford transportation and living arrangements to get to and personally attend any potential trial or any preliminary hearings in Nevada.

If Bergeron were able to reveal the relationships his sources have within the plaintiff's corporation and the nature of their past and present interactions with the hierarchy of Xyience, this case would be over already, and he would be fully exonerated at this point.

As the California Supreme Court acknowledged, "The press' function as a vital source of information is weakened whenever the ability of journalists to gather news is impaired. Compelling a reporter to disclose the identity of a source may significantly interfere with this news gathering ability; journalists frequently depend on informants to gather news, and confidentiality is often essential to establishing a relationship with an informant." **Mitchell v. Superior Court** (1984) 37 Cal.3d 268, 274.)

The Ninth U.S. Circuit Court of Appeals has also recognized a qualified First Amendment privilege. *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993) (*Shoen I*). "Rooted in the First Amendment, the privilege is a recognition that society's interest in protecting the integrity of the newsgathering process, and in ensuring the free flow of information to the public, is an interest 'of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.'" *Id.* (quoting *Herbert v. Lando*, 441 U.S. 153 (1979) (Brennan, J., dissenting)

**Form Number 1**

(internal quotation omitted)). "A civil defamation lawsuit is important. But it is not the only thing that is important." *Id.* at 1302 (Kleinfeld, J., concurring). Justice is all the more important, and no justice is served by putting lives in danger or forcing the defendant to accept a position that puts him at a severe, blatant disadvantage.

In order to provide the public with information about matters of public importance and interest, journalists must sometimes rely on confidential sources. The cases cited above all support the principle that if journalists are compelled to become investigators for government or civil litigants, confidential sources will no longer be willing to provide information to journalists. The result will be a restriction in the flow of information to the public, inhibiting the public's ability to make informed choices related to government, industry, health and a host of other subjects that affect people's everyday lives.

New evidence has also come to light regarding possible investors in Xyience who are also owners of Station Casinos (See Exhibit 11 and 23). The evidence before this court shows the Fertitta Brothers may benefit directly depending on how this case is decided. Because Judge Williams has been endorsed by Station Casinos, owned by Frank and Lorenzo Fertitta (Exhibit 19), there is at the very least *an appearance* of a possible conflict that could result in all decisions being overturned on appeal.

As much as the judge might be offended by the mere inference that he would let a public endorsement interfere with any of his court decisions, Bergeron's case is of a very serious nature and could result in him being mandated to pay the plaintiff over $25 million in damages. Understandably, even the vaguest possibility of the scales of justice being balanced toward the plaintiff unfairly is a major concern that should be addressed. Bergeron has thus far given the judge the benefit of the doubt by not motioning for Williams to recuse himself.

The precedents of our nationally significant law in the United States is of utmost importance in defining and determining what this case is primarily about and what should be done to reach a justified

decision here. If the right effort is not undertaken to analyze the appropriate and applicable laws and precedent cases here, this matter will only be finally adjudicated by a long appeals process that will damage both sides and serve no purpose. There is no reason this case cannot be finalized in a quick and painless fashion based on the overall merits presented to this point. The law speaks for itself: the First Amendment issues provide blanket protection over Bergeron's reporting as it has not been demonstrated to be driven in any way by reckless disregard for the truth, and his actions to expose this story have not been motivated by any malice or intent to harm Xyience. Besides that, and most importantly, Bergeron has only written the truth while the plaintiff has only tried to fabricate their own truth to suit their needs.

**CONCLUSION:**

There is no evidence to justify a trial in this matter. It is the plaintiff who bears the burden of proof, and the plaintiff has not provided any that outweighs what Defendant Bergeron has provided. Plaintiff has not even provided adequate proof of any damages resulting directly from Bergeron's blog postings, nor have they even named or identified the potential investors who have allegedly refused to invest due to Bergeron's stories. Instead, it is Bergeron who has had to inform the court who these investors actually are. His ability to predict the future in this matter is a factor of the connections he has cultivated within the company at the highest levels of authority.

