# EXHIBIT
# 50
# PART A

Form Number 1

ANSW
Rich Bergeron
147 OLD COUNTY ROAD
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

FILED

2008 FEB 19 P 3:36

CLERK OF THE COURT

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

XYIENCE, INC., A Nevada Corporation, CASE NO.: A544781

Plaintiff, DEPT. No.: XVI

v.

Rich Bergeron, An Individual,

Defendant.

Rich Bergeron, An Individual

Counter-Claimant,

v.

Xyience, Inc., a Nevada Corporation

Fertitta Enterprises, a Nevada Corporation

Counter-Defendants.

# ANSWER TO COMPLAINT AND COUNTERCLAIM FOR DECLAMATORY RELIEF

Defendant and Counter-Claimant Rich Bergeron hereby answers the complaint of Plaintiff Xyience, Inc. and requests the attachment of Fertitta Enterprises as counter-defendants, on personal



STAD 2/14/08

RECEIVED
FEB 19 2008
CLERK OF THE COURT

CEM8

knowledge as to its own activities and on information and belief as to the activities of others, as follows:

## RESPONSE TO SPECIFIC ALLEGATIONS

1. The defendant concurs with the plaintiff's contention as to the parties in that the plaintiff is a corporation and the defendant is an individual.

2. Defendant denies the allegations within paragraphs 4 through 36 of the initial complaint and has already provided evidence regarding why these claims are both false and deserving of sanctions being levied on Attorney Jamie Cogburn, Former Xyience Board Member Adam Frank, and the plaintiff corporation.

3. Defendant agrees with the identical paragraphs 37 and 45 of the initial complaint.

4. Defendant denies the allegations contained within paragraphs 38 through 44 and paragraphs 46 through 48 and has already provided evidence regarding why these claims are both false and deserving of sanctions being levied on Attorney Jamie Cogburn, Former Xyience Board Member and Co-CEO Adam Frank, and the plaintiff corporation.

5. Defendant denies allegations of any wrongdoing on his part for any claim against him in any subsequent pleadings filed by the plaintiff. Under the First Amendment to the U.S. Constitution he is protected as a member of the press and has the right to publish the truth about the plaintiff's and counter-defendants' fraudulent activities.

## JURISDICTION AND VENUE

6. By appearing at the February 7th hearing on Plaintiff's various motions, Defendant submits to the jurisdiction of Nevada by default, but there is also sufficient evidence to show that this litigation may be subject to future removal to federal court under 28 U.S.C. § 1441, § 1343 and also to seek a counter claim under § 1367.

## AFFIRMATIVE DEFENSES

1. Each and every separate claim for relief alleged by plaintiff and counter-defendant Xyience, Inc. fails to state sufficient facts to constitute a cause of action against Defendant and fails to state a claim upon which relief may be granted.

2. Plaintiff is estopped from asserting its claims against Defendant.

**Form Number 1**

3. Plaintiff's claims are barred by the doctrine of waiver.

3. Plaintiff's claims are barred by the statute of frauds.

4. Plaintiff's claims are barred by Plaintiff's failure to mitigate its damages, if any.

5. Plaintiff's claims are barred by the lack of consideration.

6. All injuries and damages, if any, allegedly suffered by Plaintiff are a result of Plaintiff's own acts or omissions.

7. WHEREFORE, Defendant, Rich Bergeron, demands judgment dismissing all counts of Plaintiff's Complaint, together with attorneys' fees, Rule 11 sanctions, costs of suit and such other and further relief that the Court deems just and equitable.

**COUNTERCLAIMS**

As and for its Counterclaims against Xyience, Inc. and Fertitta Enterprises Rich Bergeron hereby alleges as follows:

1. Counter-claimant Bergeron is an individual and the operator of a sole-proprietor owned Web-site called Fight News Unlimited with a URL of www.unlimitedfightnews.com. The principal place of cross-plaintiff Bergeron's business is at his home at 147 Old County Road in East Sandwich, MA, 02537.

2. Counter-defendants Xyience, Inc. and Fertitta Enterprises are both Nevada corporations and are authorized to do business in the State of Nevada. Fertitta Enterprises' principal place of business is at 2960 W SAHARA AVE., Las Vegas, NV 89102 with a mailing address of P. O. Box 27555, Las Vegas, NV, 89126-1555. Xyience's principal place of business is at 4572 W Hacienda Ave., Las Vegas, NV, 89118.

3. The true names and capacities, whether individual, corporate, associate, or otherwise, of fellow Counter-Plaintiffs, including hundreds of defrauded investors and a group of Xyience-sponsored fighters with unfulfilled contracts, are not fully known to Counter-Plaintiff Bergeron. Said potential Counter-Plaintiffs are due damages and/or sanctions resulting from Counter-Defendants' fraudulent activity. Counter-Plaintiff Bergeron sues on behalf of said Counter-Plaintiffs and will

compile a list of these names upon sufficient discovery. Counter-Plaintiff will ask leave to amend this complaint to show the true names and capacities of each Counter-Plaintiff at such time as the same has been ascertained.

## JURISDICTION AND VENUE

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1367(a) as these Counterclaims are so related to the claims contained in Plaintiff Xyience's Complaint that they form part of the same case or controversy under Article III of the United States Constitution and are compulsory Counterclaims under Fed. R. Civ. P. 13(a).
5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) and (c) as both Counter-defendants reside in this district and are subject to personal jurisdiction in this district.
6. Defendant reserves the right to file a motion to remove to federal court due to federal question concerns regarding the violation of Bergeron's First Amendment rights.

## FACTS

7. Lorenzo and Frank Fertitta III, are members of the family that founded Station Casinos and own Fertitta Enterprises. They also are 90 percent owners of Zuffa, LLC, which is the parent company of the Ultimate Fighting Championship (hereinafter UFC).
8. Fertitta Enterprises is a creditor of Xyience with at least $12.5 million in unsecured claims and $5.3 million in secured claims along with sustained additional capital for bankruptcy purposes.
9. Xyience paid $15 million in sponsorship to the UFC for 2007 according to published reports.
10. Xyience has signed a contract to pay $9 million in sponsorship to the UFC for 2008.
11. Xyience COO and President Omer Sattar reported recently that the company has obtained post-bankruptcy financing enabling it to pay for a backlog of drinks being kept by the drink maker, Cott Corp. The financing will enable Xyience to avoid losing shelf space to competitors, which would be difficult to regain, he said.
12. The Fertitta Family has made regular and substantial contributions to local, state and national candidates for public office, which is a matter of public record (see exhibit attached). For example, a grand total of $65,000 went out to Las Vegas Sherriff Candidate Doug Gillespie in August of 2006 that all traced back to Fertitta Family members or Fertitta Family business interests (See Exhibit Attached).
13. Lorenzo and Frank Fertitta oversee a vast financial empire, which often puts them in extremely influential and public positions of authority and advisory roles within multiple illustrious financial

institutions in Las Vegas. The same family is also entrenched in various massive real estate developments, which are often featured in Las Vegas news publications. In fact, some of their real estáte developments, such as Aliante Station, are in partnership with the Greenspun Corporation, which owns the Las Vegas Sun and has a cooperative agreement with the Las Vegas Review Journal. Frank and Lorenzo Fertitta are public figures, and Xyience, Inc. is a private business entity attaching itself with a significant topic of public interest: the sport of Mixed Martial Arts (hereinafter MMA). Xyience has done this through sponsorship of the UFC and various MMA fighters.

14. S&P began covering Zuffa in the fall of 2007 in anticipation of the company securing a $350 million senior secured credit facility. That number represents a term loan for $325 million due in 2015 and a $25 million revolving credit facility (a so-called "revolver") due in 2012. As of June 30, 2007, Zuffa's total debt outstanding was $325 million. The loans are secured by bank-issued securities as opposed to the company's assets. In fact, Zuffa has very little in the way of tangible assets. S&P expects meaningful recovery (50-70%) of the principal in the event of default, placing the estimated resale value of Zuffa's assets, namely its brands, contracts, and cash, assuming a forced liquidation, at roughly $150-240 million.

15. S&P initially assigned Zuffa a credit rating of BB on May 21, 2007. A BB rating reflects a company that is less vulnerable in the near term than other lower-rated obligors. Yet the rating also indicates that Zuffa faces ongoing uncertainties and exposure to adverse business, financial, or economic conditions that could lead to its inadequate capacity to meet its financial commitments. Bonds rated BB and below are considered junk bonds due to the risk of failure associated with the companies that issue them.

16. On Sept. 14, 2007, S&P concluded that Zuffa's credit outlook is negative: "Failure to improve the company's currently depressed margins through more stringent cost controls and continued top line growth or a shift to a more aggressive financial policy over the intermediate term could lead to a downgrade. Conversely, if the company can restore its previously strong credit metrics through cash flow growth and debt repayment, the outlook could be revised to stable."

17. The issue-level rating on Zuffa's $350 million senior secured credit facilities was lowered to BB- from BB, S&P reported in November of 2007 (see attached exhibit), noting that the recovery rating on this debt remains at 3. The agency said that the downgrade follows the second consecutive quarter of operating performance that was meaningfully below its expectations, adding that the BB-

rating reflects Zuffa's revenue and cash flow volatility given its primarily event-driven business model, vulnerability to changing consumer tastes and relatively short operating history.

