# EXHIBIT 50 PART B

**Form Number 1**

skip to main | skip to sidebar
http://www.mmapayout.com/http://www.mmapayout.com/

**October 23, 2007**

## More Trouble for Xyience: Top Fighters Split with Company *UPDATED*

Dave Meltzer reported in this week's Wrestling Observer that Chuck Liddell, Forrest Griffin, and Rich Franklin are no longer involved with Xyience for a variety of unreported reasons. Liddell ended his relationship after the company failed to pay on his substantial endorsement deal when it experienced its first round of financial trouble. The company's website still features Griffin and Franklin in its fighters media section along with Anderson Silva, Sean Sherk, Matt Hughes, BJ Penn, Mike Swick, Cung Le, and Josh Koscheck.

In an interview with Five Ounces of Pain, when asked about his association with the company, Sean Sherk responded: "Oh no, I'm not sponsored by them anymore. I used to be but they stiffed me a bunch of money. They stiff everybody. A lot of people are leaving them."

**UPDATE** - MMAPayout.com has confirmed that Matt Hughes is no longer associated with the company. When asked about the relationship, Hughes business manager Brian Patton said, "Matt is no longer with Xyience and is now with Nutritox. His contract expired on August 15th. He has since signed a long-term deal with Nutritox. He was not happy with [Xyience's] performance."

**UPDATE 2** - MMAPayout.com has confirmed with Rich Franklin's business manager, J.T. Stewart, that nonpayment was also the reason Franklin ended his association with Xyience.
Posted by Adam Swift

---

Update: Report Connects Zuffa to Xyience
By Adam Swift

[11/5/2007]

Xyience recently signed a three-year extension on its exclusive partnership with the UFC, but the supplement company's reportedly close ties to the mixed martial arts promotion have not appeased several disgruntled fighters Xyience once sponsored.

Xyience, which formed in 2004, announced the extension in conjunction with a $12 million funding effort.

A relationship between Xyience and Zuffa that runs much deeper than advertising and sponsorship agreements has long been speculated though not acknowledged. However, this week in the Wrestling Observer Newsletter, Dave Meltzer released a non-sourced report that said UFC owners Lorenzo and Frank Fertitta were responsible

for Xyience's recent multi-million dollar funding.

When asked for comment on the source of funding and specifically about the Fertittas' and Dana White's involvement in Xyience, the Las Vegas-based sports nutrition company, through a public relations representative, told Sherdog.com that the money was provided "by a private group of local strategic investors. Company policy is to not comment on the specific individuals that participated in a round of funding."

Requests for comment from the UFC went unanswered.

The Fertittas' reported involvement in Xyience could raise eyebrows in light of reports that several high-profile UFC fighters recently severed ties with the company, saying it failed to honor the financial terms of endorsement deals, and news of possible supplement contamination.

In the Oct. 24 Wrestling Observer Newsletter, Meltzer reported that former UFC light heavyweight champion Chuck Liddell (Pictures) is no longer associated with Xyience due to nonpayment on his substantial endorsement deal. Meltzer also reported that Forrest Griffin (Pictures) and Rich Franklin (Pictures) have left the company.

Liddell and Griffin -- along with Josh Koscheck (Pictures), Mike Swick (Pictures) and Cung Le (Pictures) -- have been paid in full as of a couple weeks ago, according to their manager DeWayne Zinkin Jr.

"Early on there were issues," Zinkin told Sherdog.com Monday morning. "But since we've dealt with [Xyience CEO] Adam Frank and the new people in charge now, everything that they have said they were going to do, they've done. All of our guys have been paid in full, so we're happy. We're waiting to get proposals from them for future work."

The same could not be said for Franklin.

"At the beginning of the year Xyience quit returning phone calls and e-mails," Franklin's manager, M-1 president and CEO Monte Cox, said late Sunday. "They are now seven or eight months behind on payment for Rich."

Despite the wishes of several fighters, including UFC champions Matt Hughes (Pictures) and Sean Sherk (Pictures), the Xyience Web site continues to feature fighters who have split with the company.

"Matt is no longer with Xyience and is now with Nutritox," Hughes' business manager, Brian Patton, told Sherdog.com. "His contract expired on Aug. 15. He has since signed a long-term deal with Nutritox. He was not happy with [Xyience's] performance."

Of his relationship with Xyience, Sherk told fiveouncesofpain.com in late October that he's no longer affiliated with them after "they stiffed me a bunch of money."

"They stiff everybody," said the lightweight, who is currently appealing California State Athletic Commission allegations that he tested positive for the anabolic agent nandrolone metabolite following a fight in Sacramento versus Hermes Franca (Pictures). "A lot of people are leaving them."

In response to the reports of fighters fleeing its ranks, a company representative said Xyience "has made good on its obligations regarding fighter sponsorships. Sponsoring fighters continues to be an important part of our strategy, and we value the relations with the fighters."

Of greater concern for Xyience could be the contents of a pre-trial brief and exhibits filed by Sherk's attorney Howard Jacobs with the CSAC and obtained by Sherdog.com.

Among a litany of reports, it is asserted that "Xyience Xtreme Joint Formula" -- one of several Xyience-branded supplements Sherk said he took before his July 7 title defense at the Arco Arena -- tested positive for the anabolic agent 1-androstendione.

**Form Number 1**

Said Susan Wierzbicki, Xyience's Director of Quality Assurance: "The company employs stringent quality control procedures and contracts with manufacturers that are GMP (Good Manufacturing Practices) compliant."

Jacobs told Sherdog.com it was not his intention to finger Xyience as the culprit of Sherk's positive test in California.

Wierzbicki said Xyience halted all shipments of the product until it can conduct independent testing by a certified lab.

Seemingly unrelated to the contamination and fight sponsorship issues, Xyience is currently subject to a Desist and Refrain Order issued by the California Department of Corporations on Sept. 10, 2007, for the fraudulent business practices of Xyience founder and former CEO Russell Craig Pike.

The Desist and Refrain Order obtained by Sherdog.com contains a laundry list of allegations against the company and Pike: selling $2.1 million of stock to California residents without the state's authorization; making material misrepresentations to investors regarding pending litigation and the prior business success of Pike; failure to disclose a default judgment against Pike for writing bad checks; failure to disclose signed confessions of judgment in an action involving Pike's former business venture, Advanced Cart Technology (ACT), for using false pretenses, false representations, and fraud to convince investors to invest in the company; failure to disclose a prior guilty plea to bank fraud, money laundering, and aiding and abetting in connection with ACT, resulting in a sentence of 59 months in a federal prison, three years of supervised release and a restitution order for $2,367,146; failure to disclose ACT bankruptcy proceedings; failure to disclose a prior prison sentence for grand theft and forgery.

