# EXHIBIT 70

Electronically Filed
03/14/2008 02:54:52 PM

CLERK OF THE COURT

**Form Number 1**

0026
Rich Bergeron
147 OLD COUNTY ROAD
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

XYIENCE, INC., A Nevada Corporation,

Plaintiff,

v.

Rich Bergeron, An Individual,

Defendant.

CASE NO.: A544781

DEPT. No.: XXIII

# DEFENDANT'S EX PARTE MOTION TO VACATE ORDER FOR AN EXTENSION AND TO CONTINUE HEARINGS ON DEFENDANT'S MOTION FOR RULE 11 SANCTIONS AND MOTION TO DISMISS ON ORDER SHORTENING TIME

Defendant Rich Bergeron submits this Ex Parte Motion to vacate order for an extension and to continue hearing on Defendant's motion for Rule 11 sanctions and motion to dismiss on order shortened time. This motion is made and based upon the papers and pleadings on file, the following Memorandum of Points and Authorities, the accompanying exhibits, including Declaration of Pro-Se Defendant Rich Bergeron, and any oral argument that is heard by this court.

DATED THIS 14th Day of March, 2008.

Rich Bergeron
147 Old County Road
East Sandwich, MA 02537
Serving as Attorney Pro Se



STAD 3/14/08

**Form Number 1**

**DECLARATION OF RICH BERGERON IN SUPPORT OF EX PARTE MOTION TO VACATE ORDER FOR AN EXTENSION AND TO CONTINUE HEARINGS ON DEFENDANT'S MOTION FOR RULE 11 SANCTIONS AND MOTION TO DISMISS ON ORDER SHORTENING TIME**

**1.** I am attorney pro-se in this case, and I have personal knowledge of the facts stated in this declaration except for those upon information and belief, and to those matters I believe them to be true. This declaration is made in support of defendant's motion to strike the March 6, 2008 order on plaintiff's ex parte motion for an extension on an order shortening time.

**2.** Upon information and belief, on March 6, 2008, an order was secured by the plaintiff without a proper and fair hearing being held to allow me to actively participate as I was told I could.

**3.** On February 29th, 2008 The Department XXIII secretary left a message on my answering machine offering strict instructions to call the court at 9:30 AM on the following Monday to participate in a telephonic hearing regarding the plaintiff's motion for an extension.

**4.** The instructions left for me also informed me to contact the opposing attorney. I did so and left a message with Attorney Laurel Davis explaining the directive I was given regarding calling into the court at 9:30 AM to take place in the hearing telephonically.

**5.** I called the court and department XXIII at the appropriate time only to find out an order had already been secured by the plaintiff and I had been barred from appearing telephonically at any future hearing.

**6.** The plaintiff's attorneys have asked for a 60-day extension in this matter when they are in full knowledge of the fact that there is a public auction set for Xyience on April 1, 2008.

**7.** I have been granted an order to proceed informa pauperis in this matter and will not be able to afford to travel to Las Vegas to be present at any future hearings. Barring me from appearing telephonically is a direct violation of my federally protected right to due process. Absent the plaintiff providing me with assets to travel to Las Vegas to attend hearings personally, the plaintiff will continue to benefit unfairly from one-sided hearings secured through denying my explicit and federally protected rights to participate in the process of publicly defending myself in this matter.

**8.** In recording the last public hearing (February 7, 2008) on this matter I was not acting in violation of any law or Nevada statute. The proceedings are not under seal, the hearing was a matter of public discourse, and there was no reason the session could not be legally recorded. I provided a fair and accurate recording of the hearing and did not alter the conversation or discourse in any way.

**Form Number 1**

9. Judge Timothy Williams actually told me at that hearing that I have a right to publish the pleadings in this case on my Web-site. This litigation has all the hallmarks of a precedent-setting, landmark case. The subject of this litigation is also directly connected to a major public issue. Every aspect of it should be available to the public, including the tape of the hearing.
10. Should I be told I cannot legally record future hearings or that I must seek permission from the parties before I do so, I will gladly abide by those stipulations. However, as of the date of the first and only hearing I have been able to personally participate in, I had no valid reason to believe making a recording of the court's publicly noticed and publicly accessible hearing was in any way out of bounds or inappropriate.
11. The law clearly protects the right of any person to record a conversation that person is party to. I was a party to the public conversation that took place at the hearing I recorded. Nevada law does not prohibit the recording of any public conversation in which at least one party to that conversation consents to being recorded. As the recorder and pro-se attorney at the hearing I was a consenting party.
12. Without the opportunity to appear telephonically, I will only be able to participate in this case with strictly on-paper motions and will not have a fair opportunity to affect the outcome of any future hearings.
13. The February 7, 2008 hearing has been the only hearing in this entire litigation through which I have been able to achieve any sort of success or victory. At each and every previous and subsequent hearing in which I have not been allowed to participate I have suffered setbacks, unfavorable rulings, and direct violations of my rights to due process. My presence via telephone at that one hearing and the outcome I was able to achieve is direct evidence of the effect my ability to appear in my own defense has on the court. Without the opportunity to personally appear, there are grounds for an immediate appeal of any judgment on the plaintiff's behalf due to egregious violations of my constitutional rights.
14. The plaintiff's attorney has lied to this court by claiming on one hand they are eager to resolve this issue while on the other hand asking for a 60-day extension. Fennemore Craig, P.C. is purposely utilizing delay tactics to maintain this case improperly as a valid asset when it will become a liability if Bergeron's motion to dismiss and motion for Rule 11 sanctions are approved. This is tantamount to bankruptcy fraud with intent to deceive potential buyers who will be making bids at

the April 1, 2008 auction of Xyience.

15. Xyience is set for public auction on April 1, 2008 and may no longer be retaining Fennemore and Craig once that sale is completed, as the company will no longer need their bankruptcy attorneys once that sale has been completed and new ownership is put in place. They are asking for an extension they are well aware will essentially allow their client to escape responsibility and accountability.
16. By avoiding answering my motions in the appropriate time frame, the plaintiff will be passing their fraud onto the next owner of Xyience. Fennemore Craig, P.C. has managed to delay these hearings and abuse this court by passing this case to the future owners without resolving it appropriately as they have falsely maintained they are eager to do.
17. Fennemore Craig, P.C. is deserving of censure by this court for both abuse of the judicial process and outright misrepresentations of the facts involved. For instance, Fennemore Craig P.C. Attorneys maintain that neither their office nor Xyience headquarters were served with my counterclaim. Yet, in an email sent to me, one of their attorneys clearly tries to maintain that my service of the proper documents accomplished on my behalf by a licensed Nevada attorney to Xyience headquarters was not proper. They openly admit to knowing the documents were served on Xyience directly after stating in writing as part of a motion that came before this court that those documents were never properly served.
18. Fennemore and Craig did not abide by the proper rules of service regarding orders shortening time as far as their motion for an extension in this matter. They were required to provide me a physical copy of their order shortening time via process server according to stipulations in the Rules of Procedure for the 8th Judicial Court. Rule 2.26 clearly explains service of such order by U.S. Mail is improper, and I never consented to being served by email by Fennemore Craig, P.C. in this case.
19. I am fighting on behalf of myself and countless victims who were defrauded by Xyience, and I have a right to a speedy trial.
20. I intend to file a motion for relief from the automatic stay imposed by Xyience's bankruptcy case (BK-08-10474-MKN) in the near future so there will be no future judgment issues in this case that the company's bankruptcy will supercede. I am also planning to seek a dismissal or suspension of Xyience's bankruptcy proceedings based on massive fraud instituted by both counter-defendants in this case. I have already made a full report of that fraud to the appropriate authorities.

**Form Number 1**

21. Without the vacation of the order in question I will suffer immediate harm and will be unable to proceed adequately, fairly, and effectively.

22. Should I be forced to travel to Las Vegas for a hearing, I could also be killed. Death threats have been issued to some of my sources already. Counter-defendant Fertitta Enterprises is directly connected to the Fertitta family, which has a long history of being involved with organized crime endeavors up to and including the possible murder of former Frank Fertitta, Jr. associate Carl Thomas. (See Exhibit 1)

23. Frank Fertitta Jr. is founder and former chairman of Station Casinos. Federal investigations linked him to a money-skimming operation in 1985, but he was never charged or sanctioned. Nonetheless, Missouri gaming officials in 1992 refused to issue a gambling permit to Station unless the company guaranteed Fertitta would have no part in its management, according to published reports. However, he has significant funds invested in the activity of Fertitta Enterprises and has reportedly put some of his own funds into Xyience.

24. Based on the dubious, surreptitious, collusive, and possible criminal element of the partnership between Fertitta Enterprises and former Global Cash Access Holdings executives (designed specifically to bankrupt Xyience to promote huge, illegitimate profits), I contend that there are grounds for an extensive investigation into likely RICO Act violations pertaining to Xyience, Fertitta Enterprises, and Global Cash Access Holdings.

25. I have voiced my concerns about the Fertitta/GCA bankruptcy scheme to federal government agencies and already provided these agencies with actionable information relating to Xyience founder Russell Pike and other Pike family members and associates (see exhibit 2).

26. I have thus far put my trust in the state courts of Nevada to discharge their collective duties fairly and impartially regarding this matter. Yet, there have been several instances in which the over-riding federal issues involved in this case have been trampled by numerous inconsequential technicalities, nuances of process, and favoritism of the plaintiff's law firms handling the case.

