ORIGINAL

RECEIVED
AND FILED

MAR 28 3 34 PM '08

U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

Rich Bergeron
147 OLD COUNTY ROAD
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>XYIENCE, INC., A Nevada Corporation<br><br>Debtor. | No. BK-S-08-10474-MKN<br>Chapter 11<br><br>Eighth Judicial District Court<br>Las Vegas, Clark County, Nevada<br>Case No. A544781, Dept. XXIII |
| XYIENCE INCORPORATED, a Nevada Corporation,<br>Plaintiff,<br><br>v.<br><br>RICHARD BERGERON, an individual<br>Defendant. | CASE NO. BK-2-08-AP-01082-MKN<br><br>**DEFENDANT AND COUNTERCLAIMANT'S (I) EMERGENCY MOTION TO SUSPEND BANKRUPTCY PROCEEDINGS PENDING INVESTIGATION OF FRAUDULENT BANKRUPTCY FILING AND (II) MOTION FOR SUMMARY JUDGMENT ON DEFENDANT'S RULE 11 MOTION, MOTION TO DISMISS, AND COUNTERCLAIMS** |
| RICHARD BERGERON, an individual,<br><br>Counterclaimant,<br><br>v.<br><br>XYIENCE INCORPORATED, a Nevada corporation; FERTITTA ENTERPRISES, INC., a Nevada corporation,<br><br>Counterdefendants. | Hearing Date: ____________, 2008<br><br>Time: _______________<br><br>Location: 300 Las Vegas Blvd. South<br>Courtroom #2<br>Las Vegas, NV 89101 |

*"When I sit down to write a book, I do not say to myself, "I am going to produce a work of art." I write it because there is some lie that I want to expose, some fact to which I want to draw attention, and my initial concern is to get a hearing." GEORGE ORWELL'S 'WHY I WRITE' (1947)*

Comes now Pro-Se Defendant and Counter Claimant Rich Bergeron and hereby moves that the court suspend these bankruptcy proceedings based on instances of severe fraud instituted by and through the collusion of: the debtor; Fertitta Enterprises; Zuffa, LLC; Zyen, LLC; Bevanda Magica; and a core group of insiders from Global Cash Access Holdings (GCA) who left GCA to invest in or be employed by Xyience. These parties all engaged in a corrupt scheme which may lead to formal charges based on possible violations of the federal RICO Act. To provide due justice to all parties who are now disputing the legitimacy of Zyen's and Fertitta Enterprises' lien position in this matter, the proceedings should be suspended pending the determination of all outside creditor cases and claims. Fertitta Enterprises, Zyen, and Xyience should not be allowed to abuse this court to conceal their fraudulent behavior.

Bergeron also requests summary judgment for the egregious injustices he's faced thus far in defending what the evidence shows is a frivolous lawsuit. The struggle to clear his name from the plaintiff's defamation and slander has cost him his reputation and potential future profits, among other damages. The same parties listed as counter-defendants defrauded other investors and creditors for hundreds of millions of dollars. Meanwhile, the Fertitta Brothers get listed on the Forbes 500 list.

The plaintiff's been espousing lies in multiple Las Vegas courtrooms through the paid services of three law firms, about a half dozen assigned attorneys, and now in front of the third judge to oversee the matter. The process of defending himself has cost Bergeron dearly. What he is asking for as a final determination of the fraudulent case against him is generous. He requests $5 million in sanctions as part of his Rule 11 Motion, which the Fertittas should also be held liable for considering

their recent behavior and the attached evidence that shows they inspired this lawsuit and engaged in the Zyen loan instrument only after Xyience secured an unconstitutional injunction that is a clear Prior Restraint against Bergeron. A total package of $5 million may be more appropriate for damages due to Xyience's frivolous case, and Bergeron only requests that he be paid no more than 10 percent of that final judgment as well as 10 percent of the soon-to-be-amended in lieu of summary judgment $10 million counterclaim. The remaining judgment awarded should be set aside for all of Xyience's creditors and lienholders, many of whom are listed in Exhibit A and named as creditors attached to this case. Should Xyience be unable to afford these payments, Fertitta Enterprises should be held liable for all expenses. A full and fair discovery process should take place to determine the validity of each claimant's request for relief, and the bulk of the sanctions and remaining counterclaim damages should be paid out to the victims.

Bergeron has already gathered a tremendous amount of evidence of erratic, corrupt, and fraudulent behavior at Xyience prior to engaging in any "formal" discovery. His discovery has been done the old fashioned way. He calls people who know exactly what's going on, he acquires documents, and he presents all the bare facts to the courts. People in positions of power and influence at Xyience have trusted him at times more than their own fellow board members.

We are talking about the same company that arranged for Bergeron to be flown in to watch UFC 78 in Newark, New Jersey. How many companies suing a guy for $25 million dollars: give him $500 for travel; pay for luxury coach service to and from the airport for the guy; buy round trip plane tickets for the guy; take the guy out to lunch; hand the guy $200 in cash at the end of the meal; and hand him two big tickets to the last event where Xyience's logo graced the middle of the UFC mat? Really, how many companies give that much to a guy who's supposedly spreading lies about them?

The Xyience financed trip was organized while Fertitta Enterprises was in direct financial control of Xyience through their loan instrument agreement. Upon Bergeron's return from the UFC trip, he sent Xyience Co-CEOs Adam Frank and Kirk Sanford a statement of what settlement he might agree on. Adam Frank told him they were only ever going to offer him $5,000 to settle the case. $15 million is more appropriate considering the damage the counter-defendants have done and their indifference to it. This is not the way to do good business. It is more like the way to pull off a good burglary.

By forcing Xyience and Fertitta Enterprises to provide the victims restitution based on their filing this bankruptcy and the case against Bergeron under false pretenses, it will be due and adequate justice for all at this point. The bulk of the remaining case should be determined in a mass arbitration process with eligible creditors determined through discovery.

At all times when Fertitta Enterprises acted on behalf of Xyience they sought to protect and bolster their own financial interests while alienating and causing undue harm to hundreds of shareholders, a group of UFC fighters, a group of former Xyience employees (See Exhibit A), multiple banking institutions, countless creditors (See Exhibit B) and investors in a $350 million financing package guaranteed to Zuffa based on their knowingly false accounting of the strength of their business and their Xyience sponsorship contract. A full, intensive discovery process will provide even more evidence of fraud, some of which may be able to help the federal government agencies Bergeron has been in direct contact with over the past few months regarding Xyience. $15 million in damages is a pittance compared to the total amount of damage done through the case against Bergeron and through Zuffa and Fertitta Enterprises misrepresenting the depth of all the direct relationships Xyience, Fertitta Enterprises, Zyen, GCA, ZUFFA, et al shared. From Page 22 of

Sattar's January Declaration in this case:

> 77. Although a valuation of the Business is currently under way, Xyience does not believe that the value of the Business will exceed the dollar amount of the Zyen secured claim and the priming lien granted to Zyen in order to obtain the DIP loan. Consequently, Xyience did not contact Key Management, Prosperity Investments Alliance, Pacific Investment Network, LLC or Darlis Investments to request their permission or consent to use of Cash Collateral.
>
> **B. Zuffa Marketing, LLC**
>
> 78. Zuffa Marketing, LLC ("Zuffa Marketing") promotes, sponsors and presents a variety of mixed martial arts events, centered around live ULTIMATE FIGHTING CHAMPIONSHIP® ("UFC") productions of mixed martial arts competitions and exhibitions. Zuffa Marketing owns a variety of trademarks used in connection with those events.
>
> 79. Xyience has previously entered into a January 3, 2007 and October 3, 2007 Sponsorship Agreements with Zuffa Marketing, both of which have now terminated. In conjunction with the Zuffa Marketing Sponsorship Agreements, Xyience was permitted to place the UFC a label on each can of Xenergy™ drink. Xyience presently has existing inventory of Xenergy™ drinks which contains the UFC logo on each label, and in order to maintain the Business, Xyience requires the manufacture of additional inventory of Xenergy™ drinks.

The key question is how long did Fertitta Enterprises and Mr. Sattar know the business was not worth more than what they put into it? The evidence indicates that Fertitta Enterprises always intended to bankrupt Xyience even before they invested in the brand. Once in control of Xyience, Fertitta Enterprises only kept the company alive long enough to finalize the multi-million dollar sponsorship agreement with Fertitta-controlled Zuffa, LLC. They did nothing to sustain the business, acquire products such as the Xenergy backlog held by Cott, or legitimately promote other outside interests to invest any significant capital. Though several investors and investment firms were listed in the bankruptcy paperwork with regards to efforts made to collect further financing, based on the tone and attitude of Bergeron's November 17th meeting with Sanford and Frank it appears that Xyience officials played down their need for capital by telling at least one potential financier they were going bankrupt anyway.

Xyience, under Fertitta Enterprises control, is only now trying to secure product to sell through these bankruptcy court proceedings. Xyience represented to this court that a marketing agreement is required to obtain the Cott product and legally sell it. So, it stands to reason that rather than signing an overblown and overpriced 3-year title sponsorship agreement with Zuffa, LLC in October of 2007, Xyience should have negotiated that marketing agreement alone in order to sustain the business and prevent bankruptcy as they promised shareholders they would. As de facto owners of Xyience and 90 percent owners of Zuffa, Fertitta Enterprises representatives would have been in a unique position to negotiate a fair, affordable deal to promote the interests of both parties. Instead, they completed a deal that was a detriment to Xyience and a benefit to Zuffa, LLC. Zuffa subsequently defaulted on the 3-year deal with Xyience and secured the Harley Davidson sponsorship contract to fill the slot. The Harley Davidson agreement is said to be valued at only $200,000 more

than the Xyience deal.

Through Zyen, LLC Fertitta Enterprises defaulted on their loan agreement with Xyience as soon as it was possible to do so. Even after promising the shareholders who ratified the loan agreement that the funding would be used to expand the business and avoid bankruptcy, Zyen and Fertitta Enterprises GM Bill Bullard made moves to bankrupt the company with the aid of the GCA contingent in the most expeditious manner possible. They specifically engaged in bankruptcy proceedings after enriching themselves with voluminous "penny warrant" stock options and negotiating a deal favorable to Zuffa and disastrous for Xyience. All the advertising paid for by Xyience through the Zuffa sponsorship deal was absolutely useless without having sufficient product to provide their customers.

The egregious situation Fertitta Enterprises placed this company in resulted in countless victims being swindled out of their interests in Xyience and debts owed to them by Xyience through the fraudulent bankruptcy before this Court. As long as this Court continues to provide Fertitta Enterprises with free reign to proceed with this case as the priority lienholder without taking a hard look at these allegations of serious fraud, they will be able to enrich themselves even more through the sale of Xyience at public auction on April 1, 2008. A hearing should be held on this motion as soon as possible, and the sale should be delayed until such hearing can be accomplished.

That sale should be suspended along with all the proceedings in order to determine the extent of the fraud engaged in by Xyience and Fertitta Enterprises officials and their associates to facilitate this bankruptcy. Any sale of the company should benefit any and all creditors entitled to relief, not just a small group of people who hijacked this company at the last minute to further a fraudulent scheme. Fertitta Enterprises and their management plants from GCA are attempting to use this court

to commit extensive fraud after spending nearly all the money they put into Xyience thus far on themselves. Should Fertitta Enterprises and the GCA contingent be in the ultimate position to approve a sale and recover assets, this Court will be putting its stamp of approval on a long and painful process of promoting fraud and criminal business activity.

**INTRODUCTION:**

When Debtor Xyience filed its voluntary Chapter 11 petition with this Court on January 18, 2008, it was less than 60 business days after Fertitta Enterprises loaned the company $12 million on October 4th, 2007. Other investors brought in with Fertitta Enterprises also sank millions into the company, namely GCA Founder Karim Maskatiya, who is said to have invested approximately $5 million. Almost immediately after ratifying the October Fertitta loan, Xyience signed a well-publicized 3-year sponsorship agreement with Zuffa, LLC (exhibit 28) which led to at least three known sponsorship agreements that were financially based on that Xyience contract that was defaulted on in December, 2007 under Fertitta Enterprises' control of Xyience. The first year of Xyience's sponsorship contract with the UFC was set at $9 million for the 2008 term. At the time the deal was done Fertitta Enterprises also paid off a significant past-due sponsorship payment to Zuffa.

After depleting their own loan through the huge sponsorship contract they intended to default on down the line, Fertitta Enterprises is now attempting to bankrupt Xyience. At all times Fertitta Enterprises was operating Xyience to enrich themselves through payments to Zuffa. Even in bankruptcy court Zuffa has taken steps to craft contracts which heavily favor their parties and cripple Xyience. There clearly could've been a kinder and gentler contract hashed out between these two inter-connected parties, or at least one that was a bit less expensive. They show a penchant for actually preferring to destroy the product rather than let Xyience profit off selling it:

NONEXCLUSIVE LIMITED LICENSE AGREEMENT EXHIBIT 1

This Nonexclusive Limited License Agreement (the "Agreement") is entered into as of January __, 2008, by and between Zuffa Marketing, LLC, a Nevada limited liability company, with its principal place of business in Las Vegas, Nevada ("Zuffa Marketing"), and Xyience, Incorporated, a Nevada corporation with its principal place of business in Las Vegas, Nevada ("Xyience" or the "Debtor") (Xyience and Zuffa Marketing may be referred to herein individually as "Party" or collectively as the "Parties").

Debtor further agrees that any labeling on products allowed under Section 3 containing the ULTIMATE FIGHTING CHAMPIONSHIP® name and/or logo must be specifically pre-approved in writing by Zuffa Marketing, and any allowed products bearing mention of Zuffa Marketing or its intellectual property must not be sold outside the Term of License and the provisions of this Agreement; provided, however, that Debtor will have thirty (30) days after the expiration or termination of this Agreement to sell any remaining inventory of the products allowed under Section 3 bearing Zuffa Marketing's intellectual property. At the end of this thirty (30) day period, Debtor is prohibited from using any of the Zuffa Marketing Trademarks and Debtor shall, in the sole and absolute discretion of Zuffa Marketing, destroy any remaining inventory of products bearing such intellectual property or deliver the remaining inventory of products to Zuffa Marketing or its designee. Violation of this provision shall constitute a material default under this Agreement. Additionally, Debtor is prohibited from using the ULTIMATE FIGHTING CHAMPIONSHIP® name and/or logo in any point of sale purchase marketing. FROM DEBTOR'S EXHIBIT 1, PAGE 4

Debtor further agrees to provide Zuffa Marketing with a status report, no less than every 30 days during the Term of License, on the sales of the Xenergy® drinks and Xyience performance-enhancing supplements.

8. Debtor's Waiver. In consideration for accrual of the License Fees, the Debtor waives, on its behalf and on behalf of the bankruptcy estate and any trustee that may be appointed in Debtor's bankruptcy estate, any and all rights to: (i) challenge the accuracy of any of the contentions contained in Recitals A through M, inclusive, of this Agreement; (ii) offsets, defenses or counterclaims against any claim of Zuffa Marketing, past, present or future, whether known or unknown, contingent or noncontingent, liquidated or unliquidated; or (iii) bring any avoidance actions under Bankruptcy Code Sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 and similar provisions of the Bankruptcy Code or applicable non-bankruptcy law as to Zuffa Marketing's liens, claims and collateral.

Bergeron has obtained complete audit reports for 2005 and 2006 at Xyience (see exhibit C), but even though these documents are dated from November of '07, the A.J. Robbins accountants did not get a chance to report on much of the 2007 numbers. Fertitta Enterprises and the GCA contingent would like nothing more than to pass the fraud they've been engaged in at the company onto the next person and let nobody see those independent reports. A.J. Robbins accountants are still owed $100,000 according to the insider who provided Bergeron with the audit documents.

In order to set the wheels in motion for the Fertitta funding deal, Xyience, Inc. filed suit against Rich Bergeron in Clark County District Court on July 18, 2007. The plaintiff's initial motion for a preliminary injunction in the case included the following excerpt from page 4 of that document:

> 10. Bergeron continues to post false and defamatory statements on his website with the intent to harm the reputation of Xyience. Moreover, these false and defamatory statements have led to potential investors refusing to invest substantial amounts of money until these articles are taken down.
>
> 11. Potential investors refuse to invest money because they fear that this assault on the internet against Xyience will detrimentally effect the value of there shares.
>
> 12. Specifically, one investor plans to invest $15,000,000.00, however, they have decided to wait until these articles are taken off the internet based upon the fear that the value of Xyience will be decreased because of these false statements.

