# Exhibit C

COMPLETE XYIENCE 2005 AND 2006 AUDIT

# XYIENCE, INC.

## FINANCIAL STATEMENTS

Contents


| | Page |
|---|---|
| Report of Independent Auditors | [illegible] |
| Financial Statements: | |
| Balance Sheet As Of December 31, 2006 and 2005 | 2 |
| Statements Of Operations For The Years Ended December 31, 2006 and 2005 | [illegible] |
| Statement Of Stockholders' Deficit For The Years Ended December 31, 2006 and 2005 | 4 |
| Statements Of Cash Flows For The Years Ended December 31, 2006 and 2005 | [illegible] |
| Notes To Financial Statements | [illegible] |

AJ. ROBBINS, P.C.
CERTIFIED PUBLIC ACCOUNTANTS
216 SIXTEENTH STREET
SUITE 600
DENVER, COLORADO 80202

## Report of Independent Auditors

To The Board of Directors and Stockholders of
Xyience, Inc.
Las Vegas, Nevada

We have audited the accompanying balance sheets of Xyience, Inc. as of December 31, 2006 and 2005 and the related statements of operations, stockholders' deficit and cash flows for the years then ended. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. We were not engaged to perform an audit of the Company's internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audit provides a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Xyience, Inc. as of December 31, 2006 and 2005, and the results of its operations and cash flows for the years then ended, in conformity with accounting principles generally accepted in the United States of America.

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note __ to the financial statements, the Company has experienced recurring losses and negative cash flows from operations and has a capital deficit at December 31, 2006, that raises substantial doubt about its ability to continue as a going concern. Management's plans in regard to these matters are also described in Note __. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

*/s/ AJ. Robbins PC.*

AJ Robbins PC
Certified Public Accountants

Denver, Colorado
November __, 2007

# XYIENCE, INC.

## Balance Sheet

As Of December 31, 2006 and 2005

| | | 2006 | | 2005 |
|---|---|---|---|---|
| **Assets** | | | | |
| **Current Assets:** | | | | |
| Cash and cash equivalents | $ | 210,151 | $ | 26,014 |
| Accounts receivable, net of allowance for doubtful accounts of $198,611 and $15,073 | | 2,670,386 | | 557,056 |
| Inventory | | 5,529,817 | | 1,249,375 |
| Prepaid expense and other current assets | | 202,509 | | 284,712 |
| Total current assets | | 8,612,863 | | 2,117,157 |
| **Property and Equipment, net** | | 528,271 | | 61,590 |
| **Loans Receivable, Related Party** | | 130,768 | | 1,613,275 |
| **Total Assets** | $ | 9,271,902 | $ | 3,792,022 |
| **Liabilities and Stockholders' Deficit** | | | | |
| **Current Liabilities:** | | | | |
| Cash overdraft | $ | 125,071 | $ | 270,854 |
| Accounts payable | | 19,025,443 | | 4,095,317 |
| Notes payable | | 447,500 | | 598,955 |
| Notes payable, related parties | | 2,437,513 | | 407,141 |
| Convertible notes payable | | 848,340 | | 1,091,006 |
| Convertible notes payable, related parties | | 13,827,710 | | 1,540,937 |
| Accrued interest | | 1,088,120 | | 361,196 |
| Accrued payroll and related benefits | | 424,544 | | 83,764 |
| Accrued legal settlements | | 570,000 | | - |
| Customer deposits | | 134,000 | | - |
| Accrued expenses | | 439,542 | | 856,845 |
| Liabilities to be settled in equity | | 1,549,827 | | 507,570 |
| Capital lease obligations | | 15,477 | | - |
| Total current liabilities | | 40,933,087 | | 9,633,584 |
| **Capital Lease Obligations, net of current portion** | | 78,173 | | - |
| **Total Liabilities** | | 41,011,260 | | 9,633,584 |
| **Stockholders' Deficit** | | | | |
| Common stock, $0.001 per share; 200,000,000 shares authorized; 47,979,311 and 33,895,100 shares issued and outstanding | | 47,979 | | 33,895 |
| Additional paid-in capital | | 52,580,002 | | 7,497,195 |
| Stock subscription receivable | | - | | - |
| Accumulated deficit | | (84,367,339) | | (13,372,652) |
| Total stockholders' equity | | (31,739,358) | | (5,841,562) |
| **Total Liabilities and Stockholders' Deficit** | $ | 9,271,902 | $ | 3,792,022 |

The accompanying notes are an integral part of these financial statements

XYIENCE, INC.
Statements of Operations
For The Years Ended December 31, 2006 and 2005

| | | 2006 | | 2005 |
|---|---|---|---|---|
| **Sales** | $ | 19,775,480 | $ | 3,784,430 |
| **Cost of Goods Sold** | | 15,499,297 | | 1,673,961 |
| **Gross Profit** | | 4,276,183 | | 2,110,469 |
| **Operating Expenses** | | | | |
| Selling and marketing expenses | | 44,194,630 | | 9,306,137 |
| Compensation and related expenses | | 6,096,986 | | 1,062,858 |
| Professional and consulting fees | | 3,289,125 | | 1,113,005 |
| General and administrative expenses | | 5,403,716 | | 1,365,992 |
| **Total Operating Expenses** | | 58,984,457 | | 12,847,992 |
| **Loss From Operations** | | (54,708,274) | | (10,737,523) |
| **Non-Operating Income (Expense):** | | | | |
| Interest income | | 116,930 | | 45,068 |
| Interest and financing costs | | (16,403,343) | | (2,340,100) |
| **Total Non-Operating Income (Expense)** | | (16,286,413) | | (2,295,032) |
| **Loss Before Provision For Income Taxes** | | (70,994,687) | | (13,032,555) |
| **Provision For Income Taxes** | | - | | - |
| **Net Loss** | $ | (70,994,687) | $ | (13,032,555) |

The accompanying notes are an integral part of these financial statements

XYIENCE, INC

Statement of Stockholders' Deficit

For The Years Ended December 31, 2006 and 2005

| | Common Stock Shares | Common Stock Amount | Additional Paid in Capital | Stock Subscription Receivable | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|
| **Balance, December 31, 2004** | 27,900,000 | 27,900 | 70,712 | - | (340,097) | (241,485) |
| Stock issued for cash | 4,146,500 | 4,146 | 4,984,854 | | | 4,989,000 |
| Stock issued for offering costs | 128,600 | 129 | (129) | | | - |
| Stock issued as additional consideration for debt | 294,000 | 294 | 151,468 | | | 151,762 |
| Stock issued for settlement of debt | 500,000 | 500 | 499,500 | | | 500,000 |
| Stock issued for convertible debt | 550,000 | 550 | 299,450 | | | 300,000 |
| Stock issued for subscription receivable | 300,000 | 300 | 299,700 | (300,000) | | - |
| Stock issued for cash not received into Company bank account | 56,000 | 56 | 55,944 | | | 56,000 |
| Stock issued to consultants for services | 20,000 | 20 | 19,980 | | | 20,000 |
| Write off of stock subscription receivable | | | | 300,000 | | 300,000 |
| Fair value of beneficial conversion feature | | | 680,237 | | | 680,237 |
| Fair value of options granted to employees | | | 334,979 | | | 334,979 |
| Fair value of warrants granted to consultant | | | 100,500 | | | 100,500 |
| Net loss | | | | | (13,032,555) | (13,032,555) |
| **Balance, December 31, 2005** | 33,895,100 | 33,895 | 7,497,195 | - | (13,372,652) | (5,841,562) |
| Stock issued for cash | 11,045,378 | 11,045 | 28,976,456 | | | 28,987,501 |
| Payment of offering costs | | | (353,594) | | | (353,594) |
| Stock issued for effect of re-price of stock sold and notes converted | 548,500 | 549 | (549) | | | - |
| Stock issued for offering costs | 545,800 | 546 | (546) | | | - |
| Stock issued as additional consideration for debt | 34,167 | 34 | 66,371 | | | 66,405 |
| Stock issued for convertible debt | 1,807,500 | 1,808 | 2,193,192 | | | 2,195,000 |
| Stock issued for accrued interest | 431,238 | 431 | 441,199 | | | 441,630 |
| Stock issued to consultants for services | 468,413 | 468 | 1,037,145 | | | 1,037,613 |
| Stock issued for deferred financing costs | 1,050,000 | 1,050 | 2,787,750 | | | 2,788,800 |
| Stock issued for loan receivable from founder | 279,215 | 279 | 197,711 | | | 197,990 |
| Stock repurchased from founder | (2,126,000) | (2,126) | (4,000,874) | | | (4,003,000) |
| Fair value of beneficial conversion feature | | | 10,432,690 | | | 10,437,690 |
| Fair value of options granted to employees | | | 790,775 | | | 790,775 |
| Fair value of warrants granted to consultant | | | 1,040,000 | | | 1,040,000 |
| Fair value of warrants issued as additional debt consideration | | | 1,470,081 | | | 1,470,081 |
| Sale of options to purchase stock | | | 5,000 | | | 5,000 |
| Net loss | | | | | (70,994,687) | (70,994,687) |
| **Balance, December 31, 2006** | 47,979,311 | $ 47,979 | $ 52,580,002 | - | $ (84,367,339) | $ (31,739,358) |

The accompanying notes are an integral part of these financial statements

XYIENCE, INC.

Statements of Cash Flows

For The Years Ended December 31, 2006 and 2005

| | | 2006 | | 2005 |
|---|---|---|---|---|
| **Cash Flows From Operating Activities:** | | | | |
| Net loss | $ | (70,994,687) | $ | (13,032,555) |
| Adjustments to reconcile net loss to net cash provided used in operating activities: | | | | |
| Depreciation and amortization | | 91,472 | | 5,102 |
| Provision for bad debt | | 183,538 | | 15,034 |
| Write off of stock subscription receivable | | - | | 300,000 |
| Stock issued for services | | 1,037,613 | | 20,000 |
| Fair value of warrants issued to consultant | | 1,040,000 | | 100,500 |
| Fair value of vested options issued to employees | | 790,775 | | 334,979 |
| Stock issued for cash not received into Company bank account | | - | | 56,000 |
| Stock to be issued for additional debt consideration and services | | - | | 107,970 |
| Stock issued for deferred financing costs | | 2,788,800 | | |
| Note payable issued from commission | | - | | 27,500 |
| Amortization of debt discounts | | 10,575,406 | | 1,254,269 |
| (Increase) / decrease in assets: | | | | |
| Accounts receivable | | (2,296,868) | | (569,505) |
| Loan receivable - related party | | 1,680,497 | | (1,219,151) |
| Inventory | | (4,280,442) | | (1,179,299) |
| Prepaid and other assets | | 83,203 | | (284,712) |
| Increase / (decrease) in current liabilities: | | | | |
| Accounts payable | | 14,930,126 | | 4,039,468 |
| Accrued interest | | 1,156,554 | | 362,958 |
| Accrued payroll and related benefits | | 340,780 | | 82,664 |
| Accrued legal settlements | | 570,000 | | - |
| Customer deposits | | 134,000 | | - |
| Accrued expenses | | (417,298) | | 835,700 |
| Liabilities to be settled in equity | | 1,042,257 | | - |
| **Net Cash Used In Operating Activities** | | (41,545,574) | | (8,743,978) |
| **Cash Flows From Investing Activities:** | | | | |
| Acquisition of property and equipment | | (453,419) | | (62,971) |
| **Net Cash Used In Investing Activities** | | (453,419) | | (62,971) |
| **Cash Flows From Financing Activities:** | | | | |
| Cash overdraft | | (145,763) | | 270,834 |
| Proceeds from the sale of common stock | | 28,987,501 | | 4,989,000 |
| Payment of offering costs | | (353,594) | | - |
| Proceeds from sale of option to purchae stock | | 5,000 | | - |
| Proceeds from issuance of note and convertible notes payable | | 19,925,555 | | 4,134,485 |
| Payments on note and convertible notes payable | | (2,221,485) | | (568,113) |
| Repurchase of common stock | | (4,003,000) | | - |
| Payment on capial lease obligation | | (11,084) | | - |
| **Net Cash Provided By Financing Activities** | | 42,183,130 | | 8,826,206 |
| **Net Increase In Cash and Cash Equivalents** | | 184,137 | | 19,257 |
| **Cash and Cash Equivalents - Beginning Of Year** | | 26,014 | | 6,757 |
| **Cash and Cash Equivalents - End Of Year** | $ | 210,151 | $ | 26,014 |
| **Supplemental Disclosure Of Cash Flow Information:** | | | | |
| Interest paid | $ | - | $ | - |
| Income taxes paid | $ | - | $ | - |
| **Supplemental Non-Cash Investing and Financing Activities:** | | | | |
| Capital lease obligations | $ | 104,734 | $ | - |
| Convertible notes payable converted to equity | $ | 2,195,000 | $ | 300,000 |
| Debt converted to equity | $ | - | $ | 500,000 |

The accompanying notes are an integral part of these financial statements

## NOTE 1 -LINE OF BUSINESS AND SIGNIFICANT ACCOUNTING POLICIES

### Line of Business

Xyience, Inc. ("Xyience" or the "Company") was incorporated in the state of Nevada in May 2004. The Company operates in the supplements and energy drink markets. The Company sells its products in the specialty retail and gym market and it fulfills orders to food, drug, mass and convenience store chains for supplements and energy drinks.

### Going Concern; Management's Plans

The accompanying financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America, which contemplate the Company's continuation as a going concern. The Company incurred a net loss for the year ended December 31, 2006 of $70,994,687, used cash for operating activities of $41,545,574 for the year ended December 31, 2006 and at December 31, 2006, had an accumulated deficit of $84,367,339. In addition, the Company is involved in numerous lawsuits (see Note 7) which could have a significant negative impact on the Company if not settled in the Company's favor. The Company may seek to raise the additional capital required through the private sale of debt or equity securities. The Company cannot give any assurance that it will be able to secure the additional cash or working capital it may require to continue its operations. Should the Company be unable to raise the additional working capital required to fully execute its plan of operation over the next twelve months, the Company may be forced to reduce or suspend its operations in the meantime. The foregoing circumstances raise substantial doubt about the Company's ability to continue as a going concern in the event it is unable to raise the additional capital required. These financial statements do not include any adjustments that might result from the outcome of this uncertainty These financial statements do not include any adjustments relating to the recoverability and classification of recorded asset amounts, or amounts and classification of liabilities that might be necessary should the Company be unable to continue as a going concern.

### Amendment of Articles of Incorporation

On November 14, 2006, the Company amended its articles of incorporation to increase the authorized shares of common stock to 60,000,000. On May 25, 2007, the articles of incorporation were further amended to increase the authorized shares of common stock to 90,000,000 and on October 1, 2007 to 200,000,000 shares.

### Valuation of the Company's Stock

Since inception, the Company has completed numerous private placements of its equity securities at various prices. Current management does not represent that the prices

offered in those private placements represents the fair market value of the Company's common stock for those stock based transactions.

