RECEIVED AND FILED

2008 NOV 25 P 1:29

U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

Rich Bergeron
147 OLD COUNTY ROAD
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>XYIENCE, INC., A Nevada Corporation<br><br>Debtor. | No. BK-S-08-10474-MKN<br>Chapter 11<br><br>Eighth Judicial District Court<br>Las Vegas, Clark County, Nevada<br>Case No. A544781, Dept. XXIII |
| XYIENCE INCORPORATED, a Nevada Corporation,<br>Plaintiff,<br><br>v.<br><br>RICHARD BERGERON, an individual<br>Defendant. | CASE NO. BK-2-08-AP-01082-MKN<br><br>**<u>DEFENDANT AND COUNTER-CLAIMANT'S MOTION FOR AN IMMEDIATE SHOW CAUSE HEARING TO STRIKE THE PERJURED DECLARATIONS OF ADAM FRANK (Dkt. #3, Exh. 3) AND JAMIE COGBURN (Dkt. #3, Exh. 8); AND MOTION TO VACATE THE CLARK COUNTY DISTRICT COURT'S MODIFIED PRELIMINARY INJUNCTION ORDER (Dkt. #3, Exh. 28)</u>** |
| RICHARD BERGERON, an Individual,<br><br>Counterclaimant,<br><br>v.<br><br>XYIENCE INCORPORATED, a Nevada corporation; FERTITTA ENTERPRISES, INC., a Nevada Corporation,<br><br>Counterdefendants. | Hearing Date: ____________, 2008<br><br>Time: 9:30 AM<br><br>Location: 300 Las Vegas Blvd. South<br>Courtroom #2<br>Las Vegas, NV 89101 |

**DEFENDANT AND COUNTER-CLAIMANT'S MOTION FOR AN IMMEDIATE SHOW CAUSE HEARING TO STRIKE THE PERJURED DECLARATIONS OF ADAM FRANK (Dkt. #3, Exh. 3) AND JAMIE COGBURN (Dkt. #3, Exh. 8); AND MOTION TO VACATE THE CLARK COUNTY DISTRICT COURT'S MODIFIED PRELIMINARY INJUNCTION ORDER (Dkt. #3, Exh. 28), SINCE THE STANDING ORDER IS A CLEAR PRIOR RESTRAINT AND ENJOINS REPORTING OF THE TRUTH**

This Application for a show-cause hearing is made and based on the attached points and authorities, the affidavits in support of this motion, and the papers and pleadings previously on file herein, judicial notice of which is respectfully requested.

Defendant and Counter Claimant Rich Bergeron respectfully represents as follows:

**Introduction:**

> As the Supreme Court has stated, "a central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." Grogan v. Garner, 498 U.S. 279, 286 (1991) (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)). But this fresh start was intended to be limited to the "honest but unfortunate debtor." Id. at 287.

The bankruptcy process is designed to shield parties who need legitimate protection from the bankruptcy code, the automatic stay, and the reorganization benefits, but it should never be hijacked to shield corporate fraud. The plaintiff and its representatives throughout these proceedings--from the district court complaint filing to the present day—have used the courts improperly in a campaign to unfairly and unconstitutionally silence Defendant and Counter-Claimant Rich Bergeron through the imposition of a prior restraint. The debtor and its attorneys' behavior in the instant case and in the core proceedings reveals a predisposition to be dishonest in order to promote their extremely good fortune, contrary to the bold type above explaining the true purposes of bankruptcy.

The instant matter is now before this court as an adversary proceeding, having been removed improperly by the plaintiff firm Fennemore Craig, P.C. on March 20, 2008. Bergeron is neither a creditor nor a shareholder, nor has he ever had a working or business relationship with Xyience.

This corrupt and manipulative litigation campaign to silence Bergeron, undertaken by a group of co-conspirators to be named in a forthcoming Rule 11 and 9011 sanctions motion, began with the initial Cogburn complaint, the supporting and perjured Declaration of Adam Frank In Support of an Ex Parte Application For a Temporary Restraining Order **(Dkt. #3, Exh. 3)**, and the Declaration of Jamie Cogburn, Esq. In Support of an Ex Parte Application For a Temporary Restraining Order

**(Dkt. #3, Exh. 8).** Adam Frank was at the time General Manager of Xyience. Cogburn was the company's original official legal counsel for this case. These declarations, signed by Frank and Cogburn under penalty of perjury, were nearly identical and included facts these men were never in a position to corroborate. As such, their written testimony amounts to perjury considering later conversations Bergeron had with Xyience Co-CEOs Adam Frank and Kirk Sanford on November 6 and November 17, 2007 that proved the company knew Bergeron's stories were true.

