For the same reasons stated above, paragraph 7 is moot. Bergeron never alleged the UFC as a whole split skimming profits and did not report that Xyience was as a whole operating a skimming operation on its investors.

Paragraph 8 is entirely out of line and not substantiated by any specific allegations or supporting evidence. Bergeron, in fact, continues to print the truth and follow the actions of Xyience while working with shareholders to help them recover justice for their being defrauded by the bankruptcy.

Paragraph 9 is completely false except for the fact that Bergeron's articles do allow for comments. Bergeron only ever prevents abusive and disturbingly violent comments from appearing. He has allowed for wide public back and forth discourse and scathing criticism of him and his work in the comment section of all his stories. He has even left all the comments in place on all the stories he removed.

Paragraph 10 is the opposite of the truth. Bergeron continues to write and expose the truth behind the Xyience scandal with the intent to write the true account and help the shareholders get a fair shot at relief for their legitimate investments. His intent has never been to harm the reputation of Xyience as an entity. Bergeron's mission is and always has been to hold the company's principals accountable for their transgressions in order to allow the brand to move forward in a positive direction. Since the articles themselves were not false, their false nature certainly did not cause shareholders to refuse to offer capital. It was the fact that the articles illustrated the true happenings behind the scenes at Xyience that really discouraged investors. However, as to the potential investors willing to offer funds only if the articles were taken down, that could be true, but only because they knew the articles were true, not because the pieces were false.

If the stories really were false, why didn't Xyience issue any kind of public statement on its own to denounce them? Why did it resort to a suit to silence Bergeron rather than respond with facts or answers to Bergeron's questions?

Paragraphs 11 and 12 of the Frank Declaration could certainly be true up until the portion at the end of paragraph 12 where the "false statements" term is used again, this time without attention to specific allegations.

Paragraphs 13 and 14 are wholly untrue. The plaintiff Xyience filed the application for the injunction to silence Bergeron and artificially inflate the value of the stock in the marketplace by

sweeping the company's secrets under the rug. Bergeron did not interfere with any contracts or engage in any egregious conduct. An ex parte restraining order was not necessary or even legal under the constitution in this scenario. The detrimental effect of the articles had nothing to do with them being false and everything to do with them being completely accurate. If anything it was the behavior of Xyience executives and the poor management of the company that led to potential investors of Xyience being skeptical.

There was no immediate and irreparable harm done to Xyience that was ever properly demonstrated. If someone says they are not going to invest until the sky turns to Jello, a lawyer can't ask for an injunction to make the sky turn to Jello. Just because an investor refused to provide funds out of concern for stories on the Internet does not give a company the right to sue for damages. No actual damage to the company can actually be corroborated as it relates to the stories themselves unless those who actually promised to invest present their own affidavits. Even so, if the stories were true (which Bergeron contends they are and backs up that contention with affidavits) then the point is moot altogether. In that case, even if there was irreparable harm resulting from Bergeron's stories it was because the stories were true and accurately portrayed the havoc that was going on behind the scenes at Xyience. A restraining order was not necessary to prevent the harm. The curtailing of the illicit fraudulent behavior at the heart of Bergeron's stories was what was truly necessary to promote a growth environment for the brand.

Accountability would have saved the day, such as when Jan Hall and Bill Underhill came on board and looked to be the real deal team to turn things around. Underhill, a former fraud prosecutor in Los Angeles, was up to the task and secured a $30 million recapitalization deal with Burrill Life Sciences that would have worked for all if he was allowed to stay on as CEO. Instead, he was ousted by Sanford and Frank as they purposely tanked the company for Fertitta Enterprises.

Paragraph 15 is by far the most important one of all, and if in fact that is Adam Frank's signature below that paragraph he is subject to contempt of court charges for perjury. Cogburn could also be complicit in the inconsistencies on the record in the declaration, depending on how much negligence was involved on his part. Another motion will address attorney and client culpability later, but it is definitely important now to look at questions attorneys and clients should always ask about each possible claim that comes to their attention.

