RECEIVED
IN DROP BOX
Jan 9 09
3 51 PM '08
U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

Rich Bergeron
147 OLD COUNTY ROAD
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>XYIENCE, INC., A Nevada Corporation<br><br>Debtor. | No. BK-S-08-10474-MKN<br>Chapter 11<br><br>Eighth Judicial District Court<br>Las Vegas, Clark County, Nevada<br>Case No. A544781, Dept. XXIII |
| XYIENCE INCORPORATED, a Nevada Corporation,<br>Plaintiff,<br><br>v.<br><br>RICHARD BERGERON, an individual<br>Defendant. | CASE NO. BK-2-08-AP-01082-MKN<br><br>**DEFENDANT AND COUNTER CLAIMANT'S JOINT REPLY TO LIMITED FERTITTA ENTERPRISES OPPOSITION AND XYIENCE INCORPORATED'S OPPOSITION TO DEFENDANT AND COUNTER CLAIMANT'S MOTION FOR AN IMMEDIATE SHOW CAUSE HEARING TO STRIKE THE PERJURED DECLARATIONS OF ADAM FRANK (DKT. #3, EXH. 3) AND JAMIE COGBURN (DKT. #3, EXH. 8); AND MOTION TO VACATE THE CLARK COUNTY DISTRICT COURT'S MODIFIED PRELIMINARY INJUNCTION ORDER (DKT. #3, EXH. 28)** |
| RICHARD BERGERON, an individual,<br><br>Counterclaimant,<br><br>v.<br><br>XYIENCE INCORPORATED, a Nevada corporation; FERTITTA ENTERPRISES, INC., a Nevada corporation,<br><br>Counterdefendants. | Hearing Date: January 7, 2009<br><br>Time: 9:30 AM<br><br>Location: 300 Las Vegas Blvd. South<br>Courtroom #2<br>Las Vegas, NV 89101 |

**DEFENDANT AND COUNTER CLAIMANT'S JOINT REPLY TO LIMITED FERTITTA ENTERPRISES OPPOSITION AND XYIENCE INCORPORATED'S OPPOSITION TO DEFENDANT AND COUNTER CLAIMANT'S MOTION FOR AN IMMEDIATE SHOW CAUSE HEARING TO STRIKE THE PERJURED DECLARATIONS OF ADAM FRANK (DKT. #3, EXH. 3) AND JAMIE COGBURN (DKT. #3, EXH. 8); AND MOTION TO VACATE THE CLARK COUNTY DISTRICT COURT'S MODIFIED PRELIMINARY INJUNCTION ORDER (DKT. #3, EXH. 28)**

## INTRODUCTION:

The recent filings from Fertitta Enterprises and Xyience, Incorporated regarding Bergeron's motion for a show cause hearing are both indicative that neither party plans to defend the Cogburn and Frank affidavits. Both parties go to legal extremes to twist this case into a purely procedural matter, pointing to partial statutes and rules that might help but don't really apply. Both parties have denied the true facts whenever they cannot delay the process.

Most striking of all the written utterances in the two opposing filings on the Bergeron show cause motion, is the following passage from the Xyience, Incorporated opposition:

> **"Xyience does recognize that this adversary case has and will generate unnecessary expenses and most likely to the detriment of the estate. As such, Xyience at some point, may seek a dismissal of its claims against Mr. Bergeron. Such dismissal would not be sought on the merits of the case, but rather it would be based on a cost-benefits analysis and what is truly in the best interest of Xyience's estate."**

The above revelation appears on page two in the section of the Xyience opposition titled "*Preliminary Statement*." This case is at the precipice of trial, almost 18 months into the litigation process, and finally Fennemore Craig attorneys have just about filed a full confession admitting the case has no merits and is a waste of money. Xyience attorneys further explain that the litigation as a whole is being carried on "to the detriment of the estate." Examining the above three sentences it is clear that regardless of what comes after the confession Xyience feels the need to preface it all with assurances that it recognizes this case is and has been losing the estate money, Xyience will eventually dismiss the matter, and the merits supposedly have nothing to do with it.

Throughout the rest of the filing the attorneys who drafted it dance around the core issues involved, seek to obscure and exclude valid evidence, forget to account for a major exception to a rule they cite improperly (Fed, R. Evid. 408) under the existing circumstances, and continuously refer to other methods by which Bergeron could have opposed the preliminary injunction.

Regardless of all the legal arguments, prevailing statutes, and previously available methods of relief, Bergeron is not "like any other litigant" as Xyience classifies him on page 9. He is an individual haled into a court battle halfway across the country, representing himself. This is an exceptionally onerous burden made even more difficult because of clear due process issues that prevented Bergeron from having an adequate opportunity to appear in person and argue his case prior to the injunction being issued. Bergeron was still trying to find a pro bono legal representative at the time when the modified injunction was sought by the plaintiff.

