RECEIVED & FILED

JAN 21 2 41 PM '09

U.S. BA... MARY A. SCHOTT, CLERK

Rich Bergeron
147 OLD COUNTY ROAD
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>XYIENCE, INC., A Nevada Corporation<br><br>Debtor. | No. BK-S-08-10474-MKN<br>Chapter 11<br><br>~~Eighth Judicial District Court~~<br>~~Las Vegas, Clark County, Nevada~~<br>~~Case No. A544781, Dept. XXIII~~ |
| XYIENCE INCORPORATED, a Nevada Corporation,<br>Plaintiff,<br><br>v.<br><br>RICHARD BERGERON, an individual<br>Defendant. | CASE NO. BK-2-08-AP-01082-MKN<br><br>**DEFENDANT AND COUNTERCLAIMANT'S AMENDED MOTION FOR RULE 11 AND 9011 SANCTIONS**<br>Hearing Date: ________, 2008<br><br>Time: 9:30 AM<br><br>Location: 300 Las Vegas Blvd. South<br>Courtroom #2<br>Las Vegas, NV 89101 |
| RICHARD BERGERON, an Individual,<br><br>Counterclaimant,<br><br>v.<br><br>XYIENCE INCORPORATED, a Nevada corporation; FERTITTA ENTERPRISES, INC., a Nevada Corporation,<br><br>Counterdefendants. | |



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

# DISPOSITIVE MOTION FOR RULE 11 AND 9011 SANCTIONS

**"The public interest in being fully informed about controversies that often rage around sensitive issues demands that the press be afforded the freedom to report such charges without assuming responsibility for them. The contours of the press's right of neutral reportage are, of course, defined by the principle that gives life to it. Literal accuracy is not a prerequisite: if we are to enjoy the blessings of a robust and unintimidated press, we must provide immunity from defamation suits where the journalist believes, reasonably and in good faith, that his report accurately conveys the charges made."** ***Edwards -v- National Audubon Society*** **[1977] 556 F. 2d 113**

## INTRODUCTION

Defendant Rich Bergeron presents this motion and supporting evidence primarily to facilitate sanctions against: the plaintiff Xyience; original Xyience Attorney Jamie Cogburn; Attorneys John Mowbray, Jon Pearson and Laurel Davis and their firm: Fennemore and Craig; Attorney Pamela Lawson and her firm Hunterton and Associates; Attorneys Matthew C. Zirzow and Gregory Garman and their firm: Gordon and Silver, LTD; Frank Fertitta, Jr.; Frank Fertitta III; Lorenzo Fertitta; Bill Bullard; Zyen, LLC; Zuffa Marketing, LLC; Kirk Sanford; Karim Maskatiya; Omer Sattar; Adam Frank; Zuffa, LLC; Station Casinos; and Fertitta Enterprises.

These parties should be sanctioned for orchestrating, bringing, and pursuing--without any adequate investigation of the facts--a frivolous suit against Bergeron based on the federal and state provisions of Rule 11 and bankruptcy rule 9011, which is nearly identical in purpose, design, and format as Rule 11. This behavior also injured the class of shareholders invested in Xyience as the purpose of this entire litigation was to silence and severely handcuff Bergeron's ability to report on the facts as Xyience was being purposely driven into the ground by Fertitta Enterprises and its co-conspirators to promote a fraudulent bankruptcy.

The above-named parties are either directly, indirectly, or completely vicariously culpable for continuing, funding, instigating, and/or fraudulently orchestrating the filing and maintenance of this frivolous lawsuit against Bergeron. This motion is also designed to encourage the immediate end to the bogus initial litigation filed by Xyience, Inc. against Rich Bergeron and supported by the above named individuals and entities. Their conspiracy to silence Bergeron led to hundreds of shareholders being left in the dark about the corrupt behavior that went on at the company leading up to the Fertitta Enterprises buy-in and the subsequent fraudulent bankruptcy. Therefore, Bergeron asks that any sanctions awarded heavily favor the interests of the shareholders who were injured as a direct result of this case against Bergeron.



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

**PARTIES SUBJECT TO SANCTIONS AND BASIC CONDITIONS UNDER WHICH SANCTIONS SHOULD APPLY:**

**Xyience, Inc. and Fertitta Enterprises** (Fertitta), the main co-conspirator entities, are both Nevada corporations and are authorized to do business in the State of Nevada. **Bill Bullard and Zyen, LLC** are also associated with Fertitta Enterprises and the fraud as the Zyen, LLC name and Bullard's signature were placed on certain fraudulent documents, such as the Zyen foreclosure notice. As such, both are subject to sanctions, and both shall be served with this motion at Fertitta Enterprises' same address. Fertitta Enterprises' principal place of business is at 2960 W SAHARA AVE., Las Vegas, NV 89102 with a mailing address of P. O. Box 27555, Las Vegas, NV, 89126-1555.

**Xyience, Inc.'s** principal place of business is at 4572 W Hacienda Ave., Las Vegas, NV, 89118.

**Jamie Cogburn**, the most culpable of all attorneys as the originator of the frivolous complaint, is a Nevada attorney doing business through Cogburn Law Offices. Jamie Cogburn's principal place of business is at 170 S. Green Valley Pkwy., Suite 280, Henderson, NV 89012.

**Attorneys Laurel E. Davis (NV Bar No. 3005), John H. Mowbray (Managing Director of Fennemore Craig, P.C.'s Las Vegas Office), and Jon T. Pearson (NV Bar No. 10182)** are all employed by **Fennemore Craig, P.C.**, which has the responsibility of carrying the company through bankruptcy. While it may be the debtor firm's duty to hold on to all assets, this case is and has been from the outset a disgusting abuse of process that Fennemore and Craig Attorneys have not properly investigated as to its merits or viability, even after being duly warned. (see emails in exhibits 55 and 56) They have been adequately informed of the weaknesses and lack of foundation of their argument and evidence, and they have been told their case was based on fraud, but they have continued to maintain the case anyway. Fennemore Craig, P.C.'s and the above named attorneys' principal place of business is at 300 South Fourth Street, Suite 1400, Las Vegas, Nevada, 89101.

**Attorney Pamela Lawson and Hunterton & Associates** are culpable for seeking a default judgment and sanctions based on a fraudulent complaint they obviously did not properly investigate. Lawson's and Hunterton & Associates' principal place of business is at 333 South Sixth Street, Las



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

Vegas, NV 89101. Bergeron can show that this firm was the personal choice of Adam Frank and Kirk Sanford (Exhibit 60), and the firm would also be in a position to know the initial complaint was baseless if they had done a proper investigation.

