These cross-examinations of the pertinent legal representatives should take place in a fashion involving these attorneys being sequestered outside the courtroom and questioned independently one by one. The answers to appropriate questions regarding their individual levels of due diligence should be enough to determine each individual's level of ultimate culpability for sanctions in this matter. It should also help determine how culpable their clients were for their roles in this litigation.

The above-named attorneys have at all times supported and defended what is clearly an unconstitutional prior restraint (The district court injunction) and presented frivolous papers in this matter on several occasions. Above and beyond that behavior they have wasted this court's time with such matters as the September 10, 2008 show cause hearing called by Attorney Garman and having no evidentiary support to justify such hearing.

**As one court has explained, "[t]he challenge facing the court . . . is to construe the Rule in a manner that will promote the goal of limiting harassment, delay and expense, without impeding zealous advocacy or freezing the common law in the status quo." Aetna Life Ins. Co. v. Alla Med. Servs., Inc., 855 F.2d 1470, 1476 (9th Cir. 1988).**

It should never be considered mere zealous advocacy when a lawyer pushes a motion forward with absolutely no definitive evidence or basis to do so. Garman and Zirzow have at all times acted to assist Xyience attorneys and at the same time disconnect their client from the fact that they own Xyience indirectly (through Zyen, LLC). The opposition has at all times abused the civil process by filing and continuing to advocate and fund this suit.

The First Amendment implications of this case were apparent from a very early stage since Judge Timothy Williams asked Attorney Cogburn to draft a First Amendment brief early on in the case. Cogburn (though he told Bergeron over the phone later on that he usually handles people on his side of First Amendment cases) did not produce any evidence of defamation other than the declaration he and Adam Frank signed. Also, even in those declarations there was no foundation for any claim to hold up under the "actual malice" standard plaintiffs must prove in regards to their public figure status. Malice is not shown by a "failure to investigate" alone (Harte-Hanks Communications, Inc. v. Connaughton (1989) 491 U.S. 657,692). Rather, as shown by St. Amant v. Thompson (1968) 390 U.S. 727, 732-733, there must be some indicia of "an awareness" by the defendant of the "probable falsity" of the statement, or evidence of a "doubtful mind." Since Bergeron has always maintained and even sworn in affidavits that he stands by the truth of his reports and never bore any malice for the company, neither the standard of a basic defamation claim nor the additional



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

requirement of "actual malice" can be justified in this case.

No lawyer has ever interviewed Bergeron as to his editorial policies or to determine whether or not he knew the reports he published contained any falsehoods. There has also been no evidence entered on the docket to prove any of Bergeron's reports actually included definitive factual statements that can be proven false.

**OTHER INDIVIDUALS SUBJECT TO SANCTIONS:**

**Former Xyience CEO Adam Frank** is also subject to sanctions for providing false testimony and signing a declaration that constitutes perjury. Frank's declaration (see Plaintiff's Exhibit 2) is the entire balance of independently-produced evidence in the plaintiff's possession (see Xyience Motion to Dismiss). A recorded conversation Bergeron was party to with Frank and Kirk Sanford on November 6, 2007, alluded to in past motions and linked to Bergeron's Web-site (http://premium.fileden.com/premium/2007/9/16/1434673/frankandsanford.mp3), shows beyond a reasonable doubt that Frank actually ***relied on the information reported by Bergeron*** when he became Xyience Co-CEO with Kirk Sanford. During the conversation, Sanford and Frank both agreed Bergeron's site was a resource for them as they attempted to piece together the history of the company. Frank's various claims made in the declaration are all nullified by the recording. A motion to strike the declaration has already been filed.

Specifically, during that **November 6, 2007** conversation between Frank, Bergeron, and Sanford, the following quotes were recorded:

**KIRK SANFORD: "From you know, Adam and my perspective, you know, We don't know all this history. We actually go to your web-site to try to figure out what's gone on around this place. So, that's a little bit funny."**

**ADAM FRANK: "Yeah, The funny thing is it's probably one of the better resources to find out what the Hell, you know, has happened in this company historically."**

Frank and Sanford arranged for Bergeron to be flown to New York City to attend UFC 78 at the Prudential Center in Newark, New Jersey on November 17, 2007. Both men admitted to Bergeron that they needed his help in moving forward with the company. Fertitta Enterprises was at the time in direct financial control of Xyience and had a previous relationship with Sanford's former employer: Global Cash Access.



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

It is clear that Sanford and Frank both knew the case against Bergeron was illegitimate at the time of the November, 17, 2007 meeting and when the two spoke to Bergeron at length on November 6, 2007. They both agreed the case against Bergeron would not continue at the November 17th meeting, although no number was ever raised at that meeting and subsequent email negotiations on settlement terms later broke down.

**Kirk Sanford, Former Xyience Co-CEO** and former Global Cash Access Executive would also, naturally, be subject to serious sanctions. Sanford admitted Bergeron's site was a resource even while making moves to financially fund the case against Bergeron and find new representation (Hunterton & Associates) upon Cogburn's payment protests (Frank and Sanford have also retained Hunterton and Associates for other related and unrelated civil cases they are party to).

Sanford on one hand represented a clear desire to fund the company while also in the next breath bashing the company and advocating a "scorched earth" approach to a forced bankruptcy during his November 17, 2007 meeting with Bergeron and Standard General Representative Robert Lavan. Even while he should have been soliciting funds from Lavan at the November 17th Meeting in Times Square attended by Bergeron, Frank, Lavan and Sanford, Mr. Sanford contradicted himself on several occasions, bashing the Xyience brand's viability and promoting nothing but bankruptcy. It was clear he wanted nothing to do with actually finding capital to sustain the business.

Sanford, having a direct former relationship with Fertitta Enterprises through Global Cash Access, was already familiar with Fertitta Enterprises and their casino operations. His being placed in direct control of Xyience has to be directly related to his role in previous business dealings with Fertitta Enterprises and Zyen, LLC General Manager William Bullard as well as Fertitta executives Lorenzo and Frank Fertitta III through the GCA contracts he worked on with Station Casinos.

It is Sanford and Frank who most vociferously campaigned for the initial claim against Bergeron to move forward. Sanford in particular turned down offers of financial help from several viable sources during the time leading up to the bankruptcy filing. Sanford, Adam Frank and William Bullard all acted with direct allegiance to Fertitta Enterprises in preventing the first installment of the initial Fertitta-led Xyience loan agreement from being paid. The foreclosure was planned by the co-conspirators to trigger immediately upon the arrival of that first payment date, and the principal parties blatantly pushed through the whole process with little time for shareholder revolt. Each party



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

to this behavior took special care taken to give themselves unsurpassed and undue reward in the most expeditious time frame possible.

