RECEIVED & FILED

'09 FEB 18 A7:54

RECEIVED IN DROP BOX

FEB 17 4 05 PM '09

U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

Rich Bergeron
147 OLD COUNTY ROAD
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>XYIENCE, INC., A Nevada Corporation<br><br>Debtor. | No. BK-S-08-10474-MKN<br>Chapter 11<br><br>Eighth Judicial District Court<br>Las Vegas, Clark County, Nevada<br>Case No. A544781, Dept. XXIII |
| XYIENCE INCORPORATED, a Nevada Corporation,<br>Plaintiff,<br><br>v.<br><br>RICHARD BERGERON, an individual Defendant.<br><br>RICHARD BERGERON, an Individual,<br><br>Counterclaimant,<br><br>v.<br><br>XYIENCE INCORPORATED, a Nevada corporation; FERTITTA ENTERPRISES, INC., a Nevada Corporation,<br><br>Counterdefendants. | CASE NO. BK-2-08-AP-01082-MKN<br><br>**DEFENDANT AND COUNTERCLAIMANT'S MOTION TO RECONSIDER COURT'S DECISION ON DEFENDANT AND COUNTERCLAIMANT'S MOTION FOR AN IMMEDIATE SHOW CAUSE HEARING TO STRIKE THE PERJURED DECLARATIONS OF ADAM FRANK (DKT. #3, EXH. 3) AND JAMIE COGBURN (DKT. #3, EXH. 8); AND MOTION TO VACATE THE CLARK COUNTY DISTRICT COURT'S MODIFIED PRELIMINARY INJUNCTION ORDER (DKT. #3, EXH. 28)**<br><br>Hearing Date: _______________, 2009<br>Hearing Time : 9:30 AM<br><br>Location: 300 Las Vegas Blvd. South<br>Courtroom #2<br>Las Vegas, NV 89101 |

**DEFENDANT AND COUNTERCLAIMANT'S MOTION TO RECONSIDER**

# INTRODUCTION

***"WHAT WENT WRONG?...ONE GUY WITH A FEW FRIENDS, AND HELPERS, DISCOVERED THIS THING, NEARLY A DECADE AGO, LED YOU TO THIS PILE OF DUNG THAT IS, THAT IS BERNIE MADOFF, AND STUCK YOUR NOSE IN IT, AND YOU COULDN'T FIGURE IT OUT!"***

***REP. GARY ACKERMAN, D-NY, ADDRESSING AN SEC PANEL***
***CONGRESSIONAL HEARING ON MADOFF CASE (FEB 4, 2009)***

The economic times we live in have never been more uncertain and volatile and also subjected to such a major impact by massive fraud at the same time. We are only now figuring out why all this off-the-charts fraud we've been seeing nationwide has been so easy to get away with over the years. Regardless of your political affiliation, as an American paying taxes you've got to be angry to see a guy like Bernie Madoff allowed to do his dirty deeds for ten years after someone first alerted the SEC to his Ponzi scheming ways. Bernie Madoff just fell through the cracks.

I know lots of people who fell through the cracks in their own tragic ways in the Xyience case. I know folks who had their lives ripped apart by the actions of Fertitta Enterprises in hijacking the company to serve their own needs. Retirement, college, and savings funds were wiped out. Families were altered forever as a real and direct consequence of the fraud perpetrated by all the entities named in the Rule 11 motion now before the court.

The Fertittas have so overbuilt themselves into a corner with Station Casinos that there is already serious talk about a planed bankruptcy circulating through the press. All the individuals and business entities attached to irresponsible actions in this situation, as named in the Rule 11 Motion, have at all times sacrificed the hopes and dreams of hundreds, if not thousands of innocent victims to bolster their own bottom lines. It's a game of maximum profit for minimum investment, and they don't care how they win it. These ruthless thugs in business suits will be trying to convince their creditors to take cents on the dollar to keep the Casino chain alive. These same people only control Xyience because they wanted another $350 million in credit for the Ultimate Fighting

Championship. Fertitta Enterprises, still to this day, controls Xyience as it wades through bankruptcy.

