RECEIVED & FILED
RECEIVED IN DROP BOX
'09 FEB 18 A7:53
FEB 17 4 06 PM '09
U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

Rich Bergeron
147 OLD COUNTY ROAD
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

# UNITED STATES BANKRUPTCY COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>XYIENCE, INC., A Nevada Corporation<br><br>Debtor. | No. BK-S-08-10474-MKN<br>Chapter 11<br><br>Eighth Judicial District Court<br>Las Vegas, Clark County, Nevada<br>Case No. A544781, Dept. XXIII |
| XYIENCE INCORPORATED, a Nevada Corporation,<br>Plaintiff,<br><br>v.<br><br>RICHARD BERGERON, an individual<br>Defendant. | CASE NO. BK-2-08-AP-01082-MKN<br><br>**DEFENDANT AND COUNTERCLAIMANT RICH BERGERON'S AFFIDAVIT IN SUPPORT OF MOTION TO RECONSIDER**<br><br>Hearing Date: ____________, 2009<br><br>Time: 9:30 AM<br><br>Location: 300 Las Vegas Blvd. South<br>Courtroom #2<br>Las Vegas, NV 89101 |
| RICHARD BERGERON, an Individual,<br><br>Counterclaimant,<br><br>v.<br><br>XYIENCE INCORPORATED, a Nevada corporation; FERTITTA ENTERPRISES, INC., a Nevada Corporation,<br><br>Counterdefendants. | |

**DEFENDANT AND COUNTERCLAIMANT RICH BERGERON'S AFFIDAVIT IN SUPPORT OF MOTION TO RECONSIDER COURT'S DECISION ON DEFENDANT AND COUNTERCLAIMANT'S MOTION FOR AN IMMEDIATE SHOW CAUSE HEARING TO STRIKE THE PERJURED DECLARATIONS OF ADAM FRANK (DKT. #3, EXH. 3) AND JAMIE COGBURN (DKT. #3, EXH. 8); AND MOTION TO VACATE THE CLARK COUNTY DISTRICT COURT'S MODIFIED PRELIMINARY INJUNCTION ORDER (DKT. #3, EXH. 28)**

**Richard Edward Bergeron III, being first duly sworn, states as follows:**

1. I am a pro-se representative and have been at all times in these proceedings currently pending as *Xyience, Incorporated vs. Richard Bergeron*, Case #: 08-01082-MKN and currently listed as an adversary proceeding under Debtor Xyience Case #: 08-10474-MKN.
2. I make this affidavit in support of the **MOTION TO RECONSIDER COURT'S DECISION ON DEFENDANT AND COUNTERCLAIMANT'S MOTION FOR AN IMMEDIATE SHOW CAUSE HEARING TO STRIKE THE PERJURED DECLARATIONS OF ADAM FRANK (DKT. #3, EXH. 3) AND JAMIE COGBURN (DKT. #3, EXH. 8); AND MOTION TO VACATE THE CLARK COUNTY DISTRICT COURT'S MODIFIED PRELIMINARY INJUNCTION ORDER (DKT. #3, EXH. 28)**
3. I have personal knowledge of, and I am competent to testify to the facts contained in this Affidavit, except those matters based upon information and belief and, as to such matters, I believe them to be true.
4. On July 18, 2007 Xyience filed this case against me in Clark County District Court with direct intent to silence my investigative reporting of ongoing fraudulent activity at the struggling supplement company.
5. Xyience's own initial complaint points to at least two investors willing to provide $15 million in financing if my stories were removed from the internet.

