RECEIVED & FILED
Aug 26 12 47 PM '09
U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

RECEIVED IN DROP BOX
Aug 25 4 25 PM '09
U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

Rich Bergeron
47 OLD COUNTY ROAD
East Sandwich, MA 02537
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

**UNITED STATES BANKRUPTCY COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| In Re:<br><br>XYIENCE, INC., A Nevada Corporation<br><br>Debtor. | No. BK-S-08-10474-MKN<br>Chapter 11<br><br>Eighth Judicial District Court<br>Las Vegas, Clark County, Nevada<br>Case No. A544781, Dept. XXIII |
| XYIENCE INCORPORATED, a Nevada Corporation,<br>Plaintiff,<br><br>v.<br><br>RICHARD BERGERON, an individual<br>Defendant. | CASE NO. BK-2-08-AP-01082-MKN<br><br>**DEFENDANT AND COUNTERCLAIMANT'S EX PARTE MOTION 1.) TO DISMISS FOR FAILURE TO PROSECUTE; 2.) FOR SUMMARY JUDGMENT ON COUNTERCLAIM; and 3.) TO COMPEL HEARING ON RULE 9011 SANCTIONS** |
| RICHARD BERGERON, an individual,<br><br>Counterclaimant,<br><br>v.<br><br>XYIENCE INCORPORATED, a Nevada corporation<br><br>Counterdefendant. | Hearing Date: N/A<br><br>Time: 9:30 AM<br><br>Location: 300 Las Vegas Blvd. South<br>Courtroom #2<br>Las Vegas, NV 89101 |

**DEFENDANT AND COUNTERCLAIMANT'S EX PARTE MOTION 1.) TO DISMISS FOR FAILURE TO PROSECUTE; 2.) FOR SUMMARY JUDGMENT ON COUNTERCLAIM; and 3.) TO COMPEL HEARING ON RULE 9011 SANCTIONS**

**INTRODUCTION:**

Defendant and Counter Claimant Rich Bergeron hereby moves for the immediate dismissal of the initial Xyience case against him for lack of prosecution. It is entirely clear Xyience, Incorporated does not intend to pursue the initial claim. The contention has actually been made by the plaintiff's own legal counsel that this case is a waste of the estate's resources. Aside from that admission, there has been no scheduling conference in this matter. Yet more than two years have passed since the inception of the litigation. Xyience's legal team filed their last offensive motion on April 09, 2008. That was Docket # 13: Motion to Dismiss AND TO STRIKE RICHARD BERGERON'S COUNTERCLAIMS Filed by JON PEARSON on behalf of XYIENCE INCORPORATED (PEARSON, JON) (Entered: 04/09/2008).

Bergeron also hereby requests that he be granted summary judgment on the amended counterclaim as it relates to Xyience. There has been no evidence presented by Xyience that disputes any matter within the counterclaim. The brief reply filed by Xyience in response to the counterclaim simply states no knowledge of the events Bergeron illustrates in his counterclaim and therefore denies much of Bergeron's claims blindly. There is no Xyience denial supported by affidavit or declaration of any party who would have been in a position to actually corroborate a denial. None of the facts presented by Bergeron and offered within the affidavits of Gary Nelson and Bart Donovan can therefore be considered to be in dispute. Defamation occurred, was documented, and damages are due in the amount of at least $1 million for the counter-claimant.

Bergeron is willing to concede that any relief he has sought in the past for shareholders as it applies to his counterclaims is better left to the sanctions motion. As such, the $10 million request is hereby reduced to $1 million in total. The damage done by this suit is ongoing, and without the case ending Bergeron will be unable to pursue his ultimate career goals. If the high relief request is a barrier, this reduction will relieve that concern.

Finally, a hearing must be held on the matter of sanctions. At the very least, Judge Nakagawa should make a decision on this matter once and for all. The recent death of Frank Fertitta, Jr. now

means a key witness to the events in question will never testify. Mr. Fertitta was named in the sanctions motion and was reported to Bergeron to be one of the masterminds behind the pre-planned & ultimately fraudulent Xyience bankruptcy. Due to the lack of immediate action to guarantee due process and promote adequate hearings on these matters, Frank Fertitta, Jr. will never be afforded the opportunity to speak in his own defense. Also, new evidence has come to light in the attached documentation illustrating more impropriety of the same nature involving other key players in Xyience named in the sanctions motion. Global Cash Access (hereinafter GCA) recently hit a roadblock in Arizona after an investigation done into the company by gaming officials there resulted in GCA being denied a license. This evidence bears strongly on the individuals from GCA who made the transition to Xyience amid these scandalous activities exposed in the official investigation. This evidence additionally makes a hearing in regard to sanctions all the more necessary.

**Legal Argument:**

MOTION TO DISMISS FOR FAILURE TO PROSECUTE

The defendant Rich Bergeron files this motion to dismiss for failure to prosecute under Federal Rule of Civil Procedure 41(b):

**"If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it. Unless the dismissal order states otherwise, a dismissal under this subdivision (b) and any dismissal not under this rule — except one for lack of jurisdiction, improper venue, or failure to join a party under Rule 19 — operates as an adjudication on the merits."**

Rule 41(b) applies to adversary proceedings by way of Federal Rule of Bankruptcy Procedure 7041:

**"Rule 41 F.R.Civ.P. applies in adversary proceedings, except that a complaint objecting to the debtor's discharge shall not be dismissed at the plaintiff's instance without notice to the trustee, the United States trustee, and such other persons as the court may direct, and only on order of the court containing terms and conditions which the court deems proper."**

Xyience's actions in this case have been perpetually on the defensive and not motivated in any fashion by a desire to push this case toward resolution of the initial claim. Legal counsel for Xyience has repeatedly made mention of the liquidation trustee as the one who will effectively end the matter against Bergeron. They have made no effort to make sure a scheduling conference is held, made no push for discovery, and other than the removal paperwork there have been no offensive pleadings

filed by Xyience legal counsel in over 16 months. There have also been no attempts made by Xyience to otherwise settle this litigation.

Xyience never presented a single affidavit from any individual within the company other than Adam Frank, and his testimony has since been called into question by contradictory statements made to the defendant. All the other affidavits filed by the opposition within this case are from lawyers alone and do not refute the evidence Bergeron presented through affidavits of his own and other former Xyience investors.

It is clear there is no intention on Xyience's part to take this matter to trial and no intention to file any offensive pleadings. As such, the initial case should be dismissed. Furthermore, the plaintiff's case has ultimately been exposed as a fraud, and there are no merits to the initial case that would warrant an exception to the case being dismissed with prejudice.

MOTION FOR SUMMARY JUDGMENT ON COUNTERCLAIM:

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Xyience's skimpy 6-page response to the amended counterclaim and supporting affidavits includes repeated mention of the following legalese: "it is without knowledge or information to form a belief as to the truth or falsity of the allegations." There is in other words no way for the plaintiff to explain or refute Bergeron's contentions, testimony, and supporting evidence.

Counter-Claimant Rich Bergeron respectfully moves this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable herein pursuant to Rule 7056 of the Rules of Bankruptcy Procedure, for summary judgment as follows:

(i) On the First Cause of Action as set forth in the Counter-Complaint, dated November 3, 2008, for judgment against Counter-Defendant Xyience, Incorporated (Xyience) in

the reduced amount of $1,000,000.00, plus after-accruing interest thereon, together with reasonable fees and costs of collection.

For the legal basis of this motion for summary judgment, the plaintiff and counter-defendant Xyience has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier of fact to find that defamation of the defendant did not occur. Discovery is not anywhere close to being initiated, and it is unnecessary considering the bulk of the evidence Bergeron provided this court already through his own and supporting affidavits from Gary Nelson and Bart Donovan. The defendant's own counsel admits that this litigation is taxing the estate more than it can afford. As such, an immediate end to this case should be facilitated through the granting of summary judgment on the counterclaim.

MOTION TO COMPEL HEARING ON RULE 9011 SANCTIONS REQUEST

Defendant and Counter-claimant Rich Bergeron has been battling this litigation for more than 2 full years, before three different judges thus far, and through two different court systems. Those who orchestrated this whole fiasco to harm his reputation and in turn deceive hundreds of shareholders are meanwhile enjoying the fruits of their ill-begotten gains. Xyience has been rebuilding and repositioning itself as a premiere company in the industry while burned shareholders have been struggling more than ever in a down economy. They can only watch as the company they built continues to pay dividends to the folks who stole it from them.

Judge Nakagawa has held a number of hearings for the opposition on matters which featured lesser evidence of impropriety on Bergeron's part. The last hearing in this case is a perfect example. The attorney for the opposition who spoke at the hearing didn't even have his dates correct, and the entire opposing argument was lacking in any substance or legal grounds that would warrant any action by any judge against Bergeron. In fact, the inadequate pleadings filed by the opposition, and the facilitation of the hearing itself was entirely suspect. Fertitta Enterprises should be sanctioned for their own behavior in that scenario rather than Bergeron being sanctioned for fighting to expose the truth.

Furthermore, a key individual in this case recently died. Frank Fertitta, Jr. was formerly the CEO of Fertitta Enterprises and in position to know some of the pertinent facts that are at the heart of

this motion. He is a party named in the sanctions motion who could have provided testimony had a hearing on this matter been held at a much earlier date more consistent with date of the actual filing of this motion. People invested their family trust funds and life savings into Xyience, and each day they seemingly have no chance at relief is another day they must suffer through. Bergeron can move forward with the adjudication of the counterclaim and the dismissal of the suit which will clear his name, but over 375 people who earnestly and honestly placed their trust in Xyience cannot move on without some kind of per-share restitution, which should be provided by sanctions.

If no hearing is to be held an announcement should be made at the least. Otherwise these shareholders are in permanent limbo, wondering if they will ever be granted relief for their undue suffering. If a hearing is to be held, advance notice should be sufficient to allow for the funds to be raised by Bergeron to facilitate a trip to the court in Las Vegas to personally present his argument. Dragging this case out any longer is only beneficial to the opposition, though the argument can be made that delaying the inevitable is no benefit to any party. Whatever decision the judge is inclined to make on this matter should already be made. All that's left is an announcement of said decision.

CONCLUSION:

For the reasons set forth above, the initial case should be dismissed with prejudice, Bergeron should be granted Summary Judgment on the counterclaim, and a hearing should be held on the motion for Rule 9011 sanctions barring an outright decision on that matter by Judge Nakagawa in place of such a hearing.

