Rich Bergeron
PO Box 5212
Weirs Beach, NH 03247
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>XYIENCE, INC., A Nevada Corporation<br><br>Debtor. | No. BK-S-08-10474-MKN<br>Chapter 11<br><br>Eighth Judicial District Court<br>Las Vegas, Clark County, Nevada<br>Case No. A544781, Dept. XXIII |
| XYIENCE INCORPORATED, a Nevada Corporation,<br>Plaintiff,<br><br>v.<br><br>RICHARD BERGERON, an individual<br>Defendant. | CASE NO. BK-2-08-AP-01082-MKN<br><br>DEFENDANT/COUNTER-CLAIMANT RICH BERGERON'S AFFIDAVIT IN SUPPORT OF DEFENDANT/COUNTER-CLAIMANT'S MOTION FOR LEAVE TO AMEND RULE 9011 SANCTIONS MOTION |
| RICHARD BERGERON, an Individual,<br><br>Counter-claimant,<br><br>v.<br><br>XYIENCE INCORPORATED, a Nevada corporation<br><br>Counter-defendant | Hearing Date:<br><br>Time: 9:30 AM<br><br>Location: 300 Las Vegas Blvd. South<br>Courtroom #2<br>Las Vegas, NV 89101 |

RECEIVED AND FILED

NOV [illegible] 2010

U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

SCANNED

# DEFENDANT/COUNTER-CLAIMANT RICH BERGERON'S AFFIDAVIT IN SUPPORT OF DEFENDANT/COUNTER-CLAIMANT'S MOTION FOR LEAVE TO AMEND RULE 9011 SANCTIONS MOTION

**Richard Edward Bergeron III, being first duly sworn, states as follows:**

1. I am a pro-se representative and have been at all times in these proceedings currently pending as *Xyience, Incorporated vs. Richard Bergeron*, Case #: 08-01082-MKN and currently listed as an adversary proceeding under Debtor Xyience Case #: 08-10474-MKN.

2. I make this affidavit in support of the attached motion for leave to file a second amended Rule 9011 Sanctions motion.

3. I have personal knowledge of, and I am competent to testify to the facts contained in this Affidavit, except those matters based upon information and belief and, as to such matters, I believe them to be true.

4. On July 18, 2007 Xyience filed this case against me in Clark County District Court with direct intent to silence my investigative reporting of ongoing fraudulent activity at the struggling supplement company.

5. This case has been continued by all legal representatives handling it for Xyience without regard for the actual facts and true, altruistic motivations behind my investigative reporting.

6. The parties named in the standing amended motion are the most central perpetrators of the bankruptcy fraud, but other individuals and/or entities must be added to further the interests of justice.

7. I have discovered recent evidence revealing Michael Levy, the current CFO and COO of Xyience Incorporated, was also embroiled in the fraud leading up to and persisting throughout the forced takeover and bankruptcy of Xyience by Fertitta Enterprises through Zyen, LLC.

8. Xyience Trustee Counsel Jon Backman (hereinafter Backman) relied on some of my information and documentation (provided to him by both email communications and during a personal visit to Bloomington in the first week of February, 2010 facilitated by the trustee's office) to pursue various claims against certain parties named in Backman's multiple adversary cases.

9. During email and telephone discussions with Backman subsequent to the February, 2010 meeting, I discovered that it was his intent to assist Fennemore Craig Attorney Laurel Davis (hereinafter Davis) avoid culpability for clear transgressions outlined in the existing amended Rule 9011 Sanctions motion.

10. Davis herself sent an email to me telling me she had already been paid in full for her bankruptcy involvement, that this court had already denied the Rule 9011 request that is still pending, and I therefore had no recourse to recover damages from her or her firm.

11. Backman indicated to me that he needed to work with Davis in the bankruptcy case and required her approval to make crucial moves in the future regarding the core case and his adversary proceedings.

12. Backman intimated to me that he knew Davis and other attorneys involved in the bankruptcy fraud were culpable for their actions, but procedure and courtesy among lawyers precluded him from lashing out against them legally in his capacity as trustee's counsel.

13. Backman also expressed to me his frustration with the vast spread of corruption involved in the bankruptcy lead-in and execution. He explained that this scenario made it difficult for him to file all appropriate and necessary claims against all possible parties under such a strict deadline schedule that he faced at the outset of his being named as liquidating trustee counsel.

14. Backman also assisted Fennnemore Craig attorneys by allowing them all to be paid in full for their services, even those billed hours that were in furtherance of the entire bankruptcy scheme and willfully executed with obvious intent to defraud the original Xyience shareholders.

15. These billable hours included the time spent by these lawyers addressing my case alone, although Davis herself admitted in one of her pleadings that she knew that keeping the instant case alive against me was a waste of the estate's resources.

16. I cut off communication with Backman and blocked his email addresses when previous negotiations broke down and his behavior supporting the culpable lawyers became too offensive and egregious for me to tolerate.

17. Despite my disapproval of Backman's methodology, willingness to look the other way when it came to fellow lawyers, and his refusal to demonstrate even a basic knowledge of my case paperwork, I am compelled to release the estate itself from Rule 9011 claims so as to focus on the major culpable individuals and entities driving the fraud from day one.

18. I still intend to explore the possibility of naming Backman himself and Liquidation Trustee David Herzog as individuals to the amended sanctions motion if this type of obstructionist behavior in regard to Fennemore Craig attorneys and other issues persists.

19. Backman promised on multiple occasions to take action to dismiss the initial claim against me filed by Xyience, but recently he revealed to me he was not even aware of what the initial claim entailed or who the judge on the instant case was.

20. Since the filing of this bankruptcy and the removal of the instant case to this Court, I have been in contact with multiple sources, both inside and outside of Xyience's day to day operations.

21. One insider currently within the company shared details of a recent (November, 2010) meeting in which my name was brought up, and an announcement was made pertaining to a new employee who

would be paid a sum of $25,000 to push my Xyiencesucks.com (see attached Exhibit 3 Google search results) Web-site listing off the first page of Google's search engine results for the term "Xyience."

