RECEIVED
AND FILED

NOV 2010

U.S. BANKRUPTCY COURT
MARY A. SCHOTT, CLERK

Rich Bergeron
PO Box 5212
Weirs Beach, NH 03247
Telephone: (617) 209-4325
Defendant as Pro Se Attorney

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In Re:<br><br>XYIENCE, INC., A Nevada Corporation<br><br>Debtor. | No. BK-S-08-10474-MKN<br>Chapter 11<br><br>Eighth Judicial District Court<br>Las Vegas, Clark County, Nevada<br>Case No. A544781, Dept. XXIII |
| XYIENCE INCORPORATED, a Nevada Corporation,<br>Plaintiff,<br><br>v.<br><br>RICHARD BERGERON, an individual<br>Defendant. | CASE NO. BK-2-08-AP-01082-MKN<br><br>DEFENDANT AND COUNTER-CLAIMANT RICH BERGERON'S BRIEF AND MEMORANDUM OF FACT IN SUPPORT OF DEFENDANT AND COUNTER-CLAIMANT'S MOTION FOR SUMMARY JUDGMENT |
| RICHARD BERGERON, an Individual,<br><br>Counterclaimant,<br><br>v.<br><br>XYIENCE INCORPORATED, a Nevada corporation<br><br>Counterdefendant | Hearing Date:<br><br>Time: 9:30 AM<br><br>Location: 300 Las Vegas Blvd. South<br>Courtroom #2<br>Las Vegas, NV 89101 |

**BRIEF AND MEMORANDUM OF FACT IN SUPPORT OF DEFENDANT/COUNTER-CLAIMANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION:**

Defendant and Counter-claimant Rich Bergeron (hereinafter, "Bergeron") respectfully submits this brief and memorandum of fact in support of the dispositive motion for summary judgment filed herewith. The designated record demonstrates the absence of genuine issues of material fact and Bergeron's entitlement to judgment as a matter of law.

Debtor/Plaintiff/Counter-defendant Xyience, Inc. (hereinafter "Xyience" or the "Estate"), removed this action From Nevada District Court to the bankruptcy courts on March 20, 2008 and since made no effort to compel a scheduling conference, to provide evidence for the docket independent of the initial frivolous claim's unfounded evidence, or to sufficiently deny the responsibility of Xyience for the defamatory campaign against Bergeron to undermine him to shareholders with lies. This case's scheduling conference has been continued ten (10) times and was finally vacated on February 24, 2009 (See Docket #161). Absolutely no action has been taken by any party, and no judge or clerk made any entries on the docket since December of 2009.

As to the initial case against him, Bergeron has been sought out by the liquidation trustee's counsel Jon Backman and provided actionable information crucial to his ongoing cases against their common adversaries. This information was provided freely and without payment or reward or promise of settlement. Bergeron met with Backman on a trip financed by Backman (paid for by Pay-Pal transfer to Bergeron by Backman's law office, *see exhibit* 1) that involved Bergeron traveling to Bloomington, IL and discussing the case at length with Backman over a period of 2-days. Bergeron handed stacks of information and documentation to Backman when they met. Bergeron accepted only a fair value stipend for the trip costs and provides receipts and documentation of the trip attached to his affidavit in support of this Motion.

The Trustee and his counsel have made no efforts to dismiss or prosecute the $25 million claim against Bergeron that gave rise to this instant case. Xyience's initial Bankruptcy attorneys (who have been fully paid out already as part of the bankruptcy) have, throughout this case, done nothing but delay these proceedings. Backman's very first communication with Bergeron by email agreed with Bergeron's contention that there was no reason for the Estate to continue the case

against him (*see exhibit 2*). Backman knew the initial case was not worth pursuing but never made a single move to voluntarily dismiss the action despite several inferences that he would do so, independent of settlement discussions and conditions. There is no valid reason for Backman to engage in these delays. Backman engaged himself with Bergeron as an advocate of the company concerned about finding every claim possible against every possible defendant, yet he refused to recognize the clear culpability of firms like Fennemore Craig and attorneys Laurel Davis and Jon Pearson along with Firm Director John Mowbray. Backman seemed reluctant to admit the shareholders had rights to recovery as well, and powerful rights at that. Backman was particularly ignorant of the powers of Rule 9011 and its treatment as a veritable abuse of process claim.

