RECEIVED & FILED

13 SEP 13 10 :09

U.S. BANKRUPTCY COURT
MARY A [illegible] CLERK

**Richard E. Bergeron III**
**Email: Rich.Bergeron@gmail.com**
**617-209-4325**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| **In re:** | **Case No: BK-S-08-10474-MKN** |
| | **Chapter 11** |
| **XYIENCE, INCORPORATED,** | |
| **A Nevada Corporation,** | |
| | **Adversary No. 08-1082-MKN** |
| **Debtor.** | |
| **RICHARD BERGERON, an individual,** | **<u>MEMORANDUM OF LAW AND OBJECTION TO LEGAL REPRESENTATION OF PARTIES IN ADVANCE OF SEPTEMBER 19th SANCTIONS HEARING</u>** |
| **Movant.** | |
| **v.** | |
| **FERTITTA ENTERPRISES, ET AL,** | |
| **Parties Subject to Sanctions.** | |
| | **Hearing Date: September 19, 2013** |
| | **Time: 9:30 AM** |

# MEMORANDUM OF LAW AND OBJECTION TO LEGAL REPRESENTATION OF PARTIES IN ADVANCE OF HEARING ON AMENDED MOTION FOR RULE 11 AND RULE 9011 SANCTIONS

**INTRODUCTION:**

Movant Rich Bergeron Hereby provides this instant memorandum and OBJECTION in advance of the scheduled September 19th, 2013 hearing on his wide-ranging request for Rule 11, 9011 and Inherent Power sanctions against: Attorney **Jamie Cogburn**; Attorneys **John Mowbray**, **Jon Pearson**, and **Laurel Davis** and their firm: **Fennemore and Craig**; Attorney **Pamela Lawson** and her firm **Hunterton and Associates**; Attorneys **Matthew C. Zirzow** and **Gregory Garman** and their firm: **Gordon and Silver, LTD**; **Frank Fertitta, Jr.**; **Frank Fertitta III**; **Lorenzo Fertitta**; **Bill Bullard**; **Zyen, LLC**; **Zuffa Marketing, LLC**; **Kirk Sanford**; **Karim Maskatiya**; **Omer Sattar**; **Adam Frank**; **Zuffa, LLC**; **Station Casinos**; and **Fertitta Enterprises**.

The September 19th hearing would serve best as a scheduling conference for a larger hearing encouraging testimony from the parties listed above who are subject to sanctions. Such a sanctions hearing is typically designed to be a "Show Cause" proceeding in which the accused parties must explain why they should not be sanctioned.

The inherent power of a federal court to investigate whether a judgment was obtained by fraud, is beyond question (in this situation the adversary case itself is a fraud and the core case was initiated under fraudulent circumstances). ***Hazel-Atlas Co. v. Hartford Empire Co.*, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250**. The power to unearth such a fraud is the power to unearth it effectively. Accordingly, a federal court may bring before it by appropriate means all those who may be affected by the outcome of its investigation. But if the rights of parties are to be adjudicated in such an investigation, the usual safeguards of adversary proceedings must be observed. No doubt, if the court finds after a proper hearing that fraud has been practiced upon it, or that the very temple of justice has been defiled, the entire cost of the proceedings could justly be assessed against the guilty parties. The cost of the proceedings here is astronomical, especially considering the length of time shareholders have been deprived of their rightful investments in the company stolen out from under them by the Fertittas and their associates. A proper hearing requires all parties subject to sanctions to appear and be subject to cross examination in order to properly assess their roles in the fraud outlined by both this instant case and the work of the Trustee's Counsel Jonathan Backman.

Of particular relevance here, inherent power also allows a federal court to vacate its own judgment upon proof that a fraud has been perpetrated upon the court. See ***Hazel-Atlas Glass Co. v. Hartford-Empire Co***., **322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944)**;***Universal Oil Products Co. v. Root Refining Co*., 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946).** This "historic power of equity to set aside fraudulently begotten judgments," ***Hazel-Atlas*, 322 U.S., at 245, 64 S.Ct., at 1001**, is necessary to the integrity of the courts, for "tampering with the administration of justice in [this] manner . . . involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public." ***Id*., at 246, 64 S.Ct., at 1001.** Moreover, a court has the power to conduct an independent investigation in order to determine whether it has been the victim of fraud. ***Universal Oil*, supra, 328 U.S., at 580, 66 S.Ct., at 1179**.

As such, the sanctions hearing should be an involved process, and it should take into consideration the initial $150 million request for sanctions to benefit the injured shareholders. Despite there being a standing issue for Bergeron on this front, that does not prevent the court from executing inherent power sanctions against the parties Bergeron outlines in his request. Though Bergeron has no official standing to ask for relief on behalf of the shareholders, the court nonetheless has the authority to grant such relief after an independent inquiry into the facts brought to light by Backman and Bergeron.