Whether it is deliberate or not, Bergeron's evidence and points of law have not been given the same weight as that of the plaintiff's. In fact, it appears the plaintiff's evidence has been given far more weight than it actually deserves. The judge's rulings thus far have made it easier for those acting on behalf of the plaintiff to defraud investors, and according to the judge's injunction order Bergeron is not even allowed to state what he can now prove is a verifiable fact. CPA Mike Hilson's email and subsequent faxing of the injunction order on September 7th both prove Xyience is actively defrauding investors AND using the court ordered injunction to defame Bergeron. The subsequent verification of a pattern of investor fraud illustrated by the California investigation's conclusions is of paramount

importance to validating Bergeron's stories as true and accurate. As outlined in the order prohibiting Xyience from selling stock in the state of California, this company needs to have a complete overhaul in order to survive. As evidenced by Exhibit 23, the company might be bankrupted due primarily to principle causes of ongoing fraud and corruption shareholders are attempting to block through restricting the holdings of those engaging in those activities.

Those using this company to line their own pockets need to be removed from any responsibility and any official capacity with any access to influence the company's assets and interests. The long term survival of Xyience, Incorporated will not have anything to do with whether Rich Bergeron's stories remain on the Internet or not. It will have everything to do with whether or not the right people are in place with the proper motives.

The following information came from the National Bureau of Economic Research's Web-site: "What external control mechanisms are most effective in detecting corporate fraud? To address this question we study in depth all reported cases of corporate fraud in companies with more than 750 million dollars in assets between 1996 and 2004. We find that fraud detection does not rely on one single mechanism, but on a wide range of, often improbable, actors. Only 6% of the frauds are revealed by the SEC and 14% by the auditors. More important monitors are **media** (14%), industry regulators (16%), and **employees** (19%)."

Bergeron has relied on the power of the press and the testimony of insiders at Xyience to produce this entire series. He has a long list of sources connected to the company in one form or another, some who have actually gone on the record and some who have not. The above statistics are for high profile companies who made extraordinary profits. If the SEC and auditors only discover the fraud going on at that level just twenty percent of the time, it can be logically concluded that smaller frauds are even harder for the SEC and auditors to find. Therefore, it can also be concluded that it is all

the more important for employees and the press to work together to expose fraudulent behavior at this level of business in order to facilitate public awareness and help the government do a job it cannot seem to effectively do alone.

Bergeron is being persecuted in this case for something he has clearly done to promote justice. He is the son of two public servants. His father is a retired chief of police and once investigated FBI Most Wanted Fugitive James "Whitey" Bulger. The government's coddling of Bulger as an FBI informant led to Bulger's subsequent escape from indictments for murder and racketeering. Bergeron's mother was a nurse before she died due to medical negligence in 1984, and she was always a strong advocate of bringing more compassion to the field of healthcare. Bergeron has always been committed to picking up where his parents left off and trying to root out the wrong he sees in the world by taking action where others might just throw up their hands and surrender. The examples of what struggles his parents endured are clearly being repeated in this case. The very system that is supposed to ensure that Bergeron's work is appreciated and acted upon is instead attempting to strike it down and ruin all his honest, heartfelt effort and every bit of the earnest progress he's made in this case.

Bergeron is at a substantial disadvantage if forced to defend his innocence in this case over 2,750 miles from his Cape Cod, Massachusetts home with no attorney representing him. Under *International Shoe Co. v. Washington*, a prospective party must have "certain minimum contacts with the forum state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Bergeron has never had ***any*** contact with Nevada. Bergeron's treatment thus far by this court not only offends those traditional notions, but also eradicates them. In the interest of "fair play and substantial justice," this matter should be dismissed as frivolous. The preliminary injunction order should be vacated, and no damages or court fees should be awarded to plaintiff. If anything, Bergeron is entitled to damages in this case, which he will accept at any amount determined by the court's discretion.