18. Xyience has filed for voluntary bankruptcy under Fertitta Enterprises ownership through Zyen, LLC, which they specifically and surreptitiously used for the purposes of foreclosure. (see attached Exhibit) Meanwhile there is a group of collective shutout investors who have filed an involuntary bankruptcy petition. Fertitta Enterprises is now exploring sale opportunities for Xyience, which they have been given a 75-day window to entertain offers for.

19. The plaintiff filed their case with the primary evidence on the docket being: one email and disclaimer Defendant and Counter-Plaintiff Bergeron published on a now non-existent on-line social profile page; one perjurious affidavit (evidence to be entered into the record at hearing) signed by Co-CEO Adam Frank, who was at the time the General Manager of Xyience; and one of Bergeron's own on-line publications in what he dubbed as "The Xyience Series."

20. The initial claim filed against Bergeron by Xyience, Incorporated featured a contention and supporting affidavit that affirmed the existence of an investor who was said to be willing to invest $15 million in Xyience if Bergeron's stories were removed from the Internet. The initial Xyience financing provided by Fertitta Enterprises exceeded that estimate and only came to pass very shortly after the injunction in this case against Bergeron was signed by Judge Williams.

21. There was no significant push to find further funding for Xyience after the company signed their sponsorship extension with the UFC, though public reports of Xyience's voluntary bankruptcy filing featured Omer Sattar claiming $7.5 million in additional funding was needed to keep the company alive and running smoothly. Xyience lost $56 million in 2006 according to financial reports acquired by Bergeron (see attached exhibit). Most of it was wrapped up in marketing costs. Late 2007 saw Xyience spend virtually an entire financing package—purported to numerous shareholders, employees, and officials to be a preventive measure to avoid bankruptcy—strictly on marketing expenses. They willfully and intentionally refused to fund the brand's expansion they allowed Adam Frank to publicly state as the company's plan for the new financing. They purposely flooded the company with marketing funds without bothering to account for distribution or production of goods.

22. Bergeron is actually enjoined from writing future stories claiming Xyience is under investigation by the SEC despite having actually filed his own formal complaint to the SEC about what his own investigation has revealed. The SEC informed Bergeron officially they would be looking into Bergeron's evidence and needed to keep information regarding their possible activity quiet to facilitate their investigation. Bergeron still maintains regular contact and provides direct

**Form Number 1**

information to the IRS, FBI, and SEC regarding Xyience, Zuffa, and Fertitta Enterprises. Bergeron already provided actionable information which led to an IRS summons issued for Xyience investors and/or associates Russell Pike, William Pike, Jennifer Pike, and Michael Clark.

23. Bergeron has thus far engaged in exhaustive research and intense investigation to the point where he can now be considered to be an expert on the subject of Xyience.

24. Bergeron has already been presented with two settlement offers from Xyience in a case in which he is the one being sued.

25. Bergeron's investigations have relied upon the testimony of multiple insiders who provided direct evidence of fraud, some of which he cannot name due to death threats and their fear of reprisals.

## FIRST COUNTERCLAIM
(DEFAMATION)

26. Counter-plaintiff Bergeron repeats the allegations set forth in Paragraphs 1 through 19 as though fully set forth herein.

27. On or about July 18th, 2007 Xyience, Inc. filed suit against Rich Bergeron for Defamation, Tortuous Interference With Prospective Economic Advantage, and Intentional Interference With Contract.

28. As a journalist Bergeron is bound by the principles and tenets of the profession as well as standards of accuracy he has learned through working for various print publications since graduating from Norwich University with a Bachelor's Degree in English in 1999. Bergeron is also not, and never has been, in business with any competitor of Xyience. There was never any motive on his part or pattern of behavior that would lead to him abusing the expectations of his duties as an investigative journalist.

29. At all times Bergeron reported quotes accurately, only published verifiable information, and never published facts he could not corroborate through at least two credible inside sources.

30. There was never any factual basis for Xyience to claim Bergeron engaged in any defamation, and by labeling him with this lawsuit as a renegade journalist with a vendetta they in turn defamed Bergeron.

31. Bergeron has been slandered and defamed in bogus blogs produced about him and connected directly to Xyience employees and/or associates through IP addresses. These blogs have included the false suggestions that Bergeron is a homosexual, Bergeron was removed from a teaching

position due to a situation with a minor, and Bergeron had a personal vendetta against Xyience.

32. A Xyience representative used this Court's own preliminary injunction to misrepresent to at least one Xyience shareholder that the Court sentenced Bergeron to a 30-day suspended jail term and fined him $1,000. The same representative also told the same shareholder that Bergeron was a former Xyience employee, which is also false. This representative also admitted he was seeking loans for Xyience Consultant Russell Pike at 10 percent interest.

**SECOND COUNTERCLAIM**
(VIOLATION OF FIRST AMENDMENT RIGHTS)

33. Counter-Plaintiff realleges and reincorporates by reference each and every prior allegation contained above.

34. Counter-Defendants Xyience, Inc. and Fertitta Enterprises engaged in a quid-pro-quo agreement described in the initial complaint that sought a prior restraint to enjoin Bergeron from reporting the truth about the fraudulent activities of both companies. In exchange for Xyience obtaining a preliminary injunction against Bergeron, Fertitta Enterprises promised to provide $15 million in capital to Xyience.

35. Just one day after a preliminary injunction became official in this case on September 13, 2007, a funding consent letter went out to shareholders seeking ratification of a $12 million loan agreement between Fertitta Enterprises and Xyience.

36. Xyience Attorney Jamie Cogburn and Former Xyience Co-CEO Adam Frank assisted in manufacturing and misrepresenting evidence in order to bolster their attempt to secure the preliminary injunction against Bergeron.

37. Bergeron was enjoined from reporting the truth due in part to Cogburn misrepresenting the tenets of the First Amendment as it relates to prior restraints. Cogburn admitted to Bergeron in a recorded telephone call that he is well aware of the First Amendment's protections, as he usually defends clients on Bergeron's side of this issue.

38. By continuing to prosecute this case even after new Xyience leadership was installed under Counter-Defendant Fertitta Enterprises financing, both Counter-Defendants became complicit in supporting and sustaining a direct violation of Bergeron's First Amendment rights. Both Counter-Defendants further sanctioned the case by hiring a new legal representative to push the case forward.

39. In addition to procuring the preliminary injunction in an unethical and unconstitutional manner, Attorney Cogburn also sought to remove stories posted on Bergeron's Web-site (unlimitedfightnews.com) from the Google search engine. Cogburn's successful request for a

**Form Number 1**

modified preliminary injunction against Bergeron was based entirely upon false, manufactured, and misrepresented evidence as well as a wholly fabricated case designed to further the collusion of the Counter-Defendants in clear fraud.

40. Attorney Cogburn also sanctioned the perjury of Former Xyience Co-CEO Adam Frank in an affidavit attached to this case to support the preliminary injunction request.

41. Attorney Cogburn made the entirely false claim in his pleadings that Bergeron made up quotes by Attorney David Winterton. This is entirely false, and evidence has already been presented to prove it was a Xyience official who improperly represented Winterton's words.

42. Attorney Cogburn also made the false claim that Bergeron met the standard of "actual malice" in regards to Bergeron's stories without providing adequate proof through discovery as required to demonstrate the motivations of the defendant and cross-plaintiff in writing his reports on Xyience.

43. Counter-Defendants Xyience, Inc. and Fertitta Enterprises willfully and knowingly colluded to invent, file, and sustain a frivolous case against Bergeron with specific intent to suppress the truth, silence Bergeron, and conceal the unjust enrichment of the principal owners of these corporations. The Counter-Defendants used the preliminary injunction secured through this case to willfully and knowingly support loan fraud and falsely represent to shareholders that they were saving the company from bankruptcy. Hundreds of shareholders, a group of UFC fighters, Counter-Plaintiff Rich Bergeron, and this Court were all victimized as a result.

## THIRD COUNTERCLAIM

## (TORTUOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

44. Counter-Plaintiff realleges and reincorporates by reference each and every prior allegation contained above.

45. Through the direct actions of the Counter-Defendants in this case the Counter-Plaintiff Bergeron has been forced to represent himself in this matter. The horrendous and egregious damage the distraction of this case has caused Bergeron to endure is impossible to quantify. He has lost untold streams of income due to having to rigorously defend the spurious charges against him, restore his good name through fighting litigation that should have never been filed, and having to forego work on countless other more meaningful and profitable projects.

46. Bergeron has been teamed with a forensic pathologist to write a book on a subject of the HBO Documentary Plastic Disasters. He had to cut work on that project short because of this case. The

subject, Lucille Iacovelli, is experiencing incredible mental and physical agony, suffering that could be alleviated if this book project is completed promptly and her case gets due and adequate attention. However, any ruling against Bergeron in this case could impair his ability to get this book published and leave him subject to a monetary judgment that would cripple his ability to earn any income to sustain this project.

47. Bergeron secured an opportunity to write a feature article for St. Anthony Messenger, a Catholic magazine, in the summer of 2007. The article profiled the work of Catholic missionaries in poverty-stricken Haiti. Since that project was completed and accepted for publication Bergeron has not had any sufficient time to solicit work from other magazines due to the intense strain this case has put on him.