According to Robert Walsh, public information officer for the Nevada secretary of state, Pike was listed as president of Xyience from July 20, 2005, until an amended list was filed on Oct. 13, 2006.

A Xyience spokesperson said Pike is currently a minority shareholder in the company, and any stock he owns is non-voting.

"He has no role in management or operations," the spokesperson said, "and is not an employee of the company."

In the year that Pike has taken a step back, Xyience increased distribution from 4,600 to 45,000 stores, including national chains such as 7-11 and GNC, according to a company news release.

Said UFC president Dana White on the relationship between his company and Xyience: "We look forward to our future endeavors together as both of our companies continue their explosive growth."

*Adam Swift is the editor of www.MMAPayout.com*

# EXHIBIT 26

**Form Number 1**






Contact Us | Policies | Careers | Sitemap | About Xyience | Affiliates | Forum

©2007 Xyience, Inc.

# EXHIBIT 29

**Form Number 1**

Adam Frank < adam@adam-frank.com > wrote:

Hey Rich,

Its the weekend, so we wont be able to get to it until Monday, but we said we would take care of so, we will get it done. Note, I have never spoken to Cogburn. He is Russell's guy although we had our paralegal inform him recently that he should no longer take direction from Russell.

Have a great weekend.

Best,

Adam

---

From: Rich Bergeron [mailto:boxer_47@yahoo.com]
Sent: Saturday, November 10, 2007 4:50 PM
To: Adam Frank
Subject: Re: FW: Itinerary for BERGERON RICHARD Saturday 17 November 2007

Adam,

I would really like to get this case out of the way completely before I make the trip if that's possible. I'm just not comfortable having that open. It looks to me like Cogburn is still pushing it with the recent filing of the modified preliminary injunction. I will have to file the motion for sanctions if it is not resolved. I think you need to call off Cogburn on this one. I would really be more inclined to help with the future if I had more of a guarantee that the case would be set aside before we make any future agreements.

Thanks,

Rich

Adam Frank < adam@adam-frank.com > wrote:

Don't feel bad- we will take care of. You can pay us back when you write the true story of the early days of xyience. Shld be a best seller!

----- Original Message -----
From: Rich Bergeron <boxer_47@yahoo.com>

To: Adam Frank
Sent: Thu Nov 08 23:29:59 2007
Subject: Re: FW: Itinerary for BERGERON RICHARD Saturday 17 November 2007

Adam,

Everything looks great. The only issue I have is that I have pretty much no working capital at this point and could use some funds to travel with. It won't be misconstrued as anything shady if you could possibly send along a little gas money to get me to the airport. You can either go to unlimitedfightnews.com and hit a donation button or go to paypal directly where my account is under this email address.

I am really enthusiastic about moving forward with everything and putting this massive distraction behind me. In addition to the encouraging prospect of getting back to working on my Web-site more consistently, I will also get the chance to put more time into a book project I'm working on about a victim of plastic surgery who was featured on HBO's Plastic Disasters documentary.

I believe we think alike in a lot of ways, and we can accomplish much greater things through cooperation than we could through trying to destroy each other. One of my favorite quotes of all time is something said by George C. Marshall: "There's no limit to the good you can do if you don't care who gets the credit."

Although the source wasn't much of an admirable guy, Richard Nixon once said, "Those who hate you never win unless you hate them." At times I found myself consumed by way too much stressful, negative, self-destructive energy as I was forced into a position of having to defend myself or pay off a $25 million debt for the rest of my life. I could not think of anything else but Xyience and how to prove I was right. It was a very uncomfortable feeling for me, and I'm glad to have a sense of relief to put it behind us now.

I think we'll have a very productive meeting and make some real, honest, meaningful progress.

Thanks,

Rich

Adam Frank < adam@adam-frank.com > wrote:

Rich,

Please confirm that all this works. We will arrange car to and from the airport in NY as well.

Ill give you a buzz later.

Best,

Adam

**Form Number 1**

For approval only.

Trip Locator: 72WNZH

RICHARD BERGERON

Saturday 17 November 2007
Miscellaneous

Miscellaneous Fee

Description:
THANK YOU FOR CHOOSING PRESTIGE TRAVEL
Cost:

Remarks:

CORPORATE DEPT 702-253-9909

YOUR AIRFARE IS $236.80 PLUS SERVICE FEE OF $25.00

Saturday 17 November 2007
Air

Us Airways - Flight US 2123
Status:
Confirmed

Depart:

Boston Logan Int'l Airport
Airline Ref:
BW69MN

Boston , MA , US
Seat:

10:00 AM
Class:
E-Economy/Coach

Terminal B
Mileage:
191

Arrive:
New York La Guardia Airport
Travel Time:
1:17

New York , NY , US
Stopovers:
0

11:17 AM
Aircraft:
Airbus A319

Terminal US
Meal:

Remarks:

Saturday 17 November 2007
Hotel

W Hotels

**Form Number 1**

W NEW YORK TIMES SQUARE

1567 BROADWAY

NEW YORK NY US 10036

Tel:
12129307400
Fax:
12129307500

Number of Rooms:
1
Status:
Confirmed

Check Out:
Sunday 18 November 2007
Number of Guest:
1

Room Type:
1K BED BEST AVAILABLE RATE
Confirmation:
C021373651

Rate:
599.00 USD
Number of Nights:
1

Remarks:

CXL AFTR16NOV07TM16:00 AMT:599.00 USD

Sunday 18 November 2007
Air

Us Airways - Flight US 2134
Status:
Confirmed

Depart:
New York La Guardia Airport
Airline Ref:
BW69MN

New York , NY , US
Seat:

4:00 PM
Class:
E-Economy/Coach

Terminal US
Mileage:
191

Arrive:
Boston Logan Int'l Airport
Travel Time:
1:15

Boston , MA , US
Stopovers:
0

5:15 PM
Aircraft:
Airbus A319

Terminal B
Meal:

Remarks:

**Form Number 1**

Agency Remarks

$100000.00 FLIGHT INSURANCE INCLUDED.