27. The strategy employed by all of Xyience's attorneys thus far is to cloud the real issues and block a fair hearing on the actual merits of the case through harping on these technicalities and nuances of process I have had to expend voluminous hours trying to learn and grasp. Xyience has always been represented by a licensed attorney, while I have always had to defend myself due to a lack of financial standing.

28. There are serious, palpable, and superceding federal issues involved in this case which justify removing the case from the state courts upon the dismissal of Xyience's action against me so as to proceed in federal court with my counterclaim.
29. My ability to secure timely, appropriate, and due judgment in the case currently before this court hinges on those responsible for filing this frivolous case being held accountable before they can pass the fraud on to another owner and another law firm.
30. An order shortening time is absolutely crucial to the administration of proper justice and the acquisition of legal fees I am entitled to that will be utilized to recover from the egregious financial situation the plaintiff's fraudulent case has imposed upon me.
31. The plaintiff has been using, abusing, and defrauding this court for long enough and needs to be held accountable for the filing and pressing of this frivolous case. Without such immediate accountability their fraudulent schemes will be able to proceed and injure further parties entitled to adequate and timely relief. Barring immediate relief the plaintiff will no doubt further abuse the trust of this court and further support a frivolous filing rife with perjured testimony, manipulated and manufactured evidence, and misconstrued points of law.
32. I intend to conduct extremely intensive discovery in this matter which I know will result in the exposure of a tremendous amount of criminal activity in which both Xyience and Fertitta Enterprises took part in with the help and financing of several Global Cash Access executives. This discovery process will serve to assist in providing further actionable information to federal authorities and will help provide relief to multiple victimized parties.
33. I declare under penalty of perjury under the laws of the State of Nevada (NRS 53.045), that the foregoing is true and correct.

Rich Bergeron

**POINTS AND AUTHORITIES**

**INTRODUCTION:**

**Form Number 1**

Defendant Rich Bergeron was instructed by the Department XXIII secretary on February 29, 2008 to dial the number 702-671-0588 at 9:30 AM on March 3, 2008 in order to appear in his defense for a hearing on the plaintiff's ex parte motion for an extension. Bergeron dialed in a few minutes early only to receive no answer. He immediately called Department XXIII where the same secretary informed him the order had already been filed and the judge had already ruled on the matter.

Bergeron was also told he would not be permitted to appear telephonically at any future hearing. This is Bergeron's only way to appear, as evidenced by his order to proceed informa pauperis. There is no way he can afford to travel to Nevada for any hearing. He is also in a position where he will be in constant fear for his life if he should be forced to travel to Las Vegas.

60 Days is an incredibly excessive amount of time for Fennemore Craig, P.C. to ask for considering the motion to dismiss has been on the docket in this case for almost five months now. The plaintiff also blatantly lied in their pleadings to support the extension. They claimed in writing that the extension isn't about delay. They claim they need the time to review voluminous documents. That is laughable. They are a GIANT LAW FIRM! They have abundant resources and capabilities that are more than adequate to answer Bergeron's pleadings and prepare for hearings in a much more timely fashion. Bergeron is one man and he's willing to proceed. The burden is on him, not them.

The plaintiff's attorneys are specifically trying to delay having to declare this case a liability rather than an asset. Fenemore Craig, P.C. may never be back before this court if their extension is allowed to stand. Xyience will be sold to the highest bidder on April 1, 2008. Fennemore Craig, P.C. will be replaced by the in-house counsel of the new owners who will realize at some point that they were hoodwinked into believing this case was an asset. The April 1, 2008 auction is Fennemore Craig, P.C.'s April Fools joke on this court.

This case is the only chance for the countless victims of the plaintiff's fraudulent activity to secure justice from the appropriate offending parties. The plaintiff seems to be forgetting that they sued Bergeron. Now that he's proven the entire case to be a fraud they want the court to believe they should

**Form Number 1**

be immune from immediate accountability. On one hand they're telling the court Bergeron can't exact any relief from them due to the ongoing bankruptcy. On the other hand they are purposely trying to keep this case as an asset until the sale of the company goes through. At all times they have improperly pursued this case through acts of undeniable fraud. That fraud victimized this very court on multiple occasions, and if allowed to continue it will go on victimizing this court and countless other innocent victims.

The plaintiff's request for an extension is precisely designed to delay justice and deny responsibility for their actions. Even if given an eternity to respond, the preponderance of the evidence points to the plaintiff engaging in the kind of behavior that cannot be explained away by any exonerating evidence. The plaintiff is actively pressing a case with absolutely no merits to rely on, no possible merits that exist to discover, and no definitive evidence outside of what they may be able to manufacture and present in a false light. They will never be able to free themselves of the burden they have created for themselves in pressing this frivolous suit so far. They should not be able to appear before this court and be given any further time to respond to charges they have had months to digest and disagree with.

As long as the judicial process can be manipulated in this manner simply through changing attorneys, Xyience could conceivably delay justice for years that should have already been granted months ago. Bergeron has gone out of his way and spent thousands of hours learning to be a pro-se defendant. These are hours he is not receiving any compensation for while each of the plaintiff law firm's hours provide them with a tidy profit. They are able to bill their client enough to more than adequately cover their expenses while Bergeron has had trouble just raising the proper capital to facilitate proper postage of some of the motions he's had to serve on the plaintiff.

Since the plaintiff stopped paying Attorney Jamie Cogburn they have completely abandoned

the so-called merits they based the initial case on. Now this new firm is trying to run away from all the perpetrators who put this thing together while at the same time moving forward with the case those same people created.

Bergeron has presented over 40 exhibits that all point to a grand fraud being perpetrated on this court. The plaintiff has done nothing but sustain and support the ongoing fraud, and this is the third law firm they've used to press this frivolous case.

Although Bergeron may not be a procedural expert, he's gone out of his way to bring truth to these proceedings while the plaintiff continues to lie and cloud the truth. Fenemore Craig, P.C. is pulling every possible technicality out of their big bag of bogus legal tricks, and they're doing it to distract this court from the real issues here and the merits Bergeron presented to show the entire case against him is a fraud. All the bells and whistles they throw at the court still can't conceal the truth Bergeron's been laying out meticulously since the beginning of these proceedings.

Bergeron is an individual. They have an entire law firm at their disposal. Look at the sheer amount of paperwork they've added to this case since they came on board. Clearly they've shown a genuine ability to act fast when they have to and assemble pleadings with relative ease. They don't need 60 days. They don't even need 6 days. If this court instructs them to file a responsive pleading, they could do it overnight if they had to. Allowing Fennemore and Craig such a ridiculously advantageous reprieve from having to justify the plaintiff's case is like pitting an entire mechanized infantry unit in combat against a blindfolded, unarmed individual. Fennemore Craig, P.C.'s Web-site boasts that they are "a full service law firm with over 190 attorneys." They list three offices in Arizona, a Las Vegas office, and a Colorado office while receiving proceeds from an illustrious client list that includes several major corporations and banking institutions. Why should this huge firm be given special treatment while Bergeron is constantly disadvantaged and punished by the actions of this court?

**Form Number 1**

Aside from the delay they're asking for how can they even answer the truth spread out over more than 40 exhibits now? How can they invent a way around something that is happening the way Bergeron reported it all along? Bergeron predicted the company would go bankrupt a month before the proceedings started. That's how highly entrenched his sources are.

If Bergeron had to travel to Las Vegas, he would never make it home. He is convinced of that. Going to New York City to meet with the plaintiffs was risky enough. There have been death threats issued to several sources he's contacted, and he has publicly exposed the plaintiff's financiers' connections to organized crime. Due to the voluminous amount of money at stake for the plaintiff and their financiers and the criminal implications brought to light by Bergeron's stories, a trip to Vegas could result in him being executed before he can provide further information to the federal Government agencies he has been actively cooperating with.

This case has crippled Bergeron financially, physically, and emotionally and changed his entire life. If his chance to obtain relief is delayed for 2 months he will not have an opportunity to recover justice for himself or all the other victims in this case from the guilty parties. The plaintiff will be under new ownership, and those responsible for these egregious offenses will be long gone after obtaining voluminous illegitimate profits off the fraud they've perpetrated. The plaintiff is hoping to keep using this court to commit and sustain fraud. They hope to pass that fraud on to the highest bidder upon the auction of the company April 1, 2008.

This is a First Amendment, precedent setting case. Bergeron has a right to a speedy trial and due process. He is representing himself. This is a public issue. He has a right to include the case material on the public record. The public has a right to know what's going on. He had every right to record and publish the February 7th hearing. He is so confident in his right to obtain and disseminate the recording that he can demand without fear of any consequence that this court find him in contempt

**Form Number 1**

if there is evidence he acted in violation of any state statute or federal law.

The plaintiff's attorneys are handling a matter that is a public issue and deals with a public figure. By association their involvement and behavior regarding this case is a public issue. Bergeron has a right to publish a complete record of the proceedings as a result. If the court should deem otherwise, an immediate contempt order should be filed and Bergeron should be extradited to Nevada to face criminal contempt charges.