The above mentioned "one investor" was Fertitta Enterprises. Xyience filed suit specifically to inspire Fertitta Enterprises to invest significant capital in their company. They crafted what's proven to be a frivolous case and manufactured and misrepresented evidence in order to do so. Bergeron's presented a stockpile of evidence to reflect the lengths plaintiff's attorneys went to in order to file and press their frivolous case this far. Exhibit 11 also outlines what happened as soon as the injunction against Bergeron became official. The Exhibit 11 email and supporting faxed order clearly corroborates that the above statement in paragraph 12 is in reference to Fertitta Enterprises.

As his own attorney fighting this case from more than 3,000 miles away from the venue, Bergeron is already at a severe disadvantage in this matter. He has had to put himself through an informal law school to get this far. While plaintiff's attorneys have racked up voluminous legal fees for themselves and are able to bill their client for every hour, Bergeron has yet to be paid a cent for his own fees. Due to the incredible injustice he's faced and the violation of his constitutional rights through the filing of this frivolous case, Bergeron is entitled to adequate attorney fees and sanctions

to be paid out to the multiple parties victimized by this entire situation. The plaintiffs have never shown Bergeron had any malice or intent to harm in his reporting. There isn't any proof of actual defamation that cannot be discredited. There's no other possible evidentiary justification for their suit that holds any water. This case against Bergeron has been insolvent for a long time, just as Xyience has been.

Only a few issues and claims remained for the District Court's determination when Fennemore Craig, P.C. had this case transferred to this court. Efficient resolution of the remaining issues and claims in this dispute is important to not only Bergeron, but also to Xyience, for the issues concern both legal and financial questions that are critical to the direction of Xyience's reorganization. Xyience's counsel is attempting to keep this case classified as an asset rather than the liability it may soon become due to Bergeron's motion to strike the Adam Frank Affidavit and most of the subsequent orders, motion to dismiss and motion for Rule 11 sanctions. The Court should at the very least have an opportunity to decide on these crucial motions before Xyience should be allowed by the Bankruptcy Court to facilitate any sale.

The suspension of bankruptcy proceedings is also necessary in regard to Bergeron's counterclaims in this case. Bergeron intends to amend the complaint to include a long list of burnt creditors and other defrauded parties as counter-plaintiffs. Just a few of these names that could potentially be added are attached to this motion as Exhibit A or have already had their names revealed through exhibits already presented as part of these proceedings.

Each and every creditor seeking relief in this action or due relief for debts owed or contracts not met is a potential counter-claimant in Bergeron's case. Xyience and Fertitta Enterprises both colluded in violating Bergeron's First Amendment rights in securing a prior restraint against him in

order to facilitate their initial formal partnership through the Zyen loan instrument. As Xyience's initial request for a preliminary injunction in this case indicates, Fertitta Enterprises' investment in Xyience was completely dependent on Xyience securing a preliminary injunction in a case they manufactured specifically to appease Fertitta Enterprises and inspire them to provide the ailing company with capital.

A funding consent letter went out to shareholders seeking ratification of the Fertitta funding just one day after the injunction order hit the docket in this case. That order was secured based primarily on Bergeron's inability to appear and the plaintiff's misrepresentation and manufacturing of crucial points of evidence. This case has since been dragged on and on over 8 months with the plaintiff's so-called "merits" deteriorating more with each day. We are on the third plaintiff's law firm already, the third judge presiding, and the second court. Justice has been delayed long enough and traveled from one court to the next, just like Xyience being passed from one abuser to the next. This case is an orphan looking for a parent, and it's a good kid who needs the proper guidance to grow up knowing and believing there actually is such a thing as justice in this country.

***"A man who has nothing for which he is willing to fight, nothing which is more important than his own personal safety, is a miserable creature and has no chance of being free unless made and kept so by the exertions of better men than himself."***

**JOHN STUART MILL**

AN IMMEDIATE AND THOROUGH INVESTIGATION OF ALL BUSINESS ACTIVITY OF DEBTOR AND THOSE COLLUDING WITH DEBTOR TO DEFRAUD CREDITORS, DEFAULT ON CONTRACTS, AND DESTROY THE COMPANY'S ACCOUNTABILITY THROUGH BANKRUPTCY WITH INTENT TO IMPROPERLY ENRICH THEMSELVES SHOULD BE INSTITUTED:

Section 548 of the Bankruptcy Code sets out a fraudulent conveyance provision. As under applicable state law, the Bankruptcy Code permits transfers to be avoided in instances of both actual and constructive

fraud. *See Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 210 (3d Cir. 2006); 11 U.S.C. § 548(a)(1)(A) (actual fraud), (a)(1)(B) (constructive fraud).

Bankruptcy Code. Section 105(a) provides that "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

In re Duratech Industries, Inc., 241 B.R. 283 (E.D.N.Y. 1999) (bankruptcy court determined to abstain from hearing chapter 11 proceedings until litigation between debtor and third person in district court was concluded; even if suspension of chapter 11 proceedings is not appropriate under § 305(a)(1), the bankruptcy court may sua sponte abstain from administering chapter 11 case under § 105(a)).

See also Western Cities Broadcasting, Inc. v. Schueller (In re Schueller), 126 B.R. 354 (D. Colo. 1991) (under § 105, bankruptcy court could suspend consideration of a chapter 11 plan pending resolution of a possibly dispositive state court action).

Pleasant Pointe Apartments, Ltd. v. Kentucky Housing Corp., 139 B.R. 828 (W.D. Ky. 1992) (bankruptcy court may dismiss chapter 11 case sua sponte if the court finds that the case was filed in bad faith; in this instance, the court conducted a four day hearing on a creditor's motion to lift the automatic stay before making a finding of lack of good faith).

Argus Group 1700, Inc. v. Steinman (In re Argus Group 1700, Inc.), 206 B.R. 757 (E.D. Penn. 1997) (bankruptcy court may dismiss chapter 11 case sua sponte, based upon §§ 1112(b) and 105(a), if the court finds that the case was filed in bad faith; in this case, the judge informed the parties that sua sponte dismissal might occur if the cases did not serve "legitimate bankruptcy purposes" and the court would schedule an order to show cause hearing).

Bergeron can prove this bankruptcy was filed in bad faith, and direct evidence of a criminal conspiracy and loan fraud will be unveiled through diligent discovery. In the interests of justice, there should be an investigation into the 2007 action at the company under Fertitta Enterprises' direction and financing. A.J. Robbins should be paid and allowed to complete their audit.

Xyience and Fertitta Enterprises crossed federal boundaries in this case to falsely promote fraudulent business practices. It is fitting that the case has finally wound up in Federal Court.

Bankruptcy Fraud, 18 U.S.C. Section 157 describes the following criminal behavior:

**Conspiracy to Commit Bankruptcy Fraud, 18 U.S.C. Section 371: If two individuals are involved in the**

**scheme, conspiracy may also be charged.**

**False Statement, 18 U.S.C. Section 1001: Any false statement or document designed to mislead the court or the United States Trustee, whether or not under oath. False Statement, 18 U.S.C. Section 152(3): Statement must be under oath or under penalty of perjury.**

Instances of the above behavior are evident throughout the entire Fertitta Enterprises Investment in Xyience. Not only did they plan the bankruptcy, but they utilized this bankruptcy process in attempt to ratify promises they made in their $350 million financing package for Zuffa that reflected the Xyience sponsorship as much stronger than it actually was. Omer Sattar lied in his declarations and furthered the Fertitta fraud as a perfect example of the fall guy he was set up to be along with Co-CEOS Adam Frank and Kirk Sanford. Fertitta Enterprises and GCA representatives conspired to commit bankruptcy fraud and took action on that conspiracy as soon as they possibly could.

It is as if an infection of impropriety took over Xyience a long time ago. From the beginning it has been a stolen entity (see 2005 and 2006 Audit), and since then it has led to fraud at virtually every stage of its existence on multiple levels, accomplished by multiple parties both individual and corporate. The Fertittas are not immune to that sickness. This company has all the hallmarks of a corrupt scheme, and it's reached the level of criminal behavior before any of the criminal actors have been duly investigated and held accountable for how many people's lives they've ruined. Rather than make amends with the injured parties this case is attempting to defraud them.

The Fertittas and Xyience have only been allowed to get this far by securing a Prior Restraint against Rich Bergeron, who never made up any facts or defamed Xyience in any way. Xyience sued and scapegoated Rich Bergeron on behalf of the Fertittas in order to bury the truth. Both counter-defendants breached federal law and abused the U.S. Constitution in a scheme orchestrated to make the principal owners millions. The United States Constitution and all the precedent Supreme Court First Amendment law does not support the order of an injunction against any charge of defamation that has not been borne out of full judicial proceedings.

Until Bergeron's case is decided and he is allowed to conduct proper discovery to validate the information already in his possession, Fertitta Enterprises should not be permitted to profit off clear, undeniable fraud. Should Bergeron be given a fair hearing on his existing motion to dismiss and motion For Rule 11 Sanctions, there will be no reason to deny him relief. The plaintiff has dragged these proceedings on long enough. For the purposes of this motion, Bergeron asks for Summary Judgment

unless the plaintiff and counter defendants can promptly provide some merit to their own argument that is not as easily debunked as the rest of their entire case.

However, knowing full well the odds of getting Summary Judgment while 3,000 miles away from the venue and serving as his own attorney, Bergeron is also willing and able to continue. He will seek the help and cooperation of other creditors and victims of Fertitta Enterprises and Xyience in order to move forward on his counterclaim. Knowing he stands on the side of the truth, Bergeron will continue fighting this frivolous Xyience case as long as it takes to secure the justice he is due. The hearings on Bergeron's motion for Rule 11 Sanctions, Motion to Dismiss, and Motion to Strike Adam Frank's Affidavit, etc. have already been changed and delayed multiple times. Judging by the speed at which Xyience attorneys have been running from these motions, Bergeron can see that his work pegged his adversaries in this case correctly. They want to bury the truth at all costs.

Bergeron will file an amended counterclaim in federal court attaching each and every victim he can properly justify, including banking institutions and brokerage houses sold on the $350 million financing package with Zuffa, and seeking at least $500 million in damages. He will acquire the names of every business and individual in collusion with Fertitta Enterprises and Xyience who aided and abetted their extensive fraud and petition to add them as counter-defendants.

> 25. Due to negative blogs and adverse information posted about Xyience on the internet, Xyience has also suffered a public relations backlash within the beverage industry resulting in new challenges with suppliers and distributors. Employee morale is not good, and some Xyience critics have emerged among the UFC community. As a result, Xyience has experienced a slump in existing sales.
>
> **Omer Sattar January Declaration PAGE 7**
>
> **III. Current Operations**
>
> 26. There are three core components of the Business that are critical to its continued operations: (a) product production; (b) marketing; and (c) distribution.

Xyience pretends to bring a valid "defamation" claim against Bergeron and bring it to federal court when the documents they've filed in this very court point to "negative blogs and adverse information." The above is from Omer Sattar's January 19th Declaration. He mentions no issues with the case now before this court or any charges of defamation regarding Bergeron or any of the other blogs that took up the story. In fact, in all of the bankruptcy documentation Bergeron has thus far reviewed,

there is absolutely no mention of this case against Bergeron at all. Fennemore Craig, P.C. represented this litigation as an asset in official court documents, yet they do not list it in any filings of evidence in the bankruptcy case. Sattar also lists product production as the highest priority, while he helped use the Zyen loan to flood the marketing sector of Xyience long before considering acquiring product.

Negative and adverse are not synonyms of "untrue." Sattar's language under penalty of perjury reveals no valid claim against Bergeron. Sattar also does not account for any other factors causing Xyience's financial demise such as frequent instances of the company being victimized by continuous fraud. The company blames all its ills on blogs? Get real. This company has been brought down by crooked dealing, cronyism, and pure fraud. Everyone is taking their turn at the till collecting and collecting from a company's losing streak, leaving all the creditors to bear the ultimate burden.

Bergeron has thus far been the only blogger sued for defamation and the only defendant Xyience has ever taken up litigation against as far as records show. Knowing full well he could not afford to fly to Vegas from previous conversations between Bergeron and Xyience Employee John Chadwell, Xyience decided to sue based partly on their beliefs that Bergeron would be unable to fight the claim. The prospect of receiving $15 million as a reward for achieving an injunction against Bergeron was the driving force behind the case's initial filing, and all the evidence reveals that Xyience completely backed off pressing the case upon receipt of their final modified preliminary injunction.

This case is now over 8 months old, and since Attorney Jamie Cogburn's withdrawal the plaintiffs have all but abandoned any and all merits put forth by Cogburn's initial complaint. Fertitta Enterprises, in answering the counterclaim, seems to believe that since they were never a party to the litigation they are absolved from all responsibility. Yet, the bulk of the counterclaim describes a situation in which the injunction against Bergeron became a triggering event for massive fraud Fertitta Enterprises engaged in through Xyience. The evidence thus far bears this out. Evidence also points to Fertitta Enterprises entering into a quid-pro-quo agreement promising capital to Xyience based entirely on the success of the lawsuit now before this court against Bergeron, which has in turn resulted in a violation of Bergeron's First Amendment rights. It is the plaintiff's own admission that $15 million would be provided to the company if Bergeron's stories were removed from the Internet. Furthermore, the Fertitta counterclaim response ignores the fact that Xyience continued this litigation under direct Fertitta Enterprises control, tried to settle, financed Bergeron's UFC trip, and continues to press this case.

Consider this section of page 5 of Sattar's January Declaration:

16. Mr. Frank and Mr. Sanford acted quickly to address the financial crises they were faced with. They immediately reduced the number of Xyience employees from 88 to 53 and dramatically scaled back the scope of the previous business plan. In addition, they succeeded in restructuring Xyience's existing trade debt and amounts due noteholders by negotiating workout arrangements with Xyience vendors and noteholders, resulting in a reduction of amounts due and establishing workable repayment plans.

17. Additionally, Mr. Frank and Mr. Sanford actively sought capital support from a number of potential financial partners including Burril, Lazard, Westcap, Wakabayshi, and Accord Financial, none of whom was ultimately willing to provide a financing commitment to Xyience at the time. In fact, the only entity willing to lend funds to Xyience at the time was an affiliate of the UFC known as Zyen, LLC. ("Zyen"). Zyen was only willing to provide a loan to Xyience if all of the other secured creditors agreed to subordinate their security interests to Zyen.

18. On October 4, 2007, Zyen provided $12,000,000 in exchange for a senior secured convertible note and warrants for 10% of the company. The transaction was approved unanimously by the board of directors and by over 60% of Xyience shareholders.

19. A key covenant of the Zyen loan required Xyience to remain current on the repayment plans that it had negotiated with its noteholders and vendors. In addition, the proceeds of the Zyen loan could only be used to finance ongoing business as opposed to meeting the company's commitments to noteholders and vendors.

The above priceless paragraphs say it all. Sattar calls Zyen, LLC ("Zyen") "an affiliate of the UFC" in paragraph 17. Yet, while in an ownership position of one of the UFC's major sponsors, they doled out huge payments in organizational level sponsorship while failing to relieve the debts and retain the contracts of UFC and Xyience employees. Several of the UFC's most recognized fighters (Travis Lutter, Rich Franklin, Chuck Liddell, Sean Sherk, Heath Herring, Evan Showman, Matt Serra, et al) got shafted on their sponsor deals while the UFC's was paid in full. Chuck Liddell is even listed as holding $1 million shares of Xyience stock. (see exhibit A)

The "unanimously" approved (paragraph 18) move by the Xyience Board of Directors to accept the Zyen, LLC loan was a decision made under considerable stress and with people in position at

Xyience on the board of directors who bore allegiance to the Fertittas for previous big business deals. Add to the situation the fact that part of the incoming crew left their last company and set the stock down ¾ of it's value with the mess they left behind.

The worst part of the above-pictured section is the last two lines:

> proceeds of the Zyen loan could only be used to finance ongoing business as opposed to meeting the company's commitments to noteholders and vendors.