Stock Based Compensation to Employees

The Company accounts for its stock-based compensation in accordance with Statement of Financial Accounting Standards ("SFAS") No. 123R, "Share-Based Payment, an Amendment of Financial Accounting Standards Board ("FASB") Statement No. 123." The Company recognizes in the statement of operations the grant-date fair value of stock options and other equity-based compensation issued to employees. Prior to the adoption of SFAS No. 123R, the Company accounted for stock based compensation to employees under the provisions of Statement of Financial Accounting Standards No. 123, "Accounting *for Stock-Based Compensation.*"

Stock Based Compensation to Other than Employees

The Company accounts for equity instruments issued in exchange for the receipt of goods or services from other than employees in accordance with Statement of Financial Accounting Standards No. 123, "Accounting *for Stock-Based Compensation,*" and the conclusions reached by the Emerging Issues Task Force in Issue No. 96- 18, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring or in Conjunction with Selling Goods or Services" ("EITF 96-18"). Costs are measured at the estimated fair market value of the consideration received or the estimated fair value of the equity instruments issued, whichever is more reliably determinable. The value of equity instruments issued for consideration other than employee services is determined on the earlier of a performance commitment or completion of performance by the provider of goods or services as defined by EITF 96-18. In the case of equity instruments issued to consultants, the fair value of the equity instrument is recognized over the term of the consulting agreement.

Use of Estimates

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosures of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenue and expenses during the reporting periods. As of December 31, 2006 and 2005, the Company used estimates in determining the realization of its accounts receivable, inventory, fixed assets, accounts payable, accrued expenses, and the fair value of equity instruments issued for services. Actual results could differ from these estimates.

Fair Value of Financial Instruments

For certain of the Company's financial instruments, none of which are held for trading purposes, including cash, accounts receivable, notes payable, accounts payable and

accrued expenses, the carrying amounts approximate fair value due to their short maturities.

The amounts shown for notes payable also approximate fair value because current interest rates and terms offered to the Company for similar debt are substantially the same.

Cash and Cash Equivalents

For purposes of the statements of cash flows, the Company defines cash equivalents as all highly liquid debt instruments purchased with a maturity of three months or less, plus all certificates of deposit.

Inventory

Inventories are stated at the lower of cost or market on a first-in, first-out basis. The Company's inventory balance at December 31, 2006 and 2005 consisted of the following:

| | 2006 | | 2005 | |
|---|---|---|---|---|
| Raw materials | $ | 349,455 | $ | 628,658 |
| Finished goods | | 4,512,306 | | 199,922 |
| Inventory held by third parties | | 668,056 | | 420,795 |
| | $ | 5,529,817 | $ | 1,249,375 |

Inventory Held by Others

As part of the Company's sales arrangements with certain customers, the Company sells to the customer finished goods that are payable upon the sale by the customer to the end user ("pay on scan or POS"). The inventory is returnable by the customer if it is not sold.

Concentration of Credit Risk

Financial instruments, which potentially subject the Company to concentrations of credit risk, consist of cash and accounts receivables. The Company places its cash with high quality financial institutions and at times may exceed the FDIC $100,000 insurance limit. The Company has not experienced a loss in such accounts. The Company extends credit based on an evaluation of the customer's financial condition, generally without collateral. Exposure to losses on receivables is principally dependent on each customer's financial condition. The Company monitors its exposure for credit losses and maintains allowances for anticipated losses, as required. For the years ended December 31, 2006 and 2005, one customer accounted for [redacted]% and [redacted]%, respectively, of the Company revenue

Impairment of Long-Lived Assets

In accordance with SFAS 144, Accounting for the Impairment or Disposal of Long-Lived Assets, The Company reviews its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Recoverability of assets to be held and used is measured by a comparison of the carrying amount of an asset to future net cash flows expected to be generated by the asset. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. Assets to be disposed of are reported at the lower of the carrying amount or fair value less costs to sell. No impairment loss was recorded in 2006 or 2005.

Allowance for Doubtful Accounts

The Company maintains an allowance for doubtful accounts resulting from the inability, failure or refusal of customers to make required payments. The Company determines the adequacy of this allowance by regularly reviewing the accounts receivable aging and applying various expected loss percentages to certain accounts receivable categories based upon historical bad debt experience. The Company generally writes-off accounts receivable balances deemed uncollectible.

Property and Equipment

Property and equipment are stated at cost. Depreciation is computed using the straight-line method based on estimated useful lives from 3 to 5 years. Expenditures for maintenance and repairs are charged to operations as incurred while renewals and betterments are capitalized. Gains and losses on disposals are included in the results of operations.

Revenue Recognition

Sales revenue is recognized at the date of shipment to customers when a formal arrangement exists, the price is fixed or determinable, the delivery is completed, no other significant obligations of the Company exist and collectibility is reasonably assured. Shipping and handling charges that are billed to customers are included in gross sales, with the related costs included in cost of sales.

Pay on Scan Revenue Recognition

The Company recognizes Pay-on-Scan sales as revenues at the earlier of when 1) it is notified of the customer's sales through periodic sales reports, 2) when the Company receives payments from the customer, or 3) when certain sales milestones have been met based upon the sales contracts.

XYIENCE, INC.
Notes To Financial Statements
For The Years Ended December 31, 2006 and 2005

Advertising and Marketing Costs

The Company expenses costs of advertising and marketing as incurred. Advertising and marketing expense for the years ended December 31, 2006 and 2005 were $44,194,630 and $9,306,137, respectively.

Income Taxes

The Company accounts for income taxes in accordance with SFAS No. 109, "*Accounting for Income Taxes*." Deferred taxes are provided on the liability method whereby deferred tax assets are recognized for deductible temporary differences, and deferred tax liabilities are recognized for taxable temporary differences.

Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all of the deferred tax assets will be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Debt Discounts

Debt discounts costs are principally the values attributed to the detachable warrants issued in connection with the convertible debentures and the value of the beneficial conversion feature associated with the convertible debentures. These debt issuance costs are accounted for in accordance with Emerging Issues Task Force ("EITF") 00-27 issued by the Financial Accounting Standards Board ("FASB")

Comprehensive Income

SFAS No. 130, "Reporting Comprehensive Income," requires the reporting of comprehensive income (loss) in addition to net income (loss) from operations. Comprehensive income (loss) is a more inclusive financial reporting methodology that includes disclosure of certain financial information that historically has not been recognized in the calculation of net income (loss). The Company had no components of other comprehensive income (loss) during the years ended December 31, 2006 and 2005.

Recently Issued Accounting Pronouncements

In September 2006, the FASB issued SFAS No. 157, "*Fair Value Measurements*." This statement clarifies the definition of fair value, establishes a framework for measuring fair value and expands the disclosures on fair value measurements. SFAS No 157 is effective for fiscal years beginning after November 15, 2007. Management has not determined the effect, if any, the adoption of this statement will have on the Company's financial statements.

FASB Interpretation No. 48, "*Accounting for Uncertainty in Income Taxes, an interpretation of FASB Statement No.109.*" Interpretation No. 48 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. Benefits from tax positions should be recognized in the financial statements only when it is more likely than not that the tax position will be sustained upon examination by the appropriate taxing authority that would have full knowledge of all relevant information. The amount of tax benefits to be recognized for a tax position that meets the more-likely-than-not recognition threshold is measured as the largest amount of benefit that is greater than fifty percent likely of being realized upon ultimate settlement. Tax benefits relating to tax positions that previously failed to meet the more-likely-than-not recognition threshold should be recognized in the first subsequent financial reporting period in which that threshold is met or certain other events have occurred. Previously recognized tax benefits relating to tax positions that no longer meet the more-likely-than-not recognition threshold should be derecognized in the first subsequent financial reporting period in which that threshold is no longer met. Interpretation No. 48 also provides guidance on the accounting for and disclosure of tax reserves for unrecognized tax benefits, interest and penalties and accounting in interim periods. Interpretation No. 48 is effective for fiscal years beginning after December 15, 2006. The change in net assets as a result of applying this pronouncement will be a change in accounting principle with the cumulative effect of the change required to be treated as an adjustment to the opening balance of retained earnings on January 1, 2007, except in certain cases involving uncertainties relating to income taxes in purchase business combinations. In such instances, the impact of the adoption of Interpretation No. 48 will result in an adjustment to goodwill. While the Company analysis of the impact of adopting Interpretation No. 48 is not yet complete, it does not currently anticipate it will have a material impact on the Company's financial statements.

In December 2006, the FASB issued FASB Staff Position ("*FSP*") EITF 00-19-2, *Accounting for Registration Payment Arrangements*. EITF 00-19-2 addresses an issuer's accounting for registration payment arrangements. This FSP specifies that the contingent obligation to make future payments or otherwise transfer consideration under a registration payment arrangement, whether issued as a separate agreement or included as a provision of a financial instrument or other agreement, should be separately recognized and measured in accordance with FASB Statement No. 5, "*Accounting for Contingencies.*" The guidance in EITF 00-19-2 amends FASB Statements No. 133, "*Accounting for Derivative Instruments and Hedging Activities,*" and No. 150, "*Accounting for Certain Financial Instruments with Characteristics of both Liabilities and Equity,*" and FASB Interpretation No. 45, "*Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others*", to include scope exceptions for registration payment arrangements. EITF 00-19-2 further clarifies that a financial instrument subject to a registration payment arrangement should be accounted for in accordance with other applicable generally accepted accounting principles (GAAP) without regard to the contingent obligation to transfer consideration pursuant to the registration payment arrangement. EITF 00-19-2 is effective for fiscal year beginning after December 15, 2006.

The Company has determined that this FSP will not have an impact in its December 31, 2006 financial statements.

NOTE 2 - PROPERTY AND EQUIPMENT

The cost of property and equipment at December 31, 2006 and 2005 consisted of the following:

| | 2006 | 2005 |
|---|---|---|
| Office equipment and furniture | $ 285,250 | $ - |
| Computer equipment | 92,179 | 39,515 |
| Software | 55,875 | - |
| Leasehold improvements | 191,821 | 27,456 |
| | 600,580 | 66,971 |
| Less accumulated depreciation | (96,854) | (5,381) |
| | $ 528,271 | $ 61,590 |

Depreciation expense for the years ended December 31, 2006 and 2005 was $91,572 and $5,102, respectively.

NOTE 3 - RELATED PARTY TRANSACTIONS

Prior to the formation of Xyience in 2004 by Russell Pike and others "founding" stockholders, the supplements now sold by Xyience were sold by a company called Nitro. Mr. Pike was a founding stockholder of Xyience and is currently a large stockholder of the Company's common stock. Current management is of the belief that Nitro was controlled by Mr. Pike and the other "founding" stockholders. Mr. Pike purportedly raised a substantial amount of debt and equity financing in Nitro. Selected stockholders of Nitro also received stock in Xyience. Current management is of the belief that when Xyience was formed, it assumed select portions of Nitro's debt and the formulations of the supplements that became the basis of Xyience's initial products. The Company is in the possession of an incomplete asset purchase agreement among, Xyience, Nitro and an entity called the Supplements Store. Current management believes that, if a signed document did exist, it may have subsequently been destroyed. Many documents which may have supported the proper treatment of the transactions were purportedly in the possession of Mr. Pike or his brother and may have been destroyed.

During the time that Mr. Pike was in charge of the Company, there were numerous transactions that were either (1) directly attributable to Mr. Pike; (2) associated with

Nitro; or (3) not substantiated as to their business purpose. Current management, as part of its preparation for the audit, reviewed each transaction and determined that any transaction that met one of the three criteria listed above would be recorded to the Russell Pike Loan Receivable account. Initially, Mr. Pike agreed to sign a statement that the loan amounts are attributable to him. However, there currently is a strained relationship between current management and Mr. Pike and a signed document is not likely.

In addition to the assumption of transactions (debt/equity) with Nitro and at the direction of Mr. Pike, the Company issued stock for conversions of Nitro debt that did not appear to have been assumed by the Company. These transactions have been treated at rates confirmed by the stockholders (i.e. a $30,000 note converted into 120,000 shares was initially recorded at $120,000 or $1 per share, but was subsequently adjusted to $30,000 or $.25 per share). The corresponding entry was an increase in the loan receivable from Mr. Pike.

Additionally, current management believes that Mr. Pike sold stock and debt for cash and did not remit those funds to the Company. The Company is aware of one convertible note for $27,500, which did not appear to be deposited into the Company bank account. Stock sales also occurred, which have been classified in the financial statements as sale of common stock for cash not received by the Company.

Withdrawals were made for cash from the Company's banks account. 2005 cash withdrawals, which have no support and have been attributed to Mr. Pike totaled $184,550.

During 2004, Mr. Pike allegedly withdrew or had cash disbursements or other transactions totaling $235,454 attributable to him and repayments of ($59,144) attributable to him.

During 2005, Mr. Pike withdrew or had cash disbursements or other transactions totaling $1,210,744 attributable to him and repayments of ($29,700) attributable to him.

During 2006, Mr. Pike allegedly withdrew or had cash disbursements or other transactions totaling $1,473,189 attributable to him

NOTE 4 - DEBT

Note payable at December 31, 2006 and 2005 are as follows:

| | 2006 | 2005 |
|---|---|---|

XYIENCE, INC.
Notes To Financial Statements
For The Years Ended December 31, 2006 and 2005

| | | 2006 | 2005 |
|---|---|---|---|
| [redacted] | Note payable dated ____; interest accrues at __% per annum and was due on ____. $315,000 of this note was converted to equity in 2006 and the remainder was repaid in cash in 2006. | $ - | $ 386,485 |
| [redacted] | Note payable dated April 29, 2005; interest accrues at 10% per annum and was due on ____. $40,000 of this note was converted to equity in 2006. | 27,500 | 67,500 |
| [redacted] | Note payable dated ______; interest accrues at __% per annum and was due on ____. The note was repaid in 2006. | | 125,000 |
| [redacted] | Note payable dated February 2, 2005; interest accrues at 3.75% per month. The note was due within one year of issuance and is currently in default. | 20,000 | 20,000 |
| [redacted] | Note payable dated ______; interest accrues at __% per annum and was due on ____. The note is currently in default | 150,000 | - |
| [redacted] | Note payable dated March 13, 2006; interest is payable at 5,000 shares per month and was due on 14 days from issuance. The note is currently in default. | 200,000 | - |
| [redacted] | Note payable dated ______ interest accrues at __% per annum and was due on ____. The note is currently in default. | 50,000 | - |
| | | $ 447,500 | $ 598,985 |

Note payable, related party at December 31, 2006 and 2005 are as follows:

| | | 2006 | 2005 |
|---|---|---|---|
| [redacted] | Note payable to [STATE HOW RELATED] dated ____; interest accrues at __% per annum and was due on ____. The note was ___ in 2006. | $ - | $ 22,141 |