The preliminary injunction in this case should be vacated as soon as possible, as significant and entirely undue reputational damage has been done to the defendant and counter-claimant without due process of law. Plaintiff and counter-defendant Xyience's officials and attorneys at various stages of the process have abused the court's injunction by acting in concert to remove some of the most popular articles on Bergeron's Web-site from Google's search engines. These pieces enjoyed high placement until Plaintiff and counter-defendant Xyience was able to convince Google to remove them with the district court's help. Bergeron exercised extreme caution in keeping these stories on his site while also conforming to the court's order by removing content that the order enjoined. Plaintiff purposely left the court in the dark about these changes Bergeron made after receipt of the court order.

Plaintiff secured the amendments to the injunction without explaining to the court that Bergeron had acted in good faith by making changes to comply with the order. Furthermore, the plaintiff has been able to remove several pieces not party to this litigation with the court's injunction despite their having no basis to do so. They have only ever entered one article into evidence in these proceedings to dispute the facts contained in it, yet multiple articles and pages were removed from Google's search rolls.

The standing order is a prior restraint (See Bergeron's First Amendment Brief) secured by the plaintiff's presentation and subsequent support of false and misrepresented evidence. The court can no longer let that order stand based on the evidence entered into the record and the preceding case law that stipulates this type of injunction is forbidden under the tenets of the First Amendment and precedent setting appeals decisions. These "kill the messenger" litigation tactics undertaken and orchestrated by the counter-defendants should be stopped before being allowed to cause any more damage.

Furthermore, regardless of the prior restraint issues and unconstitutional nature of the

preliminary injunction itself, Bergeron's reports cannot be considered defamation as they are true, and truth is the ultimate defense. Bergeron will be entering various affidavits into these proceedings to prove he never intended to harm the shareholders and is now fighting on their behalf. The actual malice standard cannot possibly be met to sustain the defamation claim since there has been no dispute from Xyience Incorporated that they are a public figure. There was never any bad faith on Bergeron's part, his accounts were true and based on actual interviews with subjects in possession of intimate inside knowledge of fraud (see affidavits and attached emails), and at all times he only published information he could verify through at least two credible sources.

Yet, one cannot ignore the clearly-outlined prior restraint format of the preliminary injunction issued by the district court. The order enjoins Bergeron from writing future reports including facts he knows to be true. The order protects the subjects of Bergeron from him making statements about them that he and other press outlets have definitively outlined as true. Bergeron has produced volumes of new reports regarding Xyience since the injunction, refusing to abide by that injunction's grossly over-reaching language. Bergeron has challenged the bankruptcy court to sanction him, extradite him, fine him, or hold him in contempt for violating the bogus injunction order. This court has thus far refused to do so. At the same time, based on the language used by both the district court and the bankruptcy court judges in the hearings Bergeron's been able to participate in, the courts both seemed to recognize and acknowledge that there are serious First Amendment issues at the heart of this matter.

**THE PRIOR RESTRAINT DOCTRINE**

The United States Supreme Court's first encounter with a law imposing a prior restraint came in Near v. Minnesota ex rel. Olson, 283 U.S. 697 (1931), in which a five-to-four majority voided a law authorizing the permanent ***enjoining of future violations*** by any newspaper or periodical **once found to have published or circulated** an "obscene, lewd and lascivious" or a "malicious, scandalous and defamatory" issue. An injunction had been issued after the newspaper in question had printed a series of articles tying local officials to gangsters. Liberty of the press to scrutinize closely the conduct of public affairs was essential, said Chief Justice Hughes for the Court:

> **"[T]he administration of government has become more complex, the opportunities for malfeasance and corruption have multiplied, crime has grown to most serious proportions, and the danger of its protection by unfaithful officials and of the impairment of the fundamental security of life and property by criminal alliances**

**and official neglect, emphasizes the primary need of a vigilant and courageous press, especially in great cities. The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the immunity of the press from previous restraint in dealing with official misconduct." Id. at 719-20.**

The Court defended the actions of the newspaper in the above case and maintained that the vigilance and courage of the press in tackling controversial subjects is essential to the weeding out of corruption in society. In Bergeron's case there was never any definitive evidence that he engaged in any real defamation or committed any tort in relation to his true accounting of activity at Xyience Incorporated. His protections are therefore broader, and his ultimate defense is the truth being presented on the record.