In determining whether an attorney had or had not conducted a reasonable inquiry, a court

undoubtedly should consider a variety of pre-filing factors. In this case, for example, what information about the client's business did the attorneys have? Was the information verified? How involved had these attorneys been in their client's business? For how long? Were other professionals, such as accountants or bankers consulted? What independent investigation, if any, did the attorneys undertake prior to the filing? What did their clients tell them? Were they justified in believing what their clients told them? Did a time problem exist when a decision to file was made? What was the business (and legal) sophistication of the clients and the attorneys?

These along with a myriad of other factual details would be crucial to have in hand before determining whether the action taken or not taken by the attorneys prior to filing the case against Bergeron was or was not reasonable. The same questions should have been asked when ownership and counsel shifted in this matter, and Bergeron contends that they were not. Only Adam Frank was ever asked to come forward to support the outlandish allegations. As long as the facts of the matter as determined by a court fit the counter-defendants' interests, they had no reason to care if those facts weren't actually true.

**THE DECLARATION OF JAMIE COGBURN, ESQ. IN SUPPORT OF AN EX PARTE APPLICATION FOR A TEMPORARY RESTRAINING ORDER <u>(Dkt. #3, Exh. 8)</u> CONSTITUTES PERJURY:**

The Adam Frank and Jamie Cogburn declarations are nearly identical. Specifically, paragraphs 3 through 14 in Cogburn's declaration consist of exactly the same text that is contained within Frank's declaration. Bergeron stands by the above objections to those similar paragraphs for the same reasoning.

Particularly offensive and absolutely unfounded is Cogburn's assumption that Bergeron acted "with the intent to harm the reputation of Xyience" when he wrote his articles. It is necessary to qualify here that Bergeron never spoke to Cogburn personally prior to the suit's filing. Cogburn had no way of determining what Bergeron's motivations were, and he presented no definitive evidence to show that Bergeron had ever publicly or privately stated that he wanted to harm Xyience in any way. At all times Bergeron acted to improve Xyience by removing the fraudulent actors at the company

from any responsibility. That way, Bergeron often explained to readers in the comment sections of his stories, the company could move on and prosper with better leadership.

Bergeron has no dispute with paragraphs 2 and 15 of the declaration, and again the signature on the pleading under the perjury penalty stipulation clearly makes Cogburn just as guilty as Frank for that offense.

Paragraph 1 of the declaration is partially true and partially false. The beginning and ending sentences of that paragraph are true, but the middle sentence is not. That sentence reads "I have personal knowledge of the facts stated in this declaration except for those upon information and belief and to those matters I believe them to be true." Clearly the evidence shows Cogburn never had a grasp on any of the facts in this case. To fully examine Cogburn's culpability he should be cross-examined to discover exactly what he did believe and why he believed it without conducting an adequate investigation that would have shown Bergeron did nothing wrong and always presented the truth in his stories.

**CONCLUSION:**

A show-cause hearing should be held as soon as possible on this motion **at the earliest available date** to determine whether or not the Adam Frank and Jamie Cogburn Declarations can be allowed to stand. This hearing should also address the preliminary injunction's prior restraint issues and determine whether that order should be vacated or revoked.

The court can also sanction the parties responsible for any impropriety at the conclusion of the show-cause session in which Adam Frank and Jamie Cogburn should both be subject to cross-examination regarding where they received whatever information they based their declarations on.

Bergeron is due just and proper relief from the unconstitutional standing injunction order and from the improper, unjustified, frivolous case against him, which is supported only by the perjured testimony of Adam Frank and Jamie Cogburn in their declarations. The truth is the ultimate defense in defamation cases, and the truth is on Bergeron's side. Without the defamation claim, all other claims against Bergeron are moot since the perjured declarations also support those claims and no injury can be justified for articles reporting the absolute truth.

The transgressions of the opposition have allowed the wool to be pulled over the eyes of over

375 shareholders, who had their interests snatched away from them by a group of Fortune 500 movers and shakers who by all accounts didn't really need or earn the money. It is despicable and unacceptable to allow these kind of folks to get away with this kind of behavior by using a public court of law and the protections of bankruptcy to avoid their responsibility and culpability.

The recording of the November 6, 2007 conversation, the attached affidavit and exhibits, and the circumstances of the November 17, 2007 meeting between Frank, Sanford, Bergeron, and Standard General Employee Robert Lavan all point to a scenario in which Frank ultimately decided to abandon all the claims he made in the initial declaration. The declaration should therefore be stricken from the record.