The fact that prior avenues of relief were available should not have any bearing on whether or not it is right, fair, and in the interest of justice to let the unconstitutional injunction stand now. It is a prior restraint, clear and simple, and notice should be taken that Xyience does not dispute that and even points out Bergeron could have filed a First Amendment Writ. Bergeron did not even know what that was until after it was too late to file one.

Also on page 9, Xyience attorneys write, "The State Court was obviously satisfied by the evidence and legal authority that had been presented because it ruled in favor of Xyience and granted its Preliminary Injunction Order." Regardless of all the previous methods and strategies that may have been employed previously by Bergeron at the state court level, this motion is before the federal bankruptcy court now and seems to be the only form of relief available in this situation. It is no longer a matter of what the state court was satisfied with. This case is now at the federal level and must abide by federal rules and precedents. It is now a matter of what is right and constitutional here and now in the face of a prior restraint that must be reversed. The landscape of this case is vastly different now, more evidence is

available, more witnesses have come forward, affidavits have been filed, and Bergeron now has a much firmer grasp on procedure and points of law. As such, based on the record that exists there is no reason to let the unconstitutional order stand.

Unfortunately Xyience attorneys failed to mention that Judge Timothy Williams (endorsed for his seat by Fertitta-run Station Casinos) hinged the preliminary injunction order on a decades old state proceeding and a rule of state civil procedure, ignoring the over-riding and clearly stated objections raised by Bergeron and the First Amendment issues and Supreme Court precedents that applied:

> **IT IS HEREBY ORDERED**, that Plaintiffs Motion for Preliminary Injunction is Granted pursuant to NRCP 65 and Sobol v. Capital Mangmt. Consultants, 102 Nev. 444, 726 P.2d 335 (1986), as Xyience has showed that there is a strong likelihood of success on the merits, there is a threat of irreparable harm, there is little to no harm that will result to the Defendant, and this Court has an interest to protect the public from defamatory statements.

In *Sobol v. Capital Management Consultants, Inc., 102 Nev. 444, 726 P.2d 335 (1986)*, the Supreme Court of Nevada determined that usurping the name of a medical facility interferes with the legitimate business interests of the facility by causing confusion, infringing on goodwill, and potentially damaging the reputation of the legitimate namesake. The unauthorized use of another's business name is thus prohibited. Also In *Sobol v. Capital Management Consultants, Inc.*, the Supreme Court of Nevada sanctioned an attorney $5000 because the attorney misrepresented a stipulated fact and quoted a portion of a case as if it were the case holding rather than language from the dissent. The court termed these "statements of guile and delusion." Bergeron's case has no common issues except for the fact that sanctions should also apply here.

The oppositions filed regarding the show-cause hearing motion are full of glaring misrepresentations, and as admitted by Fennemore Craig attorneys this is all a grand waste of time and money that is hurting the Xyience estate. Yet, these attorneys have pursued this case even after being warned of its flaws and lack of any merit. They have brought Bergeron into these proceedings and made him a party in bankruptcy but now want to somehow deny him the opportunity to file anything in this

case or the core case on behalf of the shareholders Xyience sued Bergeron to hoodwink and deceive.

Bergeron contends that he does have standing to ask the court to grant relief to the class of shareholders who have no other voice in these proceedings. Furthermore, the Fennemore Craig Attorneys filed completely self-serving and entirely superficial pleadings to become the real party plaintiff of the shareholder adversary proceeding but never intended to take up the cause to fight for this class of company creditors who are being denied relief and proper recognition as creditors.

On page 7 of the Fertitta opposition filing, attorneys state, "…Fertitta Enterprises has never supported the injunction or any evidence submitted in support thereof." This is more fitting of the "ridiculous" label Xyience attorneys try to pin on Bergeron's pleadings. Fertitta Enterprises has continuously denied what is now clearly outlined on the record: that they are completely and inextricably connected to Xyience, Incorporated. Also, attorneys for Fertitta Enterprises have denied they had any part in the initial claim's filing or support, as if when they took over ownership of Xyience they had no sway whatsoever as to whether or not the case against Bergeron would move forward.

Furthermore, Bergeron has sworn through affidavits along with other witnesses to the facts surrounding the issuing of the injunction. These facts point to a conspiracy to unconstitutionally silence Bergeron engaged in by multiple corporate entities and individuals. Almost immediately after securing the injunction at the state court level, Xyience ratified and received the investment led by Fertitta Enterprises that resulted in the Fertitta Enterprises (through Zyen, LLC) foreclosure and subsequent bankruptcy.