**Attorneys Matthew C. Zirzow and Gregory Garman and their firm Gordon and Silver, LTD** are also liable for sanctions considering their direct and indirect support of Xyience's position in the initial case as well as their unfounded request and motion for a show cause hearing regarding the court recording. Zirzow's, Garman's, and Gordon and Silver, LTD's principal place of business is at 3960 Howard Hughes Parkway, Ninth Floor, Las Vegas, Nevada 89169.

**Frank Fertitta, Jr., as Chairman of the Board of Fertitta Enterprises** is liable for sanctions due to his chief role in the corporation. Fertitta has a long line of connections to organized crime figures in Kansas City and Texas. This "family" history has tainted his reputation with the Nevada Gaming Commission and led to the transfer of Mr. Fertitta's Station Casinos interests to his sons Lorenzo and Frank Fertitta III.

The Fertitta family, with Frank Junior **(See Exhibit 61)** and his son Frank III setting the pace, makes regular, significant contributions to Republican and other powerful interests at the national and state level, frequents Station Casinos establishments regularly, and runs the family business. Bergeron has also been told that Frank Fertitta, Jr. put a significant amount of his own assets behind the Zyen, LLC loan instrument that facilitated the Xyience bankruptcy situation. Bankruptcy fraud is not a stretch for Frank Fertitta, Jr., as he has been living a fraud for most of his adult life as he pretends to this day to have never had anything to do with organized crime despite glaring evidence to the contrary. There's been a book and a movie about the skimming Fertitta ***was implicated in***: by both wiretap evidence and Harry McBride's testimony in Kansas City (see exhibit 62). Most of Fertitta's associates were indicted and convicted, but Fertitta was spared.

Frank Junior had to indoctrinate his sons early in the old-school Mafia methods of greasing the wheels with payouts and support rendered to big political campaigns (like that of Judge Timothy Williams who first presided over this case in Clark County) and taking care of the local police. The Las Vegas Sheriff's Position has been especially rewarding. Fertitta family members and business interests gave a combined $65,000 to Doug Gillespie's uncontested campaign for the seat in 2006 after Sheriff Bill Young's retirement. Sheriff Young went right to work as the head of security for



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

Station Casinos before other job offers could overwhelm him. (see exhibit 63)

Frank Junior may try to appear inconspicuous and inconsequential as far as his role in the family business, but his money and influence goes a long way in making all this fraud possible, and as such he should be sanctioned heavily as well.

**Frank Fertitta, Jr.'s** principal place of residence is 20 Vintage Court, Las Vegas, Nevada, 89113.

**Frank Fertitta III and Lorenzo Fertitta** are liable and sanctionable for their behavior to bolster Zuffa, LLC through an impossible to maintain Xyience sponsorship agreement they set up to benefit themselves. These individuals stood to gain the most in this whole scheme, and after Bergeron had begun to report on their involvement, each of these individuals acted in concert to stop Bergeron's reporting with a fabricated lawsuit. The Fertittas were so anxious to get Bergeron's stories off the net that they promised to pump $15 million into the struggling company sponsoring their other organization (Zuffa) to get the job done. Bergeron's stories were getting too close for comfort, and Zuffa, Xyience, and Fertitta Enterprises needed radio silence to pull off the maneuvers that also make the core case suspect:

Using Xyience's thrown together sponsorship to satisfy the covenants of their $350 million senior secured credit facility taken out on Zuffa, LLC in the summer of 2007, Zuffa, LLC's officials, especially the Fertittas, knowingly and willfully lied to the loan guarrantors regarding the strength of Xyience considering the Fertittas were planning to invest in it and knew full well that the company was highly distressed and would soon be bankrupted by their own team of corporate raiders.

Lorenzo Fertitta is also not only a majority owner but also now chairman and chief executive officer of the UFC's parent company, Zuffa, LLC, which has been the prime beneficiary of the Xyience bankruptcy aside from Fertitta Enterprises.

**Frank Fertitta III's** place of residence is at 9400 Kings Gate Ct., Las Vegas, NV 89145.

**Lorenzo Fertitta's** place of residence is at 8913 Greensboro Lane, Las Vegas, NV 89134.

The Fertitta family has a significant interest in **Station Casinos**, and through that company they forged the relationship with Global Cash Access that would lead to a line of ousted GCA employees flocking to Xyience in a time of need. The opposition's lawyers will likely try to maintain that there is no liability on behalf of Station Casinos, but the Fertittas planned this entire situation to



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

get the kind of debt instrument out of the UFC they could no longer get from their casino empire.

Using a desperate situation at Station to suit their own needs, they recently tried to get their investment partners to agree to a deal that is reported as being very similar to what Fertitta Enterprises did with Xyience. They essentially tried to get another first-lien position they could take into bankruptcy. One of multiple newspaper reports on the subject described Station's last minute dealing this way:

**"The offer has strings attached. Unless 82.5 percent of the old bonds are exchanged, the owners' loan would be ahead of both the old and new bonds in the capital structure. This means that Station's Fertitta family, which owns about 24 percent of the company, or Colony Capital, the private equity firm that put up the majority of the money in the buyout, would be paid before bondholders in a bankruptcy."**

Before other entities were ever paid in full for past debts, a Fertitta-owned Xyience paid off all past UFC debts that Xyience had accrued and signed an overblown sponsorship extension that was heavily publicized. They did all this with their first lien position. They only wound up in that position after threatening bankruptcy if the company didn't sign it over to them.

The Xyience bankruptcy seems peculiar in light of the current Station Casino issues. (http://www.reuters.com/article/marketsNews/idUSN1245664020081212) Judge Nakagawa's courtroom seems to be the stage of a dress rehearsal Fertitta Enterprises executed as if one hand did not know what the other hand was doing. Overburdening themselves with building projects and land-buying sprees, the Fertittas maxed out their corporate credit and now have to squeeze more out of other entities as a result. Knowing this trouble was on the horizon they now appear to be using this smaller entity as a practice run for what they will have to do with the bigger one.