Kirk Sanford at all times knew this case was illegitimate, promoted it out of a desire to unjustly enrich himself and his associates through the bankruptcy and sale of Xyience, and promised to settle the matter against Bergeron for $5,000 without even consulting a lawyer to draw up the appropriate paperwork or allowing a lawyer to review the arrangements and discussions. No attorney was ever present or party to any actual conversations that Sanford, Frank, and Bergeron had.

**Zyen and Ferttita Enterprises General Manager Bill Bullard** is equally culpable for sanctions being levied against him. Bullard willfully and intentionally bankrupted Xyience in the shortest time frame possible after foreclosing on the first lien position held by Fertitta Enterprises offshoot Zyen, LLC. He also initiated that first lien position in a campaign that began almost immediately after the preliminary injunction against Bergeron became official. Bullard was the financial mastermind behind this whole mess, drafting and signing documents that were corrupt at their core and designed specifically to steal Xyience from its true owners and subsequently bankrupt it.

**Bullard distributed documents to shareholders he needed decisions from the day after the injunction against Bergeron hit the docket (see exhibit 23).** Bullard received enough limited support and approval (although much of the process and methods used to gain such approval are now seen as suspect) to enable him to set Fertitta Enterprises up in chief lien position over Xyience (see exhibit 57).

Once Bergeron was "out of the way" (see Donovan and Nelson affidavits) it was possible for Bullard to accomplish his mission in a more relaxed environment. Through the securing of an injunction, Bergeron's reporting would not be as intensely focused on the fraud Fertitta Enterprises was about to commit through the sponsorship agreements with Xyience and the bankruptcy court's protections.

**Frank Fertitta III** and **Lorenzo Fertitta** are both subject to sanctions because both are directly named in the Gary Nelson and Bart Donovan affidavits as wanting to invest in Xyience if Bergeron's stories were removed from the Internet.

The Fertitta brothers' position of financial influence with the Ultimate Fighting



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

Championships' parent company Zuffa, their sway over decisions at Fertitta Enterprises and Station Casinos, and their position of influence in Las Vegas and in the financial world were all brought to bear to prevent Bergeron from accurately reporting the depth of the Fertitta scheme to pocket tens of millions of dollars in dividends individually by using the Xyience investment as a crutch to appear as if they were not in breach of the covenants of their $350 million senior secured credit facility they obtained for Zuffa, LLC. (see Bergeron Web-site posting within Fertitta Enterprises Motion to dismiss evidence, Bergeron Affidavit in Support of Motion to strike…).

As 90% owners of Zuffa, LLC the Fertitta brothers would have been in a direct position to benefit from a Fertitta Enterprises infusion of capital into Xyience that would have come right back to Zuffa, LLC through a Xyience agreement with Zuffa Marketing, LLC. The Bergeron suit was orchestrated to provide a comfort zone for the brothers to engage in this scheme without the watchful eyes of an investigative reporter finding out what they were up to.

The brothers also used the media and their dual association with both Xyience and Zuffa to artificially inflate the middle-of-the-UFC-mat Zuffa, LLC sponsorship/advertising rate. Fertitta-owned Xyience entered into a completely ridiculous and overpriced sponsorship arrangement with the UFC in 2007 and subsequently produced a widespread press release celebrating the new 3-year deal and its high, multi-million dollar price tag, not ever mentioning that Fertitta Enterprises owned Xyience and the UFC at the same time. Harley Davidson then had to exceed the Xyience contract rate (which was defaulted) to replace Xyience after UFC 78. Knowing Xyience was so distressed it would have to default on the sponsorship agreement, the Fertittas unjustly enriched themselves by creating an artificial bidding war for the space through their surreptitious investment and control of Xyience that they did not publicly report.

The behavior of both Fertitta brothers as far as their intimate role in manipulating the situation amounts to loan fraud considering their use of Xyience to help justify their $350 million senior-secured credit facility for Zuffa, LLC. As such, and without regard to seeking outside funding help, they have now both graduated to bankruptcy fraud by purposely driving the brand into the ground. They did so by discouraging other potential creditors and/or funding sources from getting involved in rebuilding the brand. Both brothers orchestrated a scheme in which they could legally flood the marketing sector and take care of their more cherished company (Zuffa) without accounting for any



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

significant production and distribution at Xyience. They used and abused the bankruptcy court repeatedly in order to improperly promote that ultimately successful mission.

Even William Smith, who is part of the group that purchased Xyience (Manchester Consolidated Corporation) knew that marketing alone would not carry Xyience. The following exchange is from the unsecured creditors' committee deposition of Smith in the core proceeding:

> Q. And, Bill, I think I touched on this,
> but based on your guy's diligence into looking at
> this deal, it sounds like you viewed Xyience's
> marketing relationship with Zuffa and the Ultimate
> Fighting Championship as being pretty critical to
> the value of the business?
> A. Well, it is important, but also take
> into account the other relationship with the
> product supply. They are both fundamental. You
> can spend all your money on marketing, if you can't
> get product to supply and sell, you can't do one
> without the other. They are both critical.

The Fertitta-owned Xyience, through a previous Omer Sattar declaration, admitted knowing the company needed approximately $7.5 million to stay afloat and purchase adequate Xenergy product to sell, yet they saturated the marketing sector with wholly uncalled for expenses tied directly to the UFC and Zuffa. (see previous Bergeron Affidavits and insider emails) Furthermore, they conjoined their interests by making the Xenergy product acquisition hinge on the signing of a Zuffa marketing agreement that was wholly unfair to Xyience and completely preferential to Zuffa Marketing, LLC. Consider the fact that a Fertitta-owned Xyience should have been much better situated to draw up a more sympathetic and sensible sponsorship deal but instead robbed Xyience blind through Zuffa with outrageous, impossible to pay premiums and price tags for their newly signed obligations to the Fertitta-owned entity.

**Global Cash Access Founder and Xyience Investor Karim Maskatiya** was also in a position of influence at Xyience and in direct media focus regarding his previous activity at Global Cash Access. Maskatiya is subject to sanctions as one of the chief investors in the Fertitta group funding with a reported contribution around $5 million. Maskatiya is accused in multiple lawsuits of enriching himself unjustly off a scheme to collect the commissions designed for casino venues where



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

GCA machines were in operation. Maskatiya is also suspected of involvement in skimming operations through GCA that he allegedly presided over in Macau.

Bergeron began to grasp the GCA connection and the side story that ensued only after the GCA officials who left the company for Xyience began appearing in reports of fraud and potential shareholder litigation regarding GCA. Maskatiya would have been in a direct position to influence Sanford to keep the lawsuit against Bergeron going. As Sanford's former employer and partner in the GCA skimming operation Maskatiya would have exerted tremendous pressure on Sanford to do his bidding. The injunction against Bergeron has also obscured adverse information about Maskatiya that is published on Bergeron's web-site in relation to the Xyience series.