The question I keep asking myself is why can't the civil system pick up the slack? The government's been neglecting a serious watch dog duty, and agents apparently at times don't even accept an honest whistleblower's help. The system is so convoluted with the process and the technicalities that somehow it is immaterial whether or not the injunction against me is constitutional as long as the process was followed correctly to get there. Where's the justice in that? To me, that is the best excuse to despise the practice of the law in this day and age. The very concept that allows for an unconstitutional order to stand based on the fact that the process went forward in a smooth manner is ridiculous. Just because the right steps were taken to get to the injunction shouldn't take away from the fact that the injunction is unconstitutional on its very face.

I don't know how anyone would believe I enjoy having to be engaged in these proceedings. I don't. I hate every step of the process.

I hate reading every bad decision. I hate how evidence gets excluded willy-nilly just because it incriminates the opposition.

I hate how a judge can say I never objected to evidence exclusions…

**"Xyience objects to the admissibility of the evidence offered by Mr. Bergeron in support of the OSC Motion. See Xyience Opposition at 13:2 to 15:9. No written response to the evidentiary objections was filed by Mr. Bergeron, nor were any responses to the objections presented at the hearing."**

**Case: 08-01082-mkn Doc #: 138 Filed: 01/30/2009 Page: 5 of 10**

When it is clear as day that I did file a written response and object:

**XYIENCE CITES INSUFFICIENT GROUNDS FOR EXCLUSION OF EVIDENCE PLACED PROPERLY ON THE DOCKET BY BERGERON AND ACCOMPANIED BY AFFIDAVITS:**

**In regard to the contentions raised by Xyience on Page 13 of the opposition and on subsequent pages of the filing in list form, Bergeron vehemently opposes such request and challenges the grounds for requesting and granting such exclusions.**

Case: 08-01082-mkn Doc #: 133 Filed: 01/02/2009 Page: 14 of 18

A copy of the above-referenced order and reply pleading are on file and properly before the

court.

There are a few more things I hate about litigation that I won't mention. All I know is that if I had to judge my experience thus far on this adversary case I'd have to say being a lawyer is all about hiding the truth and hijacking the nuances of process to handicap true justice. I've cited precedent cases, civil statutes, and adequate reasons for judicial relief only to have the court here ignore the rule of law and refuse to recognize the entire Prior Restraint Doctrine outlined by the United States Constitution and the Justices of the Supreme Court over generations of First Amendment litigation.

Judge Nakagawa's MEMORANDUM DECISION ON MOTION OF DEFENDANT/COUNTERCLAIMANT RICH BERGERON FOR AN IMMEDIATE SHOW CAUSE HEARING TO STRIKE THE PERJURED DECLARATIONS OF ADAM FRANK (Dkt. # 3, Exh. 3) AND JAMIE COGBURN (Dkt. #3, Exh. 8); AND MOTION TO VACATE THE CLARK COUNTY DISTRICT COURT'S MODIFIED PRELIMINARY INJUNCTION, filed on January 7, 2009 makes absolutely no mention of the rule of law and First Amendment implications of letting an unconstitutional Prior Restraint stand.

I devoted a great deal of attention in the above-named motion to illustrate the fact that such an over-reaching preliminary injunction, as exists in this case, is forbidden under the tenets of the U.S. Constitution. Judge Nakagawa ruled based on statutes regarding burden of proof and evidence inclusion. While doing so he failed to look at or address the exception to a major evidence rule regarding when a settlement negotiation conversation is admissible. Rule 408 allows for these discussions to be entered as evidence if they prove a bias.

Adam Frank and Kirk Sanford, acting in direct control of Xyience at the time of the conversation with me in early November of 2006, engaged in a very tame conversation regarding the litigation. The back and forth dialogue did not pertain directly to any negotiations of figures or discussions of possible legal conclusions to the case. The actual negotiation and monetary discussions occurred later, both after the recording stopped and in subsequent conversations. I don't think I ever referred to this particular initial recorded portion of the first conversation as a settlement discussion. I did not mean to imply the discussion that was recorded related to settlement. I meant to

say that the day's entire conversation began a settlement discussion. It was the opening of the dialogue, the pleasantries, so to speak. I have included a notarized copy of the transcript of this recording along with an affidavit swearing to its authenticity.