6. Xyience's initial complaint and Adam Frank's initial declaration both contained several misrepresentations and clear factual errors, as outlined in previous motions. Frank was also never in a position to testify as to my intent since he did not even communicate with me until the late fall of 2007.
7. Neither Frank, nor Attorney Jamie Cogburn were ever in any position to represent that my reports on Xyience were written with malicious intent since they had never met or spoken to me prior to creating their declarations.
8. I have never put a word to paper that has been motivated by any malice whatsoever toward Xyience. I have at all times been attempting to assist Xyience as it attempts to remove itself from a chain of fraudulent actors that have controlled it in recent years.
9. My first conversation with Adam Frank and Kirk Sanford (http://www.fileden.com/files/2007/9/16/1434673/frankandsanford.mp3) was a call that came from a Utah cabin owned by Kirk Sanford and in which Frank and Sanford spoke initially of free will without an inquiry as to whether the call was being recorded.
10. This call took place on November 6, 2007.
11. This call, as outlined in the transcript attached, was an opening of dialogue between myself and Xyience but did not broach settlement negotiations, discussions, or terms in the recorded portion.
12. My reference to this conversation as a settlement discussion in a prior motion was mistaken. Though settlement discussions did later take place through emails, the actual negotiations did not officially begin until after my trip to New York City to meet Sanford and Frank and attend UFC 78.
13. I disconnected my recording equipment when Sanford and Frank did ask whether or not they were being recorded and requested the call continue without recording. They never, even during the unrecorded portion of the call, protested the initial recorded portion of the conversation or asked me to keep it private.
14. During the November 6, 2007 conversation Frank and Sanford both agreed my Web-site was a resource for them to find out more about the company.
15. Adam Frank and Kirk Sanford invited me to the Ultimate Fighting Championships 78 show on Saturday, November 17th, 2008 and met with me the morning of November 17th

at a restaurant in the W Hotel in Times Square, New York City. The entire trip was paid for by Xyience, but there was no talk of the words "settlement conference" and no lawyer for Frank, Sanford, or Xyience participated in the discussions held with Frank and Sanford on that weekend.

16. My research before the meeting confirmed that Frank and Sanford were operating at the time in direct subordination to Fertitta Enterprises, namely the General Manager of Fertitta Enterprises: Bill Bullard.

17. I also learned that Fertitta Enterprises formed Zyen, LLC in a direct attempt to avoid attaching Xyience directly to their own multi-billionaire interests under direct supervision of Fertitta Enterprises.

18. Sanford and Frank told me they represented Xyience at the time as the company's Co-CEOs. Both men mentioned Fertitta Enterprises and admitted they were acting on behalf of the company.

19. Robert Lavan, an employee of NYC based Standard General, attended the meeting with myself and Frank and Sanford on November 17th.

20. During the course of the conversation Adam Frank and Kirk Sanford both repeatedly mentioned that they were going to bankrupt the company and there was no hope to salvage anything despite Lavan being from a company that might have possibly provided Xyience with potential funding.

21. Sanford specifically used the term "scorched earth" to describe the bankruptcy process he wanted to undertake.

22. Lavan gave both men extensive advice on what other courses they might possibly take that could avoid an ugly bankruptcy. Sanford was fully aware that his approach would burn over 340 investors, and he actually used the 380 figure to describe those shareholders who would lose their interests in the company in the event of bankruptcy.

23. At the end of the conversation Frank and Sanford each gave me $100 in order to get to the New Jersey venue for the night's fight: The Prudential Center in Newark, New Jersey. I met New Jersey Boxing Writer and Web-site Owner Danny Seratelli at the fights, and he also met Frank and Sanford in one of Xyience's luxury boxes. Xyience provided tickets for both of us to watch the event.

24. At the end of the event I was unable to get in touch with Frank and Sanford and did not get a chance to meet with them the following day. If the meeting was supposed to pertain to settlement, Sunday, November 18th would have been the day to discuss it, but there was no attempt to contact me further until after I returned home later that day.

25. When I returned home from the trip I found several concerned individuals' emails in my inbox. One of them was from a representative of Xyience who had an office directly next door to Omer Sattar's. Knowing layoffs were imminent and a select few were stealing all the spoils for themselves, this witness heard all the planning going on through the thin office walls.