*DATED this 25th day of August, 2009.*

IN PROPER PERSON

[signature]

Rich Bergeron
147 Old County Road
East Sandwich, MA 02537
617-209-4325
Attorney Pro-Se
Rich.Bergeron@gmail.com

**CERTIFICATE OF SERVICE**

1. On August 25, 2009 I served the following document:

**DEFENDANT AND COUNTERCLAIMANT'S EX PARTE MOTION 1.) TO DISMISS FOR FAILURE TO PROSECUTE; 2.) FOR SUMMARY JUDGMENT ON COUNTERCLAIM; and 3.) TO COMPEL HEARING ON RULE 9011 SANCTIONS**

2. I served the above-named document by the following means to the persons as listed below:

[x] a. **By direct email (as opposed to through the ECF system)** (list persons and email addresses):

Laurel E. Davis (NV Bar No. 3005) ldavis@fclaw.com
Jon T. Pearson (NV Bar No. 10182) jpearson@fclaw.com
GREGORY E GARMAN: bankruptcynotices@gordonsilver.com, bknotices@gordonsilver.com

I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

**I declare under penalty of perjury that the foregoing is true and correct.**

*DATED this 25th day of August, 2009.*

IN PROPER PERSON

Rich Bergeron

Rich Bergeron
147 Old County Road
East Sandwich, MA 02537
617-209-4325
Attorney Pro-Se

EXHIBIT A

# Arizona Department of Gaming

202 East Earll Drive, Suite 200
Phoenix, Arizona 85012
Tel 602.604.1801
Fax 602.255.3883
www.azgaming.gov

**Janice K. Brewer**
Governor

**Mark Brnovich**
Director

June 3, 2009

**Via Fed-X** (Overnight)

Mr. Scott Betts
President, Chief Executive Officer
Global Cash Access, Inc.
3525 East Post Road, Suite 120
Las Vegas, Nevada 89120

RE: **NOTICE OF INTENT TO DENY STATE CERTIFICATION**
**Global Cash Access, Inc.**
**State ID # 94352**

Dear Mr. Betts:

The Arizona Department of Gaming ("the Department") hereby provides notice of its intent to deny renewal of State certification of Global Cash Access, Inc. ("GCA"). The Department's decision to deny GCA's renewal of State certification is based upon information possessed by the Department at this time. However, the Department is not waiving its ability to, at any point, request additional and/or up-to-date information and to rely upon additional and/or up-to-date information.

GCA has the right to contest the Department's action. The process for doing so is explained at the end of this notice.

This notice contains the following:

1. A summary of the procedural history of this matter and the basis for the Department's action;

2. A description of the relevant factual background;

3. Identification of the statutes and tribal-state gaming compact sections upon which the Department's action is based;

4. A description of the basis for denial of GCA's State certification; and

5. An explanation of GCA's right to request a hearing and a settlement conference.

**SUMMARY**

As you are aware, GCA provides cash access services at casinos operated by certain Tribal governments within the exterior boundaries of Arizona. These Tribes have entered into tribal-state gaming compacts (the "compacts") with the State of Arizona. By operation of State law and the compacts, GCA is required to have a current, valid State certification at all times while doing business as a provider of gaming services to these Tribes. State law requires the Department to evaluate companies such as GCA in adherence with the process and standards set forth in the compacts. The Department may deny certification when any one of thirteen (13) criteria listed in the compacts exist with respect to a gaming services provider.

GCA initially acquired a State certification to conduct business as a gaming services provider at Tribal casinos in 2000. In 2005, GCA applied for a renewed State certification. Inquiry from another regulatory agency led the Department to begin an extensive, additional investigation of GCA at that time.

One of the issues the Department examined was whether GCA had engaged in the deliberate underpayment of interchange fees to banks in the Visa network. Other issues were investigated as well. These include whether GCA had provided complete and accurate information to gaming regulators.

During the course of the Department's investigation, GCA was involved in additional incidents of concern. These incidents became part of the Department's suitability determination. Any relevant future events or additional discoveries by the Department will also become part of the determination.

The Department's investigation has revealed that a number of the thirteen (13) compact criteria upon which denial of a State certification can be based exist with respect to GCA. These include, but are not limited to:

1. Compact Section 5(f)(2) – GCA knowingly conspired with a company called USA Payment Systems to underpay certain fees owed to banks by approximately $6.1 million in violation of the laws of the State;

2. Section 5(f)(3) – GCA obtained a State certification through fraud, misrepresentation, concealment or through inadvertence or mistake by not providing the Department information relevant to its suitability determination;

3. Section 5(f)(5) – GCA and its principals failed to disclose and misrepresented material facts to the Department;

4. Section 5(f)(6) – GCA has failed to demonstrate, by clear and convincing evidence, that it is qualified to hold a State certification;

5. Section 5(f)(9) – GCA and its principals have willfully failed to disclose documents and information, and have purposefully misrepresented facts, to gaming regulators;

6. Section 5(f)(10) – GCA has pursued economic gain by intentionally and knowingly underpaying issuing banks by approximately $26 million in violation of the criminal laws of the State and in a manner detrimental to the proper operation of gaming in Arizona; and

7. Section 5(f)(12) – GCA's prior activities, reputation, habits and associations pose a threat to the public interest and the regulation of gaming, and enhance the danger of unsuitable activities in the conduct of gaming, including with respect to the business and financial arrangements incidental to gaming.

That any one of these circumstances exists demonstrates that GCA is not suitable to act as a provider of gaming services to Tribes conducting compacted gaming within the exterior boundaries of Arizona. State certification to provide gaming services "**is a privilege and not a right**." A.R.S. § 5-602(B)(emphasis added). GCA has failed in its burden to show by clear and convincing evidence that it is worthy of this privilege. Thus, the Department has determined to provide GCA this Notice of Intent to Deny State Certification.

## FACTUAL BACKGROUND

GCA began as an identically named, but privately held, company that was founded in 1996. Two years later, as part of a joint venture, it was used to form BMCF Gaming, L.L.C., the name of which was changed to Global Cash Access, L.L.C. in May of 1999. In 2005, GCA became a publicly traded company.

GCA's products and services allow gaming patrons to access funds at casinos through, most significantly, money orders, along with other means. GCA currently provides these services at approximately twenty (20) Tribal casinos within the exterior boundaries of Arizona.

### A. GCA'S THEFT OF INTERCHANGE FEES.

#### 1. Introduction to Interchange Fees.

GCA-facilitated transactions take place within electronic transaction-processing networks. Visa Inc. operates the world's largest processing network. Visa allows banks

to issue credit cards to qualified customers for use in its network, and Visa promulgates its own unique operating regulations that ensure the proper flow of monies between all parties involved in Visa network transactions.

At issue in this case are Wire Transfer Money Order ("WTMO") transactions.[1] These transactions are a type of "quasi-cash" transaction which results in the issuance of a money order to a casino patron.[2] The process begins when a patron uses a Visa credit card from an issuing bank at a GCA terminal. Information about the transaction is captured and GCA's authorization processor, a company called USA Payment Systems, Inc. ("USA Payment Systems"), routes it to the patron's issuing bank through Visa. The issuing bank then either sends an approval or denial message back through USA Payment Systems to GCA's terminal. If the transaction is approved, the patron is instructed to go to the casino cashier cage, where a money order is printed which the patron can exchange for cash to use in the casino. With Visa WTMO's, there is no money or script dispensed at the GCA terminal.

If the issuing bank approves the transaction, USA Payment Systems sends a second transmission of transaction data to a "settlement processor."[3] The settlement processor forwards the data to Visa. Once Visa receives the transaction data, a settlement takes place during which GCA must pay an "interchange fee" to the issuing bank.

The amount of the interchange fee GCA is required to pay is set by Visa regulation. In retail transactions (also known as "CPS" transactions), GCA is generally required to pay a lower interchange fee than it is with quasi-cash transactions (also known as "EIRF" transactions), such as WTMOs. Visa regulations require transaction "acquirers," such as GCA, to ensure that the information exchanged about their

---

[1] WTMOs allow casino patrons to get cash using their credit cards. Within the gaming industry, they are often simply referred to as cash advances. WTMO's are used in the casino business because multiple gaming jurisdictions prohibit the extension of credit directly on the casino floor and because patrons often are restricted by cash-advance limits. With WTMOs, the patron does not directly receive cash as a result of a cash-advance (loan) transaction, but instead buys a money order redeemable only at the casino.

[2] "Quasi-cash" transactions are those transactions involving negotiable instruments that are directly convertible to cash, such as WTMOs.

[3] A company called Total Systems Services, Inc. was GCA's settlement processor for nearly all the relevant time period. It also went by the name Vital Processing Services.

transactions is accurate so that issuing banks receive the proper interchange fees.

In order to identify the type of transaction and which interchange fees apply, Visa regulations require GCA to use a proper Merchant Category Code and a proper Special Condition Indicator. The authorization and settlement data streams both include the Merchant Category Code, while only the settlement data stream includes the Special Condition Indicator. If GCA identifies a WTMO transaction with both the correct Merchant Category Code and Special Condition Indicator, the issuing bank receives notice that GCA is processing a quasi-cash transaction. This causes GCA to pay the higher quasi-cash (EIRF) interchange fee.[4]

**2. <u>The $26 Million Underpayment.</u>**

Beginning in July of 1999, GCA began to mis-code approximately 80% of its Visa WTMO transactions as retail purchases. This caused GCA to pay banks issuing Visa cards the lower retail interchange rate on approximately $100,000,000 worth of WTMO transactions every month. As a result, there was a sudden and violent swing downward in the amount of interchange fees GCA was paying. GCA failed to pay issuing banks approximately $26.6 million owed them between July 1999 and August 2002.

**3. <u>The Purposeful Nature of GCA's Actions.</u>**

GCA's mis-coding of its transactions was a willful and knowing taking of monies owed to banks issuing Visa cards.

(a) <u>Beginning before the mis-coding took place, GCA knew of the Visa regulations and knew it was required to comply with them.</u>

GCA began successfully processing WTMO (cash-advance) transactions no later than 1996. To do so, GCA had to be aware of Visa's regulations and how to comply with them.[5] There is no evidence of any widespread mis-coding by GCA until July, 1999. As mentioned previously, Visa regulations required GCA to code its transactions correctly.

---

[4] The correct Merchant Category Code for Visa WTMO transactions is 4829. Visa also requires the inclusion of an "8" in the second space of the Special Condition Indicator field of GCA's settlement data streams to identify the transaction as a "quasi-cash" transaction and trigger payment of the correct interchange fee.

[5] Robert Cucinotta was one of GCA's founders and was involved throughout in managing the Visa interchange fee matter at issue. He was "absolutely knowledgeable" of credit card transaction processing.