22. Another insider who maintained an office next to key company officials during the ramp up to the fraudulent bankruptcy provided an extensive and detailed background report regarding the motivations and methodology behind the drive to bankruptcy.

23. This report has been entered as an exhibit before this court and was also shared with Backman.

24. The litigation stream in turn persists against me even while the Trustee's office is aware the initial case has no merit and knew as early as December 29, 2009 that the complaint against me should be dismissed. (See Exhibit 1, initial e-mail from Backman regarding dismissing initial case filed by Xyience)

25. I have contact information on dozens of key shareholders, but many of them have been told lies about me by company principals at one time or another, and they therefore either never cooperated or took a long time for me to gain their trust.

26. The entire class of shareholders I am fighting for has been duped by the entire bankruptcy process, and in order for Fertitta Enterprises to even be in any position to accomplish the alienation of these shareholders from the company they built, I had to be silenced by the instant case.

27. I am working on acquiring additional affidavits from shareholders who have not yet provided them, and I also plan to re-submit more complete affidavits from those shareholders who already provided testimony. This is to ensure that a wider group of injured parties is represented and also to provide evidence to show that the further passage of time since their first affidavits has only caused these individuals further injury.

28. Some of the new affidavits I will submit if permitted leave to amend the sanctions motion

include at least one from a representative of a major shareholder.

29. Some of the new affidavits and evidence I will provide in the event I am allowed to amend the pending sanctions motion will include descriptions and documentation of how Michael Levy participated in the fraud involved in the Xyience bankruptcy and aftermath.

30. I recently discovered that Jon Pearson is no longer an employee of Fennemore Craig and now works for the Las Vegas Office of Ballard Spahr, LLP.

31. Exhibit 2 consists of communications from two insiders who witnessed fraud perpetrated by Kirk Sanford and Karim Maskatiya at Global Cash Access and in direct business transactions with a company called Infonox.

32. The communications included are redacted to protect the sources I have cultivated, who will be safer if permitted to be anonymous at this point.

33. These descriptions of ongoing fraud related to cash transaction software and hardware companies are very troubling considering the partnerships developed between these individuals and the Station-Casino-owning Fertitta brothers (Frank III and Lorenzo).

34. I am convinced upon extensive investigation that the money Maskatiya "invested" into Xyience and the cooperation of his nephew Omer Sattar and his protégé Kirk Sanford in the Xyience bankruptcy was part of a further framework of money laundering and possible international skimming operations.

35. The Maskatiya and Global Cash Access connection to the Xyience bankruptcy is troubling considering that Frank Fertitta Jr., who is now deceased, has been implicated as one of the individuals involved in a massive skimming operation in Las Vegas popularized by the book "Casino" by Nicholas Pilleggi, which was then made into a feature film.

36. Maskatiya, Sanford, and Sattar (along with other associates who were not engaged in the Xyience situation) also have a history of being involved in new wave skimming efforts and fraudulent activity related to their activities at Global Cash Access (hereinafter GCA). All of these individuals are no longer associated with Global Cash Access as a result.

37. Exhibit 5 consists of an announcement in regard to a class action settlement reached to allow GCA shareholders over $5 million in recovery funds due primarily to the fraud perpetrated at that company immediately prior to the above named individuals (some of whom were named defendants in that class action) transitioning to Xyience so seamlessly.

38. My investigation into this scenario leads me to conclude the modus operandi of the Fertittas and their associates in this type of fraudulent activity appears to be rooted in making corrupt partnerships with individuals who control and/or have a vast understanding of electronic cash transfer software and hardware.

39. It is clear to me that these partnerships have been formed to help this collective group manipulate such financial systems for pure profit, knowing if they are caught they may only face stiff fines and/or easy to defend civil suits that will be covered by insurance like the GCA settlement was.

40. The series of investigative reports I authored detailing the Xyience case over the years represent one of the most complicated, stressful, albeit earnest efforts I've ever undertaken in my life.

41. This collection of detailed reports I created will someday make up a detailed book project or documentary, but the ability to get the ball rolling in that realm will require me to completely exonerate myself from all claims against me in this court.

42. I have made several serious claims of impropriety and downright criminality regarding the behavior of certain officials operating and/or owning Xyience throughout my reporting on the company, but none of the individuals and entities I've named have filed any civil action to object to my reporting.

43. Thus far, only Xyience filed any suit disputing my reports, and then only to dispute a very narrow set of claims posted within an email I received from a third party and subsequently published, not an actual report I wrote myself.

44. I have always gone out of my way to find out the true facts and provide supporting evidence and documentation beyond anonymous sources in this case.

45. The only evidence of any kind Xyience offered throughout this litigation comes from lawyers who cannot testify for their clients and Adam Frank, who is named in both my Rule 9011 motion and multiple claims filed and recently settled by the Trustee in the core bankruptcy proceedings.

46. Exhibit 6 consists of a news report written by John G. Edwards in March of 2008, describing Levy's position of influence over Xyience's affairs in the time leading up to and during the bankruptcy.

47. Exhibit 6 also includes a picture of Levy standing among a stockpile of Xenergy that was held in limbo just so the Fertitta-owned Zuffa Marketing, LLC could work out a favorable fee to allow Xyience to keep selling the cans of energy drink which still had the UFC (also Fertitta-owned) logo on them.

48. These cans of Xenergy being kept out of the marketplace was a huge contributing factor to the company being forced to file for bankruptcy, and the Fertittas could have easily hammered out a favorable deal to allow for the sale of this product if in fact they did want it to be sold.

49. Instead of selling this product to save the company, a scheme was perpetrated to prevent the sale of this multi-million dollar stockpile of Xenergy, which would ultimately benefit the Fertittas and their other outside business interests.