These individual and collective attorneys mentioned above, working on Xyience's dime, got paid to defraud the original shareholders of Xyience, plain and simple. They purposely bankrupted Xyience knowing their actions would steal the company from the rightful shareholders. They coordinated with other lawyers and business entity representatives to do so, and they used the work of Fertitta Enterprises attorneys primarily to piggyback off of with joinders they filed against Bergeron's motions throughout this litigation. They did so without doing any independent investigation of the facts.

This false litigation stream is defamation by proxy, immune to legal precedents insulating actual pleading statements from admissibility in defamation cases. In every sense of the spirit of defamation laws, Xyience is culpable for pursuing this blind, purely superficial case for three years. The fact that this company did so even when the Trustee and other lawyers before him always knew the whole case was bogus certainly qualifies for relief under defamation standards.

Attorney Jon Backman knows the original shareholders were defrauded by these other individual and collective attorneys, persons and entities, and he knows exactly how. This is thanks in part to Bergeron, but Backman never raised a legal finger to protect the shareholders Bergeron is fighting for. He never raised a threatening legal hand against many of the parties named individually and collectively in Bergeron's sanctions motion that is still pending before this court.

Unfortunately, Backman now not only refuses to pursue the guilty legal representatives, he also takes the additional and unacceptable step of seeking to defend and insulate them.

The attached summary judgment request applies only in relation to Xyience as a party and the bankruptcy estate's ultimate culpability for defamation. Xyience's Liquidation Trustee is in the

process of hammering out a settlement on the Rule 9011 motion still pending that Bergeron requests to amend with a motion accompanying the attached Motion for Summary Judgment. He will remove Xyience and seek to add Michael Levy as a co-conspirator in the abuse of process and the fraudulent bankruptcy.

By way of this motion and the attached motion to amend, Bergeron seeks to allow the estate an ample and fair opportunity to make amends in this matter. The estate itself, which cultivated a look the other way attitude throughout this case's road through bankruptcy, would be eschewed from all ongoing claims if both motions are approved. This scenario will benefit the estate and the liquidation trustee in the long run. The requested relief being granted will go a long way in helping the estate and Bergeron focus primarily on the pursuit of the individuals and entities (including the legal representatives and their firms) who are truly responsible for destroying Xyience for the benefit of Fertitta Enterprises and a select few insiders. This cabal engaged in the destruction with direct intent to profit off the demise of all shareholder interest in the pre-Zyen, LLC corporation.

Bergeron would like to remove Xyience from these claims and let it continue and finish the bankruptcy process independent of this case's distractions. All that should remain upon approval of this request, if granted by the court, would be the abuse of process claim represented by the Rule 9011 motion and pertaining to those named already as adversaries and those Bergeron requests to add as parties to that motion. Only Xyience would be excluded as a party, a solution designed so that the liquidation trustee can focus on bringing some of the common adversaries he shares with Bergeron to justice through his more admirable efforts before this court.

Bergeron has become an expert on the downfall of Xyience, the surrounding nuances of fraud related to selling of Xyience shares, the SEC involvement in related matters, and the IRS prosecution of Xyience Founder Russell Pike for tax evasion. He has been interviewed for his online and pro-se activism related to the instant case and spoken out far and wide about the ruthless, illegal and unethical behavior of the Fertitta family, Fertitta Enterprises and Zuffa. Station Casinos, also controlled primarily by the Fertitta Family, is the ultimate result of the old phrase "practice makes perfect." The same stalking horse bidder setup involved in that company's bankruptcy belies the fact that Xyience's bankruptcy was a trial run for the casino chain's collapse. There are more than a few parallels regarding insider dealing, fraud and corruption between both cases.