A widely-ranging, all-inclusive "show cause" hearing to be held a number of months from the September 19th conference should determine whether the court should take up an independent investigation or task some other federal authority with executing an investigation into bankruptcy fraud regarding the core case and the allegations leveled by Bergeron and Backman against the Fertittas and their co-conspirators. If such fraud is found after an independent examination of the facts, all the favorable judgments and all the financial benefit's the actionable parties received from this bankruptcy should be discarded and/or reversed.

**OBJECTION TO ATTORNEY GARMAN'S REPRESENTATION OF PARTIES:**

Attorney Garman verbally agreed to represent all the parties Bergeron seeks sanctions against, with the exception of Attorney Matthew C. Zirzow. However, there is no proof anywhere on the docket of the core bankruptcy case or on the docket of this instant case where Mr. Garman is confirmed as the attorney of record for this list of all parties subject to sanctions. All of these

parties were previously served with all applicable documents and had ample opportunity to respond. So far in these proceedings, only Mr. Garman provided any answer to the sanctions claims. His representation obviously could also suitably encompass: Zyen, LLC; the Fertittas individually; Fertitta Enterprises; and Gordon and Silver, LTD. The other sanctionable parties all have their own attorneys or are actually attorneys themselves. Mr. Garman also specifically admitted under oath at a past hearing that he does not represent Station Casinos.

These realities tend to put Mr. Garman in a position to represent clients who never retained him or gave him any formal authority to do so. Default judgments should ensue against these unrepresented parties if they do not answer or otherwise appear at a future scheduled "show cause" hearing regarding the $150 million sanctions request, and this would be best suited as a hearing where they can give testimony if necessary or allow for their own personal legal representatives to answer Bergeron's claims here. Otherwise, having Mr. Garman purport to represent these parties allows him to execute a fraud on the court.

A subpoena should issue to each party that should be tasked with providing independent legal counsel or representing themselves, and default judgments should issue to any party who does not choose to attend the "show cause" hearing or send adequate legal representation. The hearing can decide whether inherent power sanctions apply or can decide further independent investigation may be needed.

The very act of attempting to represent all these various parties and individuals who perpetrated the conspiracy behind this sanctions request is questionable to begin with. This fact tends to paint Mr. Garman in a bad light, illustrating that the sanctionable behavior provided undue benefit to the Fertittas and their main business interests. That benefit is sufficient enough to give rise to Garman insisting on representing all the sanctionable parties in the face of sweeping charges of impropriety covering multiple players in the grand scheme.

Attorneys are also not permitted to testify for their clients, so even Mr. Garman's actual clients should be required to appear before the court to show cause as to why they should not be sanctioned in this matter. Courts are reluctant to allow attorneys to testify except when necessary, i.e., all other sources of relevant evidence have been exhausted. ***United States v. Armedo Sarmiento*, 545 F.2d 785 (2d Cir. 1976); *United States v. Johnston*, 664 F.2d 152 (7th Cir. 1981); *United States v. Buckhanon*, 505 F.2d 1079 (8th Cir. 1974); *United States v. West*, 680 F.2d 652 (9th Cir. 1982); see *United States v. Edwards*, 154 F.3d 915, 921 (9th Cir. 1998)**

Courts are reluctant to allow counsel for a party to testify for fear that the attorney will not

be objective and that the trier of fact will confuse the roles of advocate and witness and grant improper weight to the argument of counsel. ***United States v. Edwards*, 154 F.3d 915, 921 (9th Cir. 1998).** If an attorney has withdrawn from participating in the case (such as in the case of all opposing attorneys prior to Garman), the impediment to the attorney testifying, i.e., jury confusion about the roles of advocate and witness, is dispelled. ***Will v. Comprehensive Accounting Corp*., 776 F.2d 665 (7th Cir. 1985); *Bickford v. John E. Mitchell Co*., 595 F.2d 540 (10th Cir. 1979).**

Rule 9011 sanctions requests additionally serve as malicious prosecution and abuse of process claims. As Bergeron outlined on page 9 of his amended sanctions motion (docket #: 136, entered 1/22/09):

> **The Seventh Circuit explained that, in its view, Rule 11 "effectively picks up the torts of abuse of process . . . and malicious prosecution."Id Abuse of process corresponds to the improper purpose prong of Rule 11 in this analysis; the Restatement defines that tort as "us[ing] a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it is not designed . . . ." RESTATEMENT (SECOND) OF TORTS § 682 (1977). Malicious prosecution, on the other hand, requires that the lawsuit be without merit. *See* Grip-Pak, Inc. v. Ill. Tool Works, Inc., 694 F.2d 466, 471 (7th Cir. 1982)**

As such, any hearing on the sanctions request should be all-inclusive and allow for all witnesses to provide testimony on their own behalf as if it were an abuse of process/malicious prosecution trial setting.