**Form Number 1**

**Dated this 1st Day of October, 2007**

By:

Rich Bergeron

43 Longhill Drive

East Sandwich, MA 02537

Serving as Attorney Pro Se

# EXHIBIT 11

**Form Number 1**

From: Mike Hilson <mike_hilson@hotmail.com>
Date: Sep 7, 2007 3:05 AM
Subject: RE: A little Xyience Update
To: rich.bergeron@gmail.com

Rich :

For the past couple of months I have not kept current on Xyience. Until today I had assumed that the company was running out of money and was just trying to hang on for a few more months for a futile IPO attempt. (My "investor" friend got a letter addressed to current shareholders about a month ago begging for a further investment in shares to be priced in the $2.50 to $3.50 range. This alarmed him because he paid $4.00 each back in February).

Anyways, today my friend got an unexpected visit from the roper who convinced him to buy stock back in February. I was present, as I was meeting my friend on an unrelated matter.

This roper proclaimed he had some great news about Xyience, and gave my friend photocopies of a "PRELIMINARY INJUNCTION ORDER" filed by Xyience counsel on 9-06-2007 at 10:07 a.m. (I can fax it to you if you provide a number).

He claimed that Xyience had successfully sued you and that they were awarded legal costs and that furthermore, you had been fined $1,000.00 and sentenced to 30 days jail, suspended. Also, that you had been ordered to remove from the Internet all references to Xyience by midnight tonight or be found in contempt.He claimed that you were a former employee/investor who was on a vendetta. The "good" news was that with you out of the way, Xyience could now raise the necessary bridge financing (he mentioned Dana White and the Fertittia brothers by name as sources for $15 million each), and go public- at $20-$30 per share- in January. He claimed that 10 investment houses were competing for the offering and that Xyience was going with Bear Stearns. He also claimed that he had increased his shareholdings in Xyience and had lent Russell Pike a 6-figure amount which would earn interest at 10% per month !!!! until Xyience goes public. He mentioned to my friend that Mr. Pike would like to borrow more money on these terms and seemed to be trying to persuade my friend to put money in both of these dubious investments. After listening to this nut praise Mr. Pike and his creditworthiness for a few minutes, I made a photocopy of the court document and excused myself.

Rich, I want you to know that I am inclined to believe that you are an earnest journalist who wants to report the truth. From personal experience, I know that it is hard to fight a court injuction. I also know that lawyers for crooks are rarely held accountable for what they say or submit in writing to a court, and that fighting the good fight can be long and lonely. If there is anything I can do to help you (except cash.... I'm tapped!), do not hesitate to contact me.

Best of luck,
Mike.

STAD 10/4/07

FAX SENT BY HILSON:



ORDR
COGBURN LAW OFFICES
JAMIE S. COGBURN, ESQ.
Nevada State Bar No. 008409
170 S. Green Valley Pkwy., Suite 280
Henderson, Nevada 89012
(702) 384-3616
Attorneys for Plaintiff

FILED
SEP 6 10 07 AM '07
CLERK OF THE COURT

DISTRICT COURT

CLARK COUNTY, NEVADA

XYIENCE INCORPORATED, a Nevada Corporation,

Plaintiff,

v.

RICHARD BERGERON, an Individual,

Defendant.

Case No: A 544781
Dept. No.: XVI

COGBURN LAW OFFICES
170 S. Green Valley Pkwy., Suite 280
Henderson, Nevada 89012
(702) 384-3616 FAX: (702) 943-1936

**PRELIMINARY INJUNCTION ORDER**

Date of Hearing: August 9, 2007
Time of Hearing: 9:00 a.m.

THIS MATTER having come on before this court on the 9th day of August, 2007, on Plaintiff's Motion for Preliminary Injunction with Plaintiffs appearing by and through their counsel of record, Jamie S. Cogburn, Esq., and Defendant, Richard Bergeron not present, but having sufficient notice of the hearing. The Court having reviewed the papers and pleadings on file herein, and having heard the argument of counsel and good cause appearing therefore,

**IT IS HEREBY ORDERED**, that Plaintiffs Motion for Preliminary Injunction is Granted pursuant to NRCP 65 and Sobol v. Capital Mangmt. Consultants, 102 Nev. 444, 726 P.2d 335 (1986), as Xyience has showed that there is a strong likelihood of success on the merits, there is a threat of irreparable harm, there is little to no harm that will result to the Defendant, and this Court has an interest to protect the public from defamatory statements.