48. Bergeron's Web-site is his only substantial income at the moment, and due to the overwhelming time he has had to spend learning how to effectively litigate for himself he has had to abandon work to increase traffic to the site, recruit sponsors, compile and post important stories and compelling interviews, and handle other business responsibilities that could lead to more streams of income.

49. Counter-Plaintiff Bergeron has spent well over 500 hours on his own defense and has had no time to pursue opportunities to seek and complete freelance work as a photographer and Web-designer.

50. Bergeron has been forced to rely on the support of his cousin, who received an inheritance from a deceased relative that is almost completely spent. He has become indebted to his cousin and owes him payments for rent and other living expenses totaling close to $10,000 because he has been unable to find suitable work while also effectively defending himself in this case.

51. Bergeron has recently been barely able to afford hosting fees for his Web-site and had to forego e-filing motions because of a lack of income. He now has to regularly spend all his petty cash on postage for crucial court documents.

**FOURTH COUNTERCLAIM**

(PAIN AND SUFFERING)

52. Counter-Plaintiff realleges and reincorporates by reference each and every prior allegation contained above.

53. Counter-Plaintiff Bergeron is a graduate of the Corps of Cadets at Norwich University and attended two other military colleges, and all had honor codes through which any violation could lead to dismissal. He is also a product of Catholic school who believes strongly in the Ten Commandments. As a highly principled and moral individual it is a great affront to him to be

Form Number 1

accused of acting in any kind of dishonest manner. This case has not only falsely accused him of actions that are not supported by his character, it has also resulted in worldwide exposure of the Counter-Defendants' spurious and frivolous charges against him. As a result Bergeron has suffered endless stress and anxiety.

54. The very nature of this case has resulted in extreme levels of stress due to the fact that Bergeron had always intended to help the shareholders in Xyience rid the company of the fraud tearing it apart from within. The victims of this entire situation are looking to Bergeron to save their investment and report the facts to promote justice at the same time Bergeron must find a way to adequately absolve himself of the egregiously frivolous charges designed to keep him quiet.

55. Bergeron has lost untold amounts of sleep, worked incredibly trying and frustrating hours, and battled substantial bouts of depression due to these proceedings being allowed to continue against him for so long. Knowing at all times he published the truth and continues to do so, each day this case goes on is torture for Bergeron. Despite the lack of merits of the plaintiff's arguments, and because of the complete weight of the evidence not being accounted for, this case has dragged on incessantly. The agonizing difficulty of the rigid process he must follow to defend himself and the failure of the Court to recognize his good intentions has substantially injured Bergeron's psyche.

56. Because of his inability to earn substantial income and being forced to rely on his own cousin for help, Bergeron has experienced extreme mental anguish.

57. Bergeron has spent countless hours trying to enlist help from pro-bono lawyers and public advocacy groups designed to assist those with First Amendment defenses. However, despite sending out voluminous paperwork, mass emails, and making numerous phone calls he has only thus far been able to secure a promise from one agency to help him, and only then if he should ever need to appeal the case. He has at all times been forced to accept the fact that only he could inspire a positive outcome on his own behalf. The only advice he has received has been strictly procedural. This has caused him to feel tremendous disappointment and to lose faith in the entire system of justice that is supposed to be designed to protect the victims in situations like this.

58. By setting this whole process in motion, the Counter-Defendants effectively scapegoated Bergeron and used this case as an accessory to commit fraud. Bergeron has provided actionable information to federal agencies who have since launched formal investigations he has been informed of but asked to keep quiet out of respect for the investigators' need to conduct covert operations to obtain

evidence. The idea that he is actively assisting federal investigations into fraud, tax evasion, and possible criminal conspiracies while at the same time being charged with defamation is of such mind-boggling proportions that Bergeron has literally had to suppress his own defense tactics to promote justice. Continuous emotional angst results from this situation, leaving Bergeron unbelievably frustrated.

59. Cross-Defendant Xyience has engaged in strong-arm tactics up to and including death threats against witnesses Bergeron has spoken with. Bergeron has had to keep the names of his deepest entrenched sources a secret as a result. Further, Counter-Defendants Fertitta Enterprises may be connected to organized crime through family ties that include at least one member of past generations of Fertittas being wrapped up in official criminal investigations dating back to the initial stages of the Fertitta casino empire. The possibility that current ties may still exist in some capacity puts Bergeron in a position where he fears for his own life.

60. Cross-Defendants have directly inspired this litigation in such a manner as to attempt to destroy Bergeron's credibility in order to falsely promote their own. A writer by nature is judged for the most part on the credibility of the information he presents through his work. Bergeron has been actively writing creative works in some capacity or another since he was just five years old. To be put in a position where his credibility is constantly being questioned when he has never engaged in any false reporting in his entire life is devastating to him.

61. Bergeron realizes this litigation could take years to finally come to a satisfying close that will absolve him of the spurious and frivolous charges against him. The knowledge that he might have to waste years of his life to prove his innocence is crippling and debilitating to the point where he has been unable to focus on much else other than this case alone.

WHEREFORE: The Counter-Plaintiff Bergeron respectfully requests judgment as follows:

1. For punitive damages in favor of the counter-plaintiff and against the counter-defendants in a sum of $10,000,000.00, plus interest therein.
2. For interest at the legal rate.
3. For attorney fees as special damages in a sum to be determined at trial
4. For at least $5,000,000 in sanctions against Counter-Defendants for filing a frivolous suit with those financial sanctions accruing to defrauded Xyience-sponsored fighters with unfulfilled contracts and all Xyience investors locked out of their company interests by any of the actions occurring after the preliminary injunction took effect against Bergeron.
5. For such and further relief as the court may deem just and proper in the premises.

Dated: February 18, 2008

Respectfully Submitted By:

RICH BERGERON
147 Old County Road
East Sandwich, MA 02537
617-209-4325
SERVING AS ATTORNEY
PRO-SE

# POINTS AND AUTHORITIES

## I. INTRODUCTION AND FACTUAL SUMMARY:

The plaintiff Xyience in this case before the court is a public entity and figure as well as a private corporation. The current direct, albeit de-facto, owners of Counter-Defendant Xyience are Counter-Defendant Fertitta Enterprises. Minority Owners and Operators of Station Casinos, Fertitta Enterprises is a very influential and popular business entity in Las Vegas.

The subject of these proceedings is a major public issue. Though it is true that Xyience has never been a publicly traded corporation, the current ownership of the company includes a business entity owned by the Fertitta Family, i.e. Fertitta Enterprises (see exhibit 23). This wealthy, influential clan includes casino magnates and Principal (90%) Ultimate Fighting Championship Owners (through Zuffa, LLC) Lorenzo Fertitta and Frank Fertitta III.

Furthermore, Fertitta Enterprises bought back into their own business through Xyience, a company they loaned money to and then instantly foreclosed on (through Fertitta Enterprises Subsidiary Zyen, LLC) when just a one loan payment would have kept the company solvent.

Counter-Defendant Fertitta Enterprises orchestrated a scheme to snatch Xyience, Inc. away from over 340 investors almost immediately after they used it to make a sponsorship deal. That payment package went right back to another entity they owned (Zuffa, LLC) for an estimated total of $6.5 million in past due sponsorship fees and a $9 million premium on sponsorship for the 2008 UFC season. The three year extension is worth $32.14 million total.

Fertitta Enterprises waxed the wheels of a $350 million financing deal for Zuffa, LLC partly through representing the Xyience sponsorship and their own company's strength in a false light to their major broker house creditors.

The companies involved in this intricate scheme are clearly a conglomerate of closely connected entities all participating in a plan to defraud investors and unjustly enrich the principal owners. All told, the businesses involved in this orchestrated fraud directly connecting to both Fertitta Enterprises and Xyience Incorporated are known as: Bevanda Magica, Zuffa LLC, and Zyen, LLC. All of these businesses are hence topics of public interest, and the Fertitta Family themselves are clearly considered public figures.

Presidential Candidate John McCain has publicly decried the sport of Mixed Martial Arts as "human cockfighting," and while it may be legal and accepted in Nevada, multiple states still hold the view that the sport is too violent and dangerous to take place at all within their borders. This reality

**Form Number 1**

creates a situation in which anyone in any position to influence this sport is in turn involved in a major controversial and purely public issue.

Public officials and public figures are subject to public scrutiny and "[c]riticism of their official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes their official reputation." New York Times Co. v. Sullivan, 376 U.S. 254 (1964), Id. at 272-73.

Plaintiff's initial counsel Jamie Cogburn misrepresented the evidence, the stipulated protections of the First Amendment he was admittedly well aware of, and the plaintiff and cross-defendant Xyience's status as a public figure in his initial complaint and subsequent amended complaints. Defendant and cross-plaintiff Bergeron has already presented multiple examples of Cogburn's complicity in manufacturing and presenting this entire case in a frivolous and unethical manner worthy of heavy sanctions being imposed upon him and his client for encouraging him.

The plaintiff and both cross-defendants continue to press this frivolous case despite having absolutely no compelling evidence to support it. Xyience proceeded with Cogburn's faulty and fraudulent case under direct ownership of Fertitta Enterprises with specific intent to shield themselves and Fertitta Enterprises from Bergeron's reporting of their ongoing fraud. The multiple victims being defrauded here will be afforded true justice only when this entire operation is criminally exposed and revealed to the general public after a full federal investigation of the situation is complete.