TICKETS MUST REFLECT THE NAME AS IT APPEARS ON

YOUR GOVERNMENT ISSUED PHOTO I.D.

***FOR DOMESTIC U.S. TRAVEL***

STATE OR FEDERAL PHOTO I.D. REQUIRED AT AIRPORT.

RE-CONFIRM FLIGHTS 24 HRS BEFORE DEPARTURE.

CHECK-IN AT LEAST 2 HRS BEFORE DEPARTURE TIME.

***FOR INTERNATIONAL TRAVEL***

ALL TRAVELERS **INCLUDING U.S. CITIZENS** ARE NOW REQUIRED TO PRESENT A VALID PASSPORT TO ENTER OR RE-ENTER THE UNITED STATES BY AIR. DUE TO HIGH VOLUME PASSPORT PROCESSING MAY TAKE UP TO 6 MONTHS. MOST COUNTRIES REQUIRE THAT PASSPORTS BE VALID 6 MONTHS BEYOND INTENDED STAY. IN ADDITION- SOME COUNTRIES MAY REQUIRE A VISA FOR TRAVEL.

RE-CONFIRM FLIGHTS 72 HRS BEFORE DEPARTURE.

CHECK-IN AT LEAST 3 HRS BEFORE DEPARTURE TIME.

Yahoo! Mail - boxer_47@yahoo.com http://us.f339.mail.yahoo.com/ym/ShowLetter;_ylc=X3oDMTUzbj...

WELCOME TO

W HOTELS

Please review the following

WHERE Room# 3009

WHAT Rate 599

WHEN Departure Date 11/18

If you feel that any of the above information is incorrect please contact the Welcome Desk. There is an early departure charge or one (1) night's room and tax for checkouts prior to

PRESTIGE TRAVEL 1-800-553-0204 730A-530PM PST

**EMERGENCY SERVICE AVAILABLE FOR A FEE PER CALL

BY DIALING 800-647-6079. INTERNATIONAL CALL

COLLECT 818-575-4313 I.D. CODE PL4E-XYIENCE

**THIS TICKET IS NON REFUNDABLE-PENALTY FOR CHANGES.

**CHANGES MUST BE MADE PRIOR TO DEPARTURE OR TICKET HAS

**NO VALUE. OTHER RESTRICTIONS MAY APPLY.

Thank You For Your Business.

PC1117 21 6 10 ADULT EPC1117

303.00 LOWER LEVEL ADM $ 303.00 31X

UFC 78 VALIDATION

SAT NOVEMBER 17, 2007

DOORS 7:15 1ST BOUT 8:15

PRUDENTIAL CENTER

WWW.UFC.COM

CARD SUBJECT TO CHANGE

21 VI 31X ROW 6 SEAT 10 PRU605A 16NOV07

CN 63364 21 VI003PRU 6 A 303.00 10

2444869940706

OFFICIAL CHECK 0024115410

Operator I.D.

November 14, 2007

PAY TO THE ORDER OF ***RICH BERGERON***

***Five hundred dollars and no cents*** **$500.00**

WELLS FARGO & COMPANY ISSUER
420 MONTGOMERY STREET
SAN FRANCISCO, CA 94163
PAYABLE AT WELLS FARGO BANK, N.A.
FOR INQUIRIES CALL (480) 394-3122

VOID IF OVER US $ 500.00

CONTROLLER

⑈0024115410⑈ ⑆121000248⑆4861 505477⑈

678

**Form Number 1**

# EXHIBIT 30

From Rich Bergeron Fri Nov 23 20:27:00 2007
Received: from [75.67.179.170] by web33913.mail.mud.yahoo.com via HTTP; Fri, 23 Nov 2007 20:27:00 PST
Date: Fri, 23 Nov 2007 20:27:00 -0800 (PST)
From: "Rich Bergeron" <boxer_47@yahoo.com> Add to Address BookAdd to Address Book Add Mobile Alert
Subject: RE: Xyience Discussion
To: "Robert Lavan" <rlavan@stdgen.com>
In-Reply-To:
<03AA810524776F4E853B257B66151F5E07454BAF@nymail1.corp.reservoircap.com>
MIME-Version: 1.0
Content-Type: multipart/alternative; boundary="0-563502818-1195878420=:32417"
Content-Transfer-Encoding: 8bit
Content-Length: 77363
Robert Lavan <rlavan@stdgen.com> wrote:

Rich,

Thanks for the past two emails. I do try to take holidays off but I felt I should send you an email with my thoughts.

While I appreciate your help on introducing me to Xyience and a potential investment opportunity for my firm, I think at this time we are probably going to pass on looking deeper into the company. I am waiting on in depth financials from Xyience's advisors, but from the homework we have done it doesn't look like there is much if any equity value in the company.

Let me walk you through my thoughts, and I hope you don't share these with anyone but yourself. Bankruptcy is a difficult decision thousands of corporations and million Americans make every year. While it is usually a view that bankruptcy means that a company (or a person) is worth nothing, that is not the case. Capital markets are setup for two types of investors: (i) Equity holders who look for certain returns, but retain the option on upside (and the risk of the downside) of a company and (ii) Debt holders who look for fixed returns (and consistent payments), get no upside but are protected on the downside. Bankruptcy does not always happen when there is no value left for the equity holders, but when the debt holders are not being serviced (a technical term that means receiving the consistent payments they agreed to). Xyience has a significant amount of debt, and while they may have a great product and $20mm of sales, it costs them more than $20mm a year to run the company, they are negative cash flow, cannot service their debt, and are technically bankrupt. Unfortunately, unlike Enron or Worldcom or most bankruptcies, Xyience has little asset value (Enron had powerplants, Worldcom had telephone lines), making the recovery value for the bondholders unlikely to be 100 cents on the dollar. This is a risk that any equity investor takes, and no matter the circumstance of the equity raise, the 340 shareholders are subordinate to the debt of the company, and unfortunately legally will deserve little to no retribution. If the shareholders disagree with this, they will have an opportunity to acquire the company once it goes into bankruptcy, but this is usually complicated as you need someone to run the company, which isn't that easy with all its marketing and distribution arms. Xyience has some cool products, but you need more than that in an extremely crowded market that has little barriers to entry and can watch any startup quickly put energy supplements or drinks into the mass market. Now I am not closing the door, but I have a million other projects to work on and have to devote my energy to other work.