While an order has been placed on the docket barring Bergeron from actively participating in public hearings in his defense, no order has been either proposed or placed on the docket defining any breach of Bergeron's pro-se attorney responsibilities or enjoining him from publishing the recording of the hearing he obtained on February 7, 2008.

Meanwhile, the plaintiff's counsel continues to be rewarded despite the fact that they are now exhibiting the same kind of behavior that Attorney Jamie Cogburn engaged in to fabricate this frivolous case. Based on misrepresentations already made by Fennemore Craig, P.C. attorneys to this court, their firm is susceptible to their own criminal contempt charges for making false statements to support their lack of a case. Yet, because they are licensed, have direct access to hearings, and work in offices in close proximity to the courthouse, they have been given free reign to lie to this court in order to deny Bergeron the protections the U.S. Constitution is supposed to guarantee him.

Fennemore Craig, P.C. Attorney Jon Pearson sent an email on March 4th intimating that sending a counterclaim in this matter to the Xyience headquarters on February 21 was insufficient service. This is a blatant misrepresentation of the law and a clear example of Pearson's lack of integrity. On February 25, 2008, Xyience filed a Substitution of Counsel substituting Fennemore in place of Hunterton & Associates. There is no requirement in any of the 8th Judicial Court's Rules of Procedure or the Federal Rules of Procedure stipulating that service of documents is not proper when

served upon the plaintiff's physical address rather than on a yet-to-be-named law firm. (see exhibit 3)

Bergeron was aware at the time of service due to inside sources at Xyience that the case was in legal limbo in regards to a representative attorney. His only choice was to have the counterclaim documents served directly on Xyience's main office. It is not Bergeron's fault that the documents served properly on Xyience by a licensed Nevada attorney providing pro-bono assistance did not make the transition to Fennemore and Craig's offices upon that firm taking over the case.

Furthermore, Plaintiff's attorneys have utilized this tactic before to try and escape responsibility for responding in a timely manner to properly served documents. Hunterton and Associates used the same old trick to compel Judge Williams to force Bergeron to resubmit hundreds of pages of documents he had already served to Attorney Jamie Cogburn by E-service Cogburn had an agreement with the court to accept. Fennemore is acting in a manner that is designed to deceive the court and Bergeron into taking unnecessary steps to unfairly balance the proceedings in their favor. They have also sent a demand letter (see exhibit 4) threatening to charge Bergeron with contempt if he does not withdraw the counterclaim from this court and file a proof of claim in Bankruptcy court.

Fennemore Craig, P.C. represented this tactic as the only method Bergeron can possibly utilize to move forward in this matter without becoming liable for contempt and for attorney fees Fennemore would incur should they have to file a motion designed to inspire contempt charges against Bergeron. Using strong-arm tactics and trying to manipulate Bergeron's next logical move, the demand letter is a clear example of why censure is necessary. Bergeron's subsequent research led him to discover more applicable alternatives and more accurate descriptions of the laws they tried to use to improperly influence Bergeron to proceed in a manner more favorable to their case. Bergeron's best course of action is not to voluntarily withdraw the counterclaim, and Fennemore is well aware of that fact. He is better suited and more likely to be successful in filing a motion to lift the bankruptcy stay or

**Form Number 1**

a motion for relief from the bankruptcy stay that will keep the claim before this court where it currently belongs.

Fennemore is acting with blatant disregard for the law and the truth. Like Hunterton and Associates they refuse to even confront the merits of Bergeron's argument against Xyience. They seek to distract this court with each and every technicality they can possibly apply to this matter. They continue to run away from the truth at every turn, and they are getting away with it despite reams of evidence provided by Bergeron proving the entire case against him is a fraud.

**POINTS OF LAW:**

The law is clear and unequivocal—Prior restraints are not permitted except in the most exceptional of circumstances, involving "such a grave threat to a critical government interest or to a constitutional right." *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996).

It is a violation of due process and Bergeron's First Amendment rights to enjoin him from participating telephonically in the proceedings of this court. Bergeron is being unduly punished in this matter while the plaintiff has made multiple egregious misrepresentations and has never been so much as reprimanded. Bergeron has presented evidence showing the plaintiff went as far as committing perjury to support what is ultimately a frivolous case.

**Federal Wiretap Law**

A. The federal wiretapping law is part of the Omnibus Crime Control and Safe Streets Act, 18 USC §2510-2521 (the "Act"). B. The Act prohibits the interception and disclosure of oral communications. The Act contains an exception when the interceptor is a party to the communication. § 2512(a)(ii)(d).

1. This section states: "It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral or electronic communication where such person is a party to the communication...**unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.**"

b. See also *State v. Underwood*, 293 Or 389, 648 P2d 847 (1982), holding that an "interception" does not occur when one tapes one's own telephone conversation. Accord, *Newcomb v. Ingle*, 944 F2d 1534 (10th Cir 1991).

Beyond the federal statutes and Supreme Court rulings that may have conflicting conclusions

based on this issue, the key and crucial measure is what the states have to say about it. Nevada is in uncharted territory as far as the topic of recorded calls. The Supreme Court of Nevada has yet to truly test this tough subject. The case the plaintiff points to—Lane V. Allstate Ins. Co., 114 Nev. 1176, 969 P.2d 938 (1998)—has nothing to do with public hearings and the right of a party to a public hearing to record the event. That case also regards a videotape (not an audio recording) of a non-public event.

**NRS 200.650 Unauthorized, surreptitious intrusion of privacy by listening device prohibited:** Except as otherwise provided in NRS 179.410 to 179.515, inclusive, and 704.195, a person shall not intrude upon the privacy of other persons by surreptitiously listening to, monitoring or recording, or attempting to listen to, monitor or record, by means of any mechanical, electronic or other listening device, any **private conversation** engaged in by the other persons, or disclose the existence, content, substance, purport, effect or meaning of any conversation so listened to, monitored or recorded, unless authorized to do so by **one of the persons** engaging in the conversation. (Added to NRS by 1957, 335; A 1973, 1749; 1989, 660)

The conversation recorded by Bergeron was a public conversation held in a public court of law. Even if it had been private, he was party to the conversation and recorded it legally according to the above Nevada statute.

If this court's ruling contends that Bergeron cannot participate in future hearings due to a violation of Nevada law pertaining to the recording of the hearing, he should be formally charged and extradited to Nevada. Absent a formal charge and extradition, there are no grounds and no definitive evidence to suggest Bergeron is guilty of any breach of Nevada law. Until such a determination on the legality of the recording is made, Bergeron should be able to appear telephonically.

Bergeron has only ever been able to appear telephonically at one hearing thus far. That February 7, 2008 hearing resulted in the only decision made by any judge in this case that favored the defendant. Clearly, his ability to appear telephonically is essential to providing any positive outcome for himself in this matter. To bar him from any future telephonic appearance is a direct violation of his right to due process. That denial of due process also provides the plaintiff an entirely unfair advantage and makes the court an accomplice to denying the defendant's federally protected right to a fair trial.

If necessary, Bergeron can play the answering machine recording of the Department XXIII secretary for the court in which the secretary clearly denotes that Bergeron would be responsible for

calling the court at 9:30 AM on March 3, 2008. He followed instructions only to have the whole process circumvented, resulting in him being shut out of the proceedings unfairly and without any



opportunity for redress.

Procedural due process is essentially based on the concept of "fundamental fairness." As construed by the courts, it includes an individual's right to be adequately notified of charges or proceedings, and the opportunity to be heard at these proceedings. Bergeron was notified of a hearing time and was present at the time given to him by the judge's secretary. Yet, he was still barred from participation because the hearing was held before the time the judge's secretary told him to call.

Furthermore, Bergeron was never properly served with the plaintiff's order shortening time. The rules of service for the 8th Judicial Court stipulate:

**Rule 2.26.** Shortening time. Ex parte motions to shorten time may not be granted except upon an unsworn declaration under penalty of perjury or affidavit of counsel describing the circumstances claimed to constitute good cause and justify shortening of time. If a motion to shorten time is granted, it must be served upon all parties promptly. **An order which shortens the notice of a hearing to less than 10 days may not be served by mail.** In no event may the notice of the hearing of a motion be shortened to less than 1 full judicial day.

The plaintiff's motion was docketed on February 27th, 2008. The hearing was set for March 3, 2008. That puts the proper notice period in the 10-day window. The plaintiff served the motions and the order shortening time by mail, which is not permitted according to this court's rules of procedure. Bergeron even warned the plaintiff's attorney of his failure to meet the standards of the rules of procedure on February 27th via e-mail (See Exhibit 5). Bergeron has not agreed to e-service, so therefore the plaintiff should have been required to utilize a process server to comply with the rules of procedure on the order shortening time.

**CONCLUSION:**

The plaintiff in this case continues to abuse the trust of this court by circumventing Bergeron's right to due process and willfully violating his First Amendment rights. The plaintiff's latest attorneys have furthermore blatantly lied to this court by stating the need for an extension so they can answer the pleadings after 60 days, telling Bergeron in writing that the law demands he voluntarily withdraw his counterclaim, and trying to force Bergeron to resubmit a filing that was already properly served. They are clearly in a position to know that the company is set for auction on April 1, 2008, and the completion of that auction is likely to involve a transition of the case to a new attorney. They will not

be in any position to answer Bergeron's pleadings or attend any hearings on behalf of Xyience after 60 days have expired if the auction date is upheld.