Those lines expressed the glaring and explicitly stated need to do some of that ***business*** their loan was supposed to help inspire. Instead of securing and selling the Xenergy product to promote a profit, Fertitta Enterprises paid themselves through Zuffa while Xyience suffered. Sattar explained:

> 30. Xyience's supplements business has deteriorated from a high of $14.2 million in sales in 2006 to $6.1 million in 2007. This segment of the business is, again, highly competitive and requires substantial investment in research, development and marketing. Nevertheless, Xyience owns valuable trademarks and goodwill in the supplements industry and it will continue to service this segment of the market.
>
> 31. Xyience's energy drink business has shown signs of moderate and sporadic strength in certain markets, but it has never had the opportunity to operate in an environment where management could focus on operating the Business. The energy drink business: however, is a critical component of Xyience's success because the energy drink industry is rapidly expanding and it is projected to increase from sales of approximately 3.8 billion in 2006 to sales of over 7.6 billion in by 2011.

Sattar mentions Marketing, researching, and developing expenses, yet he forgets about the actual product, specifically Xenergy. If the company always intended to continue to sell the product and promote itself under Fertitta funding, why did the company collapse so quickly under Fertitta Enterprises leadership? Why wasn't any real business done other than the payment of their own past-due sponsorship note and the extension of the Xyience/UFC contract? Why did fighters go unpaid? Why did shareholders get written off? Why are the folks at Zuffa, GCA, Eisner and Frank, Fertitta Enterprises, Zyen, Manchester Consolidated Corporation, and even Bevanda Magica getting the big bucks for facilitating a fraudulent bankruptcy? Their collective wealth is high in the billions.

A great investigative reporter can predict the future at times, but he does it by finding and knowing the facts. A great financial mastermind predicts the future by manufacturing it. While the great reporter is motivated by a value, the great businessman is too often motivated by what is considered not only immoral, unethical, and sometimes illegal but also among the ranks of so-called "deadly sins." Greed at this astronomical level is all the more disgusting.

People consumed and controlled by that much greed will do whatever they have to in order to get much more than their fair share out of extremely minimal effort. Motivated by such evil and disregard for the truth, the antithesis of the honest author's intent, a person can cross over to criminal behavior and plan ruthless activity without inspiring a bat of an eye. They become all too familiar with playing the games of business and using legal representatives to get away with financial murder. It happens too often.

Fertitta Enterprises has also raised the ire of casino workers in Las Vegas with major disputes as to their compensation. The casino employees challenge the accuracy of the records kept by the Station Casino Operators and feel they deserve to be credited for many more hours worked than have been registered and paid out to them. (See Exhibit D)

The Unsecured Creditors Committee attorney makes an excellent point when he discusses the lack of "arm's length" business deals in the objection to the debtor's sale process in this case. When it comes to Fertitta Enterprises, Zyen, Xyience, Zuffa, UFC, Bevanda Magica, and even GCA, there is no party separated by more than the distance you need to be from someone to shake their hand and whisper promises in their ear you can't keep and you don't ever have to. The criminal conspiracy leaves the public hoodwinked, the fighters left hung out to dry, Bergeron's First Amendment rights in the toilet, countless investors and creditors defrauded, employees out of work, and NO EXAMINATION OF THE PEOPLE WHO REALLY PROMOTED ALL THIS FROM DAY ONE BASED ON COMPLETE LIES.

Consider Manchester's offer for Xyience and then re-examine Sattar's first declaration:

> 66. Cott is the company that manufactures Xenergy™ beverages. Although Cott presently has 169,599 cases of product in its warehouses, Xyience has not been able to purchase any of this inventory due to cash flow shortages. Xyience therefore needs an emergency approval of the proposed DIP financing in order to avoid irreparable harm to the Business resulting from this critical need for inventory, and to permit Xyience to purchase the inventory available from Cott.

Now it's not just Fertitta Enterprises they want to pay, for once, it's Cott, too. They later go on to report the product could make them as much as $8 million. All of it was also there for the taking when Fertitta Enterprises purposely entered into a Xyience title sponsorship they knew they'd default on to enrich themselves. These are very sophisticated businessmen and legal entities. The people who drew up this entire deal and have since allowed this process to keep moving forward in their own financial favor only. Xyience and Fertitta Enterprises have operated in a despicable, if not highly illegal, manner. Suddenly Manchester Consolidated wants to buy Xyience for a steal, and both former Co-CEOs who resigned from Xyience are said to be connected to Manchester now. And, guess who's on Manchester's payroll at the head of the pack:

The CEO and Chairman of Manchester Consolidated Corporation (MCC) is Anthony M. Pallante. According to the company's Web-site:

**"Previously, Mr. Pallante served as a Vice President and Officer of Cott Corporation. Over his tenure with Cott sales increased from less than $50 Million to over $500 Million world-wide. In addition, the stock value realized a forward split 3 times providing an exponential increase in shareholder value. Prior to Cott Mr. Pallante was President & CEO of Exclusive Beverage, the Royal Crown Cola franchise in Toronto Canada. His expertise is focused on financing (using both public and private companies), mergers and acquisitions strategy and general corporate structuring."**

Cott is the producer of Xenergy, one of Xyience's most valued and hyped products, and the company is at the heart of bankruptcy issues since they hold so much valuable new Xenergy product.

Not surprisingly, Pallante is not the only Cott convert to come over to MCC. The Web-site also details the background of Mr. William Smith: Executive VP of Corporate Finance/Mergers & Acquisitions. Before his employment at MCC, Smith also worked at Cott. The MCC Web-site reports:

**"Mr. Smith was Vice President, Taxation, Investor Relations and Treasurer of Cott Corporation, the worlds largest private label manufacturer of soft drinks and a publicly traded company in both Canada and the United States. He carried out a wide range of responsibilities which included M&A activity, all financings, international tax structuring, cash management worldwide (Cott operated in over 10 countries), analyst presentations for Wall Street, all contact with the media, speech writing for the CEO, writing annual reports, and arranging annual general meetings."**

The Cott Connection through MCC makes more sense as something done to further defraud those due relief from Xyience than it does as a way to make dollars for Xyience's creditors. By placing this blatantly insider-dealing proposal before the Bankruptcy Court, Fertitta Enterprises, Omar Sattar,

and Xyience are all putting their stamp of approval on a bare-bones minimum bid in which they have a major conflict of interest involving the buyer.

Zuffa, LLC is a corporation with a reputation for suing individuals who threaten them. The media often harps on the mentality behind that attitude by comparing the company itself and all the major players running it to the kid who takes his ball and goes home with it if his team is not winning. If they had the evidence or the conviction that Bergeron had ever written or said anything publicly that was at all unfounded or untrue about them, they would have sued him themselves. Yet, they didn't. They made Xyience sue for them through a promise made by Fertitta Enterprises to infuse $12 million in capital in exchange for an injunction against Bergeron's true stories. Fertitta Enterprises even tried to hide the fact they were even invested in Xyience. They are directly connected through common ownership to the major lienholders in this lawsuit, thus Bergeron named them as counter-defendants. Fertitta Enterprises has operated in collusion with this company for a long time through Zuffa and conspired to commit criminal acts.

Not only have Fertitta Enterprises and Zuffa refused to file their own litigation against Bergeron, but they have waited until the last moment to assign their own lawyer to Bergeron's counterclaim in this case. Like Xyience's attorneys have done, Fertitta Enterprises attorneys are clinging to technicalities in the hopes of having the case against them dismissed. Bergeron petitions for this case to be decided based on the merits he's presented throughout the proceedings and a hearing on this motion in which he should be allowed to participate telephonically.

SUMMARY JUDGMENT of $5,000,000, 10 percent of which is to be paid immediately to Bergeron on his unduly delayed outstanding motions in the plaintiff's case is in order. Judgment as to the counterclaims is also in order for Bergeron in the aggregate amount of $10 million with 10 percent of that judgment also going to Bergeron. The remainder of those two judgments shall go to satisfying settlements with creditors and be distributed by the Trustee in this matter. In the final accounting $1.5 million in total damages will be distributed to Bergeron with the rest of the funds given to the most deserving creditors as determined by due discovery of claims. The $13.5 million should first be applied to investors locked out by the Fertitta financing, employees laid off prematurely, and fighters stiffed on sponsorships. Next in line shall be all other business contacts and banking institutions having outstanding claims against Xyience. However, Bergeron surrenders the final authority to distribute these funds to the trustee in this case.

CONCLUSION:

The United States of America is a free country. Freedom of the press is paramount to providing some of the necessary checks and balances of an efficient government and society. Some of the most revolutionary reporters have gone into combat or put their lives in danger in a foreign land all in the name of writing the truth. There is a certain spirit in the heart of all writers to get it right no matter what. Very few go on rampages of plagiarizing or making up facts. It's not a game. It's the truth writers seek.

It happens sometimes, some writers do cross that line, but not as often as businessmen bilk companies, utilizing the infamous "golden parachute" to slip out of the executive suite and off into the sunset without a hitch. Writers are crucified when they cross the line, seen as the lowest form of journalistic filth. If you do the crime, you have to be willing to do the time. Bergeron has done nothing inappropriate or illegal in his reporting, and the entire case against him is a complete fabrication meant to facilitate Fertitta Enterprises and Xyience in efforts to promote a fraudulent bankruptcy.

Nothing in Bergeron's background indicates any motivation to make up facts. Everything in his career history points to him being a very capable and experienced reporter. He is also a graduate of military school where he followed an honor code. He still does. It is against his nature to lie. Look at the weight of these proceedings (See Exhibit F). Bergeron has been trying to get a proper hearing since day one. He would not have been able to get this far acting as his own attorney had he not kept his facts straight all along.

While each member of the plaintiff's legal parade has always marched to the same drummer—spouting technicality after technicality to delay and avoid justice—Bergeron has acted as what seems to be an absolute anomaly in today's culture: an honest lawyer. Promoting applicable points of law, the true facts of the case, and the overwhelming bulk of the evidentiary weight in the case, Bergeron managed to crack the façade of three straight lawyers, despite their attempts to confuse and lose him in the procedural maze of practicing law as one's own attorney.

Both law firms attached to the case since Cogburn abandoned all the merits of the original case Cogburn filed. They have not so much as added a single piece of new evidence that addresses any lack of merit to Bergeron's motions and evidence on the docket. They continue to pick apart the procedural nuances in order to find some loophole that saves them all from final accountability.

As far as the plaintiff goes, we haven't heard about real merits in months.

Strangely enough, nobody seems to want to talk about any of Cogburn's initial "merits" anymore. The last judge who stated he would decide the case based on the merits found himself recused. When Bergeron obtained permission to have his motions decided in the chambers of the initial judge's replacement, Plaintiff's attorneys had the case removed to Bankruptcy Court. They are hoping the stumbling block of learning to file in this court and getting a proper and timely hearing will be too formidable for Bergeron to conquer. It is another technicality ploy to avoid having to explain anything or be held responsible for their egregious actions.

Instead of being punished and put through further financial, emotional, and physical agony, Bergeron should be rewarded for the honesty he's brought to these proceedings and compensated for the effort he's undertaken to promote justice for all, not just himself. This case is about a simple concept more significant than the weight of the paperwork alone suggests. It is about people who needlessly and ruthlessly enrich themselves and the process by which they do so, requiring "the exertion of better men than themselves" to make a fat, fraudulent buck. To promote their unjust enrichment, the counter defendants colluded to trample the First Amendment rights of one of the only people who set out to expose this fraud in the public eye and make other news outlets aware of the story. Furthermore, they painted Bergeron as an enemy of the company when Bergeron at all times sought to help the company. He even brought a potential financier to a meeting with Xyience CEOs.

> 73. Among other potential lenders. Xyience has contacted Standard General

Sattar neglects to mention above, on line 73, page 20 of his January Declaration, that it is Bergeron who brought Standard General to the table in the first place, showing a clear motivation to help the business, not to harm it. It is interesting that they list Standard General first on the list. Bergeron brought Standard General Employee Robert Lavan to a meeting with him In New York City's Time Square with Adam Frank and Kirk Sanford on the afternoon of November 17, 2007. It was his first formal meeting with any Xyience official.

The connection between Xyience and Standard General was made there in the restaurant of the W Hotel. Upon accomplishing due diligence in researching the company after that first meeting, Standard General ultimately didn't see the value of dropping a dime into the company. However, Frank and Sanford repeated over and over again at that November meeting that they were going to have to bankrupt the company. The Fertittas dropped $12 million into it and liquidated that in less than four months without managing to turn any profit from sales.

Sanford and Frank's short sell to gain capital was to say "don't buy it, we're not going to keep it alive, anyhow." Instead of promoting an investment from Standard General at that November meeting Sanford promoted his plan to take the "scorched earth" approach with Xyience. He actively promoted a bad-faith bankruptcy filing at that meeting, and he displayed an outward and open intent to burn other shareholders for his and his business partners' own personal benefit.

A deposition of Standard General Employee Robert Lavan will bear out the above information, and previous exhibits have featured Lavan's communications to Bergeron about the distressed company and Sanford and Frank's plan to bankrupt it.

Xyience, through the Fertittas now, is managing to handcuff the constitution in this case to enrich themselves unjustly. This despicable behavior is wrong. It should not be supported and protected by the law, and this court should recognize all the law this process is breaching due to the counter-defendants' behavior. Above all, due to the venue this case now resides in, this company should not be allowed to proceed with any bankruptcy issues until fair hearings on these major First Amendment and fraud issues can be held.

SUMMARY JUDGMENT should be granted as to Xyience's frivolous filing and the counterclaims of Bergeron's case in the aggregate of amount of $15 million. $5,000,000 shall be

designated for sanctions and legal fees due Bergeron for having to endure the plaintiff's frivolous suit, with all but 10 percent of that total being paid out directly to a fund set aside for creditors of Xyience with valid claims in this Court. The minimum percentage should be presented to Bergeron as soon as possible. This entitles Bergeron to a $500,000 lump sum payment for sanctions and attorney fees as to the frivolous filing of the plaintiff's case.

$10 million in further judgment on the counterclaim should be divided and paid out to burnt creditors as decided by the trustee in this case, with the same percentage set aside for Bergeron. Ten percent of that $15 million aggregate judgment leaves a total of $1.5 million accruing to Bergeron for bringing the case and filing the appropriate motions for relief.

The remaining $13.5 million will be provided for other creditors to split amongst themselves in this case. In lieu of an agreement with these stipulations agreed upon, Bergeron will be forced to amend the counterclaim to include each and every counter-claimant he can recruit to join him in seeking complete and adequate justice. Absent immediate relief he will feel obligated to file an amended counterclaim seeking at least $500 million in damages and including the banking institutions that Zuffa defrauded to receive their $350 million financing package.

LEGAL ASPECTS OUTLINED

Some areas common to many typical bankruptcy frauds need to be examined with regard to the bankruptcy presently before this court. Most of these situations are explained within an article Bergeron discovered recently entitled "Identifying Bankruptcy Fraud" and written by the following well-respected and positioned legal representatives in 1999:

**"Joe B. Brown is Special Assistant U.S. Trustee, Nashville, TN, Brian Netoles is Assistant U.S. Attorney, Northern District of Illinois, Sandra Taliani Rasnak is Assistant U.S. Trustee, Chicago, IL, and Maureen Tighe is Assistant U.S. Attorney, Central District of California."**

The Full Article can be viewed at: http://www.crfonline.org/orc/pdf/ref11.pdf and the following points paraphrase the piece and include applicable points that have parallels to the matter

at hand in this court. (Bergeron's commentary in parentheses):

**Bankruptcy Fraud, 18 U.S.C. Section 152** deals with concealed assets or false statements. Classic "bustout" or planned bankruptcies where goods are moved out the back door with the plan of filing for bankruptcy are usually charged as concealment "in contemplation of bankruptcy." (Zyen, LLC did this in conjunction with Xyience and the GCA contingent by refusing to buy the Cott Products it could have paid for and sold immediately to help prevent bankruptcy and promote sales.)

(Under Fertitta Enterprises Xyience never held a sufficient shareholders meeting and never operated in a mode of full disclosure. They acted surreptitiously and without direct oversight or control by a significant amount of the initial shareholders. Most of the people who had interest in the company believed all the lies Bill Bullard, Adam Frank, and Kirk Sanford told them along with the Eisner and Frank law firm that snapped up a big financial bonus for the Fertitta Loan. Xyience employees likely saw the loan as a sign that they would keep their jobs through the holidays, but most of them were axed anyway just a few scant months after the millions came in the front door and flew right out the back. Many employees were displaced during the holidays not long after Xyience thought it necessary to dispatch Bergeron on their dime to UFC 78 to participate in a fruitless discussion that did nothing to resolve their case against him. It was quite the snipe hunt paid for with a corporate Xyience account for a person they had a $25 million lawsuit against.)