**XYIENCE, INC.**
**Notes To Financial Statements**
**For The Years Ended December 31, 2006 and 2005**

| | | | |
|---|---|---|---|
| [redacted] | Notes payable to [STATE HOW RELATED] dated September 9, 2004; interest accrues at 48% per annum. The note was due 90 days from issuance and is currently in default. | 100,000 | 100,000 |
| [redacted] | Note payable to [STATE HOW RELATED] dated July 6, 2005; interest accrues at 36% per annum. The note was due 120 days from issuance and is in default. | 40,000 | 40,000 |
| [redacted] | Note payable to [STATE HOW RELATED] dated March 31, 2005; interest accrues at 10% per annum. The note was due 13 months from issuance and is in default. | 150,000 | 150,000 |
| [redacted] | Note payable to [STATE HOW RELATED]; interest accrues at __% per annum and is due on _____. | 50,000 | 50,000 |
| [redacted] | Note payable to [STATE HOW RELATED]; interest accrues at __% per annum and is due on _____. The note is currently in default. | - | 45,000 |
| [redacted] | Note payable to founder and former officer dated _____; interest accrues at __% per annum and is due on _____. | 1,897,513 | - |
| [redacted] | Note payable to [STATE HOW RELATED] dated February 16, 2006; interest accrues at 18% per annum. The note is secured by a lien against GNC PO#54019. The note was due within 30 days of issuance and is currently in default. | 200,000 | - |
| | | $ 2,437,513 | $ 407,141 |

Convertible note payable at December 31, 2006 and 2005 are as follows:

| | 2006 | 2005 |
|---|---|---|



[redacted]

| | | | |
|---|---|---|---|
| [redacted] | Note payable dated ____; interest accrues at __% per annum and is due on _____. This note was repaid in 2006. | $ - | $ 100,000 |
| [redacted] | Note payable dated December 23, 2005; interest accrues at 15% per annum. The note is secured by all of the Company's inventory located in its warehouse, contract manufacturers, in transit, GNC retail stores and GNC distribution center. The loan was due 120 days from issuance. This loan was converted to equity in 2006. | - | 25,000 |
| [redacted] | Note payable dated December 31, 2005; interest accrues at 10% per annum. The note was due 3 months from issuance and is currently in default. | 24,000 | 16,000 |
| [redacted] | Notes payable entered into on various dates between September 1, 2005 and December 6, 2005; interest accrues at 15% per annum. The notes are secured by all of the Company's inventory located in its warehouse, contract manufacturers, in transit, GNC retail stores and GNC distribution center. The notes were due within 120 days of issuance and are in default. These notes were converted to equity in 2006. | - | 900,000 |
| [redacted] | Note payable dated September 19, 2005; interest accrues at 15% per annum. The note is secured by all of the Company's inventory located in its warehouse, contract manufacturers, in transit, GNC retail stores and GNC distribution center. The loan was due within 120 days of issuance and is currently in default. | 50,000 | 50,000 |
| [redacted] | Note payable dated February 2, 2006; interest accrues at 18% per annum and is due 90 days from issuance. This note is currently in default. | 500,000 | - |

| | | 2006 | 2005 |
|---|---|---|---|
| [redacted] | Note payable dated April 19, 2006; interest accrues at 12% per annum. The note is secured by substantially all of the Company's assets. The note was due within one year and is currently in default. The note is convertible into shares of the Company's common stock at $4 per share. | 75,000 | - |
| [redacted] | Note payable dated February 1, 2006; interest accrues at 18% per annum for each full month prior to partial repayment and 15% per annum each month thereafter. | 100,000 | - |
| [redacted] | Note payable dated September 8, 2006; interest accrues at 24% per annum and is currently in default. | 178,018 | - |
| [redacted] | Note payable dated April 14, 2006, interest accrues at 18% per annum and is due within 180 days. The note is secured by all of the Company's inventory located in its warehouse, contract manufacturers, in transit, GNC retail stores and GNC distribution center. The note is convertible into shares of the Company's common stock at $4 per share. | 50,000 | - |
| | Less debt discounts | (128,678) | - |
| | | $ 848,340 | $ 1,091,000 |

Convertible note payable, related party at December 31, 2006 and 2005 are as follows:

| | | 2006 | 2005 |
|---|---|---|---|
| [redacted] | Notes payable to [STATE HOW RELATED] entered into on various dates between July 6 and 16, 2005; interest accrues at 36% per annum. The notes were due 120 days from issuance and are now in default. The note is convertible into shares of the Company's common stock at $1 per share. | $ 270,000 | $ 270,000 |

XYIENCE, INC.
Notes To Financial Statements
For The Years Ended December 31, 2006 and 2005

| | | | |
|---|---|---|---|
| [redacted] | Notes payable to [STATE HOW RELATED] dated _____; interest accrues at __% per annum. The note was due ___ from issuance and is currently in default. The note is convertible into shares of the Company's common stock at $_____ per shares. [redacted] | - | 150,000 |
| [redacted] | Notes payable to [STATE HOW RELATED] October 1, 2004; interest accrues at 14% per annum. The note was due 1 year from issuance and is currently in default. The note is convertible into shares of the Company's common stock at $0.20 per shares. | 100,000 | 100,000 |
| [redacted] | Notes payable to PIA LLC entered into on various dates between April 26, 2005 and October 20, 2005. Interest accrues at 36% per annum. The note is secured by substantially all of the Company's asset. Notes were due 120 days from issuance and are all currently in default. The note is convertible into shares of the Company's common stock at $1 per share. | 837,500 | 852,500 |
| [redacted] | Note payable to [STATE HOW RELATED] dated July 7, 2006; interest accrues at 12% per annum. (Interest may be paid by common stock at a price per share of $2, following which will be a 2% increase in interest rate.) The loan is secured by substantially all of the Company's assets. The loan was due on September 6, 2006 and is in default. The note is convertible into shares of the Company's common stock at $4 per share. | 10,000,000 | - |

| | | |
|---|---|---|
| [redacted] Note payable to [STATE HOW RELATED] dated December 20, 2006; interest accrues at 15% per annum. The loan was due on March 19, 2007and is currently in default. The loan is secured by substantially all of the Company's assets. The note is convertible into shares of the Company's common stock at a price per share equal to 85% of the Company's next price per shares offered in the next financing. | 3,500,000 | - |
| [redacted] Note payable to former officer dated April 21, 2006; interest is paid by 2,000 shares of common stock per month. The note is secured by substantially all of the Company's assets. The note was due 60 days from issuance and is currently in default. | 175,000 | - |
| Less debt discounts | (1,054,790) | (31,563) |
| | $ 13,827,710 | $ 1,340,937 |

During the years ended December 31, 2006 and 2005, the Company issued various convertible notes payable that are convertible into shares of the Company's common stock, generally at a price per share equal to or less than the determined market price of the Company's common stock at the date of issuance. For most of the convertible notes, the Company issued to the convertible note holder shares of the Company's common stock or warrants to purchase shares of the Company's common stock as an additional incentive for the note holders to make the loans. In accordance with EITF 00-27, the Company first determined the value of the note and the common stock or the fair value of the detachable warrants issued in connection with these convertible notes. The estimated value of the common stock issued was based on the market value of the Company's common stock at the date of the issuance of the convertible note. The estimated value of the warrants was determined using the Black-Scholes option pricing model and the following assumptions: term of 1-3 years, a risk free interest rate of 4.6%, a dividend yield of 0% and volatility of 117%. The face amount of the convertible note was proportionately allocated to the notes and the common stock or the warrants. The amount allocated to the common stock or warrants was recorded as a discount on the convertible note and as an addition to common stock and/or additional paid in capital. The value of the convertible note was then allocated between the convertible note and the beneficial conversion feature. The amount allocated to the beneficial conversion feature

was recorded as a discount on the convertible note and as an addition to additional paid in capital. The discounts attributed to both the common stock or warrants and the beneficial conversion feature are being amortized into interest expense and financing costs over the term of the convertible note payable. During the years ended December 31, 2006 and 2005, the Company recorded debt discounts of $1,536,486 and $552,262, respectively, related to the common stock or warrants and $10,432,690 and $680,237, respectively, related to the beneficial conversion feature. During the year ended December 31, 2006 and 2005, the Company amortized $10,575,106 and $1,254,269, respectively, of debt discounts as interest expense and financing costs.

## NOTE 5 – STOCKHOLDERS' EQUITY

Common Stock

*For The Year Ended December 31, 2006*

During the year ended December 31, 2006, the Company issued shares of its common stock as follows:

- 11,045,378 shares to investors in private placement offerings for gross cash proceeds of $28,987,501 and paid offering costs of $353,594;
- 548,500 shares to common stockholders due to re-pricing of shares previously sold.
- 545,800 shares to placement agents and individuals as commissions related to the sale of the Company's common stock;
- 34,167 shares to note holders as additional incentives for the note holders to lend money to the Company. The note proceeds were allocated to the common stock and note payable based on their respective values. The value of the common stock issued was $66,405;
- 1,807,500 shares for the conversion of convertible notes payable in the amount of $2,195,000;
- 431,238 shares to pay accrued interest in the amount of $441,630;
- 468,413 shares to a consultant for services rendered valued at $1,037,613;
- 1,050,000 shares issued to convertible note holders as deferred financing costs valued at $2,788,800;
- 279,215 shares for a loan receivable from one of the Company's founders; and

- 2,126,000 shares were repurchased from one of the Company's founders for $4,003,000.

*For The Year Ended December 31, 2005*

During the year ended December 31, 2005, the Company issued shares of its common stock as follows:

- 4,146,500 shares to investors in private placement offerings for gross cash proceeds of $4,989,000;
- 128,600 shares to placement agents and individuals as commissions related to the sale of the Company's common stock;
- 294,000 shares to note holders as additional incentives for the note holders to lend money to the Company. The note proceeds were allocated to the common stock and note payable based on their respective values. The value of the common stock issued was $151,762;
- 500,000 shares for the settlement of debt valued at $500,000;
- 550,000 shares for the conversion of convertible notes payable in the amount of $300,000;
- 300,000 shares for a stock subscription receivable, which has never been collected by the Company and has been written off;
- 56,000 shares for $56,000 in cash which was never deposited into the Company's bank account (see Note3); and
- 20,000 shares to a consultant for services rendered valued at $20,000.

[redacted]

Description of Stock Plans

*Xyience, Inc. 2006 Stock Incentive Plan*

On _____, the Company's board of directors adopted, the Xyience, Inc. 2006 Stock Incentive Plan (the "*2006 Plan*"). The purpose of the Plan is to promote the success and enhance the value of the Company by providing the participants with an incentive for outstanding performance in generating superior returns for the Company shareholders and by enhancing the Company's capability to motivate, attract, and retain the services of individuals whose knowledge, judgment, interest and special effort contribute to the

Company's success. Under the 2006 Plan, a total of 7,500,000 common shares will be available for issuance.

The following table summarizes options granted for the periods or as of the dates indicated:

| | Options Granted | Weighted Average Exercise Price |
|---|---|---|
| Balance, December 31, 2004 | - | |
| Exercised | - | |
| Cancelled | - | |
| Granted | 1,350,000 | $1.00 |
| Balance, December 31, 2005 | 1,350,000 | $1.00 |
| Exercised | - | |
| Cancelled | - | |
| Granted | 375,000 | $3.07 |
| Balance, December 31, 2006 | 1,725,000 | $1.45 |
| Exercisable, December 31, 2006 | 600,000 | $1.35 |

The fair value for these options was estimated at the date of grant using a Black-Scholes option pricing model with the following weighted-average assumptions for the year ended December 31, 2005: risk-free interest rate of 4.5%; dividend yields of 0%; volatility factors of the expected market price of the Company's common shares of 117%; and a weighted average expected life of the options of 2 years.

The weighted average remaining contractual life of compensatory options outstanding is 4.28 years at December 31, 2006. The intrinsic value of the outstanding options at December 31, 2006 was [illegible]. The exercise price for options outstanding at December 31, 2006 were as follows:

| Number of Options | Exercise Price |
|---|---|
| 1,450,000 | $1.00 |
| 25,000 | $2.00 |
| 250,000 | $4.00 |
| 1,725,000 | |

For options granted to during the year ended December 31, 2005 where the exercise price was equal to the stock price at the date of the grant, the weighted-average fair value of such options was $1.22 and the weighted-average exercise price of such options was $2.00. For options granted to during the year ended December 31, 2006 where the exercise price was less than the stock price at the date of the grant, the weighted-average fair value of such options was $3.83 and the weighted-average exercise price of such options was $1.00. For options granted to during the year ended December 31, 2006 where the exercise price was greater than the stock price at the date of the grant, the weighted-average fair value of such options was $1.72 and the weighted-average exercise price of such options was $4.00.

For options granted to during the year ended December 31, 2005 where the exercise price was equal to the stock price at the date of the grant, the weighted-average fair value of such options was $0.61 and the weighted-average exercise price of such options was $1.00. For options granted to during the year ended December 31, 2005 where the exercise price was less than the stock price at the date of the grant, the weighted-average fair value of such options was $1.48 and the weighted-average exercise price of such options was $1.00. No options were granted during the year ended December 31, 2005, where the exercise price was greater than the stock price at the date of grant.

Summary of Warrants Granted

The following table summarizes warrants granted for the periods or as of the dates indicated, including both compensatory options/warrants (referred to herein as warrants), granted to consultants under the aforesaid stock plans and in the form of free-standing grants as well as non-compensatory warrants sold or granted.

XYIENCE, INC.
Notes To Financial Statements
For The Years Ended December 31, 2006 and 2005

| | Warrants | Weighted Average Exercise Price |
|---|---|---|
| Balance, December 31, 2004 | - | |
| Exercised | - | |
| Cancelled | - | |
| Granted | 150,000 | $1.00 |
| Balance, December 31, 2005 | 150,000 | $1.00 |
| Exercised | - | |
| Cancelled | - | |
| Granted | 1,332,501 | $2.50 |
| Balance, December 31, 2006 | 1,482,501 | $2.35 |
| Exercisable, December 31, 2006 | 1,471,668 | $2.34 |

The weighted average remaining contractual life of the common share purchase warrants outstanding is 2.62 years at December 31, 2006. The exercise price for common share purchase warrants outstanding at December 31, 2006 were as follows:

| Number of Warrants | Exercise Price |
|---|---|
| 650,000 | $1.00 |
| 250,000 | $2.50 |
| 582,501 | $4.00 |
| 1,482,501 | |

During the years ended December 31, 2006 and 2005, the Company issued a total of 565,000 and 150,000 common share purchase warrants to a consultant for services valued at $91,500 and $831,700, respectively. In addition, during the year ended December 31, 2006, the Company issued a total of 100,000 common share purchase warrants to a former employee for a settlement valued at $193,000.