One of this nation's most illustrious newspapers, The New York Times, taught us that expression on matters of public interest is vehemently protected by the First Amendment. Within that area of protection is commentary about the public actions of individuals. Even if the plaintiff had "smoking gun" evidence pointing to an instance of Bergeron printing a falsehood (which they don't), they have no such evidence regarding Bergeron's mental state or editorial policy regarding his published reports. The fact that expression contains falsehoods, which is Xyience's fraudulent and dishonest argument here, does not deprive it of protection, because otherwise such expression in the public interest would be deterred by monetary judgments and self-censorship imposed for fear of judgments.

As the Supreme Court has explained:

**"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. A criminal penalty or a judgment in a defamation case is subject to the whole panoply of protections afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted. Only after judgment has become final, correct or otherwise, does the law's sanction become fully operative. A prior restraint, by contrast and by definition, has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication "chills" speech, prior restraint "freezes" it at least for the time."** ***Nebraska Press Ass'n v. Stuart*****, 427 U.S. 539, 559 (1976).**

Over the years, the Supreme Court has developed an increasingly complex set of standards governing who is protected to what degree with respect to matters of public and private interest.

**PUBLIC FIGURES MUST PROVE ACTUAL MALICE:**

First, the Court created a subcategory of "public figure," which included those otherwise private individuals who have attained some prominence, either through their own efforts or because

it was thrust upon them, with respect to a matter of public interest, or, in Chief Justice Warren's words, those persons who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." Curtis Publishing Co. v. Butts, 388 U.S. 130, 164 (1967) (Chief Justice Warren concurring in the result).

Later, the Court curtailed the definition of "public figure" by playing down the matter of public interest and emphasizing the voluntariness of the assumption of a role in public affairs that will make of one a "public figure." Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974).

Clearly, the standard of proof of actual malice must have therefore been met in the plaintiff and counter-defendant Xyience's case due to the public nature of the plaintiff corporation's ownership. Constitutional "actual malice" means that the defamation was published with knowledge that it was false or with reckless disregard of whether it was false, New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964); Garrison v. Louisiana, 379 U.S. 64, 78 (1964); Cantrell v. Forest City Publishing Co., 419 U.S. 245, 251 -52 (1974).

Reckless disregard is not simply negligent behavior, but publication with serious doubts as to the truth of what is uttered, St. Amant v. Thompson, 390 U.S. 727, 730 -33 (1968); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81 (1967). A defamation plaintiff under the Times or Gertz standard has the burden of proving by "clear and convincing" evidence, not merely by the preponderance of evidence standard ordinarily borne in civil cases, that the defendant acted with knowledge of falsity or with reckless disregard, Gertz v. Robert Welch, Inc., 418 U.S. 323, 331 -32 (1974); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 83 (1967). See New York Times Co. v. Sullivan, 376 U.S. 254, 285 -86 (1964) ("convincing clarity").

Moreover, the Court has held, a Gertz plaintiff has the burden of proving the actual falsity of the defamatory publication, Philadelphia Newspapers v. Hepps, 475 U.S. 767 (1986) (leaving open the issue of what "quantity" or standard of proof must be met). A plaintiff suing the press for defamation under the Times or Gertz standards is not limited to attempting to prove his case without resort to discovery of the defendant's editorial processes in the establishment of "actual malice." Herbert v. Lando, 441 U.S. 153 (1979). The state of mind of the defendant may be inquired into and the thoughts, opinions, and conclusions with respect to the material gathered and its review and handling are proper subjects of discovery.

Since discovery has yet to be performed in this case, it stands to reason that the plaintiff's entire

pending case is suspect and the resulting preliminary injunction is unconstitutional. The "actual malice standard" is non-existent.