Regardless of the admissibility of the recording or the success of the motion to strike the declaration, the standing injunction order is clearly a prior restraint enjoining Bergeron from printing the absolute truth.

Immediate relief should be granted in the form of court-imposed monetary sanctions on all the attorneys and parties who promoted the injunction and utilized the Frank affidavit and Cogburn Complaint to further their own positions in the case. Since Bergeron publicly posted the recording link and included it in previous motions, the plaintiff and counter-defendants should be well aware by now that Cogburn lied in his declaration. Yet, no new evidence has come in, because Xyience and its various attorneys and representatives never accomplished an adequate investigation of the initial complaint's claims and never showed any inclination to further investigate the matter after getting their unconstitutional injunction. A show cause hearing will illustrate that and prove the injunction and the initial complaint are baseless.

Bergeron recently obtained the full list of shareholders presented to the court listing all Xyience stock owners as of 12/31/2007. Already, Bergeron has discovered more fraudulent actors who used Xyience shares to assist them in other scams. For instance, Konza Financial, Inc. is listed as having 375,000 shares. In March of 2006, Michael W. Conley entered a plea agreement with the U.S. Attorney for the Eastern District of Virginia for his role in a scheme to defraud investors through Konza Financial. Conley, in his plea agreement, waived being indicted in exchange for a plea of guilty to one count of mail fraud. Conley was sentenced to seven years in federal prison on his plea of guilty.

**Bergeron is in a very daunting position as the last case in these proceedings that has any**

**voice for the shareholders. Despite the voluminous legal work he must now do for his own case that is already incredibly taxing, Bergeron now must mount an even more challenging fight for all shareholders injured and entitled to relief.** ***Bergeron must therefore prove outright that this bankruptcy is a fraud, which he will. Bergeron plans to submit another motion to revoke or suspend the reorganization plan approval order in the core proceeding as soon as possible, likely within the next two weeks.***

Bergeron expects to have at least ten shareholder affidavits attached to that motion proving outright that these people were defrauded. Many have lost their life savings. Many of the investors are family trusts. Some investors, like Linda Lesker (who will submit an affidavit for the core case motion), spent their retirement funds to purchase Xyience stock and then had to scrape together whatever else they had left to pursue legal action through the other failed adversary proceeding.

A Rule 11 motion will be served on all the appropriate and sanctionable parties culpable individually and severally for damages in the filing and support of the overall frivolous case. Regardless of whether or not the plaintiff decides to withdraw the claim after that motion is served, the court has the power to independently sanction the guilty parties and dismiss the initial case, leaving only the counterclaims if no existing evidentiary support of the initial complaint survives the proposed show cause hearing on this matter.

This hearing should take place as soon as possible to promote justice and encourage a fair record to move forward on in this matter. Also, Cogburn and Frank should be held in contempt if determined to be guilty of perjury. If it is proven at the hearing that the current Xyience attorneys never adequately investigated their claims, it stands to reason that their due diligence (or lack thereof) throughout their involvement in the instant case and the bankruptcy case should be thoroughly scrutinized.

This motion will be served on Adam Frank and Jamie Cogburn personally, and each should be present and available to take the stand to be cross-examined at the hearing. Also, Attorneys Laurel Davis, John Mowbray, and Jon Pearson of Fennemore Craig, P.C. should be available for cross examination at the hearing to determine if their individual actions to investigate the case were sufficient to sustain their continuation of the argument even after they were in receipt of the previous Rule 11 motion. Should it then be determined by their testimony and the facts on the record that these attorneys and Frank were all guilty of supporting a frivolous case, they should all be

immediately sanctioned with the court's inherent powers and/or held in contempt of court for their behavior, which was clearly designed to undermine the justice system for their own benefit.

Specifically, with regard to Fennemore Craig, P.C. attorneys, should it be determined that they acted with callous disregard for the facts in this case, an immediate show-cause hearing should result in the core case in which Bergeron should be allowed to cross-examine the attorneys there to inquire as to whether or not they adequately investigated the claims and documents set forth there.