Leading up to and throughout the bankruptcy Fertitta Enterprises was in full managerial and financial control of Xyience. The attorneys representing Xyience seem to be imagining all that is irrelevant, but on the contrary that is the central and over-riding concept that makes Fertitta Enterprises culpable for general damages as well as sanctions. Even while in a direct position to stop this case, Fertitta Enterprises chose to let it continue and have allowed it to be carried through into bankruptcy. Therefore, they not only supported the injunction but they also funded the effort to keep it valid and enforceable. They funded the bankruptcy process almost single-handedly but they want the judge to believe they never had any part in suing Bergeron and never supported the injunction or the evidence in support of that injunction.

Fertitta Enterprises is still maintaining a partial ownership position over Xyience, so their statement of denial is clearly a matter screaming for sanctions to be issued. Despite their denial of culpability below, this is a perfectly-suited scenario for sanctions to be issued seeing as these attorneys are trying to pass off a complete lie as the truth:

> With respect to Bergeron's request for sanctions, which request is also apparently made against Ferritta Enterprises, and/or its attorneys, this Court has already denied this request as part of its previous decision on Bergeron's Motion to Suspend. See Docket No. 72, pp. 6-7. As such, Bergeron's sanctions request is now barred by claim and/or issue preclusion. In any event, as with his prior pleadings, Bergeron's Motion also still fails to offer any admissible evidence that Fertitta Enterprises, or any of its attorneys, was in any way involved in obtaining the injunction, or was otherwise a party to any sanctionable conduct. Bergeron's Motion forgets that Fertitta Enterprises has never filed any claims against him; rather, it is Bergeron who has asserted a defamation claim against Fertitta Enterprises.

Bergeron's sanctions motion was never previously ruled upon, and the motion to suspend the bankruptcy was failing primarily in supporting evidence such as affidavits Bergeron had not been previously aware he had to file. Also, there were service issues Bergeron just recently became aware of regarding that motion, so it stands to reason that the matter was never seriously before the court as an adequate request for sanctions. A forthcoming Amended Rule 9011 and Rule 11 Motion will be filed once the 21-day "safe harbor" period has expired. Bergeron anticipates that he will officially file that motion on or around January 12-15, 2009 should Xyience refuse to withdraw its claims and settle the matter. Also, Bergeron is in receipt of five official affidavits from Xyience shareholders in support of a forthcoming motion to be entitled: **DEFENDANT AND COUNTERCLAIMANT RICH BERGERON'S MOTION TO SUSPEND/REVOKE DEBTOR'S REORGANIZATION PLAN AND RECOGNIZE SHAREHOLDERS' RIGHT TO RELIEF.**

**BERGERON'S STANDING TO PURSUE CLAIMS ON BEHALF OF THE SHAREHOLDERS IS VALID AND ENFORCEBLE AS THEY ARE "SIMILARLY SITUATED" PLAINTIFFS DESERVING FAIR AND ADEQUATE RELIEF FOR DIRECT CLAIMS AGAINST THE ESTATE:**

Bergeron is reaching out to as many shareholders as he can and maintains direct contact with over a hundred of these defrauded individuals through email and by phone. Fennemore Craig's attorneys make the offensive insinuation: "Bergeron seems to be under the impression that he is some sort of savior and must 'fight' on behalf of all of Xyience's shareholders that were allegedly injured and allegedly entitled to

relief." Bergeron is essentially now for all intents and purposes a creditor in light of the statements of Fertitta Enterprises and Xyience attorneys which reveal that neither of them seem to want the case to continue. Xyience admitting a dismissal of the charges is appropriate is a direct and unavoidable statement of surrender, regardless of what the lawyers say the basis is. At this stage it is likely not at all possible for Xyience to simply extricate themselves from this case without asking the liquidating trustee to decide on an appropriate settlement amount, which Xyience attorneys predict is the way things will unfold.

Bergeron is not under any "impression" that he is Jesus Christ to the shareholders. He in fact doesn't have to do squat for the shareholders and in some cases probably would have been better off staying out of engaging in core case concerns due to his struggle to grasp the legal process. On top of the regular Nevada State Court requirements already foreign to him at the time of the case's initial filings, Bergeron has had to try to assimilate a vast amount of bankruptcy law in his research to bolster his pleadings. Bergeron has presented a vast amount of documented evidence, affidavits in support of previous motions, and arguments summarizing the basics behind what happened here and who is most culpable. At all times as an investigative reporter in this matter Bergeron was intent on using his writing to help people he saw being screwed over and defrauded from a very early stage in Xyience's development. He is helping the shareholders now not to be a savior but to be the voice nobody else has stepped forward to provide. Bergeron has compiled so much information, personal testimony, and evidence that it would be a true travesty if he were to simply write about it all at this stage when he could potentially do so much more. He is compelled and encouraged by his "service before self" military school background to do whatever he can to gain rightful relief for those defrauded by this unfortunate chain of events.

By haling him to this jurisdiction, elevating the case to the federal bankruptcy level, and continuing to maintain a case they now basically admit as worthless, the actions of the opposing parties alone are evidence enough that Bergeron does indeed have standing to "fight" on behalf of shareholders.