The Conflict of Interest issues involved in the Global Cash Access Holdings connection to both Station Casinos and the Xyience bankruptcy process is staggering. The obvious problems and potential for abuses that stem from a sponsor being owned by the company it sponsors are magnified tenfold in this scenario. In this case, Fertitta Enterprises really went the extra mile to abuse the Xyience ownership position. Under the leadership of Global Cash Access officials Xyience signed a multi-million dollar, widely publicized, middle-of-the-mat sponsor deal with Zuffa, LLC. Xyience, Fertitta Enterprises, and all company officials aware of the state of the company's books should have known such a deal was impossible to maintain. **So, why draft and execute a deal you know you are surely going to break? To create a false bidding war and get a new and improved client to take the deal at a higher price.**



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

(i.e. Harley Davidson, Bud Light)

This is why Fertitta Enterprises orchestrated the suit against Bergeron: to keep their involvement in this whole scandal and all their intricate maneuvers within it out of the public view. Harley Davidson had to outbid Xyience by a reported $200,000 to replace the Xenergy can in the center of the UFC mat. Bud Light no doubt paid more than Harley Davidson to take over the spot they own now.

Given this situation, Station Casinos can also be considered culpable for vicarious liability. All these arms were operating with direct orders from one main brain: Fertitta Enterprises. This was their party, and they invited a lot of guests so they could scatter the blame for what they were going to do. Yet, the one chief and over-riding financial interest of the Fertitta Family is Station Casinos. Any action they took against Bergeron to silence his reporting would have been a direct attempt to avoid his digging into their activities. Also, they knew if their role in the bad faith, fraudulent bankruptcy was exposed it would get the family in trouble with the state's gaming commission. The particular common ingredient of both Xyience and Station Casino operations is the relationship with Global Cash Access, which should by its very dual nature be investigated heavily as it relates to potentially widespread international money laundering.

**Station Casinos'** Principal Place of Business is: 1505 SOUTH PAVILION CENTER DRIVE, LAS VEGAS, NV 89135.

**Zuffa, LLC & Zuffa Marketing, LLC** are subject to sanctions as collectively the primary businesses benefiting from the Bergeron injunction, as Xyience funding—from a campaign that began almost immediately after the injunction's filing—allowed Zuffa Marketing to achieve full collection of past debts from a Fertitta-owned Xyience just before bankruptcy. Zuffa Marketing is also culpable for the signing of a new sponsorship/marketing contract through false pretenses, paid for by bankruptcy-approved funds despite the high cost and rate of said sponsorship/marketing and the close relationship between the Fertittas, Xyience and Zuffa. **Zuffa Marketing, LLC's** principal place of business is at 2960 W. Sahara Avenue, Suite 100, Las Vegas, NV 89102. **Zuffa, LLC's** principal place of business is at 2960 W Sahara, Suite 200, Las Vegas, NV 89102.

**Kirk Sanford**, former CEO of Global Cash Access Holdings, former associate of Fertitta Enterprises' Station Casinos through past business dealings, and the former Xyience Co-CEO, is



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

culpable for sanctions on multiple levels. While in a direct managerial position at Xyience he pursued a lawsuit against Bergeron he knew was unfounded. Sanford made a conscious decision to both refuse to pay and replace Jamie Cogburn as company counsel. At the same time Sanford and Xyience continued to stand by Cogburn's initial complaint and unconstitutional injunction under new legal counsel. Sanford was served with a previous Rule 11 motion in late November of 2007. **Kirk Sanford's** place of residence is at 7199 Ranchito Cir., Las Vegas, NV 89120-3039.

**Karim Maskatiya** is culpable under vicarious liability for sanctions related to his collusion with fellow Xyience investor/board member/co-CEO Kirk Sanford to improperly and unconstitutionally silence Bergeron through the courts so Bergeron would not expose ongoing investigations at GCA Holdings and Xyience, Incorporated. Maskatiya's background ties him to some huge financial transactions and some major money processing corporations, which make allegations of Maskatiya being engaged in overseas skimming operations through Global Cash Access Holdings very intriguing and worthy of a serious inquiry. Maskatiya has been brought up on Civil RICO charges before and paid the price financially but not criminally for his behavior then. He has apparently not learned to engage in more reputable deals. Karim Maskatiya's principal place of business is at 643 River Oaks Pkwy., San Jose, CA 95134-1907.

**Omer Sattar**, the President of Xyience throughout the bankruptcy, produced declarations for this court in the core bankruptcy that were rife with perjury, made no mention of the Bergeron proceeding, and improperly classified the causes and nature of the bankruptcy and the motivations for the filing. In regards to the instant case, Omer Sattar had a fiduciary duty to ensure a proper investigation into the Bergeron claim had been conducted. Sattar did not perform a due diligence assessment of the claim and continued the suit without regard as to its validity or supporting evidence. Omer Sattar's place of residence is at 660 Tam O' Shanter, Las Vegas, NV 89109-0102

**Adam Frank**, Co-CEO with Kirk Sanford in November of 2007 when Bergeron attended the UFC 78 mixed martial arts event at their request, signed a declaration that constitutes perjury. Frank's declaration is the bread and butter of this case, and it attests to facts Frank was never in any position to corroborate. Frank contradicts the declaration in a recorded conversation Bergeron details later in this motion. Frank also contradicted the entire purpose of the initial complaint and injunction along with the intentions he expressed to the shareholders about the direction of the company when



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

he met with Bergeron and Robert Lavan of Standard General in Times Square prior to UFC 78. Upon information and belief Adam Frank's place(s) of residence(s) is(are) 620 Palmwood Ln., Las Vegas, NV 89123-0250 **AND/OR** 6238 Santa Cruz Ave, Las Vegas, NV 89108-3316.

Whether or not all of the above named individuals were intimately aware of the full spectrum of facts regarding this lawsuit they all profited off the suit's advancement and/or provided some kind of direct or indirect support to continue the case. Even if any of the above named individuals weren't apprised of all the facts, it was their legal or fiduciary duty to learn them and it was their negligence in allowing this sham of a case to continue. That kind of abusive litigation strategy, furthered by corporate executives and Vegas power brokers, constitutes sanctionable and even criminal behavior in some instances. The above-named parties engaged in a conspiracy to abuse the court system by way of this illegitimate suit, and abuse of process torts would only apply at the state level. The same goes for the intentional and fraudulent bankruptcy process they have followed in the core case, and as such all injured shareholders should receive at least a $2 a share valuation pending a full investigation. Those who were part of the conspiracy network and sought to smuggle the company through foreclosure and bankruptcy are just as culpable as those who funded this whole ugly process. They should all forfeit whatever shares they own completely. Those shares should be redistributed evenly to the remaining "similarly situated" shareholders as far as relief being due for the fraudulent process and the counter-defendants' and above named parties' collusion in abusing it. A show cause hearing should ensue to determine whose shares should be challenged and redistributed and which shareholders are due full and fair relief. Any and all individuals and entities attached to the above-named individuals should be excluded from collecting relief on their listed shares.