Maskatiya's influence was so broad and powerful that he installed his own nephew Omer Sattar, as Xyience President. **Omer Sattar** is also culpable in this case considering he was in a direct managerial position and should have therefore performed his own review of this case and its merits before allowing it to proceed under his direction of the company. It is Sattar's name that appears on much of the bankruptcy documentation and affidavits and declarations supporting the core case.

Also, consider Maskatiya and Sanford's role in ongoing GCA litigation as well as past litigation including: U.S. District Court, Las Vegas CASE #: 2:08-cv-00171-RCJ-PAL; US District Court, Southern District of New York Case #: 08-CV-3516 (Lowinger Class Action Case); Stueve Vs. Sanford, et al. In US District Court, Las Vegas, CASE #: 2:07-cv-01659-JCM-PAL, etc..

The paragraphs below are from pages 9 & 10 of the Aug. 18, 2008 Consolidated Class Action Complaint in the above-referenced Lowinger Class Action case:

**21. Defendant Kirk Sanford ("Sanford") served as the President and Chief Executive Officer ("CEO") of GCAH and GCA from 1999 until his resignation on October 31, 2007. Sanford joined the Boards of both GCAH and GCA in March 2005 and remained on the Boards until his resignation as CEO in October 2007. Sanford was a member of the Company's management committee when the Company conducted its operations as a limited liability company from 1998 through May 2004. Before serving as the Company's CEO, Sanford was the Company's Executive Vice President of Sales, Marketing and Product Development from 1998 to 1999. According to the Prospectus, the Company was "highly dependent on the involvement of" Sanford, who possessed "substantial experience with [the Company's] operations and the gaming patron cash access industry." Prior to March 2005, Sanford owned 1% of M&C and provided advisory services to M&C, for which he was paid approximately $17.3 million in 2004, $1 million in 2003, and $600,000 in 2002. Additionally, in March 2005, M&C transferred 575,213 shares of Company stock to Sanford, issued a note in the amount of $7,572,696.21 that was payable to Sanford upon consummation of the IPO, and forgave a note from Sanford in the principal amount of $5,741,178, all in further consideration of his advisory services to M&C. At or about the same time, M&C redeemed Sanford's ownership interest in M&C for 283,239 shares of the Company's stock and $437,717.82 in cash. Sanford signed the Registration Statement and the Second Registration Statement. Sanford offered and sold 300,000 shares of GCAH common stock in the Secondary Offering, for total proceeds of over $4,500,000.**



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

**23. Defendant Karim Maskatiya ("Maskatiya") was a co-founder of GCA and, at the time of the IPO and throughout the Class Period, was Co-Chairman of the Board of Directors of GCAH and GCA. Maskatiya either personally or through an attorney-in-fact signed the Registration Statement and Second Registration Statement. Maskatiya beneficially owned 50% of Defendant M&C International ("M&C") and during the Class Period served as M&C's President and Chairman. M&C offered and sold 2,774,870 shares of GCAH common stock in the IPO, and an additional 4,215,810 shares of GCAH common stock in the Secondary Offering, for total proceeds of over $99,000,000. Maskatiya maintains his principal place of business at M&C's offices located at 643 River Oaks Parkway, San Jose, California 95134.**

**Business Entities Deserving of Sanctions: (Zyen, LLC; Fertitta Enterprises; Xyience Incorporated; Zuffa, LLC; Zuffa Marketing, LLC; Manchester Consolidated Corporation)**

Sanford and Frank were directly subordinate to **Fertitta Enterprises** when they made the trip arrangements for Bergeron to attend UFC 78 in November of 2007, and Fertitta Enterprises was also funding Xyience at the time.

Even if the counter-defendants try to argue that Fertitta Enterprises had nothing to do with the initial case, upon securing a direct ownership position of Xyience through **Zyen, LLC** Fertitta Enterprises subjected themselves to sanctions as soon as they decided to continue to pursue the matter. Frank and Sanford further subjected Zyen, LLC, Fertitta Enterprises, and **Xyience Incorporated** to sanctions by admitting that they knew Bergeron's reporting was accurate and that they would need his expertise in the future.

Standard General Employee Robert Lavan also attended the November 17th meeting with Bergeron, Fank and Sanford in Times Square (see Bergeron affidavits). A deposition of Lavan will show that Sanford and Frank were convinced they would have to bankrupt the company and would not reasonably consider any other viable alternative.

Zuffa, LLC benefited from a $350 million senior secured credit facility based on their business strength at a time when a highly distressed Xyience was their only sponsor. Bergeron learned this information from contact with a group of insiders at Xyience employed in serious positions of authority up until the bankruptcy process began. These employees banded together to communicate personally through email and direct phone calls with Bergeron and outlined a scenario in which the main goal was to tank the company and enrich the principal players. **(See Bergeron affidavits and insider emails)** Adam Frank and Kirk Sanford acted on direct behalf of Zuffa and Zuffa Marketing, LLC to flood those entities with marketing dollars and to make Xyience appear stronger. They



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

propped the company up just long enough to spend all the money on Zuffa and create an artificial bidding war won by Harley Davidson for the middle-of-the-mat UFC sponsorship Xyience would default on.

The company's promise to use the Fertitta funds to promote a worldwide expansion for the brand was a front for a sinister plan to use nearly all those funds to obscure the fact that they were knowingly breaching the covenants of Zuffa's $350 Million Senior Secured Credit Facility package. This illegal bid-rigging process used Xyience as a pawn in a business strategy that represented a clear-cut conflict of interest and resulted in multiple breaches of fiduciary duty to Xyience shareholders. The Fertitta-led financing facilitated the defrauding of over 380 shareholders out of millions of dollars worth of pre-IPO Xyience stock, which have been rendered worthless by the conspiring parties' actions to purposely bankrupt the company on their terms.

As such, any Rule 9011 sanctions should also weigh the evidence of abuse of procedure in the core case. The mere filing of such a bankruptcy on false pretenses after keeping the company viable only long enough to settle the UFC sponsorship issues is cause enough for an abuse of process claim to be adjudicated in this realm through a motion such as this.

There is no doubt bad faith shown in the actions of Fertitta Enterprises and their co-conspirators. The culpability of certain parties is greater than others, and some have insulated themselves with huge stockpiles of the same shares they tried to defraud others out of. This way they win no matter what, even if shareholder claims are eventually recognized. These individuals should be separated from the class of shareholders due relief as a result of this motion, and the discovery phase of this case will bear out exactly who is entitled to relief and who should have their class status revoked. Any and all parties engaging in fraud should be mandated to forfeit their shares outright or have them redistributed evenly to the rest of the shareholder class.