Regardless of the settlement or non/settlement status of this conversation, with relation to Adam Frank's remarks, they are adverse to his affidavit. Both Kirk Sanford and Adam Frank admit My site is a great history source. The recording goes to the bias of Frank, to the very heart of whether or not his testimony can or cannot be counted upon. The exception to the evidence rule applies.

Ignoring the existing and earnestly submitted evidence will not serve to make the process fair for either party. It will just delay the inevitable for the opposition. Sooner or later Xyience and Fertitta Enterprises will be backed into a corner with no real way to throw any more technicalities out to save themselves. This approach is offensive to the basic rule of law that applies to my argument on its face, regardless of what supporting evidence exists on the record.

Essentially, the court actually aided and abetted the opposition's attempts to make this entire case hinge on technicalities. Here are just a few of the precedent cases, points of law, and statutes cited by Bergeron which were ignored and/or overlooked in Judge Nakagawa's ruling:

## PRIOR RESTRAINT:

**"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights. A criminal penalty or a judgment in a defamation case is subject to the whole panoply of protections afforded by deferring the impact of the judgment until all avenues of appellate review have been exhausted. Only after judgment has become final, correct or otherwise, does the law's sanction become fully operative. A prior restraint, by contrast and by definition, has an immediate and irreversible sanction. If it can be said that a threat of criminal or civil sanctions after publication "chills" speech, prior restraint "freezes" it at least for the time." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976).**

The United States Supreme Court's first encounter with a law imposing a prior restraint came in Near v. Minnesota ex rel. Olson, 283 U.S. 697 (1931), in which a five-to-four majority voided a law authorizing the permanent ***enjoining of future violations*** by any newspaper or periodical **once found to have published or circulated** an "obscene, lewd and lascivious" or a "malicious, scandalous and defamatory" issue. An injunction had been issued after the newspaper in question had printed a series of articles tying local officials to gangsters. Liberty of the press to scrutinize closely the conduct of public affairs was essential, said Chief Justice Hughes for the Court:

**"[T]he administration of government has become more complex, the opportunities for malfeasance and**

**corruption have multiplied, crime has grown to most serious proportions, and the danger of its protection by unfaithful officials and of the impairment of the fundamental security of life and property by criminal alliances and official neglect, emphasizes the primary need of a vigilant and courageous press, especially in great cities. The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the immunity of the press from previous restraint in dealing with official misconduct." Id. at 719-20.**

In *Rendish v. City of Tacoma*, 123 F.3d 1216, 1219 (9th Cir., 1997), the Ninth Circuit determined that the "[t]raditional criterion for granting a preliminary injunction include: 1) a strong likelihood of success on the merits; 2) the possibility of irreparable injury to the plaintiff; 3) a balance of hardship favors the plaintiff; and 4) the advancement of the public interest."

**Bergeron will prevail in these proceedings, as the truth is on his side, and learning the truth about this ongoing scandal is definitely in the public interest. As far as an injury having to apply, "it is clear" that Bergeron is actually the one who will suffer irreparable injury because "[I]t is indisputable that the loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury." Id. At 1464 [quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2689, 49 L. Ed. 2d 547 (1976)].**

## PUBLIC FIGURES AND ACTUAL MALICE:

First, the Court created a subcategory of "public figure," which included those otherwise private individuals who have attained some prominence, either through their own efforts or because it was thrust upon them, with respect to a matter of public interest, or, in Chief Justice Warren's words, those persons who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." Curtis Publishing Co. v. Butts, 388 U.S. 130, 164 (1967) (Chief Justice Warren concurring in the result).

Later, the Court curtailed the definition of "public figure" by playing down the matter of public interest and emphasizing the voluntariness of the assumption of a role in public affairs that will make of one a "public figure." Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974).