26. The emailer intimated that the Xyience investment was all orchestrated to back up the covenants of a senior secured credit facility for one of the Fertittas' other businesses: Zuffa, LLC. This $350 million loan was reported to me to be based on strong sponsorships. Instead, Zuffa obtained the loan based on information Fertitta Enterprises reps would have known to be completely false since they were in direct financial control of the company and orchestrated that control by promising to pump money in that would avoid bankruptcy.

27. Investors with shares in Global Cash Access also contacted me around this time by phone and email to tell me what had happened in regards to all ex-GCA employees who transferred to Xyience.

28. Kirk Sanford, Karim Maskatiya, and Kathryn Lever all left GCA just before a major scandal became public relating to millions of dollars in commissions owned to facilities where their cash machines were located. Sanford personally unloaded thousands of shares before leaving the company to head up Xyience.

29. I later discovered that Global Cash Access had contracts with multiple Station Casinos locations. Station Casinos is owned by Fertitta Enterprises and is now also in bankruptcy trouble.

30. Fertitta Enterprises had to know that the GCA officials had been in place at the company and may have had knowledge of the lack of commissions going out from GCA to their own casinos, yet GM Bill Bullard gave three of GCA's former officials an immediate spot at XYIENCE.

31. Karim Maskatiya's nephew Omer Sattar even earned a slot as the company's President.
32. Even though the Fertittas would have been on the list of defrauded companies due to the commission scheme, Fertitta Enterprises did not remove the former GCA employees when the information came out about their engagement in possible fraud at GCA.
33. Sanford and Frank instead resigned voluntarily from Xyience much later on.
34. These Global Cash Access employees would not have been in position to take over the company and bankrupt it had (1) Karim Maskatiya not invested millions of dollars of his own money into the company (2) Fertitta Enterprises had never dealt with the company before in previous engagements.
35. This is a clear indication, based also on voluminous testimony from multiple sources, that Fertitta Enterprises and Global Cash Access are coordinating with each other to purposely commit fraud.
36. I have been told by sources currently on the inside of Xyience and those formerly on the inside that the Fertittas never wanted it known that they had any control over Xyience. I have also been told by very reliable contacts that the GCA officials and Adam Frank were all put in place with the specific purpose of bankrupting the company.
37. I have been in contact with various investors and other lawyers engaged in litigation pertaining to Xyience. All of them have outlined similar concerns in relation to the quickness of the bankruptcy and the initial promises of Fertitta Enterprises to provide the influx of capital in order to prevent bankruptcy when in fact the purpose was to prevent defaulting on their $350 million loan.
38. This was the only reason Xyience signed such a quick sponsorship deal with the UFC that they clearly couldn't afford at the time due to the ongoing financial hardship. Fertitta Enterprises used this deal to take money out of a newly acquired company they cared nothing about in order to put it in an established company they have been grooming for years.
39. I have been contacted by lawyers all over the country seeking information on the companies and parties involved. I have been interviewed by a print magazine and three different web-sites thus far due to my expertise on the subject. I have compiled almost all the related court documents with the intent to study as much as possible and produce a

non-fiction book at the end of the whole process.

40. I hereby attest that all the information and allegations present on or linking out from http://www.unlimitedfightnews.com/xyience.htm are true and backed up by facts and research. Those inclusions obviously meant to infer satire are exempt.

41. All the facts and allegations contained within and linking from the following web-site addresses are also true and point to serious, witness substantiated allegations that will be proven through discovery and will be exposed outright during any future trial. These facts and allegations also are of the serious nature that should warrant an immediate and thorough investigation into this bankruptcy:

http://podcast.thelightsoutshow.com/2007/04/18/vol-11a--wwwthelightsoutshowcom.aspx

http://www.fightopinion.com/?s=Rich+Bergeron

http://www.unlimitedfightnews.com/xyiencewow.htm

http://unlimitedfightnews.com/wordpress/?cat=15

http://unlimitedfightnews.com/wordpress/?cat=15&paged=2

http://unlimitedfightnews.com/wordpress/?cat=15&paged=3

http://www.fightlinker.com/?p=1911
http://www.fightlinker.com/?p=1670

http://www.fightlinker.com/?p=1588

42. All of the factual contentions and various allegations contained within all previous motions and all other filings, pleadings, and declarations I have filed thus far are true and backed up by constant research into the players involved, conversations with those in direct position to know about what is going on at the different corporations involved, and first hand knowledge gleaned

through reviewing official court documents and other pertinent company documents and communications I have been able to intercept or collect from witnesses, some of whom will be called to be deposed in discovery.