In addition, in November of 1999, GCA signed a contract with Bank of America, its sponsoring bank, in which GCA agreed to process its transactions "in strict adherence to the [Visa] Operating Rules." GCA further agreed to monitor its transactions and accounts "to ensure compliance," to report inaccuracies to both Bank of America and Visa, and to indemnify Bank of America for any failure by GCA "to comply with Operating Rules." That same month, Total Systems Services, Inc. ("Tsys") began processing GCA's settlement data streams. The November 1999 USA Payment Systems–Tsys Project Charter for GCA also stated that GCA was responsible for ensuring "Interchange Compliance."

(b) GCA deliberately chose to begin mis-coding its transactions for financial gain.

GCA merged with a competitor, ComData Gaming Services ("ComData"), in 1998. This occurred prior to the start of the underpayment of interchange fees by GCA. ComData had mis-coded its transactions and underpayed interchange fees in 1996. It was caught, but suffered little by way of consequences. Some employees of ComData later became GCA employees. One of those employees was executive Teresa Eubank. Eubank was Director of Risk Management and Compliance for ComData. She knew of ComData's underpayment of fees and later, after GCA started underpaying, wrote a memorandum explaining what had happened with ComData and that it had not been required to pay back any of the ill-gotten interchange fees. Predictably, Eubank was also GCA's Director of Risk Management and Compliance at the time GCA began to mis-code its WTMO transactions. GCA, knowing through Eubank and others of ComData's actions and the lack of consequences, deliberately chose the same path.[6]

This conclusion is borne out by the course of events in July, 1999. That month, suddenly, there was a coding change in approximately 80% of GCA's Visa WTMO (cash-advance) transactions. Because GCA paid the retail (CPS) rates instead of the higher quasi-cash (EIRF) interchange rates, GCA underpaid issuing banks by approximately $700,000 that month.

This sudden swing in the amount of interchange fees GCA was paying did not go unnoticed. This data was contained in spreadsheets maintained by GCA's Chief Financial Officer, an individual named Robert Fry. CFO Fry refused to book the extra income, and those running GCA were aware of his actions. Yet, the mis-coding was allowed to continue. If the mis-coding were a mere mistake, it would have been rectified immediately.

---

[6] Other GCA employees also knew of ComData's mis-coding of cash advance transactions. Robert Cucinotta knew that ComData had mis-coded transactions and knew how that company had done it.

Moreover, to cause the WTMO transactions to be mis-coded required two separate actions. In addition to changing which of the Merchant Category Codes it was using in its authorization data streams, GCA also had to effect a coding change in its settlement data streams. GCA changed Merchant Category Codes away from the one which Visa used to identify WTMOs (4829) in the authorization data streams and to a different one (7995). It also dropped the Special Condition Indicator (8) identifying its transactions as quasi-cash in the settlement data streams. The fact that both steps were taken shows that those changes were intentional rather than a mere mistake.

That GCA deliberately chose to begin mis-coding its transactions knowing that what it was doing was wrong is demonstrated conclusively in an email written by Eubank and copied to CFO Fry. The email was sent on August 23, 1999, which was less than two months after the mis-coding began. Eubank wrote in the email that she had received a call from Equifax Card Services. Equifax had tried to decline all cash-advance transactions over $300.00 in response to a "credit master fraud scam." Eubank wrote:

> It didn't work (because of our recent VAP[7] change I am sure) and **the CPS interchange issue is about to blow up for us**. Equifax has got Visa looking into why their auth parameters didn't work.
>
> **I will give Visa the rest of this week before they discover our recent changes** and for the call to come in to me from Sam Galdes with Visa. I know Kirk's on vacation but wanted someone to know. We may want to get Charlie Fote's attorneys on "ready" if he really wants to fight this beast with Visa- **for right now as usual I will play dumb to the whole issue**.[8] (emphasis added).

Tellingly, the email is titled "**Gigs Up!**"

This email shows that GCA's coding changes were intentional from the outset. When this email was written, Eubank already knew that GCA had made "recent" coding changes. She did not write that GCA had a computer glitch, experienced some unplanned change, or caused or suffered an error. Instead she wrote that the Equifax attempt to block cash-advance transactions failed because of GCA's recent changes.

---

[7] "VAP" presumably refers to the Visa Access Point that USA Payment Systems used to send authorization data streams to Visa for approval.

[8] Kirk Sanford was GCA's Chief Executive Officer at the time. Charlie Fote was the President of First Data Corporation, which held a majority share of GCA and had three members on GCA's management committee.

GCA planned and executed the coding changes she discussed in the email. These changes were GCA's alone; Eubank mentions no other company. Eubank did not work for an authorization or settlement processor and she did not code transactions. She was GCA's Director of Risk Management and Compliance.

This email further shows that GCA knew from the outset that its coding change violated Visa regulations and was wrong. Eubank did not write with concern that Visa might discover a coding mistake; she already knew that there was an "interchange issue" and wrote that the "Gig's Up!" In other words, GCA's scam had failed. Eubank expected high-level Visa involvement and a "blow up."[9] Sam Galdes was a Senior Vice President of Visa USA. Eubank recommended notifying attorneys if the company wanted to fight. She thus always knew that Visa would not approve of the coding changes, but GCA made them anyway.

(c) Even if GCA did not deliberately choose to begin underpaying interchange fees, it knowingly and willfully decided not to stop doing so.

In 1999, at the very outset of the mis-coding, GCA's CFO, Robert Fry, discovered that GCA was not paying enough interchange fees on Visa transactions. In particular, he determined that GCA was no longer paying the higher quasi-cash (EIRF) interchange fees to issuing banks in Visa WTMO (cash-advance) transactions, but was instead paying the lower retail (CPS) fees. Further, when he discovered the interchange underpayment, Mr. Fry informed everyone and refused to allow the windfall to be booked because he "absolutely" did not believe it belonged to GCA. Mr. Fry was questioned about this in an interview in 2005:

Q: Okay. But again, when you – **when you discovered this, did you inform anybody of this**?

Fry: **Absolutely**. Everyone knew – Karim Maskatiya, Kirk Sanford, Robert Cucinotta, Charlie Fote, Kim Patmore, Paula Redmond, Brent Willing, you name it, **everyone knew this, because obviously, I did not allow it to be booked as income**. So we had this substantial reserve on the books. ... (Emphasis added.)

In addition, less than two months after the mis-coding began, Ms. Eubank wrote her "Gig's Up!" email. She specifically identifies "the CPS interchange issue" and that it

---

[9] As matters turned out, Visa first learned of mis-coding by GCA two years after Eubank sent her email.

was "about to blow up for us." Regardless of knowing of the issue and that its own CFO was refusing to book the ill-gotten revenue, GCA continued to mis-code its WTMO (cash-advance) transactions for another two (2) years.

From that point there were repeated events that demonstrate that GCA deliberately chose to let the mis-coding continue for its own profit. First, the underpayment of interchange fees became immediately apparent to GCA's largest shareholder, First Data Corporation ("FDC"), which brought the issue to the attention of GCA. FDC asked Robert Cucinotta, Kirk Sanford, GCA's CEO, and others in an email on September 2, 1999, "**[S]houldn't the association (Visa) . . . reject the lower interchange. . .?**" (Emphasis added.) GCA chose to ignore the inquiry. Six weeks later, in an internal memorandum dated October 22, 1999, FDC noted:

> [V]isa is being processed a majority of the time under CPS . . . rather than EIRF . . . which has resulted in a $2 million differential in interchange charged from mid July through September 1999.
>
> **[We] have attempted to contact Robert Cucinotta and Kirk Sanford regarding this issue and have not received any response.** I spoke with two individuals from FDMS who indicate that if the items are being processed under the Merchant Category Code for Gaming of 7995 **a retail rate should not be received.** (Emphasis added.)[10]

Despite having the problem brought to its attention by FDC, which itself quickly figured out that the interchange fees being paid were wrong, GCA did nothing.

Next, GCA hired Tsys to be its settlement processor, and Tsys began processing GCA's transactions on November 17, 1999. As part of its service, Tsys automatically provided GCA with Proof of Verification Reports that showed transaction-level detail for individual transactions and summary information for the different interchange classifications (retail [CPS], quasi-cash [EIRF]). At the transaction level, the report showed the Merchant Category Code, the Special Condition Indicator field and states, by name, the interchange rate paid. Thus, every day from November 17, 1999, forward, GCA received reports showing that it was mis-coding transactions and underpaying interchange fees. GCA executives admit that the Tsys reports allowed GCA to

[10] There was initially some confusion with a Visa representative who, in January of 2000, suggested that quasi-cash transactions could qualify for certain CPS "programs." However, this suggestion was obviously contrary to Visa regulations and was quickly corrected. An internal FDC memorandum dated April 5, 2000, noted that Visa sent an email to it "which indicates that 'Wire Transfer Quasi Cash transactions do not qualify for CPS retail rates.'"

understand what interchange rates it was paying, that GCA used the Tsys information to create its own reports on interchange expenses, and that GCA tracked its payment of interchange fees.

Thereafter, on May 15, 2000, Kirk Sanford, GCA's CEO, wrote Karim Maskatiya[11] a memorandum acknowledging that GCA was not coding its transactions correctly and raising the concern that, if GCA complained about declined transactions under Merchant Category Code 7995, Visa might discover the mis-coding. He stated, in pertinent part:

> As of January 1, 2000, Visa began categorizing all Internet Gaming transactions with SIC 7995. GCA currently uses this same SIC for all Quasi-cash transactions. **GCA changed to the 7995 SIC from a 4829 SIC (which 4829 is technically the right SIC to use) back in early 1999** . . . .
>
> A potential problem may face GCA if we continue to utilize the 7995 SIC code due to the fact that some issuer processors support a mechanism (including FDC) for the card issuers to block all 7995 transactions . . . because they may be viewed as risky Internet gaming transactions. . . .
>
> If you look at the definition by Visa of these two MCC's, 7995 states specifically betting, wagering, purchase of lottery tickets. MCC 4829 however is a third-party processor of WTMO at premises of a casino . . . It makes sense that Visa and MC went ahead and used **7995** for Internet gaming – it **is** actually gambling and **not the third-party transfer of funds that we are doing**.
>
> **The 7995 SIC could be why we are seeing CPS retail qualification without being detected by Visa. If we bring up the complaint to Visa** that they should use another SIC other than 7995 for Internet Gambling **we may bring to light what we are doing** and I don't know if we want to do that or not.
>
> I have to sort out all the pro's and con's on this, but, **I would like your opinion** and input **because we will have** some decisions **to** make and more importantly **be prepared when someone other than us figures it out**. (Emphasis added.)