50. Exhibit 4 consists of an article from Bevnet.com illustrating how company officials, under

Fertitta Enterprises control, decided to fire the sales staff during the holiday season of 2007 just prior to initiating the fraudulent bankruptcy the following January.

51. Of particular importance in Exhibit 4 is a quote from one of the laid off personnel: ***"They were spending so much on marketing that we didn't even have Point-of-Sale" materials, said one laid-off salesman. "The tie in with UFC is incredible, but there are a lot of issues."***

51. I am intent on improving and refining a second amended motion (if granted leave to amend) by way of intense work and further investigation. I have an inherent duty to the shareholders to present the evidence and knowledge only I possess in such great detail that proves how and why these people and business entities were defrauded of their rightful interests in this company.

DATED this 15th of November, 2010

Rich Bergeron Rich Bergeron

Rich Bergeron, AFFIANT
PO BOX 5212
Weirs Beach, NH 03247
617-209-4325
Attorney Pro-Se
Rich.Bergeron@gmail.com

Subscribed and Sworn to before me
This 16th day of November, 2010.

Kari L. Dami

NOTARY PUBLIC

My Commission Expires:

KARI L. DAMI
Justice of the Peace - New Hampshire
My Commission Expires September 17, 2[illegible]

KARI L. DAMI JUSTICE OF THE PEACE NEW HAMPSHIRE

# EXHIBIT 1

Gmail Rich Bergeron <rich.bergeron@gmail.com>

# Re: DAVID HERZOG, Xyience Trustee

**Jon Backman <jbackman@backlawoffice.com>** **Tue, Dec 29, 2009 at 10:32 PM**
Reply-To: Jon Backman <jbackman@backlawoffice.com>
To: Rich Bergeron <rich.bergeron@gmail.com>
Cc: Jon Backman <jbackman@backlawoffice.com>, Eileen <ebackman@backlawoffice.com>, David Herzog <drhlaw@mindspring.com>

Dear Mr. Bergeron ---

I am the attorney for Mr. Herzog and will be taking the lead role in the case for him. I appreciate your email and would like very much to speak with you next week.

I also agree that we need to dispose of the case involving you. Are there any hearing dates approaching?

In any event, please let me know when you will be available to speak. This week is tough because of the holiday, but next week should work.

Thanks for contacting us.

Jon Backman

Law Office of Jonathan A. Backman
www.backlawoffice.com
117 North Center Street
Bloomington, IL 61701
(309) 820-7420
FAX: (309) 820-7430
jbackman@backlawoffice.com

NOTICE:
This communication is covered by the Electronic Communications Privacy Act, found at 18 U.S.C. 2510 et. seq. This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify us by reply e-mail and immediately and permanently delete this message and any attachments. Thank you.

> ----- Original Message -----
> **From:** Rich Bergeron
> **To:** jbackman@backlawoffice.com
> **Sent:** Tuesday, December 29, 2009 9:13 PM
> **Subject:** ATT: DAVID HERZOG, Xyience Trustee
>
> Mr. Herzog,
>
> As you may be well aware, I am engaged in an adversary proceeding in the bankruptcy case of Xyience, Incorporated.

I just read your complaint against Fertitta Enterprises, William Bullard, Adam Frank, Kirk Sanford, and Karim Maskatiya. I would urge you to keep digging and seek other defendants to add to the complaint such as Karim Maskatiya (Omer Satter's uncle and Kirk Sanford's former boss who is said to have invested $5 million in Xyience to help orchestrate the fraudulent bankruptcy). Also, the complaint could potentially include Zuffa, LLC who bankrupted Xyience only after securing a $350 million senior-secured credit facility for the UFC based on the strength of sponsorship noted in the covenants. Frank may have been motivated by money alone, but Sanford and his contingent from Global Cash Access have another mysterious connection to Fertitta Enterprises principals. Station Casinos has a major contract with Global Cash Access that was brokered while Sanford was CEO of that company. Sanford has been involved in Civil RICO claims regarding past business with Maskatiya and Robert Cuccinotta. All of this may not be relevant, but as far as evidence of impropriety, I can certainly provide that. I had a well documented appointment with Sanford myself in New York City. A Xyience shareholder I know contracted a private investigator to spy on Frank and Sanford that weekend (November 15th, 2007), and the investigator took a picture of myself, Frank, Sanford, and another gentleman from Standard General, an investment firm in NYC. We were all attending a lunch meeting at the time. I brought the guest from the investment firm: Robert Lavan. I specifically remember Sanford telling me then that the plan was to bankrupt the company and go "scorched earth."

I would like to put the case against me to rest and assist your efforts if possible. Please contact me at your earliest convenience if you would like to discuss this matter further. Due to financial constraints I currently don't have a working phone line, but I will address that within the coming days. Until then I will be available at this email address.

Thanks,

--
Rich Bergeron
Editor/Writer/Webmaster
www.unlimitedfightnews.com
www.fightnewsunlimited.com
www.rocky49wins.com
www.judgegod.com
www.xyiencesucks.com
www.fightspaceonline.com
THE BEST FIGHT NEWS ON THE NET!!!
617-209-4325

SPONSORED BY:
http://www.1shoppingcart.com/app/?af=1091814
http://shop.ebay.com/supplement.hub/
www.tristatecagefighting.com
www.bulletfightgear.com
www.drinkredux.com

# EXHIBIT 2

Gmail

Rich Bergeron <rich.bergeron@gmail.com>

# GCA, Infonox, TSYS . . .

[redacted] Sat, Oct 2, 2010 at 4:31 AM
To: Rich Bergeron <rich.bergeron@gmail.com>

Infonox was majority owned by Maskatiyas (70%) and major tech supplier to GCA. When TSYS bought Infonox, the point man at TSYS was Robert Philbin, who was an old buddy of the Maskatiyas. Philbin was then let go rather abruptly after the takeover, when the merger started smelling, and the whole GCA thing hit the ceiling.