The Fertittas set themselves up for their casinos to crash and burn knowingly, always

intending to bankrupt the company and buy it back. They did the same thing with Xyience through Fertitta Enterprises with an elaborate scheme involving Manchester Consolidated. Manchester Consolidated defaulted purposely on their "stalking horse bidder" payment agreement with Zyen, LLC—now a Fertitta Enterprises entity once again (*see Exhibit 3*)—so Fertitta Enterprises would have complete control over a sponsor of another company the Fertittas own a majority interest in (Zuffa, LLC). The Xyience bankruptcy came first, and getting through this process relatively unscathed thus far obviously convinced the Fertittas they could get away with a bigger bankruptcy in the same court system.

The Fertitta Family is using Xyience and betrayed the company's shareholders to make a buck for themselves and their other companies. They own Xyience now, and as a result they also own the liabilities they produced by way of their cruel bankruptcy scheme. The company at all times sought to abuse the process and defame Bergeron to keep the shareholders wary of cooperating with him. Bergeron has had to fight for years for his own reputation and for some relief for these burned investors who had every reason to believe Xyience would succeed. They were told by everybody and anybody in a position of power at Xyience, including all those who collaborated to bankrupt it, that the association of Xyience with the UFC would someday carry the public stock to unbelievable heights. Instead, it is that very association that devalued Xyience and made the company's shares useless.

The structure was there at the time investors were told all these lies. The association between Zuffa and Xyience was purposely represented as solid and unwavering. A bevy of popular UFC fighters were at the time sponsored by Xyience including Chuck Liddell, Anderson Silva, and BJ Penn. After the bankruptcy only one fighter from the pre-bankruptcy sponsorship roster came back to the Xyience team: Matt Serra. Why?

Part of the bankruptcy involved Fertitta Enterprises making purposeful moves to make Xyience pay the company UFC sponsorship before squaring up debts Xyience owed to its own sponsored fighters. In other words, the Fertittas, through Zyen, LLC, made sure virtually all the money they put in as a promise to bail out Xyience and its shareholders went back into their own pockets (to the tune of tens of millions of dollars). Meanwhile they cheated their own fighters out of less than a couple million bucks in outstanding sponsor contract money in total due to all fighters sponsored at that time or still owed for previous contracts. They also at the same time neglected to

pay for a stockpile of Xenergy created by Cott. The reasoning for refusing the Cott payment was primarily due to a marketing agreement that should have been easily hashed out if the interest was really to keep the company viable and not simply to line the already deep pockets of the Fertitta Family.

Why would the Fertittas screw their own UFC fighters sponsored by Xyience, though? It wasn't about simply getting their own money back. No, it was more devious than that. They also used the Xyience sponsorship payment plan they set up themselves to create a false bidding war for the middle of the mat sponsorship space now held solidly by Bud Light. The Xyience logo formerly in that position went away due to a defaulted Xyience sponsor contract which collapsed not long after it was made. Xyience was set up to fail by Fertitta Enterprises, and the Fertittas made wads of cash off that failure. Other companies like Bud Light and Harley Davidson would have to put in higher bids to replace the Xyience logo with their own even though the Fertittas knew Xyience would never be able to afford those premiums.

It has been the culture at Xyience to play off Bergeron's reports as conspiracy theories or off the wall blogging. He's been called homosexual at worst and "Lead Attorney" at best throughout he process of defending himself and launching his own counter-suit and claims through Rule 9011. Bergeron has recently been connected to a company insider who reported to him that someone has been hired at Xyience to knock Bergeron's Xyience page (www.xyiencesucks.com, www.unlimitedfightnews.com/xyience.htm) off the first page of Google search engine results for "Xyience" (*See Exhibit 4*). This individual Xyience is said to be hiring for this task is reportedly being paid $25,000.

Rather than confront and address the facts, the company attitude is still directed at downplaying the facts and reports Bergeron created over the years. There is no accountability from the actual perpetrators of the fraud that led to Bergeron's reports, and as a result Bergeron is being scapegoated throughout the company to this day as the person responsible for falling sales and other issues with the business' reputation.