**JUDGE KING NEEDS TO COMPLETE A FULL REVIEW OF THE CASE MATERIAL:**

The record is particularly important to this hearing, and making the proper decision on the sanctions request would require an extensive review of that record by the presiding judge. Judge King demonstrated a lack of knowledge surrounding the background of this case at a prior hearing that resulted in a failed appeal attempt due solely to technicality issues surrounding a filing deadline. Judge King still admitted at the contested hearing that he had not reading the bulk of Bergeron's paperwork explaining the material claims in that matter. Since any appeal of a decision on this instant request would require a full review of the record due to the First Amendment issues involved, Judge King should take the time to review the full record of this adversary claim, dating back to before the case landed in bankruptcy court.

Formal Judicial notice should be taken of all seminal documents filed in the adversary case

as well as the core bankruptcy proceeding with particular attention paid to all claims and actions filed against and/or involving the sanctionable parties named in this motion and all the conduct of such parties in the core case and in support of the adversary proceeding.

For this motion the initial sanctions request should also be examined along with all associated affidavits from Bergeron and the following witnesses: Bart Donovan (Docket # 108), Gary Nelson (Docket #109), Richard Klingenberg (Docket # 118), Janis Grady (Docket # 166), Linda Lesker (Docket #: 169), Michael J. Clark (Docket # 170 & 171), Joseph Bojrab (Docket # 172), and Patrick Douglas Patterson (# 173). All these witnesses should also be permitted to testify at a future "show cause" hearing.

Judicial notice should also be taken of the fact that there are no affidavits or declarations on file regarding the sanctions allegations for any of the sanctionable parties themselves. There are no supporting witnesses who provided affidavits on behalf of those parties, either. The only affidavits on file by any of those parties are in relation to restraining order requests unrelated to the sanctions motion. Only attorneys provided affidavits in support of any opposition filed to the sanctions request or any other crucial document in the unfolding of this case in the bankruptcy court and prior to that in the district court..

Also of importance is the fact that the docket itself is more than 256 items long and spans nearly five and a half years, not including the time the case spent in Las Vegas district court. The full docket of that district case, filed by Las Vegas Attorney Jamie Cogburn, should also be reviewed by Judge King.

For a case that never should have made it to a courtroom in the first place, the facts and the overall weight of these proceedings, spanning back to March of 2007, are relevant to showing how the sanctionable parties all conspired to make this a long, drawn-out, and complicated process.

An appeal of whatever Judge King's ruling is here in the bankruptcy is almost guaranteed. Bergeron is prepared to appeal any adverse ruling, and he is fairly certain that Mr. Garman would formally appeal any ruling adverse to himself and his "clients." Still, the FULL records of all matters involving Bergeron and the sanctionable parties should be reviewed closely by Judge King. He must review these records intently so he can defend any decision as an educated determination arrived upon only after an intense effort to research the legal background, material facts and extensive evidence presented in this case.

As outlined above, at a prior hearing Judge King admitted not reading much of the past material in this case. This is an ongoing concern, and Judge King should not be in a position at the

next hearing to have to ask where we are in this case and where we've been. He ought to be coming in with sufficient knowledge of this important matter, as it could potentially conclude Bergeron's involvement with this court indefinitely. As it stands Bergeron is the "last dog in the fight" to hold the Fertittas and their associates responsible for their fraudulent actions and inactions leading up to and permeating throughout this case.

**OTHER ISSUES SHOULD BE ADDRESSED AT A SCHEDULING CONFERENCE:**

There are also some evidentiary issues to hash out at what should be a scheduling conference on the 19th for a larger show cause hearing in a few months. There are some very integral documents that only came to Bergeron's attention in recent months. These volunteered communications date back to the inception of this lawsuit and the motivations behind it. They are crucial to the case and can be authenticated by the live testimony of William Pike, Jr., who is the brother of Xyience Founder Russell Pike. Mr. Pike personally emailed these communications to Bergeron and can explain further how the Fertittas pressured Xyience to pursue Mr. Bergeron in court to silence his reporting. The most crucial communication is attached to this memorandum/objection as Exhibit AAA. This is outright proof this case was always a matter of a bad faith filing. It is also proof that it is critical for Attorney Cogburn himself to answer for this communication. It is "smoking gun" evidence that the case was filed for an improper purpose and represented a prior restraint. Mr. Pike can be present in the courtroom on September 19th to verify this communication and confirm that the Fertittas were primarily responsible for demanding Xyience file the initial case against me.

**LEGAL BASIS AND CASE BACKGROUND JUSTIFY SWEEPING SANCTIONS:**

The basic breakdown of this case is simple. It is about a man targeted for court-ordered silencing. This fabricated case giving rise to this sanctions request was recently dismissed. This was not a settlement. The claim Bergeron had against the estate was accepted without conditions. This is the long-sought end to a case that only came about as a way to tarnish Bergeron's reputation as a journalist.

The Fertittas chiefly inspired the case against Bergeron in order to further the goals of a pre-planned bankruptcy scheme, but the sanctionable parties saw direct benefit or played direct,

undeniable roles in the scheme. That "loan to own" scheme, as described by Trustee's Counsel Jonathan Backman, injured hundreds of innocent shareholders and numerous creditors while allowing the Fertittas and their co-conspirators to line their own pockets and assist their other businesses.