**IT IS FURTHER ORDERED**, that the Defendant, Richard Bergeron, shall remove any and all articles or postings regarding false claims about Xyience from the internet and Defendant shall be enjoined from communicating any statements or making any representations which in any manner state, advise, represent, assert, allege, suggest, or imply, in any manner which is intended to, or does evoke an inference or create an impression that Xyience is being investigated by the SEC.

**IT IS FURTHER ORDERED** that the Defendant, Richard Bergeron, shall remove any and all articles claiming that Xyience is defrauding investors and/or is conspiring with Dana White or the Ultimate Fighting Challenge to defraud investors. Richard Bergeron shall be enjoined from communicating any statements or making any representations which in any manner state, advise, represent, assert, allege, suggest, or imply, in any manner which is intended to, or does evoke an inference or create an impression that Xyience is defrauding investors and/or conspiring with Dana White or the Ultimate Fighting Championship to defraud investors.

**IT IS FURTHER ORDERED** that if Defendant, Richard Bergeron, fails to remove the defamatory articles regarding Xyience, then Xyience may take appropriate actions with internet service providers to have the defamatory articles removed.

COGBURN LAW OFFICES
170 S. Green Valley Pkwy., Suite 280
Henderson, Nevada 89012
(702) 384-3616 FAX: (702) 943-1936

Form Number 1



**IT IS FURTHER ORDERED** that the instant Preliminary Injunction Order is conditioned upon the posting of security by Plaintiffs in the sum of $ 1,000.00.

TIMOTHY C. WILLIAMS

DISTRICT COURT JUDGE 9/26/07

Respectfully submitted by:

COGBURN LAW OFFICES

By: ____________________

Jamie S. Cogburn, Esq.
Nevada State Bar No. 008409
170 S. Green Valley Pkwy., Suite 280
Henderson, Nevada 89012
Attorneys for Plaintiff

COGBURN LAW OFFICES
170 S. Green Valley Pkwy., Suite 280
Henderson, Nevada 89012
(702) 384-3616 FAX: (702) 943-1936

# EXHIBIT 12

**Form Number 1**

INFORMATION ABOUT SEC INVESTIGATIONS

Each year, thousands of investors ask the Securities and Exchange Commission to investigate the activities of other investors, financial professionals, corporations, brokerage firms, investment companies, stock exchanges, and others. These complaints generally suggest some impropriety or misconduct and sometimes make a plea to the SEC for direct assistance in resolving a grievance.

The SEC has the authority to investigate whether violations of the federal securities laws have occurred, and we make every effort to evaluate promptly and thoroughly the information provided by investors. But we cannot investigate every investor complaint. While many investor complaints do lead to full investigations and, if appropriate, to enforcement actions, we cannot guarantee that our review will lead to further investigation or that the SEC will take any legal action.

***We also cannot provide you with updates on the status of your complaint or your request for an investigation. The SEC conducts investigations confidentially for two main reasons. First, we can conduct investigations more effectively if they are not announced publicly. For instance, important documents and evidence can be destroyed quickly if people hear of an investigation. Second, we keep our investigations confidential to protect the reputations of companies and individuals if we find no wrongdoing or decide we cannot bring a successful action against them. The SEC will not confirm or deny the existence of an investigation unless, and until, it becomes a matter of public record as the result of a court action or administrative proceeding.***

When there is proof that someone has violated the securities laws, the sanctions may include financial penalties, orders to surrender profits, cease and desist orders, or an injunction by a court to prevent further violations. The SEC may also bar individuals from working for a securities firm, investment adviser, or investment company. We can also ask a federal court to bar individuals from being officers and directors of publicly held companies. In some situations, we may refer a case to the Department of Justice for possible criminal prosecution.