Cross-defendant Fertitta Enterprises took on a concocted case of Xyience's after their own installed Co-CEOs Adam Frank and Kirk Sanford paid Bergeron $500 for travel, paid for luxury coach service to and from Logan Airport in Boston, Massachusetts, paid for round trip plane tickets to New York City, Purchased Bergeron a complimentary hotel room, and allowed him to utilize two company owned Ultimate Fighting Championship tickets for UFC 78: Validation (see exhibit).

Now-former Xyience Co-CEOs Kirk Sanford and Adam Frank also provided the defendant in this case with $100 each in cash at the termination of their first group meeting at a restaurant located within New York City's W Hotel in Times Square. Standard General Employee Robert Lavan attended (see exhibit) and witnessed this meeting where the money changed hands and Adam Frank asked Bergeron what it was like to know his case would soon be over. Kirk and Sanford had previously promised Bergeron $5,000 and also re-iterated that the amount would be their highest settlement bid after Bergeron returned from his Xyience sponsored trip to New York City.

Sanford and Frank were operating as appointed officers of a company that at the time was being driven entirely by Fertitta Enterprises financing. Both men discussed numerous possibilities as to how to proceed with Xyience, Incorporated as a business with Bergeron and Lavan. Lavan spoke at length giving several suggestions to the Xyience CEOs as to how to accomplish a mass buyout of shareholder interests to proceed. Lavan also outlined the detailed pros and cons of a full out bankruptcy and spoke to Frank and Sanford about different ways to find working capital. Both Sanford and Frank re-iterated numerous times that they felt they had no choice but to bankrupt the company (Xyience) throughout the entire meeting. Sanford specifically used the term "scorched earth" to describe their strategy. That four-party conversation unfolded in a public place in Times Square, NYC on the afternoon before UFC 78 took place (November 17, 2007). Both Sanford and Frank also asked for Bergeron's help in filing a civil RICO Act case against Russell Pike at that same meeting.

Sanford came to Xyience directly after leaving Global Cash Access (hereinafter GCA) under suspicion of illegal insider trading. Sanford cashed out 118,969 shares in GCA at a $10 average price on 11/01/07. The stock subsequently dropped below $4 a share in mid-November. Adam Frank joined the Board of Directors at Xyience while a Las Vegas W Hotel development project he was involved in was the subject of a serious civil breach of contract case against him. Both men were suspected of previously fraudulent behavior. A contingent of influential GCA employees also came over as employees or invested into Xyience soon after Sanford left GCA.

Karim Maskatiya, a gentleman reported to be on the federal government's terrorist watch list, is still in position at GCA. Maskatiya (also suspected of running a skimming operation out of GCA's Maccau office), Kathryn Lever, and Maskatiya's nephew Omer Sattar were all given company positions and/or significant stock options in Xyience. As part of the restructuring and Fertitta Loan package Fertitta Enterprises secured millions of penny warrants while all traces of the old Xyience leadership were slowly pushed out of any position of significant influence in the direction of the company. Much of this evidence will be ascertained through discovery, but a substantial amount has been provided already through testimony Bergeron has heard from witnesses previous to this filing.

A February of 2006 report reveals GCA and Station Casinos (a Fertitta funded company) signed a multi-year agreement in which GCA promised to continue to provide its products and services at 13 of Station Casinos' gaming establishments. The agreement also announced GCA would begin servicing Red Rock Casino Resort Spa, one of Station Casinos' newest casinos, upon that casino's opening in the spring of 2006 (see attached exhibit).

Fertitta Enterprises clearly utilized the loyalty of the GCA contingent to perpetrate a scheme in which they made every attempt to distance themselves from being recognized as the true de-facto

creditors of Xyience. There was no public admission of their status as creditors until long after that fact was officially published by defendant and cross-plaintiff Bergeron. Bergeron acquired this information through the interception of an internal company email already entered into evidence in this case as Exhibit 23.

Fertitta Enterprises representatives have yet to personally make any public or published comments about their true involvement in Xyience. At all times they have left public relations responsibilities to Xyience President Omer Sattar, or Co-CEOs Adam Frank and Kirk Sanford.

Fertitta Enterprises General Manager William Bullard also surreptitiously placed the financing of Xyience under an entity called Zyen, LLC: a subsidiary of Fertitta Enterprises. Zyen soon after foreclosed on Xyience under that name rather than the Fertitta Enterprises name. Voluntary Bankruptcy papers filed on behalf of Xyience in January of 2008 indicated another Zyen, LLC subsidiary Bevanda Magica also had significant stock holdings in Xyience.

The unnamed "one investor" the initial filing in this case alluded to as wanting to invest $15 million simply had to be Fertitta Enterprises. The pattern of behavior exhibited so soon after the injunction by that company matches up perfectly with their not wishing to be named in the initial claim and directly corresponds with the characterization of their intended promise of capital upon certain conditions being met by this case. The funding consent letter (see exhibit) sent out to shareholders for ratification of the Fertitta deal is dated only one day after the injunction became official.

Fertitta Enterprises willfully and knowingly allowed and are still allowing this fraudulent case to continue while in a position of funding the company. They not only kept pressing the case even after promising to end it in the presence of a witness, they also oversaw the hiring of a second lawyer in the matter after Attorney Jamie Cogburn stopped receiving payment from Xyience. (see exhibit)

Fertitta Enterprises officially installed characters known to have questionable financial dealings behind them at the highest positions of authority at Xyience while also trying to appear as distant from Xyience as possible. They simply used Xyience as a conduit to invest back into another company they owned after promising shareholders not connected to the Fertitta financing deal that the Fertitta loan would help provide for sustaining the Xyience brand (see exhibit).

Officers hired by the Fertittas also threatened to foreclose on previous financing Fertitta Enterprises provided to Xyience if investors chose not to ratify their infusion of $12 million in further capital. The agreement reached in October of 2007 between Xyience and Fertitta Enterprises was

framed specifically as a solu[illegible]n to avoid bankruptcy. A chain of ema[illegible]was forwarded to numerous Xyience employees, officers, and investors to inspire the confirming and ratification of that Fertitta Enterprises agreement. Investors had two choices essentially: allow the company to go bankrupt or do the Fertitta deal as soon as it could be drawn up. (see exhibit 23)

The chain of emails was the first instance in which Fertitta Enterprises participated in and facilitated clear, undeniable fraud on the over 340 original investors in Xyience by making a promise they had set out to break. Bergeron will prove through discovery that Fertitta Enterprises General Manager Bill Bullard purposely prevented the first payment expected on the Fertitta Enterprises loan.

Upon finalization of their capital infusion, Fertitta Enterprises-funded Xyience made an almost immediate sponsorship deal between Xyience and the Ultimate Fighting Championsip: of which Frank and Lorenzo Fertitta have a 90 percent ownership interest in through Zuffa, LLC.

Fertitta Enterprises (soon after the sponsorship agreement had been signed and partially funded) allowed UFC President and 10 percent Zuffa, LLC Owner Dana White to publicly announce his praise for that deal and make substantial misrepresentations of Xyience's financial state. The primary UFC owners were in a direct position to know White's accounting of both companies in his public statements was false, and they knowingly allowed White to lie to the press on the record.

Adam Frank also publicly proclaimed that funding from a "private group of investors" would be used to fuel the "worldwide expansion" of the Xyience brand. Instead, that funding was used almost exclusively for marketing costs. (see exhibit)

The differences between what Zuffa, LLC; Xyience, Inc.; and Fertitta Enterprises openly promised in intentionally misleading public statements and what actually unfolded is startling to say the least. Xyience's own analytics firm intimated that the company's sales figures did not come close to matching up with the company's public claims of massive, fast-paced growth at that time. And unless "worldwide expansion" can be directly translated to mean "huge sponsorship deal" all the above named players are responsible for colluding with each other to defraud investors in Xyience, the general public, the press, and some of the most famous fighters Zuffa, LLC employed and Xyience sponsored.

These early problems already surfacing at the outset of the deal should be considered even more egregious in the face of Xyience's January filing of a voluntary bankruptcy notice. They went forward with the filing shortly after a group of Xyience investors (who were foreclosed on by Fertitta subsidiary Zyen, LLC) filed their own involuntary bankruptcy petition on behalf of the other Xyience creditors.

Making matters even more blatantly fraudulent, Xyience recently received new Fertitta

Enterprises funding to explore a sale of the company they have been given a 75-day window to pursue. This entire chain of events stemmed directly from substantial misrepresentations of fact printed and transmitted over the Internet to numerous Xyience employees. The resulting re-structuring of the Xyience hierarchy and subsequent failure to position any of the Fertitta capital infusion into a long-term strategy to fund the operation and distribution of Xyience products was deliberately done with intent to defraud major banking institutions that guaranteed the Zuffa, LLC $350 million loan package. The bankruptcy in turn allows Xyience and Fertitta Enterprises to defraud hundreds more investors who put Xyience on the map in the first place. Some have invested their life savings and their entire family trusts into this company that the Fertittas are acting fast to get rid of in 75 days.