**Form Number 1**

Now an important word of warning to you. I am not a lawyer, but take this as advice from someone who has worked on Wall Street for many years and has been through a number of bankruptcies from every side (I was working with Enron before they even went bankrupt, the stories I could tell). In bankruptcy, the creditors of the company will look to every option to recover their capital. Unfortunately, bankruptcy allows for creditors to sell their claims to what I call "glorified debt collectors". These guys are SCUMBAGS and will go through every piece of value the company has to make money. That will include the lawsuit against you. If they think there is a 1% chance to win the $25mm case against you, they will follow through with it to the end of time and throw more lawyers, time and money against you than Xyience can today. While you have many years with this and I am new to this situation, I would be cautious of any company that goes through bankruptcy.

If I get any updates from Adam, I will be sure to keep your informed.

All the best,

Robert

From: Rich Bergeron [mailto:boxer_47@yahoo.com]
Sent: Friday, November 23, 2007 7:17 PM
To: Robert Lavan
Subject: RE: Xyience Discussion

Robert,

Forget Kirk and Adam. They are not going to last in their CEO roles. I am dealing directly with some of the folks among the 340 shareholders, and I have a go between who might want to talk to us both about getting this mess cleaned up.

Kirk and Adam are determined to bankrupt this company. They won't take no for an answer, and I want to prevent them from being able to do so. I have some folks on the inside sending me information, and I'm starting to get a clearer picture of what actually brought the current deal to the table and how it was arranged.

This will be a tremendous story if Xyience can be brought back to former glory with new management who really has the company's best interests in mind. I'll be in touch over the coming week, and I know we can accomplish some great things if we do enough research and figure out the best course here to proceed.

If nothing happens, though, I will still have to proceed with fighting their lawsuit against me. I'm asking for $5 million in damages and sanctions. I'm looking into getting it removed from state court in favor of federal jurisdiction. I'm trying to keep that on the back burner for now, but eventually I'll have to do something to show them I mean business.

See Ya,

Rich

# EXHIBIT 31

**Form Number 1**

FindArticles > Business Wire > Feb 6, 2006 > Article > Print friendly

Global Cash Access Signs Multi-Year Contract with Station Casinos

LAS VEGAS -- Global Cash Access (GCA), a leading provider of cash access products and related services to the gaming industry, announced it has signed a multi-year agreement with Station Casinos, Inc. GCA will continue to provide its products and services at 13 Station Casinos' gaming establishments. It will also begin servicing Red Rock Casino Resort Spa, one of Station Casinos' newest casinos, when it opens in spring 2006.

GCA offers a number of products and services, including ATM technology, cashless gaming and marketing services that help casino patrons access cash, help gaming establishments better understand their patrons, and enhance gaming establishments' patron marketing activities.

Under the agreement, Station Casinos' locations will utilize QuikCash(TM) cash advance terminals, QuikCash Plus(TM) (QCP) Web and Casino Cash Plus(R) 3-in-1 ATM, which offers patrons a quick way to access cash through ATM cash withdrawals, point-of-sale (POS) debit card transactions and credit card cash advances with patented 3-in-1 rollover functionality. One of GCA's most popular ATMs, the Casino Cash Plus(R) 3-in-1 ATM provides convenience to casino patrons and revenue potential to casino operators.

Station Casinos gaming establishments included in the agreement are:

--Barley's Casino & Brewing Company - Henderson, Nev.

--Boulder Station Hotel & Casino - Las Vegas

--Fiesta Henderson Casino Hotel - Henderson, Nev.

--Fiesta Rancho Casino Hotel - Las Vegas

--Gold Rush Casino - Henderson, Nev.

--Green Valley Ranch Station Casino - Henderson, Nev.

--Magic Star Casino - Henderson, Nev.

--Palace Station Hotel & Casino - Las Vegas

--Red Rock Casino Resort Spa - Las Vegas

--Santa Fe Station Hotel & Casino - Las Vegas

--Sunset Station Hotel & Casino - Henderson, Nev.

--Texas Station Gambling Hall & Hotel - North Las Vegas, Nev.

--Wild Wild West Gambling Hall & Hotel - Las Vegas

--Wildfire Casino - Las Vegas

About Global Cash Access, Inc.

Las Vegas-based Global Cash Access, Inc., a wholly-owned subsidiary of Global Cash Access Holdings, Inc. (NYSE: GCA), is a leading provider of cash access products and related services to approximately 960 gaming properties and other clients in the United States, the United Kingdom, Switzerland, Canada and the Caribbean. GCA's products and services provide gaming establishment patrons access to cash through a variety of methods, including ATM cash withdrawals, point-of-sale (POS) debit card transactions, credit card cash advances, check verification and warranty services and Western Union money transfers. GCA provides products and services that improve credit decision-making, automate cashier operations and enhance patron marketing activities for gaming establishments. With its proprietary database of gaming patron credit history and transaction data on millions of gaming patrons worldwide, GCA is recognized for successfully developing and deploying technological innovations that increase client profitability, operational efficiency and customer loyalty. More information is available at GCA's Web site at www.globalcashaccess.com.

Forward-Looking Statements

The statements contained in this press release that are not purely historical are forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Act of 1934. Such forward-looking statements include, but are not limited to, any statement or implication that the gaming establishments named in this press release will continue to use the products or services described in this press release. Such forward-looking statements involve risks and uncertainties that, if realized, could materially impair Global Cash Access Holdings, Inc.'s results of operations, business, and financial condition. These risks and uncertainties include, but are not limited to, (a) the termination of one or more of the contracts with gaming establishments described in this press release, and (b) the factors discussed from time to time in reports filed by Global Cash Access Holdings, Inc. with the Securities and Exchange Commission. The forward-looking statements contained in this news release are made as of the date hereof, and Global Cash Access Holdings, Inc. does not intend, and undertakes no obligation to, update or qualify any of the forward-looking statements made herein.

COPYRIGHT 2006 Business Wire
COPYRIGHT 2006 Gale Group

**Form Number 1**

# EXHIBIT 32

**[Xyience Incorporated Letterhead]**

September 14, 2007

Dear Xyience Incorporated Stockholder:

We are writing to give you an update on the Company's financial condition, and to seek your approval of a significant debt financing and certain related matters.

**Update on Financial Condition and Potential Financing Activities**

The Company's liquidity and capital resources currently are severely limited. Additionally, the Company has significant obligations outstanding to vendors, lenders, and other creditors. Accordingly, without an immediate infusion of significant capital, as well as a major restructuring of the Company's existing obligations, the Company will not be able to continue in existence.