The extension order should be vacated, and a proper hearing date should be set on Bergeron's



motion to dismiss and motion for Rule 11 sanctions. That date should be placed on the calendar in advance of the April 1, 2008 public auction of Xyience. To promote due process and provide the defendant ample opportunity to seek redress from the party that filed this frivolous suit, the court should demand Bergeron's pleadings be answered by the plaintiff before the same April 1, 2008 sale date.

Without a determination by the criminal courts of Nevada that Bergeron is guilty of a crime regarding the recording of the February 7, 2008 hearing before Judge Williams in Department XVI, Bergeron should be permitted to appear telephonically at all future hearings. To this point he has yet to be even charged with any crime and therefore deserves to be allowed to participate telephonically until such point where he is formally charged with a crime. Furthermore, Bergeron has presented ample evidence to prove he committed no crime in the recording of the public hearing.

The plaintiff continues to try to avoid being held accountable for filing a frivolous suit against Bergeron. They have yet to champion any of the original merits of the case since Attorney Jamie Cogburn withdrew from the case due to the plaintiff's failure to pay his fees. Each new lawyer continues to press the plaintiff's case based purely on technicalities while the merits of Bergeron's argument continue to be ignored and overlooked by this court. Bergeron has a right to a speedy trial, and the circumstances regarding the company's upcoming public sale provide a situation in which an order shortening time on this motion is both necessary and crucial.

Dated March 14, 2008

Respectfully Submitted By:

Rich Bergeron
147 Old County Road
East Sandwich, MA 02537
Serving as Attorney Pro Se

**Form Number 1**



# EXHIBIT 1

**Form Number 1**

PUBLISHED MATERIAL DETAILING THE FERTITTA FAMILY'S CONNECTIONS TO ORGANIZED CRIME

http://educationforum.ipbhost.com/index.php?showtopic=6339&mode=threaded

After the James Committee drove the rackets underground, it became much more difficult to distinguish between organized crime and legitimate business in Jefferson County. The families with connections to organized crime also invested in apparently legitimate businesses. It is nearly impossible to tell whether these were fronts for money laundering, or entirely separate from criminal endeavors. Now that gambling was no longer openly tolerated by Jefferson County law enforcement, the two Southeast Texas families most prominently associated with organized crime—the Fertittas and the Rogers brothers—began to branch out into legally-sanctioned gambling enterprises in Nevada.

The Maceo-Fertitta Crime Family

The Fertittas descend from the notorious Maceo brothers' crime family, who terrorized the island of Galveston during the wide-open era. Sam and Rosario Maceo got their start by smuggling alcohol during Prohibition. After Prohibition was repealed they graduated to drug smuggling. In 1937, Sam Maceo was indicted in a massive narcotics investigation. By the 1950s, the Galveston crime family was in decline, and they were reputedly kicking tributary payments upstairs to Mafioso Carlos Marcello in New Orleans.

Marcello was reputed to control the rackets all up and down the Texas Gulf Coast, as well as inland metropolises of Dallas and Houston. Marcello was also linked to industry through Houston oilman Lenoir Josey, among others. As in Jefferson County, ninety miles up the Coast to the east of Galveston, the Maceos operated their gambling establishments right out in the open by compromising the local power structure: judges, politicians, and law enforcement.

Pete Salvato—an associate of the Maceos who ran his own casino—told one reporter about the family's relationship to the lawmen: "Paid them off, every month, in cash. They used the law to chase the competition out of town." The Maceos also used murder, mayhem, and threats to muscle out potential competitors in the legitimate businesses they owned.

As the Maceo brothers aged, control of their crime family passed to their nephews, Victor and Anthony Fertitta. The Maceo family had long-standing connections with organized crime in Jefferson County. These ties were made public after the Texas State Attorney General obtained an injunction against Western Union that prevented the telegraph company from transmitting horse-racing information in to the state.

When the Maceos continued to offer gambling on horse races, the state legislature investigated. It found that a Beaumont man named Felix J. DeMary owned a small café in Louisiana, just across the river from Orange, Texas. DeMary's Louisiana operation obtained racing information from a wire service controlled by the Carlos Marcello family in New Orleans. DeMary had contracted with Sam Maceo to transmit the information to Maceo's Turf Grill in Galveston via a direct telephone hook-up.

When the state Attorney General shut down the Maceo crime family's gambling operations in Galveston in 1957, many of the Galveston mobsters moved east to Jefferson County. As mobsters tend to do, they branched out into ostensibly legitimate businesses, which were often linked to mob activities. For example, several of the immigrants from Galveston opened glass businesses. Legitimate glass replacement is wonderfully synergistic with illegitimate protection racket. If you have to break someone's window to get them to pay protection, you then get to charge them again for replacing the glass. In Beaumont, testimony to the James Committee revealed that the Fertitta family ran a market that sold alcohol illegally, even to minors, and operated a real estate office as a front for gambling.

**Form Number 1**

Other members of the Fertitta family opened up shop in Las Vegas. The family already had ties to Vegas. Sam Maceo had helped secure a Nevada gaming license for Moe Dalitz, when the Cleveland mobster moved to Las Vegas in the 1940s.

Maceo nephew Frank Fertitta Jr. went to Vegas in the late 1950s, shortly after the Texas Rangers broke up the Galveston concession……..Today, Frank Fertitta Jr. and his sons—Lorenzo and Frank III—run Station's Casino, which operates a number of casinos nation-wide. In the 1990s, Fertitta was one of the largest contributors to the Republican Party. Station's was driven out of Missouri in 2000, after Michael Lazaroff, Station's Missouri lobbyist, was discovered to be influencing Missouri Gaming Commission decisions. Conveniently, Carl Thomas was killed in a mysterious one-car accident, shortly before he was scheduled to testify in that hearing about Fertitta's role in the skimming racket.

Frank Fertitta and his cousin Tilman Fertitta have maintained a major business presence in southeast Texas, representing the third generation of the Maceo family's dubious enterprises. Tilman Fertitta began his entrepreneurial career in Houston in the1970s, engaging in a series of businesses that have traditionally been popular with racketeers: pornography and adult bookstores, coin-operated video games, and construction. Fertitta lived high on the hog, running up bank loans of over $10 million, and then weaseling out of them after the mob-driven S&L scandal led to widespread bank failures. This happy circumstance allowed Fertitta to pay back only pennies on the dollar to the federal taxpayers who insured the banks' depositors. "Thank God the banks failed," Fertitta once gushed, a remarkable comment indeed from a man who had once sat on the board of a failed S&L.

More recently Fertitta has involved himself in shady waterfront development deals up and down the Texas Gulf Coast. Much of his enterprise has been financed by taxpayer dollars. When Tilman Fertitta is asked about his family's organized crime ties, he responds with the classic evasion: "I don't know. What's the Mafia? I never…what is that? I've never seen the word Mafia used, though. That's the first I've ever heard the word Mafia used. They were in the gambling business."

Fertitta aims to bring gambling back to Galveston, and admits that: "If I were a fish, I'd be a shark." Speaking of Galveston, the Maceo crime family's traditional stomping ground, Fertitta boasts: "I basically have the Island,"

Tilman Fertitta has emerged as one of the dominant economic and political powerbrokers on the Gulf Coast, and his influence even extends into Democratic national politics. His cousin Frank Fertitta is one of the country's biggest Republican contributors, thus ensuring that the family has both parties tied up…… While there are whispers that drug smuggling remains part of the family's business repertoire, there have been no indictments. In truth, smuggling may well be besides the point by now. While the prominent Fertittas do still associate with unsavory characters right and left, they are also raking in millions every year in clean money, generated by apparently legitimate business enterprises. And you can buy politicians just as well with clean money as you can dirty money.

Either way, the Fertittas today remain nearly untouchable on the Gulf Coast. In that sense, not much has changed since the wide-open days. The Rubenstein Family in the 1930s, members of Chicago's notorious Rubenstein family began to migrate south to Texas. Jacob Rubenstein settled in Dallas, where he quickly established ties with the local mobsters. He changed his name to Jack Ruby, and later became infamous formurdering Lee Oswald, the presidential assassin. Prior to his notoriety, Ruby was involved in smuggling drugs from Mexico through Texas, along with Chicago crime boss Sam Giancana. Giancana and other members of the Chicago mob were also heavily invested in casinos in Nevada and around the world. Casinos are a synergistic business for underworld types, because they are effective means of laundering money. You can easily launder illicit funds by betting and losing on a turn of the roulette wheel.

Nicholas Pileggi, in his book Casino, reports that one of the minority partners in Circus Circus was the legendary skimmer, Carl Thomas, whowas brought in to ply his trade in the Rogers brothers' casino, just as he testified havingdone with Fertitta. In 1977, Sol Rogers formed a group of investors bidding to take over the mob-ridden Aladdin for $25 million, and to assume the hotel's $38 million debt owed to the Teamsters' pension fund. The attempted takeover fell through when government investigators discovered the hidden underworld interests involved in the deal. Like the Fertitta family of Galveston, Beaumont's Rogers brothers eventually made a transition from mob-infested enterprises to corporate business. It is difficult to tell exactly when they left their unsavory alliances behind, if they ever did.