**Bankruptcy Fraud, 18 U.S.C. Section 157**: If any act of the fraud occurs after October 22, 1994, this statute may be used. The use of bankruptcy must aid the fraud scheme in some way. Delaying creditors, allowing the debtor to continue to operate or covering up the scheme are examples.

**Examples Of Bleedouts: Corporate Raider Bleedouts:** A stable company with very liquid assets, such as a large pension and/or profit sharing fund, is acquired in a leveraged buyout. The company is operated for the sole purpose of allowing the insiders to loot the company. A Chapter 11 is filed to allow the insiders to complete their scheme. Business transactions are complex and purposefully confusing, which makes fraudulent conveyance actions expensive and difficult to prove. This type of scheme is used in all types of industries. (Bergeron is not the only one objecting to the sale process:)

Finally, the Committee has been informed that there is a relationship between the Fertitta family (the ultimate owners Fertitta Enterprises, which created Zyen and is the 90% owner of Zuffa, LLC ("*Zuffa*") – the parent company of the Ultimate Fighting Championship, of which the Debtor is a major sponsor), and Manchester – the proposed purchaser of the Debtor's assets. Although the Committee needs to conduct further discovery to fully understand the relationship, for a variety of reasons it is quite possible that Manchester may not qualify as a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and that Zyen may be seeking a short-marketing period in order to improperly consummate a "lend to own" strategy. The Committee reserves the right to further object to the proposed sale for this and other reasons once it has had an opportunity to obtain discovery.

**OBJECTIONS TO THE SALE MOTION**

For the basic reasons summarized above, the Sale Motion must not be approved in its present form. Absent modification as suggested herein, the proposed sale would severely prejudice the rights of creditors, and would not maximize the value of the Debtor's assets. Each of the main problems with the Sale Motion is discussed in greater detail below:

**1. More Time is Needed to Properly Market the Debtor's Assets and Maximize Value for the Benefit of the Debtor's Creditors – the Marketing Effort to Date has been Insufficient**

A minimum of an additional 60 days of marketing time is needed to truly maximize the value of the Debtor's assets, time that is necessary to, among other things, give Sierra a meaningful opportunity to procure alternative bidders. Sixteen business days – the time period between March 6, 2008 and the proposed deadline for bids on March 28, 2008 – is not enough time for potential bidders to conduct due diligence and present competitive bids. This unquestionably reduces interest in the Debtor's assets and chills bidding to the detriment of the

(Page 4-5 of the Initial Objection of Official Committee of Unsecured Creditors to the Manchester bid and short-auction sale process expressly states valid reasoning for delaying the process to further examine the parties. See both above and below snapshots of that objection):

Debtor's stakeholders. In fact, the Debtor has produced absolutely no evidence indicating that such a short marketing period is adequate. There is no affidavit from the Debtor's marketing consultant, and the Debtor has indicated that it does not intend to call witnesses at the hearing.

Even the Debtor's own description of its marketing process suggests that it has been less than adequate, in large part due to the unnecessary haste with which Zyen is forcing the Debtor to consummate the sale. For example, the Debtor asserts that since the Petition Date, it "has worked with its consultants and advisors, including the Sierra Consulting Group, to market the Assets for sale." (Sale Motion at p. 7) (footnote omitted). However, there is no discussion of the nature of these efforts, or what interest has been received.

An additional 60 days of marketing time would allow Sierra and the Committee a reasonable and realistic opportunity to test the market for the Debtor's assets, and it might even benefit Zyen, who claims that it expresses a preference for a cash buyer as opposed to the current proposal (an assumption of its allegedly secured claim). Absent a meaningful marketing process, the Court will have no way of satisfying itself that alternatives for maximizing value have been explored. And until it does so, approving a fire sale of the Debtor's assets for the benefit of one insider (as currently proposed) would be highly inappropriate.

**"White Knight" Bleedouts:** A business consultant is hired by a troubled business to assist it in acquiring new financing and streamlining operations. On occasion, the "white knight" is given an ownership interest in the business. The consultant takes control of the financial operations of the business and uses his position to convert company assets. Often this includes failing to pay withholding taxes, failing to make pension fund contributions, diversion of receivables, paying personal expenses with company funds, taking excessive salary and bonuses and, in some situations, paying false invoices to entities or individuals related to the consultant:

XYIENCE'S WHITE NIGHTS (FROM OMER SATTAR'S JAN, 2008 DECLARATION):

9. From May 2006 through the end of that year, Xyience raised additional capital, among other things, through private placements and the fundraising efforts of the company's founder and then CEO. Russell Craig Pike.[2]

10 During the fourth quarter of 2006. Xyience retained ARC Investments to assist in raising capital, resulting in a $5 million secured convertible loan from Darlis Investments. Shortly thereafter. Mr. Pike resigned as CEO and Adam Roseman, the principal of ARC Investments. assumed management. Unfortunately, Mr. Pike's efforts to sell Xyience stock in the State of California resulted in the entry of a September 10. 2007 Desist and Refrain Order against Xyience and Mr. Pike by the State of California. Department of Corporations. a copy of which is attached as Exhibit 2.

[2] Mr. Pike is a Petitioning Creditor in the Involuntary Case filed against Xyience on January 3, 2008 as Case No. BK-S-10049-MKN wherein he alleges that the sum of $2,157,515.75 is owed to him by Xyience for a promissory note. Although the financial records of Xyience do reflect a contested unsecured claim due Mr. Pike in the amount of $1,800,011.08. see Schedule F. there is no documentation in Xyience's books and records to support this claim.

- 3 -

11. Under Mr. Roseman's leadership, Xyience entered into a $15 million sponsorship agreement with the UFC for the year 2007. The company continued to explore financing options and presented the investment opportunity to numerous investment banks and private equity funds including Cowan & Co., Lazard, Deutsche Bank, Piper-Jaffray, JP Morgan, Lehman Brothers, Canacord Adams, CSFB, Merriman, Och-Ziff and Curhan and Ford. None of those prospects agreed to invest.

12. In February 2007 a receiver, previously appointed by the Securities and Exchange Commission to take control of AA Capital's assets, liquidated AA Capital's investment in Xyience. That investment was ultimately acquired by Key Management.

13. In early 2007, following the resignation of Mr. Pike, Xyience brought in new management, with a focus on maximizing top-line revenue. Respected restaurant entrepreneur, Bill Underhill, became CEO and former Coca-Cola executive, Jan Hall, served as President and Chief Operating Officer. Under the leadership of Mr. Underhill and Ms. Hall, Xyience embarked on an effort to roll out the company's new energy drink, Xenergy™, on a national basis. The anticipated cost of the company's marketing plan was approximately $29 million.

14. In order to finance the national rollout of Xenergy™, Mr. Underhill and Ms. Hall worked to secure capital investment from a variety of investment banks and private equity funds. Unfortunately, their efforts were not successful. In May 2007, Mr. Underhill and Ms. Hall resigned.

15. On June 1, 2007, Adam Frank and Kirk Sanford were appointed to lead the company, Mr. Frank as Interim General Manager, and Mr. Sanford as Special Advisor to Management. At that point, Xyience had liabilities to trade creditors of approximately $25,000,000 and obligations to noteholders of $18,000,000. Based on prior management's plan for a nationwide rollout of the company's energy drink, Xyience had staffed up to 88 employees, and was operating with a breakeven sales requirement of

- 4 -

(All the above listed "White Nights," up to an including Adam Frank and Kirk Sanford could not and would not save Xyience if it meant sacrificing their own personal bank accounts to do so. The last true White Night of Xyience was John Scott's Nitro Predecessor Nitro Supplements. Xyience stole that entity away from Owner John Scott to establish Xyience. If we are to believe the above disclosures are true, Xyience needed a total of 43 million dollars to maintain itself adequately as a going concern.)

**(None of the above White Nights were truly able to staunch the bleeding, but they pretended they could time and time again. Each one profited off their own particular scheme, never intending to properly raise the capital to keep the company solvent.)**

**Parallel Entities:** A long-standing company experiences financial problems. Insiders of the company create a new business (Zyen, Bevanda Magica) in the same industry just prior to or soon after the bankruptcy filing. In some cases, the debtor sells some of its assets to the new entity for a fraction of

their value just prior to the bankruptcy. The non-debtor entity is usually not disclosed. The insiders operate the debtor until they have successfully transferred the debtor's inventory, receivables, customers and goodwill to the new company. In addition, the insiders may use the debtor to purchase goods and services for the new company with the intent of never repaying the Chapter 11 administrative creditors. This is usually a lawyer-assisted fraud. (At least the three lawyers listed below colluded in supporting Xyience's fraudulent bankruptcy thus far. Kirk Sanford and Adam Frank are reportedly setting the wheels in motion to join Manchester Consolidated after their recent resignation from the Xyience Board of Directors, fulfilling the type of fraud outlined in the above paragraph.)

(a) If to the Purchaser, at:

ZYEN, LLC
c/o Fertitta Enterprises, Inc.
2960 West Sahara Avenue, Suite 200
Attention: Mr. William Bullard
Secretary
Facsimile: (702) 362-5889

With copies to:

Milbank, Tweed, Hadley & McCloy LLP
Attention: Kenneth J. Baronsky, Esq.
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Facsimile: (213) 892-4733

(b) If to the Company, at:

Xyience Incorporated
10650 West Charleston Boulevard
Suite 110
Las Vegas, NV 89135
Attention: Chief Executive Officer
Telecopy No.: [ ]

With copies to:

Eisner & Frank
9601 Wilshire Blvd.
Suite 700
Beverly Hills, CA 90210
Attention: Michael Eisner
Telecopy No.: 310.855.3200

Fennemore Craig, P.C
Laurel E. Davis (NV Bar No. 3005)
Daniel W. Glasser (Nv Bar No. 6990)
Jon T. Pearson (NV Bar No. 10182)
300 South Fourth Street, Suite 1400
Las Vegas, Nevada 89101
Telephone: (702) 692-8000
Email: ldavis@fclaw.com

**COGBURN LAW OFFICES**
JAMIE S. COGBURN, ESQ.
Nevada State Bar No. 008409
170 S. Green Valley Pkwy., Suite 280
Henderson, Nevada 89012
(702) 384-3616

**AGREED AND ACCEPTED:**

**ZYEN, LLC**

By: ______________
Name: ______________
Title: MGR

**2960 West Sahara Avenue**
**Suite 200**
**Las Vegas, Nevada 89102**
**Attention: Mr. William Bullard**
**Facsimile: (702) 362-5889**

## Ponzi Schemes (Investor Fraud)

A Ponzi scheme (pyramid) invoices soliciting investments by promising interest rates well above the market rate. Early investors recover their investments with the promised rate of return and encourage others to invest. As the pyramid begins to crumble, investors are unable to recover their original investments and interest is no longer paid. Chapter 11 cases are filed to allow the debtor to continue the scheme. When the scheme collapses before bankruptcy, either a voluntary or involuntary case is filed. (Both were filed in this instance)

The essence of these schemes is a promise of a very high return on an investment. Once it fails, many investors are reluctant to complain because they realize they have been duped. It is important to identify and contact the investors because they generally are excellent witnesses.

(According to audit paperwork Xyience was $84 million plus in the hole at the end of $2006, yet at the end of Russell Pike's connection with the company he had a roper going around telling

people the company was going to go for an IPO soon with Bear Stearns. Pike utilized the District Court's Prior Restraint against Bergeron through a representative seeking loans for Xyience to spout lies about the court's findings in order to discredit Bergeron and inspire Fertitta Enterprises to invest in the brand (see Exhibit 11). The counter-defendants actively sought to make voluminous income off the prior restraint they placed on Bergeron to prevent him from reporting on their crooked activities. Fertitta Enterprises facilitated a cover up of the previous fraud at Xyience through instituting this bankruptcy and inspiring the case against Begeron in order to go through with the grand plan.)

(It was rumored months before Fertitta Enterprises invested in Xyience that they were talking about doing so. The news was all over the Mixed Martial Arts media circles and passed around by people with close relationships to Xyience officials or employees. They always planned to swoop in and pluck the company out of all its debt when the time was right and the ongoing fraud was at its worst. So, they bought in and instituted their own fraud just before bankruptcy. Now they are only taking care of themselves and other key insiders, and nobody who really helped build the company from the ground up is being offered a dime without a fight.)

A debtor who fails to list assets on his/her bankruptcy schedules commits both the crime of concealment and false statement. By concealing assets, the debtor attempts to preserve property for future use and to deprive creditors of their fair share of assets. Concealment may take the form of omission of assets in their entirety or the gross undervaluation of assets.

**Undervalued Assets** are Assets which are listed, but their value is grossly understated or deemed worthless. The intent is to persuade the trustee and creditors not to liquidate the assets. (Bergeron's case is deemed an asset, but Fennemore Craig, P.C. has not made any petition as of yet to liquidate their asset by seeking a judgment in the case. Only one default judgment has been sought, which Bergeron answered in an appropriate manner and was still punished with an illegitimate default order he had to petition to remove on February 7, 2008 during his only public appearance in this matter, via telephonic hearing.)

**Transfer of Assets Pre-petition:** The debtor transfers assets with little or no consideration to third parties with the agreement that after the case is closed the property will be returned to the debtor. The relationship to the debtor or the agreement with the transferee is not disclosed. (i.e. Xyience's huge $30-plus million, three-year Zuffa sponsorship contract gets defaulted on after being

manufactured by the Fertitta representatives who were also in a 90% ownership position of Zuffa).

(This is exactly what is happening with Manchester Consolidated Corporation. Assetts were kept in possession of Cott, which has a deep connection with the potential pre-approved buyer. Zyen was in a perfect position to purchase this product in lieu of their ridiculously overpriced sponsorship arrangement with Zuffa that should have been crafted more in the context of a marketing agreement for the product label stamp, just like the latest bankruptcy papers have approved.)

**False Statement, 18 U.S.C. Section 1001**: Any false statement or document designed to mislead the court or the United States Trustee, whether or not under oath.

**False Statement, 18 U.S.C. Section 152(3)**: Statement must be under oath or under penalty of perjury.

**Forbearance, 18 U.S.C. Section 152(6)**: Bidder, the debtor and/or a creditor have side deals on a sale. Sale agreement not disclosed and creditors are victimized.

**Strawbuyer/Fictitious Bidder:** The debtor sells assets to a court-approved buyer and the assets are secretly resold at a profit pursuant to a previous agreement with a third party. Where fictitious bidding is suspected, creditors should require a statement to the effect that the buyer is bidding for himself or have him state the purpose of the purchase. False statement prosecutions have been brought where this statement is false.

**Examples Of Straw Buyer/Fictitious Bidder; Kickbacks**: An insider agrees to sell assets to a purchaser who agrees to pay the insider a kickback. The purchase price disclosed in the motion to sell is less than the price agreed upon by the insider and the purchaser. When the sale is completed, the debtor receives the difference between the court-approved price and the undisclosed sale price.

**Straw Sales**: Insider wants to conceal his purchase of estate assets because he wants to orchestrate the sale to allow him to buy the assets for a depressed price. A fictitious purchaser or nominee is used to acquire the assets. Once the sale is consummated, the assets are transferred to the insider for a fee. Insider and purchaser do not disclose the relationship to the court. Oftentimes, both parties will make affirmative statements claiming there are no connections or agreements between them. **Red Flags/Common Characteristics** · Pre-existing, undisclosed relationship between the debtor and the straw buyer. · Sale terms are structured to prefer one bidder. · Inadequate or no effort

to locate other purchasers. Advertising not placed in appropriate newspapers or journals to reach potential purchasers. · Unusually high bid-protection or break-up fees. · High price offered, but broad terms allow the purchasers substantial setoff rights. · Purchaser is represented by counsel with close ties to debtor's counsel. · Debtor interferes with potential purchasers' due diligence efforts.· Short notice request on sale because of "emergency" situation.

**Civil Responses To Consider** · Appointment of a Chapter 11 trustee · Objection to the sale. Grounds include inadequate disclosure concerning the insider relationship to purchaser; inappropriate advertising, e.g., terms of sales not reasonable and too broad · Trustee adversaries to avoid sale

**Bankruptcy Fraud, 18 U.S.C. Section 152 a(1)-(5)**: Concealment of assets and false statements to the court or in 2004 depositions. The insider receives property of the estate with the intent to defeat the provisions of Title 11 because the property is not sold at its real value.