NOTE 6 – INCOME TAXES

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial statement purposes and the

amounts used for income tax purposes. Significant components of the Company's deferred tax liabilities and assets as of December 31, 2006 and 2005 are as follows:

| | 2006 | 2005 |
|---|---|---|
| Deferred tax assets: | | |
| Net operating loss carryforwards | $ 23,243,000 | $ 4,047,000 |
| Accrued salaries | 170,000 | 33,000 |
| Accrued litigation | 228,000 | — |
| Allowance for bad debts | 79,000 | 6,000 |
| Equity compensation | 1,330,000 | 182,000 |
| Less valuation allowance | (25,050,000) | (4,268,000) |
| Net deferred tax asset | $ — | $ — |

Following is a reconciliation of the amount of income tax expense (benefit) that would result from applying the statutory federal income tax rates to pre-tax income and the reported amount of income tax expense (benefit) for the years ended December 31, 2006 and 2005:

| | 2006 | 2005 |
|---|---|---|
| Tax federal statutory rates | (34.0%) | (34.0%) |
| Accrued salary | 0.2% | 0.2% |
| Accrued litigation | 0.3% | 0.0% |
| Allowance for bad debt | 0.1% | 0.0% |
| Equity compensation | 1.4% | 1.2% |
| Non deductible financing costs | 5.1% | 3.2% |
| Increase in valuation allowance | 26.9% | 29.4% |
| Income tax expense | 0.0% | 0.0% |

At December 31, 2006, the Company has provided a valuation allowance for the deferred tax assets since management has not been able to determine that the realization of that asset is more likely than not. The net change in valuation allowance for the years ended December 31, 2006 and 2005 was an increase of $20,782,000 and $4,153,000, respectively. The Company has net operating loss carryforwards of approximately $68,000,000 that begin to expire in 2019

XYIENCE, INC.
Notes To Financial Statements
For The Years Ended December 31, 2006 and 2005

NOTE 7 – COMMITMENTS AND CONTINGENCIES

Leases

On April 11, 2005, the Company leased a 5,778 square foot office/warehouse building in Las Vegas, Nevada under an operating lease agreement that expires on May 30, 2008. The lease provides for monthly lease payments of $4,487. On January 31, 2006 the Company entered into a non-cancelable operating lease agreement to lease a 20,647 square feet property. The lease agreement expires on May 31, 2011 and provides monthly lease payment of $30,971. Both operating lease payments are increasing over the term of the lease. The Company also leased office equipment under capital lease obligations.

Future minimum lease payments under non-cancelable operating leases with initial or remaining terms of one year or more are as follows:

| | Operating Leases | Capital Leases |
|---|---|---|
| Year ending December 31, | | |
| 2007 | $ 433,490 | $ 27,648 |
| 2008 | 413,077 | 27,648 |
| 2009 | 402,204 | 27,648 |
| 2010 | 414,592 | 27,648 |
| 2011 | 139,574 | 16,128 |
| | $ 1,802,937 | 126,720 |
| Less amount representing interest | | (33,070) |
| Present value of net minimum lease payments | | 93,650 |
| Less current portion | | (15,477) |
| Long-term portion | | $ 78,173 |

The Company incurred rent expense of $361,729 and $50,509 for the years ended December 31, 2006 and 2005, respectively. Amortization expense for the assets under capital leases was $8,390 for the year ended December 31, 2006. The cost of the assets under capital lease obligations was $104,734 at December 31, 2006.

Pending Litigation

*DHE/Poma v. Xyience*, Case No. 07-1399 (CC) (Puerto Rico) -civil action brought by Michael Poma and his company, DHE (collectively "Poma"), against Xyience for alleged violation of the strict statutory protection allowed distributors against impairment or termination without just cause (Law 75). Poma alleges that he signed exclusive distribution contracts with Xyience in December 2005 and again in December 2006 and that Xyience had impaired or terminated the relationship by selling directly, not processing orders, changing terms of payment and not reimbursing promotion costs, etc., in alleged violation of Law 75. Poma claims at least $4,000,000 for damages for "goodwill" and another $1,000,000 in assorted expenses (promotion/administrative costs). Poma also seeks payment for or return of a Xyience stock certificate for 12,500 shares that he and his mother, Gladys Ramirez, mysteriously --and apparently incorrectly --obtained in 2006-2007 through misrepresentations. The certificate was pledged back when executing the distribution contract --along with several other related contracts --in December 2006 as security for a new line of credit. Thus, it is currently in possession of Xyience. Xyience believes that the damages, if any, only amount to $100,000 and that Xyience has a strong defense against Poma, because Xyience defeated Poma in a separate trademark infringement case, at the preliminary injunction stage, and the court concluded that Poma had committed fraud and made misrepresentations. Xyience anticipates that Poma will eventually be charged criminally, since in the trademark infringement case it was discovered that Poma was a fugitive from Florida where he was convicted of counterfeit and fraud (mostly bounced checks). Poma also sewed time in Florida for failure to abide by his parole conditions for those crimes. An extradition proceeding was started, but to Xyience's knowledge Poma remains at large (although an arrest warrant for him is outstanding).

*Neiber/Launch Marketing Concepts, Inc. v. Xyience Incorporated*, Case No. 07 CV 0449 (California) -civil action brought by Neiber, on behalf of Launch Marketing Concepts, Inc. ("Launch Marketing") for $1.3 million. This dispute arises out of a sales brokerage contract that Xyience had with Launch Marketing, a company controlled by Tricia Weldon, which was cancelled on April 30, 2006. Weldon signed a release on behalf of Launch Marketing. In March, 2007, Ms Weldon's husband, Mark Neiber, sued Xyience, purportedly on behalf of Launch Marketing. Xyience understands that on March 12, 2007, Neiber was arrested in Las Vegas for two counts of extortion, directly related to this case. Xyience further understands that Ms. Weldon's attorney is reporting Neiber's attorney, Charles Weller, to the California Bar for filing a fraudulent complaint. On July 17, 2007, the District Court of Nevada declared Ms. Weldon to be the sole director and owner of Launch Marketing and, therefore, Xyience does not believe Neiber has standing and, accordingly, filed a motion to dismiss in California on July 2, 2007. That hearing was originally set for August 6, 2007, but the court took the motion under submission without oral argument, and has not yet issued a ruling. Xyience believes its motion to dismiss will be granted and will dispose of the entire case, since the finding by the Nevada court that Ms. Weldon is the sole director and owner of Launch Marketing makes Neiber's case against Xyience not only frivolous, but also fraudulent. In a related case before the

American Arbitration Association, the Arbitrator has disqualified Neiber and Weller from representing Launch Marketing. The Judge in San Diego has been informed of both these facts. In Las Vegas, Xyience's attorneys have met with the office of the Attorney General and the Secretary of State and they are going to take action against Neiber for forgery and filing fraudulent documents. In Clark County Court, Neiber's hearing for extortion and aggravated stalking was on the calendar for September 25, 2007, but Neiber was granted a continuance for that hearing to October 25, 2007.

*GIG Enterprises, LLC, Maurice Owens et al. v. Xyience Incorporated*, Case No. A523762 (Nevada) -GIG and Owens brought this civil action for alleged failure to tender stock and stock options based on Owens' investments in Xyience and his purported role as a Xyience employee chartered with locating investors. Additional defendants include Russell Pike and the Pike Family Trust (represented by other defense counsel). In addition to damages, Owens seeks derivative status, the appointment of a receiver, and has alleged violations of Nevada RICO statutes and securities statutes. Xyience recently moved to dismiss the derivative claim, the receiver request, one breach of contract claim, the RICO and securities allegations, and a state law tort claim alleged in the First Amended Complaint. The hearing on that motion to dismiss is scheduled for September 18, 2007. Recently, counsel for Plaintiffs was granted Leave to withdraw and Plaintiffs have not obtained new counsel. Xyience believes that these claims have no merit and that GIG and Owens are indebted to Xyience in the amount of $200,000. The Court granted Xyience's Motion to Dismiss the derivative claim, the receiver request, one breach of contract claim, the RICO and securities allegations, and the state law tort claim. The Court also recently entered an order setting a new trial date and discovery cutoff deadline. Xyience has also filed a Motion for Dispositive Sanctions, asking the Court to dismiss the Plaintiffs' remaining two claims (breach of contract and conversion) for failure to comply with the Court's Order to Compel. The Court is set to hear Xyience's dispositive motion on November 29, 2007. If the Court grants the dispositive motion, the only issues which will remain in the lawsuit are Xyience's counterclaims. Xyience will then need to determine whether it wishes to move forward with pursuing its counterclaims. This matter is still in the preliminary stages of litigation, however, and an evaluation of the likelihood of an unfavorable outcome or an estimate of the amount or range of potential loss cannot be made at this time.

*Xyience Incorporated v. Chemtrix, Inc.*, Trademark Trial and Appeal Board Opposition No. 91 175073 -Xyience has filed an opposition to the mark application filed by Chemtrix, Inc. ("Chemtrix") for the mark XENERGY in association with clothing and apparel. The Opposition proceeding is currently in the discovery phase. Xyience has propounded written discovery, but has not yet received answers or responses. Chemtrix's counsel has stated that Chemtrix will settle this Opposition provided that: (a) Chemtrix is allowed to sell-off any remaining inventory of hair care products and apparel bearing the mark XENERGY (Chemtrix reports that it has about 6 months of inventory remaining for hair care products, and a small number of tee-shirts and hats which are typically distributed

as promotional items associated with the hair care products); and (b) Chemtrix sells its pending registrations for the mark XENERGY. Xyience has entertained settlement discussion with Chemtrix's attorney. Chemtrix has offered to settle for $10,000. Xyience has countered at $5,000. Xyience has priority to the mark XENERGY and so Chemtrix has little merit to its position. Management has proposed that Xyience either (a) offer to settle at $7,500, or (b) demand that Chemtrix respond to outstanding discovery requests and see what Chemtrix does in response.

*Lamar Central Outdoor, LLC v. Xyience Incorporated*, Case No. A546045 (Nevada) -civil action brought by Lamar Central Outdoor, LLC ("Lamar") against Xyience for alleged breach of advertising contracts and breach of good faith and fair dealing related to outdoor billboard and vinyl advertising.. Plaintiff has claimed damages in excess of $10,000. This matter was recently filed and is still in the preliminary stages of litigation. Xyience filed its Answer to Lamar's Complaint.. An evaluation of the likelihood of an unfavorable outcome or an estimate of the amount or range of potential loss cannot be made at this time.

Potential Litigation

*R&R* -potential dispute over monies purportedly owed to R&R for radio advertising. If this does not settle, litigation is commenced, and R&R prevails, Xyience's damages could be at least $45,000. Xyience does not believe this is an issue, as it is paying down the $45,000.

*Evolution Brands, Inc.* -potential dispute over monies purportedly owed to Evolution Brands, Inc. ("Evolution") by Xyience for sales commissions payable to Evolution for acting as a sales agent for Xyience from May 1, 2006 to October 31, 2006. There is an outstanding balance of $15,842.50, but the parties are working this out.

*Dave Networks* - potential dispute over monies purportedly owed to DaveNetworks for website development. Xyience has agreed to pay the outstanding amount over time and this does not appear to be an issue. If this matter cannot be settled, litigation is commenced, and Dave Networks prevails, Xyience's damages could be at least $60,000.

*Public Media, LLC* -potential dispute over monies purportedly owed to Public Media, LLC., ("Public Media") by Xyience for marketing services. The alleged agreement states that Public Media shall receive 15% of gross charges levied by media for advertising placed by Pubic Media. Xyience asserts that no work was done to its knowledge and that to the extent Public Media performed any work it was not consistent with its obligations under the agreement and no monies are owed. Based on these facts, an evaluation of the likelihood of an unfavorable outcome or an estimate of the amount or range of potential loss cannot be made at this time

*Citicorp Vendor Finance* -potential dispute over monies purportedly owed to Citicorp Vendor France for software financing. The parties have agreed that Xyience will pay $20,375 per quarter until the balance of $206,000 is paid off, so this no longer appears to be an issue. Xyience is in default as of October 1, 2007 for failure to pay the $20,375 owed as of that date.

LA Stars, LLC -potential dispute over monies purportedly owed to LA Stars, LLC ("LA Stars") for sponsorship in the LA Stars' game day. LA Stars claims that $112,500 remains outstanding under al lagreement for a $150,000 sponsorship. Xyience offered to settle this dispute for $37,500 and paid LA Stars that amount. During the August 3-5, 2007 event, Xyience was given sub-par sponsorship (presumably in accordance with the discounted payment). Although no litigation has been threatened, there is still a possibility LA Stars could seek the additional monies outstanding. If this matter is pursued and cannot be settled, and LA Stars prevails, Xyience's damages could be at least $112,500.

*Jerry Mattelus* -potential dispute for copyright infringement for photographs Xyience purportedly used, but never paid for. The parties are currently discussing settlement. Discussions were for a settlement of $10,000, but Xyience has offered $6,000. If this matter cannot be settled, litigation is commenced, and Mattelus prevails, Xyience's damages could be at least $10,000.

*Federal and State Securities Laws* -the Company may have previously violated certain federal and state securities laws with respect to prior securities issuances by the Company and, as a result, may have to take certain actions in order to remedy those violations, which actions and remedies may require the Company to expend significant amounts of capital and otherwise may have a Material Adverse Effect on the Company, and there is no guaranty that the Company will be able to adequately remedy such alleged violations. Moreover, if the Company is not able to remedy such alleged violations, it would have a Material Adverse Effect on the Company.

*Crown Cork & Seal USA* -potential dispute over monies purportedly owed to Crown Cork & Seal USA ("Crown Cork") in the amount of $104,273. Xyience has agreed to pay the outstanding amount over time and this does not appear to be an issue. If this matter cannot be settled, litigation is commenced, and Crown Cork prevails, Xyience's damages could be at least $104,273.

*Howard Hughes* -potential dispute over monies purportedly owed in past due rent to Howard Hughes. Xyience has paid off all outstanding rent due (approximately $85,000) and this no longer appears to be an issue.

*Candi Jones* -potential dispute over $6,000 purportedly owed to Candi Jones, a spokesmodel, for services rendered under a spokesmodel contract. Xyience has paidoff the $6,000 due and this no longer appears to be an issue.

*Riley Judd* -potential dispute with a former employee over $71,000 in sales commissions allegedly owed and a counter-dispute over breach of confidentiality and non-compete provisions in an employment agreement, as well as trade secret misappropriation and defamation. The parties have reached a settlement of $45,000 and are currently memorializing this in a settlement agreement. Based on these facts, an evaluation of the likelihood of an unfavorable outcome or an estimate of the amount or range of potential loss cannot be made at this time

*Nathan Judd* --potential dispute with a former employee over $103,000 in sales commissions allegedly owed and a counter-dispute over breach of confidentiality and non-compete provisions in an employment agreement, as well as trade secret misappropriation and defamation. The parties have reached a settlement in the principal amount of $50,000 and are currently memorializing this in a settlement agreement. If the settlement amount is not paid, potential liability is $355,000.

*Shareholders* -potential dispute with various shareholders who claim that Xyience failed to hold its annual shareholder meeting for 2007 and seeks that Xyience hold its annual shareholder meeting prior to 2007 calendar year end. Xyience intends to comply with this request and foresees no dispute.

*Craig Orr* -potential dispute with Craig Orr ("Orr"), a party to promissory note with Nitro Supplements, a former affiliate of Russell Pike. Orr claims Xyience owes him approximately $150,000 under this note, which Xyience denies as it is not a party to this note. No legal action has been taken yet. Based on these facts, an evaluation of the likelihood of an unfavorable outcome or an estimate of the amount or range of potential loss cannot be made at this time

Pending Settlements

*XY Holdings, LLC* -potential dispute with XY Holdings, LLC ("XY") with respect an investment made by XY in the amount of USD $500,000. Xyience and XY are in the process of reaching a settlement with respect to this investment.