Even the plaintiff's attorney Jon T. Pearson brings up the actual malice standard in the plaintiff's own prior pleading (see page 6 of Xyience's Opposition to Defendant/Counter Claimant Richard Bergeron's Motion to Dismiss), proving Xyience was well aware of their public figure status and still made no effort to prove any actual malice ever occurred:

> NLVII, Inc., 109 Nev. 478, 483, 851 P.2d 459, 462 (1993). Moreover, if the plaintiff is a public figure, a defendant will not be held liable for damages in a defamation action involving such public figure, unless "actual malice" is alleged and proven by clear and convincing evidence. Pegasus v. Reno Newspapers, Inc., 118 Nev. 718-19, 57 P.3d at 90. Actual malice has been defined as "knowledge that [the statement] was false or with reckless disregard of whether it was false or not." Id. at 718, 57 P.3d at 90 (citations omitted). Reckless disregard means that the publisher of the statement acted with a "'high degree of awareness of . . . [the] probable falsity'" of the statement or had serious doubts as to the publication's truth. Id., 57 P.3d at 90-91.

**THE INJUNCTION REPRESENTS A PRIOR RESTRAINT, BERGERON IS THE REAL PARTY INJURED, AND THE BALANCE OF THE MERITS ARE IN HIS FAVOR**

Plaintiff failed to meet the criteria for the granting of a preliminary injunction, and the Clark County District Court overlooked more recent appeals level cases to make the determination that such an injunction was appropriate in the instant case. Attorney Jamie Cogburn manipulated the proceedings and fabricated evidence to compel Judge Williams to rule in his favor while Bergeron was never afforded the opportunity to appear in any fashion to defend himself until long after the injunction had been secured and modified.

Cogburn even mis-stated the purpose of the injunction on page 12 of his initial motion for a preliminary injunction **(Dkt. #3, Exh. 8):**

> there is no harm to the Defendant as the articles will only be removed until a full hearing can be conducted on this issue. In addition, the Defendant will not suffer any financial hardship as he creates these false and defamatory articles on his own website, wherein he receives no revenue. Based upon the circumstances a $500 bond would be appropriate.

In fact, the injunction has hurt the defendant Rich Bergeron tremendously, and Xyience went bankrupt even with the injunction in place at the earliest opportunity it could be. Furthermore, the

injunction was described by Cogburn as being needed only until a full hearing could be conducted on the issue. Most blatantly false, however, is the assumption that Bergeron makes no income from his site. In fact, Google ads he places on his Web-site pages are his most significant source of his meager income. Prior to the injunction, the stories in the Xyience series were the most popular pieces on Bergeron's site. Their high placement in Google search engines resulted in more people visiting those popular pages and the rest of the site where they would also be able to click on a multitude of ads that supported Bergeron. The injunction resulted in almost all of Bergeron's Xyience pages and blog stories being taken out of the Google search engine rolls even though only one article was ever entered into evidence in support of the injunction request. Also, the extreme legal responsibilities undertaken by Bergeron as a result of this case resulted in having to focus more on litigation than he could on managing his site. Subsequently, the site lost its high positioning in the worldwide ranking of Web-sites.

Bergeron had been told more than once by Clark County District Court clerks that he could not appear telephonically and the court room was not equipped for that. Only after presenting a formal motion to the court and taking a chance by adding in the telephonic appearance stipulation did he secure rights to appear.

Xyience Incorporated has at all times tried to maintain a position in the initial action that they cannot sustain with existing evidence. In *Rendish v. City of Tacoma*, 123 F.3d 1216, 1219 (9th Cir., 1997), the Ninth Circuit determined that the "[t]raditional criterion for granting a preliminary injunction include: 1) a strong likelihood of success on the merits; 2) the possibility of irreparable injury to the plaintiff; 3) a balance of hardship favors the plaintiff; and 4) the advancement of the public interest."