DATED this 24th of November, 2008

IN PROPER PERSON

Rich Bergeron
147 Old County Road
East Sandwich, MA 02537
617-209-4325
Attorney Pro-Se
Rich.Bergeron@gmail.com

# EXHIBIT 50

From: Greg Young [mailto:greg@b-c.com]
Sent: Thu 5/24/2007 10:38 AM
To: Ted Lanes; William Underhill AOL; William Underhill
Cc: Giovanni Ferrara; Jackie Tay
Subject: Burrill term sheet

Dear Bill & Ted,

Burrill & Company is pleased to extend to you an executed term sheet for a Series A preferred raise. We look forward to working with you to both close this financing and moving forward, assist as best we can in building value.

There is one notable change, which I just now attempted to call both of you to discuss. The change is an addition of an exclusivity clause, which in my mind is really just a good faith statement and our attempt to ensure we have a seat in return for all of our efforts, i.e. you won't take someone else's $30M check and shut us out in the middle of the closing process.

As always, I'm available at all times to discuss.

Best regards,

Greg
Cell 415.671.5111

# TERM SHEET FOR THE PRIVATE PLACEMENT OF

# SERIES A PREFERRED STOCK OF

# Xyience, Inc.

THIS TERM SHEET SUMMARIZES THE PRINCIPAL TERMS OF THE PROPOSED FINANCING OF XYIENCE, INC. (THE "COMPANY"). IN CONSIDERATION OF THE TIME AND EXPENSE DEVOTED AND TO BE DEVOTED BY THE INVESTORS WITH RESPECT TO THE PROPOSED FINANCING, THE "EXPENSES" AND "CONFIDENTIALITY" PROVISIONS OF THIS TERM SHEET WILL BE BINDING OBLIGATIONS OF THE COMPANY WHETHER OR NOT THE FINANCING IS CONSUMMATED. NO OTHER LEGALLY BINDING OBLIGATIONS ON THE PART OF ANY NEGOTIATING PARTY WILL BE CREATED UNTIL A DEFINITIVE STOCK PURCHASE AGREEMENT IS SIGNED BY ALL PARTIES. THIS TERM SHEET IS NOT A COMMITMENT TO INVEST AND IS CONDITIONED ON THE COMPLETION OF DUE DILIGENCE, LEGAL REVIEW AND DOCUMENTATION THAT ARE SATISFACTORY TO THE INVESTORS. THIS TERM SHEET DOES NOT CONSTITUTE EITHER AN OFFER TO SELL OR AN OFFER TO PURCHASE SECURITIES.

| | |
|---|---|
| ***Amount to be Raised:*** | A minimum of $15 million in new money, which will trigger conversion of $6 million of "Darlis" notes, $5 million of which convert into Series A Preferred at $2.50 per share and $1 million of which convert into Series A preferred at $1.75 per share. A maximum of $25 million in new money will be raised. |
| ***Type of Security:*** | Series A Preferred Stock ("Series A Preferred"). |
| ***Number of Shares:*** | Up to 13,583,947 shares. |
| ***Purchase Price:*** | $2.270 per share (the "Purchase Price"). |
| ***Pre-Money Valuation:*** | The Purchase Price is based upon a fully-diluted pre-money valuation of $200,000,000. Conversion of the "Darlis" notes is included in the fully-diluted pre-money share total, resulting in 88,100,145 shares. (See Cap Table) |

| *Investors:* | | Investment Amount | Number of Shares |
|---|---|---|---|
| | Burrill Funds | $8 million to $10 million | up to 4,405,007 |
| | Other New Investors | up to $15 million | up to 6,607,511 |
| | Darlis notes - Conversion | N/A | 2,571,429 |

***Closing Date:***

The initial closing of the sale of the Series A Preferred (the "Initial Closing") will be on or before June 15th, 2007, subject to a minimum sale of 6,607,511 shares. Subsequent sales may occur within 45 days of the Initial Closing.

***Rights, Preferences and Restrictions of Preferred Stock:***

**Dividends**: The holders of Series A Preferred will be entitled to receive cumulative dividends in preference to the holders of Common Stock at an annual rate of 8% of the Purchase Price per share from legally available funds and payable upon liquidation or redemption, whether or not declared by the board. Otherwise, the holders of Series A Preferred will be entitled to receive noncumulative dividends when, as and if paid on the Common Stock.