There have been other scenarios in which adversary cases have been able to seek relief on behalf of others in other venues:

First, several circuits have recognized such standing when the trustee or debtor-in-possession unreasonably refuses to bring suit on its own. See, e.g., In re Smart World Techs., 423 F.3d at 176; Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery, 330 F.3d 548, 583 (3d Cir. 2003) (en banc); Fogel v. Zell, 221 F.3d 955, 965 (7th Cir. 2000); Canadian Pac.

Forest Prods. Ltd. v. J.D. Irving, Ltd. ( In re Gibson Group, Inc.), 66 F.3d 1436, 1440-41 (6th Cir. 1995); La. World Exposition v. Fed. Ins. Co., 858 F.2d 233, 247-48 (5th Cir. 1988).

The plaintiff Xyience already abused its discretion by dismissing and not pursuing the derivative complaint they claimed to have a real party interest in. They did so without explaining why ratification by, or joinder of, the Trustee were not appropriate alternatives.

Rule 17(a) of the Federal Rules of Civil Procedure requires that "[e]very action shall be prosecuted in the name of the real party in interest." "The real party in interest is the person holding the substantive right sought to be enforced, and not necessarily the person who will ultimately benefit from the recovery." Farrell Construction Co. v. Jefferson Parish, La., 896 F.2d 136, 140 (5th Cir. 1990). The purpose of this provision "is to assure a defendant that a judgment will be final and that res judicata will protect it from having to twice defend an action, once against an ultimate beneficiary of a right and then against the actual holder of the substantive right." Id. at 142.

Since the decision on the derivative case clearly stated the reasoning for such decision was based on not all shareholders being attached as "similarly situated" parties, Bergeron's recent pleadings call for a situation which will reward all shareholders who have been defrauded. As such, Bergeron's claim and motions for relief (both existing and forthcoming) recognize that there is a core group of honest shareholders entitled to relief and a series of discovery and/or show-cause hearings can determine who should be denied an opportunity to collect due to fraudulent behavior. Xyience will not have to defend the same action twice as Bergeron is seeking an entirely different course of relief that has virtually no similarity to the derivative action filed on behalf of a limited number of individual participants.

The real party in interest in the scenario Bergeron has laid out are Bergeron himself and all those who were holding shares prior to the Fertitta funding and were hoodwinked into foreclosure and bankruptcy that ultimately eliminated their entire investments while other shareholders in management hurriedly shuttered and sold the company after taking care of its conflict-of-interest motivated needs.

The estate cannot deny this relief by claiming it is the real party in interest or that Bergeron lacks standing, as the substantive right to be enforced belongs to the class of shareholders who were defrauded by the purposeful and entirely baseless push for foreclosure and bankruptcy. The very foreclosure and bankruptcy process itself is what Bergeron is pushing for all culpable parties to be held accountable for. It would therefore be a complete conflict of interest for the estate to take over such a case. The claims are not by any means property of the estate, and there is no basis to insinuate they are.

Thus, a dismissal of this action and the denial of standing to Bergeron means that the shareholder

creditors will have no possibility of any recovery. Under these circumstances, and in the light of Rule 17(a)'s purpose of preventing forfeitures, it will be an abuse of discretion for the court to dismiss the action without explaining why the less drastic alternatives of either allowing an opportunity for ratification by the Trustee, or joinder of the Trustee, are inappropriate. See Sun Refining & Marketing Co. v. Goldstein Oil Co., 801 F.2d 343, 345 (8th Cir. 1986) (Rule 17(a) designed to avoid unjust forfeiture of claims).

In July of 2003, the 2d U.S. Circuit Court of Appeals weighed in on a similar issue in Breeden v. Kirkpatrick & Lockhart LLP (In re: The Bennett Funding Group, Inc.), 2003 WL 21653878 (2d Cir., July 15, 2003). In reaching its decision that the trustee in Breeden lacked standing to pursue the claims at issue, the 2d Circuit addressed a number of important issues for litigants in adversary proceedings.

The Bennett Funding Group, Inc. (BFG), was alleged to have been "used as the vehicle" to carry out the "greatest Ponzi scheme on record" at the time it was uncovered. In essence, BFG sold and resold the same office equipment leases time and again. Richard C. Breeden, the bankruptcy trustee for BFG, brought suit alleging, among other things, negligence against BFG's lawyers and accountants for failing to detect the fraud. Central to the claims was the assertion that the defendants should have reported the fraud to "innocent" directors and officers of BFG, who would have put a stop to it and spared the company.

The defendants asked the court to dismiss the claims, asserting that the trustee lacked standing to sue on behalf of the corporation because the company itself had defrauded its creditors. The U.S. District Court agreed with the defendants and rejected all of the claims. On appeal, the 2d Circuit affirmed the decision. Because participation in the fraud by high-level BFG personnel was central to its decision, the court analyzed the company's management structure at length.