The Seventh Circuit explained that, in its view, Rule 11 "effectively picks up the torts of abuse of process . . . and malicious prosecution."Id Abuse of process corresponds to the improper purpose prong of Rule 11 in this analysis; the Restatement defines that tort as "us[ing] a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed . . . ." RESTATEMENT (SECOND) OF TORTS § 682 (1977). Malicious prosecution, on the other hand, requires that the lawsuit be without merit. *See* Grip-Pak, Inc. v. Ill. Tool Works, Inc., 694 F.2d 466, 471 (7th Cir. 1982)

A Rule 11 Motion, such as this, which will be served on all named parties 21 days before it is filed, is the only available and appropriate remedy. Abuse of process and malicious prosecution claims



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

are valid and enforceable here, and as such this detailed motion constitutes such claims properly pursued under Federal Rule 11 and Bankruptcy Rule 9011. Moreover, the abuse of process claims are leveled in both this proceeding and the core bankruptcy case. To provide further evidence of impropriety in the bankruptcy case, Bergeron is willing to submit a supplementary brief regarding only the core case issues and supporting evidence. All shareholders due full and fair relief should be granted such and allowed to collect at a minimum $2 a share valuation. Many of them bought at the $3.00 to $5.00 range (and some above that even), but as it is they are receiving nothing. No compromise agreement should consider a lesser amount per share for these damaged parties in addition and direct relation to Bergeron's being forced to stop reporting the facts to them.

**AN AWARD OF SPECIAL DAMAGES AND PUNITIVE DAMAGES IS APPROPRIATE AND SHOULD BENEFIT ALL PARTIES DAMAGED BY ALLEGED SANCTIONABLE BEHAVIOR:**

Bergeron should be awarded reasonable legal fees as special damages and punitive damages proportionate to the egregious injustices he has suffered as a result of this frivolous case and the amount of time he has had to put into defending himself and the currently unofficially-represented class of honest share holders. Bergeron has had to put himself through an informal law school that has occupied a ridiculous amount of time that can never be recovered. Bergeron has been unfairly targeted by a vicious and deceptive campaign to undermine his impeccable integrity in order to promote an investment in Xyience by a group of players led by Fertitta Enterprises and former Global Cash Access Holdings employees. The courts of Nevada have been used and abused at several levels by these individuals and entities, bankruptcy fraud has been instigated on their behalf, and they are all coordinating to silence Bergeron to keep their involvement in the whole grand scheme quiet.

Bergeron, for being unjustly targeted and attacked, is therefore entitled to just compensation due to the initiation of the plaintiff's fraudulent complaint. A $150,000,000.00 compensatory award for: Bergeron's reasonable attorneys' fees and costs; a set allowance for the court's costs; and a sufficient and substantial allowance for injured shareholders (at least $2 a share plus 10 percent interest, and excluding fraudulent actors in conspiracy from collecting) can be sustained under that judgment on the basis of the court's inherent authority, recognized in § 105(a), (5) to impose sanctions for a pattern of bad faith conduct that transcends conduct addressed by particular rules or



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

statutes. Chambers v. NASCO, Inc., 501 U.S. 32, 51 (1991); Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)., 77 F.3d 278, 283 (9th Cir. 1996). As the Supreme Court explained in Chambers, "if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." Chambers, 501 U.S. at 50. The entities and collective individuals involved in this will not learn anything from a slap on the wrist or a free pass to do it again. They've just been identified repeating past transgressions they got away with that resulted in the current catastrophe. Allow them to do it again at the fraud will be bigger next time. How big does it have to be for this court to act?

This court can also levy its own sanctions based on the facts presented:

> The inherent power to sanction bad-faith conduct is a separate and distinct source of authority, which is not displaced by the federal statutes and rules. Chambers, 501 U.S. at 46. It is broader than Rule 9011 sanctions and "extends to a full range of litigation abuses." Id. Thus, a court may sanction pursuant to its inherent authority even when the same conduct may also be punished under another sanctioning statute or rule. Id. at 49 ("[I]nherent power of a court can be invoked even if procedural rules exist which sanction the same conduct."); Link, 370 U.S. at 629-32 (holding, in sua sponte dismissal for failure to prosecute, that the existence of Fed. R. Civ. P. 41(b), which allows a party to move for dismissal for lack of prosecution, did not abrogate this "long . . . unquestioned" power); Primus Auto. Fin. Servs., Inc. v. Batarse, 115 F.3d 644, 648 (9th Cir. 1997) (citing with approval a Third Circuit case which held that it is not necessary for a court to "exhaust all other sanctioning mechanisms prior to resorting to its inherent power).

Sanctions under a court's inherent power are justified against a party who willfully disobeys a court order or acts in bad faith, "which includes a broad range of willful improper conduct." Fink v. Gomez, 239 F.3d 989, 991-92 (9th Cir. 2001). To impose inherent power sanctions, a court must find that a party acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers, 501 U.S. at 44. A show cause hearing on this motion will prove beyond the shadow of doubt that bad faith exists in the instant case, but the attached exhibits and affidavits also speak to the bad faith filing argument.

A monetary penalty is an appropriate sanction, and such a penalty may be combined with other sanctions necessary to deter. Fed. R. Bankr. P. 9011(c)(2). See also 10 Collier on Bankruptcy ¶¶ 9011.02[2], 9011.09 (Lawrence P. King, et al. eds., 15th ed. rev. 2002) (citing Federal Civil Rule 11, and quoting the Advisory Committee Note to the 1993 Amendments, which states: ***"[U]under unusual circumstances, particularly for (b)(1) violations, deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation."); Schwartz v. Kujawa (In re Kujawa), 270 F.3d 578, 583-84 (8th Cir. 2001).***



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

Bergeron was not the only party injured by the conspiracy to silence him outlined in this motion, and he also is not the only one being damaged by the overall fraudulent bankruptcy itself. Silencing Bergeron illegitimately prevented hundreds of shareholders from learning of the fraud at hand until it was much too late to protest. Their shares were made worthless while Bergeron was being tied up in the courts and unable to devote more effort to reporting on the scandal.