**FURTHER POINTS OF LAW TO SUPPORT FEDERAL RULE 11 and BANKRUPTCY RULE 9011 SANCTIONS**

*Pierce v. Commercial Warehouse*, 142 F.R.D. 687 (M.D.Fla. 1992) establishes the attorney's duty under Rule 11 to support a lawsuit with existing law. The court held that an attorney cannot mislead the court by contending that his or her argument is supported by existing law, in the sense that the issue has been decided, when that is not true.



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

Attorney Jamie Cogburn repeatedly represented that precedent cases applied to this case that had nothing to do with the press or the Internet. In supporting his claims that personal jurisdiction was proper, he also misrepresented the law numerous times. Cogburn alluded to precedent cases that did not properly address Bergeron's capacity as a journalist, which is what he clearly is according to the Free Flow of Information Act of 2007. That act defines journalism as:

***"the gathering, preparing, collecting, photographing, recording, writing, editing, reporting, or publishing of news or information that concerns local, national, or international events or other matters of public interest for dissemination to the public."***

An attorney must be clear in presenting the argument for what it is. Cogburn argued Bergeron was not a reporter in one motion without researching the case law specific to what classifies a person as such and what constitutes journalism. Cogburn also repeatedly misconstrued the law applicable to personal jurisdiction and preliminary injunctions relating to the press and the Internet. Rule 11 requires disclosure and precludes presentation of the argument as though it rested on existing law.

Fundamentally, a party cannot use litigation or litigation techniques to punish the opposing party. The playing field is leveled by this--a well padded party cannot litigate for the purpose of grinding the rest of us into submission. The above named parties subject to sanctions are all complicit in the process of filing and supporting this case for fraudulent purposes and with specific intent to force Bergeron to give up without a fight. Their claiming over $25 million in damages, which is entirely unfounded and unsupported by evidence, was a clear scare tactic meant to inspire Bergeron to surrender swiftly. Bergeron has been genuinely harassed with needless litigation in this matter and hereby petitions the court for sanctions under Rule 11 and 9011 for both himself and the class of defrauded shareholders who are not currently represented by any other interest in these proceedings.

Adam Frank's affidavit was literally a carbon copy of Cogburn's argument in this case. He clearly drafted the document and instructed Frank to sign it.

Sanctions should include ethics training for Cogburn. Not only did Cogburn try to settle this case with offers ranging from "a box of sodas" to $1,000, he continues to maintain he never lied about anything. He is a classic example of why sanctions are needed to curtail irresponsible lawyers.

In almost all of the defenses raised by Fennemore Craig, P.C. Attorneys litigating on behalf of Xyience, the perjured Adam Frank declaration (Plaintiff's Exhibit 2) is referenced. Bergeron has



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

already submitted a motion to strike that declaration and Cogburn's own declaration which is nearly identical. Fennemore and Craig therefore knows evidence exists proving Frank's affidavit to be perjury, and rather than withdraw the initial claims the firm's lawyers have actually made moves to exclude such evidence without cause or adequate legal grounds. Attorneys Laurel Davis and Jon Pearson were also warned on several occasions by Bergeron through emails explaining to them that they were pursuing a frivolous case supported by fabricated evidence.

Contrary to the Xyience attorneys' contention that Rule 11 sanctions only apply to specific pleadings filed with the court, an attorney may be sanctioned under Rule 11 for pressing claims after post-complaint or motion evidence shows the claim to be frivolous. See Fed. R. Civ. P. 11(b) O'Brien V. Alexander, 101 F.3d 1479 (2d Cir., 1996) (Court may sanction counsel for maintaining a frivolous position in court even without submission of frivolous paper). The fact that Fennemore and Craig was afforded a 60-day extension at the outset of their involvement in this case makes their firm's failure to withdraw the frivolous claim even more offensive and sanctionable.

In *Harlyn Sales Corp. v. Investment Portfolios*, 142 F.R.D. 671 (N.D.Ill. 1992), the court established guidelines which acquit attorney and client from Rule 11 sanctions. The guidelines are these:

**1. Make a reasonable inquiry into the facts of the case before filing a pleading, motion, or any paper.**

**2. Make a reasonable investigation into the law applying to the case.**

**3. Do not submit any pleading to harass, delay, or increase the cost of litigation for the opposing party.**

**4. Do not include unnecessary parties.**

**5. Do not sign any document that could mislead the court.**

**6. Make sure every document explains the matter without a requirement for qualification. The writing must speak the entire truth by itself.**

(1.) Cogburn and Xyience, and each subsequent party or attorney who supported the initial complaint and subsequent proceedings, obviously never made any kind of reasonable inquiry into the facts. They have all repeatedly held that David Winterton's quotes were made up by Bergeron without bothering to secure any kind of affidavit from Winterton. Exhibit 64 shows that Winterton would have cooperated with Xyience by this point if there were quotes made up. They had ample opportunity to provide evidence that Bergeron's quotes were inaccurate, but they have provided



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

nothing to even call into question Winterton's quotes in Bergeron's story.

(2.) Cogburn and subsequent attorneys and sanctionable parties also did not make any reasonable investigation into the law applying specifically to this case. Cogburn admitted in a recorded telephone conversation that he usually defends clients on Bergeron's side of this First Amendment issue. Yet, Cogburn relentlessly sought out a prior restraint he should have known to be restricted by precedent case law. The very judge overseeing the case in the beginning (Clark County District Court Judge Timothy Williams) actually had to instruct and order Cogburn to submit a supplemental brief regarding the First Amendment issues surrounding the case despite the fact that Cogburn admittedly had ample personal experience in that realm before taking this case on. Attorney John Mowbray of Fennemore Craig, P.C. was actually a defendant in another local Nevada lawsuit in 2000 where the plaintiff attempted to secure a preliminary injunction against a Bar Association advertising campaign. The injunction was denied.

This case invoked the "effects" test employed in Calder v. Jones, 465 U.S. 783 (1984), and Core-Vent Corp. v. Nobel Industries, 11 F.3d 1482 (9th Cir. 1993), yet Cogburn and subsequent attorneys relying on his initial complaint and supporting evidence never addressed or applied that test to their own arguments. Even after Bergeron presented the Calder vs. Jones test, attorneys danced around the issue by pointing to cases with no significant connection or similarity to this case.

(3.) This entire case was designed to harass Bergeron, delay him from securing justice in the matter, and make him submit by way of forcing him to spend more time and money than he could afford to on defending the case. Bergeron becoming his own lawyer was never a contingency Cogburn or subsequent attorneys and sanctionable parties seem to have planned for.