Clearly, the standard of proof of actual malice must have therefore been met in the plaintiff and counter-defendant Xyience's case due to the public nature of the plaintiff corporation's ownership. Constitutional "actual malice" means that the defamation was published with knowledge that it was false or with reckless disregard of whether it was false, New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964); Garrison v. Louisiana, 379 U.S. 64, 78 (1964); Cantrell v. Forest City

Publishing Co., 419 U.S. 245, 251 -52 (1974).

Reckless disregard is not simply negligent behavior, but publication with serious doubts as to the truth of what is uttered, St. Amant v. Thompson, 390 U.S. 727, 730 -33 (1968); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81 (1967). A defamation plaintiff under the Times or Gertz standard has the burden of proving by "clear and convincing" evidence, not merely by the preponderance of evidence standard ordinarily borne in civil cases, that the defendant acted with knowledge of falsity or with reckless disregard, Gertz v. Robert Welch, Inc., 418 U.S. 323, 331 -32 (1974); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 83 (1967). See New York Times Co. v. Sullivan, 376 U.S. 254, 285 -86 (1964) ("convincing clarity").

Moreover, the Court has held, a Gertz plaintiff has the burden of proving the actual falsity of the defamatory publication, Philadelphia Newspapers v. Hepps, 475 U.S. 767 (1986) (leaving open the issue of what "quantity" or standard of proof must be met). A plaintiff suing the press for defamation under the Times or Gertz standards is not limited to attempting to prove his case without resort to discovery of the defendant's editorial processes in the establishment of "actual malice." Herbert v. Lando, 441 U.S. 153 (1979). The state of mind of the defendant may be inquired into and the thoughts, opinions, and conclusions with respect to the material gathered and its review and handling are proper subjects of discovery.

The supporting evidence that Judge Nakagawa allowed to be discarded was not essential to any of the above arguments and citations of precedent cases that show the injunction is unconstitutional and the initial case lacks any merit. The evidence that was not allowed only put the explanation point on the fact that this case has been garbage from the get go.

The Nakagawa ruling on this matter cites many of the opposition's points and arguments while completely avoiding any discussion of First Amendment issues of Prior Restraint and Public Figures. The ruling excludes evidence which impeaches the Frank affidavit. Rule 408 has a particular exception Judge Nakagawa refused to recognize in regard to the settlement nature of the proceedings.

## POINTS OF LAW TO SUPPORT OVERTURNING INJUNCTION

**The "special vice" of a prior restraint is that it suppresses expression not only directly, but also by "inducing excessive caution in the speaker." (Pittsburgh Press Co. v. Human Rel. Comm'n (1973) 413 U.S. 376, 390.)**

A preliminary injunction should only issue when the moving party demonstrates a likelihood of success on the merits and the possibility of irreparable harm. See Sun Microsystems v. Microsoft Corp. , No. 99-15046 (9 th Cir. Slip Op. 9601-9619) ( "Slip Op." ). Alternatively, a moving party must demonstrate serious questions concerning the merits and a balance of hardships tipping sharply in its favor. See id. **Xyience has made neither showing.**

It is no secret that I have never truly abided by the injunction, and I have admitted such before this court and asked to be held in contempt. Xyience has never protested or asked that I be held in contempt or even alleged any further harm from my violating the existing injunction.

My own pleadings and affidavits show I am the one who has been injured most. My life has been impacted in a severely negative manner by these proceedings. The stigma of the injunction will always follow me as long as it is in place and as long as the initial Xyience complaint is allowed to move forward. It is a great dishonor to be charged with defamation as a journalist. The very nature of a slander/defamation charge once inspired duels between even the most esteemed gentry in the early days of this country. Former U.S. President Andrew Jackson himself participated in such a duel in his early career as a lawyer.

District Court Judge Timothy Williams ignored federal law in making his decisions on the initial injunction, and apparently the Federal court venue we are in now makes no difference. Xyience obtained a prior restraint, a facially unconstitutional preliminary injunction, and this court should act immediately to remedy that problem.

An appeal of the motion to vacate will reveal the shortcomings of Judge Nakagawa's memorandum in failing to even account for the Prior Restraint argument. The section of the initial complaint marked "Prior Restraint Doctrine" was not just a casual afterthought or a

side note. It was a central theme of the entire motion.