43. I have been engaged in reporting for much of my adult life, having completed several previous investigative reports and thousands of published articles without incident. I have never before this case been accused of defamation by any article subject in over 7 years of reporting experience. I know and abide by the various journalists' codes and ethical rules that pertain to defamation and anonymous sources, and I am well aware of the protections of the First Amendment. I have never printed or published anything in print or on-line that I didn't have sufficient facts to back up, usually from multiple sources who demonstrate clear knowledge of what's going on and a clear connection to the subject matter.

44. Judge Mike Nakagawa has shown extreme deference to the opposing attorneys with particular favoritism given to the Fennemore and Craig attorneys even in the face of their admitting that they plan to dismiss the initial case.

45. I have gone out of my way to present evidence corroborated by affidavits only to have the opposition seek to obscure this evidence. It is the counter defendants who do not want discovery to take place, and it is they who benefit from needless delay.

46. The deeper Xyience gets into the bankruptcy process, the harder it will be to obtain due and proper relief.

47. Judge Nakagawa is clearly biased and prejudiced against the petitioner and has shown extreme negligence in case management which has allowed the debtor in the bankruptcy case to carry on a charade of a complaint with no merit and allowed an unconstitutional injunction to stand simply because the process to obtain it was followed properly.

48. Nakagawa is overlooking several serious First Amendment issues in this case and delaying justice to appease the core proceedings. Furthermore, he is ignoring serious concerns which warrant an immediate and through investigation into the motivations and self-serving actions behind the initial filing of the core proceedings. The chain of events that led to the bankruptcy and that I have been reporting on since December of 2006 contain several red flags and indicators of sophisticated fraud.

49. No evidence of any serious inquiry into this fraudulent behavior exists on the core docket

or on any of the adversary proceedings' dockets. The trustee has plenty of evidence with which to pursue such an investigation based on the various indications of fraud that have been reported, but no such investigation has been initiated.

50. At the soonest possible opportunity I will be filing a new adversary proceeding to block the implementation of the reorganization plan due to serious instances of fraud. I already have ten shareholder affidavits in support of that new proceeding.

51. I stand by each and every exhibit I have entered into these proceedings and the evidence contained within each exhibit. These documents are all genuine and come from either insiders at the companies involved or directly from the PACER service system. With respect to audio evidence and evidence within on-line articles: these were gleaned during the course of my investigative reporting and were produced with particular attention paid to verifying information from all anonymous sources.

52. I have purposely had to suppress certain aspects of my defense due to ongoing law enforcement agency inquiries and investigations into Xyience, Incorporated and the various players and corporations involved in the bankruptcy.

53. At all times I have engaged in this investigation with the hopes of exposing the ultimate truth for the benefit of the victims who have lost their entire investments because of the crude and corrupt practices of criminal minded billionaires.

54. My First Amendment rights have been violated by this case, I have been subjected to public ridicule at times, I have lost work opportunities, and I have been discriminated against by potential sponsors because of these fraudulent proceedings.

55. It has been nearly impossible to get a job or obtain regular work because of both the constraints of this case and the reputation it has garnered.

56. Xyience never had any grounds to pursue this lawsuit, and their case never had any supporting evidence that could not be exposed as perjury with a sufficient hearing. This case has actually been allowed to continue unchecked for over a year with only one declaration supporting it that is not from a lawyer. That declaration has already been proven in the recording I made to be completely bogus and an instance of clear perjury. Adam Frank should be appropriately sanctioned.