---

[11] Karim Maskatiya was the other of GCA's founders, along with Robert Cucinotta. At the time of the letter, a Maskatiya and Cucinotta company owned a significant share in GCA, and Maskatiya was involved in the running of the company.

This memorandum, Eubank's prior "Gigs Up!" email, the FDC email and memorandum, Fry's reporting and refusal to book ill-gotten interchange fees, and the Tysis reports demonstrate that, as of May 2000, it is beyond doubt that Sanford, Eubank, Cucinotta, Maskatiya, Fry and personnel at FDC all knew that GCA had underpaid interchange fees. They also all knew that Visa was unaware that GCA was paying the wrong interchange rates on WTMO transactions. Sanford and Eubank, respectively GCA's CEO and its Director of Risk Management and Compliance, had by this point both expressed in writing their concern that someone would discover GCA's wrongdoing.

Seven months later, on December 8, 2000, Eubank wrote her previously mentioned memorandum explaining what had happened with ComData and that it had not been required to pay back any ill-gotten interchange fees. The memo was written at the request of Maskatiya and was "offered for the purpose of determining a consequence if any for erroneous qualification of Interchange Reimbursement Fees . . ." Eubank wrote that:

(i) "...[in 1996] a decision was made by [ComData] management...to qualify interchange transactions as CPS/Retail/versus EIRF...Management was made aware of possible consequences and made the decision to go forward."

(ii) "Visa USA did not apply any penalties in this case . . ." and "ComData Corporation was not ordered to reimburse Visa USA or its member institutions any inappropriate interchange fees ..." once its mis-coding was discovered, and

(iii) GCA would "...not suffer significant consequences in regard to its current qualifying interchange transactions" if Visa discovered GCA's payment of retail rates.

Eubank purported to base her opinion on the idea that "added enhanced card data" qualified GCA's WTMO transactions for the retail interchange rate and, if this were wrong, "Visa USA and its member institutions would of [sic] filed written notice . . ." These are false premises. With respect to the former, *Eubank admitted in her memo that, under Visa's regulations, quasi-cash transactions* **"do not qualify under . . . CPS/retail"** *but instead under EIRF and that* **"it is unclear as to if [incentives for enhanced card data] applies to transactions categorized as quasi-cash."** With respect to the latter, *Eubank failed to mention that the transactions were mis-coded* so that Visa and others could not catch GCA.

Of note, *nowhere does Eubank mention contacting Visa.* She could have easily picked up the phone and asked whether GCA transactions properly qualified as retail

and if enhance card data made any difference. *GCA did not take this simple step, however, because it already knew what it was doing was wrong.* It did not want to call Visa's attention to its misconduct and the millions of dollars which it was improperly pocketing.

Thereafter, there was a push to have Fry book the ill-gotten revenue as income. On March 26, 2001, Kirk Sanford wrote a memorandum to "GCA Members" at Maskatiya's request to provide "the basis for justification of booking interchange reserve as income." Sanford parrots Eubank's letter, claiming "enriched data" allowed the lower interchange rate and Visa's silence was proof of compliance with its regulations.[12] However, Sanford admits the Merchant Category Code was changed to 7995 and that all of GCA's transactions did not include the Special Condition Indicator. This confirms again that GCA's top executive knew that his company was not coding its transactions correctly. When Sanford used the term "special condition indicator," he referenced the exact Visa-required indicator used to identify WTMO quasi-cash transactions versus retail transactions in the settlement data streams processed by Visa, the dropping of which prevented Visa from discovering GCA's actions. As for "enhanced data," Sanford admits:

> **[W]e are not certain, however, if it's the enriched data that accounts for the reduction in interchange . . . or that TSYS is not sending the special indicator flag**. (Emphasis added.)

Of course, Sanford does not indicate ever calling Visa to have this issue resolved. GCA did not want the answer. He also does not cite Visa's regulations which set forth the requirement for a Special Condition Indicator of "8" for quasi-cash transactions, although he manages to quote the regulations in detail regarding notice of, and fines for, improper payment of interchange fees.

Subsequently, GCA's management committee issued an "Interchange Discussion Memorandum" dated April 18, 2001. The memorandum repeats the premises advanced by Eubank and Sanford, even while admitting:

> **GCA performs Quasi-Cash Transactions . . .. [Visa] Regulation . . . identifies Quasi-Cash transactions as "not" eligible for CPS Retail Rates**. . . . Due to the discrepancy between what GCA was charged by Visa and the Visa regulations as outlined, GCA accrued the positive interchange difference between EIRF and CPS Retail in a liability account from August of 1999 through March 2001. **The Rules are silent as it**

---

[12] It appears that Robert Cucinotta was the first person to advance the "enriched data" premise.

> **relates to Quasi-Cash transactions qualifying for lower interchange should the processor successfully provide enriched data.** . . .

Regardless, GCA's management committee decided to book as revenue the approximately $15 million interchange surplus that resulted from CFO Robert Fry's twenty-two (22) month long refusal to book monies received from the underpayment of interchange fees.

Immediately thereafter, GCA's majority owner, FDC, was repeatedly provided information that taking of the interchange fees was wrong. On May 8, 2001, Visa wrote to FDC that "**quasi cash transactions cannot receive CPS. . . . The best US fee they can get is EIRF** . . . ." (Emphasis added.) In July of 2001, Paula Redmond, Senior Vice President of FDC, wrote an email to another FDC executive to relay "GCA's findings." She stated:

> GCA is trying 4829 SIC Code for a select casino. Tsys is downgrading the transactions to EIRF **as expected even with the enriched data present**.
>
> 7995 is currently used and slipping through Tsys at CPS [retail]. (Emphasis added.)

Redmond's email shows that GCA knew which code to use to correctly identify GCA's transactions and that it was paying the lower interchange rates because of a mis-coding of its transactions, not because of "enriched data." The fact that Redmond states that the correct code caused the higher interchange fee "**as expected**" shows that GCA never believed any of its stated premises for booking of the interchange surplus. Yet, GCA continued to mis-code transactions and book the balance of interchange fee underpayments.

Incredibly, GCA's theft of interchange fees would become even more brazen. In late August, 2001, Wells Fargo discovered that GCA had been paying the wrong interchange fees. Wells Fargo escalated the issue to Visa. Visa directed that GCA's underpayment of interchange fees be corrected. On October 25, 2001, Tsys provided instructions on how to fix the mis-coding by including the Special Condition Indicator "8." GCA made the correction, *but only for Wells Fargo.*

Nine (9) months later, in July of 2002, Visa discovered that GCA was still deliberately mis-coding most of its transactions. In fact, GCA was still underpaying interchange fees to all issuing banks except Wells Fargo, which had previously caught GCA's misconduct. In the ten (10) month period after GCA was caught by Wells Fargo, it underpaid other issuing banks an additional $6.1 million. There can be no argument that GCA did not know how to fix the problem; GCA had instructions from Tsys and had corrected the underpayment for Wells Fargo. Moreover, Tsys continued throughout to

send GCA reports which showed at a "glance" that GCA's transactions were not qualifying at the proper rates.

As a result of GCA's conduct, Visa took action in October of 2002. It fined Bank of America, GCA's sponsoring bank, $384,000 for GCA's violation of the Visa regulations, which caused "the material underpayment of Interchange Reimbursement Fees" to issuing banks. Bank of America passed the fine down to GCA, which paid it on December 15, 2002.

GCA never contested any action by Visa, either when Wells Fargo caught the mis-coding or later. It never advanced the "enriched data" premise. It knew its actions were inexcusable. GCA did not try to blame Visa; it just paid the fine, which was a small price to pay for a $26 million windfall. Moreover, at no point while the underpayment of fees was ongoing, did GCA contact Visa, Tsys, Bank of America or any issuing bank to explore the interchange fee issue it knew was ongoing. The mis-coding was deliberate, so GCA never took any steps to discover if there was a problem or to correct a mistake.

Visa reached the same conclusion regarding the intentional nature of GCA's actions. On August 8, 2002, Visa Vice President Patrick Moran wrote:

> We believe all of GCA's transactions should be defined as quasi cash and as such should have a "special condition code" indicating such included in the settlement record. **We believe this code is being deliberately excluded in order to qualify for lower interchange fees.** In the spreadsheet rows 1705-4025 summarize transactions where the special condition code is being manipulated and the interchange therefore improperly calculated. (Emphasis added.)

On August 27, 2002, Mr. Moran wrote that GCA's mis-coding was "**extremely egregious**" and that Bank of America Merchant Services was "...as irritated as [Visa] that **this merchant has been abusing the system**." (Emphasis added.)

## B. GCA'S CONSPIRACY WITH USA PAYMENT SYSTEMS.

Two individuals, Karim Maskatiya and Robert Cucinotta, created the company underlying GCA in 1996. That same year, Maskatiya and Cucinotta also formed USA Payment Systems with two brothers named Tom McCarley and Jerry McCarley. Initially, USA Payment Systems was responsible for sending GCA's authorization data streams.

In 1999, GCA hired Tsys. Beginning in November of that year, USA Payment Systems sent GCA's settlement data streams to Tsys for processing. The Tsys project manager for the GCA account, Jason Williams, created a Tsys-USA Payment Systems

Project Charter. The Charter states that GCA is responsible for compliance with the Visa Operating Regulations. After an initial testing period, Tsys did not monitor GCA's transactions and it was up to GCA to maintain compliance with Visa regulations. In response to questioning, Tsys representative Jeff Anderson testified on this point:

> Q: So it was incumbent upon them the day after they went live, if they hadn't done it before, to make sure that the system was working correctly?
>
> A: Right. We supply the framework to allow our clients and our system to be compliant with the requirements per the associations. . . . **[A] client is responsible for ensuring that their business model is compliant**.
>
> **Our system is there to ensure that they are allowed to be compliant. We cannot force their hand.** We cannot go behind them and hold their hand and make sure -- **we cannot be the police for their business**. **They have to be compliant with Visa and MasterCard.** (Emphasis added.)

GCA was responsible for the coding of its own transactions. Tsys took what it was provided and gave GCA back reports that showed which interchange rates Visa applied to the transactions.