The link between Fertitas and Infonox was through Amin and Vali Maskatiya - as well as the rigging of stuff at casinos by Infonox in the US and India.

Will send you some stuff, but why dont you also speak with the SEC? I can give them your name, or just pass your blog's link to them, they are investigating the Maskatiyas bigtime.

Bes[redacted]

ps: I'm past caring about confidentialities, not really scared of their death threats in [redacted] anymore . . .
[Quoted text hidden]

Gmail

Rich Bergeron <rich.bergeron@gmail.com>

# Fwd: Fw: Infonox - Robert Cucinotta

[redacted] Sun, Oct 10, 2010 at 5:19 AM

To: Rich Bergeron <rich.bergeron@gmail.com>

----- Original Message -----
From: [redacted]
To: [redacted]
Sent: Thursday, December 17, 2009 3:46 AM
Subject: RE: Infonox - Robert Cucinotta

Hi [redacted] I guess I should explain my position a little better to you, in order to put your mind at rest. I do not break the law, and I have no vested interest other than trying to see if justice can eventually be served. I am not a reporter or an attorney. I am, as I mentioned, just trying to put all the pieces together on a number of activities surrounding Robert/Karim and related companies.

You may be unaware that Robert and Karim are now suing a number of parties here in the US for loss of revenue (they were forced to sell their shares in GCA in order for GCA to do business). Deloitte and Touch are one of them - they are claiming damages of $400 million. You can google that story.

I lost my job while trying to adhere to a code of ethics from BofA, Tsys, Visa, etc. You can't win if the decision-makers are being bribed. I could not be bought, so I was gone ....

I had identified Infonox long ago as a primary player in some of their activities, along with a number of other companies. I set up many Infonox accounts (their purpose unknown), with DDAs directed to GCA / BMCF Gaming (just doing my job and told to not worry about it). I was told the accounts were for "testing". Could you tell me some things that Robert may have asked you to do that you felt were out of line? Or anything that seemed odd?

---

From: [redacted]
To: [redacted] Cucinotta
Date: Wed, 16 Dec 2009 21:41:31 +0530

Dear [redacted]

Whatever you wish for, as long as it is legal

[redacted]

Gmail

Rich Bergeron <rich.bergeron@gmail.com>

# GCA, Infonox, TSYS . . .

[redacted]

Sat, Oct 2, 2010 at 10:30 PM

To: Rich Bergeron <rich.bergeron@gmail.com>

Good Morning from [redacted]

a) My phone number is [redacted] and my address is [redacted] it is my reasonable apprehension that my electronic communications are severely compromised by people unknown, so that is that.

b) The Maskatiyas have a history of currency and financial shortcut business plans going back generations, especially as part of the vast havala network in South Asia/sub-Continent. This is much in the news lately due to the terrorist thing, but fact remains, it was always there also for fund conversion for the narcotics / gaming and arms industry. As you are aware, these three industries are now also linked intricately to the oil industry, and were very important in pumping funds into the last banking colapse. That's the larger picture.

c) Maskatiya's wife's death - he had a partner called Sunil Suri, kind of reclusive, who would certainly speak more to the authorities in the US if summoned. Alternately Amin Maskatiya, who knows things, too. There is also an old-timer, a Sikh carpenter, who mumbles about this stuff - works at Karim's house in Mountain View.

d) Infonox was originally a clean enough technology arm for the gaming industry, via GCA, but in due course of time started making the technology which allowed skimming of fees in excess. TSYS are the largest in the payment processing industry, but largely stuck in USA, and wanted an entry into the global payment processing industry - which the moment you enter Asia, is intricately linked with the hawala industry. Asia is the new growth region. The problems between GCA and TSYS are easily found by researching on the internet. In the bargain, GCA had to offer all sorts of deals to TSYS. The point man at TSYS and Infonox were Robert Philbin and Safwan Shah respectively, both of whom were also let go soon after the TSYS takeover of Infonox.

e) TSYS(NYSE:TSS) is very intricately linked to Synovus who are in deep trouble on defaults, selling Sea Island and other properties to a private investor at about 10% of their asset values, it is rumoured that this investor is backed by Asian influences, who are using Maskatiya as a via media here too.

f) Why would they use GCA to bankrupt Xyience? i don't know, but running companies under for some benefit or the other has been a Maskatiya/Suri ploy for some time now, including some real estate outfits in CA. Kirk Sanford is a Maskatiya trused person through and through. One line of work that was being rumoured was working with the Macau casinos, which got embroiled in North Korean counterfeit currency

scam which were rumoured to have links to Asian hawala interests.

g) I am sure the SEC agents would want to hear from you. Shall send you their links separately. They are investigating the whole Infonox - GCA - TSYS - Synovus linkage and more.

I prefer email, think better in writing,

Best [redacted]

[Quoted text hidden]

----- Original Message -----
From: [redacted]
To: [redacted]
Sent: Wednesday, December 16, 2009 9:40 AM
Subject: Infonox - Robert Cucinotta

Hi [redacted] - I saw your interest in the article in the Las Vegas Sun Times regarding GCA / Robert Cucinotta / Karim Muskatiya. Would you like to start a dialogue regarding our respective roles surrounding Infonox? I was the person who set up the accounts at Bank of America, with many "mystery" Infonox accounts. I am following many aspects of what I know to be much illegal activity, relating to international money laundering, etc. There is much more to this than any one person realizes, and I have spent the last few years trying to put all the pieces together.

[redacted]

---

Hotmail: Powerful Free email with security by Microsoft. Get it now.

---

Your E-mail and More On-the-Go. Get Windows Live Hotmail Free. Sign up now.