Meanwhile, those who used to denounce Bergeron in the Online press now embrace his reporting and back it up with some of their own. Sites like Fightopinion.com devoted entire columns and radio show segments to discussing this case. Knoqout.com just recently interviewed Bergeron as well. Bergeron has additionally been consulted by the attorneys for the PRIDE organization

regarding civil litigation against ZUFFA, LLC and worked with the IRS and SEC in the early stages of his Xyience investigative reporting. To this day people still contact Bergeron to discuss new wrinkles and connections of parties and individuals involved in or connected to Xyience's bankruptcy. Most recently, Bergeron received several detailed messages from a business owner in India who complained of being defrauded by Xyience co-conspirator Karim Maskatiya.

The extensive fraud and collusion of the conspiring parties in this case belies their connection to other fraud Bergeron since uncovered. Those involved or loosely connected to the fraudulent bankruptcy process all seem to have thick litigation jackets and appetites for destroying companies. The evidence of their past and continues impropriety is tremendous. Some parties have engaged in fraud prior to as well as after being engaged in or connected to the fraudulent bankrupting of Xyience. This is a culture of corruption fed by every single pass they get from every court someone tries to bring them all to justice in collectively or individually. These parties know armies of lawyers must be employed to delay and deny justice, destroying and decrying the adversary in the process who can't afford legal fees of their own to fight back. Since Bergeron represents himself this aspect of their usual approach has not been much use to them, but they still tried to employ it at every turn.

Bergeron has been a persistent victim of the false characterizations made by those associated or connected to the core operators of Xyience and their legal teams since before these proceedings were even instituted in Clark County District Court. The abuse of process and damages from the affirmed defamation of his character is extensive and ongoing. The abusing of the bankruptcy process to deny Bergeron appropriate recourse and relief he seeks for both himself and the company's rightful shareholders is only furthered by the actions and inaction of Liquidation Trustee David Herzog and his Counsel (Jon Backman). These lawyers should both know better and operate on a higher plane of ethical responsibility than the devious and plainly guilty attorneys they seem to want to protect rather than prosecute.

All those in any position to direct the Xyience case have persisted with or refused to dismiss claims they know they cannot prove and charges they know should have never been filed in the first place. They have wasted the court's time on purpose and disadvantaged Bergeron every step of the way by refusing to dismiss the initial case.

This is ultimately a case where the estate definitively bears liability for what Bergeron has been put through in these proceedings for simply standing up for the truth and reporting it earnestly

even while fighting false and baseless legal allegations designed to cripple his finances and shatter his efforts to right a major injustice. Even after Bergeron went out of his way to provide assistance of his own free will and without promise of any reward or other considerations, the Estate's representatives refused to act in any timely manner to dismiss the claims against him.

Backman and Herzog knew the claims against Bergeron were false and could not be sustained moving forward. Evidence they presented on their own behalf in their other adversary cases in addition to the evidence Bergeron provides through affidavits of his own and those of Xyience shareholders proves that in a perfect world the estate and Bergeron would have and should have worked together. If they had done just that they could have more easily implicated the true perpetrators: each and every party involved in destroying and dismantling this company from day one of the bankruptcy planning.

The courts should never be abused so horribly by those put in positions of such great "trust" as lawyers like Backman and Herzog. They should not be permitted to provide rewards to those they should know had a hand in failing to investigate fraud that was easy to see from early on in the bankruptcy process. Xyience as an entity and an estate is culpable and liable for costs associated with the effects of these abuses of process and the defamation that can be directly connected to efforts to discredit Bergeron and his honest reporting. His life has been altered in a way he can never truly quantify with any cash value, but under the circumstances the $175,000 judgment he requests is a modest offering. It is designed to streamline this case and center on the many more even more culpable and liable adversaries surrounding his Rule 9011 sanctions requests.