The Fertittas did not set about the chain of events that led to their takeover of Xyience through bankruptcy until they secured a preliminary injunction against Bergeron. They made all the moves related to taking control of Xyience after that injunction hit the docket.

The shareholders remain the most hopeless of all parties to the core case as far as receiving any legitimate relief for what the Fertittas and their co-conspirators did to destroy the value of the company in order to facilitate a takeover. Bergeron hereby asks this court to put his standing issue aside and determine that INHERENT POWER sanctions apply to their situation above and beyond whatever sanctions can be paid to Bergeron for his own personal ordeal.

Sanctions generally take the form of attorneys' fees awards to opponents; in some cases attorneys and clients have been held jointly liable for the opponent's fees and doubled costs, or additional monetary amounts. ***FE&B v. Charter Technologies, Inc.***, **57 F.3d 1215 (3d Cir. 1995)** (disallowance of all fees); ***Dreamlite Holdings Ltd. v. Kraser***, **890 F.2d 1147 (Fed. Cir. 1989)**(refusing to accept further filings on behalf of clients or their attorney until award of fees and double costs paid in full and satisfactory proof furnished to court); ***In re Salter & Co., Ltd.***, **99 B.R. 327 (E.D. La. 1989)**(fees and double costs); ***In re Beugen***, **99 B.R. 961 (9th Cir. BAP 1989)**(same); ***In re Start the Engines, Inc.***, **219 B.R. 264 (Bankr. C.D. Cal. 1998)**($100,000 awarded against attorney and client, jointly and severally).

Rule 9011 now includes a provision on the nature and limitations of sanctions. A sanction imposed for violation of that rule is to be limited to what is sufficient to deter repetition of the conduct by the one sanctioned or others similarly situated. It may consist of non-monetary directives, a court penalty, or an order to pay reasonable attorneys' fees and costs incurred as a direct result of the violation according to Bankruptcy Rule 9011(c)(2). Sanctions may also include disgorgement of retainers or interim fees previously awarded to DIP counsel. ***In re Kendavis Industries International, Inc.***, **91 B.R. 742 (Bankr. N.D. Tex. 1988)**. The attorney or attorneys seeking an improper execution of bankruptcy protection may likewise be precluded from recovering compensation for that petition if it is found to be filed in bad faith. ***In re Addon Corp.***, **231 B.R. 385, 391 (Bankr. N.D. Ga. 1999)**.

Sanctions under other authority than Rule 9011, including the inherent power of the court,

may be stiffer, as described in section I, infra. The party seeking sanctions has a duty to mitigate its damages by using reasonable efforts to resolve disputes by inexpensive means, but need not take actions that would impair its rights. ***In re Film Ventures Intern.*, Inc., 89 B.R. 80, 86 (9th Cir. BAP 1988)**. The sanctioned attorney and affected parties may stipulate to a settlement; the court may approve it or may impose more draconian sanctions. ***In re Smith*, 257 B.R. 344, 353 (Bankr. N.D. Ala. 2001).** The court imposing sanctions is to consider the ability to pay of the sanctioned party or attorney, but only if limited ability to pay is raised in a timely manner. ***In re Y.J. Sons & Co., Inc.*, 212 B.R. 793, 806-07 (D. N.J. 1997).**

The *Chambers vs. Nasco* court's reliance on the inherent power did not thwart the mandatory terms of Rules 11 and 26(g). Those Rules merely require that "an appropriate sanction" be imposed, without specifying which sanction is required. ***Bank of Nova Scotia v. United States*, 487 U.S. 250, distinguished. Pp. 12-17.** It has long been understood that "[c]ertain implied powers must necessarily result to our Courts of justice from the nature of their institution," powers "which cannot be dispensed with in a Court, because they are necessary to the exercise of all others." ***United States v. Hudson*, 7 Cranch 32, 34, 3 L.Ed. 259 (1812)**; see also ***Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980)** (citing ***Hudson*** ).

***Chambers v. Nasco*** is a perfectly applicable case to this instant litigation, especially due to the actions of Chambers that were ultimately sanctioned. The sanction amount in that case was $1 million, and the case centered around an $18 million sale of a television station. Chambers entered into a sale agreement only to have a change of heart and throw up every roadblock he could to block a sale he previously agreed to.

Here, in the instant case, we have Fertitta Enterprises and the sanctionable parties execute a “loan to own scheme” designed to first provide a “bridge loan” to Xyience and help support the company with the express purpose of **preventing** bankruptcy. All the while the plan was to force a bankruptcy of the company, which was achieved only after silencing the reporting of the petitioner for these sanctions.

Much like Chambers used the courts to attempt to pull off an intricate scam, Fertitta Enterprises and their associates named in this sanctions motion abused the process of this bankruptcy to end up with the controlling interest in Xyience, which they retain to this day after rigging the “stalking horse bidder” process to make it appear that they were selling the brand to a third party.