The SEC publishes news releases about its lawsuits and administrative actions, and the news media often report on them. You can read and download the SEC's ""Enforcement Actions"" on our website at www.sec.gov/divisions/enforce/enforceactions.shtml. Or you can obtain hard copies by contacting us at:

Office of Public Reference
100 F Street, N.E.
Washington, DC 20549-0102
Phone: (202) 551-8090
Fax: (202) 777-1027
E-mail: publicinfo@sec.gov

# EXHIBIT 13

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) | |
| Plaintiff, | ) | Case No. 06 C 4859 |
| v. | ) | Hon. Robert W. Gettleman |
| AA CAPITAL PARTNERS, INC. and JOHN ORECCHIO, | ) | Hearing Date and Time: February 21, 2007 1:30 p.m. |
| Defendants. | ) | |

## MEMORANDUM OF RECEIVER IN SUPPORT OF MOTION FOR AUTHORITY TO CONSENT TO BRUSH MONROE PARTNERS, LP'S SALE OF INTEREST IN XYIENCE

W. Scott Porterfield, Receiver for AA Capital Partners, Inc. ("AA Capital"), submits this memorandum in support of his motion for authority to consent to the sale by Brush Monroe Partners, LP ("Brush Monroe") of a portion of its interest in Xyience Incorporated ("Xyience").

**A. Brush Monroe's sale of its Xyience stock is a prudent investment decision and not prohibited by the Stockholders Agreement.**

1. AA Capital manages three investment funds. Each fund is a limited partnership with investors holding limited partner interests. The present matter concerns the Brush Monroe fund.

2. Brush Monroe was created in the spring of 2006. Brush Monroe's investment activity is limited to an equity and debt investment in Xyience. Xyience is a Las Vegas-based company that markets sport drinks, energy bars and food supplements. Brush Monroe has a

$21 million equity investment in Xyience and a $10 million secured debt investment in Xyience.

3. Upon his appointment, the Receiver commenced an investigation into the Xyience investment. In that investigation, the Receiver found:

(a) The Xyience equity investment of $21 million was not subject to the due diligence process AA Capital normally used when considering an investment. In fact, it appears that AA Capital's former president, John Orecchio, personally handled the investment without the input of AA Capital's senior investment specialists;

(b) At the time Brush Monroe made the $21 million equity investment, Xyience did not have by-laws and, consequently, the rights of Brush Monroe as a stockholder were not defined;

(c) The $10 million debt investment did not have senior secured priority over all other debts, as had been intended. It appears that Mr. Orecchio waived that requirement at or near the closing of the loan and consequently the debt is now junior to the rights of other creditors;

(d) Prior to making the $21 million equity investment, Brush Monroe either conducted no due diligence of Xyience's principal owner and chief executive, Russell Pike, or the results of any due diligence were disregarded. Subsequent background checks by other investment professionals at AA Capital revealed that:

(i) Mr. Pike has been convicted of the financial crime of money laundering (See Exhibit A) and charged with multiple counts of passing bad checks (Exhibit B), and

(ii) Mr. Pike was a debtor in a bankruptcy proceeding (Bankr. D. Nev. Case no. 96-02199) in which a number of creditors, principally Las Vegas casinos and other gaming interests, sought on the basis of fraud to have him denied a discharge of all or some of his debts (See Exhibit C);

(e) Brush Monroe's $10 million note from Xyience was due and payable on September 30, 2006. Xyience did not have the money to repay the note and has not made any interest payments due under the note. Although the note permits Xyience to issue shares of Xyience stock to Brush Monroe in lieu of paying interest in cash, no shares have been issued despite repeated requests by Brush Monroe; and

(f) Xyience's monthly expenses greatly exceed its monthly income. Xyience requires large (multi-million) and continuous infusions of new capital in order

to survive long enough for its brand to take hold and generate the sales needed for profitability.

4. The Receiver submits that no prudent investment fund would make a $21 million equity investment into a company that lacked by-laws. The Receiver submits that any prudent investment fund would have conducted due diligence on the principals of a company being considered for a $21 million equity investment. The Receiver further contends that no prudent investment fund would place client dollars into a company headed by a convicted felon, particularly when the crime was financial in nature.