The Fertitta buy-in to Xyience was orchestrated wholly to improperly enrich the owners of Zuffa, LLC with huge multi-million dollar dividend payments from their $350 million credit package from multiple lending institutions and brokerage houses. The covenants of that package partly depended upon healthy sponsorship income from viable and sustainable companies, which Bergeron will provide concrete evidence of through discovery and has already been informed of by high level sources at Xyience.

Frank and Sanford both told Defendant Bergeron in a recorded conversation that Xyience was insolvent when they came on board to run it under Fertitta Enterprises. Clearly they were able to inform Fertitta Enterprises representatives of that predicament. There is no reason they would not be required to let the company's financiers know about the company's status and need for properly directed capital infusions and production costs to promote further sales of the brand.

There is no logical excuse for Frank and Sanford to funnel such a substantial amount of capital toward sponsorship fees unless they intended all along to purposely ignore production and distribution costs that would serve to sustain the business. They would have done so with the explicit approval of Fertitta Enterprises as well as with funding provided by the cross-defendant Fertitta Enterprises. While Frank and Sanford mismanaged the company's money on behalf of Fertitta Enterprises, numerous employees were laid off and production was halted.

Zuffa, LLC, under 90% control of Frank and Lorenzo Fertitta, falsely characterized the Xyience sponsorship by not disclosing to their creditors that the extension of the Xyience sponsorship was fed by money coming out of one of their own business' bank accounts to go right into another. That fraud was passed on to other parties due to the investment offerings in the Zuffa, LLC bond held

by brokerage houses.

Essentially Dana White, Lorenzo and Frank Fertitta III, Adam Frank, Kirk Sanford, Karim Maskatiya, Kathryn Lever, and Omer Satter all operated in collusion with each other to lock out most of the company's remaining shareholders through a foreclosure and bankruptcy designed to ultimately facilitate a hasty sale of the company they only about a week earlier promised would undergo a Chapter 11 reorganization. Bergeron will prove through discovery that these associate and official representatives of Xyience were at all times acting subordinate to the interests of Fertitta Enterprises.

This entire convoluted and dishonest process was set in motion by a chain of email communications. Those transmissions began almost immediately after Xyience secured a preliminary injunction against Rich Bergeron in this pending litigation back on September 13, 2007. This entire case was designed as a way for Xyience to "earn" their loan through a severe abuse of the court system Fertitta Enterprises willfully and recklessly inspired through a quid-pro-quo agreement with Xyience officials who were assisted and directed at that time by Adam Frank. Under pressure to help promote a $15 million infusion of capital, Xyience Attorney Jamie Cogburn participated in this grand fraud and used the courts to both set it in motion and cover it up by getting the court to approve a preliminary injunction based on lies, misrepresentations, and manufactured evidence. Cogburn's originally stipulated "merits" are disintegrating more with every day.

Each and every stated stipulation of the existing preliminary injunction order is written so as to deny Defendant Bergeron's right to publish the truth.

For instance, Bergeron is not allowed to publish the fact that Xyience and the UFC are actively defrauding investors. The court ordered Bergeron to remove factual material from the pages of his Web-site so the plaintiffs and counter defendants in this matter could profit. This court's judgments thus far in this case have literally aided and abetted clear acts of fraud at the expense of Bergeron, two Nevada attorneys and law firms, Judge Williams' wasted time reviewing this frivolous case, Xyience investors, Xyience-sponsored fighters who have yet to collect on promised sponsorship payments, Xyience employees who were laid off as a result, holders of stakes in the Zuffa, LLC $350 million financing package, and major brokerage houses who guaranteed that note.

Xyience makes matters worse by neglecting to remove fighters pictured on their Web-site as sponsored fighters despite public proclamations by these fighters that they no longer have anything to do with the company (see exhibit 26) and also by proceeding with a fast-track sale of the company so as to separate themselves from the scene of the crime.

**Form Number 1**

II. ARGUMENT

A. PUNITIVE DAMAGES ARE APPROPRIATE IN THIS SITUATION

For enduring through this horrendous and trying experience of attempting to be his own attorney in this matter, Bergeron has suffered endless frustration, stress, and serious financial damage. His Web-site at one time was ranked in the top 300,000 sites in the world according to Alexa.com before this case began. It's now sunk to a ranking of over 900,000. Due to the distractions this case has initiated Bergeron has not been able to promote his site sufficiently enough to bring it back to the popularity level and global reach it enjoyed between April and July of 2007 (see exhibit). A substantial portion of Fight News Unlimited's traffic came directly from the Xyience stories. That traffic slowed significantly when Bergeron was sued, bogus blogs subsequently appeared across the internet proclaiming him to be homosexual (see exhibit), and the litigation inspired a vastly held and expressed belief by many fight fans and MMA press insiders that Bergeron was simply a conspiracy theorist.

Bergeron has spent an inordinate and impossible to quantify amount of time, effort, and energy learning to defend himself and producing proper legal documents he has never had any experience with before. He has suffered endless bouts of confusion and almost insurmountable frustrations with the intricacies of the legal process he is expected to study, understand, and utilize to adequately exonerate himself. This has required the defendant to self-school himself with the kind of information law students learn over the course of years. Yet, Bergeron has been forced to fast track his own education while at the same time being expected to understand and observe all the various nuances of the process, precedents, and promotion of his case through the stages of this lengthy litigation.

Since receiving by email the July 18th, 2007 filing Bergeron's life has changed drastically. The amount of attention he has been forced to focus on this case has crippled any possibility of earning any substantial income, hurt the reputation of his site, and resulted in too many sleepless nights spent researching the law and formulating motions, pleadings, and other court paperwork. He has had to rely on an inheritance from his aunt's death given to his cousin and roommate for almost all the living expenses he is fortunate enough to be able to forego at the moment despite officially owing his cousin thousands of dollars at this point. Sponsorship and advertising payments from what little business he is able to accomplish around the schedule of his pro-se defense have all gone to back rent, partial living expenses, postage for court paperwork, Web-site hosting fees, and e-filings that cost $10 for each item's filing and $10 for each filing's service to Cogburn.

Before this case beg[illegible]gainst him Bergeron was a dynamic s[illegible]tarter who devoted every waking hour to promoting his dream of being an independent professional journalist and freelance writer. In the summer of 2007 he received an agreement with Catholic Magazine St. Anthony Messenger to write a story about a missionary couple from New Hampshire who facilitated and organized regular and sustained shipments of donated goods to the Haitian poor. He has had numerous ideas and possible story angles to pursue since that agreement came to fruition, but this case has interfered with his ability to properly solicit or secure new publication opportunities. Furthermore, if he could get assigned stories he would be unable to complete them professionally due to the undue strain put on him by the frivolous litigation now before this court.

Bergeron has begun to outline a book proposal based on the story of a woman featured in a documentary on HBO called Plastic Disasters. He has been in contact with the main subject of this project for more than a year and a half yet cannot devote enough time to do this woman's story justice in book format due to the time constraints put on him by this case. Bergeron has been teamed with a forensic pathologist to help craft this book and cannot sufficiently cooperate with that doctor to make progress on the joint project because of this case's interference and multiple distractions.

It is by no means possible to gauge the potential streams of income Bergeron has lost due to the waste of time this case amounts to based on the evidence currently on the record. Bergeron filed a Rule 11 Motion for sanctions in part because he is not the only victim in this matter. Because he has had to bear the brunt of the litigation work and the resulting stresses and loss of income, he considers $10 million in punitive damages and reasonable attorney fees an appropriate remedy while also calling for $5 million in sanctions to be levied on Xyience, Inc., Jamie Cogburn, and Adam Frank with regards to the initial case's dismissal. With this filing he also requests Fertitta Enterprises pay a significant portion of those sanctions and damages due to their responsibility for inspiring this frivolous case with the promise of a $15 million investment as a reward for winning an injunction.

First and foremost those sanctions should be paid out directly to investors who have been injured by the fraudulent case plaintiff has been allowed to file and the chain of events that has put so many of them in the position of having to resort to their own litigation to reclaim any of their initial interest in the company. Each and every shareholder locked out by any action which took place once Xyience secured an injunction against Bergeron should be compensated collectively and proportionately through those sanctions. Funds should also be set aside to pay Xyience sponsored fighters who still have contract claims outstanding. A small portion should also be devoted to paying a Web-master to remove those fighters from the Xyience Web-site who are no longer associated with the brand.

**Form Number 1**

Attorney Cogburn should face financial penalties that exceed the amount he was paid to file and press the case as far as he did. He should also be required to complete rigorous ethics training. Attorney Lawson and Hunterton and Associates should be compensated duly for their due diligence in trying to re-assemble the fragmented pieces of the broken case Cogburn left behind. It is not their fault that the plaintiff willfully used them to conceal their fraudulent activity. Clearly Ms. Lawson is not in a direct position to know the complete lack of a case she inherited when she volunteered to take on this litigation. It appears she has also been defrauded.