Throughout the last several months, management has routinely conferred with members of the Board of Directors and significant stockholders to keep them apprised of the Company's financial condition and to solicit their input on potential financing alternatives. In an effort to raise the additional capital required to continue the Company's operations, the Company has (1) solicited indications of interest from its existing stockholder base, and (2) met with approximately 5 potential sources of additional financing.

Candidly, the response to the Company's proposal to raise additional capital from the Company's existing stockholder base was disappointing. As you are aware, the Company recently solicited indications of interest from its existing stockholder base for a potential new round of equity financing. Based on the response to date, the amount the Company reasonably believes it could raise from existing stockholders within the necessary time periods is well short of the amounts required. Accordingly, the Company has concluded that an internal raise would not be a viable, short-term financing solution to raise the additional capital necessary to continue its operations.

The response from potential outside investors, including several venture capital firms and factoring companies, also has not been encouraging, especially given the current capital markets' environment. Although several of these sources have indicated a mild interest in investing in the Company, and one may still have an interest, only one has completed due diligence and is currently willing to commit to providing sufficient capital in the time period necessary for the Company to continue its operations.

**Proposed Funding**

The Company has negotiated a Convertible Senior Secured Note and certain related transaction documents (collectively, the "**Transaction Documents**") with an investment group organized through Fertitta Enterprises ("**F.E.**"), pursuant to which the Company would have access to an immediate infusion of capital (the "**Funding**"). F.E. is a local investment management group which manages investments for members of the Fertitta family and other high net worth individuals.

Under the terms of the Funding, the Company would receive access to up to $12 million dollars of capital, subject to the satisfaction or waiver of the conditions contained in the Transaction Documents. A summary of the material terms of the Funding is attached hereto as **Exhibit A**. Copies of the Transaction Documents are available upon request.

The Company believes that the Funding is attractive for a number of reasons, including, without limitation, the following:

- Provides the Company with immediate working capital for its near term operations
- Provides the Company with a strategic partner with the ability to potentially widen the Company's distribution channels
- Provides the Company with an extremely well-respected partner, which should improve the Company's reputation and could improve the Company's ability to raise additional capital
- Provides the Company with access to additional resources and relationships in the beverage industry

**Matters for Stockholder Approval**

The Board of Directors has approved the Funding as being advisable and in the best interests of the Company and its stockholders, and has directed that the Funding be submitted to the stockholders for approval. **PURSUANT TO THE TERMS OF THE TRANSACTION DOCUMENTS, THE FUNDING WILL NOT CLOSE, AND THE COMPANY WILL NOT BE ENTITLED TO BORROW ANY MONEY, UNLESS THE FUNDING IS APPROVED BY 70% OF THE VOTING SHARES OF THE COMPANY OR THE COMPANY OBTAINS A WAIVER OF THIS REQUIREMENT.**

The Company seeks your approval to the Funding, as well as an amendment to the Company's Articles of Incorporation in order to increase the Company's authorized shares of common stock from 90 million to 200 million. Attached as**Exhibit B** you will find an Action by Written Consent for this purpose (the "**Consent**").

Please review the Consent, as well as the summary of the Funding very carefully. In doing so, you should also carefully consider the following information:

1. **Warrant Coverage**. As part of the Funding, the Company will issue to the lenders a warrant to purchase 10% of the Company's capital stock, on a fully diluted basis measured at the time of exercise, at a per share exercise price of $0.01 per share. The number of shares purchasable under this warrant will be increased by (A) an additional 10% of the Company's capital stock, on a fully diluted basis measured at the time of exercise, if certain representations and warranties set forth in the Transaction Documents prove to be inaccurate when made, and (B) an additional 40% of the Company's capital stock, on a fully diluted basis measured at the time of exercise, if the Company is unable to timely meet its obligations to certain material creditors, vendors, or lenders (each, an "**Additional Dilution Event**"). Thus, if both of those events occur, the lenders would be entitled to purchase 60% of the Company's capital stock on a fully diluted basis measured at the time of exercise, for a nominal purchase price, which would materially dilute your interest in the Company, and the lenders would have control over the Company, including, without limitation, the ability to elect its Board of Directors. The warrant also contains customary registration rights, anti-dilution rights, and other customary provisions.

2. **Equity Compensation to Adam Frank and Kirk Sanford**. The Board of Directors has approved an option grant to Adam Frank and Kirk Sanford, members of the Company's Board of Directors and management team, which allows each of Mr. Frank and Mr. Sanford to purchase 4.2 million shares of the Company's common stock at an exercise price equal to $2.50 per share (the "**Options**"). Neither Mr. Frank nor Mr. Sanford receive any cash compensation from the Company.

The Options are subject to the following vesting schedule:

- 25% percent of the Options will vest in equal monthly installments beginning on September 30, 2007 and ending on August 31, 2008 (the "**Vesting Period**").

- 37.5% of the Options will vest if the Company achieves $21.0 million in revenues in any 3 consecutive monthly period during the Vesting Period.

- 100% of the Options will vest on a change of control of the Company during the Vesting Period or the 6 month period thereafter.

The Options are contingent on the completion of the Funding (i.e., if the Funding does not close, the Options will not be granted). In addition, each of Mr. Frank and Mr. Sanford have agreed to forfeit the Options if an Additional Dilution Event occurs. Thus, by voting to approve the Funding you will, in essence, be voting to approve the Options described above, which, if vested and exercised, will materially dilute your percentage interest in the Company.

**Form Number 1**

## Instructions

If the Consent meets with your approval, please:

- Complete and sign the signature page of the Consent attached as **Exhibit B**; and
- Deliver the signature page to the Company by one of the following means:
  - By fax: Fax the signature page to the attention of the Company's Chief Financial Officer, Michael Levy, at 702.439.5495; or
  - By mail: Mail the signature page to the attention of the Company's Chief Financial Officer, Michael Levy at Xyience Incorporated, 10650 West Charleston Boulevard, Suite 110, Las Vegas, Nevada 89135; or
  - By PDF: PDF the signature page and email it to the Company's Chief Financial Officer, Michael Levy at mlevy@xyience.com

In order to ensure that the Funding can be completed in time to make available to the Company the funds needed to continue its operations, **PLEASE DELIVER THE CONSENT NO LATER THAN SEPTEMBER 18, 2007.**

If you have any questions regarding the foregoing, please contact Michael Levy, the Company's Chief Financial Officer, at 702.430.5407. We also urge you to contact Keith Sutton, of the Company's legal counsel, Eisner & Frank, at 310.855.3200.