**Form Number 1**

For example, in the1980s, in the wake of the Reagan administrations' deregulation of S&Ls, organized crime elements began to systematically loot savings institutions throughout the state. While this catastrophe made Tillman Fertitta rich, it was disastrous for the nation's taxpayers. In Beaumont, the Rogers brothers had founded several banks of their own, including San Jacinto Savings. In April 1985, at the height of the S&L looting, money from New Orleans mob associate Herman Beebe was funneled through the Rogers' brothers' San Jacinto Savings in a series of shady transactions—after Beebe had already been convicted of defrauding the Small Business Administration. Shady associates and dealings aside, by the end of their lives, the Rogers brothers were raking in millions from apparently legitimate development deals, and they had become major power players in Jefferson County politics.

Like the Fertittas, the Rogers brothers played both sides: Ben Rogers ran the local Democratic Party in Jefferson County, while Vic Rogers controlled the local Republicans, thus insuring that their interests were protected, no matter what the electorate wanted. The prominent role that the Rogers brothers continued to play in Jefferson County's power structure is one more piece of evidence indicating that the reforms brought about in the wake of the James Committee were superficial. Most of the same players were able to remain in power—no matter how mobbed-up they may have been—as long as they were willing to submit to industry's overriding interests in the local political economy.

Ibid. pp. 258, 259, 261-2652 Brewton, Pete. The Mafia, CIA, and George Bush. New York: Shapolsky, 1992, pp. 120-121; Brown, JeanM., Free rein : Galveston Island's alcohol, gambling, and prostitution era, 1839-1957, Master's thesis, Lamar University, 1998.3 Brown, Jean M., Free rein : Galveston Island's alcohol, gambling, and prostitution era, 1839-1957, Master's thesis, Lamar University, 1998. James Committee report., pp. 147, 118-1195 Brewton, Pete. The Mafia, CIA, and George Bush. New York: Shapolsky, 1992, pp. 120-121. Linsalata, Phil. "Casino Developer's Family Ties Include Skimming Case." St. Louis Post-Dispatch (Missouri), October 14, 1992, Wednesday, five star edition, p. 1A; Associated Press. "Carl Thomas Sr.; Banned From Nevada Casinos," Los Angeles Times, November 11, 1993, Part A; Page 42; Column 3; Metro Desk, Alison Cook. "Food Fight." Houston Press. June 30,19948 Allan Turner. "CEO casts his net for downtown." Houston Chronicle October 20, 2002, Sunday, p. A1; Brewton, Pete. The Mafia, CIA, and George Bush. New York: Shapolsky, 1992, p. 120. Alison Cook. "Food Fight." Houston Press. June 30,1994; Brewton, Pete. The Mafia, CIA, and George Bush. New York: Shapolsky, 1992, p. 120.10Allan Turner. "CEO casts his net for downtown." Houston Chronicle October 20, 2002, Sunday, p. A1;Alison Cook. "Food Fight." Houston Press. June 30,1994; Katy Vine, "Fertittaville," Texas Monthly July, 2004, p. 38.11Brill 1978, Demaris, Ovid. The Boardwalk Jungle (New York: Bantam, 1986); Reid, Ed, The Grim Reapers (New York: Bantam, 1969); Pileggi, Nicholas, Casino (New York: Simon & Schuster, 1995) See the Las Vegas Sun's history of the Alladin, downloaded December 2004 from http://www.lasvegassun.com/dossier/events/aladdin/history.html

http://www.cernak.sk/2006/02/18/pribeh-z-filmu-kasino/3/

The FBI swooped on Glick's strawman empire in 1979 and arrested Fertitta's partner Carl Thomas, Glick, the Civello Brothers and about a dozen others. Despite the seemingly incriminating wiretap transcript, the FBI could not get enough substantial evidence to charge Fertitta. Despite the testimony of former Fremont Security Chief, Harold McBride, where he swore under oath that Frank Fertitta jr had been involved in the skimming operation at the Fremont, and wiretap evidence of the Civella's and Thomas that implicated him, Fertitta was never charged with the skimming at Fremont casino where he presided.

Amazingly, when Thomas first became implicated by the FBI, the ownership of The Bingo Palace was transferred solely to Frank Fertitta jr. Did this mean that Frank Fertitta was now a front man for the Kansas City mob, or are we to believe that they happily sold him Thomas's share of the casino and wished him well? It's a tough call, I know.

In 1979 the Nevada Gaming Control board ordered Glick to sell up and he did, to associates of Moe Dalitz, the man that Frank's relative, Sam Maceo had helped to get started all those years ago. Glick sold for $2 million in cash, the assumption of $92 million in debts and with another $66 million to be paid from the casino's earnings by 1991.

Although he was one of the few to escape prison, Frank Fertitta jr did not go completely unscathed in the aftermath of the skimming scandal. Fertitta was the target of a four year investigation by the Nevada Control Board but in 1989 they voted 2-1 not to initiate disciplinary action against him.

Despite this decision, Fertitta's reputation had been damaged. Some sources claim that Frank Fertitta jr knew that his mob connections could hamper any future applications for gaming licences. Whatever the actual reasons, in 1993 Frank

**Form Number 1**

Fertitta jr officially stepped down as the Chairman of the board and handed over to his son, Frank Fertitta III, or 'Frankie Three Sticks', as he is known in some circles. The company then became public. Station Casino's then applied for licences with the Missouri Gaming Commission to run casinos in Missouri. Many would ask if it's possible for a business that was believed to be built on mob money and mob connections to become squeaky clean simply by changing the name of the Chairman.

In 1993 the Missouri Gaming Commission called on Frank Fertitta's former employer and business partner, the convicted casino skimmer Carl Thomas. They requested information from Thomas about Frank Fertitta jr, Thomas agreed to attend an inquiry with them. Before he did this however, Thomas drove to Vegas from his home in Oregon and met with Station executives to discuss his testimony with them. No one really knows exactly how that meeting went down or what transpired. The people that do know, aren't talking. He then left Vegas to return to Oregon before heading to meet with the Missouri Gaming Commission. Before he could attend that meeting and give testimony on Frank Fertitta's background, Thomas was killed in a bizarre single car accident, it was a clear night and the road was in good condition. Thomas knew the area well. Due to Thomas's untimely death, the Missouri Gaming Commission were unable to complete their inquiry into Frank Fertitta jr and they granted licenses to Station Casinos.

Today, Frank Fertitta jr keeps busy with his finance company, Frank Fertitta Enterprises and with his many positions in the community, including being on the board of Trustees of the University of Las Vegas and a member of the Bishop Gorman High School Development Corporation. These days Frank Fertitta jr mixes with the Governor of Nevada and is a respected member of the Las Vegas community.

When asked about his former associates Frank Fertitta jr and Carl Thomas, the infamous criminal Frank 'Lefty' Rosenthal, recollects;

"Carl introduced me to Frank Fertitta, as "my main guy", and his right-hand man. Frank became the President of Allen Glick's Fremont Hotel Casino at the recommendation of Carl Thomas during my temporary absence from the industry while I was awaiting the outcome my appeal versus the Nevada Gaming Commission. When I regained my former position as the CEO of all properties under the "Argent" (Allen R. Glick Enterprises) umbrella Frank and I became more interactive. Frank had gained a solid reputation as a topnotch casino executive who understood the games with a high degree of professionalism. After several private meetings and close personal observation I too agreed that Frank was well suited to operate the second largest Casino in the downtown area.

During the course of the next several years Frank with assistance from Carl Thomas forged an imposing empire. Soon thereafter Carl Thomas died when his car ran off a winding road in the mountains of Oregon, I think he could have been bumped! In 1976 Frank opened the Bingo Palace, ultimately renamed Palace Station. Next came Boulder Station, then Texas Station, Barley's and Sunset Station.

Frank was driving hard on course to become a behemoth within the gaming industry. In 1998 he purchased King 8, renaming it The Wild, Wild West. Next came the Santa Fe and Fiesta casinos. Frank acquired 49 acres near Jackie Gaughn's Suncoast, with future plans to build on other parcels at Craig Ranch Station and Martin Luther King Road. Frank decided he had enough and retired into the sunset. Some guys always seem to windup with all the dirty work. Estimated wealth $1 Billion" - Frank 'Lefty' Rosenthal.

Station Casino Executives Are Young, Energetic,
Take Chances and Create Profits
By Steve Wiegand, The Sacramento Bee, Calif.
Knight Ridder/Tribune Business News

Jun. 9, 2003 - LAS VEGAS -- There are ghosts in this city, among the pyramids and pirate ships and palaces. Ghosts with names like Bugsy and Moe and Tony the Ant.

They are the spirits of some of Nevada gambling's first generation of entrepreneurs, people who skimmed profits, laundered money and buried their problems in shallow desert graves.

**Form Number 1**

The "wise guys" are gone, most gambling industry experts will tell you, replaced by closely monitored and scrutinized, publicly traded mega-corporations.

"Casinos are the most highly regulated form of business in the world, and yet with a terrible reputation and history in the public mind," said Nelson Rose, a Whittier Law School professor and an expert in gambling law.

"A lot of times the companies quite literally get into trouble just for the company they keep, or kept."

Nearly every big modern casino company has had things go bump in the night, and Station Casinos Inc., the firm that today begins operations of the Thunder Valley Casino for a Placer County Indian tribe, has its own ghosts, with names like Carl, and Lance, and the state of Missouri.