**Bankruptcy Fraud, 18 U.S.C. Section 157**: If the bankruptcy system was used to aid the fraud, concealment and false statement may be charged under this section. Provides a broader description of the crime.

**Conspiracy to Commit Bankruptcy Fraud**, 18 U.S.C. Section 371: If two individuals are involved in the scheme, conspiracy may also be charged.

All of the above characterizations and conditions of fraud and impropriety exist in the motivations of Zyen, Fertitta Enterprises, Adam Frank, Kirk Sanford, Manchester Consolidated, Cott, Zuffa, Ultimate Fighting Championship, Karim Maskatiya, Kathryn Lever, and Omer Sattar to speed up the bankruptcy and liquidation of the company. The current and past Xyience regime have always operated with fraud in mind at some level of the business. Fertitta Enterprises is facilitating a cover up of corruption that has been ongoing since the very start of Xyience and taking the further step of trying to profit off the company's demise. The quicker they can do so, the more profitable their scheme will be.

Bergeron moves that these proceedings be suspended and brought to a halt long enough to take a deep breath and a good long look around at the major issues and allegations.

SUMMARY JUDGMENT should be granted as to Bergeron's case in the aggregate of amount of $15 million. $5,000,000 shall be designated for sanctions and legal fees due Bergeron for

having to endure the plaintiff's frivolous suit, with all but 10 percent of that total being paid out directly to creditors of Xyience and that minimum percentage being presented to Bergeron as soon as possible. $10 million in further judgment on the counterclaim should be divided and paid out to burnt creditors as decided by the trustee in this case. Just 10 percent of that $15 million aggregate judgment leaves a total of $1.5 million accruing to Bergeron for bringing the case and filing the appropriate motions for relief. The remaining $13.5 million will be provided for other creditors to split amongst themselves in this case. In lieu of an agreement with these stipulations being agreed upon, Bergeron will be forced to amend the counterclaim to include each and every counter-claimant he can recruit to join him in seeking complete and adequate justice. Absent immediate relief he will feel obligated to file an amended counterclaim seeking at least $500 million in damages and including the banking institutions that Zuffa defrauded to receive their $350 million financing package.

Dated this 26th day of March 2008.

IN PROPER PERSON

[signature]

Rich Bergeron
147 Old County Road
East Sandwich, MA 02537
617-209-4325
Attorney Pro-Se
Rich.Bergeron@gmail.com

EXHIBIT 11

**Form Number 1**
From: Mike Hilson <mike_hilson@hotmail.com>
Date: Sep 7, 2007 3:05 AM
Subject: RE: A little Xyience Update
To: rich.bergeron@gmail.com

Rich :

For the past couple of months I have not kept current on Xyience. Until today I had assumed that the company was running out of money and was just trying to hang on for a few more months for a futile IPO attempt. (My "investor" friend got a letter addressed to current shareholders about a month ago begging for a further investment in shares to be priced in the $2.50 to $3.50 range. This alarmed him because he paid $4.00 each back in February).

Anyways, today my friend got an unexpected visit from the roper who convinced him to buy stock back in February. I was present, as I was meeting my friend on an unrelated matter.

This roper proclaimed he had some great news about Xyience, and gave my friend photocopies of a "PRELIMINARY INJUNCTION ORDER" filed by Xyie counsel on 9-06-2007 at 10:07 a.m. (I can fax it to you if you provide a number).

He claimed that Xyience had successfully sued you and that they were awarded legal costs and that furthermore, you had been fined $1,000.00 and sentenced to 30 days jail, suspended. Also, that you had been ordered to remove from the Internet all references to Xyience by midnight tonight or be found in contempt.He claimed that you were a former employee/investor who was on a vendetta. The "good" news was that with you out of the way, Xyience could now raise the necessary bridge financing (he mentioned Dana White and the Fertittia brothers by name as sources for $15 million each), and go public- at $20-$30 per share- in January. He claimed that 10 investment houses were competing for the offering and that Xyience was going with Bear Stearns. He also claimed that he had increased his shareholdings in Xyience and had lent Russell Pike a 6-figure amount which would earn interest at 10% per month !!!! until Xyience goes public. He mentioned to my friend that Mr. Pike would like to borrow more money on these terms and seemed to be trying to persuade my friend to put money in both of these dubious investments. After listening to this nut praise Mr. Pike and his creditworthiness for a few minutes, I made a photocopy of the court document and excused myself.

Rich, I want you to know that I am inclined to believe that you are an earnest journalist who wants to report the truth. From personal experience, I know that it is hard to fight a court injuction. I also know that lawyers for crooks are rarely held accountable for what they say or submit in writing to a court, and that fighting the good fight can be long and lonely. If there is anything I can do to help you (except cash.... I'm tapped!), do not hesitate to contact me.

Best of luck,
Mike.

FAX SENT BY HILSON:

SEP 07 2007 2:14PM HP LASERJET 3200 P.3

ORDR
COGBURN LAW OFFICES
JAMIE S. COGBURN, ESQ.
Nevada State Bar No. 008409
170 S. Green Valley Pkwy., Suite 280
Henderson, Nevada 89012
(702) 384-3616
Attorneys for Plaintiff

FILED

Sep 6 10 07 AM '07

CLERK OF THE COURT

DISTRICT COURT

CLARK COUNTY, NEVADA

XYIENCE INCORPORATED, a Nevada Corporation,

Plaintiff,

v.

RICHARD BERGERON, an Individual,

Defendant.

Case No: A 544781
Dept. No.: XVI

COGBURN LAW OFFICES
170 S. Green Valley Pkwy., Suite 280
Henderson, Nevada 89012
(702) 384-3616 FAX: (702) 943-1936

PRELIMINARY INJUNCTION ORDER

Date of Hearing: August 9, 2007
Time of Hearing: 9:00 a.m.

THIS MATTER having come on before this court on the 9th day of August, 2007, on Plaintiff's Motion for Preliminary Injunction with Plaintiffs appearing by and through their counsel of record, Jamie S. Cogburn, Esq., and Defendant, Richard Bergeron not present, but having sufficient notice of the hearing. The Court having reviewed the papers and pleadings on file herein, and having heard the argument of counsel and good cause appearing therefore,

**IT IS HEREBY ORDERED**, that Plaintiffs Motion for Preliminary Injunction is Granted pursuant to NRCP 65 and Sobol v. Capital Mengmt. Consultants, 102 Nev. 444, 726 P.2d 335 (1986), as Xyience has showed that there is a strong likelihood of success on the merits, there is a threat of irreparable harm, there is little to no harm that will result to the Defendant, and this Court has an interest to protect the public from defamatory statements.

COGBURN LAW OFFICES
170 S. Green Valley Pkwy., Suite 280
Henderson, Nevada 89012
(702) 384-3616 FAX: (702) 943-1936

**IT IS FURTHER ORDERED**, that the Defendant, Richard Bergeron, shall remove any and all articles or postings regarding false claims about Xyience from the internet and Defendant shall be enjoined from communicating any statements or making any representations which in any manner state, advise, represent, assert, allege, suggest, or imply, in any manner which is intended to, or does evoke an inference or create an impression that Xyience is being investigated by the SEC.

**IT IS FURTHER ORDERED** that the Defendant, Richard Bergeron, shall remove any and all articles claiming that Xyience is defrauding investors and/or is conspiring with Dana White or the Ultimate Fighting Challenge to defraud investors. Richard Bergeron shall be enjoined from communicating any statements or making any representations which in any manner state, advise, represent, assert, allege, suggest, or imply, in any manner which is intended to, or does evoke an inference or create an impression that Xyience is defrauding investors and/or conspiring with Dana White or the Ultimate Fighting Championship to defraud investors.

**IT IS FURTHER ORDERED** that if Defendant, Richard Bergeron, fails to remove the defamatory articles regarding Xyience, then Xyience may take appropriate actions with internet service providers to have the defamatory articles removed.

SEP 07 2007 2:14PM HP LASERJET 3200 p.3

**IT IS FURTHER ORDERED** that the instant Preliminary Injunction Order is conditioned upon the posting of security by Plaintiffs in the sum of $ 1,000.00

TIMOTHY G. WILLIAMS

DISTRICT COURT JUDGE 9/6/07

Respectfully submitted by:

COGBURN LAW OFFICES

By: ______________________

Jamie S. Cogburn, Esq.
Nevada State Bar No. 008409
170 S. Green Valley Pkwy., Suite 280
Henderson, Nevada 89012
Attorneys for Plaintiff

COGBURN LAW OFFICES
170 S. Green Valley Pkwy., Suite 280
Henderson, Nevada 89012
(702) 384-3616 FAX: (702) 943-1936

# EXHIBIT A

4. During the week of January 28, 2008, Adam Frank, Kirk Sanford, Lanis O'Steen and Jerry Kramer resigned from the Debtor's Board of Directors. Michael Levy and I are the remaining members of the Debtor's Board of Directors.

5. On the Petition Date, the books and records of Xyience reflect that 432 persons and entities own stock in Xyience. *See* Petition, Docket 1, List of Equity Security Holders. Based upon the 2005 and 2006 conduct of Russell Pike and then management of Xyience which resulted in entry of a September 10, 2007 Desist and Refrain Order by the California Department of Corporations, Exhibit A, regarding the improper solicitation and sale of 1,541,667 shares at a cost of $2.1 million to California residents, Xyience has serious questions and concerns about the accuracy of its books and records with respect to the issuance of stock and the identity of its existing shareholders, as well as persons or entities who claim to own stock in Xyience.

6. In November of 2007, certain shareholders submitted a request for information to Xyience through their legal counsel, Daniel Newman of Broad & Cassel of Miami, Florida. On November 29, 2007, Xyience provided Mr. Newman with

documents responsive to his request for information. The documents provided to Mr. Newman contained financial data, including budgets, projections and historical financial documents; detailed records regarding the issuance of stock, identity of shareholders, stock and options; and corporate books and records, including documents filed with the Nevada Secretary of State, articles, bylaws and corporate minutes.

# SEE SCHEDULE 7(f) and 8(e) in Zyen, LLC October 4, 2007 Convertible Senior Secured Note AND RELATED DOCUMENTS (Part 4)

## EXHIBIT 26




Compared with the list of creditors and contracts filed into this case, the above page does not wash at all with the actual state of the company. All of these fighters are no longer being sponsored by Xyience and have not been paid, yet Xyience refuses to fix the page. Over 208 creditors are listed for this case, including all the depicted fighters above and other Xyience sponsored fighters stiffed on final payments. The list of creditors covers every letter of the alphabet with the exception of the letters X and Y.

Xyience Inc
Outstanding Options/Warrants (including employee options not yet granted)
As of 9/10/07

(Unaudited)

| Name | | Date of Grant | Expiration Date | Option Price | Shares | |
|---|---|---|---|---|---|---|
| UFC (warrants) | UFC | 03-Jan-07 | 03-Jan-12 | 2.50 | 5,125,318 | |
| Katie | Board Member | 01-Jun-07 | 01-Jun-12 | 1.75 | 250,000 | |
| Mike Kurdziel | Board Member | 01-Jun-07 | 01-Jun-12 | 1.75 | 250,000 | |
| Adam Frank | Board Member | 01-Jun-07 | 01-Jun-12 | 1.75 | 250,000 | |
| Kirk Sanford | Board Member | 01-Jun-07 | 01-Jun-12 | 1.75 | 250,000 | |
| William Underhill | Board Member | 01-Mar-07 | 01-Mar-12 | 1.75 | 250,000 | |
| Janet Hall | Board Member | 01-Mar-07 | 01-Mar-12 | 1.75 | 250,000 | |
| Gregory DeStefano | Consultant | 17-Dec-06 | 17-Dec-16 | 2.50 | 40,000 | |
| Kirk Sanford | Consultant | 21-Mar-07 | 21-Mar-12 | 2.50 | 750,000 | |
| Adam Frank | Consultant | 21-Mar-07 | 21-Mar-12 | 1.75 | 600,000 | |
| Tony Berger | Consultant | 01-Jun-07 | 01-Jun-12 | 1.75 | 500,000 | Marketing |
| Wilson Chuairs | Consultant | 12-Jun-07 | 12-Jun-12 | 1.75 | 75,000 | Sales Supplemen |
| Jill Benedict | Consultant | 01-Jun-07 | 01-Jun-12 | 1.75 | 200,000 | Marketing |
| Laura Hayden | Consultant | 12-Jun-07 | 12-Jun-12 | 1.75 | 80,000 | Admin assistant |
| Ray Welzel | Consultant | 01-Jul-07 | 01-Jul-12 | 1.75 | 80,000 | Sales consultant |
| Paul Grady (disputed) | Employee | 31-Aug-07 | 31-Aug-10 | 1.00 | 1,500,000 | |
| Terrence O'Leary | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 60,000 | |
| Devin Keays | Employee | 17-Jul-07 | 17-Jul-17 | 1.75 | 75,000 | |
| Angela Hunter | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 25,000 | |
| Nitosha Hall | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 10,000 | |
| Jake Hatten | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 10,000 | |
| Vicki DiBernardo | Employee | 17-Jul-07 | 17-Jul-17 | 1.75 | 200,000 | |
| Susan Curry | Employee | 17-Jul-07 | 17-Jul-17 | 1.75 | 200,000 | |
| Josh Dennen | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 10,000 | |
| Willie Marshall | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 10,000 | |
| Susan Wierzbicki | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 25,000 | |
| Jeffrey Martin | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 75,000 | |
| Larry Pettis | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 75,000 | |
| Dara Asuncion | Employee | 22-Jun-07 | 01-Jun-17 | 1.75 | 10,000 | |
| Michael Levy | Employee | 17-Jul-07 | 17-Jul-17 | 1.75 | 200,000 | |
| Darin Mehike | Employee | 17-Jul-07 | 17-Jul-17 | 1.75 | 50,000 | |
| Peejay Lamotte | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 10,000 | |
| Stephen Smith | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 10,000 | |
| Beau Christensen | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 50,000 | |
| Tim Shackelford | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 25,000 | |
| Tera Toadvine | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 | |
| Ray Marquez | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 50,000 | |
| ~~Lindsey Jabs~~ | ~~Employee~~ | ~~02-Jul-07~~ | ~~02-Jul-17~~ | ~~1.75~~ | ~~10,000~~ | |
| Herman Zuluaga | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 50,000 | |
| Bill Coffey | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 10,000 | |
| Paul Guyot | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 50,000 | |
| Samuel Rodriguez | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 10,000 | |
| Reuben Rios | Employee | 17-Jul-07 | 17-Jul-17 | 1.75 | 150,000 | |
| John Schmidt | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 25,000 | |
| Cameron Rios | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 10,000 | |
| Marconi Calderone | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 50,000 | |
| Paul Sidorlak | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 50,000 | |
| Jane Stewart | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 25,000 | |
| Lee Berzman | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 50,000 | |
| Jeff Rivera | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 10,000 | |
| ~~Gregory Gottfried~~ | ~~Employee~~ | ~~02-Jul-07~~ | ~~02-Jul-17~~ | ~~1.75~~ | ~~10,000~~ | |
| Robert Park | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 75,000 | |
| Duane Tanner | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 10,000 | |
| Tony Anselmo | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 50,000 | |
| William Underhill | Employee | 10-Mar-07 | 10-Mar-12 | 1.75 | 150,000 | |
| William Underhill | Employee | 01-Jun-07 | 01-Jun-12 | 1.75 | 200,000 | |
| Janet Hall | Employee | 10-Mar-07 | 10-Mar-12 | 1.75 | 150,000 | |
| Janet Hall | Employee | 01-Jun-07 | 01-Jun-12 | 1.75 | 100,000 | |
| Timothy Olson | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 10,000 | |
| Michael Rusnak | Employee | 17-Jul-07 | 17-Jul-17 | 1.75 | 25,000 | |
| Stephen Carpenter | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 25,000 | |
| Christopher Keeler | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 25,000 | |
| Jason Dunbar | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 25,000 | |
| Keith Hickman | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 50,000 | |
| Tom Samaha | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 10,000 | |
| Jay Cwiek | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 25,000 | |
| Rick Briley | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 50,000 | |
| Tiffany Echols | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 10,000 | |
| Nina Rodriguez | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 5,000 | |



EXHIBIT

[illegible]