*Walter Taulelei* -potential dispute with Walter Taulelei ("Taulelei") with respect to an investment made by Taulelei in the amount of USD $500,000. Xyience and Taulelei are in the process of reaching a settlement with respect to this investment.

## NOTE 8 – SUBSEQUENT EVENTS

Convertible Notes

On June 21, 2007, the Company issued a convertible promissory note in the amount of $500,000. The note bears interest at 5% per annum and is payable upon demand. The note can be converted into common stock at the option the holder if the Company has a

qualified financing in excess of $10,000,000. The conversion price is the per share price offered in the qualified financing.

On October 4, 2007, the Company issued a convertible senior secured note in the amount of $12,000,000. The note bears interest at 15% per annum and is payable on October 4, 2008 or earlier if the Company raises additional capital sufficient to repay the note. The note can be converted into common stock at the option the holder if the Company has a qualified financing in excess of $12,000,000. The conversion price is the per share price offered in the qualified financing. In addition, the Company issued to the lender a warrant to purchase shares of the Company's common stock with an exercise price of $0.01 per shares. The number of shares to be purchased ranges from 10% to 60% (depending upon whether or not there has been a note breach event or a required funding default) of the Company's fully diluted shares at the time of conversion.

In connection with the issuance of $12,000,000 convertible senior secured note, certain prior note holders also signed consent agreements acknowledging the new debt and allowing the Company to issue the convertible note.

Promissory Notes

On January 10, 2007, an investor that loaned the Company a total of $3,500,000 on December 20, 2006 agreed to lend the Company another $1,500,000 under the same terms of the December 20, 2006 securities purchase agreement.

On July 1, 2007, the Company issued a promissory note in the amount of $250,000 to the Company's Chief Executive Officer. The note was due 30 days from issuance and accrued interest at 15% per annum and 18% per annum if the note is in default. The note has been repaid.

On July 1, 2007, the Company issued a promissory note in the amount of $250,000 to a director of the Company. The note was due 30 days from issuance and accrued interest at 15% per annum and 18% per annum if the note is in default. The note has been repaid.

On July 1 2007, the Company issued a promissory note in the amount of $1,000,000. The note was due 30 days from issuance and accrued interest at 15% per annum and 18% per annum if the note is in default. The note has been repaid. In connection with the issuance of $1,500,000 in promissory notes issued in July 2007, certain prior note holders also signed consent agreements acknowledging the new debt and allowing the Company to issue the promissory notes.

Conversion of Debt

On January 16, 2007 a debt holder converted $_____ of a convertible note into 500,000 shares of the Company's common stock.

Settlement Agreements

On April 13, 2007, the Company entered into a settlement agreement and release, whereby by the Company agreed to pay $1,457,070 in full satisfaction of $1,607,070 due to a vendor of the Company. The agreement calls for the Company to make an initial payment of $250,000 and then weekly payments of $60,000 increasing to $80,000 until the amount is paid in full. The Company will recognize a gain on settlement of debt of $150,000 once the Company has made all the required payments under the agreement.

On September 1, 2007, the Company entered into a settlement agreement and general release whereby the Company agreed to pay $425,000 in full satisfaction of $1,250,000 due to a vendor that provided advertising and promotion of the Company's product. The agreement calls for the Company to make various payments totaling $425,000 beginning in September 2007 and ending in February 2008. The Company will recognize a gain on settlement of debt of $825,000 once the Company has made all the required payments under the agreement.

On September 14, 2007, the Company entered into a settlement agreement and general release whereby the Company agreed to pay $450,000 in full satisfaction of $800,000 due to a vendor pursuant to a sponsorship agreement. The agreement calls for the Company to make various payments totaling $450,000 beginning in September 2007 and ending in February 2008. The Company will recognize a gain on settlement of debt of $350,000 once the Company has made all the required payments under the agreement.

On September 17, 2007, the Company entered into a settlement agreement and mutual release whereby the Company agreed to pay $300,000 plus 75,000 shares of the Company's common stock valued at $______ in full satisfaction of $2,600,000 due to a vendor pursuant to a sponsorship agreement. The agreement calls for the Company to make various payments totaling $300,000 beginning in September 2007 and ending in February 2008. The Company will recognize a gain on settlement of debt of $______ once the Company has made all the required payments under the agreement and issued the 75,000 shares of common stock.

On September 19, 2007, the Company entered into a settlement agreement and general release whereby the Company agreed to pay $4,000,000 in full satisfaction of $10,692,878 due to a vendor pursuant to an advertising agreement. The agreement calls for the Company to make various payments totaling $4,000,000 beginning in October 2007 and ending in June 2008. The Company will recognize a gain on settlement of debt of $6,692,878 once the Company has made all the required payments under the agreement.

Stock Restriction Agreement

On May 1, 2007, Russell Pike who holds 3,238,482 shares of the Company's common stock agreed to sell such shares back to the Company upon the occurrence of a Buy-Out Event. The price per shares will be the fair market value of the Company's common stock at the date of buy-out. In addition, Mr. Pike may not transfer his shares, in whole or in part, without prior written consent of the Company.

**XYIENCE, INC.**
**Notes To Financial Statements**
**For The Years Ended December 31, 2006 and 2005**

Options and Warrants

In addition to the warrants issued with the October 4, 2007 convertible senior secured note, subsequent to December 31, 2007, the Company issued at total of _____ options and warrants to purchase shares of the Company's common stock to employees, board members, consultants, investors for additional loan consideration and as part of settlements. The exercise prices range from $___ to $____.

Abandonment of Office Lease and New Lease

In November 2007, the Company abandoned its office lease for 20,647 square feet that expires on May 31, 2011. The Company is currently attempting to find a tenant to sub-lease the property, but remains liable for the lease payments through the term of the lease.

On November 1, 2007, the Company entered into a new one year lease for corporate office space with monthly payments of $5,175.

Sponsorship Agreements

Subsequent to December 31, 2006, the Company has entered into four sponsorship agreement that require sponsorship fees to be paid of approximately $140,000,000 at various times from 2007 to 2011.

Restructuring of Company

On November 28, 2007, the Company reduced its workforce from 84 employees to 47 employees. Of this reduction 35 were sales employees located across the U.S. and the other 2 employees were in Marketing. The Company took this action in order to reduce costs as sales were falling below estimated targets.

**Exhibit A**

**Warrant**

[Attached]

Xyience Inc.
Bank Account Listing
Through 10/1/07

Wells Fargo Bank
4425 W. Russell Road
Las Vegas, NV 89126

| Account Name | Account Number | Formed |
|---|---|---|
| Active | | |
| General 1 | 747-6769613 | Jun-04 |
| Merchant | 747-6760207 | Aug-04 |
| Debit Account | 665-5429998 | Aug-06 |
| Expense Payment | 665-5430004 | Aug-06 |
| Payroll | 222-0536003 | Mar-05 |
| General 2 | 906-5846799 | Apr-05 |
| Canada Account | 512-7270782 | May-07 |
| Factoring Deposit | 278-2157874 | Aug-07 |
| Factoring Checking | 278-2167775 | Aug-07 |
| Frank Deposit account | 510-2592663 | Sep-07 |
| Sanford Deposit account | 510-2692671 | Sep-07 |
| No Activity | | |
| New Merchant | 665-5429972 | Aug-06 |
| New Payroll | 665-5429964 | Aug-06 |
| Training Center | 390-3439598 | Sep-06 |
| Apparel | 390-3439606 | Sep-06 |
| Advertising | 390-3439663 | Sep-06 |
| Beverage | 390-3439655 | Sep-06 |
| Supplements | 390-3439648 | Sep-06 |
| Bars & Snacks | 390-3439614 | Sep-06 |

[REMAINDER LEFT BLANK – SIGNATURE PAGE FOLLOWS]

XYIENCE INCORPORATED

By: ____________________

Michael Levy

CEO

# Stock Broker Agreement

Parties: Xyience Corporation, a Nevada Corporation hereinafter known as "The Corporation" and Migron Corporation, a Florida Corporation hereinafter known as "The Broker."

The Corporation agrees to pay The Broker a finder's fee hereinafter known as "The Fee" for placement of any stock of Xyience Inc. hereinafter known as "The Stock," with individual investors or institutions hereinafter know as "Investors" as follows:

1) A sign on bonus of one hundred and seventy seven thousand dollars ($177,000.00) to be paid to the broker in three installments of fifty nine thousand dollars ($59,000.00) each: The first installment to be paid upon the signing of the Agreement, the second installment to be paid on April 15, 2007 and the third installment to be paid on May 15, 2007 and twenty seven thousand five hundred twenty four (27,524) shares of the stock.

2) A two thousand dollar ($2,000.00) salary per week.

3) The Fee shall be 10% to The Broker when shares are placed directly with Investors by the Broker. The Fee to The Broker shall be 5% cash and 5% in shares of The Stock at the price per share of The Stock paid by the Investor (i.e. the investor purchases $100,000.00 of The Stock at $5 per share, the Fee will be $5,000.00 and 1,000 shares of The Stock).

Where a third party that is introduced and receives a finders fee or commission of 5% for placement of The Stock with an Investor, The Fee to The Broker shall be 7.5%; 3.75% cash and 3.75% in shares of The Stock at the price per share of The Stock paid by the Investor (i.e. the Investor purchases $100,000.00 of The Stock at $5 per share, the Fee will be $3,750.00 and 750 shares of The Stock).

Where a third party that is introduced receives a finders fee or commission of 10% for placement of The Stock with an Investor, The Fee to The Broker shall be 5%; 2.5% cash and 2.5% in shares of The Stock at the price per share paid by the Investor (i.e. the Investor purchases $100,000.00 of The Stock at $5 per share, the commission will be $2,500.00 and 500 shares of The Stock).

The same Fee shall be paid for any Note or Debt, hereinafter known as "The Debt," placed by The Broker for The Corporation. In configuring The Stock portion of the Fee on The Debt placement, a price of $4 per share of The Stock shall be used.

The Fee on The Stock shall be paid to The Broker upon receipt of payment of The Corporation for The Stock placed by The Broker. The commission on The Debt will be paid on the date when the Debt is converted into The Stock.

The Broker shall be reimbursed for all reasonable expenses incurred in procuring investors for The Corporation. This reimbursement shall be paid by the Corporation to The Broker by The Corporation with in one week of The Corporation's receipt of an invoice from The Broker.

This agreement includes all individuals, agents and affiliates introduced to The Corporation by The Broker or Ronald Solomon and individuals, agents and affiliates introduced by them, etc.

*The terms of this agreement may be altered only by an agreement in writing by both parties. This* agreement transcends all previous stock brokerage agreements between the parties.

Agreed on this date March 1, 2007 in the State of Nevada

William Underhill, Chief Executive Officer of Xyience Inc., The Corporation

Ronald Solomon for Miguel Durand, President of Migron Corporation, The Broker

# Broker Agreement

October 16, 2006

Parties: Xyience Inc., a Nevada Corporation, with a principal address of 10650 West Charleston Blvd. #110, Las Vegas, NV 89135 and Patricia Weldon, an individual or her assignees, with a principal business address of 9811 West Charleston Blvd. #2155, Las Vegas, NV 89117.

Weldon will receive $5,000.00 per month and a ¼% commission of all sales generated from sales of all Xyience products to supermarket and drug store chains hereinafter known as "Customers" listed in Exhibit A.

This compensation as well as all reasonable expenses incurred by Weldon will be remitted to Weldon upon receipt of payment by Xyience Inc. from the Customers on the tenth day of each month.

This Agreement will have a term of two years and may only be terminated with the mutual consent in writing of both parties.

Agreed,

Russell Pike as CEO

Russell Pike CEO, Xyience Inc.

Patricia Weldon

Patricia Weldon

**XYIENCE, Incorporate**

**10650 West Charleston Blvd**

**Suite 110**

**Las Vegas, NV 89135**

October 5, 2007

**VIA ELECTRONIC MAIL** (ronaldsol@msn.com)
Mr. Ronald Solomon
Migron Corporation

Re: ***Xyience Incorporated – Request for Stockholder Meeting***

Dear Mr. Solomon:

We are in receipt of your October 2, 2007 email to the Board of Directors of Xyience Incorporated, a Nevada corporation (the "**Company**"), in which you requested that the Company call a special meeting of stockholders. We are also in receipt of the proxies from stockholders of the Company (the "**Proxies**"), on whose behalf you have made the request for the special meeting.

We are writing to inform you that the Company has reviewed the Proxies and has determined that they do not represent more than 25% of the shares of the Company's stock entitled to vote at the meeting, for the reasons specified below. Accordingly, we are unable to honor your request at this time.

As you are aware, Section 2.b of the Company's Bylaws provides, among other things, that special meetings of the stockholders "*shall be called by the President at the request of the holders of not less than twenty-five percent (25%) of all outstanding stock of the Corporation entitled to vote as such meeting . . .*" (the "**25% Requirement**"). Although the Proxies, on their face, appear to meet the 25% Requirement, stockholders Russell Pike, Jennifer Pike, William Pike, Jr., and Michael Clark (collectively, the "**Voting Agreement Parties**") are parties to a certain Voting Agreement, dated September 27, 2007, with the Company, pursuant to which they agreed to abstain and refrain from voting their shares, *including by proxy*, for the period of time set forth in the Voting Agreement. As such, the shares held by the Voting Agreement Parties would not be entitled to vote at the special meeting and therefore cannot be counted towards the 25% Requirement. Without the shares of the Voting Agreement Parties, the Proxies do not satisfy the 25% Requirement.

We appreciate your concern and assure you that the Board of Directors intends to set a record date for an annual meeting of the stockholders in the coming weeks, and intends to hold the meeting before the end of the year, in full compliance with Nevada law. We look forward to hearing and addressing your concerns at that time.

We also wish to reiterate that neither you nor your firm have been engaged, and we are not interested in engaging you or your firm, at this time to undertake capital raising efforts on behalf of the Company. We have made this decision for a variety of reasons, including certain matters related to you prior capital raising efforts, and the fact that we could not locate you or your firm on FINRA's list of licensed broker-dealers which, as you know, could expose the Company to substantial liability. Accordingly, we require that you immediately cease any and all activities, whether or not related to the raising of capital, purportedly undertaken by you or your firm on behalf of the Company.

Sincerely,

Adam Frank

President
Xyience Incorporated

substituted by notice given as herein provided. The giving of any notice required hereunder may be waived in writing by the party entitled to receive such notice. Failure or delay in delivering copies of any notice, demand, request, consent, approval, declaration or other communication to any Person (other than the Company or the Holder) designated below to receive copies shall in no way adversely affect the effectiveness of such notice, demand, request, consent, approval, declaration or other communication.