Bergeron will prevail in these proceedings, as the truth is on his side, and learning the truth about this ongoing scandal is definitely in the public interest. As far as an injury having to apply, "it is clear" that Bergeron is actually the one who will suffer irreparable injury because "[l]t is indisputable that the loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury." Id. At 1464 [quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2689, 49 L. Ed. 2d 547 (1976)]. The money and opportunities Bergeron lost as a result of the counter-defendants' transgressions is irretrievable. Potential or even direct harm done to the plaintiff as a result of true stories about the behavior of the business and its principals cannot

constitute a hardship caused by Bergeron. It should not even be able to constitute a tort, unless Bergeron was a former employee with a confidentiality agreement in place, which he never was. As such, the harm done to Bergeron, enjoined unconstitutionally from reporting the central facts of his most popular investigative series, is now and always has been much more severe. The balance of hardship never favored the plaintiff here.

The legal standards governing the issuance of a preliminary injunction in the Ninth Circuit are clear. The moving party may meet its burden by demonstrating either "a combination of probable success on the merits and the possibility of irreparable injury" or "that serious questions are raised **and** the balance of hardships tips sharply in his favor." *Sports Form, Inc. v. United Press International, Inc.*, 686 F.2d 750 (9th Cir. 1982); *Wright v. Rushen*, 642 F.2d 1129 (9th Cir. 1981). Counter-defendants Xyience, Incorporated and Fertitta Enterprises had no valid hardship and did not suffer any injury as a result of Bergeron's behavior. It is their own actions and omissions that resulted in their bad picture in the press. Bergeron merely reported the truth.

Also, it is 100 percent clear that even now in bankruptcy the plaintiff can afford a team of attorneys to present its side of the case while Bergeron's hardship has resulted in him barely having enough money to afford telephonic appearances. He has at all times defended himself in this matter and is an individual up against two corporations.

Xyience had a full staff of employees, access to a much wider press pool, and a much greater forum with which to explain their side of the story and refute Bergeron's reporting. They chose not to. Furthermore, the company's success never really hinged on Bergeron's stories being removed.

Bergeron spoke with Former Xyience CEO Bill Underhill (he left the company in May, 2007) and a few other major shareholders in Las Vegas recently (as part of a trip completely paid for by concerned Xyience shareholders). Underhill reported that he could have set the company up with $30 million in capital from a company called **Burrill Life Sciences Capital Fund**. A copy of the term sheet for that agreement is attached to this motion, marked as exhibit 50. Adam Frank and Kirk Sanford helped nix the deal so Fertitta Enterprises could in turn take over and then bankrupt Xyience under conditions favorable to themselves and Zuffa, LLC. Underhill, a former LA fraud prosecutor, told me in a later phone conversation that he never had trouble raising money because of my stories. He also told me that those within the company who were overheard by him complaining about my stories never brought up the contention that there was anything untrue in them. They only seemed

angry in regards to the stories being bad for the company's image.

The opposing attorneys and other parties supporting this case throughout these proceedings have abused the courts by filing and pressing a fraudulent case in order to unjustly enrich themselves and their clients. Fertitta Enterprises promoted the lawsuit to silence Bergeron with the intent at all times to use Xyience to conduct bankruptcy fraud. Under Fertitta control Xyience drafted one-sided contracts with other entities owned by the Fertitta Brothers that had existing business partnerships with Xyience. Fertitta Enterprises even used the bankruptcy court to promote further payment to these entities they owned (Zuffa, LLC and Zuffa Marketing, LLC), making sure a marketing agreement with Zuffa would hinge on whether or not the Cott Corporation could release their inventory of Xenergy product. Fertitta Enterprises neglected all other payments possible while promoting payment of the creditor obligations owed to their own interests.

The behavior of the principals involved in the instant case, specifically that of Fennemore Craig, P.C. attorneys, could reflect negatively on their handling of the core bankruptcy proceeding. ***If Fennemore Craig, P.C. attorneys did not investigate this instant case properly it is likely that they also overlooked the investigation and due diligence expectations involved within their handling of the core bankruptcy case.***

**THE DECLARATION OF ADAM FRANK IN SUPPORT OF AN EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER (Dkt. #3, Exh. 3) CONSTITUTES PERJURY:**

Adam Frank's declaration (see **Dkt. #3, Exh. 3**) is the entire balance of independently-produced evidence in the plaintiff's possession (see Xyience Motion to Dismiss). A recorded conversation Bergeron was party to with Frank and Kirk Sanford on November 6, 2007, alluded to in past motions and linked to Bergeron's Web-site (http://premium.fileden.com/premium/2007/9/16/1434673/frankandsanford.mp3) shows beyond a reasonable doubt that Frank actually relied on the information reported by Bergeron when he became Xyience Co-CEO with Kirk Sanford. During the conversation, Sanford and Frank both agreed Bergeron's site was a resource for them as they attempted to piece together the history of

the company. Frank's various claims made in the declaration are all nullified by the recording.