**Liquidation Preference**: In the event of any liquidation, dissolution or winding up of the Company, the holders of Series A Preferred Stock will be entitled to receive in preference to the holders of Common Stock, the amount of $2.270 per share (subject to adjustments for stock dividends, splits, combinations and similar events) and accrued dividends, if any (the "Initial Payment"). After the Initial Payment has been made, the holders of Series A Preferred and the holders of Common Stock will participate ratably. A sale, lease, conveyance, license or other disposition of all or substantially all of the property or business of the Company, or a merger or consolidation with or into any other corporation (collectively, an "Acquisition" of the Company), other than a merger effected exclusively to change the domicile of the Company, will be deemed to be a liquidation for purposes of the liquidation preference.

**Voluntary Conversion**: Each holder of Series A Preferred will have the right, at the option of the holder at any time, to convert shares of Series A Preferred into shares of Common Stock at an initial conversion ratio of one-to-one.

**Automatic Conversion**: The Series A Preferred will be automatically converted into Common Stock, at the then applicable conversion rate, in the event of either (i) the election of holders of a majority of the then outstanding Preferred Stock, voting together as a class on an as-converted basis, or (ii) the closing of an underwritten initial public offering of the Company's Common Stock pursuant to a Registration Statement under the Securities Act of 1933, as amended (an "IPO") with aggregate gross proceeds of at least $50 million at a public offering price of at least $5.00 per share (subject to adjustments for stock dividends, splits, combinations and similar events).

**Antidilution Provisions:** The conversion price of the Series A Preferred will be subject to proportional adjustment for stock splits, stock dividends and the like, and in the event of any issuances at a purchase price less than the then-effective conversion price will be adjusted to such lower purchase price subject to the following carve-outs: (i) the issuance of securities pursuant to stock splits, stock dividends, or similar transactions; (ii) the issuance of up to [TO BE DETERMINED] shares of common stock (subject to adjustments for stock dividends, splits, combinations and similar events) to employees, consultants, officers or directors of the company pursuant to stock option plans or restricted stock plans approved by the Board of Directors (including options granted prior to the Financing); (iii) the issuance of securities pursuant to currently outstanding warrants, notes, or other rights to acquire securities of the Company; (iv) the issuance of securities in connection with acquisition transactions approved by the Board of Directors; (v) the issuance of common stock upon conversion of the Series A Preferred; (vi) the issuance of common stock in a public offering.

**Redemption Rights**: The Series A Preferred will be

redeemable from funds legally available for distribution at the option of holders of a majority of shares of Series A Preferred commencing any time after the third anniversary of the Initial Closing at a price equal to the Purchase Price (subject to adjustments for stock dividends, splits, combinations and similar events) plus all accrued but unpaid dividends. Redemption will occur in four equal quarterly portions. Upon a redemption request from the holders of the required percentage of the Series A Preferred will be redeemed.

After the fourth anniversary of the Initial Closing, Series A Preferred will be redeemable at the greater of:

i) a price equal to the Purchase Price (subject to adjustments for stock dividends, splits, combinations and similar events) plus all accrued but unpaid dividends; or

ii) a share price equal to an independent valuation of the Company's enterprise "fair market value" divided by the total number of shares of capital stock then outstanding on a fully diluted basis.

**Voting Rights:** The holder of a share of Series A Preferred will be entitled to that number of votes on all matters presented to stockholders equal to the number of shares of Common Stock then issuable upon conversion of such share of Series A Preferred.

**Protective Provisions:** Without the approval of the holders of at least a 2/3 of the Series A Preferred, the Company will not take any action, whether by merger, consolidation or otherwise, that (i) effects a sale, lease, license or other disposition of all or substantially all of the Company's assets, (ii) effects or enters into any agreement regarding any transaction, or series of transactions, which results in the holders of the Company's capital stock prior to the transaction owning less than 50% of the voting power of the Company's capital stock after the transaction(s), (iii) alters or changes the rights, preferences or privileges of the Series A Preferred, (iv) increases or decreases the number of authorized shares of Series A Preferred, (v) authorizes the issuance of securities having a preference over or on a parity with the Series