In analyzing the trustee's standing to pursue the claims, the court discussed several well established points of law:

- **A bankruptcy trustee may only pursue claims held by the bankrupt corporation, not those held directly by the creditors.**
- **If a bankrupt corporation's management and a third party engaged in fraud, the trustee can sue only if he or she can show that the corporation suffered damages greater than those suffered by third-party creditors.**
- **Even if the corporation was damaged, the trustee cannot recover if the "bad actor" was the corporation's sole stockholder and decision maker.**

In this action, Bergeron and other "similarly situated" shareholder creditors seek to assert a cause

of action on their own behalf, by way of encouraging the creation of an Investor Claim Trust, that normally would only be thought to be brought either by the debtor entity itself, or by its shareholders, by way of a derivative action.

This sort of creditor-initiated litigation was proven valid by a decision out of the Delaware Chancery Court in 1991. *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, 1991 WL 277613 (Del. Ch. 1991). The chancellor there noted that directors and officers owe their fiduciary duties not so much for the benefit of the corporation itself as such, but rather for the benefit of the entities for whose benefit the corporation exists – its shareholders of course, but also its creditors, at least when the corporation enters the zone of insolvency. *Id.*, at *34.

The comment picked up steam over the years from a number of quarters, giving rise to the notion that directors might have a fiduciary duty not to exacerbate a firm's insolvency, because to do so would do harm to the legitimate entitlements of the firm's creditors, and creditors thus would have a right to sue for damages resulting from directors' or officers' breach of their fiduciary duties in "deepening" the firm's insolvency. *See, e.g. Geyer v. Ingersoll Publications Co,*, 621 A.2d 784, 787 (Del. Ch. 1992) (when insolvency arises, it creates fiduciary duties for the benefit of creditors); *Production Resources Group, LLC v. NCT Group, Inc.*, 863 A.2d 772, 790 (Del. Ch. 2004) (noting that it is "uncontroversial" that when a corporation is insolvent, directors owe fiduciary duties to the firm's creditors under Delaware law); *see also Carrieri v. Jobs.com*, 393 F.3d 508, 534 (5th Cir. 2004) (directors had expanded fiduciary duty to all creditors because the firm was in the zone of insolvency); *Weaver v. Kellogg*, 216 B.R. 563, 583-84 (S.D.Tex. 1997) (when directors believes the firm was in the zone of insolvency, the board knew or should have known that it needed to take action to salvage some value for both creditors and shareholders). On a similar track, the Fifth Circuit recognized that there might be "generalized claims" that creditors could bring on behalf of the estate, as opposed to particularized claims of individual creditors. *See Matter of Educators Group Health Trust*, 25 F.3d 1281, 1284-85 (5th Cir. 1994).

Thus was born the raft of litigation in which creditors seek recovery from officers and directors, or recovery from those who it is alleged knowingly participated in the wrongful conduct of said officers and directors. The forthcoming motions regarding sanctions and revoking or suspending the reorganization plan will seek such recovery on behalf of all those injured shareholders who have not thus far been adequately represented by any other party.

Courts across the nation have looked to Delaware for further developments and clarification regarding the cause of action seemingly birthed by the *Credit Lyonnais* decision.

In fact, courts had recognized that fiduciary duties might be owed to a broader constituency than simply the corporation itself much earlier. *See, e.g.*, *Schacht v. Brown*, 711 F.2d 1343, 1350 (7th Cir. 1983); *FDIC v. Sea Pines Co.*, 692 F.2d 973, 977 (4th Cir. 1982); *see generally* F. Easterbrook & D. Fischel, *The Corporate Contract*, 89 COLUM. L.REV. 1416-1419-20 (1989) (noting that corporations do not exist as an end in themselves, but to facilitate contracts between directors and beneficiaries).

Distinction between standing to sue and the real party in interest doctrine is being blurred here by Fennemore Craig lawyers. Both concepts are "used to designate a plaintiff who possesses a sufficient interest in the action to entitle him to be heard on the merits." Charles A.Wright et al., Federal Practice and Procedure § 1542 (2nd Ed. 1990).

**BASIS FOR SHOW CAUSE HEARING:**

The contention by Xyience attorneys that Bergeron "is attempting to rehash previous arguments that were unsuccessful" at the state level is off-base and inaccurate. Bergeron's arguments in regard to the instant motion to vacate the injunction are unique and entirely different from anything Bergeron filed previously at the state level. Having absolutely no experience as an attorney while acting in that capacity at the beginning of the proceedings Bergeron may not have taken advantage of every applicable avenue of relief, but such a reality does not preclude him from being granted relief at this current point. Such relief is due Bergeron under the tenets of the U.S. Constitution, federal rules of procedure, and the general rule of law. The fact that supporting affidavits now exist on the docket, the exception to Rule 408 applies to the Frank and Sanford telephone recording, and federal law applies as far as legal admissibility of the same recording have completely changed the landscape of this litigation.