Filing bankruptcy was a direct and so-far successful attempt by the conspiring individuals and entities to subterfuge the company purposely, to impose the bankruptcy stay and the court's protections by filing an illegitimate bankruptcy petition, and to lock out all the other shareholders and note-holders with the first Fertitta lien position (by defaulting immediately after the very first loan payment was due and engaging in these bankruptcy proceedings soon afterward). The first funding consent letter (see exhibit 57) went out to shareholders almost immediately after the injunction became official against Bergeron (September 13, 2007), and the expedited path toward bankruptcy at one point relied on a failed effort by Xyience to actually recruit Bergeron as an ally in a lawsuit Russell Pike brought against the two former Xyience Co-CEOs Adam Frank and Kirk Sanford.

The above-named attorneys and parties managed to get away with what they have done here to Bergeron and to injured shareholders through silencing him for so long now that it almost seems to be too late for any other alternative besides immediately forcing the culpable parties to pay appropriate damages for their roles in damaging so many innocent individuals. This can be accomplished through the enforcement of this motion. It's more than probable that the above named parties also abused the core proceedings in a similar if not more egregious fashion. They have built their case on lies and fabrication, and all parties culpable should be held accountable for their respective roles.

**Fed. R. Bankr. P. 9011(b).**

**5. Section 105(a) provides:**

(a) **The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.**

Xyience Counsel Jamie Cogburn filed several triggering fraudulent motions, all supported by subsequent attorneys and firms, and all based on misrepresentations of fact, falsified evidence, and



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

utter abuses of the legal process. The bad faith motive was always to silence Bergeron so the improper, fraudulent bankruptcy could go forward. As a result of the conspiracy to silence Bergeron now being brought to full light with supporting affidavits and fully-certified evidence, the preliminary injunction issued by this court should be vacated, and the case should be dismissed ***with prejudice***.

The basis for such a sweeping decision is laid out in the various affidavits on the record and those attached to this motion proving this case was induced by fraud, supported without questions being asked or proper investigations being completed, and continued to this day based on absolute lies. The above-named individuals and entities collaborated to destroy Xyience and improperly enrich themselves in the process.

**Federal Rule of Bankruptcy Procedure 9011** provides in pertinent part:

> **"The signature of an attorney or a party constitutes a certificate that the attorney or party has read the document; that to the best of the attorney's or party's knowledge, information, and belief formed after reasonable inquiry it is well-grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and that it is not interposed for any improper purpose . . . ."**

Any sanctions issued should weigh the culpability of the above-named individuals and entities appropriately and provide for severe punishment that adequately discourages such behavior in the future by each party involved in the deception at the heart of this fraudulent case. It is clear that all the attorneys named above are immediately sanctionable as per Rule 9011, but it is also pertinent and necessary to level special damages sanctions at those who funded, supported, and profited off the general conspiracy to file and press this case despite the complete lack of any foundation for legal action against Bergeron.

The initial and revised arguments and pleadings in this case have been supported and abetted by: Xyience, all attorneys working on behalf of Xyience or supporting its position in the initial claim, all of the above named business entities and other individuals who either profited off this arrangement or encouraged it to continue based on known fraud, and most of all by the vicariously liable chain of networking entities and individuals that make up the whole cabal behind this wave of corporate fraud with Frank Fertitta III, Lorenzo Fertitta, Fertitta Enterprises, Zuffa Marketing, LLC, and Zuffa, LLC making the most significant profit off said fraud.



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

These colluding parties used Xyience as a mere pawn in a grand scheme of financial fraud strengthened by the Fertittas' powerful political influence and associations. The counsel of these various parties have subsequently made and raised arguments and pleadings in this case as well as within the core bankruptcy proceeding that are lacking any plausible legal or factual basis, are undoubtedly unmeritorious, do not abide by common sense, have been brought in bad faith, and have resulted in unreasonable, unnecessary and vexatious increases in litigation and other costs to the parties, together with a multiplicity of proceedings.

Rule 11 and Bankruptcy Rule 9011 empower federal courts to impose sanctions where a signed paper submitted to the court is either frivolous or filed for an improper purpose. Townsend v. Hellman Consulting Corp., 914 F.2d 1136, 1140 (9th Cir.1990) (en banc ). The court has broad fact finding powers when imposing sanctions under Rule 11. United States v. Skyline Terrace, 26 F.3d 923, 927 (9th Cir.1994) (citing Townsend, 929 F.2d at 1366). The court also has inherent authority to sanction bad faith. Chambers v. Nasco, Inc., 501 U.S. 32, 111 S.Ct. 2123 (1991).

Several pleadings themselves qualify as sanctionable offenses, and each attorney named above has filed at least one, and in some cases a number of motions, without properly investigating many of the "facts" within those motions. If need be, Bergeron can produce a supplemental brief outlining exactly where every instance of fraud occurs in each motion filed by those attorneys who have handled the litigation against him thus far. Beyond that behavior, however, is the generally lackluster attitude all the above named parties showed toward this lawsuit and in bolstering the initial fraudulent claim. It is clear they all banked on winning the suit because they were facing a pro-se attorney and had the money to pay their lawyers to crush him.

An evidentiary hearing in which all the above named parties are cross-examined will show the lack of a proper investigation and enable the court to find out whether or not any due diligence at all was exercised on behalf of the plaintiff, subsequent attorneys, and those named above who participated in the conspiracy to silence Bergeron's reporting and therefore keep shareholders out of the loop as to the ongoing fraud. These parties profited off of Bergeron's silence and collectively instigated these bankruptcy proceedings in order to defraud the company under the radar.

**RULE 11 AND 9011 GROUNDS FOR SANCTIONS AND DETAILED ALLEGATIONS AGAINST PARTIES SUBJECT TO SANCTIONS:**



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

**ATTORNEY SANCTIONS SHOULD BE INSTITUTED AGAINST ANY AND ALL ATTORNEYS HANDLING THE CASE AGAINST BERGERON AND SUPPORTING THE INITIAL CLAIM IN ANY WAY.**

All of the plaintiff's various attorneys in this case, especially Jamie Cogburn, should incur sanctions levied by this court under Nevada Rule 11 and Bankruptcy Rule 9011 provisions based on the false and misrepresented evidence submitted to present this fraudulent case.