Xyience knew Bergeron could not afford to even appear in their jurisdiction from a previous attempt to get Bergeron to come to Las Vegas for an interview. Back then, Xyience Consultant John Chadwell offered to fly Bergeron to Xyience headquarters on their dime. They requested in return that Bergeron write a positive piece about the company. No Xyience official ever asked Bergeron to remove his existing stories, contrary to the Adam Frank Declaration and Cogburn's fabricated complaint.

(4.) Cogburn's most significant evidence came from Adam Frank. Bergeron's story that gave rise to this litigation had absolutely nothing to do with anything that occurred under Adam Frank's tenure



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

with the company. Cogburn made Frank a party to the case and asked him to sign a document containing information Frank could not have possibly been in any position to corroborate. Frank contradicted himself and his declaration testimony later on, telling Bergeron his site was "one of the better resources" on the history of Xyience in early November, 2007. His affidavit now amounts to pure perjury as a result.

(5.) Bergeron's recorded conversation with Frank and Kirk Sanford in November, 2007 reveals that Adam Frank admitted he had no knowledge of what went on at the company before he became involved in a position of authority on the board of directors. Sanford also admitted in the recording that he values Bergeron's Web-site and uses it personally to find out what went on at Xyience before he arrived. This recording is available at: http://www.fileden.com/files/2007/9/16/1434673/frankandsanford.mp3.

If Cogburn ever properly interviewed Frank as Bergeron did, he knew he was asking Frank to sign false testimony. Cogburn's signature on the pleadings entering that evidence into the case is a stamp of approval of the fraudulent claims that he never independently investigated. It is a clear case of inventing evidence to bolster a shaky, crooked civil lawsuit. Cogburn is as culpable as his clients.

Virtually every document Cogburn has signed that is not a simple formality of the litigation process has contained some lie, false evidence, or misrepresentation of the facts. He clearly drafted Frank's testimony and advised the newly crowned CEO to sign it. Having broadcast the link to the Frank and Sanford recording in previous motions and on his Web-site, Bergeron and the court can be assured that the above-named parties subject to sanctions were aware of that recording and knew Bergeron's history of the company has always been accurate. Whether the counter-defendants' legal representatives in this case thought the recording was admissible in these proceedings or not, they would have had to review the recording as part of their due diligence. A show cause hearing can determine the depth of their knowledge as to this recording.

Bergeron has never voiced any kind of desire to hurt Xyience or Fertitta Enterprises. He is now and always was out to discover the truth behind the ongoing Xyience scandal. Due to the clear classification of Xyience as a public figure due to its attachment to the sport of Mixed Martial Arts and its frequent appearance in press reports, to justify defamation charges and sustain a preliminary injunction, Xyience would have had to have intimate knowledge of Bergeron's state of mind when he wrote the reports that are the subject of the suit against him. They would have had to prove with



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

"convincing clarity" that Bergeron acted with ill will and actual malice toward Xyience with his reporting, regardless of whether or not said reporting was false. Otherwise, they should not have been able to acquire a preliminary injunction in this matter. Yet, Xyience attorneys utilized Fertitta Enterprises' connection with the judge overseeing this case since Judge Timothy Williams owed a debt of gratitude to Station Casinos for endorsing him when he ran a campaign for the seat on the district court bench. They won their injunction with little effort and no adequate hearings being held in which Bergeron was actually able to personally participate.

Xyience and Fertitta Enterprises should not be allowed to abuse this court to protect their own shaky reputations. The counter defendants should not be allowed to pursue a case based on evidence known to be false, and they should not go unpunished for presenting and standing by evidence that can easily be proven to be false, misleading, or manufactured. There is no reasonable doubt as to whether or not the attorneys engaged at any point in this litigation should have been able to verify or rule out the various claims made in the initial complaint by conducting a proper investigation. An adequate investigation would have allowed the attorneys to discover more applicable evidence and supporting affidavits if any of the initial Cogburn complaint's allegations were ever true. Yet, nothing of any weight and substance has been entered into evidence since the perjured Frank declaration. The plaintiff in this matter has not made any recent moves to maintain the matter has any merit whatsoever. Furthermore, the answer Xyience filed in response to Bergeron's Defamation Counterclaim denies several actionable offenses in the same breath it states having no knowledge of the facts surrounding them.

(6.) Finally, Cogburn's initial arguments and those of subsequent attorneys supporting Cogburn provide no explanation of any facts that do not require qualification. His motions not only obscured the truth, but they have also rewritten the truth to fit the mold of this frivolous case. Namely, Cogburn repeatedly insinuated that defamation is not protected speech under the First Amendment without explaining that such speech must be determined to be defamation by a complete trial process before it can be enjoined legally by an instrument such as the preliminary injunction Cogburn managed to squeeze out of the district court. Cogburn blatantly lied to that court and bastardized the law, and it is clear that his client, Xyience, has been complicit in shaping these lies and including them in their motions in this court. Adam Frank subjected himself to sanctions by supporting and signing a



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

declaration he knew was false. Fertitta Enterprises attorneys Zirzow and Garman have both stood by the initial case and provided much of the leg work for Fennemore and Craig to oppose Bergeron's various motions since the first counterclaim's filing. Cogburn, all subsequent Xyience attorneys, Xyience itself, Zyen, Frank, Sanford, Maskatiya, both Fertitta Brothers, Zuffa, LLC Zuffa Marketing, LLC and Fertitta Enterprises should all suffer Rule 11 consequences as a result.

Neither Cogburn nor any of the above parties have any reason to be acquitted of sanctions. Regardless of existing statutes that do not allow pro-se attorneys to collect attorney fees, the awarding of such fees to the plaintiff attorneys for their work in pressing a case they knew was improper is simply wrong.

Cogburn and subsequent attorneys flooded this case with motion after motion knowing Bergeron has had no legal representation throughout. At all times it is clear Bergeron's pro-se status gave the attorneys involved more wiggle room to obscure the truth, abuse the laws and procedures involved in the case, and keep the bogus litigation going for a little less than a year and a half now. Xyience even asked for a default order to be granted before Bergeron even received any word that his request to proceed informa pauperis had been granted.

There is every indication that Cogburn and other subsequent plaintiff and counter-defendant attorneys used their intimate knowledge of court procedure at every opportunity to try to discredit Bergeron and cast Bergeron's true stories in a bad light through legal wrangling, misdirection, and flat out lies rather than the pure, irrefutable evidence they would have had to put on the docket if they were facing a more traditional legal representative. Cogburn and other attorneys even relied on their relative proximity to the court to gain an unfair advantage over Bergeron, who is literally thousands of miles away from the Clark County facility.