Nakagawa also cites Massachusetts law regarding recording conversations but overlooks the Federal Wiretapping Law, which takes precedence in these proceedings. He also fails to account for my citing of the exception to the "settlement" rule of evidence (408) regarding the Frank and Sanford recording (see transcript and affidavit).

The Judge's Order and Memorandum Decision on at least the Motion to Vacate the Injunction should be reconsidered in light of the Prior Restraint Doctrine and First Amendment concerns. The language of the injunction is on its face unconstitutional, this court has refused to punish me for admitting to be in violation of it, and Xyience has not in any way supported their claim that the injunction is protecting them from harm.

To refuse to vacate this injunction on the grounds that the evidence is lacking is to overlook the rule of law and factual basis of the argument, precedent cases applying, and sufficient appeals level cases in support of a different ruling.

According to Ninth Circuit precedent, in order to obtain a preliminary injunction, the moving party must demonstrate either (1) a combination of probable success on the merits and the possibility of irreparable injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of the movant. Associated General Contractors, 950 F.2d at 1410. These formulations are not different tests but rather two points on a sliding scale in which the degree of irreparable harm increases as the probability of success on the merits decreases. Id.

In considering a request for a preliminary injunction, a court must remain mindful that such relief is aimed primarily at preserving the status quo pending trial. See Los Angeles Mem. Coliseum Comm'n v. National Football League, 634 F.2d 1197, 1200 (9th Cir. 1980) ("fundamental principle" governing preliminary injunctive relief is the need to maintain the status quo prior to determination on the merits). Under either formulation of the test, a court, in balancing the harms, must also take into account any public interests implicated by the injunctive relief sought. Caribbean Marine Services Co. v. Baldrige, 844 F.2d 668, 674 (9th

Cir. 1988).

Where the deprivation of a constitutional right is involved, courts generally hold that no further showing of irreparability is required. See Associated Gen. Contractors, 950 F.2d at 1412; 11A Wright & Miller, Federal Practice and Procedure section 2948.1.

The balance of hardship, moreover, tips decidedly in my favor. In contrast to the injury outlined above, a preliminary injunction would impose little hardship on members of the counter-defendant class. I have openly announced in court that I am not abiding by the injunction and asked in open court to be punished for violating the unconstitutional injunction. My actions have not affected the Status Quo at all, as Xyience and Fertitta Enterprises continue to be allowed to exclude evidence and escape accountability thus far. One way or another, they keep finding their way around any major damage from this proceeding. Meanwhile, I am forced to devote much of my daily life to a real-life crash course in law. Most people give me no chance and don't get beyond the whole "charged with defamation" aspect when it comes to finding work. This case has essentially become my identity, and winning or losing it will impact my entire life drastically.

A party seeking a preliminary injunction must demonstrate either a combination of probable success on the merits and the possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips in its favor. United States v. Odessa Union Warehouse Co-op, 833 F.2d 172, 174 (9th Cir.1987). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." Id. At minimum, the party seeking the injunction "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." Arcamuzi v. Continental Air Lines, Inc., 819 F.2d 935, 937 (9th Cir.1987) (citations omitted).

We turn now to the application of our rules governing review of a preliminary injunction and determine whether there was an abuse of discretion. I contend that the district court applied an incorrect standard for determining whether a preliminary injunction should issue and allowed the injunction to be worded in a way that made it a prior restraint on its face. I also argue that the district

court's decision rested on clearly questionable testimony from a disconnected and dishonest party: Adam Frank. The district court misapprehended and misapplied the law, and the District Court judge had a favorable relationship with the principals of Fertitta Enterprises.

To determine whether an abuse of discretion occurred, we examine whether the district court "misapprehended the law with respect to the underlying issues in litigation." Zepeda, 753 F.2d at 725. The district court ignored Supreme Court and Ninth Circuit precedents that prevented granting Xyience's injunction. The prior restraint on the exercise of First Amendment rights was allowed to go forward despite only citing one state case as a basis that was over 20 years old and based on completely different circumstances.