57. I have spoken with attorney Jamie Cogburn and emailed him several times. He personally

informed me he will no longer work again for Adam Frank and Kirk Sanford, and he has yet to be even paid for the completely fraudulent case he compiled against me. Cogburn lied repeatedly and misrepresented several facts pertaining to the case (see sanctions motion).

58. All attorneys taking the case on after Cogburn's withdrawal were operating under Xyience's direct control while the company was owned and overseen by Fertitta Enterprises.

59. If the counter defendants are allowed to further this complicated scheme there will be more victims affected in the long run and it will make it easier for these corporations and individuals to victimize more people down the line.

60. I did in fact object, in writing, to the exclusions of evidence asked for and granted to the Xyience Attorneys, and that objection is outlined in the attached motion. While I did not voice my objections at the hearing on the matter, I was not given adequate time to raise all of the points I had prepared. Objecting to the evidence exclusions would have been part of my remarks if Judge Nakagawa's full docket didn't interfere with my right to speak on the motion I brought before the court. Nakagawa rushed me through my prepared statement and cut me off before I could finish due to his overcrowded courtroom that day.

61. Since this motion is in many ways crucial to the Rule 11 and 9011 Motion before this court and scheduled for a February 25th hearing, I will require a continuance of that hearing so this reconsideration motion can be heard first.

62. Since continuing the Rule 11 and 9011 hearing will likely move that hearing beyond the date of the next scheduling conference hearing, I will also require that hearing to be moved out to another date as well.

63. I have read both oppositions to the previously filed Rule 11 Motion, and a consistent refrain from the opposition is that they were not allowed enough time to respond to the motion. As such, I believe an extension of time is necessary to maintain the status quo and prevent an unnecessary appeal of any decision to come out of the Rule 11 and 9011 hearing. Enough time should be granted to the opposition so they can amend their filings if they feel they must.

64. I will file a new notice of motion and serve it on all the parties once a new hearing date on the Rule 11 and 9011 motion is filed.

DATED this 18th of February, 2009

IN PROPER PERSON

[signature]

Rich Bergeron
147 Old County Road
East Sandwich, MA 02537
617-209-4325
Attorney Pro-Se
Rich.Bergeron@gmail.com

Subscribed and Sworn to before me

This 18th day of February, 2009.

[signature]

NOTARY PUBLIC
My Commission Expires:

CARLOS CARTAGENA
Notary Public
Commonwealth of Massachusetts
My Commission Expires January 23, 2015

# TRANSCRIPT OF ADAM FRANK AND KIRK SANFORD PHONE CALL (11-06-07)

Rich Bergeron: Hello

Adam Frank: Rich?

Rich Bergeron: Yes

Adam Frank: Adam Frank and Kirk Sanford.

Rich Bergeron: How Are ya?

Adam Frank and Kirk Sanford (in unison): Good

Adam Frank: You're not an easy man to get in touch with. (chuckling)

Rich Bergeron: Alright

Kirk Sanford: How ya doin' Rich, this is Kirk. Ah, so anyway, saw your, ahh, the email you sent to Adam, and you know, we ah, we ah, we haven't been actually very close to all the kind of history you know here and some of the things goin' back and forth with, you know, you and ah, I guess, Russell, I don't even know who's legal counsel it is, Xyience's or Russel's [Pike]?

Rich: Yeah, that's ahh…

Adam Frank: Ahh, that's Jamie Cogburn…was someone that Russell was…

Kirk Sanford: Anyway, the bottom line here is Adam, you know, instead of just continuing going back and forth with all this nonsense, we just want to pick up the phone and introduce ourselves to ya and try to figure out, you know, what we're tryin' to get accomplished here.

Rich Bergeron: Right, yeah, I mean, it's obviously startin' to come out in the other public press that ah everything that I've been reporting so far is true, and ah.. the entire lawsuit is trying to say that it's not.

Kirk Sanford: Now, you know, from, you know, Adam and my perspective, you know, we don't know all this history. We actually go to your Web-site to try to figure out what's gone on around this place. So that's a little bit funny.