After Wells Fargo discovered GCA's mis-coding of WTMO transactions, GCA changed the format for its settlement data streams.[13] During the conversion, USA Payment Systems did test transactions. Tsys returned reports to USA Payment Systems and GCA showing that, when the correct Special Condition Indicator was included in the data streams, GCA's transactions were correctly identified as quasi-cash (EIRF).[14] As Visa itself would later note, "**GCA had both the capability and means to**

[13] The change was from a "Draft R" file format to a "256" file format. The Draft R format could always support correct coding of WTMO transactions. The conversion was purportedly necessary because GCA claimed it was doing retail transactions and the Draft R format could not support both WTMO (quasi-cash) transactions and retail transactions from one terminal. In fact, the conversion was an excuse for continuing to mis-code WTMO transactions. This format problem was never raised before Wells Fargo caught GCA's mis-coding and the number of GCA's actual retail transactions was minuscule.

[14] These tests were run on approximately four occasions after which Tsys would send Proof of Verification reports. One of these reports went to Jerry McCarley and

**achieve compliance**." (Emphasis added.)

GCA conspired with USA Payment Systems to withhold the correct interchange fee from issuing banks other than Wells Fargo. After Wells Fargo caught the problem in October of 2001, GCA knew that it had previously mis-coded its transactions and USA Payment Systems knew that it had been processing incorrect data streams. The conversion to the new file format for the settlement data streams and subsequent testing demonstrates that GCA and USA Payment Systems both knew exactly how to code the WTMO transactions correctly in the new file format. Yet, GCA deliberately continued to mis-code the transactions for all banks except Wells Fargo, which allowed GCA to underpay issuing banks an additional $6.1 million after Wells Fargo made its discovery. USA Payment Systems conspired with GCA in this process by knowingly processing incorrect information regarding GCA transactions.

Two former GCA executives have given sworn statements regarding GCA's conspiracy with USA Payment Systems. CFO Robert Fry stated that he was told by Jerry McCarley of USA Payment Systems that he had been instructed by Robert Cucinotta to only fix the mis-coding for Wells Fargo and that McCarley was very concerned about the potential consequences to USA Payment Systems. GCA's Chief Operating Officer, Pamela Shinkle, testified that Robert Cucinotta directed McCarley to make the Wells Fargo "fix" and that she believed the mis-coding was intentional and that Cucinotta was the "mastermind." These statements further confirm that GCA and USA Payment Systems conspired to mis-code GCA's transactions after the 256 conversion for all issuing banks except Wells Fargo.[15]

## C. GCA'S FRAUDULENT ATTEMPTS TO MISLEAD VISA AND OTHERS DURING THE INTERCHANGE FEE THEFT.

As previously mentioned, in November 1999, GCA signed an agreement with Bank of America, its sponsoring bank, to comply with Visa Operating Regulations, to monitor its transactions, and to report inaccuracies to both Bank of America and Visa. Yet, GCA deliberately paid the wrong interchange rates to issuing banks. Teresa Eubank wrote that the "Gig's Up!" in August of 1999, and that she would "play dumb" if asked about the issue. Kirk Sanford wrote that the payment of retail interchange fees was going undetected by Visa in May, 2000. Nearly a year later he wrote that GCA's

---

Robert Cucinotta on November 15, 2001, and provided detailed transaction information, including the interchange rate paid, by name, and if the Special Condition Indicator 8 was present in the transaction.

[15] Note that, as discussed below, GCA's conspiracy with USA Payment Systems continued after GCA was caught by Visa mis-coding transactions for the last time. GCA and USA Payment Systems conspired thereafter to hide their wrongdoing.

transactions were still being mis-coded. GCA never notified either Bank of America or Visa, which it should have done in July of 1999. Instead, GCA silently continued its underpayment to issuing banks until someone else discovered its mis-coding of transactions. Even after being caught by Wells Fargo and directed to fix the mis-coding by Visa, GCA converted to a new file format for its settlement data and continued with its scam undetected. GCA actively undertook to mislead Visa, Bank of America and the issuing banks.

GCA at various points offered explanations for why it was able to get away with paying retail interchange rates. These included the inclusion of "enriched data" [zip codes] in its settlement streams. Yet, GCA never once took the simple step of openly calling Visa or an issuing bank to confirm any of this; GCA's actions were intentional and it did not want to call attention to its scam. GCA management committee minutes from June 19, 2000, reflect GCA's reluctance to raise the issue with Visa:

> The Management Committee then discussed the Company's accounting for the interchange rate paid on the Company's cash advance transactions. **Mr. Sanford reported that there had been an exchange of correspondence between counsel for the Company and VISA on a "no-name" basis** regarding the proper interchange rate, **but that the issue was not free from doubt**. . . .[16] (Emphasis added.)

One document related to the Interchange Discussion Memorandum had the Management Committee postulating that Visa may have erroneously given GCA retail status:

> Management believes that either the Association erroneously gave GCA retail status or the regulations have not been updated to reflect the decreased risk associated with enriched data used by quasi-cash providers, and, as such, the Association intentionally applied "retail ED" rates to GCA.

GCA certainly never did anything to correct, and was willing to benefit from, this supposed error.

When questioned about its underpayment of interchange fees, GCA lied to Visa.

---

[16] FDC also apparently made inquiry on a "no name" basis, may have never asked about anything to do with "enriched data," and appears to have ignored the answers it got from Visa. GCA was actively attempting to mislead FDC about appropriateness of its actions. However, FDC had reason to question the interchange fees, and did not follow-up on having auditors confirm the correct coding and interchange rates with Visa.

After GCA was initially caught by Wells Fargo, Robert Cucinotta wrote an email to Visa falsely suggesting that Tsys could not correct the mis-coding. The email, dated October 31, 2001, states, in pertinent part:

> We have been working with TSYS concerning this issue, unfortunately they were unable to correct the problem on there [sic] side and have requested that we change the file format we send to them from a Draft R to a 256. We have expedited this change and should be ready in approx. 7 days from today, providing TSYS continues with its support.

Cucinotta's statement that Tsys was unable to fix the "problem" was a lie. There was no problem; it was always possible to correctly code the transactions in the Draft R file format and Tsys informed GCA of that fact six (6) days before this email was sent. The only "problem" was that GCA intentionally chose not to include the correct codes in its settlement data streams. Moreover, Tsys never requested a change in file format; this was a ruse GCA employed to excuse mis-coding.

When GCA got caught mis-coding transactions a second time in the summer of 2002, it again resorted to blaming Tsys. Bank of America requested that GCA respond to a series of questions regarding the underpayment of fees. In a September 23, 2002 email to Bank of America, Cucinotta wrote, in pertinent part:

> 1. USA Payment System was notified by Visa and Bank of America in October 2001 that Wells Fargo transactions were not qualifying for Quasi-cash...We discussed the situation with TSYS as to what was causing the problem with the Wells transactions. They said that they could not support the special condition indicator with the current message format...
> 2. The Well's transactions were qualifying as Quasi-cash because the message format was changed (at TSYS request)...
>
> 3. To USA Payment Systems knowledge, we are sending settlement files to TSYS, which will qualify transactions as quasi-cash. However, USA Payment Systems will certify to both Visa and Bank of America....

This email is also a lie. Tsys never requested or needed a change in file format in order for GCA's transactions to properly qualify as quasi-cash with Wells Fargo or any other bank. GCA also knew that USA Payment Systems was not sending settlement files to Tsys with the correct information.

Visa investigated GCA's attempt to blame Tsys. In an email dated September 26, 2002, Visa noted that "GCA is stating that they have always included the '8' and Vital [Tsys] has not been able to process it."[17] Ultimately, however, Visa did not swallow GCA's story:

> **It does not appear that the Vital [Tsys] processing solution inhibited the identification of quasi cash transactions as required by the Visa Operating Regulations.** GCA chose to convert onto Vital systems in a manner which allowed GCA (at their discretion) to identify transactions which were quasi cash. Therefore, all agreed that the fine should proceed as agreed as BAMS**GCA had both the capability and means to achieve compliance**. (Emphasis added.)

GCA never argued in any emails or in any other communication with Visa, Bank of America or any of the issuing banks, including Wells Fargo, that it was entitled to pay retail interchange rates. It also never suggested that "enriched data" was the reason for the lower rates, and never asked whether Visa might have incorrectly classified GCA as a retailer. GCA never believed any of these excuses; it knew all along that the real "problem" was that it was mis-coding transactions.

GCA's conspiracy with USA Payment Systems continued after GCA was caught by Visa mis-coding transactions for the last time. Both GCA and USA Payment Systems knew that the information USA Payment Systems sent to Tsys did not properly categorize GCA's transactions. In fact, on September 20, 2002, GCA received notice that *Visa had determined that USA Payment Systems was* **"in direct violation of the operating regulations**." Yet, a mere three days later, in an internal email on September 23, 2002, GCA directs its executives and USA Payment Systems to lie and blame Tsys:

> To All,
> As **Visa states USA payment System (USA) processes the transactions as Quasi-Cash**. However, **settlement files which are sent by Total System (TSYS) do not [sic] the same coding as the Quasi-Cash coding of USA**. The responsibility for the settlement file is TSYS, it was there [sic] responsibility to send it out correctly not USA. This should be our position. Bob [Fry] do not send out the financials." (Emphasis added.)

USA Payment Systems followed instructions. In an email to Visa dated

---

17 When confronted with this statement, Tysis called it "absolutely false. That is not a correct statement."

September 30, 2002, a Bank of America employee wrote:

> I wanted to clarify something that I learned from Jerry at USA Payment Systems...according to USA they have always used the MCC 4829 (cash-advance) in their authorization request.

This demonstrates that USA Payment Systems was following GCA's lead in attempting to mislead every other company about how it ended up underpaying interchange fees. Of course, GCA and USA Payment Systems did not include the WTMO (cash-advance) code 4829 in all authorization data streams, a fact documented in Kirk Sanford's May, 2000 memorandum. Also, as previously mentioned, FDC had noted long before that code "7995 [retail] is currently used and slipping through Tsys at CPS [retail]."

GCA's management committee also took part in the cover-up. The committee met approximately ten (10) times between June of 2000 and September of 2002. The committee knew of the Visa interchange issue.[18] Meeting minutes show that the committee discussed the issue during at least six separate meetings. Between 1999 and October 2001, according to the minutes, the committee was supposedly unable to determine if GCA's transactions complied with Visa's regulations. Instead of simply calling Visa, the committee was content to take no action while reaping the benefit of underpaying interchange fees.