# EXHIBIT 3

11/9/2010

Web Images Videos Maps News Shopping Gmail more ▾

Web History | Search settings | Sign in

Google

xyience Search

About 190,000 results (0.11 seconds)

**Everything**
Shopping
Videos
More

**Laconia, NH**
Change location

Show search tools

muscletech
bsn
cytosport
isatori
scivation

[Welcome To **Xyience**](#)
**Main home page featuring all links. From here you can navigate to any part of our website.**
www.xyience.com/

| | |
|---|---|
| Products | MMA School Search |
| Shop Online | Video |
| Team Xyience | Events |
| Xyience labs | News |

[**Xyience** energy drinks](#)
**Xyience Page Description. ... Find Xyience. Social Networking. Search ...**
www.xyience.com/index.cfm?fa=shop.beverages

[**Xyience** Supplements](#)
**If you are interested in a muscle volumizing supplement that can improve ...**
www.xyience.com/index.cfm?fa=products

[**Xyience** Photo Galleries](#)
**Fans flocked the Xyience Booth at the Fan Expo in Boston to snag an ...**
www.xyience.com/index.cfm?fa=photo.list

[Shopping results for **xyience**](#)



**Xyience** Xenergy Drink
$23.99
Bodybuilding



15 Pack - **Xyience** Xenergy...
$39.95
Amazon.com



**Xyience** XNGF
$27.99
Bodybuilding



XYience NGF Extreme Natural Growth Factor -
$15.50
Vitacost.com

[**Xyience** Really Sucks, and Here's Why](#)
**The story of an innocent man sued for $25 million for the sole crime of spreading the truth about THE ENRON OF MMA.**

[**Xyience** On Sale](#)
**We'll Instantly Beat Any Advertised Price On Xyience Supplements By 5%!**
SupplementWarehouse.com/SaveNow

[**Xyience**](#)
**Shop for Xyience.**
**Free Gift With Purchases Over $75!**
Bodybuilders.com/Xyience

[**Xyience** from Progenetix](#)
**Now Get Xyience in Canada from Progenetix at Low Canadian Prices!**
www.SportsNutritionCanada.com

www.ultimatefightnews.com/xyience.htm
Cached - Similar

Xyience at Wholesale! Buy Xyience UFC TUF MMA Ultimate Fighter ...
**Best XYIENCE & discount nutritional supplements, ephedra diet pills sports nutrition, weight loss products coupons at Supplements To Go.com!**
www.supplementstogo.com/xyience.htm -
Cached - Similar

Bodybuilding.com - Xyience Product Listing - On Sale! Lowest ...
**Xyience Products On Sale! Best Prices For Xyience!**
www.bodybuilding.com › Store - Cached - Similar

Xyience | Facebook
**Welcome to the official Facebook Page about Xyience. Join Facebook to start connecting with Xyience.**
www.facebook.com/xyience - Cached - Similar

Amazon.com: Xyience Xenergy - Health & Personal Care
**Amazon.com: Xyience Xenergy - Health & Personal Care. ... 16 Pack - Xyience Xenergy Xtreme - Cherry Rush - 16oz. $42.95. › Show only Xenergy items ...**
www.amazon.com/s?...Xyience%20Xenergy...
...Xyience%20Xenergy...
Cached

Videos for xyience



Xyience, UFC, Fertitta, Zuffa, Zyen, MMA ...
Feb 5, 2008
Uploaded by fightnews
youtube.com



Xyience Chick
Jan 14, 2007
Uploaded by
youtube.com

Pages similar to www.xyience.com

Wand Fight Team - **silverstar wanderlei silva walkout tshirt ufc** ... - wandfightteam.com
UFC.com - **04/21 4p ET/1p PT Countdown to Aldo vs. Faber** - ... - ufc.com
Tapout - **Retailer of uniquely branded MMA clothing and accessories.** - tapout.com
VYO-TECH - **vyo tech web design training computer school it certification a.** - vyotech.com

**Searches related to xyience**

| | |
|---|---|
| xyience **reviews** | xyience **clothing** |
| xyience **wiki** | xyience **nox-cg3 reviews** |
| xyience **bankruptcy** | xyience **nox-cg3** |
| xyience **bankrupt** | xyience **apparel** |

1 2 3 4 5 6 7 8 9 10 **Next**

xyience Search

# EXHIBIT 4

# Xyience Fires Sales Staff

Recommend Be the first of your friends to recommend this.

SHARE

Posted: 11/30/2007 3:21 PM

42 Comments | Email

**Company may face bankruptcy.**

It grew fast, hefted onto the shoulders of ultimate fighters. But the energy drink company Xyience might be crumbling faster than some of the opponents of Chuck Liddell.

Xyience, the Las Vegas-based maker of Xenergy, had seen fast expansion as a result of a sponsorship deal with the mixed martial arts league UFC and its popular television show "The Ultimate Fighter." But this week the company notified much of its approximately 70-member sales force that it would be firing them due to financial setbacks, and this has led to speculation it would soon file for bankruptcy.

The firings come after Xyience had experienced a remarkable run of success, drawing another $12 million in investment as recently as one month ago. The brand is viable, sources say, as it has high name recognition in the crowd of young men who support the fast-growing UFC.

"It's a great brand, and the folks out at retail really identify with it," said Earl Kight, head of sales at San Diego-based Mesa Distributing. "We were very careful and patient with it and we'll continue to be patient with it now."

That support may not carry over to investors, who earlier this year ousted the company's founder, Russell Pike. Pike, facing rumors of lawsuits and bad publicity reported on largely by the sport's rabid Internet following, was forced out in January. After installing a temporary CEO and president, one of the company's primary investors, Adam Frank, recently became CEO.

Meanwhile, the company's sales kept rising -- although those sales may not have kept up with a marketing outlay that involved television commercials, models, and the ongoing sponsorship of a sporting confederation whose surging popularity must be making it increasingly more expensive.

"They were spending so much on marketing that we didn't even have Point-of-Sale" materials, said one laid-off salesman. "The tie in with UFC is incredible, but there are a lot of issues."

That tie-in may be in jeopardy itself, however, as several of the UFC's top fighters have begun to distance themselves from Xyience products. Despite the lack of individual sponsorship, however, it remains, with Toyo Tires and Mickey's Malt Liquor, one of the league's three main sponsors.