**A. Statement of Material Facts Not in Dispute**

1. The Debtor/Counter-defendant, Xyience, Inc. (Zyen, LLC) is a Nevada corporation with its principal place of business (during the events at issue here) in Las Vegas, Nevada.
2. After its founding by Mr. Russell Pike in May 2004, and during all times material hereto, Xyience was engaged in the production, sale, marketing, and distribution of, among other things, energy drinks, fitness supplements, nutritional products, and apparel that were distributed around the United States and Canada.
3. Xyience's principal line of business became the sale and marketing of specific popular

supplements and its energy drink (Xenergy ™) which the Debtor advertises largely through its sponsorship of the Ultimate Fighting Championship (the "UFC").

4. The company's Xenergy division additionally coordinates contests with Harley Davidson, another UFC sponsor, not coincidentally.
5. Xyience initially intended to sell off this Xenergy portion of the company as a separate division.
6. This Xenergy sale was said by Pike and others at Xyience to be a move major soft-drink makers might take at the height of the energy drink market's popularity to corner the market on a promising brand like he always presented Xenergy as.
7. Until November 2007, Mr. Pike was the CEO and President of Xyience. He remained Chairman of the Board of Xyience until February 21, 2007.
8. Beginning in January 2006, Xyience had approximately thirty five million shares outstanding.
9. In April 2006, Xyience retained AA Capital Partners ("AA Capital") to provide it with debt and equity financing, management services, investor relations advice, and other financial advisor services.
10. AA Capital formed investment funds, including the Brush Monroe Partners, L.P. Fund ("Brush Monroe"), which was made up specifically to hold an investment in Xyience.
11. On or about June 7, 2006, Brush Monroe — through AA Capital —invested $22 million in equity (for what ultimately became 7.3 million shares), and another $10 million in a convertible note (the "Brush Monroe Note"), for a total investment of $32 million in Xyience.
12. AA Capital's complete collapse came not long after this mysterious investment orchestrated by John Orrechio ("Orrecchio"), and SEC documents provide a glaring and stunning glimpse at their own lack of depth to the investigation of Xyience's involvement in the company with words that explain not all of that investment money went to Xyience. (*See exhibit 4*)
13. Under the terms of the Brush Monroe Note, the note became due on October 1, 2006, and upon default, the Note was convertible, in February 2007, into approximately 13.5 million shares of Xyience stock.
14. In September 2006, AA Capital and its managing director, Orecchio, were sued by the Securities and Exchange Commission in an action styled SEC v. AA Capital Partners, Inc. and John Orecchio, Case No. 06 C 4859, U.S. District Court, Northern district of Illinois ("SEC Action"). (*See Core BK Case 08-10474-mkn-Doc-464 for full explanation of how these stocks were sold*

*out of receivership so the proceeds would not benefit Xyience*)

15. Bergeron had no personal involvement in the operations of Xyience. Poor management and organization mixed with fraud, improper and unethical behavior, and excessive spending on marketing caused Xyience to lose $25 million in investments they blame Bergeron for losing them in their initial complaint.

16. Fraud bankrupted Xyience, and the conspiracy to commit this extensive, multi-level fraud is mind boggling in scope and spread, especially considering the various connections to other inter-connected fraud that is global and based on cash machine transactions and technology that have international money laundering implications.

17. Players brought in by and including Kirk Sanford ("Sanford") and Adam Frank ("Frank") (the lone Xyience affiant via declaration who ever presented any adversarial evidence to Bergeron's in these matters thus far) failed on purpose to raise any substantial additional funds for Xyience. As a result, the company suffered, among other things, millions to tens of millions of dollars of damages through lost sales, dilution of its stockholders, damage to its credit rating and additional debt being incurred by way of further encumbrances to the UFC and Zuffa Marketing.

18. Bergeron himself brought in Robert Lavan ("Lavan"), a Standard General (investment firm) representative, to meet with Frank and Sanford on November 17, 2007 when they all met in a New York City hotel restaurant in Times Square. Documents filed in the bankruptcy would later explain that Sanford and Frank sought financial help from Standard General on their own with no reference to Bergeron's introduction.