As much as this litigation has parallels to ***Chambers V. Nasco***, it also has drastic differences. For one, this case is not about attorney fees. Despite the settlement between the trustee and Fertitta Enterprises, Mr. Backman's efforts to conduct discovery were hampered by a lack of good faith cooperation by Fertitta Enterprises GM William Bullard. Exhibit M, an email from Mr. Bullard to the Fertittas that Backman only found by going around Bullard, was only entered into evidence after Mr. Bullard failed to provide it voluntarily. It coincidentally outlined a $150 million offer to buy Xyience that the Cott Corporation tendered. This sanctions motion asks for precisely that amount, most of which should be divided among the rightful shareholders burned by the fraudulent bankruptcy.

While Bergeron has not been permitted by the court any standing of his own to seek such sanctions on behalf of shareholders, that does not mean the court itself cannot act to provide that relief to the shareholders under its own inherent power. Here, it is not just one client or party damaged by the pattern of bad faith behavior in question. Hundreds of honest shareholders were damaged by the fraud perpetrated on this court, and silencing Bergeron was instrumental to going forward with the tenets of the overall plan to steal the company out from under those shareholders.

There is no statute or rule which definitively limits the amount of a sanction that a court can enter under Rule 9011 or its inherent power. The standard is to levy the sanction as an appropriate deterrent to discourage conduct of a similar nature in the future. Here a six or seven figure judgment is not going to force any accountability. The principal authors of this scheme are billionaires, and even $150 million may not be enough to ensure that their disrespect and abuse of the legal process will never be repeated.

As the sanctions motion outlines, the Fertittas used the Xyience bankruptcy as a template for a much bigger bankruptcy of their casino chain: Station Casinos. Because they were able to burn nearly 400 Xyience shareholders, they were empowered enough to go ahead and burn their casino creditors and wind up right back in a majority ownership position on the other side of that litigation. This is a pattern that cannot be ignored. This is abuse of massive proportions that goes far beyond the mere support of a bad faith case filed against Bergeron designed to silence his reporting. This is systemic abuse in which the Fertittas achieve dominance in their business dealings by using the courts as their own personal playground, unafraid to execute bad faith financial schemes because they know their opposition cannot afford the same attorney fees they can.

Bergeron's self representation, while not masterful by any stretch, is the only reason this

case made it this far and lasted this long. Any other opponent would have been forced to give up by this point due to excessive costs. Hence, the trustee in the core case ended up being forced to accept a settlement because his own legal fees were mounting. It is the very design of the Fertitta strategy to use litigation for an improper purpose…mainly to intimidate and frustrate their opposition. Essentially, legal fees are much cheaper than doing the right thing.

Rule 9011 also serves as an abuse of process and/or malicious prosecution claim in bankruptcy courts, and both scenarios are at play here. The rule itself is not only designed to cover pleadings and papers an attorney and/or party signs but also such material that is advocated with no investigation of the stated facts or purpose behind the claims and contentions. There must be a "reasonable inquiry" into the truth of such allegations, which was obviously not accomplished in this case.

For this reason, "Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." ***Anderson v. Dunn*, 6 Wheat. 204, 227, 5 L.Ed. 242 (1821);** see also ***Ex parte Robinson*, 19 Wall. 505, 510, 22 L.Ed. 205 (1874).** These powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." ***Link v. Wabash R. Co.*, 370 U.S. 626, 630-631, 82 S.Ct. 1386, 1388-1389, 8 L.Ed.2d 734 (1962).**

In this regard, if a court finds "that fraud has been practiced upon it, or that the very temple of justice has been defiled," it may assess attorney's fees against the responsible party, ***Universal Oil Products Co. v. Root Refining Co.*, 328 U.S. 575, 580, 66 S.Ct. 1176, 90 L.Ed. 1447 [(1946)]**, as it may when a party "shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order," ***Hutto v. Finney*, 437 U.S. 678, 689, n. 14, 98 S.Ct. 2565, 57 L.Ed.2d 522 [(1978)].** The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of "vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by his opponent's obstinacy." ***Ibid.***

In that framework, Bergeron does not need standing to ask for the court to investigate whether or not sanctions should apply here and be paid to the appropriate parties, which would include genuine shareholders in Xyience. At least $150 million sanctions should still apply to the group of co-conspirators involved in this silencing attempt and the fraudulent bankruptcy, and an

official, independent representative of the court should be designated to claim and distribute those inherent power sanction funds to shareholders.

**CONCLUSION:**

The mental and physical anguish Bergeron experienced over the six-and-a-half long years this case dragged on is even more disturbing due to the fact that this case never should have been filed in the first place. It never had any basis in fact, never had any merits, and never belonged in the bankruptcy courts. Multiple lawyers had opportunities to investigate the claims and find them to be totally baseless. Instead, they all continued to keep the case alive, up to and including Mr. Garman and his firm.