5. Based on the foregoing and other information available to the Receiver, the Receiver determined that Xyience is not just a distressed investment from a credit and valuation standpoint, but that the investment is part of a larger pattern of fraud, misappropriation of investor funds, fiduciary duty breaches, and other misconduct committed by John Orecchio.

6. The Receiver's objective has been to maximize the realization on Brush Monroe's investment in Xyience. Realization is complicated by the fact that the equity and debt have little inherent value in light of Xyience's present financial condition. For the year ended December 31, 2006, Xyience lost nearly $56 million on sales of about $20 million and had approximately $19 million in accounts payable and $18 million in other debts (excluding amounts owed to Brush Monroe) (See Exhibit D). Rather, the value of Brush Monroe's investment in Xyience lies primarily in the fact that Brush Monroe's debt can be converted into shares equal to 20% of the outstanding shares of Xyience and that such shares, if combined with other shares, would potentially allow a new investor to control Xyience. A new investor

could then use that control to recapitalize Xyience with substantial new money and provide it with the management needed to realize on the value of the company's brand.

7. The Receiver had communications with Xyience management in October and November 2006 regarding whether management could find a party to purchase Brush Monroe's interest in Xyience. Management identified one credible investor, but that party backed away from Xyience when it discovered Mr. Pike's criminal past. Management also repeatedly failed to respond to the Receiver's request for certain documents, including stock certificates evidencing the shares to which Brush Monroe is entitled under its loan agreement with Xyience.

8. Brush Monroe has reached an agreement with Key Management SA ("Key") under which Key will purchase, for $9,000,000 cash, the debt that Brush Monroe holds in Xyience and all but 2,500,000 of the shares of Xyience stock held by Brush Monroe. Brush Monroe has requested that Key agree to pay $9,000,000 for immediate delivery of the debt and delivery of the stock as soon as all legal obstacles have been removed. If Key will accept this modification of the agreement, the Receiver may orally modify his pending motion at the February 21 hearing. In either case, Key is ready, willing, and able to close the transaction.

9. At the Court hearing on February 13, 2007, an attorney claiming to be counsel for Xyience[1] made reference to a Stockholders Agreement that, according to Xyience, may restrict the sale by Brush Monroe of shares it holds in Xyience. A copy of the Stockholders Agreement is attached hereto as Exhibit E. Article 3 of the Stockholders Agreement contains certain restrictions on the transfer of shares. Section 3.1 permits those transfers that are

[1] Under the Stockholders Agreement, the written consent of Brush Monroe is required before Xyience may retain any lawyer. (Ex. E, Article 5.1(w)). Brush Monroe has not consented to Xyience retaining any attorney to appear in this case.

"Exempt Transfers." Section 3.2 allows transfers by a stockholder holding in excess of 10 percent if it offers "tag along" rights to the other stockholders that are party to the Stockholders Agreement.

10. Xyience appears to argue that the proposed sale of shares should not be approved because such a sale is not an "Exempt Transfer" under Section 3.1 and is thus not permitted. This argument appears to be based on the inartful drafting of the definition of "Exempt Transfer" found in Article 9.1 of the Stockholders Agreement. That definition includes in clause (a) a transfer "pursuant to an exercise of tag-along rights as an Other Holder under Section 3.2 ..." but does not include a transfer that triggers the tag-along rights of the Other Holders under Section 3.2. Because the definition of Exempt Transfer does not explicitly include the initial transfer of securities subject to Section 3.2, but does include transfers resulting from the exercise of tag-along rights under Section 3.2, Xyience apparently argues that the initial proposed transfer that gives rise to tag-along rights is itself not an Exempt Transfer and, therefore, is not permitted.

11. Xyience's argument reads Section 3.2 out of the Stockholders Agreement, which clearly permits transfers by stockholders with large holdings so long as the tag-along provisions are enforced. It makes no sense to find that the Stockholders Agreement permits transfers occasioned by an exercise of rights under Section 3.2 while not permitting the transfers that triggered such rights in the first place. Section 9.7 of the Stockholders Agreement addresses how to resolve such an ambiguity: "Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law." This provision adopts the maxim of contractual interpretation that contracts