B. THE COUNTER-PLAINTIFF(S) ENJOYS A HIGH PROBABILITY OF SUCCESS

Bergeron has been informed that federal law enforcement authorities have already been dispatched to look into this entire egregious situation and the ensuing fraud involved in trying to keep it quiet. Due to the progress of these proceedings, Bergeron may actually be in a better position to help build the government's case through civil channels. He is committed to maintaining direct communication with federal authorities he has already contacted. The defendant and cross-claimant Bergeron is also depending on these proceedings to help over 340 shareholders regain their original investment in Xyience before Fertitta Enterprises defrauded them and locked them out of any future in the company through clear misrepresentations of intent. The complete lack of full disclosure that occurred under the direction of Fertitta Enterprises and the willful determination to eradicate Bergeron's published reports about the ongoing fraud and collusion has produced countless victims who are relying on the results of this case and Bergeron's reporting itself. This case may be the most promising measure to help them recover what they have lost in the process of the counter-defendants' attempts to unjustly enrich themselves.

Under the tenets of the First Amendment the lawsuit that is pending before this court should have never been able to go forward and would not have had it not been for the clear, documented transgressions, omissions, and misrepresentations of the plaintiff and the attorney who filed their case.

Bergeron will assemble much of the previously stipulated claims not supported by direct evidence attached hereto with a full and extensive discovery strategy. Bergeron is also in contact with a host of former investors in the company and will utilize discovery to ascertain the names of the rest of those injured parties so as proper relief can be granted to the proper parties.

In *Dominicus Americana Bohio v. Gulf & Western*, the United States District Court for the

Southern District of New Y[illegible]considered whether plaintiff, Dominic[illegible]mericana Bohio ("Dominicus"), averred fraud in a manner consistent with the strict requirement of FRCP 9(b), 473 F.Supp. 680 (S.D.N.Y. 1979).

The federal district court found that the plaintiff's allegation did not meet the strict pleading requirement of FRCP 9(b). However, because the circumstances surrounding the alleged fraud were "peculiarly within the defendant's knowledge," the court applied the relaxed standard, allowing the plaintiffs to conduct discovery, amend their complaint, and meet FRCP 9(b)'s specific pleading requirements. *Id.* at 693.

The Nevada Supreme Court noted that the federal district court's relaxed standard in *Dominicus* struck a reasonable balance between NRCP 9(b)'s stringent pleading requirement and a plaintiff's inability to allege the full factual basis concerning fraud where the information is solely in the defendant's possession and cannot be secured without formal discovery. Thus, the Court adopted the relaxed standard of the federal court in those situations where the facts necessary for pleading with particularity "are peculiarly within the defendant's knowledge or are readily obtainable by him." *Neubronner*, 6 F.3d at 672.

Due to the egregious injustice that has resulted from the preliminary injunction issued against Bergeron, this case involves an extensive list of victims that Counter-Plaintiff Bergeron reserves the right to attach at a later date with an amended complaint. Bergeron will conduct discovery with specific attention paid to ascertaining the complete list of injured parties so as to guarantee all victims some semblance of relief for the Counter-Defendants' various transgressions designed to further a fraudulent scheme that unjustly enriched the principal owners of both Counter-Defendants in this case.

These parties to be named at a later date may include more than just Xyience shareholders and Xyience sponsored Mixed Martial Artist fighters with outstanding contracts. It is likely that the discovery process will prove that holders of any interests in the $350 million Zuffa, LLC financing package listed through the S&P index are also entitled to damages. The lending institutions and brokerage houses themselves may even deserve damages as a result of this litigation setting in motion a grand fraud perpetrated on victims too numerous to even comprehend at this time.

The complex nature of this situation and the fact that there is a federal First Amendment question involved seems to favor these proceedings being removed to federal court at some point in time. Upon receipt of appropriate attorney fees and court costs Defendant and Counter-Plaintiff Bergeron should be paid from the dismissal of the initial complaint, Bergeron may choose to file for such removal and also petition for legal assistance from numerous public advocacy groups such as Public Citizen and The Electronic Freedom Foundation.

**Form Number 1**

C. FURTHER POINTS OF LAW

The United States Supreme Court's first encounter with a law imposing a prior restraint came in Near v. Minnesota ex rel. Olson, 283 U.S. 697 (1931), in which a five-to-four majority voided a law authorizing the permanent enjoining of future violations by any newspaper or periodical once found to have published or circulated an "obscene, lewd and lascivious" or a "malicious, scandalous and defamatory" issue. An injunction had been issued after the newspaper in question had printed a series of articles tying local officials to gangsters. Liberty of the press to scrutinize closely the conduct of public affairs was essential, said Chief Justice Hughes for the Court:

**"[T]he administration of government has become more complex, the opportunities for malfeasance and corruption have multiplied, crime has grown to most serious proportions, and the danger of its protection by unfaithful officials and of the impairment of the fundamental security of life and property by criminal alliances and official neglect, emphasizes the primary need of a vigilant and courageous press, especially in great cities. The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the immunity of the press from previous restraint in dealing with official misconduct." Id. at 719-20.**

One of this nation's most illustrious newspapers: The New York Times, has taught us through their case and those following afterward that expression on matters of public interest is vehemently protected by the First Amendment. Within that area of protection is commentary about the public actions of individuals. The fact that expression contains falsehoods does not deprive it of protection, because otherwise such expression in the public interest would be deterred by monetary judgments and self-censorship imposed for fear of judgments. But, over the years, the Court has developed an increasingly complex set of standards governing who is protected to what degree with respect to matters of public and private interest.

First, the Court created a subcategory of "public figure," which included those otherwise private individuals who have attained some prominence, either through their own efforts or because it was thrust upon them, with respect to a matter of public interest, or, in Chief Justice Warren's words, those persons who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." Curtis Publishing Co. v. Butts, 388 U.S. 130, 164 (1967) (Chief Justice Warren concurring in the result).

More recently, the Court has curtailed the definition of "public figure" by playing down the matter of public interest and emphasizing the voluntariness of the assumption of a role in public affairs

that will make of one a "public figure." Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974).

Clearly, the standard of proof of actual malice must have therefore been met in the plaintiff and counter-defendant Xyience's case due to the public nature of the plaintiff corporation's ownership. Constitutional "actual malice" means that the defamation was published with knowledge that it was false or with reckless disregard of whether it was false, New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964); Garrison v. Louisiana, 379 U.S. 64, 78 (1964); Cantrell v. Forest City Publishing Co., 419 U.S. 245, 251 -52 (1974).

Reckless disregard is not simply negligent behavior, but publication with serious doubts as to the truth of what is uttered, St. Amant v. Thompson, 390 U.S. 727, 730 -33 (1968); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81 (1967). A defamation plaintiff under the Times or Gertz standard has the burden of proving by "clear and convincing" evidence, not merely by the preponderance of evidence standard ordinarily borne in civil cases, that the defendant acted with knowledge of falsity or with reckless disregard, Gertz v. Robert Welch, Inc., 418 U.S. 323, 331 -32 (1974); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 83 (1967). See New York Times Co. v. Sullivan, 376 U.S. 254, 285 -86 (1964) ("convincing clarity").

Moreover, the Court has held, a Gertz plaintiff has the burden of proving the actual falsity of the defamatory publication, Philadelphia Newspapers v. Hepps, 475 U.S. 767 (1986) (leaving open the issue of what "quantity" or standard of proof must be met). A plaintiff suing the press for defamation under the Times or Gertz standards is not limited to attempting to prove his case without resort to discovery of the defendant's editorial processes in the establishment of "actual malice." Herbert v. Lando, 441 U.S. 153 (1979). The state of mind of the defendant may be inquired into and the thoughts, opinions, and conclusions with respect to the material gathered and its review and handling are proper subjects of discovery.

Since discovery has yet to be performed in this case, it stands to reason that the plaintiff's entire pending case is suspect and the resulting preliminary injunction is unconstitutional. Furthermore, Defendant and Cross-Plaintiff Bergeron inquired as to his ability to appear telephonically back at the beginning of this litigation. He was told by Judge Timothy Williams' secretary that Department 16 was not equipped for a telephonic hearing and such an appearance would not be possible. Due to that fact Bergeron's right to due process has been circumvented since he was not allowed to defend himself at multiple hearings. The last hearing in this matter on February 7th was the Defendant and Cross-Plaintiff's first opportunity to appear and speak for himself, and that hearing involved Bergeron participating via telephone. Therefore, because he was denied due process, the decisions arrived at during prior hearings should be vacated if they were in whole or in part determined due to Bergeron's

lack of appearance.

## CONCLUSION

**Defendant and Cross-Claimant Plaintiff Bergeron Should Receive Punitive Damages as a direct result of Cross-Defendants' Defamation of his character, violation of his First Amendment rights, tortuous interference with his prospective economic advantage, and the pain and suffering Bergeron has suffered due to the Cross-Defendants' pursuit of a frivolous case based on substantial misrepresentations of fact and manufactured evidence.**

Defendant and Cross-Claimant Rich Bergeron is a seasoned journalist with impeccable credentials and an exceptional educational background including stints at three military colleges with honor codes. The Cross-Defendants identified in this pleading have been implicated in serious accusations of major fraud. Their track record reveals a pattern of continuous corruption tracing back to the inception of Xyience, Incorporated's sponsorship of the Ultimate Fighting Championship. Bergeron has at all times printed the truth about the cross-defendants' business dealings and collusion to defraud investors. He deserves appropriate redress for being improperly and unconstitutionally enjoined from reporting that truth.