EXHIBIT A

SUMMARY OF MATERIAL TERMS OF FUNDING TRANSACTION

The following sets forth a brief summary of certain of the material terms of the Transaction Documents and is qualified in its entirety by the Transaction Documents. Stockholders are urged to request a copy of the Transaction Documents and to read the Transaction Documents in their entirety, as those documents, and not this summary, set forth the terms of the Funding.

| | |
|---|---|
| **Commitment Amount:** | $12 million |
| **Interest:** | 15% per annum |
| **Commitment Fee:** | 2% of the Commitment Amount per annum, payable quarterly |
| **Maturity Date:** | 1 year, subject to extension if certain debt covenant ratios are satisfied |
| **Optional Conversion:** | The lenders have a right to convert all obligations under the Note into common stock upon the consummation of an equity financing in which the Company raises an amount equal to the outstanding principal. The conversion price is equal to the amount per share paid by the investors in such equity financing. |
| **Security:** | Senior secured lien on all of the Company's assets |
| **Warrant Coverage:** | 10% of the fully diluted capitalization of the Company on a rolling basis, which is increased by an additional (1) 10% of the fully diluted capitalization of the Company, on a rolling basis, if certain representations and warranties prove to be inaccurate when made, and (2) 40% of the fully diluted capitalization of the Company, on a rolling basis, if the Company is unable to timely meet its obligations to certain material creditors, vendors, or lenders. The number |

**Form Number 1**

| | |
|---|---|
| | of shares is capped upon the occurrence of certain events. |
| **Board and Observer Rights:** | Lenders' representative to be appointed to Board. Lenders to have a Board observer. |
| **Right to Participate in Future Offerings:** | Lenders have a right of first refusal to purchase up to 50% of all future securities offerings of the Company. |

EXHIBIT B
ACTION BY WRITTEN CONSENT

**ACTION BY WRITTEN CONSENT**
**OF**
**HOLDERS OF A MAJORITY OF THE VOTING STOCK**
**OF**
**XYIENCE INCORPORATED**
**a Nevada corporation**

September __, 2007

The undersigned stockholders (the "**Stockholders**"), holding a majority of the outstanding shares of voting stock of Xyience Incorporated, a Nevada corporation (the "**Corporation**"), acting pursuant to the authorization of Section 78.320 of the Nevada Revised Statutes, hereby take the following actions by written consent in lieu of meeting and direct that this written consent be filed by the secretary of the Corporation with the minutes of the meetings of the stockholders.

**Approval of Debt Financing**

WHEREAS, the Board of Directors of the Corporation (the "**Board**") has approved the entering into by the Corporation of that certain Convertible Senior Secured Note (the "**Note**"), the Security Agreement, the Warrant, and the other documents and instruments contemplated thereby (collectively, the "**Transaction Documents**"), in each case, with Fertitta Enterprises, Inc. or one or more affiliates thereof (collectively the "**Lender**"), pursuant to which the Lender would loan to the Corporation the amounts, and on the terms and conditions, set forth in the Note (the "**Financing**").

WHEREAS, copies of the Transaction Documents were made available to the Stockholders pursuant to a letter from the Corporation dated September 14, 2007.

WHEREAS, the Stockholders desire to approve the entering into of the Financing and the performance by the Corporation of its obligations thereunder.

RESOLVED, that the Financing and entering into of the Transaction Documents and the performance by the Corporation of its obligations thereunder, are hereby ratified and approved in all respects.

**Form Number 1**

## Amendment to Articles of Incorporation

WHEREAS, the Board has approved an amendment to the Corporation's Articles of Incorporation pursuant to which the Corporation's authorized shares of stock would be increased to 200,000,000 (the "**Increase**").

NOW THEREFORE BE IT RESOLVED, that the Increase is hereby approved, ratified and affirmed in all respects.

[REMAINDER OF PAGE LEFT BLANK – SIGNATURE PAGE FOLLOWS]

# EXHIBIT 33

**Form Number 1**

From: Adam Frank [adam@adam-frank.com]
Sent: Thursday, October 04, 2007 1:37 PM
To: Adam Frank
Subject: XYIENCE - Fertitta Transaction Completed!!!

Importance: High

Dear XYIENCE Team,

We are very pleased to finally to tell you that we have closed our transaction with Fertitta Enterprises and that funding has been transmitted.

As you all know, getting this deal done has not been an easy process. In the end, everyone at XYIENCE pulled together in support of this deal and that is what matters most.

This funding is very significant for us as it will allow us to enter a new chapter of the Company's history with a committed strategic partner.

Thanks to everyone for your support through this transaction. XYIENCE has a unique team of talented people that have incredible passion, enthusiasm, and commitment to success.

We feel lucky to be part of such a great team and look forward to spectacular results.

Sincerely,

Kirk and Adam

# EXHIBIT 34

**Form Number 1**



# Sec Form 4



**SANFORD KIRK E** - Form 4 Sec Filings Insider Trading and Stock Options

1. Free real-time and historical insider trading data for individual insider or company.
2. Customized insider trading chart: ichart-1338565-500-180-0.png, where
   1338565 is the CIK number for SANFORD KIRK E,
   500 is the width and 180 is the height; 0 is for all data, or 12 for 12 months.
   Time period: [All Data] [Go!]

"Insiders might sell their shares for any number of reasons, but they buy them for only one: they think the price will rise"
- Peter Lynch ==>> What is insider trading>>

Enter Stock Ticker Symbol or Cik: [ ] Free Search! CIk Lookup...

Email a friend >>...