"They (Station executives) are young guys, very energetic, very aggressive," said Bobby Siller, a member of the Nevada Gaming Control Board. "Some of the casinos are pretty cookie-cutter in their approach, but these guys like to take chances and do things different, and sometimes that can create friction."

It can also create profits. From a modest gambling and bingo joint for locals with annual revenues of less than $3 million, the company has grown in 27 years to a casino giant, with 2002 net revenues of $792.9 million. Station has a work force of about 10,000 and has full ownership of eight casino-hotels in the Las Vegas area and half ownership of two others.

Under its seven-year contract with the United Auburn Indian Community, Station will receive 24 percent of the casino's annual net revenues, plus 2 percent of the cost of building the casino, in return for its gambling experience and expertise. That could amount to more than $50 million a year for the company.

While two Nevada gambling companies manage Indian casinos in Southern California, Station will be the first in Northern California.

According to many gambling industry analysts, the United Auburn tribe made a good choice: Station has a reputation for building successful, "friendly" casinos that appeal to local residents and casual gamblers who might drive 30 minutes to a casino, but not two hours.

"They have a good company for this kind of operation," said William Thompson, professor of public administration at the University of Nevada, Las Vegas, and a leading authority on gambling's economic and social impacts. "I don't buy casino stocks, but if I bought casino stocks, I would buy Station."

But the company also has a reputation for aggressiveness, and that has contributed to a string of controversies:

-- Company patriarch Frank Fertitta Jr.'s connection to a 1980s scandal, in which mobsters skimmed millions of dollars from several Las Vegas casinos, raised eyebrows when the company tried to establish itself in the Indiana and Missouri gambling markets.

-- After winning licenses to operate casinos in Missouri, Station was fined a total of $1.9 million between 1997 and 2000 for violations that included dumping fill materials in the Missouri River, allowing a 12-year-old girl to play slot machines and refusing to testify before a state regulatory agency looking into corruption charges. The company surrendered its Missouri licenses and sold its properties there in 2000.

-- The company also paid a $475,000 fine in Nevada in 2000 to settle a complaint the Nevada Gaming Control Board filed against Station for financing an anonymous campaign mailer. The mailer was aimed at a Clark County commissioner who had angered Station executives by voting in favor of a rival firm's development proposal after pledging to vote against it.

"Every major gaming company has stumbled from time to time," Station general counsel and corporate vice president Scott Nielson said during an interview at the company's offices at Palace Station, its first hotel-casino.

"It's a very tightly regulated business, and it would be almost impossible to completely avoid some violations over the years."

**Form Number 1**

Station's modest headquarters belies its success. The offices are above the casino's bingo hall, and the reception area is decorated in "early midtown dentist office" style, with plenty of black-and-white pictures of the old days. Occasionally, the monotonous songs of the slot machines make their way up the stairs.

The company's leadership -- which is topped by Fertitta's sons Frank III, the chairman and CEO, and Lorenzo, the president -- is young (the average age of the top five executives is 43), well compensated (the top five average $4.3 million a year) and experienced.

It is also flexible.

"We saw there was public support in California for Indian gambling," Nielson said. "So we thought that since it was going to be a reality, rather than turn our back to it, we should check and see if there were some opportunities there for us."

Opportunity was what a 21-year-old Texan named Frank Fertitta Jr. was seeking when he came to Las Vegas in 1960. Starting as a bellman, Fertitta became a blackjack dealer, then worked his way up into management.

Vegas was booming, but Fertitta figured there was still something missing: A casino for the locals, where casino employees could blow off steam after work without bosses looking over their shoulders or having to share space with the tourists.

In 1976, Fertitta scraped together enough to buy a small casino off the Strip with a partner, Carl Thomas. The casino became known as the Bingo Palace and later Palace Station.

Both Thomas and Fertitta had other jobs as well. When Thomas was made chief executive officer of four casinos owned by the Argent Corp., he brought Fertitta in to be general manager at one of them, the Fremont.

But Thomas also had other partners. They were Giuseppe Nicoli "Mr. Nick" Civella and Carl "the Cork" Civella, brothers and bosses of the La Cosa Nostra chapter in Kansas City.

In the 1980s, federal prosecutors charged that Thomas, the Civellas and others conspired to "skim" money from the Argent casinos by taking it from the counting rooms before it was on the casinos' books.

After a 1985 trial in Kansas City, a dozen defendants were convicted. Thomas, who by then was serving a 15-year sentence for a skimming conviction in a related case, testified against his former partners in return for immunity from prosecution.

In his testimony, Thomas did not implicate Fertitta, who had bought out Thomas' interest in the Bingo Palace when the skimming charges first surfaced.

Fertitta has consistently and vociferously denied any involvement, and never was indicted or charged.

But one witness who had been fired by Fertitta, former Fremont security chief Harold McBride, testified Fertitta had been involved in the skimming. Fertitta's name also surfaced in FBI wiretaps of conversations between the Civellas and Thomas.

After a four-year investigation into the allegations, the Nevada Gaming Control Board voted 2 to 1 in 1989 not to initiate disciplinary action against Fertitta.

But the shadow was there.

Fertitta Jr. stepped down as board chairman of the company in favor of his son Frank III in 1993, when the company went public. He is currently on the board of trustees for the University of Nevada, Las Vegas.

The skimming case, however, still came up when Station applied to run riverboat casinos in Indiana and Missouri.

**Form Number 1**

"As far as St. Charles riverboat gambling is concerned, we want to know not only about Frank Fertitta III, but his father and Palace Station as well," St. Charles, Mo., Mayor Grace Nichols told a local newspaper at the time.

The company eventually gave up the idea of an Indiana riverboat, but won Missouri licenses in St. Charles and Kansas City -- with the understanding that Frank Fertitta Jr. would have absolutely no role in the company's operations.

Missouri was generally not a pleasant experience for Station.

Neither casino did as well as expected, and the company ran afoul of the state's regulations.

According to Missouri Gaming Commission records, Station paid a $250,000 fine in 1997 for allowing a 12-year-old girl to play the slot machines at its St. Charles riverboat casino. In 1999, it paid a $500,000 fine for illegally dumping rock and soil into the Missouri River while doing work on its St. Charles boat. It also paid a $75,000 fine for violating water use regulations at its Kansas City site.

But the coup de grace came in 2000, when the commission launched an investigation of dealings between Station and a St. Louis attorney whom Station hired when it first started looking at the Missouri market.

The attorney, Michael Lazaroff, pleaded guilty in federal court to defrauding his law firm by taking $500,000 in bonuses from Station and not turning it over to the firm. He also pleaded guilty to defrauding clients, including Station, by padding his expenses, and of concealing the source of campaign contributions.

Gambling commission investigators also found Lazaroff had made 205 private phone calls to former commission Chairman Robert Wolfson, which was against Missouri law.

Testifying before the commission in August 2000, Lazaroff said he had used his personal relationship with Wolfson to increase Station's chances of landing a Kansas City gambling license, and that Station officials knew about it.

"They from time to time would ask me to run things by Chairman Wolfson and see what he knew about it," Lazaroff testified.

Station officials denied they knew Lazaroff was doing anything wrong, but refused to testify at the commission's public hearings, despite subpoenas. A Station attorney indignantly told the commission the company objected to the hearing being public and to not being able to cross-examine Lazaroff.

The commission then voted unanimously to strip Station and its top executives of their Missouri licenses. And in November 2000, Station agreed to pay a $1 million fine, voluntarily surrender its licenses and get out of the state.

In an interview, Station counsel Nielson attributed many of the company's problems in Missouri to cultural differences.

"Some of the things that are common practice or well accepted in Nevada aren't necessarily going to be accepted in another jurisdiction, and I think that's an important lesson to learn," he said.

"And you also had a situation where the regulatory people were ex-highway patrolmen ... and some of them didn't like gaming, and some didn't like people from Las Vegas, period."

But the company also has found trouble closer to home.

In September 2000, Station paid a $475,000 fine to the Nevada Gaming Control Board for failing to adequately supervise one of its executives.

Board investigators said the executive, Mark Brown, authorized the printing and distribution of an anonymous -- and therefore, under Nevada law, illegal -- campaign mailer against then-Clark County Commissioner Lance Malone.

**Form Number 1**

The mailer featured a cartoon of Malone with his pockets stuffed with cash and a caption reading "You just can't trust Lance Malone," and was cited as a key factor in Malone's defeat.

In testimony before the board, Brown said Malone had voted in favor of a proposed project by a Station rival, after taking $40,000 in campaign contributions from Station and pledging to vote against the project.

Brown resigned from Station and the company settled a libel suit filed by Malone for an undisclosed amount. (Malone, who became a political consultant after his defeat, is currently the subject of an FBI probe into political corruption in Las Vegas and San Diego.)

In a more recent incident, Station notified the Gaming Control Board in late April that the company had violated state laws that require it to report large cash transactions to the federal government. State investigators are looking into the violations.

And despite its reputation for running "locals' casinos," not everyone in Las Vegas is a Station fan.

The company is the largest non-union casino employer in town. When it took over a union hotel in 2000, Station fired about 1,000 workers and required them to reapply for their jobs. According to union officials, only 150 were rehired.

"This was something new for Las Vegas," said Courtney Alexander, research director for Hotel Employees and Restaurant Employees Local 226, which represents about 50,000 workers in Las Vegas.