**Outstanding Options/Warrants (including employee options not yet granted)**
**As of 9/10/07**

**(Unaudited)**

| Name | | Date of Grant | Expiration Date | Option Price | Shares |
|---|---|---|---|---|---|
| Chad Lushin | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 10,000 |
| Bryan Fortier | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 25,000 |
| Jason Marks | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 50,000 |
| Jessica Leutman | Employee | 22-Jun-07 | 22-Jun-17 | 1.75 | 25,000 |
| Siobhan Oldham | Employee | 02-Jul-07 | 02-Jul-17 | 1.75 | 60,000 |
| Randolph Sagon | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 25,000 |
| Eric Hoffman | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 25,000 |
| Eugene Tennison | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Robert Fortier | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Linda Raney | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Greg King | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Dennis Werner | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 25,000 |
| Kevin Adams | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 25,000 |
| Joseph Hurtowski | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Chris Theodorackis | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 75,000 |
| Robert Arroyo | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 25,000 |
| Thomas Leahy | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 25,000 |
| Tony Ozel | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Kenny Sanders | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Jose Navarro | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 25,000 |
| Jenna Carpio | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Jill Pollard | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 25,000 |
| Leo Garrido | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Jason McLoone | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Carlos Zuluaga | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Jeanette Merano | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 50,000 |
| Abe Ibraham | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| David Hauser | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 50,000 |
| Brent Hayden | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Laura Hayden | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 10,000 |
| Wilson Chueire | Employee | 31-Aug-07 | 31-Aug-17 | 1.75 | 75,000 |
| Chuck Liddell | Fighter | 01-May-06 | Not stipulated | 1.00 | 500,000 |
| Chuck Liddell | Fighter | 01-May-07 | Not stipulated | 1.00 | 500,000 |
| Key Management (warrants) | Investor | 21-Feb-07 | Not stipulated | 2.50 | 8,500,000 |
| RVS Ventures | Investor | 15-Mar-07 | 15-Mar-10 | 1.75 | 450,000 |
| Daniel Levene (warrants) | Investor | 23-May-07 | 23-May-12 | 6.00 | 175,000 |
| Chris Pondrak (warrants) | Investor | 23-May-07 | 23-May-12 | 6.00 | 10,000 |
| William Brubner (warrants) | Investor | 23-May-07 | 23-May-12 | 6.00 | 30,000 |
| Paul Richardson (warrants) | Investor | 23-May-07 | 23-May-12 | 6.00 | 175,000 |
| Paul Chuzi (warrants) | Investor | 23-May-07 | 23-May-12 | 6.00 | 25,000 |
| Michael McDonald (warrants) | Investor | 23-May-07 | 23-May-12 | 6.00 | 10,000 |
| Louis Shinaman (warrants) | Investor | 23-May-07 | 23-May-12 | 6.00 | 40,000 |
| Kirk Kubach (warrants) | Investor | 23-May-07 | 23-May-12 | 6.00 | 25,000 |
| Jere Matheny (warrants) | Investor | 23-May-07 | 23-May-12 | 6.00 | 5,000 |
| Erik Denoault (warrants) | Investor | 23-May-07 | 23-May-12 | 6.00 | 5,000 |
| William Zebe | Settlement | 01-Jun-07 | 31-Dec-07 | 1.00 | 350,000 |
| Jeff Dash | Settlement | 01-Nov-07 | 01-Nov-09 | 4.00 | 250,000 |
| Carol Brown | Settlement | 16-Dec-06 | 16-Dec-16 | 1.00 | 100,000 |
| Pete Rinaldo | Settlement | 05-Apr-07 | 05-Apr-10 | 1.00 | 700,000 |
| David Stewart (unsigned) | Settlement | 22-Aug-07 | 22-Aug-09 | 1.00 | 350,000 |
| Thomas Reepant | Settlement | 12-Jan-07 | 12-Jan-17 | 4.00 | 10,000 |
| Riley Judd (unsigned) | Settlement | 31-Aug-07 | 31-Aug-09 | 4.00 | 125,000 |
| Nathan Judd (unsigned) | Settlement | 31-Aug-07 | 31-Aug-09 | 4.00 | 125,000 |
| LJ Jones | Settlement | 02-Aug-07 | 02-Aug-08 | 1.75 | 8,334 |
| Brian O'Keefe | Settlement | 10-Apr-07 | 10-Apr-17 | 4.00 | 100,000 |
| Steven Paciotti | Settlement | 27-Jul-07 | 27-Jul-10 | 2.50 | 100,000 |
| Theodore Lenis | Settlement | 06-Jun-07 | 06-Jun-12 | 2.50 | 62,500 |
| | | | | **Total** | **21,617,152** |

| Cert Number | Issued To | Share Issue Date | Consideration Type | New Issue | Shares Sold | Shares Acquired | Share Balance |
|---|---|---|---|---|---|---|---|
| **Shares Acquired** | | | | | | | |
| 2 | Russell and Jennifer Pike | 24-May-04 | Founder Shares | 3,000,000 | - | - | 3,000,000 |
| 3 | Russell and Jennifer Pike | 24-May-04 | Founder Shares | 3,500,000 | - | - | 3,500,000 |
| 10 | Russell and Jennifer Pike | 30-Oct-04 | Founder Shares | 4,500,000 | - | - | 4,500,000 |
| 429 | Russell and Jennifer Pike | 23-Mar-07 | Cash | 140,000 | - | - | 140,000 |
| 11 | Russell and Jennifer Pike | 26-Apr-06 | Private | - | | 3,300,000 | 3,300,000 |
| | Russell and Jennifer Pike | 20-Mar-07 | Private | - | - | 5,000 | 5,000 |
| **Total Shares Acquired** | | | | **11,140,000** | - | **3,305,000** | **14,445,000** |
| **Shares Sold** | | | | | | | |
| 199 | Talor Zamir | 24-May-06 | Private | | (6,250) | | (6,250) |
| 208 | LJG Asset Management | 12-Jun-06 | Private | | (25,000) | | (25,000) |
| 212 | Billy Chu | 27-Jun-06 | Private | | (110,000) | | (110,000) |
| 213 | Paul A. Walbrun | 27-Jun-06 | Private | | (25,000) | | (25,000) |
| 223 | Gary Northan | 03-Aug-06 | Private | | (258,000) | | (258,000) |
| 227 | Thomas A Curti P.C. | 08-Aug-06 | Private | | (5,000) | | (5,000) |
| 228 | Gregory R. Seifert Profit Sharing Plan | 08-Aug-06 | Private | | (5,000) | | (5,000) |
| 229 | Thomas & Lois Curti | 08-Aug-06 | Private | | (5,000) | | (5,000) |
| 230 | Joan & Anthony Myers | 08-Aug-06 | Private | | (5,000) | | (5,000) |
| 231 | Bret & Lavelle Johnson | 08-Aug-06 | Private | | (5,000) | | (5,000) |
| 232 | Bruce & Sheri Vincents | 08-Aug-06 | Private | | (4,000) | | (4,000) |
| 233 | Sharon Seifert | 08-Aug-06 | Private | | (6,000) | | (6,000) |
| 234 | Scott Gagliano | 23-Aug-06 | Private | | (12,500) | | (12,500) |
| 235 | David Lawenda | 23-Aug-06 | Private | | (200,000) | | (200,000) |
| 269 | Gregory R. Seifert | 26-Sep-06 | Private | | (5,000) | | (5,000) |
| 270 | Paul Walbrun | 26-Sep-06 | Private | | (25,000) | | (25,000) |
| 275 | Vince Militello | 04-Oct-06 | Private | | (12,500) | | (12,500) |
| 276 | Robert Guariello | 04-Oct-06 | Private | | (12,500) | | (12,500) |
| 278 | Henry Guarrillo | 04-Oct-06 | Private | | (12,500) | | (12,500) |
| 274 | Steve Irwin | 12-Oct-06 | Private | | (10,000) | | (10,000) |
| 279 | Jeffrey A. Feuer | 18-Oct-06 | Private | | (12,500) | | (12,500) |
| 280 | Trygve M. Thoresen | 20-Oct-06 | Private | | (12,500) | | (12,500) |
| 281 | Paul Walbrun | 20-Oct-06 | Private | | (20,000) | | (20,000) |
| 286 | Chester Jacobs &/or Kim Jacobs | 26-Oct-06 | Private | | (28,572) | | (28,572) |
| 287 | Karim Maskatiya | 02-Nov-06 | Private | | (3,333,334) | | (3,333,334) |
| 288 | Kirk Sanford | 03-Nov-06 | Private | | (40,000) | | (40,000) |
| 289 | Daniel Allen Leo Watson | 06-Nov-06 | Private | | (2,500) | | (2,500) |
| 290 | Jeffrey A. Feuer | 08-Nov-06 | Private | | (3,750) | | (3,750) |
| 291 | David Gary Swanson | 06-Nov-06 | Private | | (25,000) | | (25,000) |
| 292 | Dave Rineberg | 06-Nov-06 | Private | | (12,500) | | (12,500) |
| 293 | Guarriello-Meyer Partnership | 06-Nov-06 | Private | | (12,500) | | (12,500) |
| 298 | W.R. Underhill Family, LLC | 17-Nov-05 | Private | | (20,000) | | (20,000) |
| 299 | Paul Dino Bertuccini Family Trust | 17-Nov-06 | Private | | (83,334) | | (83,334) |
| 300 | John Bertuccini Trust | 17-Nov-06 | Private | | (33,334) | | (33,334) |
| 301 | Jamie & / or Valerie Barker | 20-Nov-06 | Private | | (70,000) | | (70,000) |
| 303 | Kyoung Hwa Lee | 27-Nov-06 | Private | | (10,000) | | (10,000) |
| 304 | Paul J. Bertuccini Family Trust | 29-Nov-06 | Private | | (33,334) | | (33,334) |
| 316 | Ron Schmik | 15-Dec-06 | Private | | (15,000) | | (15,000) |
| 323 | Patricia Barrera | 19-Dec-06 | Private | | (3,000) | | (3,000) |
| 324 | Thomas J. Nieva &/or Nancy E. Nieva | 04-Jan-07 | Private | | (2,500) | | (2,500) |
| 325 | Janine Hamilton | 04-Jan-07 | Private | | (12,400) | | (12,400) |
| 326 | Devin Keays | 04-Jan-07 | Private | | (3,000) | | (3,000) |
| 327 | Richard Quinonez | 04-Jan-07 | Private | | (9,000) | | (9,000) |
| 331 | Berkeley Partners, LLC | 04-Jan-07 | Private | | (250,000) | | (250,000) |
| 332 | RVS Ventures, Inc | 04-Jan-07 | Private | | (125,000) | | (125,000) |
| 333 | Dr. Edward Barrera | 04-Jan-07 | Private | | (4,000) | | (4,000) |
| 356 | Paul Hesselgesser | 22-Jan-07 | Private | | (25,000) | | (25,000) |
| 367 | Randy Gilbert | 26-Jan-07 | Private | | (37,500) | | (37,500) |
| 391 | Tamako Nelson | 05-Feb-07 | Private | | (22,500) | | (22,500) |
| | Russell and Jennifer Pike | 05-Feb-07 | Retired | | (80,000) | | (80,000) |
| 402 | jeffrey L. Buchanan | 09-Feb-07 | Private | | (1,400) | | (1,400) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 403 | Jeffrey L. Hurley | 09-Feb-07 | Private | | (560) | | (560) |
| 404 | Sandra Clarke Marriott | 09-Feb-07 | Private | | (12,500) | | (12,500) |
| 405 | Douglas Grant Marriott | 09-Feb-07 | Private | | (12,500) | | (12,500) |
| 406 | Bartholmew Donovan & Patricia Dey | 09-Feb-07 | Private | | (25,000) | | (25,000) |
| 408 | Jeffrey Tomasulo | 07-Mar-07 | Private | | (8,000) | | (8,000) |
| 409 | Fairway Holdings | 07-Mar-07 | Private | | (25,000) | | (25,000) |
| 410 | Conway Schatz | 07-Mar-07 | Private | | (27,500) | | (27,500) |
| 411 | Glen C Allen | 07-Mar-07 | Private | | (12,500) | | (12,500) |
| 412 | Maria Saavedera | 07-Mar-07 | Private | | (5,000) | | (5,000) |
| 413 | The Suarez Family Trust | 07-Mar-07 | Private | | (21,000) | | (21,000) |
| 414 | Berta Suarez | 07-Mar-07 | Private | | (6,000) | | (6,000) |
| 415 | Gilbert Saavedera | 07-Mar-07 | Private | | (6,000) | | (6,000) |
| 416 | Doug Chang | 07-Mar-07 | Private | | (3,500) | | (3,500) |
| 417 | Endalkachew Mersha | 07-Mar-07 | Private | | (3,500) | | (3,500) |
| 418 | Tamako Nelson | 07-Mar-07 | Private | | (12,500) | | (12,500) |
| 419 | RVS Ventures, Inc | 07-Mar-07 | Private | | (250,000) | | (250,000) |
| 430 | Paul J Bertuccini Trust | 26-Mar-07 | Private | | (102,500) | | (102,500) |
| 431 | The John Bertuccini Trust | 26-Mar-07 | Private | | (127,500) | | (127,500) |
| 432 | The Paul Dino Bertuccini Family Trust | 26-Mar-07 | Private | | (127,500) | | (127,500) |
| 445 | Dr John Bertuccini | 13-Apr-07 | Private | | (13,750) | | (13,750) |
| 451 | William B. Pike Jr. | 16-Apr-07 | Private | | (1,500,000) | | (1,500,000) |
| 452 | Robert Fulwider | 20-Apr-07 | Private | | (12,500) | | (12,500) |
| 453 | Direct Cash, Inc. | 20-Apr-07 | Private | | (16,666) | | (16,666) |
| 455 | The Koehler Family Trust | 20-Apr-07 | Private | | (15,000) | | (15,000) |
| 456 | Troy Gartrell | 20-Apr-07 | Private | | (10,500) | | (10,500) |
| 528 | All of US LLC | 20-Apr-07 | Private | | (12,000) | | (12,000) |
| 463 | Tamako Nelson | 09-May-07 | Private | | (42,500) | | (42,500) |
| 471 | Energy Drink Investor, LLC | 16-May-07 | Private | | (23,000) | | (23,000) |
| 473 | Gilberto Saavedra | 22-May-07 | Private | | (2,727) | | (2,727) |
| 474 | Maria Saavedra | 22-May-07 | Private | | (3,727) | | (3,727) |
| 476 | Doug Chang | 22-May-07 | Private | | (1,591) | | (1,591) |
| 477 | [redacted] | 31-May-07 | Private | | (5,818) | | (5,818) |
| 481 | Jeffrey Bryant Gilkeson | 31-May-07 | Private | | (13,750) | | (13,750) |
| 482 | Alan & Jennifer Jeskey | 31-May-07 | Private | | (12,500) | | (12,500) |
| 483 | OTMS Investments Inc. | 31-May-07 | Private | | (1,785) | | (1,785) |
| 484 | Adam Hathcock 2006 Trust | 31-May-07 | Private | | (12,500) | | (12,500) |
| 475 | Endalkachew Mersha | 11-Jun-07 | Private | | (1,591) | | (1,591) |
| 480 | D & J Gilmartin 2003 trust | 11-Jun-07 | Private | | (20,000) | | (20,000) |
| 472 | Dr Gilberto & Barbara Suarez | 19-Jun-07 | Private | | (9,545) | | (9,545) |
| 488 | Dr Gilberto & Barbara Suarez | 19-Jun-07 | Private | | (45,000) | | (45,000) |
| 490 | Bertha Suarez | 20-Jun-07 | Private | | (2,727) | | (2,727) |
| 491 | Gilbert Saavedra | 20-Jun-07 | Private | | (363) | | (363) |
| 501 | Berkeley Partners, LLC | 09-Jul-07 | Private | | (75,000) | | (75,000) |
| 503 | David Kasubowski | 10-Jul-07 | Private | | (4,625) | | (4,625) |
| 511 | Tamako Nelson | 27-Jul-07 | Private | | (25,000) | | (25,000) |
| 512 | Berkeley Partners, LLC | 27-Jul-07 | Private | | (50,000) | | (50,000) |
| 513 | Rebecca Natrajan | 02-Aug-07 | Private | | (14,286) | | (14,286) |
| 525 | DTMS Investments Inc. | 14-Aug-07 | Private | | (1,000) | | (1,000) |
| 526 | OTMS Investments Inc. | 14-Aug-07 | Private | | (1,166) | | (1,166) |
| 527 | Nevada Land Advisors & Investments Inc | 14-Aug-07 | Private | | (2,500) | | (2,500) |
| 529 | All of US LLC | 14-Aug-07 | Private | | (8,000) | | (8,000) |
| 530 | Sports & Ent Media | 14-Aug-07 | Private | | (87,500) | | (87,500) |
| 531 | Berkeley Partners, LLC | 15-Aug-07 | Private | | (50,000) | | (50,000) |
| 532 | ARMR, LLC | 15-Aug-07 | Private | | (10,417) | | (10,417) |
| 533 | RVS Ventures, Inc | 15-Aug-07 | Private | | (400,000) | | (400,000) |
| 536 | William B. Pike Jr. | 10-Sep-07 | Private | | (1,000,000) | | (1,000,000) |
| **Total Shares Sold** | | | | - | **(9,390,302)** | - | **(9,390,302)** |
| **Share Balance, Pre Settlement Agreement** | | | | | | | **6,054,698** |

# EXHIBIT B: MMA NEWS MEDIA REPORTS

**WWW.MMAPAYOUT.COM AND SHERDOG.COM ARTICLES**

October 9, 2007
Details on Zuffa's New Capital Structure
By: Adam Swift
www.sherdog.com

After consulting a pair of accounting professionals, we now have a better understanding of the actual financial structure in place at Zuffa as detailed in two separate Standard & Poor's reports released this year. The company has secured two loans, totaling $350 million, which should provide a sound financial footing through at least 2015. Zuffa "will have few external funding requirements in the intermediate term once the new capital structure is implemented."