(a) If to the Purchaser, at:

ZYEN, LLC
c/o Fertitta Enterprises, Inc.
2960 West Sahara Avenue, Suite 200
Attention: Mr. William Bullard
Secretary
Facsimile: (702) 362-5889

With copies to:

Milbank, Tweed, Hadley & McCloy LLP
Attention: Kenneth J. Baronsky, Esq.
601 South Figueroa Street, 30th Floor
Los Angeles, California 90017
Facsimile: (213) 892-4733

(b) If to the Company, at:

Xyience Incorporated.
10650 West Charleston Boulevard
Suite 110
Las Vegas, NV 89135
Attention: Chief Executive Officer
Telecopy No.: [__________]

With copies to:

Eisner & Frank
9601 Wilshire Blvd.
Suite 700
Beverly Hills, CA 90210
Attention: Michael Eisner
Telecopy No.: 310.855.3200

**Migron Xylence Stock Commission Balance Sheet 7/02/2007**

| Date | Investor | Amount Inv. | Stock Price | Stock Commission | |
|---|---|---|---|---|---|
| 2/17/2006 | Boyer | $100,000 | $2 | 2,500 shrs. | Paid |
| 2/27/2006 | Kempisty | $50,000 | $2 | 1,250 shrs. | Paid |
| 3/1/2006 | Heiden | $100,000 | $2 | 2,500 shrs. | Paid |
| 3/6/2006 | Hardy | $50,000 | $2 | 1,250 shrs. | Paid |
| 3/14/2006 | Moss | $50,000 | $2 | 1,250 shrs. | Paid |
| 3/14/2006 | Oudin | $50,000 | $2 | 1,250 shrs. | Paid |
| 3/14/2006 | O'Mealia | $50,000 | $2 | 1,250 shrs. | Paid |
| 3/21/2006 | Rauch | $50,000 | $2 | 1,250 shrs. | Paid |
| 3/24/2006 | Hardy | $50,000 | $2 | 1,250 shrs. | Paid |
| 3/24/2006 | Boyer | $50,000 | $2 | 1,250 shrs. | Paid |
| 3/29/2006 | Reynolds | $50,000 | $2 | 1,250 shrs. | Paid |
| 4/7/2006 | Haswll/Pck | $50,000 | $2 | 1,250 shrs. | Paid |
| 4/10/2006 | Johnson | $50,000 | $2 | 1,250 shrs. | Paid |
| 8/9/2006 | Rineberg | $50,000 | $4 | 625 shrs. | Owed |
| 9/6/2006 | Militello | $50,000 | $4 | 625 shrs. | Owed |
| 9/20/2006 | R. Guariello | $50,000 | $4 | 625 shrs. | Owed |
| 10/2/2006 | H. Guariello | $50,000 | $4 | 625 shrs. | Owed |
| 10/12/2006 | Feuer | $50,000 | $4 | 625 shrs. | Owed |
| 10/13/2006 | Swanson | $100,000 | $4 | 625 shrs. | Owed |
| 10/15/2006 | Spector | $50,000 | Note | Shrs. & $2,500 payable on convesion 10/15/2007 | |
| 10/17/2006 | Guariello Pr | $50,000 | $4 | 625 shrs. | Owed |
| 10/23/2006 | Feuer | $15,000 | $4 | 625 shrs. | Owed |
| 11/27/2006 | Pointe Cap. | $1,325,000 | $5 | 6,625 shrs. | Owed |
| 12/4/2006 | Pointe Cap. | $700,000 | $5 | 3,500 shrs. | Owed |
| 12/8/2006 | Pointe Cap. | $900,000 | $5 | 4,500 shrs. | Owed |
| 12/26/2006 | Pointe Cap. | $525,000 | $5 | 2,625 shrs. | Owed |
| 1/7/2007 | Pointe Cap. | $550,000 | $5 | 2,750 shrs. | Owed |
| 2/6/2007 | Pointe Cap. | $400,000 | $5 | 2,000 shrs. | Owed |
| 2/16/2007 | Pointe Cap | $275,000 | $5 | 1,375 shrs. | Owed |
| 3/19/2007 | Pointe Cap. | $375,000 | $5 | 1,875 shrs. | Owed |
| 5/14/2007 | Pointe Cap. | $225,000 | $5 | 1,125 shrs | Owed |
| | | | Total | 31,375 shrs | Owed |

**Migron Xylence Cash Balance Sheet 6/08/2007**

| Date | Con. Fee | Comm. | Subscr. Amt & Investor | Payments | Balance |
|---|---|---|---|---|---|
| 2/17/2006 | | $5,000.00 | 100K Boyer | $5,000 | $0.00 |
| 2/24/2006 | $2,000.00 | | | | $2,000.00 |
| 2/27 | | $2,500.00 | 50K Kempisty | | $4,500.00 |
| 3/1/2006 | | $5,000.00 | 100K Heiden | | $9,500.00 |
| 3/3/2006 | $2,000.00 | | | | $11,500.00 |
| 3/6/2006 | | $2,500.00 | 50K Hardy | | $14,000.00 |
| 3/6/2006 | | | | $2,500.00 | $11,500.00 |
| 3/10/2006 | $2,000.00 | | | | $13,500.00 |
| 3/13/2006 | | | | $1,000.00 | $12,500.00 |
| 3/14/2006 | | $2,500.00 | 50K Moss | | $15,000.00 |
| 3/14/2006 | | $2,500.00 | 50K Oudin | | $17,500.00 |
| 3/14/2006 | | $2,500.00 | 50K O'Mealia | | $20,000.00 |
| 3/14/2006 | | | | $9,000.00 | $11,000.00 |
| 3/17/2006 | $2,000.00 | | | | $13,000.00 |
| 3/20/2006 | | | | $2,500.00 | $10,500.00 |
| 3/21/2006 | | $2,500.00 | 50K Rauch | | $13,000.00 |
| 3/24/2006 | $2,000.00 | | | | $15,000.00 |
| 3/24/2006 | | $2,500.00 | 50K Hardy | | $17,500.00 |
| 3/24/2006 | | $2,500.00 | 50K Boyer | | $20,000.00 |
| 3/28/2006 | | | | $500.00 | $19,500.00 |
| 3/29/2006 | | $2,500.00 | 50K Reynolds | | $22,000.00 |
| 3/29/2006 | | | | $12,100.00 | $9,900.00 |
| 3/31/2006 | $2,000.00 | | | | $11,900.00 |
| 4/3/2006 | | | | $2,500.00 | $9,400.00 |
| 4/7/2006 | $2,000.00 | | | | $11,400.00 |
| 4/7/2006 | | $2,500.00 | 50K Haswell/Peck | | $13,900.00 |
| 4/7/2006 | | | | $3,000.00 | $10,900.00 |
| 4/10/2006 | | $2,500.00 | 50K Johnson | | $13,400.00 |
| 4/14/2006 | $2,000.00 | | | | $15,400.00 |
| 4/21/2006 | $2,000.00 | | | | $17,400.00 |
| 4/25/2006 | | | | $2,500.00 | $14,900.00 |
| 4/28/2006 | $2,000.00 | | | | $16,900.00 |
| 4/28/2006 | | | | $3,000.00 | $13,900.00 |
| 5/1/2006 | | | | $500.00 | $13,400.00 |

| | | | | |
|---|---|---|---|---|
| 3/9/2007 | $5,500.00 | | | $268,336 |
| 3/16/2007 | $5,500.00 | | | $273,836 |
| 3/19/2007 | | $9,375.00 $375K Pointe | | $283,211 |
| 3/23/2007 | $5,500.00 | | | $288,711 |
| 3/30/2007 | $5,500.00 | | | $294,211 |
| 3/30/2007 | $1,609.79 invoice | | | $295,371 |
| 4/4/2007 | $88.65 invoices 12/6-12/20/06 | | | $295,457 |
| 4/6/2007 | $5,500.00 | | | $300,957 |
| 4/13/2007 | $5,500.00 | | | $306,457 |
| 4/20/2007 | $5,500.00 | | | $311,957 |
| 4/27/2007 | $5,500.00 | | | $317,457 |
| 5/4/2007 | $5,500.00 | | | $322,957 |
| 5/11/2007 | $5,500.00 | | | $328,457 |
| 5/14/2007 | | $5,625.00 $225K Pointe | | $334,082 |
| 5/18/2007 | $5,500.00 | | | $339,582 |
| 5/25/2007 | $5,500.00 | | | $345,082 |
| 6/1/2007 | $5,500.00 | | | $350,582 |
| 6/8/2007 | $5,500.00 | | | $356,082 |
| 6/8/2007 | | | $5,000.00 | $351,082 |

| | | | | |
|---|---|---|---|---|
| 10/6/2006 | $5,500.00 | | | |
| 10/13/2006 | $5,500.00 | | | $79,900 |
| 10/20/2006 | $5,500.00 | | | $85,400.00 |
| 10/27/2006 | $5,500.00 | | | $90,900.00 |
| 11/3/2006 | $5,500.00 | | | $96,400.00 |
| 11/3/2006 | | | | $101,900 |
| 11/8/2006 | | | $5,500.00 | $96,400 |
| 11/10/2006 | $5,500.00 | | $22,000.00 | $74,400 |
| 11/10/2006 | $11,312.50 loan | | | $79,900 |
| 11/17/2006 | $5,500.00 | | | $91,212.50 |
| 11/22/2006 | | | | $96,712.50 |
| 11/24/2006 | $5,500.00 | | $22,312.50 | $74,400.00 |
| 11/27/2006 | | $33,125.00 $1.325M Pointe | | $79,900.00 |
| 12/1/2006 | $5,500.00 | | | $113,025 |
| 12/4/2006 | | $17,500.00 $700K Pointe | | $118,525 |
| 12/8/2006 | | $22,500.00 $900K Pointe | | $136,025 |
| 12/8/2006 | | | | $158,525 |
| 12/8/2006 | $5,500.00 | | $16,500.00 | $142,025 |
| 12/15/2006 | $5,500.00 | | | $147,525 |
| 12/22/2006 | $5,500.00 | | | $153,025 |
| 12/26/2006 | | $13,125.00 $525K Pointe | | $158,525 |
| 12/29/2006 | $5,500.00 | | | $171,650 |
| 1/5/2007 | $5,500.00 | | | $177,150 |
| 1/7/2007 | $5,500.00 | | | $182,650 |
| 1/12/2007 | $5,500.00 | | | $188,150 |
| 1/19/2007 | $5,500.00 | | | $193,650 |
| 1/26/2007 | $5,500.00 | | | $199,150 |
| 2/2/2007 | $5,500.00 | | | $204,650 |
| 2/6/2007 | | $10,000 $400K Pointe | | $210,150 |
| 2/9/2007 | $5,500.00 | | | $220,150 |
| 2/12/2007 | $13,810.74 invoices | | | $225,650 |
| | 1/22-2/12/07 | | | |
| 2/16/2007 | | $6,875.00 $275K Pointe | | $239,481 |
| 2/16/2007 | $5,500.00 | | | $246,336 |
| 2/23/2007 | $5,500.00 | | | $251,836 |
| 3/2/2007 | $5,500.00 | | | $257,336 |
| | | | | $262,836 |

| | | | |
|---|---|---|---|
| 5/4/2006 | | $1,000.00 | $12,400.00 |
| 5/5/2006 | $2,000.00 | | $14,400.00 |
| 5/5/2006 | | $1,000.00 | $13,400.00 |
| 5/8/2006 | | $2,500.00 | $9,900.00 |
| 5/11/2006 | | $8,000.00 | $3,900.00 |
| 5/12/2006 | $2,000.00 | | $5,900.00 |
| 5/18/2006 | | $2,000.00 | $3,900.00 |
| 5/19/2006 | $2,000.00 | | $5,900.00 |
| 5/26/2006 | $2,000.00 | | $7,900.00 |
| 5/26/2006 | | $2,000.00 | $5,900.00 |
| 5/30/2006 | $25,000.00 | | $30,900.00 |
| 5/30/2006 | | $25,000.00 | $5,900.00 |
| 6/2/2006 | $5,500.00 | | $11,400.00 |
| 6/5/2006 | | $5,500.00 | $5,900.00 |
| 6/9/2006 | $5,500.00 | | $11,400.00 |
| 6/9/2006 | | $5,500.00 | $5,900.00 |
| 6/16/2006 | $5,500.00 | | $11,400.00 |
| 6/19/2006 | | $5,500.00 | $5,900.00 |
| 6/23/2006 | $5,500.00 | | $11,400.00 |
| 6/30/2006 | $5,500.00 | $5,500.00 | $16,900.00 |
| 6/30/2006 | | $4,000.00 | $12,900.00 |
| 7/7/2006 | $5,500.00 | | $18,400.00 |
| 7/14/2006 | $5,500.00 | | $23,900.00 |
| 7/21/2006 | $5,500.00 | | $29,400.00 |
| 7/28/2006 | $5,500.00 | | $34,900.00 |
| 8/4/2006 | $5,500.00 | | $40,400.00 |
| 8/11/2006 | $5,500.00 | | $45,900.00 |
| 8/16/2006 | | $6,000.00 | $39,900.00 |
| 8/18/2006 | | | $45,400.00 |
| 8/25/2006 | $5,500.00 | | $50,900.00 |
| 8/25/2006 | | $2,000.00 | $48,900.00 |
| 9/1/2006 | $5,500.00 | | $54,900.00 |
| 9/8/2006 | $5,500.00 | | $59,900.00 |
| 9/8/2006 | | $2,000.00 | $57,900.00 |
| 9/15/2006 | $5,500.00 | | $63,400.00 |
| 9/22/2006 | $5,500.00 | | $68,900.00 |
| 9/29/2006 | $5,500.00 | | $74,400.00 |

# XYIENCE

## BROKERS / ACCOUNTS

| BROKER | GEOGRAPHY | ACCOUNTS |
|---|---|---|
| KKM | New England | CVS<br>Brooks<br>Stop & Shop<br>Hannaford Bros.<br>BJ's |
| Performance Sales | New York, Njersey | A&P<br>Pathmark<br>Duane Reade<br>Community Dist<br>Harmons<br>Kinney Drug<br>Wegemans<br>Giant Carlisle<br>Giant Eagle |
| Rich Heiser | | Hy Vee<br>Fruth |
| Prestidge SE | Southeast | Kerr Drug<br>Harris Teeter<br>Bi Lo<br>Ingles<br>Brunos<br>Publix<br>Winn Dixie |
| MGR | Michigan/Ohio | Cardinal Health<br>Marcs<br>Meijer<br>Discount Drug Mart<br>Big Lots |
| Hansen Stahl | Wisconsin | Shopko<br>Roundys<br>Super Valu<br>Snyders |
| BMG | | Kmart |
| Torcasio Sales | Southwest | HEB<br>Brookshire Bros. |
| Feldkamp Marketing | Kroger National | Kroger Divisions |