Specifically, during that November 6, 2007 conversation between Frank, Bergeron, and Sanford, the following quotes were recorded:

**KIRK SANFORD: "From you know, Adam and my perspective, you know, We don't know all this history. We actually go to your web-site to try to figure out what's gone on around this place. So, that's a little bit funny."**

**ADAM FRANK: "Yeah, The funny thing is it's probably one of the better resources to find out what the Hell, you know, has happened in this company historically."**

Frank and Sanford arranged for Bergeron to be flown to New York City to attend UFC 78 at the Prudential Center in Newark, New Jersey on November 17, 2007. Both men admitted to Bergeron that they needed his help in moving forward with the company. Fertitta Enterprises was at the time in direct financial control of Xyience and had a previous relationship with Sanford's former employer: Global Cash Access.

It is clear that Sanford and Frank both knew the case against Bergeron was illegitimate at the time of the November, 17, 2007 meeting and when the two spoke to Bergeron at length on November 6, 2007. They both did mention ending the case against Bergeron at the November 17th meeting, but there was no mention of the word "settlement" or any discussion of amounts or conditions of any settlement. Negotiations on actual settlement terms took place well after the meeting through emails and eventually broke down, resulting in Bergeron serving a Rule 11 motion on Frank and Sanford that he promised to file if they did not settle.

There is hard evidence of Frank's contradiction of his declaration in the recording available on Bergeron's web-site: www.unlimitedfightnews.com/xyience.htm (recently taken off of Google's search engines due to the improper and unconstitutional injunction). As far as the recording's admissibility in these proceedings, federal law applies:

**Federal Wiretap Law**

A. The federal wiretapping law is part of the Omnibus Crime Control and Safe Streets Act, 18 USC §2510-2521 (the "Act"). B. The Act prohibits the interception and disclosure of oral communications. The Act contains an exception when the interceptor is a party to the communication. § 2512(a)(ii)(d).

1. This section states: "It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral or electronic communication where such person is a party to the communication...**unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the**

**Constitution or laws of the United States or of any State."**

See also *State v. Underwood*, 293 Or 389, 648 P2d 847 (1982), holding that an "interception" does not occur when one tapes one's own telephone conversation. Accord, *Newcomb v. Ingle*, 944 F2d 1534 (10th Cir 1991).

Even if the plaintiff can manage to suppress the recording, Bergeron's recollection of that call in the attached affidavit should be sufficient. The Times Square conversation on November 17, 2007 and witnessed by Bergeron and Standard General Employee Robert Lavan is also fair game and completely admissible as it was a public conversation. As far as settlement conferences being exempt from evidence gathering (even though no real settlement or compromise negotiations took place in Bergeron's actual conversations with Frank and Sanford), the rule brought up by the plaintiff has some applicable exceptions:

**Rule 408. Compromise and Offers to Compromise**

**(a) Prohibited uses.—Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:**

**(1) furnishing or offering or promising to furnish or accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise the claim ; and**

**(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.**

***Permitted uses. This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice ; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.***

The recording is certainly admissible, as it proves Frank's bias and prejudice, and the meeting on November 17th is also relevant in showing Frank's bias and prejudice as well as both Frank and Sanford's intention to bankrupt the company and burn all the shareholders. Frank lied in an official court document as a witness for the plaintiff and then admitted the truth to Bergeron to entice him to settle. The meeting itself was an attempt by Frank to avoid prosecution for perjury. Frank knew that the call was recorded having asked Bergeron if it was (Bergeron confirmed it), and Frank knew that the call contradicted his earlier signed statement. Bergeron was invited to New York City and UFC 78 in order to prevent him from incriminating both Frank and Sanford as they

dismantled the company.