A Preferred, (vii) changes the number of directors, (viii) amends, modifies or repeals the Certificate or Bylaws of the Company in a manner which adversely affects the holders of the Series A Preferred, (ix) amends or adopts any stock option or equity compensation plan, other than up to [TO BE DETERMINED] shares of Common Stock issuable pursuant to the exercise of options granted under the Company's stock option or equity incentive plan approved by the Board of Directors, including the Series A Director, (x) effects any recapitalization or reorganization, or any voluntary or involuntary liquidation under applicable bankruptcy or reorganization legislation, or any dissolution, liquidation, or winding up of the Company, (xi) declares or pays dividends on or makes any distributions with respect to any capital stock of the Company, (xii) incurs, directly or indirectly, debt in excess of $1,000,000 on a cumulative basis, outside the ordinary course of business, (xiii) effects any material change to the Company's business plan or line of business, (xiv) creates or authorizes the creation of any debt security, (xv) sells, transfers, licenses, pledges or encumbers technology or intellectual property of the Company, other than licenses granted in the ordinary course of business approved by the Board of Directors, (xvi) forms any subsidiary, or (xvii) makes any investment other than investments in prime commercial paper, money market funds, certificates of deposit in any United States bank, or obligations issued or guaranteed by the United States of America, in each case having a maturity not in excess of one year. For purposes of these protective provisions, any reference to the Company will be deemed to include any subsidiary of the Company, (xviii) change the primary lines of business of the Company or (xix) enter into any agreement, arrangement or transaction with any officers or affiliates of the Company or any member of the immediate family of any of them.

***Registration Rights:***

**Registrable Securities**: All shares of Common Stock issuable upon conversion of the Preferred Stock will be deemed "Registrable Securities."

**Demand Registration**: Beginning on the 2nd anniversary of the close, or six months after the IPO,

whichever is earlier, 3 demand registrations of at least $5 million each, upon initiation by holders of 25% of the outstanding Registrable Securities.

**Piggyback Registration Rights**: Unlimited piggyback registration rights, subject to pro rata cutback to a minimum of 30% of the offering (complete cutbacks on the IPO) at the underwriter's discretion.

**Registration on Form S-3**: The holders of at least 25% of the Registrable Securities will have the right to require the Company to register on Form S-3, if available for use by the Company, shares of Registrable Securities for an aggregate offering price of at least $500,000. The Company will not be obligated to effect more than two S-3 registration statements in any twelve month period.

**Registration Expenses**: Registration expenses (exclusive of underwriting discounts and commissions, stock transfer taxes and fees of counsel to the selling stockholders) will be borne by the Company for all demand, piggyback and S-3 registrations. The Company will also pay the reasonable fees and expenses of one special counsel to the selling stockholders.

**Assignment of Registration Rights**: The registration rights may be transferred to a transferee, provided that the Company is given prompt notice of the transfer and the transferee agrees to be bound by the terms and conditions of the Investors' Rights Agreement. Transfer of registration rights to a partner or affiliate of the transferee will be without restrictions as to minimum shareholdings.

**Lock-up Agreement**: In connection with the IPO, each holder of registration rights will be required not to sell or otherwise dispose of any securities of the Company (except for those securities being registered) for a period of 180 days following the effective date of the registration statement for the Company's initial public offering if so requested by the underwriters of such offering, provided that directors, officers and 1% stockholders of the Company are similarly prohibited from selling or otherwise disposing of any securities of

the Company.

**<u>Termination of Registration Rights</u>:** The registration obligations of the Company will terminate on the earlier of (i) 5 years after the IPO, or (ii) with respect to any holder of registration rights, at such time as all Registrable Securities of such holder may be sold within a three month period pursuant to Rule 144.

***Information Rights:*** The Company will deliver to each holder of Series A Preferred annual and quarterly financial statements as well as an annual budget. The obligation of the Company to furnish such information will terminate at such time as the Company (i) consummates an IPO, or (ii) becomes subject to the reporting provisions of the Securities Exchange Act of 1934, as amended.