Bergeron refuses to recognize the finality of the district court's decision because it is not beyond the capacity of the judge in this case to vacate an injunction that is clearly a prior restraint. It is in the interest of justice and also in the interest of preserving the guaranteed freedom of speech promised in our country's Constitution.

The incessant attempts by Fennemore Craig attorneys to frame the argument in terms of "could have" and "should have" contentions are immaterial in this instance because Bergeron is a pro-se attorney and has naturally taken a great deal of time to develop litigation skills and procedural understanding. Furthermore, such arguments absolutely ignore the principles behind Bergeron's request to vacate the injunction. Just because Bergeron did not act adequately or within the proper time frame in the context of the state court does not change the fact that the initial and modified injunctions are both prior restraints.

Bergeron has repeatedly asked this court to sanction him for violating the injunction, and this court refuses to do so, basically admitting Bergeron's arguments have merit and the order as it stands is an unconstitutional prior restraint. There is no sense in allowing an unconstitutional order to stand due only to procedural and technical deficiencies Bergeron was in no position to address in a timely fashion under the circumstances.

The following statement from page 10 of the Xyience opposition contends that Bergeron had "an opportunity" in the State Court to be granted the relief he seeks now in striking the declarations of Adam Frank and Jamie Cogburn:

> "Mr. Bergeron had an opportunity to provide **admissible evidence** to the State Court, and in fact, he did raise **similar arguments** with respect to the alleged misrepresentations contained in the Declaration of Jamie S. Cogburn and Adam Frank in his Opposition to the Preliminary Injunction Motion." (emphasis added)

Admissible evidence and arguments are obviously two vastly different aspects of litigation Bergeron is only now much more intently aware of, whereas at the time of filing his opposition to the injunction he was oblivious of that concept. Bergeron in fact only managed to get clarification regarding this point when he asked Judge Nakagawa to clarify why affidavits would not be redundant in the face of all his previous arguments and his status in this matter as a pro-se attorney.

Therefore, it stands to reason that the Xyience legal team is misguided and incorrect in its contention that, "It is irrefutable that the state court was not persuaded by Mr. Bergeron's previous arguments, and such arguments should not now be considered by this court." The state court arguments were not accompanied by the evidence that currently exists on the docket, the circumstances of this litigation have changed drastically since the injunction became official, and this court has every authority and every prevailing capacity to consider the instant motion due to such extenuating circumstances. Xyience attorneys are living in the past in this matter and would like to keep clinging to that past rather than resort to actually finding or presenting one iota of new evidence, which they would surely find impossible since no defamation or any other tort was ever committed by Bergeron against Xyience.

In fact, the only instance in which Xyience attorneys appear to defend the validity of the initial case is in pointing out that Bergeron's research methods are allegedly questionable because he failed to recognize that John Miller was not an official government agent. However, Bergeron never contended he was, as the Xyience pleading clearly denotes in the central paragraph on page 11. In quoting Bergeron's opposition they refer to Bergeron's claim that he did an internet search and found several references to the email address of the District Attorney and to John Miller. Bergeron never made the claim that Miller's government status or official capacity was in any way confirmed by his research. This central paragraph

on page 11 of the Xyience filing is irrelevant and immaterial to the current situation in this case. Xyience contends that "common sense" should have led Bergeron to question John Miller's Yahoo email address and neglects to account for Bergeron's disclaimer at the top of the email posting on MySpace. Bergeron did question the Miller email, thus he placed the disclaimer at the top of it claiming not all the information had been verified.

In all the attention shown to the John Miller email by Xyience attorneys in their latest pleading, there is never any insinuation or supporting evidence cited to prove Bergeron showed any reckless disregard or actual malice in regard to posting the Miller email. The worst allegation leveled by Xyience attorneys in their pleading is that "Mr. Bergeron's ability to verify sources is questionable at best..." Also, Xyience attorneys do not account for the fact that much of the email's facts were verifiable and Bergeron did later verify them. Also, the email posting did not truly involve Bergeron relying on the information as a "source." It was simply an email posted with a disclaimer and not a traditional article in any sense. The actual full verification of the facts and further investigation came later, as Bergeron promised it would.

## THE FRANK AND SANFORD RECORDING IS ADMISSIBLE

Again, with regard to the challenge of admissibility as to the recorded Frank, Sanford, and Bergeron conversation from November 6, 2007, Xyience attorneys are mincing words with their legal contentions. Citing Docket #3, Exhibit 64, Xyience attorneys hone in on a previous statement made by Bergeron in a prior pleading. Bergeron's words are quoted as classifying the November 6, 2007 conversation as designed "to discuss settling this case and moving forward." Like the difference between arguments and admissible evidence, there is a huge difference between settlement discussions and actual settlement negotiations. As Bergeron has previously made clear, there was brief mention of settlement in the November 6, 2007 discussion, but there was no negotiation on terms of settlement until after Bergeron returned home from the New York City trip paid for by Xyience.