**Attorney David Winterton never alleged that Bergeron made up any quotes of his.** Bergeron searched his email database and found communications with Winterton that show the attorney he quoted had no complaints about the accuracy of those quotes. (see attached Bergeron affidavit and exhibit 64)

**Xyience IS being investigated by the SEC**, and Bergeron has had communications with government officials to prove such an investigation is ongoing and was in motion before the Xyience suit against him was filed. (see exhibit 52)

**Bergeron did speak with individuals who alleged Dana White and Russell Pike participated in a joint scheme to defraud Xyience investors by selling television advertising to Xyience shareholders that White received for free from Spike TV**. The commercial airtime being given to White for free was backed up by two reliable sources, one of which sat in on the meetings with Spike TV officials and Xyience. These witnesses will not reveal their names for fear of reprisals. Bergeron never printed their accusations in a manner that left no room for questioning whether or not the accusations were true. Those who read the witness statements had a choice whether to believe the accusations or dismiss them because they came from anonymous sources and were framed as sheer allegations, not as definitive fact. Bergeron never qualified the accusations and statements as 100% true facts that all reading should be aware of and guaranteed of. Bergeron specifically reported that one of his sources told him that he never actually saw money change hands between Dana White and Russell Pike.

Russell Pike and Dana White's newfound friendship at the beginning stages of Xyience (which stemmed from Pike's wife Jennifer's association with White during their time together in high school at Bishop Gorman in Las Vegas) set the two up to use Xyience as a cash cow for the UFC right up through the company's unfortunate demise through the forced bankruptcy. The bankruptcy still has



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

not resulted in the elimination of Xyience payments to the UFC. The fact that Dana White's associations with Pike and his wife is what got Xyience into partnership with the UFC is not in dispute. That is clear now and has been reported by numerous parties Bergeron spoke with through the investigation of this story. White still maintains a strong friendship with Russell Pike's wife and should be absolutely familiar with Russell Pike's criminal background by now if he was not when they first met.

Allowing the UFC to do business with a convicted felon like Pike when he was in control and then stealing the company out from under him through Fertitta Enterprises was Dana White's way of scamming a scam. Whatever profits he allegedly pocketed from the unholy alliance before Fertitta Enterprises muscled in on Xyience, nobody saw the transactions go down in public, but enough people talked about it and hinted at it to believe it was going on. That's all Bergeron's stories reported.

Xyience as an entity continues to obscure the truth and commit fraud in their business practices. Their Web-site lists and pictures several fighters they claim to sponsor who have professed their unhappiness with their sponsorship, and despite reports of these fighters publicly proclaiming no affiliation with Xyience they are still prominently displayed in connection with the company. Bergeron has previously pointed this out in prior legal motions only to find no change in the appearance of debtor's Web-site. Beyond this, they are actively engaging in bankruptcy fraud and have defrauded hundreds of shareholders in the process of improperly enriching themselves through the whole scheme to profit off of Xyience's loss that they in fact promoted and initiated intentionally.

One Ultimate Fighting Championship fighter, Travis Lutter, in late April of 2008, publicly mentioned that he asked UFC President Dana White where his Xyience sponsorship money was. Lutter made the announcement in an audio interview available at:

http://www.mmarated.com/blogs/blog/20080429/the_travis_lutter_saga_continues___-463.html

Lutter said he e-mailed Dana White about the $36,000 that Xyience still owed him. Lutter, having just been dismissed from the UFC for a lackluster ring performance, must have targeted White in association with Xyience for a reason. Here's what Lutter said in the interview about the subject:

***LUTTER: "I sent Dana White two emails, but he didn't return 'em."***



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

*MMARATED.COM: What was it like you trying to say that you wanted to have a chance to talk with them, have your side of the story?"*

*LUTTER: "No, I just said, you know, hey, you know, thanks for the opportunity. Ah, you know, I'm still owed some money on the Xyience contract, I never got all the money for that. Are you guys gonna pay me? And you know thanks for the opportunity for fighting with you guys, and, you know, I appreciate it."*

*MMARATED.COM: "Is it a huge sum of money that they still owe you?"*

*Lutter: "Ahh, thirty-six thousand dollars."*

Lutter also explained that UFC Fighter Matt Serra was owed money as well by Xyience related to winning The Ultimate Fighter reality series competition run by the UFC, aired on Spike TV, and sponsored at one time by Xyience.

Bergeron has been told Xyience-sponsored fighters always tended to make more money per fight than non-Xyience sponsored fighters in the UFC at one point. It was as if these fighters were getting rewarded for their patience with the company. Xyience, according to a former company accountant Bergeron spoke to, was often late with checks they did send to their sponsored fighters.

The bankruptcy process led Xyience to be completely delinquent on several fighter paychecks for an extended period of time, and some fighters may still be unpaid as a result. Four of the nine fighters listed on the company's fighters page at xyience.com at the moment have told the press they are no longer sponsored by the company. The Fertittas (Lorenzo and Frank III), through Fertitta Enterprises and Zyen, LLC are heavily involved in providing the income to salvage Xyience and are also in a position to know which of their UFC fighters are actually sponsored by Xyience. It is clear that the failure to remove these fighters from the Web-site constitutes Fertitta Enterprises and the UFC willfully promoting ongoing fraud through the misrepresentation of Xyience's sponsorship efforts. Also, it is peculiar that the Fertitta-owned Xyience made it the highest priority to pay off the UFC's huge multi-million dollar sponsor payment obligations even while some of the UFC's bread and butter fighters were owed much smaller payments. It goes to show the selfish nature of these entities and individuals, who are all acting in accordance with each other's collective wishes to get paid fast and first.

Also, much of the loan payment from the Fertittas meant for Xyience went right back to the parent company of the UFC since Xyience owed the UFC over $5 million in sponsorship fees at the time the transaction went through. There was also an agreement to extend the Xyience sponsorship that was



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

reached shortly after the Fertittas were able to provide much of the capital that was supposed to prevent Xyience from going bankrupt. Essentially, most, if not all, of the financing provided by the Fertittas came out of one pocket only to go right back into another since they own 90 percent of the UFC's parent company Zuffa.