Attorneys in this case have executed a masterful and devious plan to delay justice in this matter as long as humanly possible. Since the initial complaint they have not provided a shred of new supporting evidence. They are clearly in fear of the deposition process and actually having to build some kind of a case to bring to trial. Knowing it is impossible to prove Bergeron ever acted out of line in reporting on Xyience, the counter defendants have cooperated and consciously joined forces to extend the proceedings to the point where it is beyond Bergeron's means to financially afford to maintain his defense.



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

Rule 11 has two separate prongs: first that a pleading, written motion, or other paper not be presented for any improper purpose and second, that it be well-grounded in fact and law. FED. R. CIV. P. 11(a)–(b).

Although "improper purpose" suggests that the presenter's state of mind should be the primary focus of a court's inquiry, there is in fact general agreement among the circuits that the improper purpose inquiry employs an objective standard. *See, e.g.*, Whitehead v. Food Max of Miss., Inc., 332 F.3d 796, 805 (5th Cir. 2003); G.C. & K.B. Invs., Inc. v. Wilson, 326 F.3d 1096, 1109 (9th Cir. 2003); Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1294 (11th Cir. 2002); Pac. Dunlop Holdings, Inc. v. Barosh, 22 F.3d 113, 118 (7th Cir. 1994); *In re* Kunstler, 914 F.2d 505, 518 (4th Cir. 1990).

Notwithstanding the plain language of the Rule, where the paper in question is an initial complaint, several circuits have carved out an exception to the Rule that otherwise nonfrivolous papers may be sanctioned for an improper purpose. This view, which was first adopted by the Ninth Circuit, *See* Zaldivar v. City of Los Angeles, 780 F.2d 823, 832 (9th Cir. 1986), has been followed by the Second Circuit, *See Sussman*, 56 F.3d at 458, the Fifth Circuit, *See* Nat'l Ass'n of Gov't Employees, Inc. v. Nat'l Fed'n of Fed. Employees, 844 F.2d 216, 224 (5th Cir. 1988), and the Tenth Circuit, *See* Burkhart v. Kinsley Bank, 852 F.2d.

The Ninth Circuit in *Marsch,* 36 F.3d 825 (9th Cir. 1994), first acknowledged that "[a] plain reading of the rule's language suggests . . . separate requirements, so that either frivolousness *or* improper purpose may serve as a basis for sanctions," and that in *Townsend*, it had "subordinate[d] the language [of the Rule] . . . to policy considerations." *Id.* at 829–30. The court reasoned:

In deciding whether to follow *Townsend*'s lead (in applying Bankruptcy Rule 9011, which uses language virtually identical to Rule 11) . . . we must ask whether the policy considerations that prompted the court there to depart from the clear language of FRCP 11 apply with equal force in the bankruptcy context. We conclude they do not. While bankruptcy proceedings serve important purposes, they seldom carry the broad policy implications of many federal lawsuits, such as those seeking enforcement of environmental or antitrust laws. At the same time, experience has shown that bankruptcy proceedings are subject to a degree of manipulation and abuse not typical of civil litigation. *Id.* at 830 n.2



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

Despite rejecting the *Townsend* result for bankruptcy cases, the *Marsch* court "accept[ed] *Townsend*'s basic teaching, which is that frivolousness and improper purpose are not wholly independent considerations but 'will often overlap.'" *Id.* at 830 (quoting Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1362 (9th Cir. 1991) (en banc)). The Ninth Circuit then adopted a novel solution for Bankruptcy Rule 9011: "We conclude that bankruptcy courts [considering sanctioning a bankruptcy petition] must consider both frivolousness *and* improper purpose on a sliding scale, where the more compelling the showing as to one element, the less decisive need be the showing as to the other." *Id.*

As the Ninth Circuit observed in *Marsch*, a plain reading of the text and structure of Rule 11 argues for sanctioning nonfrivolous papers if they are filed for any improper purpose, and provides no reason for treating complaints any differently from other papers.

Whether it is Cogburn himself who fabricated the case or Cogburn with Xyience complicit as an accomplice to the fraud, several violations of Rule 11 and Rule 9011 resulted from the filings of a complaint and several pleadings not well grounded in fact or law. See Jackson-Colley v. Army Corps of Engineers, 655 F.Supp. 122, 135 n. 13 (E.D.Mich.1987) (sanctions imposed on plaintiff who lied to her attorney about facts of case).

It is well established that a court may impose a sum that is appropriate for deterrence purposes, even if it exceeds the amount of the fees incurred by the opposing party. Frantz v. U.S. Powerlifting Fed'n, 836 F.2d 1063, 1066 (7th Cir. 1987) (addressing appropriate sanctions under former Rule 11).

**CONCLUSION**

This case provides plenty of reasons and corroborating evidence calling for sanctions to be levied against the plaintiff and the plaintiff's counsel. The plaintiff's actions and behavior have resulted in litigation lasting months and taking a financial toll on both original parties.

Bergeron has had to spend almost all of his Web-site's income on defending this case and so much time doing research and writing motions that his Web-site has suffered. It is impossible to determine exactly how much time he has spent defending himself in this case as his own attorney, but Bergeron estimates it is well over 1,500 hours thus far. The going rate for most attorneys for this type of case



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

falls within the $200-$300 per-hour range. In seeking an attorney at the beginning of the litigation process Bergeron could not find any lawyer to work on his behalf for anything less than a $50,000 retainer. Unlike a traditional attorney who knows the process well and is well-trained in litigation, Bergeron has had to research both precedent cases and points of procedure throughout the entire case while serving in the capacity of a pro-se defendant.

The strain has been immeasurable in financial, physical, and mental costs. Bergeron has lost sleep, suffered endless worry and anxiety over the possibility of losing his livelihood and passing the voluminous debt of a potential judgment onto his children, and worked relentlessly long hours that have physically drained him. This ordeal has taken a chunk out of his life that he can never get back.

He has had to abandon work on his site, work on a book project, and work to further his freelance writing career. By the very design of this frivolous case, he has also had to sacrifice work on one of the finest investigative reports he has ever put together. The reports he continues to produce are subject to contempt charges against him, because the Clark County District Court determined based on the plaintiff's lies that Bergeron cannot write the truth about what this company is doing and has done to swindle investors.

What the plaintiff has done here is turn the process upside down for their own personal benefit and to further their corrupt schemes. This should not be taken lightly. There should be severe penalties for that kind of behavior so as to discourage any other corporation from following the same protocol to quiet their critics. Because of the legwork Bergeron has accomplished other press outfits picked up where he left off to expose the details behind the Fertitta investment that Xyience and the UFC have so far refused to make public. Yet, none have been able to get the intimate, critical details right before events happen as Bergeron did by predicting the bankruptcy long before it happened.

Cogburn manipulated facts and dismembered the truth at every step to press a joke of a civil case based on invented premises and flat out fabricated stories. Subsequent attorneys and other above-named parties supported and abetted the case through their direct or indirect actions and through the funding of Xyience being contingent on Bergeron's stories being removed from the internet.