Three cases illustrate the federal law and appeals level decisions that over-ride the state's position in regard to the initial injunction: Nebraska Press; Columbia Broadcasting Systems, Inc. v. United States District Court, 729 F.2d 1174 (9th Cir.1983) (CBS ); and Goldblum v. National Broadcasting Corp., 584 F.2d 904 (9th Cir.1979) (Goldblum).

## NEBRASKA PRESS:

In Nebraska Press, the Court, while stating that freedom of the press is not an absolute right, 427 U.S. at 557, 96 S.Ct. at 2801, stressed that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." Id. at 559, 96 S.Ct. at 2803. The Court explained that those seeking to justify a prior restraint must satisfy a heavy burden. Id. at 558, 559, 96 S.Ct. at 2802, 2803. Courts reviewing a prior restraint must examine the evidence before the trial judge when the order was entered to determine (a) the nature and extent of pretrial news coverage; (b) whether other measures would be likely to mitigate the effects of unrestrained

pretrial publicity; and (c) how effectively a restraining order would operate to prevent the threatened danger.

The precise terms of the restraining order are also important. We must then consider whether the record supports the entry of a prior restraint on publication, one of the most extraordinary remedies known to our jurisprudence. Id. at 562, 96 S.Ct. at 2804.

The Court stated that the record must make clear that without the restraint, pretrial publicity "would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." Id. at 569, 96 S. Ct. at 2807 (emphasis added). The Court concluded that it was not clear that twelve such jurors could not be found. Id. Next, the Court emphasized the existence of alternatives available to the trial court, including extensive voir dire, change of venue, delay of trial, emphatic and clear instructions to the jury, and jury sequestration, as measures to limit any prejudicial impact of pretrial publicity before prior restraint may be necessary. Id. at 563-64, 96 S.Ct. at 2805. Finally, the Court pointed out that it was far from certain that this prior restraint would actually serve its intended purpose. Id. at 569, 96 S.Ct. at 2807.

## CBS:

In CBS, The Court reversed a district court's temporary restraining order (TRO) prohibiting the television network from "disseminating and/or broadcasting any portion of any and all government surveillance tapes generated in the investigation and prosecution" of John DeLorean. 729 F.2d at 1176. The Court reviewed the TRO under mandamus jurisdiction and, although the case involved a TRO rather than a preliminary injunction, they applied the standard articulated by

Nebraska Press to overturn the prior restraint.

The Court held that the record did not demonstrate publicity so likely to prejudice the entire community that twelve unbiased jurors could not be found. Id. at 1180. Elaborating on the Nebraska Press test, the decision determined that to assess the prejudicial effect of pretrial publicity, courts "must look not simply to [publicity's] effect on individual viewers but to its capacity to inflame and prejudice the entire community." Id.

While acknowledging the magnitude of publicity surrounding DeLorean, The Court observed that even in cases as heavily publicized as Watergate and Abscam, "many, if not most, potential jurors are untainted by press coverage." Id. at 1179-80. The Court also explained that two relevant factors in evaluating the likely impact of pretrial publicity upon a community are whether the subject matter of the case is lurid or highly inflammatory, and whether the community itself is small and rural, or large, populous, metropolitan and heterogeneous. Id. at 1181-82.

Finally, The Court rejected the district judge's dismissal of voir dire as an effective alternative and stressed the availability of voir dire, emphatic and clear instructions, and other alternatives to prior restraint. Id. at 1182.

## GOLDBLUM:

Goldblum involved a last minute effort to enjoin NBC from broadcasting a television docudrama called the "Billion Dollar Bubble" depicting securities and insurance fraud. 584 F.2d at 905. Goldblum had already been convicted and was in prison for his role in the fraud, but he contended that the docudrama inaccurately portrayed the fraud and his role in it. The docudrama, he argued, would inflame public opinion against him, and thus jeopardize his release on parole, his right

to a fair trial in a related civil action, and his right to a fair trial in any possible future criminal action. Id. at 905-07. The district judge ordered NBC to produce a copy that he could view for inaccuracies and, when NBC refused, held the network in contempt. Id. at 906.