Adam Frank: The funny thing is it's probably one of the better resources to figure out what the Hell's, you know, happened in this company, ahh historically, so I mean look, you know, we appreciate the email and you reachin' out to us, Rich, and you know, especially the fact that you said, ah you know, you got nothing against Xyience. You know, I think we'd like to say to you that we come in with no ah pre-conceived notions, we've got nothing against you. And we're really, you know, a couple guys who have come in here and trying to make sense of, you know, what is a very complex situation and figure out, you know, who's who and what's what. Um, so…

Kirk Sanford: I mean our focus, Rich, just so you know has just been on the business, and executing the business, and trying to build something we think actually does have a lot of opportunity. You know, we ahh, we like the space. You know, you, you've probably followed, you know, Monster and Rockstar and what these other guys have done.

Rich Bergeron: Right

Kirk Sanford: We think we've got a great product, we think the UFC is a very powerful marketing channel in the demographic that we're focused on. And that's really been, you know, kind of our focus since, you know, ah we got here right around June first. And a little background on myself, I was ahh, an investor in the company, ahhh, back in like 2005… clearly had no idea the things that you had, you know obviously brought to light. Umm But here nor there, I have, you know, my money invested, and quite a bit of my friend's money invested into this deal, and I became a ah director on the board sometime in I guess in March, March of this year. Ahhh really had no idea of the things that had gone on, but obviously have learned a lot, um either by witnessing it firsthand or you know, spending some time on, you know, looking at the issues and the questions that you've raised, and we've been trying to ask the same questions here internally. Ah, you know, obviously we don't want to spend our time on things that are what we consider, Ahh I won't say they're unproductive, but let's just say that they're not things that are driving ahhh, a growth opportunity in a business.

Rich Bergeron: Right, exactly.

Kirk Sanford: So, we're, as issues have come up, you know, whether it's threatened litigation, or past litigation, or past wrong-doings, what have you, as these things come up we're just trying to get 'em resolved so we can, you know, eliminate all this kind of background and unproductive noise so we can focus on the business.

Rich Bergeron: mmhmm

Adam Frank: And I think, uh, Rich, you know, it's important for you to understand that ah Kirk and I inherited a situation here, where, you know, people said OK, well, here's what this is, here's what that is, and we're tryin' to do our own diligence and really you know, figure out what exactly, ah.

Kirk Sanford: You know, I mean, we basically, we came in here June first, and we basically walked into a situation, Rich, that, the company was insolvent. You know, it had massive amounts of liabilities…

Adam Frank: Tons of lawsuits.

Kirk Sanford: Lawsuits

Adam Frank: I mean, we can't tell you how many, you probably know as well as we do how many lawsuits and claims and what not, ah, there were against the company.

Kirk Sanford: So Hey Rich, Rich.

Rich Bergeron: Yup?

Kirk Sanford: Yeah, why don't you, are you recording this call or are we just talkin' as, as people tryin' to be on the same page here?

Rich Bergeron: Yup, this ah, this is a computer phone, and it ah actually automatically records everything.

Kirk Sanford: Oh, Okay, well

Adam Frank: We're just not, you know, we're not comfortable if you're recording. I mean, we'd like to have a relationship with you where we could just talk.

Kirk Sanford: Yeah

Rich Bergeron: OK, I can, I can stop the recording

Kirk Sanford: Alright.

END OF RECORDING

I attest that the above is an accurate transcription of a phone call that took place between myself, Adam Frank, and Kirk Sanford on November 6, 2007. There is no mention of settlement or discussion of ending the case per se in any of the remarks that were recorded. No monetary figures were even mentioned.

Rich Bergeron

Rich Bergeron
February 18, 2009

Subscribed and Sworn To Before Me
This eighteenth day of February, 2009

Carlos Cartagena

NOTARY PUBLIC
MY COMMISSION EXPIRES:

CARLOS CARTAGENA
Notary Public
Commonwealth of Massachusetts
My Commission Expires January 23, 2015