As documented in the "Interchange Discussion Memorandum" dated April 18, 2001, GCA's management committee decided to book as revenue the $15.4 million interchange surplus. The committee advanced as the basis to take this money false statements about "enriched data" and the lack of any notice of problems from Visa. However, by the time this memorandum was drafted, members of the committee knew that cash-advance transactions did not qualify for the lower fee, regardless of "enriched data." *The memorandum itself states that Visa regulations identify* "**Quasi-Cash transactions as 'not' eligible for CPS Retail Rates**." (Emphasis added.) The members also knew that transactions could be and were being mis-coded, which would hide the nature of GCA's transactions from issuing banks. Unfortunately, FDC's external auditors, Deloitte and Touche, apparently concurred with the decision to book the interchange surplus based on management's representations in the memorandum.

---

[18] The committee required that its members receive GCA financial information before meetings. The Committee received this information from GCA CFO Robert Fry. It included data regarding the underpayment of interchange fees. For example, Mr. Fry prepared a memorandum he styled "2002 FORECAST INFO FOR MANAGEMENT COMMITTEE." This memorandum showed a negative amount (-$8,757,573) for GCA's interchange fees in 2001, because GCA had paid issuing banks nearly $9 million less than it should have that year due to the mis-coding of its transactions.

Interestingly, the memorandum contains quotes from Visa's operating regulations relating to possible fines for inappropriate interchange fees. The management committee knew that GCA's actions were wrong; it was evaluating the downside of GCA's actions. The committee also noted what had happened with ComData and that it was not Visa's practice to require "Retroactive correction" but only prospective compliance. This demonstrates that the committee chose to book the proceeds of the mis-coding because it thought (correctly) that, if GCA were caught, Visa would not require that those funds be paid to the rightful owners, not because it actually believe the "enriched data" or any other premise.

In a further attempt to keep hidden GCA's misconduct, the management committee's meeting minutes fail to address a number of critical events. The minutes do not reflect any discussion regarding the committee's decision to book the interchange surplus. The minutes do not address the Wells Fargo discovery that GCA had been mis-coding its transactions, or the fact that GCA continued to pay retail rates even after that discovery. The minutes do not address Visa's August 2002 discovery that GCA was again caught mis-coding transactions.

## D. GCA'S ATTEMPTS TO DECEIVE GAMING REGULATORS.

When GCA applied for certifications or certification renewals in various gaming jurisdictions, the company failed to disclose the $26 million theft of interchange fees, the $384,000 Visa fine, and documents and information related to the Visa fraud. When gaming regulators interviewed principals of GCA and USA Payment Systems, those principals lied. GCA has also misrepresented facts and failed to disclose other material information to regulators.

### 1. <u>GCA withheld information from the Michigan Gaming Control Board.</u>

GCA failed to inform the Michigan Gaming Control Board ("Michigan Gaming") of its intentional mis-coding of Visa transactions, its conspiracy with USA Payment Systems, and its attempts to hide that information. Further, on June 15, 2004, Michigan Gaming asked GCA to provide all information on any disciplinary action taken against GCA by Visa including "information of any resolved issue." GCA'S response did not mention the underpayment of interchange fees or the $384,000 Visa fine. This was deliberate. When GCA's COO, Pamela Shinkle, told CEO Kirk Sanford that GCA should disclose information of the underpayment and fine to regulators, he disagreed. GCA also pressured its executives to withhold this information in another context. GCA attempted later to excuse its failure to produce information to Michigan Gaming, but the fact remains that the most critical information was withheld. As a result, Michigan Gaming concluded that:

> [GCA's] response to Board Staff inquiry failed to divulge the issue

surrounding the material underpayment of interchange fees.

Of additional concern is the fact that there are other documents which Michigan Gaming was never provided during the course of its investigation which have now come to light. Michigan Gaming made three requests for "all documentation" regarding the interchange fee issue. Yet, GCA never provided it Teresa Eubank's "Gig's Up!" email, which shows GCA's intentional fraud, audit reports which show the interchange fee surplus, Kirk Sanford's memorandum to Karim Maskatiya dated May 15, 2000 acknowledging the mis-coding, and the management committee memorandum documenting that GCA chose to book the interchange fee surplus as revenue based upon justifications it knew were false.[19] Thus, GCA deprived a regulatory agency of material information needed to make an informed suitability determination.

2. **<u>GCA and its principals failed to disclose information to the Arizona Department of Gaming.</u>**

If a company asks the Department for a renewed state certification, the Department requests, among other items:

> A summary of past and current violations, hearings, and/or any concerns with obtaining a license or permit to conduct business in any gaming jurisdiction in or outside the United States since state certification

In its February, 2005 renewal application provided to the Department, GCA wrote that this inquiry "Does not apply. There have been none."

The application was signed by CEO Kirk Sanford and notarized on February 15, 2005. On that date, GCA knew that Michigan Gaming was actively investigating GCA's underpayment of interchange fees. By that point, Michigan Gaming had made multiple requests for information and had even interviewed both Teresa Eubank and Kirk Sanford, who signed the application. Yet, GCA chose to withhold all information regarding Michigan Gaming's investigation, the interchange fee fraud and attempts to hide it, and the Visa fine from the Department. Michigan Gaming's investigation only came to the Department's attention months later, after it received a request for information from the Mississippi Gaming Commission.[20]

---

[19] Ms. Eubank herself was specifically asked for information, including emails, related to the Visa interchange issue, and was interviewed by Michigan Gaming, but her "Gigs Up!" email was not produced. Michigan Gaming got the management committee memorandum and Sanford's memorandum from Paula Redmond of FDC.

[20] GCA's principals took further steps to hide the Michigan Gaming investigation

This was not the first time GCA misled the Department about its underpayment of interchange fees. In its renewal application dated April 14th, 2003, GCA responded "N/A" to a similar inquiry for "a list of past and current violations." *Visa had levied the fine for violations of the operating regulations only five (5) months before.*

Moreover, GCA principals lied to the Department with the initial GCA application in 1999. In 1982, Karim Maskatiya's wife was murdered. Police detectives in California questioned both Maskatiya and Cucinotta regarding the murder. Both were read their Miranda rights. The detectives felt that Maskatiya and Cucinotta gave inconsistent statements and did not cooperate with the investigation. They also felt that Maskatiya knew, but would not reveal, the identity of the murderer. The detectives thus asked Maskatiya and Cucinotta both to take a polygraph test; both refused.

GCA, Maskatiya and Cucinotta failed to disclose this information to the Arizona Department of Gaming. In multiple applications to the Department, both Maskatiya and Cucinotta answered "no" to question 5 (d):

> Have you ever been questioned by a city, state, federal, or tribal law enforcement agency, commission or committee?

**3. <u>GCA principals, executives and co-conspirators attempted to deceive the Arizona Department of Gaming and the Michigan Gaming Control Board during interviews.</u>**

Karim Maskatiya and Robert Cucinotta founded GCA, and they managed GCA's finances and operations. Both men received GCA financial reports and interchange fee information and used it to make decisions regarding the direction of the company. When anyone, including FDC, asked questions about the interchange issue, Cucinotta and Maskatiya provided the answers. Maskatiya was involved with GCA's management committee. Cucinotta wrote and received emails related to the coding of GCA's transactions and it was he who responded to inquiries by Visa and others. Both men exerted influence over not just GCA, but USA Payment Systems as well, which they

---

from the Department. The investigation arose out of an application for certification submitted by Casino Credit Services, another company owned by Maskatiya and Cucinotta, and Michigan Gaming's investigation involved that company. In 2005, as principals and owners of GCA, Maskatiya and Cucinotta revealed ownership of Casino Credit Services to the Department. After these individuals were interviewed by Michigan Gaming in March 2005 regarding to the interchange issue, their 2006 applications fail to disclose the ongoing ownership of Casino Credit Services. This failure prevented the Department from making any inquiry about Casino Credit Services and from discovering Michigan Gaming's investigation, which continued GCA's on-going cover-up of its $26 million fraud.

helped form and partially own. The evidence shows that both men were active, knowledgeable owners who knew of, and were involved in, GCA's mis-coding of transactions, and who schemed to hide the fraud. Given their significant ownership interest in GCA, they also benefitted by millions from the underpayment of interchange fees.

Maskatiya and Cucinotta were each interviewed by both Michigan Gaming and the Arizona Department of Gaming. Both attempted to mislead the investigators in order to hide GCA's interchange fee fraud and their involvement in it. For example, Cucinotta claimed that GCA was "somewhat blind" and had to rely on third parties like USA Payment Systems.[21] The evidence shows, however, that GCA knew of the fraud and was receiving Tsys reports throughout which showed that the fraud was ongoing. In attempting to downplay his own involvement, Cucinotta denied knowledge on a host of issues, including knowing anything about the conversion to the 256 file format after GCA was caught by Wells Fargo mis-coding transactions. This is contradicted by the evidence, including emails he sent and received. Cucinotta even claimed that he did not attend monthly GCA meetings in Las Vegas, despite the fact that his own assistant testified to, and documents from a third party show, the opposite.

Maskatiya made equally questionable claims. He said the mis-coding "just slipped through the cracks" at GCA after Wells Fargo had discovered GCA's fraud.[22] This is contradicted by the vast amount of data GCA received, worked with and exchanged showing it was still paying retail interchange fees. Maskatiya also said he had no idea the amount of profit GCA was seeing from the underpayment of interchange fees. Maskatiya was on GCA's management committee, received GCA's financial reports, and was part of the decision to book as revenue the interchange fee surplus.

Teresa Eubank and Kirk Sanford were interviewed by Michigan Gaming. Eubank did not produce or reference her "Gigs Up!" email although she brought "her records" to the interview. She was involved with Sanford in preparing GCA's initial response to Michigan Gaming's request for information when nothing regarding the Visa fine was provided. She also claimed that she did not deal with Cucinotta and Maskatiya, although it was Maskatiya who directed her to draft her Interchange Reimbursement Fee opinion. Sanford was also untruthful. Among other things, he blamed Bank of America and Tsys for the mis-coding of Visa transactions.

---

[21] He also at various points blames Tsys and Bank of America for the interchange fraud.

[22] Maskatiya, contrary to all the evidence, claims also that FDC ran GCA, did all the accounting, and "was the culprit."

Jerry McCarley was also interviewed by both Michigan Gaming and the Department. His company, USA Payment Systems, is half owned by Maskatiya and Cucinotta, and he takes direction from them. GCA accounts for ninety percent (90%) of USA Payment Systems' business. The above established conspiracy between GCA and USA Payment Systems extended to attempts to mislead gaming regulators, including the Department. McCarley testified that the reason only the Wells Fargo transactions were coded correctly in early 2002 was that USA Payment Systems' made a coding mistake. Cucinotta did not tell Bank of America in his September 2002 email that Jerry McCarley of USA Payment Systems made a coding mistake. GCA executives say that Cucinotta directed McCarley to correct the coding errors for only Wells Fargo. It is also impossible for McCarley to not have known that the error had not been fixed for every issuing bank given the Tsys reports and the fact that GCA continued to pay retail interchange rates. McCarley responds that he did not get Tsys reports and they only tested the new coding file format for Wells Fargo. His statements are contradicted by the evidence.