**Source: BevNET.com Staff**

# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| IN RE GLOBAL CASH ACCESS HOLDINGS, INC. SECURITIES LITIGATION | Case No. 2:08-CV-01320-JCM-PAL |

# NOTICE OF PENDENCY OF CLASS ACTION, PROPOSED SETTLEMENT, AND HEARING ON PROPOSED SETTLEMENT AND REQUEST FOR ATTORNEYS' FEES AND EXPENSES

**If you purchased or otherwise acquired common stock of Global Cash Access Holdings, Inc. ("GCAH" or the "Company") from September 22, 2005 through November 14, 2007, inclusive ("Class Period"), you might be a member of the Class in this Action entitling you to relief in connection with a proposed Settlement of the Action.**

*A federal court authorized this Notice. This is not a solicitation from a lawyer.*

- The Court has preliminarily approved the settlement ("Settlement") of a securities class action brought by investors who claim that there were misstatements and omissions of material fact in the prospectuses and registration statements by which GCAH's common stock was offered and sold to the public, in violation of the federal securities laws (the "Settlement").
- The Settlement is between the City of Richmond Retirement System ("Lead Plaintiff"), on behalf of itself and the Class (defined below), and Defendants (i) GCAH, Kirk Sanford (former President, Chief Executive Officer, and member of the GCAH Board of Directors ("Board")), Harry C. Hagerty, III (former Executive Vice President and Chief Financial Officer of GCAH), Walter G. Kortschak (a Board member throughout the Class Period), Charles J. Fitzgerald (a Board member throughout the Class Period), E. Miles Kilburn (a Board member throughout the Class Period), William H. Harris (a Board member throughout the Class Period), Karim Maskatiya (co-founder of Global Cash Access, Inc. ("GCA") and co-Chairman of both its Board of Directors and the GCAH Board throughout the Class Period), Robert Cucinotta (co-founder of GCA and, throughout the Class Period, a Board member of both GCA and GCAH), Summit Partners L.P. (a private equity and venture capital firm, which sold portions of its GCAH stock during the Class Period), and M&C International (a company wholly owned by Defendants Maskatiya and Cucinotta, which sold portions of its GCAH stock during the Class Period) (collectively, the "GCAH Defendants"); (ii) Goldman, Sachs & Co., J.P. Morgan Securities Inc., JPMorgan Chase & Co., Banc of America Securities LLC, Citigroup Global Markets Inc., Cowen and Company, LLC, Deutsche Bank Securities Inc., and Wachovia Capital Markets, LLC (collectively, the "Underwriter Defendants"), each of which served as an underwriter in connection with GCAH's Initial Public Offering on September 22, 2005 and/or GCAH's Secondary Offering on May 25, 2006; and (iii) Deloitte & Touche LLP ("Deloitte"), GCAH's outside auditor during the Class Period. The GCAH Defendants, the Underwriter Defendants, and Deloitte are referred to collectively as the "Defendants."
- The Settlement provides for $5,875,000.00 to be paid into a Settlement Fund (the "Settlement Amount"). After payment of fees and expenses, the remaining Settlement proceeds will be distributed to members of the Class who submit acceptable Proofs of Claim.
- The two sides disagree on Defendants' liability and the amount of money, if any, that could have been recovered if Lead Plaintiff won at trial.
- If the Settlement is approved, Lead Plaintiff's counsel will move the Court for an award of attorneys' fees totaling 18% of the Settlement Amount ($1,057,500), and up to $250,000.00 in reimbursement of expenses incurred in the prosecution of this Action.

- The Settlement was reached because it provides significant benefits to investors, avoids the costs and risks of continuing the lawsuit against Defendants, and relieves Defendants from the continuing costs and distractions of the lawsuit.
- If you are a member of the Class and the Settlement is approved, your legal rights will be affected whether you act or not. Read this Notice carefully to see what your options are.

| YOUR LEGAL RIGHTS AND OPTIONS IN THE SETTLEMENT | |
|---|---|
| **SUBMIT A CLAIM FORM POSTMARKED BY JULY 24, 2010** | This is the only way to get a Settlement payment. If you wish to participate in the Settlement, you must complete and timely submit the Proof of Claim form provided with this Notice. |
| **EXCLUDE YOURSELF (BY WRITTEN NOTICE POSTMARKED BY JUNE 4, 2010)** | If you exclude yourself, you will no longer be a member of the Class and will not be eligible to participate in the Settlement. This is the only option that allows you to ever be part of any other lawsuit against the Released Defendant Parties regarding the Released Claims (defined in response to Question #9 below). |
| **OBJECT (BY JUNE 4, 2010)** | If you do not exclude yourself, but you wish to object to any part of the Settlement or the application for fees or expenses, you may write to the Court about your objections. |
| **ATTEND THE FAIRNESS HEARING (ON JUNE 25, 2010)** | You may (but do not have to) attend the hearing about the Settlement and, if you have submitted a written objection to the Court, speak to the Court about your objections. |
| **DO NOTHING** | You will get no payment and you will give up your rights. |

- These rights and options—**and the deadlines to exercise them**—are explained in this Notice.
- The Court in charge of this case still has to decide whether to approve the Settlement. Payments will be made only if the Court approves the Settlement and that approval becomes final (including through its affirmance in any appeals). Please be patient.

## SUMMARY NOTICE

Statement of Plaintiffs' Recovery

Pursuant to the Settlement described herein, a Settlement Fund consisting of $5,875,000 in cash has been established. Of this amount, $5,000,000 was contributed by GCAH's insurance carrier on behalf of the GCAH Defendants, and $875,000 was contributed by Deloitte. Lead Plaintiff's counsel estimates that the average recovery per damaged share of GCAH common stock under the Settlement is $0.107 before deduction of Court-awarded attorneys' fees and expenses, and $.083 after those deductions. A Class member's actual recovery will be a proportion of the Net Settlement Amount (as defined below) determined by that claimant's Recognized Claim (as defined below) as compared to the total Recognized Claims of all Class members who submit acceptable Proofs of Claim. An individual Class member may receive more or less than the average amount, depending on the number of claims submitted, the timing of the Class member's purchases and sales, the purchase price paid for the shares, and the amount received upon any sale of the shares. *See* the Plan of Allocation set forth in response to Question #11 below for more information about your Recognized Claim.