19. The reference in bankruptcy paperwork also failed to explain that Sanford and Frank gave Lavan absolutely no positive motivation to invest in Xyience seeing as they repeatedly explained the best course would be to bankrupt the company and go "scorched earth," as Sanford termed it.

20. Bergeron never personally defamed Xyience. He always intended to help the company move away from the fraud associated with it and in the aftermath of the bankruptcy to help the shareholders who built the company with their initial investments recover some portion of the company's net worth and/or ultimate lifetime value.

21. Bergeron allegedly printed an email message on one of his MySpace profiles he received from a third party, which was the subject of defamation claims initiating this case. That profile no longer exists. The contentions contained within the email have also since been proven to be true.

22. The other publications listed as defamatory in all the supporting documents regarding the initial Jamie Cogburn complaint and supporting "evidence" are nothing of the sort.
23. The SEC did investigate Xyience to some extent as it relates to AA Capital, yet Xyience's initial case maintains that it was defamation for Bergeron to state that Xyience was being investigated by the SEC.
24. Xyience secured an injunction against Bergeron preventing him from reporting the truth.
25. During the whole of the instant case's time in bankruptcy court, no attorney or firm representing Xyience sought to significantly advance this matter favorably for Xyience or contribute any meaningful work to this case.
26. Xyience sent an official "roper" to investors prior to the bankruptcy, but after the company received an order from the district court regarding a preliminary injunction against Bergeron. This roper defamed Bergeron (See Docket #s 106-110) on behalf of Xyience.
27. Xyience took direct moves toward bankruptcy only after the Bergeron injunction (allowed by a judge who was endorsed by Station Casinos) became a reality and Bergeron's legal issues prevented him from doing much reporting on the subject.
28. Just one day after a preliminary injunction became official in this case on September 13, 2007, a funding consent letter went out to shareholders seeking ratification of a $12 million loan agreement between Fertitta Enterprises and Xyience.
29. Bergeron is an experienced newspaper reporter and journalist with a B.A. in English who is self-employed. The hours he spends on this case are unpaid and supported only by sporadic donations from shareholders and other parties empowered by Bergeron's investigative reporting and activism. These hours take away from his ability to focus on more constructive and paid work.
30. Laurel Davis and Fennemore Craig, P.C. removed this case to the bankruptcy court on March 20, 2008, which instituted an obligation on the firm and its attorneys to investigate the facts involved.
31. The case reached 200 docket lines in the bankruptcy realm before Laurel Davis filed the final piece of paperwork on behalf of Fennemore Craig, P.C. on November 10th, 2009.
32. The instant case's scheduling conference has been postponed/continued 10 times and vacated once during the time Fennemore Craig, P.C. represented Xyience.
33. Rule 9011 provides for sanctions not only for abuses of process but also for incessant and willful

delay of proceedings and/or creating a vexatious litigation environment.

34. Lorenzo and Frank Fertitta III, are members of the family that founded Station Casinos and own Fertitta Enterprises. They also are 81 percent owners of Zuffa, LLC, which is the parent company of the Ultimate Fighting Championship (hereinafter UFC).

35. Fertitta Enterprises, through Zyen, LLC, currently owns Xyience and will be responsible for bringing the company out of bankruptcy at the close of these proceedings.

36. The Fertitta Family has made regular and substantial contributions to local, state and national candidates for public office, which is a matter of public record. For example, a grand total of $65,000 went out to Las Vegas Sheriff Candidate Doug Gillespie in August of 2006 that all traced back to Fertitta Family members or Fertitta Family business interests.

37. Bergeron has thus far engaged in exhaustive research and intense investigation to the point where he can now be considered to be an expert on the subject of Xyience and the Fertitta Family's involvement in the instant bankruptcy.

38. Bergeron has been sought out to assist Xyience by two former CEOs, interested shareholders and the current liquidation trustee's counsel Jon Backman.