In Mr. Garman's case, he actually compounded the issue by making multiple attempts to fill the docket with endless stacks of paperwork, even dragging in documentation from other cases that had absolutely no relevance in this court and no connection to this case. The principles behind Rule 11 and Bankruptcy Rule 9011 is to prevent attorneys and parties from using the legal process for a purpose which it was not designed. The legal process is not meant for people to use to frustrate and silence people like Bergeron who are only trying to tell the truth and expose corruption.

All of the parties and attorneys mentioned in the latest sanctions request filed before this court had a hand in pushing this case along and keeping it going even after Xyience refused to pay the lawyer who initiated the case with complete lies and misrepresentations of fact. That lawyer, Jamie Cogburn, admitted to key Xyience personnel that the case was a delay tactic, something specifically outlined in Rule 9011 and the original Rule 11 as offensive to the rule of law and the intent of the courts.

Only Trustee's Counsel Jonathan Backman was honest and professional enough to recognize the initial case filed by Xyience was not worth pursuing, and he is the only lawyer in this whole process to refuse to prosecute it. It is the job of the trustee's counsel to pursue every possible avenue of legitimate relief on behalf of the estate. If there were any merit to the case against Bergeron, he would have no choice but to pursue it. He never filed a single document to support the initial case against Bergeron.

This case has impugned Bergeron's reputation by painting him as a liar when he did nothing but expose the truth. If he did not have to spend so many unpaid hours working on this

case, he would be in much better financial condition today. He would likely already have a book in print on this story, and possibly even a documentary project completed or underway. The story behind this case and what put it all in motion is even worthy of a Hollywood movie. In the best case scenario this kind of literary effort which goes from a print book to movie theaters could gross tens of millions of dollars. He is only asking for $1.5 million in relief, and it is honestly generous in this scenario.

There is really no price to justify what he dealt with over the last six years and counting. He wouldn't wish the experience he's had on his worst enemy. Every time he had to view a new court document from one of his multiple adversaries, there would be a huge wave of aggravation and anxiety that would overtake him. The stress has been unbearable at times, and the thought of having a $25 million judgment hanging over him for life always made him extremely uncomfortable. Worst of all, his reputation has been compromised in the worst way. As a reporter you never want to be part of the story, but he's been forced to become part of this one just to defend his reputation.

The court should engage in an independent investigation in order to determine the full amount of sanctions that should be applied to the Fertittas and their co-conspirators. Unless a show cause hearing proves the $1.5 million in sanctions paid to Bergeron is uncalled for, those funds should paid to Bergeron primarily as an abuse of process and general sanctions award under the tenets of Bankruptcy Rule 9011 and Rule 11.

The only reason for the initial suit against Bergeron was to pave the way for Fertitta Enterprises to take over and bankrupt Xyience with the help of the unfounded injunction acquired by Jamie Cogburn in purely bad faith. The design was to force Bergeron into a corner so he would compromise his investigation and give up his pursuit of the truth behind Xyience's operations.

Standing up for his rights and refusing to cower in fear cost him much more than the money he had to beg for and borrow to pursue this case. It cost him countless hours of time he can never get back. It's hard to put a price on that time, and attorney fees do not apply, but $1.5 million is a small price for the Fertittas to pay for what their actions did to negatively impact Bergeron's life and in turn the lives of hundreds of shareholders who were kept in the dark because he was forced to remain silent for so long.

No testimony from the Fertittas or any of their associates challenges anything Bergeron put on the record in court or on the Internet. There are no client affidavits from any of the parties Bergeron seeks sanctions against on the record in these proceedings. There is only an out-dated and

vague declaration signed by Adam Frank. Bergeron was actually recruited by Adam Frank and Kirk Sanford to assist the company prior to the bankruptcy, so the fact that they continued to maintain the case against him after making those overtures is proof positive that neither of them believed the charges against him to be valid.

***Traguth vs. Zuck*, 710 F.2d 90, 91 (1983)**: "Implicit in the right to self representation is the obligation on the part of the Court to make reasonable allowances to protect Pro-Se Litigants from the inadvertent forfeiture of important rights because of their lack of legal training." And the "Court's duty is even broader in the case of a [Pro-Se] defendant who finds himself in court against [his] will with little time to learn the intricacies of civil procedure and law." See **28 U.S.C.A. 1654**

The instant case may be in need of closure, but that should only come after a full and fair hearing on the merits with witness testimony and cross examination. Since there was never any discovery in this matter, it is an essential part of the process to illuminate how Bergeron's allegations and claims can be confirmed through such testimony.

**WHEREFORE:** September 19th should be designated as a scheduling conference and/or preliminary hearing to a broader future sanctions hearing in which all parties named in the sanctions motion will be personally subject to a subpoena instructing all parties to appear on their own behalf, send an official legal representative, or forfeit their portion of sanctions they should be required to pay in the wake of a favorable judgment for Bergeron and/or any independent investigation regarding sanctions to be paid to shareholders. Any issues on witness testimony, personal appearances, and other stipulations for the broader hearing can also be hashed out at this same scheduling conference.