Defendant and Cross-Claimant Bergeron has endured a case against him filed in bad faith and with reckless disregard for the truth by the plaintiff Xyience and their initial attorney Jamie Cogburn. A hearing has been set for March 5, 2008 on his motion to dismiss that matter. However, due to the plaintiff's pending Bankruptcy, Fertitta Enterprises as a major creditor of Xyience should also be held accountable for sanctions should the judge choose to approve Bergeron's Rule 11 motion.

Additionally, Bergeron seeks punitive damages via this counterclaim in the aggregate amount of $10,000,000.00 for the cross-defendants' egregious violation of his First Amendment rights, tortuous interference with his prospective economic advantage, defamation of his good name through the filing of a frivolous case, and the mental pain and suffering he has endured through the threat of a $25 million judgment being entered against him in the pending case.

Bergeron will prove all allegations through discovery and/or trial in this matter that are not directly evident from the attached exhibits. The district court should apply the relaxed standard where the facts necessary for pleading with particularity, as required by NRCP 9(b) "are peculiarly within the defendant's knowledge or are readily obtainable by him." *Id.*

In these circumstances, a plaintiff must aver that this standard is appropriate, and demonstrate in his complaint that he cannot plead with greater specificity because the defendant possesses the required information.

Bergeron has provided as much first hand knowledge and documented evidence as he possibly can at this point. The rest will be determined through vigorous discovery to both substantiate the information provided to Bergeron by high level inside sources and also to adequately determine the true names and total number of victims injured by the Counter-Defendants' collusion to commit extensive fraud. The scheme perpetrated by both Counter-Defendants was initiated immediately upon the Counter-Defendants securing a preliminary injunction against Bergeron's reporting and may also substantiate the future removal of this case to federal court due to a serious First Amendment federal question.

Dated February 12, 2008

Respectfully Submitted By:

Rich Bergeron

Rich Bergeron
147 Old County Road
East Sandwich, MA 02537
Serving as Attorney Pro Se

**Form Number 1**

# EXHIBIT 9

# Xylence, Inc.

## Balance Sheet

As of December 31, 2006

| | Dec 31, 06 |
|---|---|
| **ASSETS** | |
| Current Assets | |
| Checking/Savings | |
| Cash and Cash Equivalents | 85,079.88 |
| Total Checking/Savings | [illegible] |
| Accounts Receivable | |
| Accounts Receivable | 4,861,264.38 |
| [illegible] | [illegible] |
| Total Accounts Receivable | 4,611,212.82 |
| Other Current Assets | |
| [illegible] | 8,433,762.71 |
| Cash Deposits | [illegible] |
| Prepaid Expenses | 89,602.68 |
| Employee Advances | 10,000.00 |
| Total Other Current Assets | [illegible] |
| Total Current Assets | 11,310,308.09 |
| Fixed Assets | |
| [illegible] | [illegible] |
| Total Fixed Assets | 528,271.19 |
| Other Assets | |
| Interest Rec. [illegible] | 130,768.45 |
| Interest Receivable Pete Rinato | 3,020.55 |
| Loan Receivables | 184,896.76 |
| Total Other Assets | 331,122.31 |
| **TOTAL ASSETS** | **12,169,701.59** |
| **LIABILITIES & EQUITY** | |
| Current Liabilities | |
| Accounts Payable | |
| Accounts Payable | 19,018,792.36 |
| Total Accounts Payable | [illegible] |
| Other Current Liabilities | |
| Note Discount, Share Issuance | -1,135,789.46 |
| Accrued Rent | 53,256.06 |
| Lease Payable-AEL Financial | 93,649.62 |
| Customer Deposits | 134,000.00 |
| Contingent Liab., AP Lititag. | 570,000.00 |
| Short Term Loans Payable | 19,923,307.98 |
| Accrued Interest Expense | [illegible] |
| Accrued Liabilities | 190,233.07 |
| Payroll Liabilities | 424,544.33 |
| Total Other Current Liabilities | [illegible] |
| Total Current Liabilities | 39,359,560.26 |
| Total Liabilities | 39,359,560.26 |
| Equity | |
| Capital Stock, Par Value | 47,974.35 |
| Additional Paid in Capital | 39,461,414.87 |
| Retained Earnings | -10,865,594.24 |
| Total Equity | -27,189,858.67 |
| TOTAL LIABILITIES & EQUITY | 12,169,701.59 |

Form Number 1

3:11 PM

02/10/07

Accrual Basis

# Xyience, Inc.
## Profit & Loss
### January through December 2006

| | Jan - Dec 06 |
|---|---|
| **Ordinary Income/Expense** | |
| Income | |
| Gross Sales Revenue | 22,475,964.88 |
| Discounts, Credits and Rebates | -2,103,784.94 |
| Total Income | 20,372,179.94 |
| Cost of Goods Sold | |
| Cost of Goods Sold | 14,170,872.31 |
| Total COGS | 14,170,872.31 |
| Gross Profit | 6,201,307.63 |
| Expense | |
| Marketing | 42,165,423.35 |
| Personnel Costs | 6,383,649.53 |
| Office and Facilities Expense | 1,848,212.03 |
| Other Administrative Costs | 3,619,739.92 |
| Legal, Accounting & Consulting | 5,218,506.43 |
| Total Expense | 59,235,531.26 |
| Net Ordinary Income | -53,034,223.63 |
| **Other Income/Expense** | |
| Other Income | |
| Interest Income | 116,930.09 |
| Total Other Income | 116,930.09 |
| Other Expense | |
| Depreciation & Ammortization | 91,472.36 |
| Interest Expense | 2,823,351.11 |
| Taxes | 1,536.64 |
| Total Other Expense | 2,916,360.11 |

PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

STAD 2/14/08

# EXHIBIT 10

**Form Number 1**

Kurt Jetta
<kurtjetta@tabsgroup.com>

Hide details

to RICH.BERGERON@gmail.com
date Aug 4, 2007 9:56 AM
subject QUESTION ON XYIENCE

Rich,

I came across your block because I have Xyience set up as a Google Alert. I was very interested in your notes on Xylence. They are a client of ours, and I'm trying to get to the bottom of what their business prospects are, and who even is in charge there. Since April, our contact person has changed four times. One recent President and COO, Jan Hall, was only there about a month.

We are having a very difficult time getting paid, but it's clear that they still want our services. They don't go totally dark on us, so I don't think they're trying to duck out on their commitments.

Here's the issue I'm trying to get at: they are spending all this money on Marketing, and their in-market sales are still extremely low. So who's funding this endeavor and why? There's at least one Private Equity firm involved in the company. Are you suggesting they are getting soaked, as well?

Any hard information you can provide would be helpful. Thanks.

*Kurt Jetta*
President
203-925-9157
TABS Group, Inc.
www.tabsgroup.com
***The Experts in Consumer Analytics***

# EXHIBIT 11

**Form Number 1**

From: Mike Hilson <mike_hilson@hotmail.com>
Date: Sep 7, 2007 3:05 AM
Subject: RE: A little Xyience Update
To: rich.bergeron@gmail.com

Rich :

For the past couple of months I have not kept current on Xyience. Until today I had assumed that the company was running out of money and was just trying to hang on for a few more months for a futile IPO attempt. (My "investor" friend got a letter addressed to current shareholders about a month ago begging for a further investment in shares to be priced in the $2.50 to $3.50 range. This alarmed him because he paid $4.00 each back in February).

Anyways, today my friend got an unexpected visit from the roper who convinced him to buy stock back in February. I was present, as I was meeting my friend on an unrelated matter.

This roper proclaimed he had some great news about Xyience, and gave my friend photocopies of a "PRELIMINARY INJUNCTION ORDER" filed by Xyien counsel on 9-06-2007 at 10:07 a.m. (I can fax it to you if you provide a number).

He claimed that Xyience had successfully sued you and that they were awarded legal costs and that furthermore, you had been fined $1,000.00 and sentenced to 30 days jail, suspended. Also, that you had been ordered to remove from the Internet all references to Xyience by midnight tonight or be found in contempt.He claimed that you were a former employee/investor who was on a vendetta. The "good" news was that with you out of the way, Xyience could now raise the necessary bridge financing (he mentioned Dana White and the Fertittia brothers by name as sources for $15 million each), and go public- at $20-$30 per share- in January. He claimed that 10 investment houses were competing for the offering and that Xyience was going with Bear Stearns. He also claimed that he had increased his shareholdings in Xyience and had lent Russell Pike a 6-figure amount which would earn interest at 10% per month !!!! until Xyience goes public. He mentioned to my friend that Mr. Pike would like to borrow more money on these terms and seemed to be trying to persuade my friend to put money in both of these dubious investments. After listening to this nut praise Mr. Pike and his creditworthiness for a few minutes, I made a photocopy of the court document and excused myself.

Rich, I want you to know that I am inclined to believe that you are an earnest journalist who wants to report the truth. From personal experience, I know that it is hard to fight a court injuction. I also know that lawyers for crooks are rarely held accountable for what they say or submit in writing to a court, and that fighting the good fight can be long and lonely. If there is anything I can do to help you (except cash.... I'm tapped!), do not hesitate to contact me.

STAD 2/14

Best of luck,
Mike.

# EXHIBIT 23

**Form Number 1**

Russell,

Kirk and I very much look forward to sharing the information on Xyience's history that has been uncovered. We are very confident in the shareholder's ability to draw their own conclusions when they have the facts in front of them.