Search By Company or Insider Name: [ ] Search! Google




Total buys: $0, total sales: $9,262,810, net total $-9,262,810
(Vertical in logarithmic scale; Chart based on reported date)

## SANFORD KIRK E: Insider Trading and Stock Options

**Common stock purchase or sale:**

| Transaction & Date | Reported Date | Company | Symbol | Insider Relationship | Shares Traded | Average Price | Total Amount | Shares Owned | Filing |
|---|---|---|---|---|---|---|---|---|---|
| 2006-11-20 Sale | 2006-12-01 6:28 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 46,200 | $15.76 | $728,112 | 392,617 (Direct) | View |
| 2006-11-21--2006-11-22 Sale(A) | 2006-12-01 6:28 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 61,300 | $15.85 | $971,639 | 490,317 (Direct) | View |
| 2006-11-17--2006-11-20 Sale(A) | 2006-12-01 6:27 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 118,700 | $15.92 | $1,889,884 | 551,617 (Direct) | View |
| 2006-11-15--2006-11-16 Sale(A) | 2006-12-01 6:26 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 22,300 | $16.29 | $363,280 | 670,317 (Direct) | View |
| 2006-11-24 Sale | 2006-11-28 1:25 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 51,500 | $15.73 | $809,897 | 438,817 (Direct) | View |
| 2006-11-21--2006-11-22 Sale | 2006-11-24 12:23 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 61,300 | $15.85 | $971,641 | 490,317 (Direct) | View |
| 2006-11-17--2006-11-20 Sale | 2006-11-21 2:37 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 118,700 | $15.92 | $1,889,881 | 551,617 (Direct) | View |
| 2006-11-15--2006-11-16 Sale | 2006-11-17 4:19 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 22,300 | $16.29 | $363,279 | 670,317 (Direct) | View |
| 2006-06-01 Sale | 2006-06-01 8:06 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 300,000 | $15 | $4,500,000 | 87,500 (Direct Indirect) | View |

(A) Indicate amendment filing.

**Other transactions:**

| Transaction & Date | Reported Date | Company | Symbol | Insider Relationship | Shares Traded | Average Price | Total Amount | Shares Owned | Filing |
|---|---|---|---|---|---|---|---|---|---|
| 2007-11-01 Tax Withholding | 2007-11-02 6:07 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 118,969 | $10 | $1,189,690 | 268,729 (Direct) | View |
| 2007-10-08 Tax Withholding | 2007-10-09 6:10 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 1,646 | $11.14 | $18,336 | 387,698 (Direct) | View |
| 2007-09-07 Gift Tax Withholding | 2007-09-11 5:54 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 353,550 | $0.0514 | $18,172 | 175,952 (Direct Indirect) | View |
| 2007-05-07 Tax Withholding(A) | 2007-08-20 4:50 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 1,370 | $15.99 | $21,906 | 566,942 (Direct) | View |
| 2007-08-07 Tax Withholding | 2007-08-09 3:37 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 1,646 | $14.55 | $23,949 | 566,942 (Direct) | View |
| 2007-07-09 Tax Withholding | 2007-07-11 1:07 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 1,629 | $16.32 | $26,585 | 568,588 (Direct) | View |
| 2007-06-07 Tax Withholding | 2007-06-11 1:20 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 1,646 | $16.28 | $26,784 | 570,217 (Direct) | View |
| 2007-05-07 Tax Withholding | 2007-05-09 2:06 pm | Global Cash Access Holdings, Inc. | GCA | SANFORD KIRK E (President and CEO Director) | 3,144 | $15.99 | $50,273 | 0 (Direct) | View |

STAD 2/14/08

# EXHIBIT 35

Form Number 1



E-mail us: service@prospectnews.com Or call: 212 374 2800

**Prospect News**

**Daily market newsletters for professionals.**
***Bank Loans - Convertibles - Distressed Debt - Emerging Markets - High Yield***
***Municipals - Investment Grade - PIPEs - Structured Products - Special Situations***

Back to headline list   Back to issuer list   Back to index   Manage account   Log out

*Published on 11/28/2007 in the Prospect News Bank Loan Daily.*

# S&P lowers Zuffa

Standard & Poor's said it lowered its ratings on Zuffa LLC (d/b/a Ultimate Fighting Championship).

The corporate credit rating was lowered to BB- from BB, the agency said, adding that the outlook is negative.

The issue-level rating on Zuffa's $350 million senior secured credit facilities was lowered to BB- from BB, S&P said, noting that the recovery rating on this debt remains at 3.

The agency said that the downgrade follows the second consecutive quarter of operating performance that was meaningfully below its expectations, adding that the BB- rating reflects Zuffa's revenue and cash flow volatility given its primarily event-driven business model, vulnerability to changing consumer tastes and relatively short operating history.

Top of page

Transaction receipt   User: Rich Bergeron   Your account has been charged $1.00 for this page. Thank you

©2008 Prospect News. This page is protected by copyright law in the U.S. and elsewhere. For the use of the person downloading only.
Redistribution and copying are prohibited by law without written permission in advance from Prospect News.
Redistribution or copying includes e-mailing, printing multiple copies, faxing, photocopying or any other form of reproduction.

# EXHIBIT 36

**Form Number 1**

36

# ZYEN, LLC

PO BOX 379034 – LAS VEGAS, NV 89137

## NOTICE OF STRICT FORECLOSURE

To: Those Referenced in the Attached Distribution List

From: Zyen, LLC
2960 West Sahara Avenue, Suite 200
Las Vegas, Nevada 89102
Attention: William Bullard
Tel: (702) 221-4715

We refer to that certain Convertible Senior Secured Note dated October 4, 2007 made by Xyience Incorporated (the "Debtor") in favor of Zyen, LLC (the "Secured Party") in the principal amount of $12,000,000 (the "Note").

Pursuant to Section 9-621 of the New York Uniform Commercial Code, the Secured Party hereby notifies you that the Secured Party or an Affiliate thereof has accepted the Debtor's Collateral (as defined below) in full satisfaction of the Note. The Collateral consists of the Debtor's accounts, chattel paper, deposit accounts, documents, goods, inventory, equipment, fixtures, instruments, investment property, letter-of-credit rights, letters of credit, money, general intangibles, patents, copyrights, trademarks, the goodwill thereof, trade secrets, licenses of any of the foregoing, all other tangible and intangible personal property whatsoever of the Debtor and the proceeds of the foregoing.

If you object to the strict foreclosure, a notification of objection must be received by the Secured Party at the address noted above within the time period prescribed under Section 9-620(d) of the New York Uniform Commercial Code.