"Casinos are bought and sold all the time, and we had no history of mass terminations when a new owner came in. ... I think it marked a turning point in how Station was viewed as an employer in this town."

Station's Nielson said the firings have done little to affect the company's standing with its customers, or employees.

"We've said all along we are not anti-union, we are just pro-employee," he said. "If our employees believe they want to have someone involved to speak to management for them, they can. We've been here for 27 years, they've never felt the need to do that."

At Thunder Valley, Nielson said, the decision on whether to have unions will be made by the tribe.

In fact, while Station will run the casino's day-to-day operations, a five-member Business Council will make policy decisions.

The council consists of three tribal members and two Station officials, including Nielson, and the tribe has already shown it will wield its influence.

"You should have heard the argument we had over what color the felt would be on the card tables," said tribal chairwoman Jessica Tavares.

(For the record, the tribe won, and the felt will alternate from table to table: tan with rust trim next to a table that is rust with tan trim, to match the exterior colors of the building.)

Nielson grinned a bit ruefully when recalling another battle over the cocktail waitresses' uniforms, which tribal members found too immodest.

"There were members of the board that weren't particularly thrilled at the costumes," he said, "but we assured them there was a method to our madness, and so a slightly modified costume was chosen."

More important will be tribal dominance when it comes to regulating the casino. Under federal law and the tribes' compact with the state, each casino tribe must create its own tribal gaming agency, which becomes that casino's regulatory authority. That means the tribe, not Station, will be in charge of enforcing casino rules, compact provisions and federal law.

**Form Number 1**

"If we don't comply with the rules," Nielson said, "it (the tribal gaming agency) is going to have the ability to sanction us, just like in Nevada."

The company also will have to learn to deal with cultural differences that make Missouri look like a Las Vegas suburb.

Station officials, for example, thought they had found a way to win the Auburn tribe's hearts, through their stomachs.

When tribal chairwoman Tavares mentioned she liked crab legs, Station officials provided a mountain of them at an "appreciation picnic" for the tribe last year.

"Most people didn't even know what they were," she said. "They all said, 'ewww, fish -- I'm not going to eat that.' "

The company also gave the tribe's children goody bags full of candy and toys, including colorful rubber king snakes.

"I had to tell them king snakes are about the most bad-luck of omens there are for us," Tavares said.

"We don't want king snakes in our casino."

STATION CASINOS AT A GLANCE: Founded: 1976, with the opening of a 5,000-square-foot gambling hall called The Casino. It later became the Bingo Palace and finally Palace Station.

Properties: Owns and operates eight casino-hotels and has a half interest in two casino-hotels in the Las Vegas area.

Net revenues: $792.9 million in 2002

Assets: $1.6 billion

Work force: About 10,000

52-week stock high (May 20, 2002 -May 20, 2003): $23.95

52-week stock low: $11.21.

Sources: Station Casinos 2002 Annual Report, Securities and Exchange Commission filings

GAMBLING ANALYSTS BET CASINO WILL MAKE PLENTY: It's a safe bet that the casino opening today in Placer County will make lots of money for the owners, the United Auburn Indian Community, and the operators, Station Casinos Inc.

But the odds on figuring out exactly how much, whose pockets it will come from and where it will go are somewhat longer.

Since Indian tribes aren't required to make public what they take in at their casinos, comparisons to area tribes with gambling halls are no help.

That leaves educated guesses. Bill Eadington, director of the Study for the Center of Gambling and Commercial Gaming at the University of Nevada, Reno, uses a formula based on the number of adult gamblers in an area divided by the number of available slot machines. Revenues from slot machines generally represent about 75 percent of a casino's take.

Eadington estimates an Indian casino near a population the size of the Sacramento area will average a net of about $300 per day per slot machine.

**Form Number 1**

Since Thunder Valley will have 1,906 machines, that comes to about $209 million per year. Add another $70 million from table games such as blackjack, and it comes to about $280 million a year.

That may be conservative, according to a study released last month by CIBC World Markets, an international investment bank.

"The Station Thunder Valley property has, by far, the best location and will have the best facility in the market," CIBC analysts said. "We believe that revenue per slot per day estimates of $300-$400 ... are easily attainable."

For Station Casinos, which will get 24 percent of the net revenue for handling the casino's day-to-day operations, $280 million in annual revenues would mean more than $65 million a year.

Most of that money is expected to come from the casino's back yard: Station Casinos built its reputation as the "locals' casinos" in Las Vegas, and that's one of the reasons the tribe chose the company.

"Our emphasis will be in the Sacramento Valley area," said Scott Nielson, Station's general counsel. "We'd love to have people drive from out-market for two, three, four hours, but that's not going to be our bread and butter."

Using kiosks at area shopping centers, the casino already has signed up thousands of area residents for its "Boarding Pass" program, which rewards players with things like Thunder Valley-themed merchandise and food discounts for logging hours on the slot machines.

Not everyone, however, thinks a "locals' casino" is a good idea for the locals' economy.

"It's a good-news, bad-news thing," said William Thompson, a professor of public administration at the University of Nevada, Las Vegas. "The good is: They (Station) do a fantastic job. The bad is: Whom do they do the job on? The locals."

Thompson asserts the local economy won't benefit significantly because most of the casino's revenues will come from money local gamblers would have spent at other local businesses, such as movie theaters or shoe stores. Now, he says, a big chunk of money will be flowing out of the local economy, to Las Vegas-based Station. He estimates the tribe also will spend 10 to 15 percent of its revenue on out-of-state vendors who provide casino staples such as slot machines.

And, Thompson said, the casino won't attract enough non-local money to make up the difference.

Thompson, who is an outspoken critic of the "social costs" of gambling -- personal bankruptcies, substance abuse, divorce, lost work time -- did an economic impact study in 2000 for a group opposing the Thunder Valley Casino.

He concluded that the annual negative economic impact, including social costs, for the area within a 30-mile radius could be as much as $200 million.

But other studies have found that casino gambling's impacts on communities, both economic and social, are mixed.

A federal government review of gambling studies in the 1990s, for example, found two studies rated the overall economic impacts of casino gambling "negative," seven found it "neutral to slightly positive" and 10 found it "significantly positive."

A series of studies in 2000 by researchers at the University of Nevada, Reno, and the University of Memphis concluded that except for personal bankruptcies, there was little connection between gambling and most societal ills.

The prospect of a casino in Placer County has not caused much of an economic stir of any sort so far. Prices on surrounding parcels in the Sunset Industrial area, where the casino is located, have remained fairly constant.

But some local officials are hopeful it will spur development in the area.

**Form Number 1**

"The tribe is paying for $30 million worth of infrastructure improvements in the area," said Placer County Supervisor Robert Weygandt, who represents the area, "so in that regard, it's going to prove to be very positive."

Weygandt also notes the casino's creation of about 1,800 jobs and the prospect of enticing Bay Area residents and people headed for Reno into leaving their gambling money at Thunder Valley instead.

At least one company is betting the casino will inject cash into the area outside the slots.

Station Casinos has purchased 99 acres across the street from the casino. Company counsel Nielson said the company has no specific plans for development, although speculation has ranged from a hotel to an amusement park.

-- By Steve Wiegand

-----To see more of The Sacramento Bee, or to subscribe to the newspaper, go to http://www.sacbee.com

(c) 2003, The Sacramento Bee, Calif. Distributed by Knight Ridder/Tribune Business News.

**Form Number 1**

# EXHIBIT 2

**Form Number 1**

Form Number 1

# Summons

In the matter of RUSSELL PIKE

Internal Revenue Service (Division): Criminal Investigation

Industry/Area (name or number): Las Vegas Field Office

Periods: January 1, 2002 to October 16, 2007

**The Commissioner of Internal Revenue**

To: Xyience Incorporated

At: 10650 W. Charleston, Las Vegas, Nevada

You are hereby summoned and required to appear before Special Agent Adam Steiner or designee an officer of the Internal Revenue Service, to give testimony and to bring with you and to produce for examination the following books, records, papers, and other data relating to the tax liability or the collection of the tax liability or for the purpose of inquiring into any offense connected with the administration or enforcement of the internal revenue laws concerning the person identified above for the periods shown.

Any and all records relating to Russell Pike, Jennifer Pike, William Pike, and Michael Clark, including, but not limited to: All employment or payroll records to include records disclosing the dates of employment, wages or commissions paid; checks (front and back) used for any payments; Employees Withholding Exemption Certificate (Form W 4); Wage and Tax Statements (Forms W 2) disclosing his annual wages; U.S. Information Returns (Forms 1099) disclosing fees, commissions, etc. paid; all background records including applications for employment, personnel files, credit checks, background investigations; records of loans made to or received from any of the above listed individuals; copies of loan agreements; records of bank account withdrawals or wire transfers made by PIKE; records relating to all stock sales and purchases involving any of the above listed individuals; correspondence to or from any of the above listed individuals ; records of any and all monies received from or paid to any of the above listed individuals; contracts agreements, or any other documents pertaining to any of the above listed individuals for the time period listed abov.

**Attestation**

I hereby certify that I have examined and compared this copy of the summons with the original and that it is a true and correct copy of the original.