Zuffa currently has a $350 million senior secured credit facility at its disposal. That number represents a term loan for $325 million due in 2015 and a $25 million revolving credit facility (a so called "revolver") due in 2013. The company has full availability on its revolver indicating that to this point it has been able to fund operations out of its normal cash flow. As a result the revolver currently represents little more than a rainy day fund. Zuffa's total debt outstanding as of June 30, 2007 was $325 million.

Proceeds of the term loan were used to pay a one-time special dividend to Zuffa's owners, the Fertitta brothers (90%) and Dana White (10%), and to refinance the company's existing debt. We can only speculate about the amount of debt the company refinanced and the amount it paid out in dividends, however, some comments in the S&P reports suggest that the dividend payments could be quite substantial. It is also interesting to note that the term loan was originally proposed at $275 million, as of the May 22 report, only to be increased to $325 million after June 30. This time frame coincides with the closing of Zuffa's purchase of Pride's assets. The significance of this increase and its connection to the purchase of Pride is purely speculative.

The loans are secured by bank issued securities as opposed to the company's assets. The company's assets are almost entirely composed of their brands, contracts, and cash, with very little in the way of tangible assets. S&P estimates the resale value of the company's assets, assuming a forced liquidation, at roughly $150-240 million dollars. As a result of these numbers, free cash flow is paramount in the minds of the company's creditors. The company's credit rating outlook was cut because of weak free cash flow caused by decreased operating margins. Unless free cash flow improves, the owners will have to cut dividend payments to avoid a cut in their rating.

Special thanks to Jeremy Goodwin, CPA & Graham Stephens, CPA.

January 30, 2008
UPDATE: Bevanda Magica LLC

MMAPayout.com has confirmed through filings with the Nevada Secretary of State's Office that Bevanda Magica is a registered LLC. According to the filings, the company was formed on May 17, 2007. The managers of the company are Lorenzo and Frank Fertitta.

Posted by Adam Swift at 3:00 PM

Labels: UFC, xyience, Zuffa

'Bevanda Magica': Xyience Bankruptcy Filings Reveal Deep Ties to Zuffa
Options: Email Article | Printer Friendly
'Bevanda Magica

January 30, 2008
by Adam Swift (aswift@sherdog.com)

Xyience has been a ubiquitous presence during the UFC breakout that began in 2005. Whether in the center of the Octagon, on fighter's trunks, in television commercials or on cans during post-fight interviews, the supplement maker was everywhere the UFC went.

In many ways, Xyience represented the financial promise of the MMA industry, with ties to some of the sport's top stars, including Chuck Liddell (Pictures) and Matt Hughes (Pictures), and shelf space in GNC and health food stores across the country. But even in a rapidly evolving industry, the company's fall from grace was sudden and dramatic.

In 2007, cracks begin to emerge with missed payments to sponsored fighters, constant turnover in corporate leadership, shareholder discontent and rumors of insolvency. The days of rumored seven-figure endorsement deals and prominent placement at UFC events were gone, replaced by digitally distorted logos on UFC replays and a move from the center of the mat to the Octagon post pad.

On Oct. 13, Xyience announced what appeared to be a fresh start. With Russell Pike, the company's notorious founder and convicted felon, out of the picture, Xyience simultaneously announced a three-year extension of its exclusive partnership with the UFC and a new $12 million funding effort.

"We believe that the combination of new financing and the extension of our UFC relationship firmly positions the company for success as we embark on a worldwide expansion of the Xyience and Xenergy brands," said then CEO Adam Frank at the time.

UFC President Dana White added, "Xyience has been a long-time sponsor of the UFC, and we look forward to our future endeavors together as both of our companies continue their explosive growth."

Optimism was short lived, though, as the embattled company filed for Chapter 11 bankruptcy on Jan. 18.

Bankruptcy filings obtained by Sherdog.com suggest a much deeper relationship between Xyience and Zuffa, parent company of the UFC, than merely a lucrative sponsorship agreement.

In fact, documents reveal that Xyience's third largest shareholder is closely tied to Zuffa and the UFC.

According to a shareholder list filed in court, 5,166,667 shares (7.9 percent of shares outstanding, which constitutes 10.1 percent of voting shares) of Xyience stock are issued to "Bevanda Magica (UFC)." An Italian phrase that translates to "magic drink," Bevanda Magica LLC is listed at 2960 W. Sahara Avenue Suite 200 in Las Vegas. The company was formed on May 17, 2007 with Frank and Lorenzo Fertitta listed as its managers. Zuffa's corporate headquarters, along with several subsidiaries, is variously listed in filings with the Nevada secretary of state's office as 2960 West Sahara Avenue Suite 200 or Suite 100.

Requests for comment from Zuffa LLC went unanswered.

Also named on the shareholder list are Zuffa Chief Financial Officer John Mulkey, who holds 50,000 shares of Xyience, and resident agent John Hertig, who holds 25,000.

The significant financial investment that UFC co-owners Frank and Lorenzo Fertitta made into Xyience, first reported last October in The Wrestling Observer Newsletter, has also been confirmed by the bankruptcy filing. Xyience's single largest creditor is Zyen, a company controlled by Fertitta Enterprises that is listed at the same address as Bevanda Magica (UFC), according to filings with the Nevada secretary of state's office.

Zyen holds roughly $12.5 million in total claims against Xyience, including approximately $5.3 million in secured claims, which matches all of the company's physical assets. Last week Zyen was granted

permission by the judge presiding over the bankruptcy proceeding to make an additional $1 million loan to Xyience.

Xyience's UFC sponsorship is reportedly worth $15 million in the first year, according to the Review-Journal. Zyen's loans to the company total $12.5 million. The filings reflect Zuffa Marketing LLC, a subsidiary of Zuffa, is still owed $3 million.

Requests for comment from Xyience President Omer Sattar on the Fertittas' and Zuffa's involvement in Xyience, as well as the identity of Bevanda Magica went unanswered.

Chapter 11 bankruptcy provides a company with protection from its creditors while it attempts to reorganize. When the company's debts exceed its assets, as is the case for Xyience, the proceedings often result in the company's creditors assuming ownership of the reorganized company.

Xyience has $42,342,831 in liabilities, including $27,319,517 in secured claims, compared to just $5,285,722 in assets, bankruptcy filings show. Accordingly, the Fertitta brothers could stand to become majority owners of the reorganized company.

Last week Sattar told the Las Vegas Review-Journal that Xyience would have liquidated under Chapter 7 bankruptcy without the continued support of the Fertittas. "We're excited about the opportunity [to reorganize the company]," Sattar told the newspaper. "Xyience has a great brand name and has a strong affiliation with the UFC."

Xyience is currently involved in eight civil lawsuits and is subject to a pending involuntary bankruptcy filing by Russell Pike and other disgruntled shareholders, according to the bankruptcy filings. The Las Vegas Review-Journal reported accusations of physical threats by Pike and his associates against the current management of the company.

A shareholder, who wished to remain anonymous, told Sherdog.com that Xyience's original owners (Pike and his associates) approached him and other investors to join a lawsuit against the Fertittas.

The shareholder has chosen to remain neutral in the dispute, but told Sherdog.com that "anyone who invested in Xyience by taking the necessary steps and due diligence should have understood from their PPM (private placement memorandum) that it was extremely high risk."

The filings also validate reports of Xyience's failure to honor endorsement agreements. According to the filings, Xyience owes Rich Franklin (Pictures) ($21,000), Anderson Silva ($11,666.66), Matt Serra (Pictures) ($36,000), Travis Lutter (Pictures) ($36,000) and Heath Herring (Pictures) ($8,000).

In November, Sherdog.com confirmed reports that Chuck Liddell (Pictures), Forrest Griffin (Pictures), Matt Hughes (Pictures) and Franklin had struggled collecting from the company. All four fighters were prominently featured in Xyience's multimillion-dollar marketing campaign, including a series of television commercials.

Adam Swift is the Editor of Payout: The Business of MMA and a contributor to Sherdog.com

Update: Report Connects Zuffa to Xyience
Options: Email Article | Printer Friendly
Update: Report Connects Zuffa to Xyience
November 5, 2007
by Adam Swift (adam_m_swift@yahoo.com)

Xyience recently signed a three-year extension on its exclusive partnership with the UFC, but the supplement company's reportedly close ties to the mixed martial arts promotion have not appeased several disgruntled fighters Xyience once sponsored.

Xyience, which formed in 2004, announced the extension in conjunction with a $12 million funding effort.

A relationship between Xyience and Zuffa that runs much deeper than advertising and sponsorship agreements has long been speculated though not acknowledged. However, this week in the Wrestling Observer Newsletter, Dave Meltzer released a non-sourced report that said UFC owners Lorenzo and Frank Fertitta were responsible for Xyience's recent multi-million dollar funding.

When asked for comment on the source of funding and specifically about the Fertittas' and Dana White's involvement in Xyience, the Las Vegas-based sports nutrition company, through a public relations representative, told Sherdog.com that the money was provided "by a private group of local strategic investors. Company policy is to not comment on the specific individuals that participated in a round of funding."

Requests for comment from the UFC went unanswered.

The Fertittas' reported involvement in Xyience could raise eyebrows in light of reports that several high-profile UFC fighters recently severed ties with the company, saying it failed to honor the financial terms of endorsement deals, and news of possible supplement contamination.

In the Oct. 24 Wrestling Observer Newsletter, Meltzer reported that former UFC light heavyweight champion Chuck Liddell (Pictures) is no longer associated with Xyience due to nonpayment on his substantial endorsement deal. Meltzer also reported that Forrest Griffin (Pictures) and Rich Franklin (Pictures) have left the company.

Liddell and Griffin -- along with Josh Koscheck (Pictures), Mike Swick (Pictures) and Cung Le (Pictures) -- have been paid in full as of a couple weeks ago, according to their manager DeWayne Zinkin Jr.

"Early on there were issues," Zinkin told Sherdog.com Monday morning. "But since we've dealt with [Xyience CEO] Adam Frank and the new people in charge now, everything that they have said they were going to do, they've done. All of our guys have been paid in full, so we're happy. We're waiting to get proposals from them for future work."

The same could not be said for Franklin.

"At the beginning of the year Xyience quit returning phone calls and e-mails," Franklin's manager, M-1 president and CEO Monte Cox, said late Sunday. "They are now seven or eight months behind on payment for Rich."

Despite the wishes of several fighters, including UFC champions Matt Hughes (Pictures) and Sean Sherk (Pictures), the Xyience Web site continues to feature fighters who have split with the company.

"Matt is no longer with Xyience and is now with Nutritox," Hughes' business manager, Brian Patton, told Sherdog.com. "His contract expired on Aug. 15. He has since signed a long-term deal with Nutritox. He was not happy with [Xyience's] performance."

Of his relationship with Xyience, Sherk told fiveouncesofpain.com in late October that he's no longer affiliated with them after "they stiffed me a bunch of money."

"They stiff everybody," said the lightweight, who is currently appealing California State Athletic Commission allegations that he tested positive for the anabolic agent nandrolone metabolite following a fight in Sacramento versus Hermes Franca (Pictures). "A lot of people are leaving them."

In response to the reports of fighters fleeing its ranks, a company representative said Xyience "has made good on its obligations regarding fighter sponsorships. Sponsoring fighters continues to be an important part of our strategy, and we value the relations with the fighters."

Of greater concern for Xyience could be the contents of a pre-trial brief and exhibits filed by Sherk's attorney Howard Jacobs with the CSAC and obtained by Sherdog.com.

Among a litany of reports, it is asserted that "Xyience Xtreme Joint Formula" -- one of several Xyience-branded supplements Sherk said he took before his July 7 title defense at the Arco Arena -- tested positive for the anabolic agent 1-androstendione.

Said Susan Wierzbicki, Xyience's Director of Quality Assurance: "The company employs stringent quality control procedures and contracts with manufacturers that are GMP (Good Manufacturing Practices) compliant."

Jacobs told Sherdog.com it was not his intention to finger Xyience as the culprit of Sherk's positive test in California.

Wierzbicki said Xyience halted all shipments of the product until it can conduct independent testing by a certified lab.

Seemingly unrelated to the contamination and fight sponsorship issues, Xyience is currently subject to a Desist and Refrain Order issued by the California Department of Corporations on Sept. 10, 2007, for the fraudulent business practices of Xyience founder and former CEO Russell Craig Pike.

The Desist and Refrain Order obtained by Sherdog.com contains a laundry list of allegations against the company and Pike: selling $2.1 million of stock to California residents without the state's authorization; making material misrepresentations to investors regarding pending litigation and the prior business success of Pike; failure to disclose a default judgment against Pike for writing bad checks; failure to disclose signed confessions of judgment in an action involving Pike's former business venture, Advanced Cart Technology (ACT), for using false pretenses, false representations, and fraud to convince investors to invest in the company; failure to disclose a prior guilty plea to bank fraud, money laundering, and aiding and abetting in connection with ACT, resulting in a sentence of 59 months in a federal prison, three years of supervised release and a restitution order for $2,367,146; failure to disclose ACT bankruptcy proceedings; failure to disclose a prior prison sentence for grand theft and forgery.

According to Robert Walsh, public information officer for the Nevada secretary of state, Pike was listed as president of Xyience from July 20, 2005, until an amended list was filed on Oct. 13, 2006.

A Xyience spokesperson said Pike is currently a minority shareholder in the company, and any stock he owns is non-voting.

"He has no role in management or operations," the spokesperson said, "and is not an employee of the company."

In the year that Pike has taken a step back, Xyience increased distribution from 4,600 to 45,000 stores, including national chains such as 7-11 and GNC, according to a company news release.

Said UFC president Dana White on the relationship between his company and Xyience: "We look forward to our future endeavors together as both of our companies continue their explosive growth."

Adam Swift is the editor of www.MMAPayout.com

January 22, 2008
UPDATED: UFC Sponsor Update: Harley-Davidson Official; Budweiser Coming Soon?; Xyience Files for Bankruptcy

Over the weekend Harley-Davidson officially announced its exclusive motorcycle sponsorship of the UFC and WEC. Key quotes:

"This is the first major worldwide sports sponsorship for Harley-Davidson outside the motorcycle/automotive category," said Harley-Davidson Senior Vice President and Chief Marketing Officer Mark-Hans Richer. "We see our brand embodied in these fighters: young, aggressive, hard working individuals who cut against the grain."

"Like Harley-Davidson, UFC is a true American passion that transcends cultures and languages, and shares incredible and growing popularity in the United States, Europe and around the world. Harley-Davidson is a powerhouse brand, we are proud to call it our exclusive UFC and WEC motorcycle sponsor and to have the historic Harley-Davidson Bar & Shield in the Octagon," said UFC President Dana White.

While Harley-Davidson will occupy the center of the canvas, sources continue to tell MMAPayout.com that a deal between the UFC and Budweiser is believed to be eminent with the King of Beers set to take its place on the canvas as soon as April.