## XYIENCE

### BROKERS / ACCOUNTS

| | | |
|---|---|---|
| CMI | California | Longs |
| | | Safeway |
| | | Raleys |
| | | Save Mart |
| | | Stater Bros |

| | | | | | |
|---|---|---|---|---|---|
| 403 | Jeffrey L. Hurley | 09-Feb-07 | Private | (560) | (560) |
| 404 | Sandra Clarke Marriott | 09-Feb-07 | Private | (12,500) | (12,500) |
| 405 | Douglas Grant Marriott | 09-Feb-07 | Private | (12,500) | (12,500) |
| 406 | Bartholmew Donovan & Patricia Dey | 09-Feb-07 | Private | (25,000) | (25,000) |
| 408 | Jeffrey Tomasulo | 07-Mar-07 | Private | (8,000) | (8,000) |
| 409 | Fairway Holdings | 07-Mar-07 | Private | (25,000) | (25,000) |
| 410 | Conway Schatz | 07-Mar-07 | Private | (27,500) | (27,500) |
| 411 | Glen C Allen | 07-Mar-07 | Private | (12,500) | (12,500) |
| 412 | Maria Saavedera | 07-Mar-07 | Private | (5,000) | (5,000) |
| 413 | The Suarez Family Trust | 07-Mar-07 | Private | (21,000) | (21,000) |
| 414 | Berta Suarez | 07-Mar-07 | Private | (6,000) | (6,000) |
| 415 | Gilbert Saavedera | 07-Mar-07 | Private | (6,000) | (6,000) |
| 416 | Doug Chang | 07-Mar-07 | Private | (3,500) | (3,500) |
| 417 | Endalkachew Mersha | 07-Mar-07 | Private | (3,500) | (3,500) |
| 418 | Tamako Nelson | 07-Mar-07 | Private | (12,500) | (12,500) |
| 419 | RVS Ventures, Inc | 07-Mar-07 | Private | (250,000) | (250,000) |
| 430 | Paul J Bertuccini Trust | 26-Mar-07 | Private | (102,500) | (102,500) |
| 431 | The John Bertuccini Trust | 26-Mar-07 | Private | (127,500) | (127,500) |
| 432 | The Paul Dino Bertuccini Family Trust | 26-Mar-07 | Private | (127,500) | (127,500) |
| 445 | Dr John Bertuccini | 13-Apr-07 | Private | (13,750) | (13,750) |
| 451 | William B. Pike Jr. | 16-Apr-07 | Private | (1,500,000) | (1,500,000) |
| 452 | Robert Fulwider | 20-Apr-07 | Private | (12,500) | (12,500) |
| 453 | Direct Cash, Inc | 20-Apr-07 | Private | (16,666) | (16,666) |
| 455 | The Koehler Family Trust | 20-Apr-07 | Private | (15,000) | (15,000) |
| 456 | Troy Gartrell | 20-Apr-07 | Private | (10,500) | (10,500) |
| 528 | All of US LLC | 20-Apr-07 | Private | (12,000) | (12,000) |
| 463 | Tamako Nelson | 09-May-07 | Private | (42,500) | (42,500) |
| 471 | Energy Drink Investor, LLC | 16-May-07 | Private | (23,000) | (23,000) |
| 473 | Gilberto Saavedra | 22-May-07 | Private | (2,727) | (2,727) |
| 474 | Maria Saavedra | 22-May-07 | Private | (3,727) | (3,727) |
| 476 | Doug Chang | 22-May-07 | Private | (1,591) | (1,591) |
| 477 | [redacted] | 31-May-07 | Private | (5,818) | (5,818) |
| 481 | Jeffrey Bryant Gilkeson | 31-May-07 | Private | (13,750) | (13,750) |
| 482 | Alan & Jennifer Jeskey | 31-May-07 | Private | (12,500) | (12,500) |
| 483 | DTMS Investments Inc. | 31-May-07 | Private | (1,785) | (1,785) |
| 484 | Adam Hathcock 2006 Trust | 31-May-07 | Private | (12,500) | (12,500) |
| 475 | Endalkachew Mersha | 11-Jun-07 | Private | (1,591) | (1,591) |
| 480 | D & J Gilmartin 2003 trust | 11-Jun-07 | Private | (20,000) | (20,000) |
| 472 | Dr Gilberto & Barbara Suarez | 19-Jun-07 | Private | (9,545) | (9,545) |
| 488 | Dr Gilberto & Barbara Suarez | 19-Jun-07 | Private | (45,000) | (45,000) |
| 490 | Bertha Suarez | 20-Jun-07 | Private | (2,727) | (2,727) |
| 491 | Gilbert Saavedra | 20-Jun-07 | Private | (363) | (363) |
| 501 | Berkeley Partners, LLC | 09-Jul-07 | Private | (75,000) | (75,000) |
| 503 | David Kasubowski | 10-Jul-07 | Private | (4,625) | (4,625) |
| 511 | Tamako Nelson | 27-Jul-07 | Private | (25,000) | (25,000) |
| 512 | Berkeley Partners, LLC | 27-Jul-07 | Private | (50,000) | (50,000) |
| 513 | Rebecca Natrajan | 02-Aug-07 | Private | (14,286) | (14,286) |
| 525 | DTMS Investments Inc. | 14-Aug-07 | Private | (1,000) | (1,000) |
| 526 | DTMS Investments Inc. | 14-Aug-07 | Private | (1,166) | (1,166) |
| 527 | Nevada Land Advisors & Investments Inc | 14-Aug-07 | Private | (2,500) | (2,500) |
| 529 | All of US LLC | 14-Aug-07 | Private | (8,000) | (8,000) |
| 530 | Sports & Ent Media | 14-Aug-07 | Private | (87,500) | (87,500) |
| 531 | Berkeley Partners, LLC | 15-Aug-07 | Private | (50,000) | (50,000) |
| 532 | ARMR, LLC | 15-Aug-07 | Private | (10,417) | (10,417) |
| 533 | RVS Ventures, Inc | 15-Aug-07 | Private | (400,000) | (400,000) |
| 536 | William B. Pike Jr. | 10-Sep-07 | Private | (1,000,000) | (1,000,000) |
| **Total Shares Sold** | | | | - (9,390,302) | - (9,390,302) |
| **Share Balance, Pre Settlement Agreement** | | | | | 5,054,698 |

| Cert Number | Issued To | Share Issue Date | Consideration Type | New Issue | Shares Sold | Shares Acquired | Share Balance |
|---|---|---|---|---|---|---|---|
| **Shares Acquired** | | | | | | | |
| 2 | Russell and Jennifer Pike | 24-May-04 | Founder Shares | 3,000,000 | - | - | 3,000,000 |
| 3 | Russell and Jennifer Pike | 24-May-04 | Founder Shares | 3,500,000 | - | - | 3,500,000 |
| 10 | Russell and Jennifer Pike | 30-Oct-04 | Founder Shares | 4,500,000 | - | - | 4,500,000 |
| 429 | Russell and Jennifer Pike | 23-Mar-07 | Cash | 140,000 | - | - | 140,000 |
| 11 | Russell and Jennifer Pike | 26-Apr-06 | Private | - | | 3,300,000 | 3,300,000 |
| | Russell and Jennifer Pike | 20-Mar-07 | Private | - | - | 5,000 | 5,000 |
| **Total Shares Acquired** | | | | **11,140,000** | **-** | **3,305,000** | **14,445,000** |
| **Shares Sold** | | | | | | | |
| 199 | Talor Zamir | 24-May-06 | Private | | (6,250) | | (6,250) |
| 208 | LJG Asset Management | 12-Jun-06 | Private | | (25,000) | | (25,000) |
| 212 | Billy Chu | 27-Jun-06 | Private | | (110,000) | | (110,000) |
| 213 | Paul A. Walbrun | 27-Jun-06 | Private | | (25,000) | | (25,000) |
| 223 | Gary Northan | 03-Aug-06 | Private | | (258,000) | | (258,000) |
| 227 | Thomas A Curti P.C | 08-Aug-06 | Private | | (5,000) | | (5,000) |
| 228 | Gregory R. Seifert Profit Sharing Plan | 08-Aug-06 | Private | | (5,000) | | (5,000) |
| 229 | Thomas & Lois Curti | 08-Aug-06 | Private | | (5,000) | | (5,000) |
| 230 | Joan & Anthony Myers | 08-Aug-06 | Private | | (5,000) | | (5,000) |
| 231 | Bret & Lavelle Johnson | 08-Aug-06 | Private | | (5,000) | | (5,000) |
| 232 | Bruce & Sheri Vincents | 08-Aug-06 | Private | | (4,000) | | (4,000) |
| 233 | Sharon Seifert | 08-Aug-06 | Private | | (6,000) | | (6,000) |
| 234 | Scott Gagliano | 23-Aug-06 | Private | | (12,500) | | (12,500) |
| 235 | David Lawenda | 23-Aug-06 | Private | | (200,000) | | (200,000) |
| 269 | Gregory R. Seifert | 26-Sep-06 | Private | | (5,000) | | (5,000) |
| 270 | Paul Walbrun | 26-Sep-06 | Private | | (25,000) | | (25,000) |
| 275 | Vince Militello | 04-Oct-06 | Private | | (12,500) | | (12,500) |
| 276 | Robert Guariello | 04-Oct-06 | Private | | (12,500) | | (12,500) |
| 278 | Henry Guarrillo | 04-Oct-06 | Private | | (12,500) | | (12,500) |
| 274 | Steve Irwin | 12-Oct-06 | Private | | (10,000) | | (10,000) |
| 279 | Jeffrey A. Feuer | 18-Oct-06 | Private | | (12,500) | | (12,500) |
| 280 | Trygve M. Thoresen | 20-Oct-06 | Private | | (12,500) | | (12,500) |
| 281 | Paul Walbrun | 20-Oct-06 | Private | | (20,000) | | (20,000) |
| 286 | Chester Jacobs &/or Kim Jacobs | 26-Oct-06 | Private | | (28,572) | | (28,572) |
| 287 | Karim Maskatiya | 02-Nov-06 | Private | | (3,333,334) | | (3,333,334) |
| 288 | Kirk Sanford | 03-Nov-06 | Private | | (40,000) | | (40,000) |
| 289 | Daniel Allon Lee Watson | 06-Nov-06 | Private | | (2,500) | | (2,500) |
| 290 | Jeffrey A. Feuer | 06-Nov-06 | Private | | (3,750) | | (3,750) |
| 291 | David Gary Swanson | 06-Nov-06 | Private | | (25,000) | | (25,000) |
| 292 | Dave Rineberg | 06-Nov-06 | Private | | (12,500) | | (12,500) |
| 293 | Guarriello-Meyer Partnership | 06-Nov-06 | Private | | (12,500) | | (12,500) |
| 298 | W.R. Underhill Family, LLC | 17-Nov-06 | Private | | (20,000) | | (20,000) |
| 299 | Paul Dino Bertuccini Family Trust | 17-Nov-06 | Private | | (83,334) | | (83,334) |
| 300 | John Bertuccini Trust | 17-Nov-06 | Private | | (33,334) | | (33,334) |
| 301 | Jamie & / or Valerie Barker | 20-Nov-06 | Private | | (70,000) | | (70,000) |
| 303 | Kyoung Hwa Lee | 27-Nov-06 | Private | | (10,000) | | (10,000) |
| 304 | Paul J. Bertuccini Family Trust | 29-Nov-06 | Private | | (33,334) | | (33,334) |
| 316 | Ron Schmit | 15-Dec-06 | Private | | (15,000) | | (15,000) |
| 323 | Patricia Barrera | 19-Dec-06 | Private | | (3,000) | | (3,000) |
| 324 | Thomas J. Nieva &/or Nancy E. Nieva | 04-Jan-07 | Private | | (2,500) | | (2,500) |
| 325 | Janine Hamilton | 04-Jan-07 | Private | | (12,400) | | (12,400) |
| 326 | Devin Keays | 04-Jan-07 | Private | | (3,000) | | (3,000) |
| 327 | Richard Quinonez | 04-Jan-07 | Private | | (9,000) | | (9,000) |
| 331 | Berkeley Partners, LLC | 04-Jan-07 | Private | | (250,000) | | (250,000) |
| 332 | RVS Ventures, Inc | 04-Jan-07 | Private | | (125,000) | | (125,000) |
| 333 | Dr. Edward Barrera | 04-Jan-07 | Private | | (4,000) | | (4,000) |
| 366 | Paul Hesselgesser | 22-Jan-07 | Private | | (25,000) | | (25,000) |
| 367 | Randy Gilbert | 26-Jan-07 | Private | | (37,500) | | (37,500) |
| 391 | Tamako Nelson | 05-Feb-07 | Private | | (22,500) | | (22,500) |
| | Russell and Jennifer Pike | 05-Feb-07 | Retired | | (80,000) | | (80,000) |
| 402 | jeffrey L. Buchanan | 09-Feb-07 | Private | | (1,400) | | (1,400) |

# EXHIBIT D

Costs from buyout led to loss for quarter, year for Station Casinos

Station Casinos lost money for the quarter and the year because of costs from a management-led buyout of the company, federal filings show.

The dominant player in the locals-oriented gaming market posted a $417.4 million loss for the fourth quarter ended Dec. 31, reversing earnings of $23.1 million in the same quarter in 2006, the company's federal filings show.

For all of 2007, Station Casinos reported a net loss of $375.6 million, reversing net income of $110.2 million in 2006. In a filing with the Securities and Exchange Commission, Station Casinos said the losses were driven by a 167 percent increase in operating costs and expenses in the fourth quarter, including $299.2 million in corporate expenses, up from $15.7 million in 2006.

The expenses were tied largely to the immediate vesting of executive ownership shares in the new, privately owned company. Station Casinos went private Nov. 7 through a $5.4 billion buyout led by members of the Fertitta family, which founded the company.

Additional costs of $143.3 million related to the buyout also hit during the quarter, according to a company statement.

Even without the one-time expenses, an economic slowdown is reflected in the company's quarterly net revenues of $357.5 million, a decrease of $1.2 million from a year ago.

Station Casinos' cash flow, defined as earnings before interest, taxes, depreciation and amortization, dropped 6.9 percent to $131.7 million from $141.5 million a year earlier.

For the year, net revenues increased 8 percent, to approximately $1.4 billion from approximately $1.3 billion in 2006. Cash flow also increased 3.3 percent, to $552.5 million from $534.9 million in 2006.

-- Arnold M. Knightly

Review-Journal

Search Classifieds:

Copyright © 2008, Las Vegas Business Press

Station Casinos Announces Fourth Quarter Results

LAS VEGAS--(BUSINESS WIRE)--Station Casinos, Inc. ("Station" or the "Company") today announced the results of its operations for the fourth quarter ended December 31, 2007.

Results of Operations

The Company's net revenues for the fourth quarter ended December 31, 2007 were approximately $357.5 million, which were relatively unchanged compared to the prior year's fourth quarter. The Company reported EBITDA for the quarter of $131.7 million, a decrease of 7% compared to the prior year's fourth quarter.

During the fourth quarter, the Company incurred $1.9 million in costs to develop new gaming opportunities, primarily related to Native American gaming, $143.3 million related to costs associated with the Merger (as defined below), $287.7 million of expense related to equity-based awards, a $20.3 million

loss on early retirement of debt, a $16.6 million impairment loss, preopening expenses and other non-recurring costs. Excluding these items, the Company reported a net loss of $4.5 million.