Furthermore, there were no real compromise negotiations per se between Bergeron and the Xyience Co-CEOs Frank and Sanford. They did mention settling the case, and they did mention $5,000 for travel at one point before the trip, but there was never any sit down session where Bergeron, Frank and Sanford ever personally went over the numbers together as it related to what it would take to end the case. The conversations prior to the UFC trip and the conversations the day and night of the UFC trip with Frank and Sanford were of the character that Frank asked for specifically on November 6, 2007 when requesting Bergeron stop the phone recording:

**ADAM FRANK: "We'd like to have a relationship with you where we could just talk."**

As such, Bergeron, Frank, and Sanford were *just talking* about the company until an official $5,000 offer of settlement was indicated in writing as an amount they would have agreed to settle for. Bergeron only realized that was their intended settlement amount after he'd already returned home from the UFC trip. To Bergeron's knowledge no lawyers were ever brought in to assist at any time, and no formal settlement offer was even raised until after the November 17th meeting. Bergeron emailed his first official settlement offer of $1 million to Frank and Sanford, and they subsequently told him it was impossible to come up with those kinds of funds as a company that was basically already insolvent. Bergeron was later told in an email that the two Co-CEOS only ever intended to offer him $5,000 total to walk away from the case.

Regardless of the tape's inclusion or exclusion as evidence, Bergeron communicated in writing and by telephone with Sanford and Frank on numerous occasions in which they professed to admiring his courage, wanting to help him, and intending to end the Xyience case against him. Frank and Sanford knew Bergeron's information was true and accurate, and when confronted with the challenge of naming a specific fact he'd pegged wrong, they were both rendered speechless during the part of the November 6, 2007 conversation that did not get recorded. Bergeron's recollection of the conversation in the attached affidavit should also be sufficient evidence to prove Frank's declaration is bogus.

**SPECIFIC ALLEGATIONS OF ADAM FRANK'S PERJURED TESTIMONY:**

The first paragraph of the declaration starts out with a correct sentence. Frank was a board member when he signed the declaration and did act as General Manager. The second sentence, however, is wholly untrue. Frank did not have personal knowledge of any of the facts within the declaration and had no standing to make the bogus allegations against Bergeron, who he'd never met or spoken with. Frank signed the declaration to corroborate Cogburn's frivolous claim with perjured testimony, and he proved the testimony was perjured during subsequent conversations with Bergeron by phone and in person. As far as Frank believing his statements to be true at the time he made them, that would have to be determined by a cross-examination of Frank at a show-cause hearing on the matter. The third sentence of the first paragraph is of course true and not in controversy.

Paragraph two of the declaration is wholly and entirely untrue. Bergeron did not post an "article" on his MySpace page. It was an email with a disclaimer attached. Bergeron never alleged himself that Xyience was being investigated by the SEC. Bergeron's source did so in the email. Other web-sites printed the email with no disclaimer. Bergeron subsequently discovered much, if not all, of the contents of the message were indeed true. As to Xyience being investigated by the SEC, there is no doubt whatsoever that Xyience is a party in the ongoing SEC litigation with AA Capital. AA Capital offshoot Brush Monroe still technically owns 2,500,000 shares in Xyience stock.

The entry into the deal to purchase a debt and equity position in Xyience was reportedly made without the board of AA Capital getting involved, and deposed AA Capital CEO John Orrechio is accused of pulling the trigger on his own under the offshoot Brush Monroe's name to avoid suspicion. By way of the AA Capital investigation Xyience was in fact under investigation by the SEC at the time of the email's publication, or at least its stock was a significant part of another SEC investigation.

Either way, even if the company was not at the time of the email's publication under direct investigation by the SEC, Bergeron himself did not claim they were and did not say he verified that fact. The fact that the standing injunction forbids Bergeron from stating that the SEC is investigating Xyience exhibits the reasoning behind why prior restraints are unconstitutional. Bergeron now has direct, definitive evidence that ***Xyience is being investigated by the SEC***, but he is enjoined from reporting that fact.

As far as a class action lawsuit being underway, the email does not state that. The email's

actual language is much different. Cogburn substituted the loaded word "underway" in Frank's declaration rather than the actual email's language regarding the class action case as "being drafted." Again, Bergeron did not himself make this claim, nor could Cogburn or Adam Frank be in any position to discredit the actual claim within the published email.