***Right of First Offer:*** Each holder of Series A Preferred will have the right to participate in the event the Company proposes to offer equity securities to any person other than (i) the issuance of securities pursuant to stock splits, stock dividends, or similar transactions; (ii) the issuance of up to [TO BE DETERMINED] shares of common stock to employees, consultants, officers or directors of the company pursuant to stock option plans or restricted stock plans approved by the Board of Directors (including options granted prior to the Financing); (iii) the issuance of securities pursuant to currently outstanding warrants, notes, or other rights to acquire securities of the Company; (iv) the issuance of securities in connection with acquisition transactions approved by the Board of Directors; (v) the issuance of common stock upon conversion of the Series A Preferred; (vi) the issuance of common stock in a public offering. Such equity securities will be purchased within 20 days from notice by the Company and on the same terms as they are purchased by other third party purchasers of the equity securities. In addition, should any holder of Series A Preferred choose not to purchase its full pro rata share (assuming the conversion of all Preferred Stock into Common Stock and exercise of all issued and outstanding options under the Company's option plan), the remaining holders of Series A Preferred will have the right to purchase the remaining pro rata shares. Such right of first offer will terminate upon an IPO or upon the

acquisition of the Company.

| | |
|---|---|
| ***Board of Directors:*** | Burrill & Company will be entitled to elect one board member of the Company's Board of Directors.<br><br>The Board of Directors will meet at least quarterly unless otherwise agreed to by a vote of a majority of Directors.<br><br>The Company will obtain and maintain D&O insurance of customary amounts. |
| ***Voting Agreement; Drag-Along:*** | The stockholders of the Company will enter into a Voting Agreement providing for the election of the Director designated by the holders of Series A Preferred Stock as set forth under "Board of Directors." |
| ***Employee Stock Options:*** | All employee options will vest as follows (unless otherwise approved by the Board of Directors including the Series A Director): 25% after one year, with the remainder vesting monthly over the next 36 months. |
| ***Confidential Information and Inventions Agreements:*** | Each employee and consultant of the Company will enter into a confidential information and inventions agreement (which includes non-competition and non-solicitation provisions) in a form acceptable to the Investors. |
| ***Purchase Agreement:*** | The sale of the Series A Preferred will be made pursuant to a stock purchase agreement reasonably acceptable to the Company and the Investors, which agreement will contain, among other things, appropriate representations and warranties of the Company and the Investors, covenants of the Company reflecting the provisions set forth in this term sheet and appropriate conditions to closing which will include, among other things, qualification of the shares to be sold under applicable Blue Sky laws, the filing of the Amended and Restated Certificate of Incorporation, and delivery of an opinion by the Company's counsel in a form satisfactory to the Investors. |
| ***Management Rights Letter:*** | A Management Rights Letter from the Company, in the Investors' standard form, will be delivered prior to Closing to each Investor that requests one. |

| | |
|---|---|
| ***Expenses:*** | The Company will pay the fees and expenses of legal counsel to Burrill & Company, not to exceed $75,000. |
| ***Conditions to close:*** | 1. Standard conditions to Closing, which shall include, among other things, satisfactory completion of due diligence, qualification of the shares under applicable Blue Sky laws, the filing of an Amended and Restated Certificate of Incorporation establishing the rights and preferences of the Series A Preferred and receipt of a customary legal opinion from counsel to the Company in a form satisfactory to the Investors.<br><br>2. Signed agreement for a $20 million or greater purchase order/ account receivable loan, or similar financial instrument, agreeable to the Investors. |
| ***Exclusivity:*** | So long as the Investors are proceeding in good faith with the proposed financing, neither the Company nor the founders shall negotiate with any other parties concerning a proposed financing without the consent of Burrill. Notwithstanding the foregoing, the exclusivity provided for in this paragraph shall terminate 25 days after the execution of this term sheet or upon termination of this term sheet, whichever sooner. |
| ***Expiration:*** | This Term Sheet expires on May 28th, 2007 if not accepted by the Company by that date. |

EXECUTED this 24th day of May, 2007.

***Company:*** Xyience, Inc.

By: ______________________________

Name: ______________________________

Title: ______________________________

***Investor:*** Burrill Life Sciences Capital Fund III, L.P.
By: Burrill & Company, LLC

By: Roger Wyse

Name: Roger Wyse

Title: Managing Director