Also, the actual recording is clearly not centered around any settlement issues discussed within the entire call. The recorded portion represents the first few minutes of the call, and is not part of settlement or "compromise" negotiations of any sort, so therefore Fed. R. Evid. 408 does not apply.

However, even if this court should determine that the recording does pertain to settlement negotiations, Xyience attorneys failed to address the rule's exception that applies. While Xyience attorneys do go as far as mentioning "alleged bias and prejudice" they do not provide refuting evidence to

deny the exception to Rule 408 Bergeron asks to be applied here. As such, the later argument raised by Xyience that Federal Law is immaterial does not account for the clear exception to the rule.

The follow up contention that Bergeron failed to authenticate the recording is also invalid as Bergeron signed affidavits detailing the conversation, certified the date of the call, and explained the circumstances regarding the context of the recorded portion in sworn statements. Hearsay also does not apply as Bergeron was a participant in the conversation that reveals Frank's bias and complicity in committing perjury.

XYIENCE CITES INSUFFICIENT GROUNDS FOR EXCLUSION OF EVIDENCE PLACED PROPERLY ON THE DOCKET BY BERGERON AND ACCOMPANIED BY AFFIDAVITS:

In regard to the contentions raised by Xyience on Page 13 of the opposition and on subsequent pages of the filing in list form, Bergeron vehemently opposes such request and challenges the grounds for requesting and granting such exclusions.

Bergeron accompanied all new exhibits with a rock-solid affidavit testifying to their authenticity, including Exhibit 50. Bill Underhill spoke personally with Bergeron over Halloween weekend in Las Vegas in 2008, and Underhill attested to the facts surrounding the Burrill financing, which was hashed out while he was still CEO and later shot down because it would require Underhill to be retained as CEO. As to that matter being immaterial that is a false assumption as that financing agreement being available is central to the very heart of the adversary and the core case. The triggering of this whole situation resulted only in the days and months after the Burrill financing was rejected in favor of Fertitta Enterprises financing, which was encouraged and promoted primarily by Adam Frank and Kirk Sanford.

Also with regard to Exhibit 50, Shareholder and former Xyience Consultant Ronald Solomon will file a comprehensive affidavit as part of Bergeron's motion to revoke the reorganization plan and recognize shareholders' rights to relief. That affidavit will further authenticate Exhibit 50, and if need be Underhill himself will testify about the Burrill Life Sciences funding.

As for the rest of the challenged affidavit and exhibit evidence, Bergeron stands by any and all such challenged material and has also provided ample authentication and proof of admissibility of said challenged material. Hearsay is not an appropriate challenge due to Bergeron's interaction and communication with numerous shareholders, former Xyience officers, and countless shareholders in building this case and stacking the evidence high. All relevance challenges are moot because there is

absolutely no specificity behind Xyience's contentions regarding the alleged irrelevant statements and no proof explaining why such statements are in any way irrelevant. All challenges raising settlement conference restrictions under Rule 408 fail to account for the rule's exception and are therefore barred from consideration. Lack of personal knowledge is also not a sufficient argument to exclude Bergeron's factual contentions and evidentiary support. There is no evidence whatsoever that has been provided by Xyience and no sufficient standing based on satutes, rules of procedure, or general court practices to justify the argument that Bergeron does not have personal knowledge to confirm the facts he's added to the record and to verify the exhibits he's placed on the docket.

The reasoning of Xyience is flawed in that there is no adequate explanation given of exactly what specific grounds apply here for sustaining Xyience's objections to the affidavits' factual contentions and other evidence filed in support of the show cause motion. Previously the only over-riding and valid objections regarding admissibility surrounded Bergeron's failure to provide supporting affidavits to accompany past exhibits and arguments, so Bergeron remedied that situation by providing at least one affidavit with every new motion. Now Xyience chooses to attempt to deny Bergeron his right to provide sworn testimony authenticating exhibits and relevant facts without providing any sworn evidence or even a declaration of their own to refute Bergeron's properly placed and completely substantiated affidavits and exhibits.

Finally, formal judicial notice should be taken of the following:

**Traguth v. Zuck, 710 F. 2d 90, 91 (1983):**

**"Implicit in the right to [self-representation] is the obligation on the part of the Court to make reasonable allowances to protect Pro Se litigants from inadvertent forfeiture of important rights because of their lack of legal training." And the "Court's duty is even broader in the case of a [Pro Se] defendant who finds [himself] in court against [his] will with little time to learn the intricacies of civil procedure and law." See 28 U.S.C.A. 1654.**

**CONCLUSION:**

Fertitta Enterprises and Xyience, Incorporated attorneys should all suffer sua sponte sanctions regarding their recent conduct which represents a clear motivation to obscure the truth, delay Bergeron due relief, and alienate the interests of the shareholder class entitled to relief in this matter along with Bergeron.