Here is a portion of the lead paragraph of Xyience's official October 10,2007 press release:

**"LAS VEGAS, Oct. 10 - XYIENCE(R) Inc. (pronounced zy-ince), one of the fastest growing brands in the beverage and nutritional supplements business, today announced that the company has received access to up to $12 million in a strategic funding effort from a group of investors." (extra emphasis added, see exhibit 53 for full release)**

Here is a portion of the lead paragraph of Xyience's October 9,2007 press release draft that I obtained from Gary Nelson (see exhibit 54):

**(LAS VEGAS) October 9, 2007 -- XYIENCE® Inc. (pronounced zy-ince), one of the fastest growing brands in the beverage and nutritional supplements business, today announced that the company has received $12 million in a strategic funding effort led by Fertitta Enterprises. The company will use the investment to expand distribution of its Xenergy brand energy drink. The name Xenergy is a combination of Zen and Energy and is pronounced "Zenergy". (extra emphasis added, See exhibit for full original release)**

Xyience continued to maintain that sales numbers were constantly improving and the brand was thriving despite the obvious losses that continued to steer the company toward bankruptcy even after the Fertitta group loan. Xyience has consistently managed to burn through tens of millions of dollars of previous financing and investments. Yet, the company labeled themselves the fastest growing brand in the industry while simultaneously announcing the acquisition of millions of dollars in financing they would be expected to pay back. They also promised the capital infusion would be used for Xenergy distribution, while in reality the sustaining funds for the Xenergy product line were left unpaid until the bankruptcy proceedings were well underway.

This financing was literally sold as something to save the company from the very brink of bankruptcy. The ensuing bailout package came from individuals and entities directly connected to a company Xyience sponsors: Zuffa, LLC. The money was promised as a way to promote worldwide expansion of the brand when in reality it was put in place specifically to destroy the brand by entering into outrageous contracts paid solely to Fertitta-owned entities.



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

These questions must be asked:

**How could Xyience continue to claim to be growing while it was continually sinking itself into further debt?**

**Why would Fertitta Enterprises *__not want to be identified__* as the lead investor among the group that was supposed to *save* Xyience from bankruptcy?**

Bergeron obtained an email from Gary Nelson on April 21, 2008 (see Exhibit 58) including a full draft of the press release draft referenced above, putting Fertitta Enterprises in the lead position of the group of investors providing the $12 million. The email reached Nelson on Tuesday, October 9, 2007 at 1:33:22 PM. Since the drafting of that press release, the Fertitta attitude toward this investment changed drastically, and they went into protective mode. It is clear they did not want it known publicly that they were behind the Xyience bailout, as evidenced by the editing of the press release that actually appeared the next day, October 10, 2007.

Even worse, both the UFC and Xyience are now being backed by the same financiers. Yet, both the UFC and Xyience publicly celebrate their partnership as if they were still two entirely different entities made stronger by an outside partnership with each other.

The fact is, Bergeron knew the company was in dire straits and reported as much as he knew about the situation. Recognizing the difficulty of continuing their corrupt operation under such heavy scrutiny, Xyience and their initial attorney Jamie Cogburn scrambled to create a bogus lawsuit, secured an unconstitutional injunction, and prevented Bergeron from reporting the truth behind the ongoing scandal. Fertitta Enterprises inspired this suit through the promise of $15 million in funding to Xyience, and Xyience orchestrated the suit as a direct result of that promise.

Subsequent Xyience attorneys, who have all been made aware of the previous Rule 11 motion, did not bother to investigate the matter any further. Representatives of Xyience have actually twice made efforts to settle the case in an arrangement that would see Bergeron being paid to walk away rather than him having to pay Xyience anything. The latest settlement suggestion came from the former co-CEOs of Xyience (Adam Frank and Kirk Sanford) who were doing the bidding of Fertitta Enterprises when they invited Bergeron to UFC 78 in November of 2007. They reported to Bergeron after his return, through email exchanges, that they only ever intended to give him $5,000 to walk away and couldn't provide his $1 million counter-offer. (see exhibit 59)



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

The opposing attorneys seem to think Rule 408 of the Federal Rules of procedure, preclude Bergeron from introducing evidence for the record from the meetings leading up to actual email settlement/compromise negotiations. Here is Rule 408 in its entirety:

**Rule 408. Compromise and Offers to Compromise**

**(a) Prohibited uses.—Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:**

**(1) furnishing or offering or promising to furnish or accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise the claim ; and**

**(2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.**

**Permitted uses. This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice ; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.**

Seeing as the meeting on November 17th and the telephone call from November 6th, both in 2007, betrayed Frank's bias and prejudice, the evidence cannot be excluded even if both conversations were considered to be part of settlement talks. However, no number was raised as a possible and potential settlement figure in either verbal conversation, so neither conversation qualifies for the above rule's application at all. The recording of the first conversation speaks for itself, and if necessary Robert Lavan, the fourth participant in the November 17 conversation, can testify that the meeting did not regard settlement of the case, but more so the future of Xyience.

Attorney Pamela Lawson took over the case directly from the point of Cogburn's withdrawal due to non-payment. According to the Clark County District Courts' records system, Lawson was at the hearing regarding Cogburn's withdrawal on December 6, 2007. The minutes of the District Court Calendar for that hearing indicate the withdrawal of Cogburn and immediate replacement suggestion of Lawson, from the firm of Hunterton and Associates:

**"Court stated a corporation cannot represent themselves and ORDERED Pltf has 30 DAYS TO OBTAIN COUNSEL. FURTHER, COURT ORDERED Motion GRANTED. J. Cogburn to prepare the Order. Pamela Lawson, Esq. also present and stated she will be representing the Pltf unless there is some problem on the resolution. Court directed her to file a notice of appearance."**

Lawson did not merely take the case, however. She also took the extreme measure of trying



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

to secure a default judgement against Bergeron, obviously without doing an adequate investigation into the charges and supporting documents. Even after the Rule 11 motion served on Lawson, she did nothing to withdraw the frivolous claims, obtain new information and evidence, or back up existing evidence. Here are the minutes of the February 7, 2008 hearing during which Lawson vigorously attempted to secure a judgment based on the fraudulent and frivolous initial complaint:

**"Deft Bergeron present via telephone conference. Argument by Ms. Lawson summarizing the history of the case and regarding having not been served with the Deft's Motion to Dismiss, noting Pltf has not agreed to e-filing and requesting the Court quash the hearing and until Deft cures the default he cannot participate in this case.**