There is no way to adequately describe the level of torment Bergeron has suffered as a result of this needless litigation. The toll this case has taken on the defendant is tremendous. He will now have



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

to re-establish his reputation and restore the links to his stories that the plaintiff has been able to eradicate with the help of the district court's decisions and a paid attorney. Even after this case is dismissed he will still have to put in a tremendous amount of work to undo the damage done by the district court's unwarranted, unconstitutional prior-restraint.

This case is custom made for Rule 11 sanctions and is the kind of litigation that Rule 11 was specifically designed to handle. Each day this case continues against Bergeron is another day his future is uncertain. All the while the plaintiff is reaping benefits based on false pretenses and manufactured evidence. Justice should be granted to Bergeron as soon as possible and without any further delay. He has suffered enough unjust and undue punishment for doing a service to society and alerting the public of corporate fraud. In most circles that is considered a venerable deed, a service he should be rewarded and heralded for. Instead, the district court chilled his speech and imposed unreasonable penalties on him without significant facts or supporting points of law to justify any merits of the plaintiff's case.

Bergeron hereby requests immediate and complete relief in the form of a final dismissal with prejudice and special and punitive damages. $150,000,000.00 in total sanctions shall be a sufficient deterrent to levy against all the above named participants. Each should pay out a sum according to the level of their culpability in the conspiracy to silence Bergeron's reporting through the initiation of the state court action and the backing of that action that continues through the bankruptcy proceedings today. Extracted from that sum should be a considerable per-share allowance for defrauded shareholders and an allowance for the district and the bankruptcy court's wasted time in entertaining this frivolous case. Bergeron only requests that $500,000.00 be set aside for his work and unpaid time defending himself against the conspiratorial actions of the parties subject to sanctions who have been named in this motion. As to the amount each party is responsible for, that can be determined by a series of show cause hearings in which each party or a representative of that party is cross-examined on the witness stand. Questions should be permitted regarding the depth of knowledge each party had in the conspiracy to silence Bergeron, how much investigation (if any) was done by the culpable attorneys and firms, and how each party benefited from the scheme. Also, any questions on the approach leading up to bankruptcy and the moves made to fraudulently bankrupt the company should be fair game.



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

It is time to hold the real culprits here accountable for their actions in a manner that shows them they can't get away with this kind of thing anymore. Too many of the culpable parties named in this pleading have a history of pulling off similar types of scams before. Each time they get away they go bigger and better the next time, and in this kind of economy the end of the line is bankruptcy where one party and its attorneys are now and another is steadily approaching (Station Casinos). Even Kirk Sanford admitted in his emails before he stole the company from the shareholders that the company was worth something per share, even if his assessment was low. Even Sanford, who called for "Scorched Earth" in wiping the company out when we met earlier, wrote in a late November email to me, "Innocent people have paid upwards of $5 a share on a company that was never worth more than $0.25 per share." Yet, instead of offering even that miniscule amount to shareholders, Sanford and the conspiratorial forces behind the bankruptcy of Xyience scorched them all.

The time for twiddling thumbs is over, accountability is long overdue, and the business of this court should go back to the kinds of issues it was truly designed to handle: honest bankruptcies.

*Dated December 12, 2008*

IN PROPER PERSON

[signature]

Rich Bergeron
147 Old County Road
East Sandwich, MA 02537
617-209-4325
Attorney Pro-Se
Rich.Bergeron@gmail.com



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

Rich Bergeron
147 OLD COUNTY ROAD
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>XYIENCE, INC., A Nevada Corporation<br><br>Debtor. | No. BK-S-08-10474-MKN<br>Chapter 11<br><br>Eighth Judicial District Court<br>Las Vegas, Clark County, Nevada<br>Case No. A544781, Dept. XXIII |
| XYIENCE INCORPORATED, a Nevada Corporation,<br>Plaintiff,<br><br>v.<br><br>RICHARD BERGERON, an individual<br>Defendant. | CASE NO. BK-2-08-AP-01082-MKN<br><br>**AFFIDAVIT OF RICH BERGERON IN SUPPORT OF DEFENDANT AND COUNTERCLAIMANT'S AMENDED MOTION FOR RULE 11 AND 9011 SANCTIONS**<br><br>Hearing Date: ____________, 2008 |
| RICHARD BERGERON, an Individual,<br><br>Counterclaimant,<br><br>v.<br><br>XYIENCE INCORPORATED, a Nevada corporation; FERTITTA ENTERPRISES, INC., a Nevada Corporation,<br><br>Counterdefendants. | Time: 9:30 AM<br><br>Location: 300 Las Vegas Blvd. South<br>Courtroom #2<br>Las Vegas, NV 89101 |



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

# AFFIDAVIT OF RICH BERGERON IN SUPPORT OF DEFENDANT AND COUNTERCLAIMANT'S AMENDED MOTION FOR RULE 11 AND 9011 SANCTIONS

Rich Bergeron, being first duly sworn, states as follows:

1. I make this affidavit in support of Defendant and Counterclaimant Rich Bergeron's Amended Motion For Rule 11 and 9011 Sanctions.
2. I have personal knowledge of, and I am competent to testify to the facts contained in this affidavit, except those matters based upon information and belief, and as to such matters I believe them to be true.
3. I received all the communications in the exhibits attached to the motion from sources with a direct connection to Xyience.
4. All the exhibits I have presented are valid and are the result of hundreds of hours of research.
5. I have reached out to about 80 shareholders in the past two weeks, although I've only spoken to a few.
6. People's lives have been ruined by this loss of high price stock.
7. Family trusts have been wiped out.
8. Over 100 shareholders from the State of Nevada alone have been defrauded, and in excess of 350 shareholders are deserving of relief.
9. I recently made a trip to Las Vegas paid for by interested shareholders who wanted to know what to do next.
10. I helped lead a meeting with Former Xyience CEO Bill Underhill to explain to these folks what we could do.
11. Underhill explained to me that the company began to unravel after he was forced out not long after Jan Hall resigned.
12. All the allegations and factual contentions made in the instant motion are accurate and true.
13. I have seen all the signs of a complete lack of an investigation in this case on the part of all the attorneys and parties deserving sanctions.
14. These lawyers have never reached out to speak to me in person after Jamie Cogburn tried to



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

settle the case on tape for a "box of sodas" and then $1,000.