The Supreme Court granted mandamus relief and reversed the contempt order. The Court reviewed the order as if it were itself a prior restraint, since its sole purpose was to aid the court in determining whether to enjoin the broadcast. Id. at 906-07. Such a prior restraint was "presumptively unconstitutional." Id. at 906. The Court found no basis in fact or law for Goldblum's theories that without prior restraint the docudrama would prejudice his consideration for parole or a wholly speculative future criminal prosecution. Id. at 906-07.

The district court here in Nevada applied the preliminary injunction standard "in a manner that results in an abuse of discretion." Zepeda, 753 F.2d at 724. The Nebraska Press standard is an exacting one, and, as pointed out earlier, allows a prior restraint only if its absence would prevent securing twelve jurors who could, with proper judicial protection, render a verdict based only on the evidence admitted during trial. 427 U.S. at 569, 96 S.Ct. at 2807.

Xyience never demonstrated that my Internet reporting would inflame and prejudice the entire Clark County community, and I never asked for a jury trial. While this case may involve lurid or inflammatory subject matter, Clark County is the type of populous, heterogeneous metropolitan area where prejudicial publicity is less likely to endanger any party's right to a fair trial. Also, the judge hearing the matter at the time of the injunction being issued had a particularly interesting connection to Station Casinos, which is operated by the Fertitta Family, which now owns Xyience through Fertitta Enterprises.

The Court in Nebraska Press stressed the existence of alternatives to prior restraint. Xyience never met the burden of demonstrating why measures available to the trial court such as voir dire, jury instructions, delay, change of venue or jury sequestration would not suffice to protect the company's rights. 427 U.S. at 563-65, 96 S.Ct. at 2804-06; see also CBS, 729 F.2d at 1181-82. "The alternatives to censorship ... are judicial methods for preserving a fair trial." CBS, 729 F.2d at 1184 (Goodwin, J., concurring).

Nor has Xyience demonstrated that the proposed prior restraint would effectively protect their rights. Nebraska Press, 427 U.S. at 562, 565-67, 96 S.Ct. at 2804, 2805-07. My Web-site's coverage aside, substantial and unrestrained publicity concerning Xyience and Fertitta Enterprises has already been exposed to the public.

It should also be particularly noted that Xyience does not plan to bring the initial complaint to trial. They have made the court aware of this fact in writing, and therefore the injunction will eventually be determined moot regardless of its constitutionality. This should not be allowed to happen without the rule of law deciding this outstanding issue at the heart of this case.

This decision has direct bearing on the Rule 11 and 9011 Motion, and this motion should be heard before the hearing on the Rule 11 and 9011 Motion if possible. With regard to the declarations of Cogburn and Frank, they can be proven to be perjury through the discovery process if the initial case ever gets to discovery. However, discovery is not needed to see that the injunction as it exists is a clear prior restraint. As such, a Sua Sponte order overturning the injunction is at the very least justified. With regard to the application of the Federal Wiretapping Law standard and the Exception to Rule 408, I also hereby request that the entire memorandum decision be re-examined and that a final determination be reconsidered in light of the attached affidavit and evidence.

The transcript of the recording, the sworn testimony I provide, and the basic rule of law are all in support of striking the declarations of Adam Frank and Jamie Cogburn and overturning the injunction. At the very least, the argument and basis in precedent law and bare statute supports eliminating the injunction by any means necessary. It is facially unconstitutional, plain and simple.

I will also submit a request to continue the February 25th Rule 11 Motion and the Scheduling Conference hearings for this case to accommodate the Court to entertain a hearing on this motion

first. A show cause hearing should take place in which Adam Frank and Jamie Cogburn are subject to cross examination regarding their declarations should the evidence attached be insufficient to strike the declarations outright. The injunction, however, is unconstitutional in its very nature. Thus, there should not have to be an additional hearing in order to overturn what is on its face a clear prior restraint.

DATED this 18th day of February, 2009.

IN PROPER PERSON

Rich Bergeron
147 Old County Road
East Sandwich, MA 02537
617-209-4325
Attorney Pro-Se
Rich.Bergeron@gmail.com