## E. ON-GOING MATTERS OF CONCERN.

### 1. <u>GCA has never acknowledged or taken any action in regard to its wrongdoing.</u>

As previously established, GCA intentionally underpaid interchange fees and conspired with USA Payment Systems to effect and hide the on-going mis-coding of its transactions. GCA:

(a) failed to reveal or acknowledge the interchange fee fraud and cover-up to gaming regulators, including the Department and Michigan Gaming;

(b) retained its ill-gotten millions and has made no attempt to return them;

(c) allowed people involved in the theft and fraud, including Eubank, Maskatiya and Cucinotta, to remain as executives, directors and shareholders;

(d) continued to use its co-conspirator, USA Payment Systems, as its processor; and

(e) only took some actions to correct prior failures after it knew of the seriousness of the Department's investigation.

The above demonstrates that GCA is content to employ and work with fraud

feasors and to wait and see if it can get away with the interchange fee fraud and its subsequent attempts at deception.

**2. <u>GCA has continued contacts with persons and companies involved in the interchange fee fraud.</u>**

Karim Maskatiya and Robert Cucinotta controlled GCA during the interchange fee fraud. GCA allowed them to continue their involvement in GCA's operations even after Visa discovered the intentional mis-coding of transactions. To this day, these men remain significant shareholders in GCA. Together, they own in excess of twenty-five percent (25%) of GCA's stock. Until June of 2008, they were on the Board of Directors, a position from which they directed GCA actions. They only recently resigned, and this happened approximately six weeks after they were interviewed by the Department. If GCA were not content to benefit from the interchange fee fraud and to have people who allowed or directed it in charge, it would have removed Maskatiya and Cucinotta long ago. Since GCA did not do this, it must be assumed that, if the Department does not take action against GCA, that company will simply put Maskatiya and Cucinotta, or others like them, back on GCA's Board or allow them to take a management role again in the future.

In addition, GCA continued to use USA Payment Systems, the co-conspirator in GCA's interchange fee fraud. In fact, GCA removed Tsys, and USA Payment Systems then became both authorization and settlement processor for GCA. Maskatiya and Cucinotta are 50% owners in USA Payment Systems. Jerry McCarley, who assisted in the fraud and subsequent cover-up, and his brother own the other half of USA Payment Systems. There may be an effort by USA Payment Systems to withdraw as GCA's processor. It is also rumored that there may be an effort by GCA to remove Maskatiya and Cucinotta as shareholders. These actions have only begun recently, after GCA had notice of the extent of the Department's investigation and notice of a licensing action taken by Mississippi Gaming with respect to a related Maskatiya and Cucinotta entity (MCA Processing).

**3. <u>GCA principals failed to disclose information regarding the criminal murder investigation to other gaming regulators.</u>**

On August 22, 2007, another Maskatiya and Cucinotta owned processing company, MCA Processing, applied for licensing by the Mississippi Gaming Commission. In the Multi Jurisdictional Personal History Disclosure Forms Maskatiya and Cucinotta supplied to the Mississippi regulator, both men indicated that they had never been questioned by law enforcement and that they had not been asked to take a polygraph exam. The Department has learned that there was a recommendation that Maskatiya and Cucinotta be denied a Mississippi license based on the false statements. Maskatiya and Cucinotta were allowed to withdraw their applications with the agreement

that they would not apply again for four (4) years.

4. **<u>GCA principals failed to disclose additional account and ownership information to the Arizona Department of Gaming.</u>**

Schedule C of the Arizona Department of Gaming Financial Questionnaire requires disclosure of the following:

> ...all accounts, foreign and domestic, maintained by you, your spouse, or dependant children.

Robert Cucinotta disclosed two personal bank accounts. However, he failed to disclose a UBS International Resource Management Account. Moreover, along with Casino Credit Services, Cucinotta also failed to disclose his role with USA Merchant Services, LLC. Karim Maskatiya failed to disclose ownership of eight companies to the Department, including Casino Credit Services.

5. **<u>GCA continues to have issues with payments of fees and payments to casino patrons.</u>**

On December 31, 2006, GCA reported the following to the Securities and Exchange Commission:

> Inadequate controls related to commissions: **<u>We did not have appropriate internal control design related to how we calculate the amount of commissions we pay our customers.</u>** Specifically, 1) internal controls over commission set-up did not include a comparison of commission rates to contractual terms and 2) there was an ineffective process to determine the appropriate commission type and amount. In addition, some of the databases and applications used to maintain transaction records and perform certain commission computations were maintained by a third party, and appropriate controls to monitor and approve changes and to limit access were not in place. (Emphasis added.)

One year later, on December 7, 2007, GCA reported that it had underpaid commissions to approximately twenty "customers." Based on the numbers and dates given to the SEC and the Department, GCA underpaid commissions to twenty (20) casinos by approximately:

1. $2,624 a day in 2005 and 2006 ($1.9M/730 days);
2. $2,732 a day in the first half of 2007 ($500,000/183 days); and
3. $1,093 a day in the second half of 2007 ($200,000/183 days).

For the six months immediately after the December 31, 2006 SEC filing acknowledging internal control weaknesses, the amount of GCA's average daily underpayment of casino commissions **increased**. Despite having every reason to be sensitive to the problem of underpayment of fees, this most recent underpayment began two years before any report was made to the SEC; it was then allowed to continue another year despite the fact that GCA knew of the problem with its internal controls.

There has been another recent incident. In September, 2008, GCA's ATM's deducted money from thousands of bank accounts without dispensing any money to customers. The incident involved 10,175 transactions. GCA blamed Hurricane Ike for disrupting communications between its Las Vegas data center and a "processor based in Houston." USA Payment Systems is based in Houston, Texas and has a data center in GCA's Las Vegas office.[23]

**6. GCA's principals have had contact with gaming regulators that creates an appearance of impropriety.**

Michigan Gaming ultimately did not take any action against GCA or any related entity. It apparently made this decision despite an extensive investigation in which it concluded that Kirk Sanford had been untruthful, found indications of guilty knowledge and conspiracy regarding the mis-coding of Visa transactions, and concluded, among other things, that GCA failed to produce requested and complete information. One of the Michigan Gaming investigators involved was a man named Gary Elliott. It was Mr. Elliott, in fact, who took the lead in questioning Maskatiya and Cucinotta on behalf of Michigan Gaming. Mr. Elliott went to work for MCA Processing, a Maskatiya and Cucinotta enterprise. Mr. Elliott has called and e-mailed the Department directly on behalf of Maskatiya and Cucinotta.

## APPLICABLE STATUTES AND COMPACT SECTIONS

The State of Arizona, as authorized by the Indian Gaming Regulatory Act and as required by A.R.S. § 5-601.02, has entered into numerous tribal-state gaming compacts ("compacts") and has promulgated statutes for fulfilling its role under those compacts. A.R.S. § 5-601(D) provides that:

> The department of gaming is authorized to carry out the duties and responsibilities of the state gaming agency in compacts executed by the state and Indian tribes pursuant to the Indian gaming regulatory act.

---

[23] GCA is also currently involved in shareholder and class action lawsuits for breach of fiduciary duties, insider trading, waste of corporate assets, negligence and strict liability.

With respect to certification specifically, A.R.S § 5-602(A) states, in pertinent part:

> The department of gaming shall certify, as provided in tribal-state compacts, prospective gaming employees, facility support employees, tribal gaming office employees, financiers, management contractors, providers of gaming services and manufacturers and distributors of gaming devices to ensure that unsuitable individuals or companies are not involved in Indian gaming permitted under the tribal-state compacts. In carrying out the duties prescribed in this section, the department shall seek to promote the public welfare and public safety and shall seek to prevent corrupt influences from infiltrating Indian gaming.

Thus, by operation of State law and as a provider of gaming services to Tribes in Arizona, GCA must meet the certification requirements of the compacts and the Department is tasked with applying the certification process and standards set forth in the compacts.

The compacts, codified in State law at A.R.S. § 5-601.02(I)(6), require that providers "shall be certified by the [Department] prior to the sale or lease of any . . . Gaming Services."[24] Compact Section 4(d). State certification of a gaming service provider is effective for two (2) years, at which point the provider must seek renewal of the certification. Compact Section 5(i).

Compact Section 5(f) states:

> The State Gaming Agency may revoke, suspend or deny a State Certification when an Applicant or holder of certification:
>
> (1) Has violated, failed or refused to comply with the provisions, requirements, conditions, limitations or duties imposed by any provision of this Compact or its appendices or any provision of any State Gaming Agency rule, or when any such violation has occurred upon any premises occupied or operated by any such Person or over which he or she has substantial control;
>
> (2) Knowingly causes, aids, abets, or conspires with another to cause any Person to violate any of the laws of the State or the rules of the State or the Tribal

---

[24] The provisions relevant to this matter are identical in all current compacts.

Gaming Office, or the provisions of this Compact or its appendices;

(3) Has obtained a State Certification or tribal license by fraud, misrepresentation, concealment or through inadvertence or mistake;

(4) Has been convicted of, or forfeited bond upon a charge of, or pleaded guilty to, forgery, larceny, extortion, conspiracy to defraud, willful failure to make required payment or reports to any tribal, state or United States governmental agency at any level, or filing false reports therewith, or of any similar offense or offenses or of bribing or otherwise unlawfully influencing a public official or employee of a tribe, any state of the United States or of any crime, whether a felony or misdemeanor, involving any Gaming Activity or physical harm to individuals or moral turpitude;

(5) Makes a misrepresentation of, or fails to disclose, a material fact to the State Gaming Agency or the Tribe or Tribal Gaming Office;

(6) Fails to prove, by clear and convincing evidence, that he, she or it is qualified in accordance with the provisions of this Section;

(7) Is subject to current prosecution or pending charges, or a conviction which is under appeal, for any of the offenses included under subsection (d) of this Section; provided that, at the request of an Applicant for an original certification, the State Gaming Agency may defer decision upon the Application during the pendency of such prosecution or appeal;

(8) Has had a gaming license issued by any state or tribe in the United States revoked or denied;

(9) Has demonstrated a willful disregard for compliance with gaming regulatory authority in any jurisdiction, including suspension, revocation, denial of Application or forfeiture of license;

(10) Has pursued or is pursuing economic gain in an occupational manner or context which is in violation of the criminal laws of any state if such pursuit creates probable cause to believe that the participation of such Person in gaming or related activities would be detrimental to the proper operation of an authorized gaming or related activity in this State. For the purposes of this paragraph, occupational manner or context shall be defined as the systematic planning, administration, management or execution of an activity for financial gain;

(11) Is a career offender or a member of a career offender organization or an associate of a career offender or career offender organization in such a manner which creates probable cause to believe that the association is of such a nature as to be detrimental to the proper operation of the authorized gaming or related activities in this State. For the purposes of this paragraph, career offender shall be defined as any Person whose behavior is pursued in an occupational manner or context for the purposes of economic gain utilizing such methods as are deemed criminal violations of Tribal law, federal law or the laws and the public policy of this State. A career offender organization shall be defined as any group of Persons who operate together as career offenders;

(12) Is a Person whose prior activities, criminal record, if any, reputation, habits and associations pose a threat to the public interest of the Tribe or the State or to the effective regulation and control of Class III Gaming, or creates or enhances the dangers of unsuitable, unfair or illegal practices, methods and activities in the conduct of Class III Gaming, or the carrying on of the business and financial arrangements incidental thereto; or

(13) Fails to provide any information requested by the State Gaming Agency within 14 days of the request for the information.