Statement of Potential Outcome of the Case

Lead Plaintiff and Defendants do not agree on the average amount of damages per share that would have been recoverable if Lead Plaintiff were to have prevailed on each claim asserted. The issues on which the parties disagree with respect to the amount of damages include: (1) whether and to what extent GCAH's prospectuses and registration statements during the Class Period contained untrue statements of material fact or omitted material facts; (2) whether Defendants have valid defenses to any of the claims against them; (3) whether and to what extent shares purchased during the Class Period are "traceable" to a registration statement containing untrue statements of material fact or omitting material facts; (4) whether Lead Plaintiff and other Class members can establish standing to sue particular defendants; and (5) the extent to which any declines in value of GCAH's stock during the Class Period are attributable to allegedly untrue statements or omissions in GCAH's prospectuses and registration statements.

Statement of Attorneys' Fees and Costs Sought

Lead Plaintiff's counsel will move the Court for an award of attorneys' fees of 18% of the Settlement Amount ($1,057,500), plus interest, and for reimbursement of expenses incurred in connection with the prosecution of this Action in the approximate amount of $250,000.00. The requested fees and expenses would amount to an average of approximately $0.024 per damaged share. Lead Plaintiff's counsel has expended considerable time and effort in the prosecution of this litigation on a contingent fee basis, and has advanced the expenses of the litigation, in the expectation that if it were successful in obtaining a recovery for the Class, it would be paid from such recovery. In this type of litigation it is customary for counsel to be awarded a percentage of the common fund recovery as its fee.

Further Information

Further information regarding the Action, the Settlement, and this Notice may be obtained by contacting Lead Plaintiff's counsel, Mary S. Thomas, Esq., Grant & Eisenhofer P.A., 1201 N. Market St., Wilmington, DE 19801; (302) 622-7000.

Reasons for the Settlement

Lead Plaintiff agreed to the Settlement because of the monetary benefit it will provide to the Class, compared to the risk that recovery might not be achieved after a contested period of litigation, which could extend years into the future. Even if Lead Plaintiff were successful at trial, Defendants might be unable to pay a judgment at that time or the insurance proceeds presently available to Defendants may have been dissipated. Alternatively, Defendants might well appeal any verdict adverse to them, resulting in further uncertainty and delay.

Defendants agreed to the Settlement to settle and terminate all existing or potential claims against them, to eliminate the risk of the lawsuit, and to avoid the burden and expense of further litigation, without acknowledging any fault or liability.

# Exhibit 6

Tuesday, March 25, 2008

# XYIENCE seemed to have it all ... what went so WRONG?

***Buddies from high school high-profile investors ties to the popular UFC***

BY JOHN G. EDWARDS

t seemed odd when attorneys for a company controlled by Russell Pike filed a lawsuit in 2001, accusing PurchasePro.com and its chief executive, Charles "Junior" Johnson, of stealing Pike's business plan for an Internet auction company.

Pike was then serving a five-year sentence in federal prison for money laundering. An angry Johnson fired off a statement, denying the lawsuit's allegations. He pointed to a criminal conviction and civil judgments against Pike. The lawsuit was later dismissed.

Since then, PurchasePro has failed, Johnson has been charged with securities fraud, and Pike has become a central player in the story of another once-hot company that has landed in bankruptcy court.

This is the story of Xyience, a private company Pike founded and once managed as CEO. Xyience makes and distributes nutrient supplements, but is best known as the maker and distributor of the energy drink Xenergy, a key sponsor of the Ultimate Fighting Championship, a popular televised series of mixed martial arts contests.



CLINT KARLSEN/REVIEW-JOURNAL
Xyience President and Chief Operating Officer Omer Sattar, right, and Chief Financial Officer Michael Levy stand inside the company's warehouse.

Criminal charges have yet to be filed in the Xyience case. Still, it has attracted notoriety, partly because of its ties to UFC owners Frank and Lorenzo Fertitta, whose family founded Station Casinos.

Early days

Former Xyience director Michael Clark, owner of MJC Construction, has no interest in watching bloody UFC fights, but he was an early believer in Xyience and the company's energy drink.

Clark was also impressed by the

When it comes to affordability
HEALTH PLAN OF NEVADA
A UnitedHealthcare Company
HPN means business.

founding CEO.

"Russell and I are friends," he said. "Russell was a very intelligent man, very smart. He was probably the driving force behind Xyience." Yet, Clark also said Pike bears some blame for Xyience's downfall.

The company, for instance, showed little financial discipline, said Clark, who also said he served as a former, but unsalaried, president of Xyience.

"There weren't good checks and balances put in place," he said, citing the year that Xyience spent $50 million on marketing as an example.

Operations of the company, founded in 2004, began to come under fire. Some of Xyience's 300 shareholders sued the company in December. The lawsuit claims that shareholders were denied any voice in the company's operations.

"We really never had a board meeting until the end, until the very end," Clark said. That board meeting was called in January 2007 and ended with Clark and other dissidents leaving the board at the request of Xyience.

The company also came under fire from California officials toward the end of 2007.

**California cracks down**

The California Department of Corporations said Pike illegally sold 1.5 million shares of the private company and raised $2.1 million from California residents. The corporations department in September filed a desist-and-refrain order against Pike, ordering him to stop selling Xyience shares in the state.

The California department's order listed a series of misdeeds:

• In a 2006 private placement document, Xyience advised investors that "management does not believe there are any material (lawsuits) to be concerned with." Yet in June 2006, Xyience shareholder GIG Enterprises sued, claiming Pike, the Pike Family Trust and Xyience engaged in civil racketeering and broke contracts. GIG asked that a receiver be named for Xyience.