**B. Bergeron Is Entitled to Judgment as a Matter of Law**

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting *Fed. R. Civ. P. 1*).

Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Fed. R. Civ. P. 56(c)*. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To raise a "genuine" dispute, furthermore, Xyience "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the evidence must be sufficient to support a

verdict by a reasonable finder of fact in their favor. See *Anderson*, 477 U.S. at 248-50.

The record here establishes conclusively that Bergeron did not defame Xyience and never intended to hurt the company. Despite the absence of any legally plausible foundation for accusing Bergeron of misconduct regarding his reporting on the subject, Xyience representatives have waged a persistent and pervasive campaign devoted to silencing his publication of the truth and delaying him due justice.

Xyience additionally injured Bergeron's reputation and livelihood. He has lost revenue, time, and the very ability to fully focus on furthering his creative dreams due to this case. His career has been devoted instead on becoming a pro-se lawyer without the type of resources and training most at bar attorneys have at hand. The parties who caused this damage did so through Xyience and for the purpose of improving Xyience as an entity by eliminating all critical commentary on the company produced by Bergeron or discrediting him by any means necessary, up to and including defamation.

In all respects, there is no genuine issue of material fact requiring trial and the record firmly supports the claims raised by Bergeron as a matter of law. The motion for summary judgment, accordingly, should be granted.

**C. The undisputed facts establish per se defamation and abuse of process as a matter of law regarding Xyience, Inc. as a party.**

Considering all other parties engaged in this litigation as adversaries in Bergeron's initial Rule 9011 motion, and even after adding Current Xyience COO and CFO Michael Levy (who Bergeron seeks to add as a party to an amended sanctions motion), it is plain to see Xyience is the most directly linked to persecuting Bergeron in the instant case and to the attempts to defame Bergeron publicly and directly to shareholders. It is the Xyience brand name that has been on this lawsuit from day one, and it is the Xyience entity that pressed the case this far into bankruptcy in the first place.

Xyience's skimpy 6-page response to the Amended Counterclaim and supporting affidavits includes repeated mention of the following legalese: "it is without knowledge or information to form a belief as to the truth or falsity of the allegations." There is in other words no way for the plaintiff to explain or refute Bergeron's contentions, testimony, and supporting evidence.

The same conditions apply to Xyience's position regarding the initial claim. The failure to dismiss the frivolous complaint against Bergeron and the pattern of delay involving all Xyience legal

representatives involved in this bankruptcy process is blatant and continuous.

Fennemore Craig, P.C. Attorneys have already had the benefit of receiving approval for payment for hundreds of thousands of dollars in legal fees, including a large amount directly attributable to the Bergeron adversary case. Bergeron received no real payment of fees or costs for his involvement as of yet and cannot collect legal fees as a pro-se attorney. Still, Bergeron has worked harder than these attorneys to promote the truth about this bankruptcy, the burned shareholders, and his own adversary proceeding. Multiple times over the course of more than 200 docket items posted since the Fennemore Craig, P.C. removal of this case to bankruptcy court, the Xyience attorneys simply waited until Fertitta Etnerprises attorneys filed their oppositions to Bergeron's filings common to them and then filed very loosely written Joinders. They were all intimately aware of the process and intentionally abusing it while trying to get Bergeron lost in trying to keep up with them within their intricate world of legal nuances.

There is no evidence of any independent investigation done by any attorney involved in this case. No indisputable affidavit evidence exists adequately disputing any of Bergeron's claims. Bergeron's evidence of actual and by proxy defamation on the part of Xyience fully support a basis for a summary judgment ruling.

The parties Bergeron asks for sanctions against will still be permitted to have a hearing regarding their collective and individual involvement, but there is no need for Xyience to continue as a defendant at such a sanctions motion when their involvement is without a doubt. The liquidation trustee relied on a great deal of Bergeron's provided evidence and background and filed multiple pleadings directly in line with Bergeron's reporting and documentation over the course of more than three years of Bergeron's intensive and constantly expanding investigation into the Xyience saga. The trustee's office is accordingly settling the 9011 matter on its own, independent of the ongoing counterclaim and with full knowledge Bergeron will be filing this instant request.