Respectfully Submitted,

[signature]

Rich Bergeron
107 Cotton Hill Rd.
Belmont, NH 03220
617-209-4325
Rich.Bergeron@gmail.com

# EXHIBIT AAA

Gmail
by Google

**Fw: someone removed the page 1 Google result, but not the page 2 one, which is climbing up...it refe**

**william pike** <williampikejr@yahoo.com> Wed, Apr 10, 2013 at 9:47 PM
Reply-To: william pike <williampikejr@yahoo.com>
To: Rich Bergeron <rich.bergeron@gmail.com>

----- Forwarded Message -----
**From:** russell pike <rxyience@yahoo.com>
**To:** william pike <williampikejr@yahoo.com>
**Sent:** Wednesday, April 10, 2013 4:53 PM
**Subject:** Fw: someone removed the page 1 Google result, but not the page 2 one, which is climbing up...it refe

----- Forwarded Message -----
**From:** " ronaldsol@msn.com" <ronaldsol@msn.com>
**To:** jsc@cogburnlaw.com
**Cc:** 'william pike' <williampikejr@yahoo.com>; rxyience@yahoo.com
**Sent:** Friday, October 5, 2007 7:08 AM
**Subject:** RE: someone removed the page 1 Google result, but not the page 2 one, which is climbing up...it refe

Jamie,
The fact that Bergeron disseminated Neiber's John Miller Consumer Affairs Criminal Complaint Division email, said that John Miller was a real person and that his Agency was real and that he had verified the email address and had verified the Miller and his Agency was real with the Nevada District Attorney, who the emails say is David Roger, the District Attorney of Clark County, all this goes way beyond free speech. These are criminal acts. Bergeron is a criminal period.
I'm sure if I purported to be a Federal Government Official heading a Government Investigative Agency and was falsely stating that I was coordinating fictitious FBI and SEC investigations with the District Attorney of the lagest county in a State and was in league with a blogger who blasted this all over the internet and this blogger stated that he verified that this was all fact with that District Attorney, my crony blogger friend and I would be in prison already.
This goes far beyond free speech, it is criminal. I believe that Neiber's and Bergeron's activities should be put in front of DA Roger immediately. I would like to remind everyone, Neiber is a video doing all this crap and Bergeron has stated time and time again that he has verified Neiber's crap as true. Ron

From: jsc@cogburnlaw.com
To: ronaldsol@msn.com
CC: williampikejr@yahoo.com; rxyience@yahoo.com
Subject: RE: someone removed the page 1 Google result, but not the page 2 one, which is climbing up...it refe
Date: Fri, 5 Oct 2007 05:33:10 -0700

We also have to be careful that we don't get reversed on appeal. However, we can get the permanent injunction, which gets rid of everything and let him appeal, wherein that would take about 9 – 18 months, so that would buy you guys plenty of time to get everything in order and he will have nothing to report after that.

I can almost guarantee that we will get reversed as the injunction would be a prior restraint on free speech, which is highly protected. Not to mention, many papers and associations would file briefs

on this issue making it a bigger deal then it already is. I am hoping that the hearing next week will modify our order and get him removed, but not be a prior restraint on speech. However, if any intelligent lawyers dealing with free speech get involved, then we will lose on appeal, but like I said that takes a long time and in the meantime allows Xyience to move forward without dealing with this bullshit.

Currently, I am litigating against one of the best defamation lawyers in the nation, Deborah Drooz at Strook Strook & Lavan. She and 20 other attorneys represent Billy Walters who is suing my client for defaming his golf course, Stallion Mountain by claiming it sucks. If this proceeds to appeal we may want to retain her or a guy name Michael Blaha who is also excellent and both are out of CA.

---

**From:** ronaldsol@msn.com [mailto:ronaldsol@msn.com]
**Sent:** Thursday, October 04, 2007 10:11 PM
**To:** jsc@cogburnlaw.com
**Subject:** RE: someone removed the page 1 Google result, but not the page 2 one, which is climbing up...it refe

Gentlemen, In order to get a complete list of this guy's crap for the Judge, I suggest that we google Xyience Bergeron, Bergeron Pike, Bergeron Russell Pike and we should catch them all. Ron

---

From: jsc@cogburnlaw.com
To: ronaldsol@msn.com; williampikejr@yahoo.com; rpike@xyience.com; devin@xyience.com; josh@xyience.com
Subject: RE: someone removed the page 1 Google result, but not the page 2 one, which is climbing up...it refe
Date: Thu, 4 Oct 2007 19:44:33 -0700

That will always happen unless we get him kicked off the internet. The important thing is when someone google's "Xyience" those articles don't come up. We will have to get a permanent injunction to stop it all, which I am trying to do via default right now. If the Judge does not default him, then at the conclusion of the case we get the injunction.