Adam

----- Original Message -----
From: Russell Pike <rpike@xyience.com>
To: Adam Frank; William Underhill AOL <bunderhi@aol.com>; Katie Lever <klever@gcamail.com>; Kirk Sanford <ksanford@gcamail.com>; mk@arcinvestmentpartners.com <mk@arcinvestmentpartners.com>
Cc: rsozzi@rvsventures.com <rsozzi@rvsventures.com>; rinaldi5@cox.net <rinaldi5@cox.net>; sibock@hotmail.com <sibock@hotmail.com>; brent@pbgmail.com <brent@pbgmail.com>; pb@crowncapitalsa.com <pb@crowncapitalsa.com>; kmaskatiya@gcamail.com <kmaskatiya@gcamail.com>; Ric Klingenberg <rklingenberg@xyience.com>; janisgrady@aol.com <janisgrady@aol.com>; flamencovivo@aol.com <flamencovivo@aol.com>; apwstrategies@gmail.com <apwstrategies@gmail.com>; Michael Eisner <meisner@eisnerlaw.com>; ksutton@eisnerlaw.com <ksutton@eisnerlaw.com>; jkjets@aol.com <jkjets@aol.com>; Marc Rock <marc.rock@gmail.com>; Susan Curry <scurry@Xyience.com>; Michael Levy <mlevy@Xyience.com>; shock@cox.net <shock@cox.net>; dianefrankteam@yahoo.com <dianefrankteam@yahoo.com>; kriech18@hotmail.com <kriech18@hotmail.com>; cjs@hexagoninc.com <cjs@hexagoninc.com>; TLC FORWARDING <terry@tlcconsulting.biz>; chubilly@yahoo.com <chubilly@yahoo.com>; billyzb@yahoo.com <billyzb@yahoo.com>; paul personal <paulgrady@aol.com>; Matt R. Friesl <Matt@uacapitalpartners.com>; Reuben Rios <rrios@Xyience.com>; Devin Keays <dkeays@xyience.com>; Siobhan Oldham <soldham@Xyience.com>; Michael Rusnak <mrusnak@Xyience.com>; plamotte@xyience.com <plamotte@xyience.com>; swierczbicki@xyience.com <swierczbicki@xyience.com>; Stephen Smith <ssmith@Xyience.com>; Dara Asuncion <dasuncion@Xyience.com>; Nina Rodriguez <nrodriguez@Xyience.com>; Darin T. Mahlke <dmahlke@Xyience.com>; ronaldsol@msn.com <ronaldsol@msn.com>
Sent: Tue Oct 02 17:21:22 2007
Subject: RE: XYIENCE NOTICE OF CESSATION OF OPERATIONS

Adam,

The truth will come out about your actions that have brought us to this point.
A shareholder meeting has been called to give full disclosure to the shareholders and determine proper action.

As stated below, I had agreed as long as Mike Clark was treated fairly, which he was not.

Shareholders will be receiving a report of your actions and will take appropriate action against all involved.

---

From: Adam Frank [mailto:adam@adam-frank.com]
Sent: Tuesday, October 02, 2007 2:10 PM
To: William Underhill AOL; Katie Lever; Kirk Sanford; mk@arcinvestmentpartners.com
Cc: rsozzi@rvsventures.com; Russell Pike; rinaldi5@cox.net; sibock@hotmail.com; brent@pbgmail.com; pb@crowncapitalsa.com; kmaskatiya@gcamail.com; Ric Klingenberg; janisgrady@aol.com; flamencovivo@aol.com; apwstrategies@gmail.com; Michael Eisner; ksutton@eisnerlaw.com; jkjets@aol.com; Marc Rock; Susan Curry; Michael Levy; shock@cox.net; dianefrankteam@yahoo.com; kriech18@hotmail.com; cjs@hexagoninc.com; TLC FORWARDING; chubilly@yahoo.com; billyzb@yahoo.com; paul personal; Matt R. Friesl; Reuben Rios; Devin Keays; Siobhan Oldham; Michael Rusnak; plamotte@xyience.com; swierczbicki@xyience.com; Stephen Smith; Dara Asuncion; Nina Rodriguez; Darin T. Mahlke
Subject: XYIENCE NOTICE OF CESSATION OF OPERATIONS
Importance: High

Board, Shareholders, and Employees:

This is formal notice that we are ceasing all business operations, because we have come to the conclusion that there is

**Form Number 1**

virtually no likelihood that there will be money to meet payroll obligations. (Nor can the company meet greater than $4M of other obligations that come due by Friday)

Even if we had the money for payroll, Bill Bullard, CEO of Fertitta Enterprises, has begun the foreclosure process, which will collect on the first $1,500,000 in value. Further, we have also received a notice of default from Darlis Investment and Trade Corp, the holders of the next $6,000,000 of secured debt. In addition, we are also starting to receive numerous notices of default pertaining to the vendor settlements and structured payments which we have worked so hard to line up. Thus, even to make payroll, we believe that we would need to raise nearly $8M by Friday because all of these obligations would need to be satisfied concurrently.

The issue that is preventing the Fertittas from funding the company and solving the aforementioned payment obligation has boiled down to Russell's unwillingness to sign an agreement required by the Fertitas whereby any stock that Russell, Billy, or Mike own would have a voting restriction in it which would transfer to any other shareholder who purchased the stock.

Russell, Billy, and Mike received this agreement last Thursday. As of Friday, the board believed that Russell, Mike, and Billy had signed the agreement. On Monday, we learned that only Mike Clark had in fact signed the voting agreement. There apparently had been some signals crossed on whether the voting agreement was in fact signed, and there are claims that Russell represented that he and his family had in fact signed the agreement. On Monday, Kirk and I received an email from Russell that he had finally read the agreement, and was taking issue with the requirement that all of his, Billy's, and Mike's share certificates would need to be imprinted with a Legend that made them non-voting only during the term that the Fertitta Loan was outstanding.

The board has already unanimously approved the Fertitta transaction.

In addition, shareholders (including Russell Pike, Billy Pike Jr, Mike Clark), have approved the Fertitta transaction as required by the Fertittas and by XYIENCE's own by-laws.

The concern that Russell has expressed is that this will result in diminution of value of those shares, and restrict his and Mike's ability to sell these shares.

Kirk and I went back to Bill Bullard and asked him to consider allowing the shares to become voting to the extent that Russell, Billy, or Mike transferred them to non-affiliated parties. Bullard refused, for the following reasons:

(1) He thought it inappropriate that the founders should continue to be out selling stock during this period while other investors need to wait and moreover while the company needs to raise more money

(2) He did not want to have to police to whom the shares were being transferred

(3) He has grown tired of this deal dragging on and there always being "one more issue"
Kirk and I had numerous follow up conversations with Russell and Bill Bullard to try to broker some sort of compromise. This morning, Russell told us that he would agree to have his shares imprinted with the Legend thereby restricting their ability to vote, even if sold or transferred, so long as we could broker some compromise which allowed Mike Clark to have some flexibility on selling his shares without the Legend.

In a final appeal, Kirk and I went back to Bullard to propose this. What Bullard begrudgingly agreed to was that 1,000,000 of Mike Clark's shares would be allowed to be transferred without voting restrictions, so long as (a) he complied with a sales process that was approved by the company and provided for review and approval of prospective purchasers (b) a process that made requisite disclosures to prospective purchasers.

Kirk and I went back to Russell with this proposal. Russell hung up abruptly and told us to tell Bullard there was *NO DEAL* and that Kirk and I should call Ray Sozzi as Ray had an alternative plan for the company, and that "Ray would not let the company go under."

Kirk and I have called Ray twice but have not heard back.

Today, I had a telephone conversation with Mike Clark and he said he was going to give this proposal some consideration.

STAD 10/8/07

**Form Number 1**

It appears that Russell's self interest in continuing to sell his shares is preventing the company from doing what is in the company and the shareholder's best interest.

Anything that anyone can do to convince Russell of the selfishness of his actions and prevent this course of consequences would be greatly beneficial to the shareholders who stand to lose their entire investment if the company ceases operations.

In any event, the stark reality is that we need SEVERAL MILLION DOLLARS by Thursday. Regardless of anyone's opinion of the (only) deal on the table, we have gone back and forth several times and tried to broker a compromise, and we have clearly been told that there is no more room for discussions. To be clear, the only options are: 1) that Russell signs the document, or 2) the deal dies. There is no in-between, and nothing is open for discussion, and an answer must be given by end of day today.

We also have been open to any other financing proposals, but no firm offer has been received over the past several months. The likelihood of another deal coming through, and being negotiated, signed, and funded – by Thursday, is obviously extremely remote.

Accordingly, our duties require us to immediately inform you of the grave nature of this situation. Given Russell's refusal to cooperate, and the fact that will prevent the Fertitta deal from closing, we believe that there will not be any money for payroll, so we must cease business operations, and we also believe that the failure to make payments due Thursday and Friday for debts will result in foreclosure and/or bankruptcy. Therefore, we are sending this formal notice, and ceasing operations immediately.

We are attempting to schedule an immediate board meeting. If anything results that will save the company, we will immediately inform you, but based on the facts as we know them now, we are taking the action set forth above.

Thank you,

Kirk and Adam

# EXHIBIT 25