ZYEN, LLC

By: [signature]
Name: William Bullard
Title: MGR

LA1:#6367000

# EXHIBIT 37

**Form Number 1**

37

| | | |
|---|---|---|
| Doug Gillespie | Sheriff | |
| Name (print) | Office (if applicable) | District (if applicable) |
| 6100 Elton Ave., Suite 1000, Las Vegas, NV 89107 | | (702) 384-1120 |
| Mailing Address (include city and zip code) | | Telephone No. |
| E-mail Address | | |

[illegible]

☐ **Annual Filing - Due January 15, 2006**
Period: January 1, 2005 - December 31, 2005

☒ **Report #1 - Due August 8, 2006***
Period: Jan. 1, 2006 - Aug 3, 2006

☐ **Report #2 Due - October 31, 2006***
Period: Aug. 4, 2006 - Oct. 26, 2006

☐ **Report #3 Due - January 15, 2007*/****
Period: Oct. 27, 2006 - Dec. 31, 2006

☐ **Annual Filing - Due January 15, 2007**
Period: January 1, 2006 - December 31, 2006

FOR OFFICE USE ONLY

* **These Reports are filed by incumbents/candidates running for office in the 2006 election cycle**
** **Third Report suffices for 2007 Annual Filing if candidate also filed Report Nos. 1 and 2**

[illegible]

| | | | | |
|---|---|---|---|---|
| 1. Total Monetary Contributions Received in Excess of $100 **(See page 1 of instruction sheet)** | | | 761,797.85 | 761,797.85 |
| 2. Total Monetary Contributions Received of $100 or Less **(See page 2 of instruction sheet)** | | | 2,480.00 | 2,480.00 |
| 3. Total Monetary Contributions in the form of loans guaranteed by a third party. **(See page 2 of instruction sheet)** | | | 0.00 | 0.00 |
| 4. Total Monetary Contributions in the form of loans that were forgiven **(See page 2 of instruction sheet)** | | | 0.00 | 0.00 |
| 5. Total Amount of Monetary Contributions Received (Add Lines 1 through 4 **(See page 2 of instruction sheet)**) | | | 764,277.85 | 764,277.85 |
| 6. Total Amount of Written Commitments for Contributions (When commitment is funded, report as contribution (monetary or in kind)) **(See page 2 of instruction sheet)** | 0.00 | 0.00 | | |
| 7. Total Value of In Kind Contributions Received in Excess of $100 **(See page 2 of instruction sheet)** | 29,587.35 | 29,587.35 | | |

[illegible]

| | | | | |
|---|---|---|---|---|
| 8. Total Monetary Expenses Paid in Excess of $100 **(See page 2 of instruction sheet)** | | | 603,624.88 | 603,624.88 |
| 9. Total Monetary Expenses Paid of $100 or Less **(See page 2 of instruction sheet)** | | | 73.06 | 73.06 |
| 10. Total Amount of All Monetary Expenses Paid (Add Lines 8 and 9) **(See page 3 of instruction sheet)** | | | 603,697.94 | 603,697.94 |
| 11. Total Value of In Kind Expenses in Excess of $100 **(See page 3 of instruction sheet)** | 29,587.35 | 29,587.35 | | |
| 12. Disposition of Unspent Contributions **(Only reported on Report #3, Annual Report or 15th day of the second month after candidates defeat or incumbent does not run for reelection)** **(See page 3 of instruction sheet)** | | 0.00 | | |

[illegible]

**I Declare Under Penalty of Perjury That the Foregoing Is True and Correct.**

[signature] 08/07/06

2931

2932

[illegible]

Doug Gillespie — Sheriff

Name (print) — Office (if applicable) — District (if applicable)

**Contributions In Excess of $100 or, When Added Together from One Contributor Exceeds $100**
**Transfer Total Amount of All Campaign Contributions to Line 1 of Contributions Summary**

| CONTRIBUTOR'S NAME AND ADDRESS | DATE OF EACH CONTRIBUTION | AMOUNT OF EACH CONTRIBUTION | CHECK HERE IF LOAN | NAME AND ADDRESS OF 3RD PARTY IF LOAN GUARANTEED BY 3RD PARTY | [illegible] |
|---|---|---|---|---|---|
| Dominic P. Gentile Ltd.<br>3960 Howard Hughes Pkwy.<br>Ste. 850<br>Las Vegas, NV 89109 | 7/26/2006 | 2,500.00 | | | |
| Donald J. Campbell & Associates<br>700 S. 7th Street<br>Las Vegas, NV 89101 | 7/25/2006 | 6,000.00 | | | |
| Christiana L. Duke<br>2057 Jupiter Hills Ln.<br>Henderson, NV 89102 | 7/20/2006 | 250.00 | | | |
| Edge-Star Partners LLC<br>3930 Howard Hughes Parkway<br>Ste. 360<br>Las Vegas, NV 89109 | 8/9/2006 | 5,000.00 | | | |
| Edward A. Wilson Revocable Trust 198<br>7465 Edna Avenue<br>Las Vegas, NV 89117 | 8/3/2006 | 250.00 | | | |
| Eureka Casino<br>3217 S. Highland Drive<br>#704<br>Las Vegas, NV 89109 | 8/9/2006 | 5,000.00 | | | |
| John J. Fakula, Jr.<br>10538 Meadow Mist Ave<br>Las Vegas, NV 89135-2029 | 6/27/2006 | 250.00 | | | |
| Ted J. Fechser<br>3065 Woods Dr.<br>Las Vegas, NV 89108-4206 | 7/25/2006 | 2,000.00 | | | |
| Lorenzo J. Fertitta<br>P.O. Box 27555<br>Las Vegas, NV 89126-1555 | 8/14/2006 | 10,000.00 | | | |
| Victoria K. Fertitta<br>2960 W. Sahara Ave.<br>Ste. 200<br>Las Vegas, NV 89102 | 6/14/2006 | 5,000.00 | | | |
| Fertitta Enterprises<br>P.O. Box 27555<br>Las Vegas, NV 89126-1555 | 6/14/2006 | 5,000.00 | | | |
| Frank J. Fertitta III<br>P.O. Box 27555<br>Las Vegas, NV 89126-1555 | 6/14/2006 | 10,000.00 | | | |
| Frank J. Fertitta Jr.<br>2960 W. Sahara Ave.<br>Ste. 200<br>Las Vegas, NV 89102 | 6/14/2006 | 5,000.00 | | | |
| Amy H. Feldman<br>2081 Troon Drive<br>Henderson, NV 89014 | 7/6/2006 | 500.00 | | | |
| George Fitos<br>14 Burning Tree Ct.<br>Las Vegas, NV 89113 | 6/10/2006 | 1,000.00 | | | |

This page may be copied or duplicated if additional space is needed.



2933