[signature] Signature of IRS officer serving the summons — Special Agent, Title

**Business address and telephone number of IRS officer before whom you are to appear:**

110 City Parkway Suite 200, Las Vegas, Nevada 89106 702-868-5110

**Place and time for appearance at** 110 City Parkway Suite 200, Las Vegas, Nevada 89106

on the 29th day of October 2007 (year) at 9 o'clock a m.

issued under authority of the Internal Revenue Code this 16th day of October, 2007 (year).

[signature] Signature of issuing officer — Special Agent, Title

Signature of approving officer (if applicable) — Title

IRS
Department of the Treasury
Internal Revenue Service
www.irs.gov

Form 2039 (Rev. 12-2001)
Catalog Number 21405J

**Part A** - to be given to person summoned

1179

**Form Number 1**

# EXHIBIT 3

**Form Number 1**

Xyience Incorporated v. Bergeron

Inbox X

Reply to all
Forward
Reply by chat
Filter messages like this
Print
Add to Contacts list
Delete this message
Report phishing
Report not phishing
Show original
Show in fixed width font
Show in variable width font
Message text garbled?
Why is this spam/nonspam?
PEARSON, JON to me

show details Mar 4 (9 days ago)

Reply

from PEARSON, JON <JPEARSON@fclaw.com>
to Rich Bergeron <rich.bergeron@gmail.com>,
date Tue, Mar 4, 2008 at 7:54 PM
subject Xyience Incorporated v. Bergeron
mailed-by fclaw.com

hide details Mar 4 (9 days ago)

Reply

Mr. Bergeron:

Please be advised that as counsel for Xyience Incorporated ("Xyience") we must be served with all documents that you file in the above-referenced case.

I noticed that you filed a Certificate of Service on February 21st indicating that you had mailed a copy of your Answer and Counterclaim to Xyience's business address at 4572 West Hacienda Avenue. However, please note, this is not sufficient service. Please mail a copy of your Answer and Counterclaim to our office, and file the appropriate Certificate of Service indicating the same.

Regards,

Jon T. Pearson
FENNEMORE CRAIG, P.C.
300 South Fourth Street

**Form Number 1**

Suite 1400
Las Vegas, Nevada 89101
Direct: (702) 692-8015
Direct Fax: (702) 692-8099
Business Cell: (702) 569-6401

www.fennemorecraig.com

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). For additional information regarding this disclosure please visit our web site.

CONFIDENTIALITY NOTICE: The information contained in this message may be protected by the attorney-client privilege. If you believe that it has been sent to you in error, do not read it. Please immediately reply to the sender that you have received the message in error. Then delete it. Thank you.

**Form Number 1**

# EXHIBIT 4

**Form Number 1**

# FENNEMORE CRAIG, P.C.

Suite 1400 Bank of America Plaza
300 South Fourth Street
Las Vegas, Nevada 89101
(702) 692-8000

Jon T. Pearson
Direct Phone: (702) 692-8015
Direct Fax: (702) 692-8075
jpearson@fclaw.com

Law Offices
Phoenix (602) 916-5000
Tucson (520) 879-6800
Nogales (520) 281-3480
Las Vegas (702) 692-8000
Denver (303) 291-3200

February 28, 2008

***Via Certified Mail Return Receipt Requested***
***Receipt # 7007 0710 0004 4140 4568***
***and Via E-Mail at rich.bergeron@gmail.com***

Mr. Richard Bergeron
147 Old Country Road
East Sandwich, MA 02537

Re: Xyience Incorporated v. Richard Bergeron
Case No. A544781, Department XXIII

Dear Mr. Bergeron:

As you are aware, this firm represents Xyience Incorporated ("Xyience"), and on January 18, 2008, Xyience filed a voluntary petition for chapter 11 relief in the United States Bankruptcy Court, District of Nevada, as Case No. BK-S-08-10474-MKN ("Bankruptcy Case"). On or about February 19, 2008, you filed an Answer and Counterclaim for Declamatory [sic] relief against Xyience in the above-referenced case, which has not yet been served on Xyience or this office. Your counterclaims assert pre-petition claims against Xyience which must be asserted in the form of a proof of claim in the Bankruptcy Case, not in the form of non-bankruptcy litigation. Furthermore, your counterclaims were filed in violation of the automatic stay of Section 362(a) of the Bankruptcy Code.

The automatic stay is self-executing and it became effective immediately upon the filing of the January 18, 2008 voluntary Chapter 11 petition filed by Xyience. The automatic stay prohibits you from commencing or continuing litigation of any pre-petition claim against Xyience, regardless of whether Xyience would suffer irreparable harm from said litigation. In fact, Courts have held that even a party who is required to file a compulsory counterclaim in litigation with a debtor in bankruptcy should first seek permission from the Bankruptcy Court to file that counterclaim. You have neither sought nor obtained permission to file a counterclaim against Xyience.

**Form Number 1**

**FENNEMORE CRAIG, P.C.**

Richard Bergeron
February 28, 2008
Page 2

It is therefore indisputable that you violated the bankruptcy automatic stay when you filed your counterclaims against Xyience. As a result, Xyience hereby ***demands*** that you immediately withdraw those counterclaims and instead file an appropriate proof of claim in the Bankruptcy Case. If you do not immediately withdraw your counterclaims, Xyience will have no other alternative but to file a Motion for an order to show cause why you should not be held in contempt for your willful violation of the automatic stay. If Xyience is required to file such a motion, Xyience will seek an award of damages against you for your willful violation of Section 362(a) of the Bankruptcy Code, including attorneys fees and costs. Please voluntarily dismiss your counterclaims prior to March 7, 2008, or Xyience will have no alternative but to file such a motion.

Sincerely,

FENNEMORE CRAIG, P.C.

Jon T. Pearson

JTP.mlh

**Form Number 1**

# EXHIBIT 5

**Form Number 1**

from PEARSON, JON <JPEARSON@fclaw.com>
to Rich Bergeron <rich.bergeron@gmail.com>,
date Wed, Feb 27, 2008 at 9:13 PM
subject Xyience v. Bergeron
mailed-by fclaw.com

hide details Feb 27 (5 days ago) [Ex Parte Motion and Motion to Continue Hearings.pdf,Exhs. 3 through 6.pdf,Exhs. 1 through 2 of Motions.pdf,Order on Ex Parte Motion.pdf,Notice of Entry of Order.pdf,Certificate of Service.pdf]

Mr. Bergeron:

On February 27, 2008, the Court in the above-referenced case recused itself. This case has now been reassigned to Department XXIII.

The newly reassigned Court granted Xyience's Ex Parte Motion for an extension of time to file its oppositions to your Motion to Dismiss and Motion for Rule 11 Sanctions. Additionally, the Court has set a hearing for Monday, March 3, 2008 at 8:30 a.m. (PST) on Xyience's Motion to continue hearings on your Motion to Dismiss and Motion for Rule 11 Sanctions on order shortened time. Please find attached to this e-mail a PDF version of all the documents that were filed relating to Xyience's Motions. These documents have also been **sent via overnight mail** to you.

Lastly, because this case has been reassigned to a different department, you may either personally attend the hearing on Monday, or you will probably need to seek permission from the Court (Dept. XXIII) to attend telephonically.

Regards,

Jon T. Pearson

**Form Number 1**

FENNEMORE CRAIG, P.C.
300 South Fourth Street
Suite 1400
Las Vegas, Nevada 89101
Direct: (702) 692-8015
Direct Fax: (702) 692-8099
Business Cell: (702) 569-6401
www.fennemorecraig.com

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that, to the extent this communication (or any attachment) addresses any tax matter, it was not written to be (and may not be) relied upon to (i) avoid tax-related penalties under the Internal Revenue Code, or (ii) promote, market or recommend to another party any transaction or matter addressed herein (or in any such attachment). For additional information regarding this disclosure please visit our web site.

CONFIDENTIALITY NOTICE: The information contained in this message may be protected by the attorney-client privilege. If you believe that it has been sent to you in error, do not read it. Please immediately reply to the sender that you have received the message in error. Then delete it. Thank you.

6 attachments — Download all attachments

Ex Parte Motion and Motion to Continue Hearings.pdf
777K View as HTML Download
Exhs. 3 through 6.pdf
1030K View as HTML Download
Exhs. 1 through 2 of Motions.pdf
943K View as HTML Download
Order on Ex Parte Motion.pdf
180K View as HTML Download
Notice of Entry of Order.pdf
337K View as HTML Download
Certificate of Service.pdf

STAD 3/14/08

**Form Number 1**

143K View as HTML Download

Feb 27 (5 days ago)

Rich Bergeron to JON

show details Feb 27 (5 days ago)

from Rich Bergeron <rich.bergeron@gmail.com>

to "PEARSON, JON" <JPEARSON@fclaw.com>,

date Wed, Feb 27, 2008 at 11:59 PM

subject Re: Xyience v. Bergeron

mailed-by gmail.com

hide details Feb 27 (5 days ago)

First of all, email is not proper service. When you apply for an order shortening time and the hearing is set for less than 10 days, you cannot serve the documents by mail.

Secondly, the hearing I recorded was a public hearing. The case is not under seal. I have the right to publish the hearing, as it was a fair and accurate record of what occurred.

Third, be prepared to lose.

Rich Bergeron

Editor/Writer/Webmaster

www.unlimitedfightnews.com

www.fightnewsunlimited.com