Additionally, this morning the Las Vegas Review-Journal reported that Xyience has filed for Chapter 11 bankruptcy. MMAPayout.com will have further details on this story in the coming days.

Posted by Adam Swift at 3:22 PM

Labels: sponsorships, UFC, WEC, xyience

December 17, 2007
Details on Xyience's UFC Sponsorship

Dave Meltzer reported in the most recent Wrestling Observer Newsletter that the new three-year Xyience sponsorship agreement with the UFC is worth a total of $32.14 million, assuming the company lasts through the term of the contract. In 2006, the company's total losses before taxes were $55,837,653.65 million on $22,475,964.88 in total sales. The loss is accounted for by the $42.2 million spent on marketing the product as product costs were only roughly $14 million.

Posted by Adam Swift at 5:00 PM

Labels: sponsorships, UFC, xyience

November 5, 2007
Report Connects Zuffa to Xyience

I have a new story posted at Sherdog.com, Report Connects Zuffa to Xyience.

The story covers the Fertitta's reported financial involvement with Xyience, Xyience's failure to honor sponsorship agreements with UFC fighters, allegations of contaminated supplements, the desist and refrain order in California, and Russell Pike's involvement in the company. Quotes from Xyience, Monte Cox, and Matt Hughes business manager are included.

UPDATE: Quotes from Liddell and Griffin's manager are now included:

Liddell and Griffin -- along with Josh Koscheck, Mike Swick, and Cung Le -- have been paid in full as of a couple weeks ago, according to their manager DeWayne Zinkin Jr.

"Early on there were issues," Zinkin told Sherdog.com Monday morning. "But since we've dealt with [Xyience CEO] Adam Frank and the new people in charge now, everything that they have said they were going to do, they've done. All of our guys have been paid in full, so we're happy. We're waiting to get proposals from them for future work."

October 16, 2007
Xyience Subject to Desist and Refrain Order in California

Xyience, who recently signed a 3-year contract extension as the official energy drink of the UFC, was issued a Desist and Refrain order by California's Department of Corporations on September 10, 2007. Among the allegations contained in the order:

* Selling $2.1 million dollars in stock to California residents without the state's authorization.
* Material misrepresentations made to investors regarding pending litigation and the prior business success of CEO Russell Pike.
* Failure to disclose a default judgement against Pike for writing bad checks.
* Failure to disclose signed confessions of judgement in an action involving Pike's former business venture, Advanced Cart Technology (ACT), for using false pretenses, false representations, and fraud to convince investors to invest in the company.
* Failure to disclose a prior guilty plea to bank fraud, money laundering, and aiding and abetting in connection with ACT, resulting in a sentence of 59 months in a federal prison, three years of supervised release, and a restitution order for $2,367,146.
* Failure to disclose ACT bankruptcy proceedings
* Failure to disclose a prior prison sentence for grand theft and forgery

The order concludes:

Based upon the foregoing findings, the California Corporations Commissioner is of the opinion that the common stock of Xyience Incorporated is a security subject to qualification under the California Corporate Securities Law of 1968 (California Corporations Code section 25000 et seq.) and is being or has been offered or sold without being qualified in violation of Corporations Code section 25110. Pursuant to section 25532 of the Corporate Securities Law of 1968, Russell Craig Pike and Xyience Incorporated are hereby ordered to desist and refrain from the further offer or sale in the State of California of securities, including but not limited to common stock, unless and until qualification has been made under the law or unless exempt.

In addition, the California Corporations Commissioner is of the opinion that the securities of Xyience Incorporated were offered or sold in this state by means of written or oral communications which included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of section 25401 of the Corporate Securities Law of 1968. Pursuant to section 25532 of the Corporate Securities Law of 1~68, Russell Craig Pike and Xyience Incorporated are hereby ordered to desist and refrain from offering or selling or buying or offering to buy any security in the State of California, including but not limited to common stock, by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

The order was filed approximately one month prior to announcement of the extension of the company's relationship with the UFC.

October 11, 2007
Xyience Announces 3-year Extension of UFC Sponsorship

Yesterday Xyience announced a $12 million dollar funding effort as well as a three year extension of its exclusive sponsorship with the UFC. Xenergy is the official energy drink of the UFC. Quotes from the key players:

"XYIENCE has been a long time sponsor of the UFC(R) and we look forward to our future endeavors together as both of our companies continue their explosive growth," said Dana White, UFC(R) President.

"We believe that the combination of new financing and the extension of our UFC(R) relationship firmly positions the company for success as we embark on a worldwide expansion of the XYIENCE and Xenergy brands," said Adam Frank, XYIENCE CEO.

Terms of the sponsorship were not disclosed.

UFC Owners Defendants in Xyience Lawsuit
Options: Email Article | Printer Friendly
UFC Owners Defendants in Xyience Lawsuit
March 21, 2008
by Adam Swift (adam_m_swift@yahoo.com)

Xyience's bankruptcy proceeding is set to come to a close April 1 with a public auction, but the dispute between dissident shareholders and the company's directors appears to be far from over.

Last December shareholders, led by Ronald Soloman, who controls 35 percent of Xyience's outstanding shares by proxy, filed suit against Xyience and its directors for breach of fiduciary duty to the company's shareholders.

On March 13 the plaintiff shareholders amended their complaint to include Fertitta Enterprises and Zyen, private companies owned by UFC co-owners Frank and Lorenzo Fertitta, as defendants. The complaint alleges that Zyen and Fertitta Enterprises aided and abetted Xyience's corporate directors in breaching their fiduciary duty to shareholders as well as engaged in a conspiracy to defraud shareholders.

The source of the allegations is the Fertittas' $12 million loan to the company last fall. According to the complaint, the loan was repayable in one year with a 15-percent interest rate and collateralized by all of Xyience's assets. The terms also allegedly included warrants for 10 percent of capitalization of the company at one cent per share and 50 percent of the company's equity if Xyience failed to repay.

Thus in the event of default, the Fertittas could purchase 60 percent of Xyience's stock for a nominal purchase price. Additionally, the default provision would also be triggered if the shareholders voted to remove any members of the board.

The complaint alleges that this loan "was neither in the best interests of the shareholders or the company. Indeed, the Fertitta funding did not fund Xyience. Rather, it provided Xyience funds that were immediately used to fund a debt owed to the Ultimate Fighting Championship, which is owned by the Fertittas."

It is also believed that Xyience directors Adam Frank and Kirk Sanford each received 4.2 million stock options under the deal that vested if there were a change in control of the company.

According the complaint, the Fertittas and Xyience's directors represented that the loan would be used "to meet [the company's] capital needs and fuel its growth."

As a result the Fertittas are accused of aiding and abetting breach of fiduciary duty because of their alleged knowledge that the loan was not for its stated purpose, not in the best interest of shareholders and would result in a breach of the fiduciary duty between the directors and shareholders.

During this period Xyience also executed a new sponsorship agreement with the UFC that the complaint alleges is "completely overpriced and less valuable [than] the prior agreement between Xyience and the UFC."

The complaint says that the UFC is to receive $32.4 million over the three-year term of the new agreement: $9 million in the first year, $11 million in the second and $12.4 million in the third.

Under the prior agreement, Xyience was the title sponsor with its marquee on the center of the mat at UFC events. The new agreement provided that after March 2008, Xyience would not be the title sponsor or

appear on the center of the mat, would not be announced by the ring announcer, would not be announced as the title sponsor at commercial breaks and would no longer appear on fighters' clothing.

Adam Swift is the Editor of MMAPayout.com and a regular contributor to Sherdog.com.

**FROM: http://www.cyclenews.com/ShowStory.asp?HeadlineID=11780**

HARLEY-DAVIDSON SPONSORS ULTIMATE FIGHTING CHAMPIONSHIP®

Harley-Davidson is Presenting Sponsor of UFC® and WEC™ Events

MILWAUKEE (January 19, 2008) - Harley-Davidson Motor Company has teamed up with the Ultimate Fighting Championship® (UFC®) and World Extreme Cagefighting® (WEC™) organizations as a presenting sponsor and exclusive motorcycle sponsor.

"This is the first major worldwide sports sponsorship for Harley-Davidson outside the motorcycle/automotive category," said Harley-Davidson Senior Vice President and Chief Marketing Officer Mark-Hans Richer. "We see our brand embodied in these fighters: young, aggressive, hard working individuals who cut against the grain."

"Like Harley-Davidson, UFC is a true American passion that transcends cultures and languages, and shares incredible and growing popularity in the United States, Europe and around the world. Harley-Davidson is a powerhouse brand, we are proud to call it our exclusive UFC and WEC motorcycle sponsor and to have the historic Harley-Davidson Bar & Shield in the Octagon," said UFC President Dana White.

Harley-Davidson's sponsorship began with the UFC 79: NEMESIS event December 29, 2007 at the Mandalay Bay Events Center in Las Vegas, as witnessed by a sell-out audience of more than 11,000 and millions more on television around the world.

Harley-Davidson sponsorship of the UFC and WEC events includes its historic Bar & Shield logo placement in the center spot on the Octagon™ canvas, as a press conference and weigh-in backdrop and in other event locations. In addition, Harley-Davidson motorcycles and advertisements will appear at other UFC and WEC events and locations. The Company is also encouraging its independent dealers to hold UFC "fight night" events and customer parties in conjunction with a limited number of appropriate UFC events.

The first such dealer events begin with UFC 80: RAPID FIRE, held today in Newcastle, England, which will be broadcast live at noon Pacific Time (3 p.m. ET) as "The Prodigy" BJ Penn faces Joe "Daddy" Stevenson for the UFC World Lightweight Championship.

The Ultimate Fighting Championship® is the world's leading professional mixed martial arts organization and offers the premier series of MMA sports events. Owned and operated by Zuffa, LLC, and headquartered in Las Vegas, Nev., UFC® produces over twelve live pay-per-view events annually that are distributed residentially through North American cable and satellite providers including iN DEMAND Networks, DIRECTV, DISH Network, TVN Entertainment, Shaw Pay-Per-View, Bell ExpressVU, and Viewers Choice, and commercially through Joe Hand Promotions. In addition to its North American distribution, UFC programming is distributed in over 100 countries and territories throughout the world. For more information, or current UFC fight news, visit www.ufc.com or uk.ufc.com or www.ufcespanol.com.

The WEC brand is recognized as one of the premier mixed martial arts organizations in the United States. Founded in 2001, the WEC features many of the most prominent athletes in the sport of mixed martial arts today. Owned and operated by WEC Holdings LLC., and headquartered in Las Vegas, Nev., the WEC produces live and taped events annually that are distributed through the Versus network. In addition to its

U.S distribution, WEC programming is shown on the TSN network in Canada. For more information and current WEC fight news, visit www.wec.tv.

Harley-Davidson Motor Company, the only major U.S.-based motorcycle manufacturer, produces heavyweight motorcycles and a complete line of motorcycle parts, accessories and general merchandise. For more information, visit Harley-Davidson's Web site at www.harley-davidson.com.

**BEVNET ARTICLE:**

Xyience Fires Sales Staff

Posted: 11/30/2007 3:21:38 PM | 42 Comments | Post

Custom Beverage Formulas, Busines...

Post Ad | View All

Company may face bankruptcy.

It grew fast, hefted onto the shoulders of ultimate fighters. But the energy drink company Xyience might be crumbling faster than some of the opponents of Chuck Liddell.

Xyience, the Las Vegas-based maker of Xenergy, had seen fast expansion as a result of a sponsorship deal with the mixed martial arts league UFC and its popular television show "The Ultimate Fighter." But this week the company notified much of its approximately 70-member sales force that it would be firing them due to financial setbacks, and this has led to speculation it would soon file for bankruptcy.

The firings come after Xyience had experienced a remarkable run of success, drawing another $12 million in investment as recently as one month ago. The brand is viable, sources say, as it has high name recognition in the crowd of young men who support the fast-growing UFC.

"It's a great brand, and the folks out at retail really identify with it," said Earl Kight, head of sales at San Diego-based Mesa Distributing. "We were very careful and patient with it and we'll continue to be patient with it now."

That support may not carry over to investors, who earlier this year ousted the company's founder, Russell Pike. Pike, facing rumors of lawsuits and bad publicity reported on largely by the sport's rabid Internet following, was forced out in January. After installing a temporary CEO and president, one of the company's primary investors, Adam Frank, recently became CEO.

Meanwhile, the company's sales kept rising – although those sales may not have kept up with a marketing outlay that involved television commercials, models, and the ongoing sponsorship of a sporting confederation whose surging popularity must be making it increasingly more expensive.

"They were spending so much on marketing that we didn't even have Point-of-Sale" materials, said one laid-off salesman. "The tie in with UFC is incredible, but there are a lot of issues."

That tie-in may be in jeopardy itself, however, as several of the UFC's top fighters have begun to distance themselves from Xyience products. Despite the lack of individual sponsorship, however, it remains, with Toyo Tires and Mickey's Malt Liquor, one of the league's three main sponsors.

Source: BevNET.com Staff

**LAS VEGAS REVIEW JOURNAL ARTICLES:**

Jan. 25, 2008
Copyright © Las Vegas Review-Journal

Troubled drink maker granted $1 million loan

By JOHN G. EDWARDS
REVIEW-JOURNAL

Bankruptcy Judge Mike Nakagawa is expected to sign an order within a few days approving post-bankruptcy financing for Xyience Inc., a Las Vegas-based energy-drink maker.

Nakagawa held a hearing Wednesday and agreed to allow Zyen, a company controlled by the Fertitta family, to make a $1 million emergency loan. Zyen can increase the loan to $2.6 million in the hopes Xyience can be sold within 75 days.

Greg Garman, an attorney for Zyen, said he will prepare an order for the judge to consider signing. Zyen already has $12.5 million in unsecured claims against Xyience and a $5.3 million secured claim against the company.

The energy drink company's product, Xenergy, is a key sponsor for the Ultimate Fighting Championship, a mixed martial arts company owned by brothers Frank and Lorenzo Fertitta.

The energy drink company is sold in 24,000 grocery and convenience stories around the country, president Omer Sattar said in an e-mail. However, Xyience has had difficulty in expanding the stores that carry its products while spending large amounts of money on advertising, Sattar said.

The company signed a $15 million sponsorship contract with UFC for 2007. Other creditors include MTV Networks, the Travel Channel, MDK Motor Sports and Professional Bull Riders.

Adam Frank of Las Vegas, who owns 4.45 million shares of Xyience stock, joined the company in June as interim general manager. At the same time, Kirk Sanford was named special adviser to management. Sanford last year resigned as CEO at Global Cash Access, a Las Vegas company that operates automated teller machines in casinos.

"Employee morale is not good, and Xyience critics have emerged among the UFC community," Sattar said in a Jan. 18 statement filed with bankruptcy court. Several dissident shareholders complained during the bankruptcy court hearing Wednesday.

Xyience also has been involved in disputes with founder and former CEO Russell Pike, whom Sattar accused of using strong-arm tactics to get payments.

Pike was among those filing an involuntary bankruptcy case against Xyience early this month before the company filed a voluntary Chapter 11 petition for bankruptcy.

Under Chapter 11, companies are allowed to reorganize so that they can settle claims from creditors and continue in business.

Contact reporter John G. Edwards at jedwards@reviewjournal.com or (702) 383-0420.

WWW.BLOODYELBOW.COM

The Fertittas Deal From the Bottom of the Deck
By Kid Nate
Posted on Fri Mar 21, 2008 at 08:43:24 PM EDT

Adam Swift has a piece up at Sherdog that outlines the suit against a couple of companies owned by UFC co-owners Frank and Lorenzo Fertitta who also own the UFC. They basically loaned Xyience money that Xyience spent "sponsoring" the UFC (why you ask? they needed sponsors to secure a $325 million loan ). The kicker is that the loan included clauses that basically handed the whole company over to the Fertittas if the already floundering Xyience failed to repay. But here's the kicker, check how the new agreement works, it's a classic "heads I win, tails you lose" proposition:

The complaint says that the UFC is to receive $32.4 million over the three-year term of the new agreement: $9 million in the first year, $11 million in the second and $12.4 million in the third.

Under the prior agreement, Xyience was the title sponsor with its marquee on the center of the mat at UFC events. The new agreement provided that after March 2008, Xyience would not be the title sponsor or appear on the center of the mat, would not be announced by the ring announcer, would not be announced as the title sponsor at commercial breaks and would no longer appear on fighters' clothing.