The Company's earnings from its Green Valley Ranch joint venture for the fourth quarter were $12.8 million, which represents a combination of the Company's management fee plus 50% of Green Valley Ranch's operating income. For the fourth quarter, Green Valley Ranch generated EBITDA before management fees of $28.8 million, a decrease of 4% compared to the same period in the prior year.

Las Vegas Market Results

For the fourth quarter, net revenues from the Major Las Vegas Operations, excluding Green Valley Ranch, were $326.3 million, a 2% increase compared to the prior year's fourth quarter, while EBITDA from those operations decreased 7% to $109.6 million.

EBITDA is not a generally accepted accounting principle ("GAAP") measurement and is presented solely as a supplemental disclosure because the Company believes that it is a widely used measure of operating performance in the gaming industry and as a principal basis for valuation of gaming companies. EBITDA is further defined in footnote 1.

Capital Expenditures

Total capital expenditures were $173.7 million for the fourth quarter. Expansion and project capital expenditures included $3.6 million for the expansion of Fiesta Henderson, $6.0 million for the expansion of Red Rock including the parking garage and $139.7 million for the purchase of land.

Merger

On November 7, 2007, the Company completed its merger (the "Merger") with FCP Acquisition Sub, a Nevada corporation ("Merger Sub"), pursuant to which Merger Sub merged with and into the Company with the Company continuing as the surviving corporation. The Merger was completed pursuant to the Agreement and Plan of Merger, dated as of February 23, 2007 and amended as of May 4, 2007, among the Company, Fertitta Colony Partners LLC, a Nevada limited liability company ("FCP"), and Merger Sub.

As a result of the Merger, approximately 24.1% of the issued and outstanding shares of non-voting common stock of the Company are owned by Fertitta Partners LLC, a Nevada limited liability company ("Fertitta Partners"), which is owned by affiliates of Frank J. Fertitta III, Chairman and Chief Executive Officer of Station, affiliates of Lorenzo J. Fertitta, Vice Chairman and President of Station, affiliates of Blake L. Sartini and Delise F. Sartini, and certain officers and other members of management of the Company. The remaining 75.9% of the issued and outstanding shares of non-voting common stock of the Company are owned by FCP Holding, Inc., a Nevada corporation ("FCP HoldCo") and a wholly-owned subsidiary of FCP. FCP is owned by an affiliate of Colony Capital, LLC ("Colony") and affiliates of Frank J. Fertitta III and Lorenzo J. Fertitta. Substantially simultaneously with the consummation of the Merger, all of the shares of voting common stock of Station were issued for nominal consideration to FCP VoteCo LLC, a Nevada limited liability company ("FCP VoteCo"), which is owned by Frank J. Fertitta III, Lorenzo J. Fertitta and Thomas J. Barrack, Jr., Chairman and Chief Executive Officer of Colony.

At the effective time of the Merger, each outstanding share of the Company's common stock, including any rights associated therewith (other than shares of the Company's common stock owned by FCP, Merger Sub, FCP HoldCo, Fertitta Partners or any wholly-owned subsidiary of the Company or shares of common stock held in treasury by the Company) was cancelled and converted into the right to receive $90 in cash, without interest. Following the consummation of the Merger, the Company became privately owned through FCP HoldCo, Fertitta Partners and FCP VoteCo. The Company's common stock ceased trading on the New York Stock Exchange at market close on November 7, 2007, and is no longer listed on any exchange or quotation system.

Company Information and Forward Looking Statements

Station Casinos, Inc. is the leading provider of gaming and entertainment to the residents of Las Vegas, Nevada. Station's properties are regional entertainment destinations and include various amenities, including numerous restaurants, entertainment venues, movie theaters, bowling and convention/banquet space, as well as traditional casino gaming offerings such as video poker, slot machines, table games, bingo and race and sports wagering. Station owns and operates Red Rock Casino Resort Spa, Palace Station Hotel & Casino, Boulder Station Hotel & Casino, Santa Fe Station Hotel & Casino, Wildfire Casino and Wild Wild West Gambling Hall & Hotel in Las Vegas, Nevada, Texas Station Gambling Hall & Hotel and Fiesta Rancho Casino Hotel in North Las Vegas, Nevada, and Sunset Station Hotel & Casino, Fiesta Henderson Casino Hotel, Magic Star Casino, Gold Rush Casino and Lake Mead Casino in Henderson, Nevada. Station also owns a 50% interest in Green Valley Ranch Station Casino, Barley's Casino & Brewing Company, The Greens and Renata's Casino in Henderson, Nevada and a 6.7% interest in the joint venture that owns the Palms Casino Resort in Las Vegas, Nevada. In addition, Station manages Thunder Valley Casino near Sacramento, California on behalf of the United Auburn Indian Community.

This press release contains certain forward-looking statements with respect to the Company and its subsidiaries which involve risks and uncertainties that cannot be predicted or quantified, and consequently, actual results may differ materially from those expressed or implied herein. Such risks and uncertainties include, but are not limited to, the ability to recognize the benefits of the Merger; the impact of the substantial indebtedness incurred to finance the consummation of the Merger; the ability to maintain existing management; integration of acquisitions; the effects of local and national economic, credit and capital market conditions on the economy in general, and on the gaming and hotel industries in particular; changes in laws, including increased tax rates, regulations or accounting standards, third-party relations and approvals, and decisions of courts, regulators and governmental bodies; litigation outcomes and judicial actions, including gaming legislative action, referenda and taxation; acts of war or terrorist incidents or natural disasters; the effects of competition, including locations of competitors and operating and market competition; and other risks described in the filings of the Company with the Securities and Exchange Commission, including, but not limited to, the Company's Annual Report on Form 10-K for the year ended December 31, 2007, and its Registration Statement on Form S-3ASR File No. 333-134936. All forward-looking statements are based on the Company's current expectations and projections about future events. All forward-looking statements speak only as of the date hereof and the Company undertakes no obligation to publicly update any forward-looking statements, whether as a result of new information, future events or otherwise.

Construction projects such as the development of Aliante Station entail significant risks, including shortages of materials or skilled labor, unforeseen regulatory problems, work stoppages, weather interference, floods and unanticipated cost increases. The anticipated costs and construction periods are based on budgets, conceptual design documents and construction schedule estimates. There can be no assurance that the budgeted costs or construction period will be met.

Development of the proposed gaming and entertainment projects with the Gun Lake Tribe, the Federated Indians of Graton Rancheria, the Mechoopda Indian Tribe of Chico Rancheria and the North Fork Rancheria of Mono Indians and the operation of Class III gaming at each of the projects is subject to certain governmental and regulatory approvals, including, but not limited to, approval of state gaming compacts with the State of Michigan or the State of California, the Department of the Interior completing the process of taking land into trust for the benefit of the tribes and approval of the management agreements by the National Indian Gaming Commission. No assurances can be given as to when, or if, these governmental and regulatory approvals will be received.

(1) EBITDA consists of net (loss) income plus income tax benefit (provision), interest and other expense, net, loss on early retirement of debt, loss or gain on asset disposals, net, preopening expenses, management agreement/lease termination costs, merger transaction costs, impairment loss, other non-recurring and non-cash costs, depreciation, amortization and development expense. EBITDA is presented solely as a supplemental disclosure because the Company believes that it is a widely used measure of operating performance in the gaming industry and as a principal basis for valuation of gaming companies. The Company believes that in addition to cash flows and net (loss) income, EBITDA is a useful financial

performance measurement for assessing the operating performance of the Company. Together with net (loss) income and cash flows, EBITDA provides investors with an additional basis to evaluate the ability of the Company to incur and service debt and incur capital expenditures. To evaluate EBITDA and the trends it depicts, the components should be considered. The impact of income tax benefit (provision), interest and other expense, net, loss on early retirement of debt, loss or gain on asset disposals, net, preopening expenses, management agreement/lease termination costs, merger transaction costs, impairment loss, other non-recurring and non-cash costs, depreciation, amortization and development expense, each of which can significantly affect the Company's results of operations and liquidity and should be considered in evaluating the Company's operating performance, cannot be determined from EBITDA. Further, EBITDA does not represent net (loss) income or cash flows from operating, financing and investing activities as defined by generally accepted accounting principles ("GAAP") and does not necessarily indicate cash flows will be sufficient to fund cash needs. It should not be considered as an alternative to net (loss) income, as an indicator of the Company's operating performance or to cash flows as a measure of liquidity. In addition, it should be noted that not all gaming companies that report EBITDA or adjustments to such measures may calculate EBITDA or such adjustments in the same manner as the Company, and therefore, the Company's measure of EBITDA may not be comparable to similarly titled measures used by other gaming companies. A reconciliation of EBITDA to net (loss) income is included in the financial schedules accompanying this release.

http://www.lvbusinesspress.com/articles/2008/02/19/news/iq_19685349.txt

Three ex-Station employees claim payroll abuses while casino company denies allegations
Class action sought by Reno firm in fuzzy area of Nevada labor law

BY: VALERIE MILLER

Station Casinos, a company known for its high employee-satisfaction ratings, is facing a potential class action lawsuit over allegedly not paying its workers overtime and compensating them for all hours worked. The case may also spur similar litigation against other casino companies, observers said.

McInerney & Jones, a Reno law firm specializing in class action cases, filed the lawsuit in federal court Feb. 4 on behalf of three former Station employees: Josh Lukevich, Cathy Scott and Julie St. Cyr.

The law firm seeks to have the case certified as a class action. If it were so classified, the firm could represent the approximately 10,000 hourly employees at the locals' gaming giant.

BUSINESS PRESS FILE PHOTO
A former hourly room runner at Fiesta Henderson is one of three named plaintiffs in a lawsuit accusing Station Casinos of failing to pay its employees for all hours worked, failing to pay overtime and failing to pay wages in a timely manner.

BUSINESS PRESS FILE PHOTO
Two of three plaintiffs named in a worker pay lawsuit filed against Station Casinos spent time working at Boulder Station.

If certified as a class action, the lawsuit would seek claims exceeding $5 million, said Charles Jones, the lawyer for the named plaintiffs. His firm filed a complaint against Station claiming that it failed to pay its employees for all hours worked, failed to pay overtime and failed to pay wages in a timely manner. An additional charge of conversion was also levied. Conversion is when a person's property is converted for use by another.

Station denied the claims.

"Station Casinos ... has recently learned that three former team members have filed a lawsuit alleging that they were not paid for certain hours worked during a portion of their tenure at the company," the e-mail statement from Station reads in part. "The company is justifiably proud of its reputation as one of the best

employers in the gaming industry, and is, therefore, disappointed that these former team members would make such baseless and unfounded allegations."

Kevin Kelley, executive vice president and chief operating officer for Station Casinos, defended the company's reputation as an employer in the statement.

"We are successful because we treat our team members with respect and provide a great working environment," he said. "As such, when unfounded allegations such as these are made by former team members represented by out-of-town class action lawyers, we take such matters very seriously."

Station says it will vigorously defend the lawsuit.

The gaming company would not disclose details about how its payroll system works.

Lukevich was an hourly room runner from 2005 to 2007 at Fiesta Henderson. Scott was an hourly guest service ambassador in the slot department for 12 years at Boulder Station and Texas Station. St. Cyr spent seven years as a blackjack dealer at Boulder Station, Palace Station and Sunset Station until March 2007.

Their attorney said he has already done extensive investigations, including interviews with past and current Station employees. He declined to say what the damages of his three named plaintiffs were estimated to be.

"I can't comment as to the number of Station employees interviewed," Jones added. "As for this policy, I am satisfied it goes back more than three years."

The law now allows plaintiffs to recover up to three years of damages, but Jones is confident his clients will be allowed to go back even further.

Jones said Station had a policy at its properties that allegedly involved discouraging overtime and failing to pay employees for all hours worked, and rewarding supervisors for enforcing it.

"This policy and failure and practice was effectuated, in part, by significantly 'rounding' the hourly employees' starting and ending times of employment for each shift, forward and backward," the complaint claims.

The issue of "rounding" hours is controversial in Nevada because it has never been ruled legal or illegal, some local employment lawyers said.

"I never recommend that my clients 'round,'" said Krystol Ginapp, an attorney with Hutchinson & Steffen. "Nevada law says you pay for hours worked. The (U.S. Department of Labor) says you can round as long as over the course of time you don't fail to pay the employee."

Mark Ricciardi, an employment lawyer who has represented other gaming companies, countered that rounding itself is not bad.

"Rounding is supposed to result, during the course of the year, in neither the employer or the employee being hurt," he said.

Ricciardi gave the example of a worker being six minutes late for a shift, but not losing any money because of his hours being rounded up. On the other hand, the same employee wouldn't get overtime for working six minutes extra, either.

Ginapp said the case could have implications beyond its outcome. Other workers, she said, may begin to wonder about their own paychecks.

"It could definitely start a whole host of class action lawsuits against casinos or employers in the valley," she said.

vmiller@lvbusinesspress.com

387-5286

Copyright © 2008, Las Vegas Business Press

## EXHIBIT 28

# XYIENCE(R) Announces $12 Million Funding and Signing of Long Term UFC(R) Sponsorship

LAS VEGAS, Oct. 10 - XYIENCE(R) Inc. (pronounced zy-ince), one of the fastest growing brands in the beverage and nutritional supplements business, today announced that the company has received access to up to $12 million in a strategic funding effort from a group of investors. The company intends to use a significant portion of the investment to expand distribution of its Xenergy brand energy drink. The name Xenergy is a combination of Zen and Energy and is pronounced "Zenergy".

In just one year, Xenergy has increased distribution from 4,600 stores to 45,000 and can be found in such national retailers as 7-11, Kroger and GNC as well as in regional grocery and convenience stores around the country.

XYIENCE recently introduced three new Xenergy flavors, Mango Guava, Pink Lemon and Blu Pom, which join the popular original flavors of Citrus Clear, Cran-Razz and Big Apple. Containing no calories, sugar or carbohydrates, Xenergy is formulated to provide clean, sustainable energy. Scientifically fortified with vitamins, the proprietary blend is designed to prevent the crash ending often associated with other energy drinks.

XYIENCE also announced that the company's exclusive sponsorship relationship with the Ultimate Fighting Championship(R) (UFC(R)) has been extended for an additional three years. Xenergy is the official energy drink of the UFC(R), the world's leading professional mixed martial arts organization.

"XYIENCE has been a long time sponsor of the UFC(R) and we look forward to our future endeavors together as both of our companies continue their explosive growth," said Dana White, UFC(R) President.
"We believe that the combination of new financing and the extension of our UFC(R) relationship firmly positions the company for success as we embark on a worldwide expansion of the XYIENCE and Xenergy brands," said Adam Frank, XYIENCE CEO.

**About XYIENCE(R)**
XYIENCE, one of the fastest growing brands in the health related category, utilizes advanced science in the development of nutritional products and supplements necessary for maintaining a dynamic lifestyle. XYIENCE offerings, including energy drinks and nutritional supplements, represent an authentic lifestyle that is both functional and fashionable. For more information, visit http://www.xyience.com/.

Source: PRNewswire - Xyience, Inc.

# EXHIBIT F



This stack of papers is the volume of the pleadings in this case
So far.