Paragraph 3 starts out true but then ruins it by spiraling into another deep lie. Xyience did contact Bergeron, but only to offer to fly him out to Xyience headquarters in order to gather information to write a positive story they wanted him to write about the company. Fearing underhanded dealings and wary of the lofty promises that he would meet Dana White and some UFC fighters, Bergeron refused the offer (See Chadwell Comment From Bergeron's Blog in Exhibit 51). Xyience officials never publicly asked that he take any of his stories down until Cogburn mentioned that as a potential way to settle the case post-injunction. Adam Frank was never in any position to know who contacted Bergeron and when regarding the initial stories before the lawsuit. Frank never personally spoke to Bergeron. Bergeron only spoke directly to John Chadwell regarding the nature of the stories themselves. Chadwell represented himself as Xyience security but was later determined to be a "consultant."

Other than an interview with Pete Rinato that he conducted later on in the series, Bergeron did not discuss anything with any other Xyience employee prior to the case against him being initiated. Unless someone was contacting him from Xyience to share inside information or haranguing him anonymously, he had no other direct dealings with Xyience officials. Neither then Xyience Counsel Pete Rinato nor John Chadwell ever officially asked or requested on behalf of the company that Bergeron remove his articles for any reason whatsoever.

Paragraph 4 of the declaration mentions that the *Xyience Investigative Report* Article is "laced with false statements." The claim is made that "Bergeron alleged that Xyience was created to steal money from investors for the benefit of certain employees or directors." Bergeron's sources did the actual alleging. Bergeron simply did the reporting of their alleging and added his own opinion based on the facts. Bergeron reported the true account of what was going on behind the scenes at Xyience. There were no false statements in the article.

The initial article on Xyience has never been discredited by any definitive or contradictory evidence and cannot be. It cannot therefore be said to be laced with false statements.

Paragraph 5 is entirely false and beyond the scope of Frank's knowledge of the

company considering he did not work or communicate enough with Russell Pike or David Winterton to know what either man was doing or saying. Winterton sent an email to Bergeron (see Bergeron Affidavit) claiming there was only one nuance in Bergeron's story to clear up about a gentleman named Danny Lee. Winterton never disputed any quotes Bergeron attributed to him in the piece. Furthermore, Xyience did defraud investors when Fertitta Enterprises promised shareholders their capital would save the company from bankruptcy, only to bankrupt the company anyway. Because Bergeron is now restricted from writing what's true in that instance is another reason why prior restraints are unconstitutional. How do you defend an injunction allowed to exist unchecked in a free country when it enjoins a person from stating the God's honest truth?

Paragraph 6 of the declaration is also wholly incorrect. Bergeron did not allege that Dana White was involved directly in defrauding investors. Bergeron's sources reported that Dana White and Russell Pike *may have* split the proceeds of Pike defrauding investors to pay for television advertising spots on SPIKE TV.

According to Bergeron's sources Dana White reportedly received certain commercial spots from the network for free for the first season of the Ultimate Fighter reality TV series since the UFC entirely produced the show with their own funds. The alleged splitting of the proceeds of fraud had nothing to do with sponsorships or Xyience and the UFC colluding as whole entities. Bergeron never alleged that until the Fertittas bought into Xyience and he learned their reasoning for the acquisition was connected to the $350 million senior secured credit facility for Zuffa.

At all times Bergeron pointed to the potential individual actions of both Xyience Founder Russell Pike and UFC President Dana White regarding the scheme described by his sources to get Xyience investors to pay for commercials that had no set cost for the UFC or Xyience. Again, Bergeron's source made the contention in the first place, not Bergeron.

Secondly, Frank is in absolutely no position to prove whether or not the scheme existed or not. Not even the person reporting on the scheme was willing to definitively say money changed hands between Pike and White, and that was clearly outlined in the full story. Interestingly enough, Xyience has been conspicuously absent from the most recent seasons of The Ultimate Fighter, which is due to a multitude of issues. For one, Bergeron has been told that UFC Fighter Matt Serra's sponsorship contract, given as a prize for winning the show, was never paid by Xyience when he won.