Ultimately, the over-riding grounds for vacating the preliminary injunction favor Bergeron and

will be made even more prescient by the show-cause hearing proceedings. Such a show-cause hearing will determine the level of culpability as to all parties participating in the conspiracy to silence Bergeron and deny shareholders any due relief. A formal forthcoming and already-served Rule 11 motion will outline further sanctions requests.

Adam Frank, Jamie Cogburn, and all attorneys participating in these proceedings at this point should take the stand in such a show-cause hearing and be subject to cross-examination. This will bear out the facts as to how much each individual knew or didn't know in regard to the injunction request and the lack of evidentiary foundation with respect to the declarations of Frank and Sanford. It will also determine what questions the attorneys asked or did not ask of their clients and what investigations were undertaken to determine the validity or lack thereof of the initial claims as well as Bergeron's subsequent counter claims.

Fertitta Enterprises has repeatedly come before the court and tried to explain it does not represent Xyience and did not take part in the conspiracy to silence Bergeron or the litigation against him brought by Xyience. However, there is clear evidence that Xyience (at least while under Fertitta control) acted with direct knowledge of the flaws, holes, and shortcomings of the initial complaint in choosing to pursue the claim after acquiring the chief lien position over the company.

A show-cause hearing should take place as soon as all parties have an opportunity to verbally argue their positions at the January 7th, 2009 hearing. All applicable parties in position to provide supporting evidence or relevant testimony should get a chance to take the stand and either confirm or deny the statements made in their declarations or attest to the due diligence efforts they either undertook or failed to undertake in arguing the case and supporting the injunction.

Such a show-cause hearing is long overdue, and it will provide crucial evidence that should not be limited to the preliminary injunction situation alone as suggested by the Fertitta Enterprises opposition. On the contrary, such evidence gathering will not be so much premature discovery as it will be a sound

and essential fact-finding mission designed to prevent needlessly carrying on a charade of a case that Xyience itself does not appear to even support or believe in anymore.

It is in the best interest of justice to deny the oppositions filed by Fertitta Enterprises and Xyience, Incorporated and approve the motion for an immediate show-cause hearing. As per Xyience's admission that the case against Bergeron persisting means the estate will be faced with needless expenses going forward, there should be no delay in settling this matter as soon as possible. Xyience has admitted the case is hopeless, and waiting for the liquidation trustee to decide the resolution of this matter will only further damage the estate according to Fenemore Craig attorneys' own definitive statements in their opposition regarding the intent to eventually dismiss the case. Regardless of the reasoning methodology, the intent to end the case has been voiced. To protect the very interests of the estate it stands to reason that Xyience should be forced to engage in a settlement conference at the earliest available opportunity.

Also, Bergeron will not submit to any settlement or dismissal that allows the injunction order to stand in any format, so Xyience's entire argument is both moot and a further waste of the court's time and the estate's resources. The Xyience attorneys admit in the first breath of the motion that they will ultimately dismiss the claim and then proceed to argue on behalf of maintaining an injunction that will be immaterial, unenforceable and irrelevant in the face of any dismissal. As such, it is really pointless to allow Fennemore Craig attorneys to collect any legal fees in connection with such a contradictory and senseless pleading.

Sanctions are appropriate and applicable in this matter due to both opposing parties' recent litigation conduct, and Bergeron asks by way of this reply that sua sponte sanctions ensue against the opposition and their legal teams in an amount to be determined by the judge's discretion. Of course, Bergeron also understand that the court may want to wait for the formal sanctions motion before exercising the right to levy sanctions in this matter. If the claim is not appropriately dismissed within the next two weeks, Bergeron will file the sanctions motion. Bergeron will also file the motion to revoke or

suspend the reorganization plan approval by the end of January, 2009. Bergeron is working on figuring out an adequate approach to serving the motion on all creditors and filing such a motion in the core case as outlined by the judge's order on the previous and premature attempt to revoke the reorganization plan approval order. He anticipates being able to overcome the obstacle with help from shareholders assisting him with evidence gathering and limited funding.

As for the instant motion, it should be granted based on the prior pleadings, the evidence on the docket, the sworn affidavits in support of said motion, and the rule of law. Bergeron asks that a determination be made as soon as possible on the recording's admissibility, before the hearing if possible, as he intends to ask to play the recording for the court's review if it is deemed admissible, as it should be.

*Dated January 1, 2009*

IN PROPER PERSON

[signature]

Rich Bergeron
147 Old County Road
East Sandwich, MA 02537
617-209-4325
Attorney Pro-Se
Rich.Bergeron@gmail.com