**Statement by Mr. Bergeron. Court advised the Motion to proceed in forma pauperis was granted and under those circumstances, the Deft attempted to participate. COURT ORDERED Default SET ASIDE and Deft is permitted to file a response. Deft may file an answer and or plead whatever pleadings he wants to in this matter. FURTHER COURT ORDERED Deft Bergeron must follow the procedural requirements of the Court; he may file a 12B Motion and must have a 16.1 conference and file a 16.1 report after which time he can conduct discovery.**

**Mr. Bergeron inquired regarding his motion to dismiss. COURT ORDERED Deft to file an answer or responsive pleading pursuant to the rules and make sure it is filed and gets set with Master Calendar.**

**COURT FURTHER ORDERED the Motion to Dismiss will be heard on March 5th and Defendant is to make sure Pltf's counsel gets a copy of his points and authorities within five business days (2/14); not be e-file. Argument by Ms. Lawson regarding awarding sanctions at this time. COURT stated he will decide the issue on the merits and will not award sanctions at this time. Pltf's Motion DENIED."**

Lawson not only stood by the initial pleading wholeheartedly but also sought to initiate sanctions against Bergeron, even though Bergeron was not given sufficient time to respond to the default request. In fact, Bergeron did respond within the three-day time frame of the default notice of intent. The court set aside the default order and permitted Bergeron to file his answer, but Lawson still pushed for sanctions without any grounds or evidence or basis to do so.

Fennemore Craig **Attorneys Jon Pearson and Laurel Davis** are perhaps most culpable for sanctions among attorneys named above since they have had this case in their possession for the bulk of the time it's been in legal play. They have also improperly removed this case to the bankruptcy court from district court knowing Bergeron is neither a creditor, shareholder, or had any such relationship with Xyience that justified removal to this court. They essentially gave him standing in a court that he should not be privy to, otherwise.

Fennemore and Craig attorneys have been granted incessant delays to get their facts straight and have stood by the initial case filings 100 percent even after Bergeron contacted senior counsel at



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

the firm (**John Mowbray**) to tell him that the case against him was a joke and subject to a sanctions motion. (see email communications in exhibit 55) Davis intimated to Bergeron through email that the case would eventually be settled by a liquidation trustee (see exhibit 56), but she has made no recent moves to further the case itself on the merits or on any other basis. Davis has given no indication she is anxious to get to discovery or broaden the case one bit. Pearson is similarly situated. The Fennemore and Craig firm has not only stood by the initial flawed filing wholeheartedly but also at every opportunity piggybacked on the work of the high-powered firm representing Fertitta Enterprises with Attorney Greg Garman and Attorney Matthew Zirzow acting as a team.

Attorneys Greg Garman and Matthew Zirzow are doing everything in their power to conceal the criminal activities of their client Fertitta Enterprises. Direct and vicarious liability applies to Fertitta Enterprises since they were in a direct position of management over Xyience and it is their funding and capital that inspired the suit in the first place. Furthermore, it is Garman, Zirzow and their firm Gordon & Silver's support that have made this case so complicated. That firm and its attorneys provided the bulk of recent delays due to the fraudulently induced show cause hearing regarding the recording of a prior hearing.

Attorneys Matthew Zirzow and Greg Garman filed motions that have been used by the plaintiff to minimize the work they've had to do to proceed, and both parties have corroborated and colluded to support what is clearly a bogus case designed to improperly and unjustly enrich the principal players in the bankruptcy scheme. (See **Xyience Incorporated's Joinder in Fertitta Enterprises, Inc.'s Opposition to Defendant and Counterclaimant, Richard Bergeron's, Motion to Revoke the Bankruptcy Debtor's Plan Approval Order and Motion to Transfer Adversary Proceeding to Proper Venue.)**

Garman represents his lack of due diligence each time he appears in court and makes a statement. Lies upon more lies fly from this paid attorney's mouth to bolster a position he obviously hasn't investigated sufficiently. He has tried to testify for his client, tried to testify for Bergeron in court and in the press, and pushed his client's supposed lack of culpability like a drug he hopes the court will ingest without question. Garman has done so even while assisting and bolstering Xyience's position in this case through obscuring the truth and fancy legal tactics meant to distract the court. He continues to maintain in open court that his client never sued Bergeron and that he doesn't represent



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

Xyience. Xyience may not be paying his bills, but he's so far helped Xyience tremendously. And his clients did, in fact, motivate and orchestrate the suit against Bergeron in order to unjustly enrich themselves off the backs of Xyience investors who built the company.

At a recent hearing Garman even tried to attempt to have Bergeron disqualified from using the telephonic appearance privilege. This privilege had just been granted and reaffirmed for Bergeron after a lengthy and wholly unnecessary show cause hearing called by Garman. That hearing and Garman and Zirzow's motion to promote it was based on a hunch rather than any hard evidence of any impropriety on Bergeron's part.

As attorneys who should have known better than to stoop to such low levels the above named officers of the court should be sanctioned heavily, including forfeiture of the full amount of the legal fees they have all incurred and been paid as a result of the case at hand. The behavior of these individuals goes far beyond simple defensive and/or proactive litigation techniques. Never did one attorney in this long chain of fraudulent actors bother to produce any independent evidence beyond the initial declaration, even after Bergeron gave due and proper notice to the parties that Adam Frank's declaration constituted perjury (See Bergeron's Motion to strike Adam Frank…etc.). At all times when it was convenient to do so, the attorneys opposing Bergeron have wholeheartedly endorsed the fraudulent, perjured Adam Frank Declaration despite evidence contradicting that declaration in a recording linked to Bergeron's Xyience lawsuit web page: (www.unlimitedfightnews.com/xyience.htm).

All of the above named attorneys should be subject to cross-examination. Each should be questioned as to the depth of their official investigation(s) (or lack thereof) into the initial claims and their subsequent investigation(s) (or lack thereof) into the supporting law. An evidentiary hearing should be held in which these attorneys should all be cross-examined regarding the level of collusion in the grand legal scheme to silence Bergeron. These attorneys hijacked the courts with this improper and purely frivolous litigation so the collective clients could profit without making media waves. They always worked as a team when it was possible and acted in a coordinated fashion to delay justice to Bergeron in this litigation and subject him to ridicule in the public eye. The weight of their fraud is severe since they are fully aware of the sanctions they face for fraudulent filings and litigation behavior that is dishonest and delay-oriented at its core.



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com