15. Kirk Sanford and Adam Frank offered me $5,000 in an after the fact email, marking the end of negotiations that truly did not start until after I returned from the Xyience-paid trip to UFC 78 in Newark, New Jersey on November 17, 2007.
16. UFC 78 was the last event the Xyience symbol was placed in the middle of the mat for.
17. Exhibit 57, the funding consent letter, is dated just one day after the September 13th, 2007 injunction order against me in hit the docket in the Clark Country District Court.
18. The email following the funding consent letter was forwarded to me by a Xyience shareholder and celebrates the sealing of the Fertitta funding.
19. The Fertittas are managing partners of Station Casinos.
20. Previous to granting the injunction, Judge Williams had been endorsed in a campaign for his seat by Station Casinos.
21. Still, Fertitta Enterprises had to use their pawns Adam Frank and Kirk Sanford to put the pressure on to get the deal ratified or get people ready to go bankrupt, as is outlined in Exhibit 23, which I received from an insider at Xyience.
22. Exhibit 52 consists of some of the emails I have sent and received from SEC agents implying that the Xyience situation would be looked into. These are just a fraction of the communications I've sent to the same agents and to other agencies.
23. Exhibits 53 and 54 are The October 10th Press release in first draft (54) and final product form (53) illustrating the Xyience funding with the draft mentioning the Fertittas and the official version leaving them out of it.
24. Exhibits 55 and 56 are direct communications through email that I've had with Laurel Davis, John Mowbray, and Jon Pearson of Fennemore Craig.
25. Exhibit 58 is an email I received from Gary Nelson containing the draft Xyience press release attached and dated the day before the final release went public.
26. Exhibit 59 consists of email communications I had with Kirk Sanford, some of which Adam Frank was also sent.
27. These November emails represent the true extent and timing of actual negotiating of settlement figures.



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

28. Exhibit 60 shows Hunterton and Associates representing Adam Frank and Kirk Sanford in Clark County District Court against Xyience Founder Russell Pike. It is taken directly from the Clark County Courts on-line database.

29. Exhibit 61 is a public record available in a simple internet search for Frank Fertitta, Jr. and consists of a donation stub made out for Frank Junior where he registers the political donation as "Chairman of the Board" of Fertitta Enterprises.

30. Bergeron has been told by more than one reliable source that Frank Fertitta, Jr. put much of his own money into the Xyience funding deal.

31. Exhibit 62 details one of Frank Fertitta, Jr.'s most significant major public scandals in Nevada. Harry McBride appears to have hesitated to testify in Gaming license hearings against Frank Junior due to the Fertitta family tradition of political influence. This is a copy of the original article written by Ned Day.

32. Sheriff Bill Young left office as the Vegas Sheriff to a high paying job at Station Casinos as his heir apparent and successor Doug Gillespie got $65,000 in campaign contributions from Fertitta family members and business interests.

33. David Winterton has sent me several emails and explained that he never told Xyience officials I made his quotes up.

34. Winterton sent me the emails in Exhibit 64 when Xyience "consultant" John Chadwell was harassing me on-line under different screen names but the same Xyience IP address. He emailed Winterton and myself, and these are some of the pertinent segments.

35. Xyience's own pleadings reveal a complete lack of accounting for the First Amendment issues, the actual facts of the case, and the tendency to avoid adding anything of substance to the record.

36. Exhibit 65 comes from Xyience's own pleading, embracing the old evidence and relying on it and nothing much else but baseless argument to prove I committed some kind of offense here.

37. Exhibit 66 is the outline of the complete bankruptcy picture, how it happened, and who benefited most. I received this from a few different shareholders forwarded to me at different stages of the process.

38. I have been investigating the background of Xyience since late 2006 and never acted out of



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

any desire to injure the company or interfere with any of the company's contracts.

39. I printed the facts and the testimony I was given from individuals who were around during the earliest days of the company.

40. I have never personally spoken with any of the attorneys currently engaged in this litigation.

41. I was never interviewed by Attorney Jamie Cogburn as to my editorial policies.

42. Attorney Pamela Lawson sought a default order against me in District Court on false pretenses and utilizing a process that never gave me an adequate opportunity to respond.

43. The default was set aside and Lawson actually asked for her fees to be paid by me for her mere appearance.

44. Attorney Greg Garman and Attorney Matthew Zirzow were never in any position to know if Bergeron recorded the hearing that was the subject of the show cause hearing in this case on September 10th, 2008.

45. Garman and Zirzow filed a pleading in that instance that they knew to be frivolous.

46. Garman also made another later groundless verbal attempt to deny me my telephonic appearance privileges.

47. At all times attorneys engaging in pressing this litigation and/or attempting to deny culpability have not even been able to muster a cursory investigation into the "facts" purported and alleged in the initial complaint.

48. Such an investigation would prove I have done nothing wrong.

49. The exhibits, pleadings, and other papers filed herein and before this date, all inclusive of all exhibits presented, are the product of intensive investigation of all the parties involved in the conspiracy to silence me.

50. The Xyience bankruptcy is a fraud, and it was promoted by a false promise to shareholders that benefited Zuffa and Fertitta interests above all others.

51. Xyience shareholders deserve to be compensated for their loss as a result of Bergeron being silenced and unable to warn them of the impending disaster that resulted in this ugly bankruptcy.

52. Fertitta Enterprises appears to be using the Xyience situation as a "dress rehearsal" for the Station Casinos bankruptcy or first-lien maneuver that recently failed leaving the company in a



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com

position where those in the press are predicting bankruptcy.

53. Xyience, while owned by Fertitta Enterprises, paid off all its obligations and made new ones to Zuffa interests the Fertittas had considerable ownership interests in at the same time they owned Xyience and at the same time Xyience owed multiple other creditors, including Cott Beverages.

54. Xyience actively discouraged adequate bids to save the company from bankruptcy and foreclosed on their note as soon as possible.

55. The opposing attorneys have abused the law, their positions as attorneys, and their charge to investigate claims and pleadings before they file, press and support them.

56. The plaintiff in this case has produced no substantive new evidence to support the initial claim and has not sufficiently amended the claim or made any attempts to bring this bogus litigation to an end despite being served with another Rule 11 Motion and being duly warned of the fraudulent nature of this instant case and the core bankruptcy proceeding.

57. The Fertitta Family's connection to organized crime has deep roots in Texas and is the subject of several high profile investigations and inquiries into Frank Fertitta, Jr.'s past over the years.

58. Frank Fertitta, Jr. is at the center of the Major business entity that struck this deal in the first place as the lead investor as the Chairman of the Board of Fertitta Enterprises.

*Dated December 12, 2008*

Rich Bergeron

RICH BERGERON, AFFIANT

Subscribed and Sworn to Before Me
This 12th Day of December, 2008

Carlos Cartagena

NOTARY PUBLIC
My Commission Expires:

CARLOS CARTAGENA
Notary Public
Commonwealth of Massachusetts
My Commission Expires January 23, 2015



PDF Creator - PDF4Free v2.0 http://www.pdf4free.com