The Department has issued this Notice of Intent to Deny State Certification because it

has determined that one or more of the circumstances listed in Compact Section 5(f) exists in this case.

Pursuant to Compact Section 5(p):

> Any Applicant for State Certification agrees by making such Application to be subject to State jurisdiction to the extent necessary to determine the Applicant's qualification to hold such certification, including all necessary administrative procedures, hearings and appeals pursuant to the Administrative Procedures Act, Title 41, chapter 6, Arizona Revised Statutes and the administrative rules of the State Gaming Agency.

In fulfilling its role under State law and the compacts, including with respect to application of the above identified standards, the Department shall act "in a manner that is consistent with this state's desire to have extensive, thorough and fair regulation of Indian gaming permitted under the tribal-state compacts." A.R.S. § 5-602(C).

## BASIS FOR DENIAL OF CERTIFICATION

### A. COMPACT SECTION 5(f)(2).

GCA knowingly conspired with USA Payment Systems to mis-code GCA's Visa transactions in order to pay a smaller interchange fee. In the period after Wells Fargo discovered the mis-coding, this conspiracy caused GCA to wrongfully take approximately $6 million from issuing banks. GCA's and USA Payment Systems' actions were in violation of Arizona law, including those laws prohibiting theft and fraud. *See* A.R.S. §§ 13-1801 and 13-2310.

### B. COMPACT SECTIONS 5(f)(3), (5) and (9).

GCA has demonstrated a willful disregard for compliance with gaming regulatory authorities. With GCA's very first application in 1999, GCA principals lied about their backgrounds. Since then, GCA has misrepresented and concealed material facts and information in its dealings with the Department and others. This has allowed it to wrongfully obtain State certification. As detailed above, GCA conspired with USA Payment Systems to mislead the Department and other gaming regulators regarding its prior mis-coding of transactions. GCA and its principals misrepresented and failed to provide the Department and other gaming regulators material facts, documents and information regarding the mis-coding of transactions, the conspiracy with USA Payment Systems, the Visa investigation and fine, the Michigan gaming investigation, bank accounts, ownership of companies, knowledge and involvement in the interchange fee fraud, involvement in a prior murder investigation, and attempts to hide information from gaming regulators and others.

**C. COMPACT SECTION 5(f)(10).**

Between 1999 and 2002, GCA purposefully underpaid interchange fees to issuing banks, resulting in GCA's theft of approximately $26 million. Since that time, GCA has concealed the theft and fraudulent scheme. The theft, fraud and concealment are all actions which violate Arizona criminal laws. These actions result in probable cause to believe that GCA's participation as a gaming services provider is detrimental to the proper operation of gaming in the State.

**D. COMPACT SECTION 5(f)(12).**

GCA has committed a theft, fraud and concealment. It has conspired in these actions with USA Payment Systems. It has demonstrated a willful disregard for compliance with gaming regulatory authorities, and has misrepresented and concealed material facts, documents and information in its dealings with the Department and others. To date, it has refused to acknowledge its wrongdoing or return the stolen funds. It continues its involvement with central figures in the fraud, including its "Director of Compliance," and with its co-conspirator. It has had recent significant incidents where casinos and casino patrons were paid incorrectly, is engaged in shareholder lawsuits, and maintained its relationship with Maskatiya and Cucinotta, who now employ a Michigan Gaming investigator and have had to withdraw their applications for licenses in Mississippi.

For the Department to knowingly certify GCA, given GCA's actions, its habits, the reputation it has now created for itself, and the companies and individuals it continues to be involved with, would pose a threat to the public interest and the effective regulation of gaming. Electronic fund transfers are complicated and it is difficult to detect wrongdoing. Interchange fees, commissions and related fees are ripe for abuse. This is demonstrated by how long GCA was able to get away with the original interchange fee fraud, and by the fact that GCA recently underpaid casino commissions for three (3) years seemingly without detection. In the context of a casino, the risk of harm is greater given the various types, number and magnitude of the fund transfers. Casino vendors providing electronic fund access must be reputable, honest, diligent, and effective. GCA has proven itself to be none of these.

In addition, certifying GCA invites other third parties to attempt other or similar schemes or to attempt to gain certification where otherwise they would assume doing so was a waste of time. Moreover, allowing GCA's continued participation in gaming in Arizona damages the public's trust in Arizona casinos and casino regulators. Casinos cannot properly operate where patrons continually suspect or assume they are being cheated, and regulators are assumed to be either involved or incompetent.

GCA as the holder of State certification also enhances the danger of unsuitable business and financial activities. Allowing GCA to operate in Arizona is an invitation for it to engage in additional wrongdoing, and not unlikely given its ongoing associations and habits. GCA's recent troubles with the underpayment of commissions to casinos and funds to patrons demonstrates the manner in which electronic fund transfers can be abused to the detriment of casinos and casino patrons in Arizona. Even if GCA were to do nothing wrong in the future, there is no certainty that entities and persons that GCA is associated with, owned by, or employs, like USA Payment Systems, Maskatiya, Cucinotta, and Eubank, will not use their connection with GCA to perpetrate another fraud. Certification of GCA also sends the message to other certified gaming vendors that they can attempt their thefts, scams and frauds without fear of repercussion. The perception of the gaming industry is directly tied to the integrity of its vendors. If vendors of questionable integrity are discovered misrepresenting material facts to the Arizona Department of Gaming, and then allowed to do business with Arizona Tribes, the criminal element could be drawn to the Arizona Gaming Industry by the perception of corruption.

Other of GCA's actions are also very troubling. The fact that it and its principals actively misled and withheld information from gaming regulators is unacceptable. To ensure the proper regulation of gaming in Arizona, vendor applicants must be required to provide full and accurate disclosure of material information. In this instance, the Department's investigation of Global began with a random phone call about MCA Processing, another Cucinotta/Maskatiya company. Vendors that knowingly attempt to obtain a State certification by deceit or concealment cannot be allowed to do business with Arizona casinos, because the Department cannot always count on being so lucky in learning or discovering information. If the Department has to rely on an accidental discovery of material facts, it will fail in its mission to regulate gaming adequately. During the application process, therefore, vendors must be accountable for any failure to disclose material facts, even if accidental.

The Arizona Department of Gaming bears a responsibility to minimize the exposure of the gaming public and Arizona Tribes to unreasonable threats. The Arizona Department of Gaming cannot allow a vendor that commits a $26 million fraud the opportunity to conduct business at Arizona tribal casinos. Global Cash Access engaged in unsuitable business practices when it ignored known internal control weaknesses that resulted in the underpayment of commissions to casinos in 2007. GCA engaged in unsuitable business practices when it deducted money from thousands of bank accounts without dispensing money to customers.

Between 1999 and 2002, Global Cash Access showed a willingness to miscode transactions to intentionally defraud issuing banks of $26 million. GCA showed a willingness to deceive Visa, First Data Corp and Bank of America during its fraud. GCA showed a willingness to deceive Michigan Gaming, Mississippi Gaming and the Arizona

Department of Gaming in order to obtain gaming licenses after the fraud. In 2006, Global Cash Access showed, at a minimum, mismanagement related to underpayment of commissions to casinos. The company had inadequate internal controls and failed to immediately correct its underpayment to casinos. The Department cannot allow an organization with this extensive pattern of fraud, deception, and incompetence to conduct business with Arizona Tribes.

GCA is acutely aware of the results of the mis-coding and the benefits it received as a result. It has been caught. It paid the Visa fine without complaint, acknowledging its theft. Yet, it has not paid back any of the ill-gotten funds. Apparently, for GCA, $384,000 is a small price to pay for a return of $26 million, even if wrongfully acquired. GCA cannot be State certified; the message to all others involved in gaming, vendors or employees, that you can engage in fraud and keep both your certification and the benefits of your fraud.

**E. COMPACT SECTION 5(f)(6).**

For all the reasons provided above, GCA has failed to prove, by clear and convincing evidence, that it is qualified to hold State certification.

**RIGHT TO HEARING AND SETTLEMENT CONFERENCE**

GCA is entitled to a hearing on this action before an Administrative Law Judge designated by the Office of Administrative Hearings. GCA may obtain a hearing by filing a written notice of appeal or request for hearing with the Department within thirty (30) days after receiving this Notice of Intent to Deny. The notice of appeal or request for hearing shall identify the party, the party's address, the agency and the action being appealed or contested and shall contain a concise statement of the reasons for the appeal or request for a hearing. If a notice of appeal or request for hearing is not timely filed or is not otherwise accepted, the Department's action becomes final and is not subject to hearing or judicial review.

If GCA files a notice of appeal or request for hearing, it may also request an informal settlement conference. A request for an informal settlement conference shall be in writing and shall be filed with the Department no later than twenty (20) days before the scheduled hearing date. The Department will hold the conference within fifteen (15) days after receiving the request and a person with the authority to act on behalf of the Department will represent the Department at the conference. The parties participating in the settlement conference waive any right to object to participation of the Department's representative in the final administrative decision.

William J. Boston, Manager
Gaming Vendor Certification

Distribution:
Original – Applicant – Fed-X (Overnight)
Copy – Heidi Staudenmaier – U.S. Mail
Copy – Tribal Gaming Office – U.S. Mail
Copy – Applicant File