• A 2005 investment document said Pike was a successful entrepreneur who founded Advanced Cart Technology. But Advanced Cart filed for bankruptcy in the late 1990s. The company was discharged from bankruptcy in 1998.

• Xyience and Pike failed to disclose that The Mirage sued Pike for writing $300,000 in checks over two days from an account with insufficient money. The Mirage won a default $300,000 judgment plus interest.

• The documents didn't reveal that Advanced Cart stockholders in 1997 sued Pike, alleging that Pike made false statements to persuade them to invest in the company. Pike signed a judgment agreeing to return the investors' money plus interest, according to the California department.

• Xyience didn't tell investors that PriMerit Bank in 1996 won a default judgment against Pike and Advanced Cart for not repaying a $2.4 million loan.

• The energy drink company didn't disclose that Pike was charged with grand theft and forgery in Orange County, Calif., in 1987. He later pleaded guilty and received a prison sentence.

In a phone interview, Pike said an attorney for the company failed to file registration papers with California officials and said some documents didn't include required disclosures.

More with less

Other details about the Las Vegas-based company's rise and fall have emerged from bankruptcy court documents filed by the company's current president, Omer Sattar.

Other details about the Las Vegas-based company's rise and fall have emerged from bankruptcy court documents filed by the company's current president, Omer Sattar.

Xyience started with $109,000 sales in 2004 and drove sales to $20.4 million by 2006.

But the company always was trying to find more money to expand and exploit the national energy drink markets.

Xyience got a boost in May 2006 when it received a $21 million equity investment from the Brush Monroe Fund, a private equity group. Then, Brush Monroe bought $10 million in convertible debt from Xyience.

Pike raised more money from private placements, according to Sattar. In late 2006, Xyience retained ARC Investments to help it raise money, which resulted in a $5 million convertible loan from Darlis Investments.

Pike resigned shortly afterward, but by then problems were mounting at Xyience, which owed $25 million to trade creditors and $18 million to lenders. The company also had boosted its staff to 88 workers.

The company needed $8.5 million in sales monthly to break even, according to Sattar.

After February 2007, a receiver appointed by the Securities and Exchange Commission took over ARC assets and sold AA Capital's investment in Xyience to Key Management of Tortola in the British Virgin Islands. Patrick Brauckmann and Adam Roseman owned Key Management, according to a lawsuit filed by Xyience shareholders.

Restaurateur Mike Underhill became CEO and Jan Hall became president and chief operating officer.

The new executives planned a $29 million marketing program to roll out Xenergy nationally. The senior officers, however, were unable to raise money from investment banks and a private equity fund, and the two executives resigned in May.

A Station relation

Adam Frank and Kirk Sanford were then named to lead the company. Frank was named interim general manager, and Sanford was designated a special adviser, according to Sattar.

Sanford also was CEO of Global Cash Access Holdings, a Las Vegas company that has had business relations with Station Casinos. In February 2006, Global Cash announced that it signed agreements to install automated teller machines in 13 Station Casino resorts.

Xyience's links to the Fertittas go back to Gorman Bishop High School, where the Fertitta brothers and Pike's wife, Jennifer, were students, Clark said.

In October, Sanford retired as CEO of Global Cash Access Holdings as the company investigated claims of improper activities. Global Cash issued a statement in December saying an investigation uncovered no evidence of fraud or misconduct.

Also in October, the Fertittas' company Zyen loaned Xyience $12 million. Sattar said Xyience managers and 60 percent of its shareholders approved the $12 million deal.

The shareholders' lawsuit in December claimed the $12 million was used to pay a debt that Xyience owed the UFC and to pay $500,000 that Xyience owed Frank and Sanford.

Shareholders rebel

Xyience tried to negotiate additional financing from a group of shareholders, but the negotiations failed because of intimidation and threats from Pike and others, according to Sattar.

In his filing, Sattar said dissident shareholders in December barged into

Chief Financial Officer Michael Levy's office, demanded cash and made a death threat.

Pike called Sattar's claims "totally false" and said he hasn't been to Xyience's offices since the company moved to its current location at 14572 W. Hacienda Ave. Nor has he communicated with Xylence recently, he said. "They said I was sending my crew (to Xyience). I don't have a crew," Pike said.

The company's troubles came to a head in early January when Pike and others filed for an involuntary bankruptcy judgment against Xyience. That action was dismissed when Xylence filed a voluntary Chapter 11 bankruptcy petition later in the month listing Xyience's liabilities at $42.3 million with $5.3 million in assets.

Xylence continues to operate thanks to a $2.6 million loan from the Fertittas. The company also has found a "stalking horse" bidder, Manchester Consolidated Corp., which is affiliated with Manchester Capital, a merchant banker and investor in small growth companies.

Manchester Consolidated will pay $15 million for Xyience if no other bidders top that price.

**Risky business**

Clark is pessimistic about recovering the $800,000 in unsecured loans he made to Xyience or getting anything for the seven million shares in Xylence shares he owns.

That once represented about one-third of the outstanding shares of the private company, Clark said. Yet, the company has repeatedly issued new shares, and Clark estimates that his shares represent only a 5 percent to 7 percent stake in Xyience today -- but that may not matter.

Greg Garman, attorney for Zyen, the Fertitta company that made loans to Xylence, has predicted nothing will be left for shareholders when the company emerges from bankruptcy. Bankruptcy attorneys also question whether much will be left for unsecured creditors.

Xylence started collapsing about the time Clark saw the value of his real estate investments shrink. He struggles to make money from commercial construction today but sheds no tears over losses at Xylence.

"We're grown men," Clark said. "We take a risk in business.

John G. Edwards writes for the Business Press' sister publication, the Las Vegas Review-Journal. He can be reached at jedwards@reviewjournal.com or 383-0420.