There is no argument or dispute between Bergeron and the Trustee's office as far as the bulk of the most serious and significant adversary proceedings initiated by Mr. Backman. In fact, the bulk of these filings serve as "joinders" in their own right and in a figurative sense: joinders to Bergeron's written stories and spoken interviews about Xyience and joinders to his own earnest legal motions. Because of technicalities and nuances of process the initial and earlier motions filed by Bergeron previously fell on deaf ears. His legal experience in the civil realm since then helped him appreciate

having to follow the appropriate process as close to the letter as possible.

The real dispute between Bergeron and the Estate regards the failure of the estate to accept culpability and responsibility for the branding of their unfounded attacks on Bergeron with the Xyience name. This company has been waging a continuous false and frivolous case against him knowing it was false and Bergeron's motivations were always pure. Xyience defamed Bergeron as part of the company line and in order to raise capital for the company, and people at the company are to this day perpetrating the lie that Bergeron is to blame for Xyience's lack of success in the marketplace. This legal charade painting Bergeron for the villain he's not has been going on for over three years of Bergeron's young and promising journalism career. His incredibly dedicated efforts to look deeper and ask more important questions regarding this kind of corrupt scenario is only made more stagnant by these baseless and frivolous interruptions.

Had Xyience never resorted to filing a false suit in friendly territory at the outset of Bergeron's reporting, this story he broke in 2006 could have been the subject of a documentary, non-fiction book project, or other unique creative work put together by Bergeron. A book project, Bergeron's most viable option, could easily fetch a six figure advance and potentially sell millions of manuscript copies if published with the right house.

Any book or movie project is hopeless with litigation proceeding and because such litigation has gone on unchecked as long as it has against Bergeron thus far. The lawsuit brands him with the label of a civil defamation defendant: an accused liar for all intents and purposes. This is the ultimate insult in the world of journalism and naturally ostracizes Bergeron from more credible and higher paying magazine editors and producers within other creative operations like publishing houses and movie studios. As soon as the words lawsuit and defendant are spoken in those circles, the creative effort becomes subject to a plethora of uncertain threats to the viable publication and distribution of such creative content.

The people representing the collective parties who have delayed Bergeron justice seek to hide their own roles in this extensive and ongoing fraud by delaying the wheels of justice and denying him his day in court. They play legal games with the truth, dance around the facts with nuances of process, and avoid culpability for the most basic and fundamental wrongs they have committed that the evidence plainly shows they are guilty of perpetrating. Xyience is chief and constant among all these parties as the go-to entity and the true brand name sponsor of Bergeron's torment from being

dragged against his will into the legal system. They have dogged this man without letting up for more than three long years knowing they had not a shred of evidence to pin their complaint to in the first place. There is not now and should never be any room or place for this kind of behavior in any court in any free country in the free world.

## B. Conclusion

On the counterclaim, the record establishes no genuine issue of material fact regarding the culpability and liability of Xyience for defaming Bergeron, and Bergeron is entitled to judgment as a matter of law. Bergeron requests an award of compensatory damages in the amount of $175,000, or such other sum as the Court may find appropriate, and further requests dismissal of the initial Xyience case against him as frivolous. Additionally, reasoning applies for dismissing the initial claim on the basis of Xyience's failure to prosecute the claim. Attorney Backman has promised to do this on several occasions but did not ever follow through on these assurances to this point.

Defendant and Counter-claimant Rich Bergeron respectfully moves this Court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable herein pursuant to Rule 7056 of the Rules of Bankruptcy Procedure, for summary judgment regarding the defamation claim.

DATED this 11th of November, 2010

IN PROPER PERSON,

Rich Bergeron
PO BOX 5212
Weirs Beach, NH 03247
617-209-4325
Attorney Pro-Se
Rich.Bergeron@gmail.com