---

**From:** ronaldsol@msn.com [mailto:ronaldsol@msn.com]
**Sent:** Thursday, October 04, 2007 7:34 PM
**To:** jsc@cogburnlaw.com; 'william pike'; rpike@xyience.com; devin@xyience.com; josh@xyience.com
**Subject:** RE: someone removed the page 1 Google result, but not the page 2 one, which is climbing up...it refe

Gentlemen, If you google Xyience Bergeron they all come up. Ron

---

From: jsc@cogburnlaw.com
To: williampikejr@yahoo.com; rpike@xyience.com; ronaldsol@msn.com; devin@xyience.com; josh@xyience.com
Subject: RE: someone removed the page 1 Google result, but not the page 2 one, which is climbing up...it refers to this page?
Date: Thu, 4 Oct 2007 16:00:10 -0700

I will get Google on the other site. Devin or Josh can you send me the info Google needs as before and I will send another letter. It looks like our persistent is paying off a little finally.

---

**From:** william pike [mailto:williampikejr@yahoo.com]
**Sent:** Thursday, October 04, 2007 3:32 PM

**Cc:** jsc@cogburnlaw.com
**Subject:** someone removed the page 1 Google result, but not the page 2 one, which is climbing up...it refers to this page?



Chilling Effects Clearinghouse > Notice Unavailable

Print-friendly

# Notice Unavailable

*Court Order*
The notice is not available.
Chilling Effects serves as a clearinghouse for cease-and-desist notices. Chilling Effects is not the sender of these notices, and is not responsible for removing pages from the web or search engine listings. If you believe a web page or site was wrongly removed, you should contact the ISP or search engine who removed the site. In the case of an improper DMCA notification, you may wish to file a counter-notification.

# Cease and Desist? What is this site?

The Chilling Effects clearinghouse is a database of cease and desist notices (C&Ds) sent to Internet users, legal interpretation of those notices, Frequently Asked Questions about parts of the law that affect online activity, and related news and resources. If you have received a cease and desist, we invite you to add it to our database.
You can use this site in many different ways: choose a topic area and explore its homepage and FAQs; search the database for C&Ds similar to one you've received or sent; submit your own notice for law students at the participating clinics to analyze.

### The site's centerpiece is the database of annotated cease-and-desist notices:

Clinical law students review the notices submitted and link their legalese to explanatory FAQs. As the number of notices grows, so will the selection of FAQs, which can be read either alongside the notices or on their own.




annotated notice



The Chilling Effects clearinghouse is organized by topic area. Some topics are related to types of activity, such as fan fiction and reverse engineering, others to areas of law, such as copyright and trademark. Within each topic, you will find the linked notices, FAQs, related news, and resources such as statutes and articles.
We invite you to report your own notice to the database (received or sent), search or browse the database, or read "Weather Reports" on the legal climate for Internet activity -- compiled based on the notices submitted.

**Search**

The Chilling Effects clearinghouse offers two types of searches:
**Quick Search**, the box in the left corner of each index page, searches for words or "quoted phrases" among topics, FAQs, news, resources, and the subject lines of C&D notices.
**Search the Database**, linked from the header bar, offers a more detailed search of our database of cease-and-desist notices.

***Maintained by*** **Chilling Effects**

---

Luggage? GPS? Comic books?
Check out fitting gifts for grads at Yahoo! Search.

---

Peek-a-boo FREE Tricks & Treats for You! Get 'em!

---

Climb to the top of the charts! Play Star Shuffle: the word scramble challenge with star power. Play Now!

---

Help yourself to FREE treats served up daily at the Messenger Café. Stop by today!

**Richard E. Bergeron III**
**Email: Rich.Bergeron@gmail.com**
**617-209-4325**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | | |
|---|---|---|
| **In re:** | ) | **Case No: BK-S-08-10474-MKN** |
| | ) | **Chapter 11** |
| **XYIENCE, INCORPORATED,** | ) | |
| **A Nevada Corporation,** | ) | |
| | ) | **Adversary No. 08-1082-MKN** |
| **Debtor.** | ) | |
| ______________________________ | ) | |
| | ) | |
| **RICHARD BERGERON, an individual,** | ) | **<u>CERTIFICATE OF SERVICE</u>** |
| **Movant.** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **FERTITTA ENTERPRISES, ET AL,** | ) | |
| **Parties Subject to Sanctions.** | ) | |
| | ) | **Hearing Date: September 19, 2013** |
| | ) | **Time: 9:30 AM** |
| ______________________________ | ) | |

# CERTIFICATE OF SERVICE

1. On September 9th, 2013 I served the following document:

**MEMORANDUM OF LAW AND OBJECTION TO LEGAL REPRESENTATION OF PARTIES IN ADVANCE OF SEPTEMBER 19TH SANCTIONS HEARING**

2. I served the above-named document by the following means to the party listed below:

[x] a. By U.S. mail (certified with delivery confirmation):

Greg Garman, on behalf of Fertitta Enterprises, et al.
3960 Howard Hughes Pkwy.
Ninth Floor
Las Vegas, NV 89169

3. I declare under penalty of perjury that the foregoing is true and correct.

DATED this 9th of September, 2013

IN PROPER PERSON

Rich Bergeron
107 Cotton Hill Rd.
Belmont, NH 03220
617-209-4325
Rich.Bergeron@gmail.com